# ATTACHMENT A

# OFFICIAL REPORT OF PROCEEDINGS

## Before the

## NATIONAL LABOR RELATIONS BOARD

### Case No.:    GR-7-CA-51428

### In the matter of:

## DOUGLAS AUTOTECH CORPORATION

and

## INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), AFL-CIO, AND ITS LOCAL 822

Place:        National Labor Relations Board
              82 Ionia Street, N.W.
              Grand Rapids, Michigan

Date:         June 24, 2009

Volume:       1

Pages:        1 - 269

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, Maryland  21409
(410) 974-0947

Official Reporting Firm

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

In the Matter of:

**DOUGLAS AUTOTECH CORPORATION,**

      Respondent,

  and                          Case No. **GR-7-CA-51428**

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), AFL-CIO, AND ITS LOCAL 822,**

      Charging Party.

The above-entitled matter came on for hearing pursuant to notice, before **PAUL BUXBAUM**, Administrative Law Judge, at **National Labor Relations Board Grand Rapids Resident Office, 82 Ionia Street, N.W., Room 330, Grand Rapids, Michigan**, on **Wednesday, June 24, 2009,** at **9:00 a.m.**

<u>A P P E A R A N C E S</u>

**Counsel for the General Counsel:**

    STEVEN E. CARLSON, ESQ.
    National Labor Relations Board
    82 Ionia Ave. NW, Suite 330
    Grand Rapids, MI  49503
    (616) 456-2270

**On Behalf of the Charging Party:**

    SAMUEL C. McKNIGHT, ESQ.
    Klimist, McKnight, Sale, McClow & Canzano, PC
    400 Galleria Officentre, Suite 117
    Southfield, MI  48034
    (248) 354-9650

    MANEESH SHARMA, ESQ.
    Associate General Counsel
    UAW Legal Department
    8000 E. Jefferson Ave.
    Detroit, MI  48214
    (313) 926-5216

**On Behalf of the Respondent:**

    JEFFREY J. FRASER, ESQ.
    KIMBERLY RICHARDSON, ESQ.
    KELLEY E. STOPPELS, ESQ.
    Varnum, LLP
    333 Bridge St., NW
    P.O. Box 352
    Grand Rapids, MI  49501
    (616) 336-6000

## I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Philip Ray Winkle | 76 | 143 | -- | -- | 141 |
| John Canzano | 213 | 242 | -- | -- | -- |

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

# E X H I B I T S

| EXHIBIT NUMBERS | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| ADMINISTRATIVE LAW JUDGE'S | | |
| ALJ-1 | 23 | 23 |
| JOINT | | |
| J-1 | 67 | 67 |
| GENERAL COUNSEL'S | | |
| GC-1(a) through 1(v) | 9 | 9 |
| GC-2 | 77 | 78 |
| GC-3 | 89 | 91 |
| GC-5 | 81 | 83 |
| GC-6 | 85 | 87 |
| GC-7 | 93 | 96 |
| GC-8 | 99 | 100 |
| GC-9 | 101 | 102 |
| GC-10 | 92 | 92 |
| GC-11 | 91 | 92 |
| GC-12 | 103 | 103 |
| GC-13 | 103 | 103 |
| GC-14 | 103 | 103 |
| GC-15 | 124 | 125 |
| GC-16 | 118 | 119 |

## E X H I B I T S

| EXHIBIT NUMBERS | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| GC-18 | 217 | 219 |
| GC-20 | 220 | 221 |
| GC-21 | 222 | 223 |
| GC-22 | 234 | 235 |
| GC-24 | 235 | 236 |
| GC-25 | 236 | 237 |
| GC-37 | 105 | 106 |
| GC-38 | 122 | 122 |
| GC-39 | 215 | 216 |
| GC-40 | 223 | 226 |
| GC-41 | 231 | 232 |
| GC-42 | 232 | 233 |
| GC-43 | 237 | 237 |
| GC-48 | 67 | 73 |

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

1                    P R O C E E D I N G S

2                              (Time Noted:  9:05 a.m.)

3        JUDGE BUXBAUM:  This hearing will be in order.  It's a

4   formal trial before the National Labor Relations Board in the

5   case of Douglas Autotech Corporation and International Union,

6   United Automobile, Aerospace and Agricultural Implement

7   Workers of America, AFL-CIO, and its Local 822.  The case

8   number is GR-7-CA-51428.

9        As I think all of you know, my name is Paul Buxbaum.

10  I'm the Administrative Law Judge assigned to hear the case.

11  Now, I'm assigned out of the Washington Office of the

12  Division of Judges.  Communications to me, then, should be

13  directed through that office.

14       Let me next ask all counsel to please identify

15  themselves, beginning, Mr. Carlson, with you.

16       MR. CARLSON:  For the General Counsel, Steven Carlson.

17  I work in the Region 7 Resident Office in Grand Rapids,

18  Michigan, at 82 Ionia Northwest, Grand Rapids, Michigan,

19  49503.

20       JUDGE BUXBAUM:  Charging Party?

21       MR. McKNIGHT:  Sam McKnight of Klimist, McKnight, Sale,

22  McClow and Canzano, on behalf of the Charging Party.

23       JUDGE BUXBAUM:  And is Mr. Sharma going to take an

24  active role?  If he is, I'll want him to put his information

25  on the record.

1    MR. McKNIGHT:  I think Mr. Sharma should put his

2  information on the record.

3    JUDGE BUXBAUM:  All right.  Mr. Sharma, would you do

4  that?

5    MR. SHARMA:  Maneesh Sharma, Associate General Counsel,

6  International Union, UAW.

7    JUDGE BUXBAUM:  And for the Company?

8    MR. FRASER:  Jeff Fraser, from Varnum, for Douglas

9  Autotech.  I also have a couple of other counsel with me who

10  may be needed in the production of document issue.

11    JUDGE BUXBAUM:  Sure.  Let's have their appearance.

12    MS. RICHARDSON:  Kimberly Richardson, Varnum.

13    JUDGE BUXBAUM:  And you said there was --

14    MR. FRASER:  Kelley --

15    MS. RICHARDSON:  Kelley Stoppels just went to lock her

16  doors.

17    JUDGE BUXBAUM:  All right.  No problem.  No problem.

18  Okay.  And has everyone filled out the appearance sheet?

19    MR. FRASER:  Working on it right now, Your Honor.

20    JUDGE BUXBAUM:  All right.  Please make sure the

21  reporter gets that.  And, Mr. McKnight, have you and

22  Mr. Sharma also had a chance to sign it?

23    MR. McKNIGHT:  Yes.

24    JUDGE BUXBAUM:  Okay, good.  The next thing I think we

25  ought to do is the formal papers.  Mr. Carlson, have you

1  provided those to the other counsel?

2      MR. CARLSON:  I have, Your Honor.

3      JUDGE BUXBAUM:  Do you wish to have them admitted into

4  evidence?

5      MR. CARLSON:  I do, Your Honor.

6      JUDGE CARLSON:  I say into evidence.  Into the record,

7  let's put it that way.

8      MR. CARLSON:  Right.  Your Honor, I offer into evidence

9  the formal papers.  They have been marked for identification

10  as General Counsel's Exhibit 1(a) through 1(v), inclusive,

11  Exhibit 1(v) being an index and description of the entire

12  exhibit.  This exhibit has been shown to all the parties.

13      JUDGE BUXBAUM:  All right.  Does the Charging Party have

14  any objection to its receipt?

15      MR. McKNIGHT:  Actually, I'd like to look at it later,

16  if I could, but I don't have any objection.

17      JUDGE BUXBAUM:  Well, look at it now, Mr. McKnight.

18  Let's at least get that into evidence.

19      Does the Company have any objection to the receipt of

20  General Counsel's 1?

21      MR. FRASER:  I have not reviewed it, and I'm going to do

22  that right now.

23      **JUDGE BUXBAUM:  All right.  Let's take a moment, then.**

24  **We'll go off the record for a moment.**

25  **(Off the record.)**

1        **JUDGE BUXBAUM:  We're back on the record.**

2        Mr. McKnight, does the Charging Party have any objection

3    to the receipt of General Counsel's 1?

4        MR. McKNIGHT:  No, Your Honor.

5        JUDGE BUXBAUM:  And does the Respondent?

6        MR. FRASER:  No, Your Honor.

7        JUDGE BUXBAUM:  Then General Counsel's 1 will be

8    received into evidence.

9    **(General Counsel's Exhibit 1(a) through 1(v) marked for**

10   **identification and received into evidence.)**

11       JUDGE BUXBAUM:  While we were off the record,

12   Mr. Carlson indicated that there were a couple matters

13   related to the complaint and answer that he wanted to

14   address.

15       MR. CARLSON:  Yes, Your Honor, some housekeeping matters

16   with respect to the complaint.  The General Counsel would

17   move to amend paragraph 1(a) of the complaint.  It currently

18   reads:  "The original charge in this proceeding was filed by

19   the Charging Union on August 6th, 2008, and a copy was served

20   by regular mail on Respondent on the same date."  That should

21   read:  "Was served by regular mail on Respondent on August 7,

22   2008."

23       JUDGE BUXBAUM:  All right.  Do you want to go through

24   all of your amendments, or do you want me to inquire one by

25   one?

1       MR. CARLSON:  That is my only --

2       JUDGE BUXBAUM:  Oh, that's your only amendment.

3       MR. CARLSON:  That's our only amendment to the

4  complaint.

5       JUDGE BUXBAUM:  All right.  Is there any objection on

6  the part of either of the private parties to that amendment?

7       MR. FRASER:  No objections from Respondent/Company.

8       MR. McKNIGHT:  No objection, Your Honor.

9       JUDGE BUXBAUM:  Then you motion to amend the paragraph

10  1(a) is granted.

11       MR. CARLSON:  Thank you, Judge.  And I understand

12  Mr. Fraser has some amendments to Respondent's answer.

13       JUDGE BUXBAUM:  Very well.

14       MR. FRASER:  Your Honor, I've got a number of mechanical

15  issues that we'd like to raise, as well, so I guess I'll do

16  the pleading amendments first, and --

17       JUDGE BUXBAUM:  Yeah, please do that.  And I've got a

18  list, also, but we'll get through everyone's list of

19  preliminaries.

20       MR. FRASER:  Paragraph 5 in the answer by Respondent was

21  neither admitted nor denied, related to the UAW and Local 822

22  as labor organizations.  We would amend our answer to admit

23  paragraph 5.

24       JUDGE BUXBAUM:  All right.  Any objection to that?

25       MR. CARLSON:  No objection.

1        JUDGE BUXBAUM:  Very well.

2        MR. FRASER:  Paragraph 6 related to the status of

3   Mr. Viar as a supervisor and an agent for Douglas, and we

4   neither admitted nor denied as a legal conclusion.  The

5   Employer, Douglas, will admit paragraph 6, the allegations.

6        JUDGE BUXBAUM:  All right.  In other words, that

7   Mr. Viar, for the purposes of the Act, is a supervisor and

8   agent of the Company?

9        MR. FRASER:  That's correct.

10        JUDGE BUXBAUM:  Very well.  Any others?

11        MR. FRASER:  No.

12        JUDGE BUXBAUM:  I've got a couple, Mr. Fraser, let me

13   ask you about.  And, clearly, I understand and have no

14   problem with lawyerly answers in answers to complaints.  But

15   let's see if we can't narrow it a bit further.

16        In terms of service of process, you've now had an

17   opportunity to look at the General Counsel's 1, which would

18   contain the information regarding service.  Is there any

19   issue regarding service of the complaint?

20        MR. FRASER:  Your Honor, we acknowledge that 1(a)

21   through (v) be admitted without objection.  So to the extent

22   they provide the service, no, we don't have an objection to

23   that.

24        JUDGE BUXBAUM:  Very well.  This is both -- to see if we

25   can streamline but, also, to sort of help me grasp exactly

1   what the parties' contentions are.

2       If you'll look at complaint paragraph 11, I noted in the

3   attachments to the summary judgment motion a letter which I'm

4   assuming is going to come into evidence.  Obviously, just

5   because it's attached to the summary judgment motion doesn't

6   mean it's in evidence, but it does mean that I got to look at

7   it.  Regarding the -- I guess Mr. Viar's statement to the

8   Union that the offer to return to work was unconditional.

9       Is there an issue as to paragraph 11?  In other words,

10  you neither admitted nor denied it.  Is the General Counsel

11  going to have to address it?

12      MR. FRASER:  Yes, Your Honor, the General Counsel is

13  going to have to address it.

14      JUDGE BUXBAUM:  All right.  And as to the paragraph

15  10 -- I'm sorry, paragraph 12, is there an issue as to

16  whether or not the Company locked out the employees in the

17  unit on May 5th, 2008?  Again, referring to Mr. Viar's

18  letter.

19      MR. FRASER:  Again, Your Honor, I think that's a legal

20  issue which has factual underpinnings.  We're going to let

21  General Counsel prove its case.

22      JUDGE BUXBAUM:  All right.  That's fine.  That's

23  absolutely your right.

24      All right.  Then, are there any other issues regarding

25  the complaint and answer?

1        MR. CARLSON:  None from the General Counsel, Your Honor.

2        MR. FRASER:  None related to the complaint and answer,

3    Your Honor.

4        JUDGE BUXBAUM:  Very well.  The next thing, let me raise

5    -- well, let me note for the record that, of course, on my

6    list of things to raise was the status of the summary

7    judgment motion; and, of course, General Counsel's 1 contains

8    the order denying the motion and some interesting commentary.

9    So I can cross that off my list.

10        Next, I wanted to ask the lawyers whether they or any

11    one of them seeks the sequestration of witnesses during the

12    trial.  Again, I assume this -- it depends on your assessment

13    of how important credibility is going to be.  I'm not hearing

14    any takers.

15        MR. FRASER:  I'm waiting for them to respond before I

16    do.

17        JUDGE BUXBAUM:  Okay.  Let's do it that way, then.

18    Mr. Carlson, do you seek sequestration of witnesses?

19        MR. CARLSON:  No, Your Honor.

20        JUDGE BUXBAUM:  Mr. McKnight?

21        MR. McKNIGHT:  No.

22        JUDGE BUXBAUM:  Mr. Fraser?

23        MR. FRASER:  Yes.

24        JUDGE BUXBAUM:  All right.  You don't need to say

25    anymore.  If a party wants it, we're going to do it.

1          Then let me ask each party next to designate a

2   representative who can remain during the course of the

3   proceedings, and then we'll talk about what needs to be done

4   as far as sequestration of other witnesses.

5          Mr. Carlson, Mr. McKnight, let me begin with you.

6          MR. McKNIGHT:  I would designate Phil Winkle.

7          JUDGE BUXBAUM:  And is Mr. Winkle present?

8          MR. McKNIGHT:  Yes, he is.

9          JUDGE BUXBAUM:  Who is that?

10          MR. McKNIGHT:  He's the international representative for

11   the UAW.

12          JUDGE BUXBAUM:  And for the Company?

13          MR. FRASER:  We would represent -- or designate Paul

14   Viar.  We have an additional question.

15          JUDGE BUXBAUM:  Sure.

16          MR. FRASER:  And I guess, for clarification purposes, if

17   Mr. Viar is called as an adverse witness to testify, I'm

18   assuming that, under the sequestration rule, I still have the

19   opportunity to have someone sit with me while he testifies,

20   to make sure that I have a representative sitting at the

21   table with me.  If that happens, one, I'm seeking

22   clarification as to whether or not that is permissible.

23          JUDGE BUXBAUM:  Well, is General Counsel intending to

24   call Mr. Viar?

25          MR. CARLSON:  Yes, Your Honor.

1      JUDGE BUXBAUM:  What's your position on that request?

2      MR. CARLSON:  I'm not aware -- personally, not aware

3  that Mr. Fraser is entitled to have a representative when we

4  call his representative as an adverse witness, so I don't

5  know that he has that right.

6      JUDGE BUXBAUM:  Well, that's not quite what I asked you,

7  though.  What's your position on that?

8      MR. CARLSON:  That we would object --

9      JUDGE BUXBAUM:  Mr. McKnight?

10     MR. CARLSON:  -- because I don't know that there's a

11  right to that.

12     MR. McKNIGHT:  Same objection.

13     JUDGE BUXBAUM:  Well, Mr. Fraser --

14     MR. FRASER:  Let me -- let me --

15     JUDGE BUXBAUM:  -- I'm not aware of a right to it,

16  either -- go ahead.

17     MR. FRASER:  Well, Your Honor, hear me out, please.

18     JUDGE BUXBAUM:  Sure.

19     MR. FRASER:  The idea, obviously, when you have a

20  representative with you, is to make sure that they can pass

21  you notes and help you deal with any testimony that's

22  occurring.  If Mr. Carlson is going to call Mr. Viar as an

23  adverse witness, it'll be very difficult for me to have that

24  opportunity to pass notes and have discussion about what's

25  going on relating to his own testimony.

1    JUDGE BUXBAUM:  Well, yeah, I'd say it'd be impossible.

2    MR. FRASER:  Exactly.

3    JUDGE BUXBAUM:  I wouldn't permit it.

4    MR. FRASER:  And in that instance, obviously, the rule

5  is in effect that counsel has the help of a representative

6  from the Company to deal with the testimony that's going on.

7  It's an unusual circumstance, but if that happens, we

8  certainly believe that we have the right to have somebody

9  sitting with me at the table to help me understand and pass

10  notes related to the testimony of any witness.  That's what

11  the representative capacity is for.

12    JUDGE BUXBAUM:  I'm going to handle it this way,

13  Mr. Fraser.  I'm not going to allow you a substitute

14  representative because that erodes the sequestration which

15  you've requested.  I am going to permit you liberally during

16  the testimony of Mr. Viar to request a brief recess, not so

17  you can confer with him because, of course, I won't permit

18  that, but so that you could step outside and confer with

19  other representatives of your client if there's a question in

20  your mind, something you'd like to clarify.

21    MR. FRASER:  Very good.  Thank you.

22    JUDGE BUXBAUM:  Sure.  All right.  Now, regarding

23  sequestration, then, let me make this statement.  You know

24  that, of course, all of you, that these are public

25  proceedings, so I'm not going to grill everyone who walks in

1    the room as to who they are.  And I, of course, don't know

2    who the witnesses are and who may be somebody who's, you

3    know, just come from getting a haircut and wants to watch a

4    trial.  So you will need to keep your eyes on the room, and

5    if any of you see someone there that you believe is a

6    witness, your own or somebody else's witness, I want you to

7    draw it to my attention so that we can exclude them.

8         And I guess now is a good time to begin.  Are there any

9    persons in the room that the lawyers intend to be calling as

10   witnesses?

11        MR. CARLSON:  Judge, I guess one matter before that --

12   and I'm sorry, I should have said something earlier.  I think

13   the General Counsel is also entitled to a representative, as

14   well, in addition to the Union's representative, and I'd like

15   to exercise that right, as well.

16        JUDGE BUXBAUM:  Is it going to be someone you're going

17   to call as a witness?

18        MR. CARLSON:  Not in my case.  It is a potential

19   rebuttal witness.

20        JUDGE BUXBAUM:  Rebuttal witness.

21        MR. CARLSON:  Yes.

22        JUDGE BUXBAUM:  All right.  Well, you know, this has

23   come up before, Mr. Carlson.  I don't much like what the

24   rules are on it because I think that's two against one.  But

25   the rule appears to be that you are entitled, so if you

1  insist on it, you may do so.  Who would you designate?

2        MR. FRASER:  Your Honor, if we may respond to that?

3        JUDGE BUXBAUM:  Sure.

4        MR. FRASER:  Again, Your Honor, we would renew our

5  request, then, to have an additional representative available

6  when one of our witnesses is testifying, so that there's an

7  opportunity to have notes passed back and forth and to be

8  able to understand and fully deal with the testimony that's

9  raised through the adverse witness process.  It is two on

10  one, and we think that is unfair.

11        MR. CARLSON:  Judge, I would also point out, though, as

12  I said, this is not someone we plan on calling in our case in

13  chief.  It's a rebuttal witness, and as a rebuttal witness,

14  this is someone we would be allowed to show transcripts,

15  anyway, of testimony because that's the purpose they would be

16  called for.  So to have them in the hearing room is really no

17  different than that.

18        JUDGE BUXBAUM:  Well, Mr. Fraser, I've already indicated

19  that I sympathize, and not just on this issue but on many

20  issues in Board proceedings, it's two against one.

21  Sometimes, it's the Company and the General Counsel against

22  the Union; sometimes, it's the General Counsel and the Union

23  against the Company.  I don't much like it.  It makes me

24  uneasy as a former municipal court judge.  I'm used to, you

25  know, one on one side and one on the other.  But the Board's

1   processes call for each of the three parties to designate a
2   representative.
3       And let me also say this.  I mean, the purpose of the
4   sequestration rule is for the judge to -- is part of the
5   judge's process of drawing inferences about a witness's
6   credibility.  If you have a witness who's present during the
7   trial and then testifies, either in the case in chief or in
8   rebuttal, I'm not going to fail to take into account that
9   they were present during the trial.  Now, I'll make of that
10  what I will, but I'm going to be aware of it.  You may all
11  rest assured to that.
12      Who will your representative be, Mr. Carlson?
13      MR. CARLSON:  Kevin Kolassa, Your Honor.
14      JUDGE BUXBAUM:  Okay.  The next thing I think that I
15  want to raise is the questions that we discussed in
16  conference calls regarding subpoenas.  But maybe, before we
17  do that, let me ask each of you if there's anything else
18  besides subpoena issues.
19      Mr. Carlson, starting with you, any preliminary matters
20  other than those related to subpoenas?
21      MR. CARLSON:  No, Your Honor.
22      JUDGE BUXBAUM:  Mr. McKnight?
23      MR. McKNIGHT:  No, Your Honor.
24      JUDGE BUXBAUM:  Mr. Fraser?
25      MR. FRASER:  Several, Your Honor.

1          JUDGE BUXBAUM:  Very well.

2          MR. FRASER:  First issue that we would like to raise,

3     Your Honor, is -- and it's already happened this morning --

4     is that no matter in this process be conducted off the

5     record.  In our conference calls that we've had, Your Honor,

6     you've indicated, and I agree with you, that this is a

7     significant case which deserves full record development.  And

8     in my mind, having been through many Board proceedings, off-

9     the-record conversations tend to be discussion that takes

10    place, the judge then recapping what it is that took place

11    and asking the parties whether they agree with the recap.

12         It seems to me that the government has plenty of tapes

13    and that we ought to make sure that we use those effectively.

14    Anything that's related to this matter, whether it's

15    discussion about a document, exhibit, or other types of

16    issues, we would request that that be on the record so that

17    this record is fully developed for all purposes, for your

18    decision, for decision on appeal, and any other process that

19    needs to take place.  So that's our first request.

20         JUDGE BUXBAUM:  Mr. Fraser, if there's going to be any

21    discussion about anything other than what time we return from

22    lunch off the record, it's going to be by the consent of all

23    parties put on the record.

24         MR. FRASER:  Thank you.

25         JUDGE BUXBAUM:  So you may rest assured that that's how

1   we'll do it.  And if you perceive that I'm not doing that,

2   you draw it to my attention right away.

3          MR. FRASER:  Okay, Your Honor.

4          JUDGE BUXBAUM:  Same, of course, with everyone else.

5          MR. FRASER:  Thank you.

6          JUDGE BUXBAUM:  What's next?

7          MR. FRASER:  There are a couple of additional requests.

8   First of all, I'd like to make sure that, in this proceeding,

9   if exhibits are offered and they are rejected, that we will,

10  in fact, have an official rejected exhibit file.

11         Oftentimes, when I'm in Board proceedings, the judges

12  don't pay much attention to that.  I'm assuming, based on

13  your diligence prior to this proceeding, that that's not

14  going to be the case and we really will have a rejected

15  exhibit file in this process for anything that's offered and

16  rejected.

17         JUDGE BUXBAUM:  You absolutely will.

18         MR. FRASER:  Okay.  My next request, then, is an

19  additional document to be admitted in this case as part of

20  the stipulated record.

21         Your Honor, we've had, again, conference calls related

22  to discussion here, some of which are settlement, which we

23  have no interest in trying to get before this record.

24         On the other hand, there's one document, an e-mail that

25  you sent to all of the parties, partially in the context of

1   settlement, partially dealing with a legal issue that will be

2   part of this case.

3       And, again, in fairness, to make sure that the record is

4   complete, we would ask that your e-mail to the parties dated

5   June 18th, 2009, at 10:10 a.m., be admitted into the record

6   as a stipulated document related to a legal issue that may

7   come forth in this event.

8       JUDGE BUXBAUM:  Any objection?

9       MR. CARLSON:  No objection.

10      MR. McKNIGHT:  I'd like to see it.

11      JUDGE BUXBAUM:  Sure.  Hopefully, you've seen it before,

12  Mr. McKnight.

13      MR. McKNIGHT:  I have.

14      MR. CARLSON:  Your Honor, I don't know whether you want

15  another copy of it?

16      JUDGE BUXBAUM:  I don't need to see it, no.  That's

17  fine.  You're referring to the one regarding remedy, I take

18  it?

19      MR. FRASER:  Yes.

20      JUDGE BUXBAUM:  Yeah, yeah.

21      Any objection?

22      MR. McKNIGHT:  I'd just like counsel to tell us for the

23  record what he thinks is the relevance or the purpose of

24  offering this communication.

25      JUDGE BUXBAUM:  No, I don't think he needs to.  I'm

1   going to admit it.  Anything that I put in writing to the

2   parties, if one of those parties wants it on the record, they

3   are welcome to have it on the record.

4       So your request is granted.  We'll mark it as -- you

5   want to mark it as Respondent's 1 or ALJ-1, whatever you --

6       MR. FRASER:  Whatever you'd like us to have it marked

7   as.

8       JUDGE BUXBAUM:  Let's make it ALJ-1, and it will be

9   admitted.

10  **(ALJ's Exhibit 1 marked for identification and received into**

11  **evidence.)**

12      MR. FRASER:  One copy or two copies to the court

13  reporter?

14      JUDGE BUXBAUM:  Two copies.

15      Anything else on your list, Mr. Fraser?

16      MR. FRASER:  Yes, Your Honor.  We are making a verbal

17  motion, as a preliminary matter, that any issues in this

18  proceeding related to other statutes, unemployment statute,

19  workers' compensation statute, ERISA, COBRA, any statute

20  that's unrelated to the National Labor Relation Act, that any

21  issues raised related to those other statutes not be admitted

22  because they are statutes unto themselves, uncoordinated by

23  the National Labor Relations Act and don't have bearing on

24  whether or not an individual is an employee, whether they are

25  reemployed, or whether or not there is some other context

1    under the National Labor Relations Act.

2         And so we're asking for -- we're making a motion and

3    asking for a ruling that, since these are separate statutes

4    with different definitions, with different obligations, that

5    are not coordinated, that we rule on them now that they're

6    simply not admissible in this matter to show evidence related

7    to employee status or reemployment status under the Labor

8    Act.

9         JUDGE BUXBAUM:  Well, Mr. Fraser, I'm not going to deal

10   with it hypothetically, in advance.  I guess let me observe

11   that, if somebody wants to argue the impact of another

12   statute, that would not be a matter of evidence, would it?

13   It would be a matter of legal argument for the briefs.

14        MR. FRASER:  Obviously, it'll be a matter of argument

15   for the briefs, but I anticipate that there will be a request

16   to introduce unemployment documents, S and A documents, COBRA

17   documents, ERISA documents --

18        JUDGE BUXBAUM:  Sure, that could be.  And --

19        MR. FRASER:  -- and so, in fairness, again, I'm trying

20   to raise an issue up front to make that we're all on -- at

21   least you understand our position.  And, hopefully, if you

22   won't make a ruling now, that's fine.  We'll object when the

23   issue comes up.  But I think --

24        JUDGE BUXBAUM:  That's the norm.

25        MR. FRASER:  -- to try to proceed here in an expedited

1  fashion, we're raising that issue now.

2      JUDGE BUXBAUM:  No, I'm going to deal with it in the

3  normal course.

4      MR. FRASER:  Okay.  I would like to raise another issue.

5  I envision that there will be much conversation today about

6  the words "employee, illegal striker, reemployment," both in

7  cross and direct, and that Counsel for the General Counsel

8  will use the word "employee," that counsel for Douglas will

9  use the word "illegal striker," or something to that effect.

10  And we're asking for, essentially, a preliminary ruling on

11  your part that says counsels' characterization of those words

12  or use of those words, in fact, don't mean anything.

13      JUDGE BUXBAUM:  Well, let's see.  What lawyers say

14  doesn't mean anything.  Mr. Carlson, that sounds like a

15  reasonable proposition.

16      Seriously, you take Mr. Fraser's point, which is a

17  legitimate point?  In other words, I don't think in a brief

18  it makes sense either for any lawyer in this case to argue

19  that because a lawyer, in the heat of cross-examination,

20  maybe selected the wrong term to characterize something, that

21  that's going to be an admission on the part of a client, is

22  it?

23      MR. CARLSON:  Your Honor, Mr. Fraser and I have had this

24  conversation already, and I have assured him that we, at no

25  time, will make an argument that these employees, the locked

1　out employees, were reemployed because he accidentally called

2　them employees at one point during the hearing or at every

3　point during the hearing.  That's not our case, and we aren't

4　going to make that argument.

5　　　　And I anticipate that there will be many different

6　references to these individuals by all the attorneys.  We are

7　not going to make any argument based on anything that an

8　attorney says as to what their status is, so --

9　　　　JUDGE BUXBAUM:  Mr. McKnight --

10　　　MR. McKNIGHT:  Well, I don't understand exactly what

11　counsel is saying, but I obviously expect any trier of facts

12　to take into consideration slippage in the way the lawyers

13　use terms of art.

14　　　JUDGE BUXBAUM:  Right.  No lawyer wants to be trapped

15　by --

16　　　MR. McKNIGHT:  Other than that, I'm not willing to make

17　a commitment to what I say or what Mr. Fraser says or what

18　General Counsel says doesn't count.

19　　　JUDGE BUXBAUM:  Well, I think we can all go back to the

20　law school principle that statements made in examining the

21　witness by the lawyer, as opposed to the witness, are not

22　evidence.

23　　　　Mr. Fraser, let's put it that way, and I will certainly

24　be cognizant of the point you're making.

25　　　MR. FRASER:  Great, Your Honor.  Thank you.

1    I believe that those are the preliminary matters that we

2    have at this time.

3        JUDGE BUXBAUM:  Excellent.

4        And, Mr. Carlson, let me next turn to you regarding your

5    subpoena.  Am I right that you issued one subpoena?

6        MR. CARLSON:  That's correct, Judge.

7        JUDGE BUXBAUM:  All right.  Are there any issues in your

8    view relating to compliance with that subpoena?

9        MR. CARLSON:  Yes, Judge.  It has not been fully

10   complied with.

11       JUDGE BUXBAUM:  I'll hear you.

12       MR. CARLSON:  We have several items that have yet to be

13   produced.  I understand from Mr. Fraser he has produced some

14   of the items.  We've met on two occasions.  Yesterday was the

15   most recent occasion.  I think there are still, from what I

16   understand from what he provided yesterday and in our

17   discussions yesterday, there are still several items on the

18   General Counsel's subpoena that he was going to produce

19   documents today in response to those.  So I've yet to receive

20   those.

21       It is my hope, also, that after receiving those -- I

22   don't know what the volume of those documents or exactly what

23   I'm going to receive today, but it is my hope, also, that

24   based on my conversations with Mr. Fraser, that after having

25   a chance to look at those and perhaps address a couple other

 1  matters, that we may be able to reach some stipulations as to

 2  the documents as well as to several of the General Counsel's

 3  exhibits, which I think will really help move things along

 4  much quicker.

 5      So those are some of the things I'm looking to do with

 6  respect to stipulations and so forth, but after we've had a

 7  chance to look at the documents, yeah.

 8      JUDGE BUXBAUM:  Mr. Fraser, are there documents, then,

 9  that you have not yet provided that you are prepared to

10  provide?

11      MR. FRASER:  Absolutely.

12      JUDGE BUXBAUM:  All right.

13      MR. FRASER:  We would -- and, again, I think it's

14  important that this be on the record.  We have a box of

15  documents for Mr. Carlson, which are the final responses to

16  his subpoena request.  We have a privilege log that goes with

17  that box of documents.

18      Again, in fairness, we received two subpoenas, one from

19  Mr. Carlson -- actually, three subpoenas, one from

20  Mr. Carlson and two from Mr. McKnight.  We prepared one

21  privilege log related to all of those documents.  We did not

22  divide the privilege log.

23      JUDGE BUXBAUM:  That's fine.  No, that's fine.

24      MR. FRASER:  And we spent significant amounts of time,

25  in excess of 150 hours, with the two lawyers who are in the

1   back of the courtroom doing that.  So I believe that this,

2   then, in addition to a document that, as the parties

3   discussed yesterday, I recognized that I had failed to

4   provide, related to Request Number 1, an additional page, one

5   page of notes from Kirk that he took during a bargaining

6   session on May 21 of 2008.  So I think, with --

7           JUDGE BUXBAUM:  And so the record is clear, you've just

8   handed those to both counsel; is that correct?

9           MR. FRASER:  Yes, I did.  Yes, I did, to Mr. McKnight

10  and to Mr. Carlson.  This document is one that they

11  previously had, based on our submission of a summary judgment

12  motion, so it's not something that's new to them, but it

13  was -- clearly, they pointed out my error in not providing

14  that yesterday in the documents that we did disclose

15  yesterday morning.  So --

16          MR. McKNIGHT:  This is Mr. Kirk's notes?

17          MR. FRASER:  That's correct.

18          JUDGE BUXBAUM:  And the record will reflect, then, that

19  you have provided Mr. Carlson with a box of papers.  Is it

20  your view, then, that by providing that box and the one page

21  by Mr. Kirk, that you've now complied with the subpoena?

22          MR. FRASER:  My belief is that we have complied with

23  the --

24          JUDGE BUXBAUM:  And the log.  I'm sorry.  The log, as

25  well.

1      MR. FRASER:  My belief, based on the privilege log and

2   the documentation that has been provided today, in addition

3   to the two partial submissions of documents made previously,

4   that we have complied with all of the requests that General

5   Counsel has made, based on all the documents we've been able

6   to find that are responsive.

7      JUDGE BUXBAUM:  All right.  The next -- obviously,

8   Mr. Carlson, you are going to need some opportunity during

9   the course of the trial to examine the material before I can

10  ask you whether you have any remaining subpoena issues, so

11  I'm going to defer that to an appropriate point.  But I do

12  want to -- and I've said this, I think, in our conference

13  call off the record, and let me put it on the record, that at

14  the conclusion of the trial, if anybody has an outstanding

15  subpoena request that has not been resolved, either by some

16  agreement among the parties or by a ruling from me, I'm

17  expecting that you will put that on the record before we

18  leave this room.

19     If it's not on the record before we leave this room, I'm

20  going to consider it as waived.  If it is on the record, I'm

21  going to make a conscientious effort to resolve it.  I don't

22  want anybody sandbagged after this trial has concluded by

23  some allegation that there is an unresolved subpoena issue.

24     But, Mr. Carlson, as I said, I'm not asking you right

25  now whether you believe there's any outstanding issues.

1    You've got to look in that box.  Hopefully, it's not

2    Pandora's Box.

3        All right.  Mr. McKnight, let me turn to you next.  You

4    issued two subpoenas, am I correct?

5        MR. McKNIGHT:  That's correct.

6        JUDGE BUXBAUM:  All right.  Are there unresolved

7    subpoena issues regarding either or both of those subpoenas?

8        MR. McKNIGHT:  Yes, there are.  I do not have production

9    in response, as I understand it, to Item 2 in Mr. Lillie's

10   subpoena and Items 2 --

11       JUDGE BUXBAUM:  Now, it would help me if you'll give me

12   the numbers of the subpoenas because I don't know who

13   Mr. Lillie's -- is it 56 --

14       MR. McKNIGHT:  2005, 562005.

15       JUDGE BUXBAUM:  Thank you.

16       MR. McKNIGHT:  And Items 2 through 10 in Mr. Viar's

17   subpoena, which is 562003.

18       JUDGE BUXBAUM:  All right.  So Lillie is 005, and Viar

19   is 003; is that correct?

20       MR. McKNIGHT:  Yes.

21       JUDGE BUXBAUM:  All right.  That helps.  Mr. Fraser, let

22   me hear from you about those, maybe starting with --

23       MR. McKNIGHT:  And I would say that I do understand that

24   counsel represents that he has provided -- or Mr. Viar has

25   provided all -- Number 2 in his subpoena, documents

1    pertaining to unemployment claims.

2        JUDGE BUXBAUM:  Okay.  So the question is documents

3    pertaining to what occurred during negotiations?

4        MR. McKNIGHT:  One and two have been provided by

5    Mr. Viar --

6        JUDGE BUXBAUM:  Oh, I'm sorry.  I'm on the wrong line.

7        MR. McKNIGHT:  Okay.

8        JUDGE BUXBAUM:  Forgive me.  Do that over.  I was

9    looking at Mr. Lillie's subpoena.

10       MR. McKNIGHT:  Ah, okay.

11       JUDGE BUXBAUM:  Mr. Viar's subpoena, you're saying --

12       MR. McKNIGHT:  That Mr. Viar apparently has provided

13   what he thinks is responsive to one and two.

14       JUDGE BUXBAUM:  Okay.  And, Mr. Fraser, is that your

15   understanding, as well?

16       MR. FRASER:  We have provided -- the Company has

17   provided to Mr. McKnight those documents that are responsive

18   to Mr. Viar's subpoena, Request Number 1.  So, yes, we have

19   provided, with Mr. Kirk's single-page note this morning, all

20   documents that we believe are responsive to Mr. Viar's

21   Request Number 1.

22       JUDGE BUXBAUM:  Very good.  And Number 2?

23       MR. FRASER:  Again, Your Honor, yesterday morning, we

24   provided to Mr. McKnight all those documents that we believe

25   to be responsive to his Request Number 2 to Mr. Viar.

```
 1        JUDGE BUXBAUM:  Okay.  Mr. McKnight?

 2        MR. McKNIGHT:  Well, I'll just deal with that with

 3   Mr. Viar when he testifies.

 4        JUDGE BUXBAUM:  Sure, right.  I mean, that's exactly it.

 5   I'm just trying to smoke out on the record where everyone

 6   stands.

 7        MR. McKNIGHT:  But they represent that they've provided

 8   what's responsive to that.

 9        JUDGE BUXBAUM:  Right, and that's on the record.

10        MR. McKNIGHT:  Yes.

11        JUDGE BUXBAUM:  Anything else in regard to Mr. Viar's

12   subpoena?

13        MR. McKNIGHT:  Yes, 3 through 10.

14        JUDGE BUXBAUM:  Yeah?

15        MR. McKNIGHT:  I'm waiting for production.

16        JUDGE BUXBAUM:  You're saying you haven't seen any

17   production?

18        MR. McKNIGHT:  That's correct.

19        JUDGE BUXBAUM:  Mr. Fraser?

20        MR. FRASER:  Obviously, the subpoena request is due

21   today.  We have, as we indicated in a conference call prior

22   to being on the record -- I thought it was one box of

23   documents, it's actually two, that are sitting over here to

24   the right, along with a privilege log that we are now

25   providing to Mr. McKnight in response to his Request Number 2
```

1   for Mr. Lillie --

2       JUDGE BUXBAUM:  Request Number 2 for Mr. --

3       MR. FRASER:  For Mr. Lillie.

4       JUDGE BUXBAUM:  Lillie, all right.

5       MR. FRASER:  And his Requests Number 3 through 10 for

6   Mr. Viar, along with a privilege log, which is the document

7   that's tipped up at the front of this first box.

8       JUDGE BUXBAUM:  Now, this is a different privilege log?

9       MR. FRASER:  Same privilege log that's been provided to

10  Mr. Carlson.

11      JUDGE BUXBAUM:  Same privilege log.  Very good.

12      MR. FRASER:  As we indicated, we didn't make two

13  privilege logs.

14      JUDGE BUXBAUM:  That's fine.

15      MR. FRASER:  We also have available the privileged

16  documents to the extent there's a question about those.  We

17  also had a conversation where we had the petitions to revoke

18  Request Number 9 for Mr. Viar's subpoena, which we had

19  conversation off the record related to January 1 time frame,

20  2008.  We have made good faith effort, again, to include two

21  lawyers, four legal assistants, working from Friday evening

22  till last -- actually, until this morning at 2 a.m., putting

23  in all the time and gathering all the documents.

24      We have not gone through January 1, 2008 through May 1

25  of 2008.  We simply have not had the opportunity to do that.

1    There are a few documents on the privilege log that are

2    listed as January dates.  They were in the production that

3    our client got to us that was supposed to be May 1, 2008

4    through the present.

5        And so we continue to work at this time.  Once the

6    issues are resolved, I will ask Ms. Stoppels and

7    Ms. Richardson to continue on their path of reviewing those

8    documents.

9        JUDGE BUXBAUM:  So let me see if I am correct, then.  My

10   interpretation of what you've just said, Mr. Fraser, is that

11   the Company's representing that, with regard to both

12   subpoenas, it has provided all responsive materials except

13   those listed on the privilege log and the responses -- some

14   of the responses required by Number 9 in Mr. Viar's subpoena

15   during the time period from January 1st through May 1st,

16   2008.

17       MR. FRASER:  Yeah, and, again, it's probably through

18   April 30th, 2008.

19       JUDGE BUXBAUM:  April 30th.  But am I correct in that

20   formulation?

21       MR. FRASER:  Yes, you are.

22       JUDGE BUXBAUM:  All right.  Mr. McKnight, then, again, I

23   think that the way to do this is to -- I'm not asking you at

24   this point whether this represents your view of satisfactory

25   compliance because you can't tell me.  But before trial

1  concludes, I certainly will want to hear from you if you

2  believe that there has not been compliance in some area.

3      MR. McKNIGHT:  I would like at least 15 minutes or 30

4  minutes to look at these materials before we decide whether

5  or not those issues will be left to the very end of whatever

6  we're doing here.

7      JUDGE BUXBAUM:  Mr. Carlson, I'm assuming you're going

8  to want the same 30 minutes?

9      MR. CARLSON:  Absolutely, Your Honor.

10      JUDGE BUXBAUM:  I think 30 minutes is reasonable.

11      Mr. Fraser, before we do that, did you issue any

12  subpoenas?  I'm only asking because I want to know if you

13  have any issues regarding subpoenas.

14      MR. FRASER:  Yes, we did.  We issued --

15      JUDGE BUXBAUM:  You don't need to tell me more than

16  that, other than is there anything you'd like me to address?

17      MR. FRASER:  Yes, we would.  We have not had full

18  compliance on the subpoenas that we requested, either.  We

19  received some of the responses to our request.

20      JUDGE BUXBAUM:  Who did you subpoena?

21      MR. FRASER:  We've subpoenaed the local union, the UAW

22  international, Mr. McKnight, Mr. Canzano, I think ten

23  individual Local 822 members.  Mr. McKnight has provided some

24  documents, but there are documents that have not been

25  provided related to communications from the Union to its

1    members or Local 822 to its members.

2        And so I believe, based on our conversation yesterday,

3    that Mr. McKnight has some documents for me as well as a

4    privilege log.

5        MR. McKNIGHT:  I have a privilege log for you.

6        Can we go off the record for one second, Your Honor?  I

7    just need to check something.

8        JUDGE BUXBAUM:  You sure this isn't for discussion?

9        MR. McKNIGHT:  No.

10       **JUDGE BUXBAUM:  Okay.  We'll go off the record.**

11   **(Off the record.)**

12       JUDGE BUXBAUM:  The first thing I want to do, the

13   reporter asked me to confirm on the record that the General

14   Counsel's Exhibit 1 was received into evidence.  And

15   certainly that's my recollection.  If anybody disagrees, now

16   is the time.  But, otherwise, yes, Exhibit 1 has been

17   received.

18       Go ahead, Mr. McKnight.

19       MR. McKNIGHT:  Well, I would just like the record to

20   reflect that I have provided counsel with a privilege log.

21   And, naturally, we have the documents itself that are

22   identified in that privilege log for inspection if counsel

23   wishes.

24       JUDGE BUXBAUM:  And are you providing any other

25   materials?

1    MR. McKNIGHT:  I am, but before I do that, I want to go

2  back and ask counsel a question.  You said that you were

3  looking for communications between the Union and its members,

4  and I would ask you what item and what subpoena -- there are

5  14 subpoenas -- refers to that.

6    MR. FRASER:  Mr. McKnight, I was trying to paraphrase my

7  recollection.  Now I've pulled the request and the rider, the

8  documents to be produced, Questions Number 2 and Number 3,

9  specifically, so there's no misunderstanding about what that

10  request is --

11    MR. McKNIGHT:  Which subpoena are you referring to?

12    MR. FRASER:  Since they are essentially identical, why

13  don't we take Gary Nettleman, which is Subpoena Number

14  562032.

15    MR. McKNIGHT:  Well, that's one I never received, but I

16  think I know what it says.  Why don't you give me somebody

17  else's?

18    MR. FRASER:  Well, why don't you tell me which ones you

19  have, and I won't guess.

20    JUDGE BUXBAUM:  Well, tell him who.  Which one did you

21  receive, yeah.

22    MR. McKNIGHT:  I believe I have -- at this point, I've

23  been able to track down all of them perhaps except Nettleman

24  and one other's.

25    JUDGE BUXBAUM:  Well, pick one, Mr. McKnight.

1        MR. McKNIGHT:  Kolassa.

2        MR. FRASER:  Let me find that.

3        MR. McKNIGHT:  Number 2 is --

4        MR. FRASER:  Yeah, I can read it, Sam.  Number 2 says,

5    "Any and all correspondence sent to Douglas Autotech or any

6    Douglas Autotech representative during the time period

7    January 1, 2008 to present."

8        Number 3 says, "Any and all correspondence between the

9    UAW or UAW Local 822 and Douglas Autotech between the period

10    January 1, 2008 and the present."

11        But those were the requests that we made to the

12    individual members of Local 822 that we subpoenaed.

13        MR. McKNIGHT:  Okay.  Well, I have documents that are

14    responsive to Number 3.  Now, I must say I didn't read that

15    to mean per capita dues reports from the local to the

16    international, but communications about these issues here.

17    And I have documents responsive to that.

18        And I read Number 2 -- and counsel reminded me of this

19    yesterday -- to read, I guess, as correspondence by the

20    individual person to the Company or its representatives.  And

21    I think I have three or four applications for 401(k)

22    distributions during the lockout.

23        MR. FRASER:  I'm not --

24        MR. McKNIGHT:  Which I think would be responsive to

25    that.  Otherwise, I don't know that I have anything else I

1   could find.

2        MR. FRASER:  I appreciate, Mr. McKnight, your

3   determination as to what you thought Number 2 and Number 3

4   meant --

5        MR. McKNIGHT:  Well, Number 2, I have what I have.

6        MR. FRASER:  Okay.  Number 3, you indicated dues.  I'm

7   not even sure what was said.  Something about dues.  If that

8   was correspondence or in a form that went to -- you know,

9   between the UAW --

10        MR. McKNIGHT:  I didn't consider dues submissions

11   correspondence.

12        MR. FRASER:  Well, I think the definition is pretty

13   broad.

14        JUDGE BUXBAUM:  Well, now, be careful, Mr. Fraser.

15   That's going to be a two-edged sword.  I mean, let's be

16   reasonable here, folks.

17        MR. FRASER:  I tried to be careful.  We produced --

18        JUDGE BUXBAUM:  Let's be reasonable about this.

19        MR. FRASER:  I understand.  We produced --

20        JUDGE BUXBAUM:  Frankly, I have trouble understanding

21   why a case of this nature has boxes of documents being

22   produced by anybody.

23        MR. FRASER:  You know what, Your Honor?  I have the same

24   trouble.  The problem is we've complied and spent hundreds of

25   hours doing it --

41

1          JUDGE BUXBAUM:  Do you want these dues remittances?

2          MR. FRASER:  You know what?  If that is something that I

3    think could be useful here, why not?  Yes, I'd like to have

4    those if that's --

5          JUDGE BUXBAUM:  Well, because that's not the standard,

6    "why not."  The standard is --

7          MR. FRASER:  Your Honor, if it could lead to something

8    that might be discoverable or admissible --

9          JUDGE BUXBAUM:  Okay.  Tell me how it could lead to

10   that?

11         MR. FRASER:  Well, you know what?  I don't know General

12   Counsel's case.  He's not been kind enough to tell me what

13   proofs he's going to put on or how he's going to do it.  I

14   don't know whether he's going to raise an issue related to we

15   accepted dues money from people after May 1 of 2008; and,

16   therefore, that shows that they were still employees under

17   the Act.  I don't know that.

18         JUDGE BUXBAUM:  Well, okay.  Then I think that goes back

19   to sort of my general feeling about much of this that let's

20   wait and see.  If you believe that those dues statements

21   would be relevant or reasonably could produce relevant

22   material after you've heard the nature of his submission,

23   I'll hear you.

24         MR. FRASER:  Your Honor, and, again, I appreciate that,

25   and I don't mean to be disrespectful, but the conversation

1    that we had related to Mr. McKnight's request for

2    information, as I recall, was resolved in a way, even though

3    January 1, 2008 was the date upon which he had asked for

4    information going forward, and we had argued that May 1 of

5    2008 was the point at which anything really could be

6    relevant, you then directed us that, even though that may be

7    the case, let's narrow it down in a different way and give

8    him something because it may be that it's discoverable

9    information once he looks through it --

10        JUDGE BUXBAUM:  Sure, that's the standard.

11        MR. FRASER:  -- so, again, my --

12        MR. McKNIGHT:  Could I respond to this?

13        MR. FRASER:  Hang on.  I'm not finished yet, Sam.  So my

14    response is it goes both ways, that for us to wait now till

15    the proofs is not the standard that you have used for us to

16    disclose information to Mr. McKnight.

17        JUDGE BUXBAUM:  Well, I think it is, in large measure.

18    I don't agree, Mr. Fraser.

19        Mr. McKnight, what do you want to say?

20        MR. McKNIGHT:  Well, I just want to go back to the

21    subpoena and indicate --

22        JUDGE BUXBAUM:  Which subpoena?

23        MR. McKNIGHT:  Well, let's just deal with Mr. Kolassa's

24    subpoena.

25        JUDGE BUXBAUM:  Okay.

1          MR. McKNIGHT:  Number 2 is "Correspondence sent to

2    Douglas Autotech or any of its representatives by

3    Mr. Kolassa."  I have that.

4          JUDGE BUXBAUM:  Okay.

5          MR. McKNIGHT:  I have that --

6          JUDGE BUXBAUM:  In other words, you're stating that the

7    Charging Party has provided that material.

8          MR. McKNIGHT:  I have that with respect to Mr. Kolassa

9    and any of the other 12 individuals.

10         JUDGE BUXBAUM:  Very well.  And you've provided it?

11         MR. McKNIGHT:  No, I haven't.  I have about three of

12    these 401(k) submissions that the individuals still have.

13    I'm going to provide them to counsel.

14         JUDGE BUXBAUM:  All right.  Please do.

15         MR. McKNIGHT:  Okay.  That's Number 2.  Number 3 is,

16    "Correspondence between the UAW or Local 822 and Douglas

17    between January 1, 2008 and the present."  That doesn't

18    include union dues per capita internal reports --

19         JUDGE BUXBAUM:  Well, I wouldn't have thought so, but,

20    Mr. McKnight, you're the one who brought it up.

21         MR. McKNIGHT:  No, no, no.  I want to just go back and

22    explain what I was addressing.  There's a subpoena addressed

23    to the president of the local, which includes documents or

24    correspondence between the UAW and the local regarding any

25    matter at Douglas Autotech from January 1 to the present.  I

1  have documents responsive to that.  I did not consider

2  internal dues records a matter related to Douglas Autotech.

3      JUDGE BUXBAUM:  All right.  Well --

4      MR. McKNIGHT:  So that's all I'm saying.  I have

5  documents responsive to correspondence between the UAW and

6  its Local 822, regarding any matter pertaining to Douglas

7  Autotech, period.

8      JUDGE BUXBAUM:  Okay.  Well, then, you're saying that

9  your judgment as counsel for the Union is that you've

10  complied --

11      MR. McKNIGHT:  I'm going to --

12      JUDGE BUXBAUM:  -- or you're about to comply?

13      MR. McKNIGHT:  Correct, Your Honor.

14      JUDGE BUXBAUM:  Okay.

15      MR. FRASER:  And, Your Honor, again, we were not talking

16  about the subpoena to Mr. Winkle; we were talking about the

17  subpoena to Mr. Kolassa, and there's --

18      JUDGE BUXBAUM:  That's what he said.  That's what he

19  said.

20      MR. FRASER:  No, he's talking about two different

21  subpoenas now.  We've talked about Mr. Kolassa, Number 2 and

22  Number 3.  I don't have any arguments under Number 3 to

23  Mr. Kolassa and all the other individual bargaining unit

24  members that we subpoenaed related to dues documents.  The

25  subpoena to Mr. Winkle specifically says -- and it's a

1    different subpoena, it's a different rider --

2         JUDGE BUXBAUM:  Okay.

3         MR. FRASER:  -- and that is what Mr. McKnight is talking

4    about.  And in that instance, it says, "Any and all

5    correspondence between the UAW, UAW Local 822, regarding any

6    matter at Douglas Autotech for the period January 1, 2008 to

7    present; any and all correspondence between the UAW, UAW

8    Local 822 and Douglas Autotech between the period January 1,

9    2008; any and all documents related to unemployment matters."

10        So I'm not sure what he thinks the dues documents are

11   not responsive to, based on the argument that he's making.

12   I'm confused as to what point he's trying to make.

13        MR. McKNIGHT:  Which of those points do you think would

14   pertain to matters involving Douglas -- correspondence

15   between the UAW and Douglas Autotech, pertaining to matters

16   at Douglas Autotech?

17        MR. FRASER:  Again, Sam, I didn't raise the dues

18   document.  I'm trying to figure out why you raised it to

19   begin with.

20        MR. McKNIGHT:  Well, then, I regret raising it.

21        JUDGE BUXBAUM:  All right.  You withdraw that statement?

22        MR. McKNIGHT:  Absolutely.

23        JUDGE BUXBAUM:  Okay.  So let me ask you again,

24   Mr. McKnight --

25        MR. McKNIGHT:  I just heard this passionate argument why

1  they want the dues records, and I don't understand that those

2  are responsive to anything.

3      JUDGE BUXBAUM:  Okay.  Then let me go back to my

4  question to you, Mr. McKnight --

5      MR. McKNIGHT:  Yes.

6      JUDGE BUXBAUM:  -- which was, have you, in your

7  judgment --

8      MR. McKNIGHT:  I'm about to give counsel documents

9  responsive to everything else he has asked for.

10     JUDGE BUXBAUM:  Okay.

11     MR. FRASER:  Your Honor, again, the dues documents I

12 think are responsive to Number 2 in the subpoena to

13 Mr. Winkle.  Any and all correspondence --

14     MR. McKNIGHT:  Okay.  Well, then --

15     MR. FRASER:  -- between the UAW and the UAW Local 822,

16 regarding any matter at Douglas Autotech from the time period

17 January 1, 2008 to present.

18     MR. McKNIGHT:  Correspondence -- listen -- first of all,

19 I just want to back up.  We actually -- and we should make a

20 record of this -- agreed in telephonic conversations before

21 this hearing that requests for correspondence, per se,

22 between the parties would be -- instead of requiring massive

23 production, if either side had it, they would rely on it, and

24 General Counsel would try to prepare a list of such

25 correspondence.  And it was limited to May 1, going forward.

1   And General Counsel has done that.  That's Number 1.

2       Number 2, there is nothing in these words that would

3   possibly pertain to internal dues records.  Correspondence

4   between the UA --

5       JUDGE BUXBAUM:  You're saying a dues record is not

6   correspondence?

7       MR. McKNIGHT:  Yeah.  Regarding any matter at Douglas

8   Autotech.

9       JUDGE BUXBAUM:  All right.  So, again, let me repeat my

10  question to you, Mr. McKnight --

11      MR. McKNIGHT:  So I regret saying that I haven't

12  produced that.

13      JUDGE BUXBAUM:  Okay.  In your view, are there any

14  matters sought by the Company's subpoenas that you have

15  failed to comply with, either by producing or now producing

16  the documents or by providing a privilege log?

17      MR. McKNIGHT:  No.

18      JUDGE BUXBAUM:  All right.  Will you please, then,

19  provide the documents you were about to provide?

20      MR. McKNIGHT:  Yes.

21      MR. FRASER:  And, again, just for the record -- I

22  understand where we've been.  We'll just renew our objection,

23  then.  We'd like to see those documents.  If, Your Honor,

24  you're ruling that they're not responsive or that you're

25  going to rely upon Mr. McKnight's view of what's responsive,

1    we'll accept that.  We simply want it noted on the record.

2        JUDGE BUXBAUM:  Sure.  Look, the way this works, we're

3    all professionals here.  This is a profession, at least I

4    hope it's still a profession, and in my experience, it is

5    still a profession.  All of you are experienced trial

6    lawyers.  When you get a subpoena, your professional

7    obligation is to comply with it, either by providing the

8    document or providing a privilege log or asking the tribunal

9    that's hearing the case for some other form of relief.

10       If you don't do that in good faith, clearly, you put

11   your license on the line.  And I have no reason in this case,

12   at least yet, to think that any of the three of you are not

13   acting in good faith.  So when I ask you on the record

14   whether you believe you have provided lawful compliance with

15   a subpoena, and you tell me that you have, then that's where

16   things are going to stand, unless and until some opposing

17   party shows me differently.

18       MR. FRASER:  And, again, Your Honor, we --

19       JUDGE BUXBAUM:  And you'll all get the benefit of that.

20       MR. FRASER:  Mr. McKnight has raised the dues documents.

21   We'd like them.  I guess I'm looking for a ruling from you as

22   to whether or not they're compliant under the subpoena.

23       JUDGE BUXBAUM:  By dues documents, Mr. McKnight, are you

24   talking about letters regarding the payment of dues, or are

25   you talking simply about the ministerial act of noting what

1   dues have been received and what dues may be owed?

2        MR. McKNIGHT:  I'm talking about letters or bank deposit

3   records of similar nature, showing the dues submissions by

4   the local to the international, period.

5        MR. FRASER:  So, again, Your Honor, it's letters, it's

6   correspondence.

7        MR. McKNIGHT:  I'll go back --

8        JUDGE BUXBAUM:  If there are letters, provide them.

9        MR. McKNIGHT:  I know of no such letters.

10       JUDGE BUXBAUM:  I don't want ledgers, I don't want, you

11  know, books of receipts, I don't want bank statements

12  provided pursuant to this.  If there's a letter -- for

13  instance, I can imagine there might be a letter saying, you

14  know, "Member Joe Smith, his wife just passed away.  He's not

15  current in his dues.  You know, can we come up with something

16  to help him out?"

17       MR. McKNIGHT:  So that would be -- let me just see if I

18  can recapture this, then.  Is it not correct that, in our

19  pretrial discussions about the scope of subpoenas, that we

20  limited requests for correspondence to correspondence

21  beginning May 1 and correspondence pertaining to matters

22  between the Union and Douglas Autotech, and you actually --

23       JUDGE BUXBAUM:  Well, Mr. Fraser, there's no reason for

24  dues materials before May 1.

25       MR. FRASER:  Your Honor --

1       MR. McKNIGHT:  And, Your Honor, you directed General

2  Counsel, counsel for the Respondent, and myself, all of us,

3  not to produce in that regard and simply to have the General

4  Counsel prepare a log of the communications.  Now that --

5       JUDGE BUXBAUM:  I don't recall that I directed the

6  General Counsel prepare --

7       MR. McKNIGHT:  -- and you said, actually, most of what

8  the General Counsel was requesting in their subpoena --

9  because their subpoena went back to January 1 -- were

10  materials that the Union had probably already provided to the

11  General Counsel.

12       JUDGE BUXBAUM:  Mr. McKnight, what's your complaint

13  here?  I agree.  Make it from May 1st --

14       MR. McKNIGHT:  Well, okay, my complaint is now I'm going

15  back to wherever, and --

16       JUDGE BUXBAUM:  Make it from May 1st, 2008, if there's

17  correspondence, letters.

18       MR. McKNIGHT:  Okay.

19       MR. FRASER:  Your Honor --

20       MR. McKNIGHT:  And so I will just state for the record

21  that I do not think that correspondence between the

22  international and the local, if anything such exists,

23  regarding whether or not a member is in arrears in dues --

24  and I have no idea if any such thing exists -- pertains to

25  any matter at Douglas Autotech.  That is an internal union

1  matter, Your Honor.  It's entirely outside the scope of the

2  subpoena and outside the scope of this hearing.

3     JUDGE BUXBAUM:  See if there's anything, Mr. McKnight,

4  and then we can address it.

5     MR. FRASER:  And finally, Your Honor, just so that

6  there's no absence of response to, we agreed in off-the-

7  record discussions to produce correspondence as of May 1,

8  2008 forward.  That is not my understanding, and when I

9  attempted to use that understanding to limit the scope of

10 Mr. McKnight's subpoena request going back to January 1,

11 2008, I was specifically told by Your Honor and by

12 Mr. McKnight that that clearly was relevant.  So I'm not sure

13 where Mr. McKnight is coming up with this information, and I

14 don't agree that there was any type of an agreement with

15 Mr. McKnight related to dates May 1, 2008 forward.

16    JUDGE BUXBAUM:  All right.  We're going to shortly take

17 a 30-minute recess so that people can begin looking at the

18 documents.  When we resume, I intend to proceed with opening

19 statements and the testimony of actual witnesses with actual

20 evidence in this case.

21    And let me say, gentlemen, that I am disturbed that

22 you're losing sight of the forest for the trees here, and I

23 suppose that the trees I'm referring to are the ones we've

24 already killed to produce all this paperwork.

25    I've again had a chance to look at the motion for

1    summary judgment, which I had never seen before, you know, as

2    we were waiting for the trial to begin.  It just confirms

3    what I suspected, that this is not a case which is going to

4    be decided on some sort of nuance in the facts.  I may be

5    wrong, but I don't think so.  This is a legal case.  It is a

6    case of statutory interpretation.  It's an interesting

7    question of statutory interpretation.  Your clients, all of

8    your clients, want the answer.  They're going to get the

9    answer by getting this case before the appropriate decision-

10   makers, me initially, the Board subsequently, and perhaps the

11   Circuit Court.

12        They're not going to get the answer in a fruitless,

13   expensive, and ultimately pointless argument over subpoenas.

14   So I urge you all to get yourselves into the thought that

15   we're going to get this case tried and get an answer to an

16   entirely interesting and legitimate question about National

17   Labor Relations Act's language.  And then everyone in this

18   case, management and labor alike, can get on with their

19   lives, knowing where they stand.

20        All right.  Is there anything anybody needs to say

21   before we take a 30-minute recess?

22        MR. FRASER:  No, Your Honor.

23        **JUDGE BUXBAUM:  Very well.  We will resume, then, at**

24   **10:40 -- 10:45.**

25   **(Off the record.)**

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

1        **JUDGE BUXBAUM:  We are back on the record.**

2        As I indicated, what I'd like to do, unless any of the

3   lawyers feel strongly otherwise, is proceed with opening

4   statements, particularly since, to some extent, I agree with

5   what I think it's fair to say has been Mr. Fraser's sort of

6   frustration that he'd like to hear a clear statement of the

7   government's theory of this case.  And I think that that

8   would help us all, not only in terms of preparing to evaluate

9   and understand the witnesses' testimony, but also frankly on

10  some of these side issues.

11       So I assume, Mr. Carlson, you were going to make an

12  opening statement.  I sure hope so.

13       MR. CARLSON:  Yes, Your Honor.

14       JUDGE BUXBAUM:  And let me invite you to do that,

15  please.

16       MR. CARLSON:  Okay.  Thank you, Your Honor.

17       Judge, on August 4, 2008, Respondent discharged every

18  bargaining unit employee at its Bronson, Michigan facility,

19  145 employees, assertively for engaging in a strike without

20  providing 8(d)(3) notice.

21       The General Counsel alleges that Respondent unlawfully

22  discharged the former strikers, 116 of the employees, after

23  it reemployed them within the meaning of Section 8(d) of the

24  Act, in other words, after the former strikers had regained

25  their protected status.

1        Specifically, the evidence will show that, upon

2    discovering its 8(d)(3) notice error, the Union made an

3    unconditional offer to return to work, ending its strike.   In

4    response, the Company locked out the employees in support of

5    its bargaining position.

6        Over the next three months, the parties bargained, the

7    Company made assurances that the locked out employees would

8    be returned to work once the parties reached agreement and

9    otherwise treated the employees as reemployed vis-a-vis

10   unemployment benefits, vis-a-vis access to their 401(k)

11   accounts.

12       Now, when the Union refused to capitulate after three

13   months of bargaining, after exchanging proposals, after these

14   assurances about returning to work, when the Union refused to

15   capitulate to the Company's bargaining demands, the Employer

16   seized on the Union's 8(d)(3) notice mistake, a mere clerical

17   error, and fired the locked out employees, many of whom had

18   worked for the Company for 20, 30, and in one case, nearly 50

19   years.

20       JUDGE BUXBAUM:  But, Mr. Carlson, you're not arguing

21   from a legal point of view that the fact that this may have

22   been a mere clerical error somehow renders the applicability

23   of 8(d) different than it would be if it had been an

24   intentional example of misconduct?

25       MR. CARLSON:  I think, under existing law, under

1    <u>Bogosian</u>, I think the <u>Bogosian</u> case is that -- I think that

2    the majority in <u>Bogosian</u> said that a clerical error -- that

3    case said that it wouldn't make a difference.  I think that

4    is the existing --

5         JUDGE BUXBAUM:  That it would or would not?

6         MR. CARLSON:  -- that is existing law.  That it would

7    not make a difference.

8         JUDGE BUXBAUM:  Right, okay.  All right.

9         MR. CARLSON:  That's existing law, yes, Your Honor.

10        JUDGE BUXBAUM:  You're not arguing for a change in that

11   law, are you?

12        MR. CARLSON:  No, Your Honor.

13        JUDGE BUXBAUM:  Okay.

14        MR. CARLSON:  Significantly, Your Honor, Respondent did

15   not just fire the former strikers on August 4, it fired every

16   -- as I said, it fired every single bargaining unit employee,

17   including several employees who were on layoff or approved

18   leave status during the strike.  And it is the General

19   Counsel's position that these employees did not engage in a

20   strike and never lost the protection of the Act.

21        Finally, the evidence will show, in the aftermath of

22   it's unlawful discharges, Respondent unlawfully withdrew

23   recognition and refused to bargain with the Union in the

24   absence of an actual loss of majority status.  Now, Judge, as

25   you've --

1        JUDGE BUXBAUM:  And this is a subsidiary claim, right?

2    Because, in other words, if the Company lawfully discharged

3    the employees, then there would have been a loss of majority

4    status and there wouldn't have been an 8(a)(5) violation in

5    that regard, right?

6        MR. CARLSON:  Not necessarily, Judge, because I think

7    you can't presume even the replacement employees -- at the

8    point all the other employees, the locked out employees are

9    discharged, there's no one to take their place.  Those

10   employees are no longer temporary employees, they're

11   permanent employees, and there's no loss of -- the Employer

12   can't presume that there's no majority status for that group.

13       JUDGE BUXBAUM:  So that the Employer, in other words,

14   would have to have some evidence of that?

15       MR. CARLSON:  That's correct.

16       JUDGE BUXBAUM:  Okay.

17       MR. CARLSON:  That's correct.  Judge, as you've noted,

18   this is a case involving interpretation of Section 8(d),

19   specifically, what it means to be reemployed.  What we say

20   that means, what the General Counsel says that means, is not

21   rehire, not reinstate, reemploy.  Just as the statute says,

22   employees lose their protected status.  They lose their

23   status as employees for purposes of Sections 8, 9, and 10.

24       Re-employ means to bring back within the protective

25   mantle of the Act, to bring back within the protection of

1   Section 8, 9, and 10.  Locked out employees -- when the

2   Employer locked the employees out, that's what it did, it

3   brought them back in.  Locked out employees have Section 8

4   rights.  Locked out employees have Section 9 rights.  They're

5   the only employees who can go to the decertification

6   election.  They have Section 9 rights.  Locked out employees

7   cannot be permanently replaced.

8       These are all well-established tenets of the law.  The

9   Employer here, when it locked out these employees, it brought

10  them back within the protective mantle, and when it bargained

11  with them for the next three months, it showed that they had

12  been brought back within the protective mantle of the Act.

13      And that's the General Counsel's position with respect

14  to those employees.  Thank you, Judge.

15      JUDGE BUXBAUM:  Mr. McKnight, do you wish to be heard by

16  way of opening statement?

17      MR. McKNIGHT:  I would just add a couple very brief

18  comments.  With respect to repudiation of the collective

19  bargaining relationship, the facts will show that, even

20  subsequent to the repudiation that occurred on August 14th,

21  the Employer continued to maintain that the workers in the

22  facility were temporary.  And there is, in fact, no basis

23  whatsoever for the withdrawal of recognition and the

24  repudiation of the bargaining relationship.  There were at

25  least 30 laid-off bargaining unit employees entitled to

1    recall, had they not been fired.

2        So we do not even --

3        JUDGE BUXBAUM:  What do you mean by that?  Explain what

4    you mean by that.  In other words, how do you -- why 30 as

5    opposed to 100 or 10 or --

6        MR. McKNIGHT:  115 employees, approximately, were

7    actively working on May 1.

8        JUDGE BUXBAUM:  I see, okay.  I see.

9        MR. McKNIGHT:  And 30 were on layoff, and an unspecified

10   number were on sick leave.

11       JUDGE BUXBAUM:  That's what I didn't understand.

12       MR. McKNIGHT:  All of those were entitled to recall, and

13   all of them were discharged.

14       Furthermore, the common denominator amongst those

15   employees is their membership in the Union.

16       JUDGE BUXBAUM:  Well, you raise a good point that I

17   wanted to address with all three of you, and that is,

18   Mr. Fraser, I think, says it this way in his summary judgment

19   motion.

20       "Because employees lose all protections under the Act

21   when the Union fails to give the required notice, 'Even

22   unlawfully motivated adverse action against the employees

23   cannot be redressed under the Act, and traditional inquiries

24   into the presence of anti-union animus do not apply.  The

25   Employer's motive in discharging strikers is not a relevant

1  consideration in cases where the Union has failed to give

2  appropriate 8(d) notice.'"

3      I guess I want your understanding, both of you, as to

4  whether you agree with that proposition?  In other words,

5  that this is not a case in which -- like a Wright Line case,

6  the Employer's motivation is going to be material?

7      MR. CARLSON:  I would like to address that.  I think

8  that's a very significant point.  First of all, I want to say

9  that I agree with what Mr. McKnight said.  I mean, our theory

10  with respect to withdrawal of recognition is consistent with

11  what Mr. McKnight said with respect to the 30 employees on

12  leave.

13      With respect to your question about motive, the General

14  Counsel believes that there are multiple theories of

15  liability in this case.  Number one with respect to the

16  reemployment question, we say that these employees could not

17  be fired for going on strike because they had been

18  reemployed.  That, in and of itself, firing for the strike,

19  was illegal.  With respect to the 30, they did not --

20      JUDGE BUXBAUM:  And it was illegal regardless of

21  motivation.

22      MR. CARLSON:  That's correct.  If the motivation --

23  exactly.  The admitted motivation -- the striking, yes,

24  regardless of motivation.

25      Beyond that, as Mr. McKnight mentioned, the common

1    denominator here is that everyone in the Union was fired.

2    They fired all employees, those employees who engaged in the

3    strike, those employees who did not.  Just as in the Freeman

4    case, we believe that activity was inherently destructive.

5    That's another theory of liability here.

6        On top of that --

7        JUDGE BUXBAUM:  But, again, now, inherently destructive,

8    meaning that motivation is unimportant, immaterial?

9        MR. CARLSON:  That's correct.

10       JUDGE BUXBAUM:  Okay.

11       MR. CARLSON:  With respect to motivation, though, we

12   also think that there is another theory of liability here

13   which is a Wright Line theory, which would be that the

14   8(d)(3) notice was a pretext, and it was a pretext because

15   with the actual motivation being that the Union did not

16   capitulate to the Employer's bargaining demands.  They

17   bargained for three months.  They didn't get fired after the

18   strike.  They got fired after three months of bargaining,

19   when the Union didn't agree to their demands, which was also

20   argued and found as a basis in the Freeman case.

21       JUDGE BUXBAUM:  But if -- you agree, do you not, that if

22   the Company was justified under 8(d) in discharging these

23   employees, then it doesn't matter that they did so gleefully

24   because they wanted to get rid of a union that had aggravated

25   them?

1      MR. CARLSON:  I think, in that instance, under a Wright

2  Line theory, reemployment would be a threshold issue.  And

3  that's correct.  If you were to find that they were not

4  reemployed, we don't get to Wright Line.  I think that's

5  right, Judge.

6      JUDGE BUXBAUM:  Okay.  All right.  That helps.  That

7  helps.

8      Mr. McKnight, did I cut you off?  If I did, I want to

9  have you continue.

10      MR. McKNIGHT:  Well, you didn't cut me off, but I was

11  going to make one other brief observation here, and that is

12  that I don't really feel a need or wish to express a position

13  about whether or not motivation counts during the pendency of

14  a strike in violation of 8(d).  I understand, generally

15  speaking, due to a clerical error, the Employer has an

16  exemption from the application of the statute during the

17  pendency of that event.

18      But, here, the Union took and the employees took the

19  action they could to cure that defect.  And motivation may be

20  a contributing factor after that because they took all the

21  action they could to cure that defect by offering to return

22  to work unconditionally.

23      And I think, just for the record, I want to make one

24  little observation about that clerical error.  During

25  pretrial, I suppose, exchange of subpoenas, counsel for

1   Respondent served 14 subpoenas and, due to an apparent

2   clerical error, failed to tender witness fees on any of those

3   individuals.  We resolved that clerical error by the untimely

4   tendering of witness fees.

5       That concludes my comments at this time.

6       JUDGE BUXBAUM:  All right.  Thank you.

7       As you know, Mr. Fraser, you can either make an opening

8   statement at this time, or you can reserve it.  Obviously,

9   it's your choice.

10      MR. FRASER:  We will reserve.  Thank you.

11      JUDGE BUXBAUM:  All right.  I will say this, that --

12      MR. CARLSON:  Judge, Judge, could I just briefly amend

13  my opening statement, very briefly?

14      JUDGE BUXBAUM:  Sure.

15      MR. CARLSON:  I guess I just want to make this point

16  clear, too, and just so you have a better sense of what I

17  think is really at issue with the trial.  I think that -- we

18  anticipate that there's going to be testimony that the

19  Employer took actions in this case to reserve its rights with

20  respect to discharge of the employees.

21      Two points on that.  First of all, any reservation of

22  so-called rights we believe was not timely.  It was done

23  after the lockout.  And I think it's clear under the

24  Fairpreen (ph.) case that an employer can reemploy employees

25  even if it doesn't know about the 8(d)(3) notice.  I think

1   the Fairpreen case is very clear on that, number one.

2        Number two, we don't think this case is about any right

3   of the Employer.  This isn't about an employer's right.  We

4   think this case is about the employees' rights.

5        JUDGE BUXBAUM:  Well, of course, you would, Mr. Carlson,

6   wouldn't you?

7        MR. CARLSON:  I just wanted to make that point about the

8   reservation of rights, which I think is a significant issue

9   in this case.

10        JUDGE BUXBAUM:  Yeah, no, no, I appreciate it.  I

11   appreciate it.

12        Mr. Fraser, does that amendment to the opening statement

13   change your view of when you want to give yours?  I'm not

14   hinting at anything because the fact is that, unlike the

15   usual case, your motion, which I took the liberty over that

16   half-hour period to read even more carefully, certainly gives

17   me a good idea of the Company's position, but --

18        MR. FRASER:  No, Your Honor --

19        JUDGE BUXBAUM:  All right.

20        MR. FRASER:  -- nothing that Mr. Carlson has indicated

21   or added changes my position on when we'd like to make our

22   opening statement.

23        JUDGE BUXBAUM:  Let me draw one other thing to your

24   attention.  Sometimes, in the heat of trial, I might forget

25   to invite your opening statement at the conclusion of their

 1  cases.  If that should happen --

 2       MR. FRASER:  I'll be sure and --

 3       JUDGE BUXBAUM:  Yes, please pipe up.  All right.

 4       MR. FRASER:  Rest assured we will, Your Honor.

 5       JUDGE BUXBAUM:  Good.

 6       Then, Mr. Carlson, I think we're ready for you to

 7  proceed.

 8       MR. CARLSON:  I have a couple of stipulated exhibits

 9  that I'd like to put in, Judge, that I've had a chance to

10  discuss with counsel, and we've collaborated on in

11  preparing -- do we want to call this Joint Exhibit 1?

12       MR. McKNIGHT:  Sure.

13       MR. FRASER:  We've got ALJ-1, we have GC-1.

14       JUDGE BUXBAUM:  That's right.

15       MR. FRASER:  Joint 1 would be fine.

16       JUDGE BUXBAUM:  All right.  Well, you've all already

17  taught me -- I did come up with a new witness list -- or, I

18  mean, exhibit list form to keep track of the exhibits, and I

19  forgot both an ALJ category and a Joint category.  So the

20  next edition will have.

21       MR. CARLSON:  Your Honor, I'm going to offer into

22  evidence at this time Joint Exhibit 1.  This is a list of

23  bargaining sessions, bargaining meetings, that took place

24  between the parties --

25       MR. FRASER:  May I interrupt?  I'm sorry to do that.

1   There's an issue that's just come to my attention, and I'm

2   trying to scroll through an e-mail.  May I take three minutes

3   to look at this?  It relates to what I perceive is going to

4   happen here momentarily with the presentation of evidence.

5   If I can have three minutes to work through this, please?

6       **JUDGE BUXBAUM:  All right.  We'll resume at 11:15.**

7   **(Off the record.)**

8       JUDGE BUXBAUM:  You were, Mr. Carlson, discussing a

9   proposed Joint Exhibit 1.

10      MR. CARLSON:  Yes, Your Honor.  This is a list of

11  bargaining meetings that took place between the parties

12  between May 5, 2008 and August 14, 2008.  The first page is a

13  list of the individuals who participated in those meetings

14  and on whose behalf or who they represented.  So we have the

15  Union bargainers, the Company bargainers, and then the

16  mediators that were present during those sessions.

17      And then, on page -- the second and third pages of this

18  document are each session and who was present for whom.  And

19  we would offer this as Joint Exhibit 1 at this time.

20      JUDGE BUXBAUM:  Mr. McKnight, have you had a chance to

21  look it over?

22      MR. McKNIGHT:  Yes.

23      JUDGE BUXBAUM:  Agreeable to you?

24      MR. McKNIGHT:  Yes.

25      JUDGE BUXBAUM:  Mr. Fraser, have you had a chance to

1  look it over?

2      MR. FRASER:  That's okay.  Mr. Carlson and I spoke about

3  this document prior to coming to an agreement on the

4  stipulation, and the only exception that we have -- and I

5  think Steve and I worked out a means of dealing with that.

6      **JUDGE BUXBAUM:  Let's go off the record a moment.**

7  **(Off the record.)**

8      MR. FRASER:  Mr. Carlson and I worked out a means of

9  dealing with that.  There is one date, June 2, 2008,

10  negotiations, where, in the Company section, it lists

11  Mr. Glen Kirk as one of the witnesses, and there is a dispute

12  as to whether or not Mr. Kirk was, in fact, at the June 2,

13  2008 meeting.

14      So other than that factual issue in this document, it is

15  a stipulated document, but we would reserve to provide

16  testimony related to June 2 and Mr. Kirk's attendance.

17      JUDGE BUXBAUM:  All right.  In other words, the record

18  right now is absolutely neutral on whether Mr. Kirk was

19  present, and I will have to -- if it's material, I'll have to

20  come up with a conclusion based on evidence apart from this

21  document as to whether he was present.

22      MR. FRASER:  Yes, that's correct, Your Honor.

23      JUDGE BUXBAUM:  All right.  And other than that, Joint

24  Exhibit 1 is agreeable to the Respondent?

25      MR. FRASER:  Yes, it is.

1    JUDGE BUXBAUM:  Then Joint Exhibit 1 will be received

2    with this proviso regarding Mr. Kirk's presence at

3    negotiations on June 2nd, 2008.

4    **(Joint Exhibit 1 marked for identification and received into**

5    **evidence.)**

6    JUDGE BUXBAUM:  Mr. Carlson?

7    **(General Counsel's Exhibit 48 marked for identification.)**

8    MR. CARLSON:  Yes, Your Honor.  I have one more exhibit

9    that I would like to enter that we've discussed a stipulation

10   on, and that is a list of employees and their status.  And

11   I'll distribute that now.  It's marked for evidence as

12   General Counsel's Exhibit 48.

13   JUDGE BUXBAUM:  So you want to keep it with that number

14   as opposed to a joint --

15   MR. CARLSON:  Your Honor, I went ahead and premarked

16   everything --

17   JUDGE BUXBAUM:  That's fine.  No, that's not a problem.

18   MR. CARLSON:  -- in the interest of trying to get things

19   moving, so most of the exhibits won't be in this strange

20   order, but this one just happens to be.

21   JUDGE BUXBAUM:  That's not a problem.  And let me say

22   this to all of you.  I don't mind that exhibits are in

23   strange order as long as they're all accounted for on the

24   record.  It doesn't matter to me if there's no Exhibit 13

25   or -- it does matter if there are two Exhibits 13.  Let's not

1  do that.

2      All right.  So this is General Counsel 48 for

3  identification.  And, again, Mr. McKnight, have you seen it?

4      MR. McKNIGHT:  Yes.

5      JUDGE BUXBAUM:  Is it agreeable to you?

6      MR. McKNIGHT:  Yes.

7      MR. CARLSON:  I'm sorry, Your Honor, there's some

8  corrections to this, as well.  Nothing's easy.

9      JUDGE BUXBAUM:  Okay.  Yeah.

10      MR. CARLSON:  Okay.  There is one correction to make to

11  this and a note.

12      JUDGE BUXBAUM:  All right.

13      MR. CARLSON:  The correction is on the second page, near

14  the middle of the page.  And I apologize, I should have done

15  this before.  The employee -- her last name is Schorey.  Her

16  employee number is 511, and she's almost exactly in the

17  middle of the page.  Her name is Marcy Schorey.  And this

18  is -- she should have an SL next to her name, which would

19  indicate that she was on sick leave.

20      JUDGE BUXBAUM:  In other words, there are others on this

21  list that have that?  Where would I find that?

22      MR. McKNIGHT:  Gordon Diamond up above, Your Honor.

23      JUDGE BUXBAUM:  Oh, okay, it's over here.  I got it.  So

24  that's where it needs to be written in.

25      MR. CARLSON:  I'm sorry, Your Honor.  I should have

1  marked this --

2      JUDGE BUXBAUM:  SL, and is there a date you're going to

3  provide?

4      MR. CARLSON:  No, no.  The date with respect to

5  Mr. Diamond I think is the date he went on sick leave, and I

6  don't think that's relevant for our purposes --

7      JUDGE BUXBAUM:  So you're saying Ms. Schorey was on sick

8  leave during all relevant times?

9      MR. CARLSON:  This is a list of employees and their

10 status as of May 1st, 2008, the day the strike began.

11     JUDGE BUXBAUM:  So you're saying that Ms. Schorey was on

12 sick leave on May 1st, 2008?

13     MR. CARLSON:  That's correct.

14     JUDGE BUXBAUM:  Okay.  I take it it's your view, then,

15 that it doesn't matter when she went on sick leave?

16     MR. CARLSON:  That's correct.

17     JUDGE BUXBAUM:  Okay.  And do we need to know when

18 she -- well, no, we don't.  Strike that.  You said there was

19 a second thing?

20     MR. CARLSON:  Yes.  Well, let me do it this way.  First

21 of all, we're offering this as a list of employees and their

22 status with the Company as of May 1st, 2008.  On the first

23 page is a list of those employees who were on layoff.  The

24 box marked OCCDS is the layoff and the layoff date of those

25 employees.

1     The second and third pages are the active employees,

2    with the exceptions of Gordon Diamond, where it's indicated

3    he was on sick leave, on page 2, as we've discussed; Marcy

4    Schorey, who was on sick leave, as we discussed.

5     And on the final page, near the bottom, one, two, three,

6    four, five, six employees up from the bottom on the final

7    page, Dusty Modert, who was on workers' comp and not actively

8    working in the facility as of May 1st.

9     JUDGE BUXBAUM:  Now, there are some other abbreviations

10   in that category, such as M-a-i-n-t and M-a-c-h.  Are those

11   significant?

12    MR. CARLSON:  I think those are classifications, for

13   lack of a better word.  Maintenance, perhaps, machine

14   repair --

15    JUDGE BUXBAUM:  So, yeah, that's what I would have

16   guessed, but all right.

17    MR. CARLSON:  And I think the D's and the I's refer to

18   direct and indirect labor.  Correct me if I'm wrong.

19    MR. FRASER:  I believe that that's accurate.

20    JUDGE BUXBAUM:  Okay, fine.  And I take it I don't need

21   to know all the ins and outs of that for this case?

22    MR. CARLSON:  No, sir.

23    JUDGE BUXBAUM:  Okay.

24    MR. CARLSON:  Not that I'm aware of.

25    JUDGE BUXBAUM:  So all of the employees on pages 2 and 3

1   were -- can I say as of April 30th, were working -- actively

2   working in the plant, except for two employees on sick leave

3   and one employee on workers' comp?

4       MR. CARLSON:  That's correct, with the following caveat.

5   The only person we don't agree on at this point is also on

6   the second page, approximately 10, 12 employees down from

7   Ms. Schorey, and her last name is Vickers, Beverly Vickers.

8   It's the Employer's position that she was --

9       JUDGE BUXBAUM:  Well, hold on.  I've got to find her

10  here.  I'm not finding her.

11      MR. CARLSON:  I'm sorry, sir.

12      JUDGE BUXBAUM:  On which page?

13      MR. CARLSON:  It would be the second page.

14      JUDGE BUXBAUM:  The second --

15      MR. CARLSON:  The second full --

16      JUDGE BUXBAUM:  Ah, ah, okay.

17      MR. CARLSON:  I'm sorry, yeah, it's the first page after

18  the page with the laid-off employees, with Gordon Diamond and

19  Marcy Schorey.

20      JUDGE BUXBAUM:  Okay.  Well, I'm still not finding it.

21  What's her number?

22      MR. CARLSON:  1500.

23      JUDGE BUXBAUM:  Okay.  I found it.

24      MR. CARLSON:  Okay.  And we don't agree, Your Honor, the

25  General Counsel and Respondent don't agree.  The Respondent's

1  position is that she was an active employee at that time.

2  The General Counsel's position was that she was not, that she

3  was excused from work, and we expect to prove that up.

4       JUDGE BUXBAUM:  When you say excused from work, sick

5  leave?

6       MR. CARLSON:  Yes, she had a doctor's excuse from work.

7       JUDGE BUXBAUM:  Okay.

8       MR. CARLSON:  That's right.

9       JUDGE BUXBAUM:  All right.  So you're offering General

10  Counsel's 48 as a stipulated list of employees.  The first

11  page, all employees who were on layoff status as of May 1st,

12  the second and third page, employees who were on active

13  status except for two persons on sick leave and one person on

14  workers' comp and one person, Ms. Vickers, whose status is in

15  dispute?

16       MR. CARLSON:  Correct, Judge.

17       JUDGE BUXBAUM:  Mr. McKnight, is that agreeable to you?

18       MR. McKNIGHT:  Yes.

19       JUDGE BUXBAUM:  And, Mr. Fraser, is that agreeable to

20  you?

21       MR. FRASER:  Yes, with all of those additional

22  stipulations, yes.

23       JUDGE BUXBAUM:  Then I will admit General Counsel 48

24  into evidence with the proviso in particular -- with

25  everything that we've discussed, but the proviso, in

1    particular, that it does not constitute any evidence tending

2    to resolve the dispute as to Ms. Beverly Vickers' status as

3    of May 1st.

4    **(General Counsel's Exhibit 48 received into evidence.)**

5        JUDGE BUXBAUM:  All right.  Mr. Carlson, what's next?

6        MR. CARLSON:  Judge, if I could have about two minutes,

7    and I'll try and keep to what Mr. Fraser --

8        JUDGE BUXBAUM:  Yeah, he set a standard now.

9        MR. CARLSON:  -- to kind of shift from preliminary stuff

10   to testimony, then if that would be great, we'll be ready to

11   go.

12       JUDGE BUXBAUM:  Sure.  We'll resume in -- I'm going to

13   give him three minutes, Mr. Fraser.

14       MR. FRASER:  That's great.

15   **(Off the record.)**

16       **JUDGE BUXBAUM:  We're on the record.**

17       Mr. Carlson, you may proceed.

18       MR. CARLSON:  Okay.  Your Honor, the General Counsel is

19   ready to call its first witness.

20       JUDGE BUXBAUM:  Very well.

21       MR. CARLSON:  The General Counsel calls Phil Winkle.

22       MR. FRASER:  Your Honor, as we do that, I'd like to

23   readdress, if I could, and point out a case on sequestration.

24   My understanding is that representatives of nonnatural

25   parties, essentially corporations, are excepted from

 1   sequestration.  There's <u>Greyhound Lines, Inc.</u>, 319 NLRB 554,

 2   1995, and the ALJ Bench Book at Section 10-400.  I know

 3   you've ruled on this.  I'm simply trying to reraise the

 4   issue.  And, no, I don't have the Bench Book --

 5        JUDGE BUXBAUM:  I do.  I do.

 6        MR. FRASER:  -- which is why I asked Steve because I'm

 7   not sure where it's at --

 8        JUDGE BUXBAUM:  I don't leave home without it.

 9        MR. FRASER:  I'm relying upon others who are smarter

10   than I am.

11        JUDGE BUXBAUM:  It's 10-400, okay.  Is there some

12   specific language you want to point me to?

13        MR. FRASER:  If I could see it, maybe I could.  I don't

14   know.

15        It's the second -- the third paragraph, Your Honor.

16        JUDGE BUXBAUM:  Yeah.  How does that help?

17        MR. FRASER:  Well, "and representatives of nonnatural

18   parties."  I guess there's exception for one designated

19   representative and an exception for representatives of

20   nonnatural parties, which I assume a corporation is.

21        JUDGE BUXBAUM:  But then it goes on to say, "As we read

22   Rule 615, Exemption 2 could limit a corporate Respondent to

23   its attorney and one other representative."  Isn't that what

24   we're doing here?

25        MR. FRASER:  It seems that that's correct, Your Honor.

1   As I said, I'm relying upon people smarter than me to send me

2   e-mails, and perhaps they got it wrong.  So thank you.

3        JUDGE BUXBAUM:  Sure.

4        All right.  Have we got the witness in the room?

5        MR. FRASER:  Yeah, we need to have Mr. Kirk --

6        JUDGE BUXBAUM:  Appreciate it.

7        MR. FRASER:  He may go into the -- see if he can go into

8   the waiting area.

9        JUDGE BUXBAUM:  Anyone else, as well, who is going to be

10  -- anticipates being a witness and is not a designated

11  representative should leave the room at this time.

12       MR. FRASER:  And the individual in the back of the room

13  I understand is an NLRB representative who is simply --

14       JUDGE BUXBAUM:  Not going to be a witness?

15       MR. CARLSON:  That's correct.

16       JUDGE BUXBAUM:  That's fine.

17       MR. FRASER:  Thank you.

18       JUDGE BUXBAUM:  Mr. Winkle, stay standing for a moment.

19       We are on the record, are we not?  Good.  All right.

20  (Whereupon,

21                    **PHILIP RAY WINKLE**

22  was called as a witness by and on behalf of the General

23  Counsel and, after having been first duly sworn, was examined

24  and testified as follows:)

25       JUDGE BUXBAUM:  Please be seated.  Would you please

1   state your name and spell your last name?

2        THE WITNESS:  Philip Ray Winkle, W-i-n-k-l-e.

3        JUDGE BUXBAUM:  Okay.  You may proceed, Mr. Carlson.

4   MR. CARLSON:  Thank you, Judge.

5                    **DIRECT EXAMINATION**

6   Q.   BY MR. CARLSON:  Mr. Winkle, are you currently employed?

7   A.   Yes, I am.

8   Q.   And by whom are you employed, sir?

9   A.   The International Union, United Automobile, Aerospace,

10  Agricultural Implement Workers of America, the UAW.

11  Q.   And how long have you been employed by the UAW?

12  A.   Since April 14th of 2001.

13  Q.   And what is your current position?

14  A.   I'm an international representative.

15  Q.   And how long have you held that position?

16  A.   Since April 14th of 2001.

17  Q.   And would you briefly describe for us what you do as an

18  international representative?

19  A.   As an international representative, I am assigned to

20  certain work sites and geographical areas to assist them in

21  their needs as far as negotiations, bargaining contracts,

22  handling of grievances, and arbitration cases.

23  Q.   Mr. Winkle, are you familiar with UAW Local 822?

24  A.   Yes, I am.

25  Q.   And how are you familiar with that local?

1    A.    That's one of my work site assignments.

2    Q.    And how long have you -- excuse me.  How long has the

3    Union represented employees at -- or who does Local 822

4    represent?

5    A.    Local 822 represents Bronson Autotech, in -- Douglas

6    Autotech in Bronson, Michigan.

7    Q.    Okay.  And how long has the Union represented the

8    employees at Douglas Autotech?

9    A.    Since -- I believe their charter was in April of 1941.

10    Q.    And how long have you been involved in representing

11    employees at Douglas Autotech on behalf of the international

12    union?

13    A.    Somewhere around March of 2002, I received that

14    assignment.

15        JUDGE BUXBAUM:  Am I understanding you, Mr. Winkle, that

16    all of the members of 822 are employees at Douglas Autotech?

17    In other words, does 822 have other companies --

18        THE WITNESS:  No, sir, that's it in its entirety.

19        JUDGE BUXBAUM:  Okay.  That helps me.  Thank you.

20    **(General Counsel's Exhibit 2 marked for identification.)**

21    Q.    BY MR. CARLSON:  Mr. Winkle, I'm handing you what I've

22    marked as General Counsel's Exhibit 2 and ask if you can

23    identify that document?

24    A.    Yes, I can.

25    Q.    What is that document?

1    A.    That's the last current agreement that was in place at

2    Douglas Autotech in Bronson, Michigan.

3    Q.    And it's a little bit fuzzy on this.  Can you tell us,

4    what's the effective date of that agreement?

5    A.    The effective date is May 1st of 2005.

6    Q.    Through what?

7    A.    Through April 30th, 2008.

8          MR. CARLSON:  We would offer General Counsel's 2.

9          JUDGE BUXBAUM:  Any objection?

10         MR. FRASER:  No.

11         JUDGE BUXBAUM:  Mr. McKnight, do you want me to inquire

12   of you each time the General Counsel proposes an exhibit, or

13   do you want to pipe up if you have a problem?

14         MR. McKNIGHT:  I'll pipe up.

15         JUDGE BUXBAUM:  Okay.  We'll do it that way.  But don't

16   be shy.

17         MR. McKNIGHT:  Okay.

18         JUDGE BUXBAUM:  All right.  Then, General Counsel's 2

19   will be received in evidence.

20   **(General Counsel's Exhibit 2 received into evidence.)**

21   Q.    BY MR. CARLSON:  Mr. Winkle, were there negotiations

22   that took place between the Union and the Company for a

23   successor agreement to General Counsel's Exhibit 2?

24   A.    Yes, there was.

25   Q.    And were you involved in those negotiations?

1  A.    Yes, I was.

2  Q.    And how were you involved?

3  A.    I was the lead spokesperson for the bargaining

4  committee.

5  Q.    Okay.  And were there other individuals involved in the

6  negotiations on behalf of the Union?

7  A.    Yes, there was.

8  Q.    Mr. Winkle, I'm going to hand you what has been entered

9  into evidence as Joint Exhibit 1.  Take a look at that

10  document.  And on the first page of that document, where it

11  says "union bargainers" --

12  A.    Yes.

13  Q.    -- do you recognize those as the individuals who

14  comprise the Union's bargaining committee?

15  A.    Yes, they are.

16  Q.    And where it says "company bargainers," do you recognize

17  those as the individuals who -- as individuals who were

18  involved in negotiations on behalf of the Company?

19  A.    Yes.  Yes, they are.

20  Q.    Okay.  And with respect to the individuals -- the

21  Company's individuals, those are the individuals who were

22  involved on behalf of the Company in the bargaining sessions

23  that occurred after May 1st of 2008?

24  A.    That's correct.

25  Q.    Okay.  And just for the judge's edification, let's go

1    through the Company bargainers and just give a brief

2    description.  Who is Daniel Cohen?

3    A.    Daniel Cohen, as far as I know, is the second law firm

4    that the Company hired to represent them.

5          JUDGE BUXBAUM:  So Mr. Cohen is an attorney that

6    represented the Company?

7          THE WITNESS:  Yes, sir.

8          JUDGE BUXBAUM:  Okay.

9    Q.    BY MR. CARLSON:  And who is Diane Hedgecock?

10    A.    She is secretary to the HR, human resource department,

11    Paul Viar.

12    Q.    Okay.  She worked for Douglas Autotech?

13    A.    Yes, she did.

14    Q.    Okay.  And who is Glen Kirk?

15    A.    Glen Kirk is chief financial officer for Douglas

16    Autotech.

17    Q.    And who is Bruce Lillie?

18    A.    Was the lead legal counsel for the Company in

19    negotiations.

20    Q.    And I think there's some evidence in the record to this

21    effect, but who is Paul Viar?

22    A.    Paul Viar is -- he has several titles.  I refer to him

23    as HR, our director of administration.

24    Q.    Very good.  Now, Mr. Winkle, when did the negotiations

25    begin for the successor agreement to General Counsel's 2?

1  When did those begin?

2  A.   We had an opening preliminary meeting on January the

3  24th of 2008.

4       MR. FRASER:  Your Honor, I'm going to object on the --

5  I'm not sure where this is going -- beyond some general

6  statement about negotiations, but we would object on the

7  basis of the time frame related to this matter as somewhere

8  beginning on or about May 1 of 2008.  It's not clear to me

9  that going back to rehash any bargaining sessions much before

10  that date makes much sense.  So I'm not sure if that was

11  simply a, "Gee, when did it start?" and we're not going to

12  talk about the --

13       JUDGE BUXBAUM:  Well, let's wait and see.  Let's find

14  out.

15       MR. FRASER:  Understood.

16  **(General Counsel's Exhibit 5 marked for identification.)**

17  Q.   BY MR. CARLSON:  Mr. Winkle, I'm going to hand you what

18  I've marked as General Counsel's Exhibit 5.  Take a look at

19  that document.  Have you had a chance to review that?

20  A.   Yes, I have.

21  Q.   What is that document?

22  A.   This document is a 60-day notice to the Employer to --

23  that the Union seeks to modify or terminate the agreement to

24  open up negotiations for wages, fringe benefits, and

25  contractual language.

1   Q.   All right.  Is this a document that you gave to the

2   Company at some time?

3   A.   Yes, it is.

4   Q.   When did you give it to the Company?

5   A.   On February the 19th of 2008.

6   Q.   And how did you give it to the Company?

7   A.   I hand-delivered it.

8   Q.   And to whom did you hand-deliver it?

9   A.   To Paul Viar.

10      JUDGE BUXBAUM:  I'm sorry.  What date was that, again,

11  that you did that?

12      THE WITNESS:  February the 19th.

13  Q.   BY MR. CARLSON:  And do you see Mr. Viar's signature on

14  that document anywhere?

15  A.   Yes, I do.

16  Q.   And can you point out for the judge where you see his

17  signature?

18  A.   Right here.

19      JUDGE BUXBAUM:  In the lower right hand?

20      THE WITNESS:  Yes, sir.

21  Q.   BY MR. CARLSON:  And how do you know that's his

22  signature?

23  A.   He signed it in front of me.

24      MR. CARLSON:  We'll offer General Counsel's Exhibit 5 at

25  this time.

1       JUDGE BUXBAUM:  Any objection?

2       MR. FRASER:  No.

3       JUDGE BUXBAUM:  It'll be received.

4    **(General Counsel's Exhibit 5 received into evidence.)**

5    Q.   BY MR. CARLSON:  Mr. Winkle, explain for us, why did you

6    give this document to the Company, why a 60-day notice?

7    A.   Normally, we give a 60-day notice because most contracts

8    have language in them that, if either party doesn't give a

9    60-day notice to terminate the agreement, that the contract

10   would automatically roll status quo for a year.

11   Q.   Was there any such language in General Counsel's Exhibit

12   2?

13   A.   Yes, there is.

14   Q.   Mr. Winkle, I'm going to direct your attention now to

15   April 30th of 2008, the expiration date for the contract, as

16   you've testified.  Tell us, where were the parties at in

17   terms of negotiating a new agreement?

18   A.   We weren't very successful in negotiating a new

19   agreement.  We had only tentatively agreed at that point to

20   one specific article.

21   Q.   And what was that?

22   A.   What we refer to as V-Cap check-off.

23   Q.   Okay.  Briefly, what's V-Cap check-off?

24   A.   The law prohibits the Unions from using dues dollars to

25   make political contributions, but employees can voluntarily

1    offer part of their wages, and the Company just agrees to

2    deduct those contributions from the check and turn them over

3    to the Union through payroll deduction.  That's called V-Cap

4    check-off.

5    Q.    And no tentative agreements on any other subject?

6    A.    No, sir.

7    Q.    Did there come a time when the Union called a strike?

8    A.    Yes, sir.

9    Q.    And when did the Union call a strike?

10   A.    On May 1st of 2008.

11   Q.    And why did the Union call a strike?

12   A.    Because we had bargained to the expiration date of the

13   contract and weren't successful.

14         JUDGE BUXBAUM:  Is it in dispute, gentlemen, that this

15   is an economic strike?  Nobody contends it's anything else,

16   do they?  Mr. McKnight and Mr. Fraser?

17         MR. FRASER:  No.

18         JUDGE BUXBAUM:  Okay.  Good.  All right.  Just want to

19   be sure -- that helps.  Go ahead, counsel.

20   Q.    BY MR. CARLSON:  You can continue, Mr. Winkle.  Why did

21   the Union call a strike?

22   A.    Because we had -- the contract that expired, we hadn't

23   settled any issues, and we called a strike to put leverage on

24   the Company to get our just demands.

25   Q.    Did you notify the Company that you were going on

1  strike?

2  A.   Yes, we did.

3  Q.   And how did you notify the Company?

4  A.   By a handwritten letter.

5  **(General Counsel's Exhibit 6 marked for identification.)**

6  Q.   BY MR. CARLSON:  Mr. Winkle, I'm going to hand you now

7  what I've marked as General Counsel's Exhibit 6 and ask you

8  to take a look at that document.

9  A.   Okay.

10  Q.   Do you recognize that document, Mr. Winkle?

11  A.   Yes, I do.

12  Q.   And what is that document?

13  A.   This is the handwritten letter that we presented to

14  Mr. Paul Viar.

15  Q.   Okay.  Did you write that letter?

16  A.   No, I did not.

17  Q.   Do you know who wrote the letter?

18  A.   Yes.  Mary Ellis.

19  Q.   And how do you know she wrote that letter?

20  A.   She wrote it in front of me.

21  Q.   And how did you give this notice to the Company?

22  A.   We hand-delivered it.

23  Q.   Okay.  And to whom did you deliver it?

24  A.   To Paul Viar.

25  Q.   And when you say "we hand-delivered it," to whom are you

1  referring?

2  A.    Those names that's on the signature:  myself, Mary

3  Ellis, the local president, and Frank Gruza, the local vice

4  president, walked to the facility to hand-deliver it to

5  Mr. Viar, but we were stopped by guards, and the guard

6  escorted us into Mr. Viar's office and he told us to come in.

7  Q.    Okay.  And who was present in Mr. Viar's office when you

8  went in?

9  A.    Just himself.

10  Q.    Okay.  And you were there, and Mr. Gruza, and Ms. Ellis;

11  is that correct?

12  A.    Yes, sir.

13  Q.    Okay.  And what was said?

14  A.    We said that, "We want to officially inform you that we

15  are going on strike as of 12:01, May 1st.  We'll officially

16  notice and hand you this document."  And he asked at that

17  point if Frank Gruza, who was an ex-maintenance employee,

18  could help shut the plant down, and I asked him how long that

19  would take, and he said approximately a half hour, and I said

20  yeah, I have no problems.  And Frank went to assist the

21  maintenance in securing the plant, and we left.

22  Q.    And we left.  And you and Mary left?

23  A.    Yeah, Mary Ellis and myself left.

24      MR. CARLSON:  Very good.  We would offer General

25  Counsel's Exhibit 6 at this time.

1        JUDGE BUXBAUM:  Any objection?

2        MR. FRASER:  No objection.

3        JUDGE BUXBAUM:  It'll be received.

4    **(General Counsel's Exhibit 6 received into evidence.)**

5    Q.   BY MR. CARLSON:  And, Mr. Gruza (sic), you testified

6    that you encountered a security guard when you went to

7    deliver this letter.  Are there normally security guards at

8    Douglas Autotech?

9    A.   No, there's not.

10   Q.   Had you ever seen a security guard at Douglas Autotech

11   prior to that occasion?

12   A.   No, I had not.

13   Q.   All right.  Mr. Winkle, do you know what an 8(d)(3)

14   notice is under the National Labor Relations Act?

15   A.   Yes, I do.

16   Q.   Okay.  And prior to the strike, did you take steps to

17   file an 8(d)(3) notice?

18   A.   Yes, I did.

19   Q.   Okay.  Tell us, what steps did you take?

20   A.   When we filed the 60-day notice, I instructed the

21   secretary to get prepared the 60-day notice and, also, to

22   file the 30-day notice at the same time, so we could get it

23   filed.

24   Q.   And after the strike began, did there come a time

25   when --

1        JUDGE BUXBAUM:  Well, now, you've used two different

2    terms.  Mr. Carlson was asking you about something he called

3    an 8(d)(3) notice, and you just used the term "a 30-day

4    notice."  In your mind, are those one and the same?

5        THE WITNESS:  Yes, sir.

6        JUDGE BUXBAUM:  Okay.  Just want to be clear.

7    Q.   BY MR. CARLSON:  After the strike began, did there come

8    a time when it came to your attention that there might be an

9    issue with the Union's 8(d)(3) or 30-day notice?

10   A.   Yes, there did.

11   Q.   And when did that come to your attention?

12   A.   On May 2nd, on a Friday, approximately 2:30, 3:00 in the

13   afternoon, I got a phone call on my cell phone.

14   Q.   Okay.  And who was it who was calling you?

15   A.   A fellow international rep from the Jackson sub-regional

16   office in Jackson, Michigan, Gary Cline (ph.).

17   Q.   And what did Mr. Cline say --

18       MR. FRASER:  Objection, hearsay.

19       JUDGE BUXBAUM:  Sounds like it to me.

20   Q.   BY MR. CARLSON:  What did you do next after speaking

21   with Mr. Cline?

22   A.   I left the Union hall and went to the Jackson sub-

23   regional office.

24   Q.   And what did you do when you got there?

25   A.   Investigated through the secretary's files to help her

1  see if she could find the 8(d) notice.

2      JUDGE BUXBAUM:  So the secretary that you had referred

3  to earlier in your testimony worked in Jackson --

4      THE WITNESS:  Yes, sir.

5      JUDGE BUXBAUM:  -- at the office there?

6      THE WITNESS:  Yes, sir.

7      JUDGE BUXBAUM:  Okay.

8  Q.  BY MR. CARLSON:  And what did you discover?

9  A.  When I got there, when I walked in the office, she was

10  in tears.  She said she couldn't find the 8(d) notice.

11  Q.  Okay.  And what happened next?

12  A.  Gary Cline, who has been on staff for 24 years, said --

13      MR. FRASER:  Objection again, hearsay.

14      JUDGE BUXBAUM:  Sustained.

15  Q.  BY MR. CARLSON:  What did you do next?

16  A.  I caucused and decided that we needed to fix the

17  problem.

18  Q.  Okay.  Now, Mr. Winkle, did the Union ever file a notice

19  with FMCS?

20  A.  Yes, we did.

21  **(General Counsel's Exhibit 3 marked for identification.)**

22  Q.  BY MR. CARLSON:  Okay.  I'm handing you what I've marked

23  as General Counsel's Exhibit Number 3 and ask you to take a

24  look at that document.

25  A.  Yes, sir.

```
 1   Q.    Do you recognize that document?

 2   A.    Yes, I do.

 3   Q.    Okay.  And what is that?

 4   A.    That is the Form F-7, or the 8(d), or the 30-day notice,

 5   as I referred to it, that was filed.

 6   Q.    And who filed that notice?

 7   A.    My secretary.

 8   Q.    And at whose direction did she file it?

 9   A.    Mine.

10   Q.    And how was it filed?  What was the format?

11   A.    Electronically, over the internet.

12   Q.    And at that time, was that the normal procedure for

13   filing such notices?

14   A.    Yes, it was.

15   Q.    And when was that notice filed?

16   A.    May 5th, at 7:55 in the morning.

17   Q.    And is that indicated anywhere on the document?

18   A.    Yes, sir, at the top.

19   Q.    Okay.  And can you point out for the judge where that's

20   indicated?

21        JUDGE BUXBAUM:  Okay.  Not the first place you'd look.

22   Thank you.  Got it.

23        MR. FRASER:  I'm sorry, I didn't -- I was --

24        JUDGE BUXBAUM:  It's at the -- if you'll look underneath

25   the notice to mediation agency's title, it says date
```

1  submitted.  The very top.

2      MR. FRASER:  Thank you.

3      JUDGE BUXBAUM:  Be the last place I would look.

4      MR. CARLSON:  We'd offer General Counsel's Exhibit 3 at

5  this time.

6      JUDGE BUXBAUM:  Any objection?

7      MR. FRASER:  No objection.

8      JUDGE BUXBAUM:  It'll be received.

9  **(General Counsel's Exhibit 3 received into evidence.)**

10  Q.  BY MR. CARLSON:  Mr. Winkle, did you ever receive a

11  letter confirm -- from FMCS, confirming that they had

12  received this notice?

13  A.  Yes, we did.

14  **(General Counsel's Exhibit 11 marked for identification.)**

15  Q.  BY MR. CARLSON:  Okay.  I'm sorry.  I'm going to hand

16  you what I've marked as General Counsel's Exhibit 11.  Do you

17  recognize that document?

18  A.  Yes, I do.

19  Q.  What is that document?

20  A.  That's a document from the Federal Mediation Service,

21  assigning Dan Curry as a mediator to the case.

22      MR. CARLSON:  Okay.  We'd offer General Counsel's 11 at

23  this time.

24      JUDGE BUXBAUM:  You haven't given me a copy --

25      MR. CARLSON:  It's actually in the package --

1    JUDGE BUXBAUM:  It's in -- oh, okay, very good.  Yeah,

2  let me take a quick look --

3    MR. CARLSON:  And, Judge, I almost promise that, from

4  this point out, just about everything with respect to

5  Mr. Winkle is going to be in the package.

6    JUDGE BUXBAUM:  All right.  Very good.  General Counsel

7  11.  Let me locate it first.

8    Any objection to the receipt of General Counsel's 11?

9    MR. FRASER:  No objection.

10   JUDGE BUXBAUM:  It'll be received.

11  **(General Counsel's Exhibit 11 received into evidence.)**

12  **(General Counsel's Exhibit 10 marked for identification.)**

13   MR. CARLSON:  I'm going to propose a stipulation at this

14  time.  I've marked as General Counsel's Exhibit 10 an

15  identical letter that was sent to Mr. Viar on the same date.

16  We would offer this exhibit at this time.

17   JUDGE BUXBAUM:  Any objection to stipulating to the

18  authenticity and admissibility of General Counsel's Exhibit

19  10?

20   MR. FRASER:  No objection.

21   JUDGE BUXBAUM:  General Counsel's Exhibit 10 will be

22  received.

23  **(General Counsel's Exhibit 10 received into evidence.)**

24  Q.  BY MR. CARLSON:  Mr. Winkle, earlier in your testimony

25  you talked about, after you had discovered the notice, you

1    caucused and decided that you needed to fix it.  And what is

2    it that the Union decided to do?

3    A.   We decided to inform the top two elected officials of

4    the local --

5    Q.   And those -- I'm sorry.  Those are -- who are those

6    people?

7    A.   Mary Ellis is the local president, and Frank Gruza is

8    the local vice president.

9    Q.   Very good.  Continue.

10   A.   So we, myself and Gary Cline, went to the Union hall on

11   Saturday, met with those two individuals, informed them what

12   happened --

13        JUDGE BUXBAUM:  So that would have been on May 3rd?

14        THE WITNESS:  Yes, sir.  And so then we decided that we

15   need to have a membership meeting, and so we set about

16   posting at the local hall for a meeting Sunday at one

17   o'clock, and started calling those members that weren't there

18   present, so that we could have a membership meeting on

19   Sunday, May 4th.

20   Q.   BY MR. CARLSON:  And what was decided to do after that

21   meeting?

22   A.   After that meeting, it was voted on by the membership to

23   offer an unconditional offer to return to work.

24   **(General Counsel's Exhibit 7 marked for identification.)**

25   Q.   BY MR. CARLSON:  Mr. Winkle, I'm now going to hand you

1    General Counsel's Exhibit 7.  Take a look at that.  Do you

2    recognize that document?

3    A.    Yes, I do.

4    Q.    And what is that document?

5    A.    It's a letter to Paul Viar that the local

6    unconditionally was offering to come back to work.

7    Q.    Okay.  And did you author that document?

8    A.    Yes, I did.

9    Q.    Okay.  And I notice up there at the top, you have

10   handwritten in five.  Can you explain that?

11   A.    Yes.

12   Q.    I'm referring to the date, sir.

13   A.    Yes, yes, I can explain that.  Friday afternoon, on May

14   the 2nd, I had the secretary type this up in preparation to

15   give to Paul Viar, and I wanted to write the date in that I

16   handed it to him.  I didn't know what that would be at the

17   point it was typed up.

18   Q.    And did you give this document to the Company at any

19   time?

20   A.    I tried to.

21   Q.    Okay.  When?  When did you first try to give this

22   document to the Company?

23   A.    On Monday morning, May 5th, approximately 6:30 in the

24   morning.

25   Q.    Okay.  And what happened?

1    A.    We had the entire day shift employees at Douglas

2    Autotech report to the plant.  At that time, the Company was

3    bringing in the scabs in vans, and Paul Viar would be

4    riding -- because they were parking in another location, and

5    Paul was coming in with the scabs in a van, and I wanted to

6    hand it to him when he crossed the picket line.

7        MR. FRASER:  Your Honor, I'm going to object to the term

8    "scabs."  It seems to me that we might be able to use the

9    words "replacement workers" instead of "scabs," the

10   nonderogatory term.

11       JUDGE BUXBAUM:  Again, I agree that I'm going to expect

12   counsel to not use derogatory terms, but I think it's -- I'm

13   not going to censor the witness, unless a term is profane.

14       MR. FRASER:  Thank you, Your Honor.

15   Q.    BY MR. CARLSON:  Okay.  Continue, Mr. Winkle.

16   A.    And as the lead van came through the picket line, I had

17   this letter in an envelope with Paul Viar's name on it, and I

18   tried to flag him down as they came through the line, and

19   Paul was standing beside the driver, and he said for the

20   driver -- motioned the driver to keep going.

21   Q.    And what did you do next?

22   A.    Then myself and Gary Cline walked to the back entrance

23   of the plant, but we were stopped by security guards.

24   Q.    What did you do next?

25   A.    I asked the guard if I could speak to Mr. Viar and

1  deliver this letter to him, and he said no at first, and then

2  he called his supervisor, and I think his supervisor said

3  that -- came out and talked to us and said, "Mr. Viar is not

4  accepting any documents.  Put it in the mail," and ordered us

5  off the property and we left.

6  Q.   And what did you do next?

7  A.   We left, and then I had the secretary at the office --

8  Q.   When you say "we," you're referring to whom?

9  A.   Gary Cline and myself.

10  Q.   And what did you do next?

11  A.   We left and went back to the Union hall.  I called the

12  Jackson subregional office.  I had the secretary standing by,

13  and I had her fax it to the HR facility around a little after

14  seven that morning, on the 5th of May --

15  Q.   What HR facility?

16  A.   Douglas Autotech, to Paul Viar's fax machine.

17  Q.   And at approximately what time?

18  A.   It was around a little after seven.

19       MR. CARLSON:  We're going to offer General Counsel's

20  Exhibit 7 at this time.

21       JUDGE BUXBAUM:  Any objection?

22       MR. FRASER:  No objection.  Thank you.

23       JUDGE BUXBAUM:  Exhibit 7 will be received.

24  **(General Counsel's Exhibit 7 received into evidence.)**

25  Q.   BY MR. CARLSON:  Who was present at the plant that

1    morning, in addition to you and Mr. Cline, outside of the

2    plant?  Who was there?

3    A.    The entire committee and the entire day shift and some

4    other strikers that were on second shift.

5    Q.    Why was the entire day shift there?

6    A.    We were there, ready, in case the Company said come on

7    back to work, and we wanted to be able to report to work.

8    Q.    So you faxed General Counsel's Exhibit 7.  What happens

9    next?

10   A.    Around 7:20 to 7:30, I received a phone call on my cell

11   phone from Bruce Lillie.

12   Q.    And did you speak with Mr. Lillie?

13   A.    Yes, I did.

14   Q.    And who participated in the telephone conversations?

15   A.    Just he and myself.

16   Q.    And what was said?

17   A.    He said, first of all, he said, "Hey, Phil, what's going

18   on down there?"  And I said, "What do you mean?"  And he

19   said, "Well, you guys trying to come back to work?"  And I

20   said, "Yes, we've offered an unconditional offer to come back

21   to work."  And he said, "Well, that's not like the Union.

22   When you go on strike, you guys are supposed to be out for

23   the long haul."  And I said, "No, we want to come back to

24   work, and we want to come back unconditionally."  And he

25   said, "Well, I'll have to get back with you on that," and the

1   conversation ended.

2   Q.   All right.  And was anything else said during that

3   conversation?

4   A.   No.

5   Q.   And did he get back with you?

6   A.   Yes, he did, and --

7   Q.   And when did he get back with you?

8   A.   It was about three hours later, ten-something, 10:20,

9   10:30 in the morning.  He called back and said, "Phil, would

10  you gather up the committee, the entire bargaining committee,

11  and be willing to come to East Lansing, to the Marriott

12  Hotel, for a meeting at six o'clock?"  And I said, "Yes, we

13  can do that."

14  Q.   Okay.  And did you attend that meeting?

15  A.   Yes, I did.

16  Q.   Okay.  And did anyone come with you to that meeting?

17  A.   Yes, the bargaining committee.

18  Q.   And what time did you arrive there?  What time did you

19  and the bargaining committee arrive?

20  A.   We arrived a little bit before six, maybe 5:45,

21  something like that.

22       JUDGE BUXBAUM:  And, again, this is May 5th?

23       THE WITNESS:  May 5th, yes, sir.

24  Q.   BY MR. CARLSON:  And what happened when you arrived?

25  A.   I called Bruce on the cell phone, and he said, "Phil,

1  we're not quite ready for you yet."  You know, I told him we

2  were in the lobby.  He said, "Just make yourself at home, and

3  if you'll just hang around, I'll come down and get you when

4  we're ready," and I said okay.  So we waited till he came

5  down.

6  Q.   And did he come down?

7  A.   Yes, he did.

8  Q.   Okay.  And what happened next?

9  A.   He came down and said, "Would you follow me to the

10  meeting room?"  And so the committee and I went into the room

11  they had there, and we sat down at a big, long table, and the

12  entire committee sat around that table, and then Paul Viar

13  was there, Glen Kirk and Bruce Lillie, and they started

14  passing out a document to each one of us.

15  **(General Counsel's Exhibit 8 marked for identification.)**

16  Q.   BY MR. CARLSON:  Okay.  Now, I'm going to hand you what

17  I've marked as General Counsel's Exhibit 8 and ask you to

18  take a look at that document.

19  A.   Okay.

20  Q.   Do you recognize that document?

21  A.   Yes, I do.

22  Q.   Okay.  And what is that?

23  A.   That's the document that was presented to us on the

24  night of May 5th, in East Lansing.

25  Q.   Okay.  And I notice there's an attachment to that

1  document.  Is that the form that it was in when you received

2  it on May 5th?

3  A.  Yes, sir.  There was a stapled -- it was called a

4  synopsis/general proposal, or something of that nature,

5  contract behind, stapled to it.

6      JUDGE BUXBAUM:  And that's a 15-page document?

7      MR. CARLSON:  That's correct, Judge.

8      We're going to offer General Counsel's 8.

9      JUDGE BUXBAUM:  Well, let me get Mr. Winkle to confirm

10  it.

11      MR. CARLSON:  Oh, I'm sorry, Judge.

12      JUDGE BUXBAUM:  Mr. Winkle, I just want to be sure I'm

13  looking at the same thing you're looking at.  It's a 15-page

14  document that was attached to the letter about the lockout?

15      THE WITNESS:  Yes, sir.

16      JUDGE BUXBAUM:  Okay.

17      MR. CARLSON:  We would offer General Counsel's 8 at this

18  time.

19      JUDGE BUXBAUM:  And that includes both the letter and

20  the 15-page attachment?

21      MR. CARLSON:  Yes, sir.

22      JUDGE BUXBAUM:  Any objection to its receipt?

23      MR. FRASER:  No objection.

24      JUDGE BUXBAUM:  It will be received.

25      **(General Counsel's Exhibit 8 received into evidence.)**

1   Q.   BY MR. CARLSON:  All right, Mr. Winkle.  So the parties

2   are there, you're sitting down, this is handed out.  Is there

3   any discussion?

4   A.   Yes, there is.

5   Q.   Who spoke?

6   A.   I did.

7   Q.   Okay.

8   A.   I asked Bruce, I said, "You know, we've offered to come

9   back unconditionally.  Is this what you want us to come back

10  under, under this 15-page document?"  We took a little time

11  and looked through it, and he said, "No, absolutely not.

12  We'd like for you guys to consider this, and if you would,

13  get back with us sometime tomorrow on this."

14  Q.   And do you recall if anything else was said?

15  A.   No, that was pretty much it.  The meeting didn't last

16  very long, about 15 minutes or so.

17  Q.   Okay.  And did you respond to this the next day?

18  A.   Yes, I did.

19  Q.   And how did you respond?

20  A.   I wrote a letter.

21  **(General Counsel's Exhibit 9 marked for identification.)**

22  Q.   BY MR. CARLSON:  I'm going to hand you now what I've

23  marked as General Counsel's Exhibit 9, ask you to take a look

24  at that document.  Do you recognize that?

25  A.   Yes, I do.

1    Q.    Okay.  What is that document?

2    A.    It's a document that I told him I would get back with

3    him the next day, and this was my response to their synopsis

4    and proposal, and I sent it to Paul Viar and cc'd Bruce

5    Lillie, their attorney.

6    Q.    Okay.  And how did you send it?

7    A.    I told the secretary to fax it and then follow up with a

8    hard copy.

9    Q.    And when did you send it?

10   A.    That day.

11         MR. CARLSON:  We'd offer General Counsel's 9.

12         JUDGE BUXBAUM:  Any objection?

13         MR. FRASER:  No objection.

14         JUDGE BUXBAUM:  It'll be received.

15   **(General Counsel's Exhibit 9 received into evidence.)**

16   Q.    BY MR. CARLSON:  Now, Mr. Winkle, when was the next time

17   you spoke with Bruce Lillie?

18   A.    The next time I spoke with him was I received a phone

19   call on May 8th, in the afternoon.

20   Q.    And what was said?

21   A.    He asked me specifically, "Phil, did you file the 30-day

22   notice?  I don't think you have," is what he said, basically.

23   Q.    And did you respond to him?

24   A.    I said, "I filed my paperwork."

25   Q.    Was anything else said during this conversation?

1   A.   Yes, I asked him, I said, "Are we going to set up

2   another meeting to meet?" and he said, "Well, my schedule

3   is -- the first day I have is May 21st."  So we set up May

4   21st for our next meeting date.

5   **(General Counsel's Exhibits 12, 13, and 14 marked for**

6   **identification.)**

7   Q.   BY MR. CARLSON:  Okay.  Mr. Winkle, I'm going to put

8   three documents in front of you.  They are General Counsel's

9   Exhibits 12, 13, and 14.  Take a minute to review those

10  documents.

11       Have you had a chance to look at those?

12  A.   Yes, yes, yes.

13  Q.   Okay.  And do you recognize all of those documents?

14  A.   Yes, I do.

15  Q.   And are all those documents documents you received on or

16  about the dates indicated on them, on each of them?

17  A.   Yes, they are.  Yes, I did.

18       MR. CARLSON:  We would offer General Counsel's 12, 13,

19  and 14 at this time.

20       JUDGE BUXBAUM:  Any objection to the receipt of 12, 13,

21  and 14 or some part of it?

22       MR. FRASER:  No, we have no objections to 12, 13, and

23  14.

24       JUDGE BUXBAUM:  Then 12, 13, and 14 will be received.

25  **(General Counsel's Exhibits 12, 13, and 14 received into**

1  **evidence.)**

2  Q.   BY MR. CARLSON:  All right.  Mr. Winkle, you referenced

3  earlier -- excuse me.  Why don't you hand me those?  They're

4  getting kind of cluttered up there.  You referenced earlier a

5  conversation you had with Mr. Lillie regarding a May 21st

6  meeting.  Did the parties indeed, in fact, meet on May 21st?

7  A.   Yes, we did.

8  Q.   Okay.  And where did that meeting take place?

9  A.   At the Hampton Inn, in Coldwater, Michigan, on Willow

10  Brook Road.

11  Q.   And what happened at that May 21st meeting?

12  A.   The May 21st meeting, the federal mediator was there at

13  the -- Dan Curry was there at the facility.  The Company had

14  reserved a meeting room.  The union went in the meeting room.

15  They had a caucus room.  They were in their caucus room.  Dan

16  Curry went and talked to both parties.  Dan came to the Union

17  and said the Company is --

18      MR. FRASER:  Objection.  Dan Curry -- it's hearsay.

19      MR. CARLSON:  It is hearsay, Judge.  He's a federal

20  mediator, though, and as you're aware, we can't call a

21  federal mediator to testify in the hearing.

22      JUDGE BUXBAUM:  Why do I need to know what Mr. Curry

23  said?

24      MR. CARLSON:  It's really just preliminary, I think.

25      JUDGE BUXBAUM:  Yeah, that's what I'm thinking.  First

 1   of all, I guess, Mr. Fraser, does that alter your --

 2        MR. FRASER:  Well, I guess no, it doesn't because it

 3   seems to me, one, he is a federal mediator; two, if he was

 4   there for purposes of settlement or trying to help the

 5   parties resolve things, he can't testify about anything.

 6   That's why he can't be called.

 7        JUDGE BUXBAUM:  Sure, sure.

 8        MR. FRASER:  I don't know what's going to slip out of

 9   Mr. Winkle's mouth as he talks about what Dan Curry said, so

10   our objection is the same.

11        JUDGE BUXBAUM:  Yeah, I think I agree, yeah.  I mean, in

12   other words, this is a situation where perhaps you'd ask the

13   witness, "In response to whatever you were told, what did you

14   do or what did the Company do?"

15        MR. CARLSON:  And I'll do just that, Your Honor.  Thank

16   you.

17   Q.   BY MR. CARLSON:  So, Mr. Winkle, in response to what you

18   were told, what did the Company do -- or, excuse me, what did

19   the Union do?

20   A.   We prepared a proposal to give to the Company.

21   **(General Counsel's Exhibit 37 marked for identification.)**

22   Q.   BY MR. CARLSON:  Okay.  And I'm handing you now what

23   I've marked as General Counsel's Exhibit 37.  That's in your

24   second package.  And tell me when you've had a chance to

25   review that.

1  A.   Yes, I have.

2  Q.   Do you recognize that document?

3  A.   Yes, I do.

4  Q.   What is that?

5  A.   This is a document that -- the proposal that we prepared

6  on May 21st, in the morning, to present to the Company.

7  Q.   And did you, in fact, present it to the Company?

8  A.   Yes, we did.

9  Q.   And when did you present it to the Company?

10  A.   It was around noon, a little after -- somewhere close to

11  noon, they came in.

12      MR. CARLSON:  We're going to offer General Counsel's 37

13  at this time.

14      JUDGE BUXBAUM:  Any objection?

15      MR. FRASER:  No objection.

16      JUDGE BUXBAUM:  It'll be received.

17  **(General Counsel's Exhibit 37 received into evidence.)**

18  Q.   BY MR. CARLSON:  And did the parties discuss the Union's

19  proposal?

20  A.   Yes, we did.

21  Q.   Okay.  And tell me what was discussed.

22  A.   We went through each item and discussed it.  And Bruce

23  asked me, he said, "Then I take it that you're rejecting our

24  May 5th proposal?" and I said, "Yes, we are."

25      JUDGE BUXBAUM:  And Bruce is Mr. Lillie?

1      THE WITNESS:  Yes, Mr. Lillie.

2      JUDGE BUXBAUM:  Okay.  Thank you.

3   Q.   BY MR. CARLSON:  Was anything else said about the

4   proposal or did Mr. Lillie say anything else at that point?

5   A.   Yes, after we went through the proposal, then he said,

6   "Phil, I know now that you didn't file a 30-day notice, and I

7   think that your strike was illegal."  He said that on May

8   21st.

9   Q.   And did you respond to what he said?

10   A.   Yes, I made a comment.

11   Q.   What did you say?

12   A.   I said, "I think your lockout was illegal."

13   Q.   Any other discussion of that subject?

14   A.   Not of that subject.

15   Q.   Now, Mr. Winkle, after the lockout, did the employees

16   make claims for unemployment benefits?

17   A.   Yes, they did.

18      MR. FRASER:  Objection, Your Honor.  We're to that point

19   perhaps where we're talking about statutes outside of the

20   scope of the National Labor Relations Act.  Our objection

21   would be to the extent that it relates to any issue under the

22   statute.  Unemployment -- it's not relevant to the National

23   Labor Relations Act, definitions of employee, reemployee

24   status.  They're two separate statutes, and we would object

25   to admission of any of that evidence.

1    JUDGE BUXBAUM:  Mr. Carlson, make me a proffer as to why

2  you're seeking to admit it.  How is it relevant?

3    MR. CARLSON:  Sure, I would be happy to, Your Honor.

4  First of all, we are not going to be making any argument that

5  unemployment made some determination -- we're not going to be

6  relying on any determination that unemployment made as to,

7  you know, a specific finding whether employees were on strike

8  or locked out, as to what their status was.

9    This goes to -- really, it's what the Employer did with

10  respect to unemployment.  It's how the Company treated the

11  employees.  That's what we're going to, not to what different

12  statutes mean or how that impacts the National Labor

13  Relations Act.  We're not interested in making any arguments

14  about ERISA, about the Michigan unemployment laws --

15    JUDGE BUXBAUM:  But, Mr. Carlson, until -- we haven't

16  had it in evidence yet, but I gather, in August, the Company

17  discharged the employees.  Is there some contention by anyone

18  in this case that, up until that time, the Company didn't

19  view them as employees within the meaning of the National

20  Labor Relations Act?  Do you contend that the Company treated

21  them other than as employees under the Act, until that letter

22  in August?

23    MR. CARLSON:  No, no, that's not --

24    JUDGE BUXBAUM:  Mr. Fraser, do you?

25    MR. FRASER:  Your Honor, we would reserve to even

1   respond to that until we see what General Counsel's case is.

2   I heard their framework.  I think there are multiple answers

3   to that, one of which is I'm not sure what their status was,

4   one of which is no, they weren't employees, and one of which

5   is maybe they were under the statute, maybe they weren't for

6   other purposes.  So I, you know --

7       JUDGE BUXBAUM:  Well, I know those are the choices,

8   counsel.  I'd like you to pick one, if you can.

9       MR. FRASER:  I understand.  Well, I'm not going to pick

10  one because I'm not going to narrow myself down to a position

11  based on facts that I don't have in evidence yet and based on

12  arguments that need to be made.  I can't narrow that down.

13      MR. CARLSON:  Judge, I think, too, if I might elaborate,

14  as I mentioned before in the opening argument, I mean, we

15  expect that the Employer is going to make an argument about

16  reserving its rights with respect to the status of these

17  employees.

18      Our position is that they were reemployed through the

19  lockout and that they were treated consistently through this

20  three-month period prior to the termination -- they were

21  treated like locked out employees.  And locked out employees,

22  for example, don't get unemployment benefits, and that's the

23  position they took.  They're locked out employees.  They

24  don't get unemployment benefits.  Locked out employees don't

25  get -- can't access their 401(k) accounts because they're not

1   terminated.

2        So that's what the evidence is to show, that they

3   treated them in a way consistently that they were locked out

4   employees for this three-month period.  They're going to say,

5   "Well, we were reserving our rights.  Basically, we hadn't

6   made up our mind yet."  Our position is that you locked them

7   out and you treated them like they were locked out.  That's

8   why this is relevant.

9        And the unemployment has further relevance because there

10   are two groups of employees here.  There are employees who

11   are active and there are employees who are on layoff and sick

12   leave.  And the Company treated those two groups of employees

13   differently with respect to unemployment benefits, then they

14   fired everybody for engaging in an illegal strike.  So at one

15   point, they treated the employees -- certain employees as if

16   they had not engaged in an illegal strike but then fired them

17   later.  That's what also makes unemployment relevant.

18        JUDGE BUXBAUM:  Well, all right.  Mr. Fraser, to the

19   extent that you are concerned that admitting this evidence

20   will permit an argument that because they constituted

21   employees under some other statute, federal, local, state,

22   whatever, that that makes them employees under the National

23   Labor Relations Act, I agree that it wouldn't be admissible

24   because it's not material.  The issue is whether they're

25   employees under the National Labor Relations Act.

1       As to what the Employer's -- what this testimony may

2   show as to the Employer's subjective belief and subjective

3   intent, it's not apparent to me that that won't be relevant

4   under some of the General Counsel's theory here.

5       MR. FRASER:  Your Honor, so fine.  I understand your

6   ruling as to unemployment.  I'll make the next objection when

7   the next topic is raised.

8       JUDGE BUXBAUM:  Sure.

9       MR. FRASER:  However, you added to that, and

10  Mr. Carlson's argument was that the Employer's subjective

11  intent is relevant here --

12      JUDGE BUXBAUM:  May be relevant.  May be relevant.

13      MR. FRASER:  May be relevant.  So my response and my

14  question is, are you ruling right now that subjective intent

15  evidence is admissible from both sides?  Because it may be

16  relevant to an argument that General Counsel is going to

17  make, and it certainly may be relevant to an argument that

18  the Employer is going to make.  I just need to understand

19  that ruling.

20      JUDGE BUXBAUM:  Well, again, I can't give you a global

21  ruling because you rule on evidence as it's proffered, but in

22  this instance, I'm going to permit it because the General

23  Counsel articulated at least one of its alternate theories

24  that would include consideration of the Employer's

25  motivation.

112

1      MR. FRASER:  Understood.  So, again, just to make sure I

2  understand completely, the theory is that there is some

3  argument to be made about the Employer's subjective intent,

4  and that is why you're allowing the evidence to come in

5  because it may have some bearing on the Employer's subjective

6  intent under the unemployment statute and the status of these

7  individuals.

8      MR. McKNIGHT:  Can I respond to that, Your Honor?

9      JUDGE BUXBAUM:  Yeah, go ahead.

10      MR. McKNIGHT:  There's actually a much simpler question,

11  and I don't think it's appropriate for counsel to weave some

12  elaborate construction of a ruling.  Evidence is being

13  offered to show the Employer's conduct, what it did and what

14  it said with respect to the employees.  And that has a

15  bearing on whether or not these individuals were employees,

16  period.  And it's really not appropriate for anyone here to

17  kind of weave some global construction of a ruling on a

18  simple matter of --

19      JUDGE BUXBAUM:  Well, I agree with that.  And I'm going

20  to permit the testimony.  That's without prejudice to any

21  objections as evidence is proffered.

22      MR. FRASER:  As long as my objections are noted, that's

23  fine, Your Honor.

24      JUDGE BUXBAUM:  Of course.

25      MR. FRASER:  Thank you.

1          JUDGE BUXBAUM:  You may proceed.

2          MR. CARLSON:  Thanks, Judge.

3    Q.   BY MR. CARLSON:  Okay.  So, Mr. Winkle, again, after the

4    lockout, did the locked out employees make claims for

5    unemployment benefits?

6    A.   Yes, they did.

7    Q.   And which employees made claims?

8    A.   The active employees that were locked out.

9    Q.   And at whose direction did they make claims?

10   A.   My direction.

11   Q.   And now going back to the May 21st meeting, was there

12   any discussion at the meeting regarding unemployment

13   benefits?

14   A.   Yes, there was.

15   Q.   And who brought up the subject?

16   A.   Bruce Lillie.

17   Q.   And what was said?

18   A.   Something to the effect that, "Phil, we are considering

19   taking disciplinary actions against a few people that filed

20   an unlawful unemployment claim, saying that they were

21   terminated.  They weren't terminated.  We haven't terminated

22   anybody."  And my response was that, "Well, they received a

23   letter from the health care --"

24   Q.   I'm sorry.  Who received a letter?

25   A.   All the employees received a letter from the health care

1    carrier saying, "Your medical coverage has been canceled.

2    Reason, terminated."  So out of 140 -- 115 people, a few took

3    that when they applied for benefits as being terminated.  And

4    Lillie says, "No, the plan was terminated --"

5        JUDGE BUXBAUM:  I want to be sure I understand what

6    you're saying, Mr. Winkle.  You told Mr. Lillie about the

7    letter from the health provider?

8        THE WITNESS:  Yes, sir.

9        JUDGE BUXBAUM:  Okay.  I got it.

10        THE WITNESS:  Yes, sir.

11        JUDGE BUXBAUM:  And what was his response?

12        THE WITNESS:  His response was, "We haven't terminated

13    anybody, sir.  We terminated the plan, the health care plan."

14    Then there was no other discussion on that issue.

15    Q.    BY MR. CARLSON:  And just so this is clear on the

16    record, it's my understanding that this insurance letter was

17    issued -- when the contract expired, the insurance ended, and

18    then these employees who received this, that was where the

19    letter came from?

20    A.    Yes, yes, yes.

21    Q.    Okay.  Mr. Winkle, was there any discussion at the May

22    21 meeting regarding Gordon Diamond?

23    A.    Yes, there was.

24    Q.    Who is Gordon Diamond?

25    A.    I brought up the subject of Gordon Diamond.  He came

1    to --

2    Q.    Who is Gordon Diamond?

3    A.    Gordon Diamond is an employee of Douglas Autotech that,

4    at the time of the strike on May 1st, was on S and A or sick

5    leave benefits.

6    Q.    Okay.  And you raised it.  What did you say?

7    A.    I said is --

8        MR. FRASER:  Objection, Your Honor.  Again, I'm going to

9    make another objection, this time related to short-term

10   disability plan, that it's not relevant to this proceeding

11   related to employment status, reemployment or any other issue

12   that is before this Court to decide under the National Labor

13   Relations Act.

14       JUDGE BUXBAUM:  Make me a proffer, Mr. Carlson.

15       MR. CARLSON:  Judge, Mr. Diamond was an employee who was

16   on sick leave at the time of the strike, and our theory is he

17   is included in that group of employees who did not lose the

18   protection of the Act because he did not participate in the

19   strike.  He was on leave.  He did not withhold labor.  He was

20   on leave.  He was legitimately absent from work, consistent

21   with existing Board law.  He did not join the strike.

22       JUDGE BUXBAUM:  Okay.  But you're asking Mr. Winkle to

23   tell us what?

24       MR. CARLSON:  There's conversation about Mr. Diamond at

25   this meeting.  There's a brief conversation about his status,

1    and Mr. Winkle makes statements at the meeting to Mr. Lillie,

2    responds to those statements about Mr. Diamond's status.

3        MR. FRASER:  Your Honor, if I may respond, there's a

4    stipulated document, which is GC-48, which lists Gordon

5    Diamond, number 723, on the second page, and it says, "SL, 3-

6    14-08."  I don't know that there's any dispute about the

7    status of Mr. Diamond and discussing what was said during

8    bargaining isn't going to bear any light on that, other than

9    to get to exactly what I'm objecting about, which is an

10   argument on, "Well, he must have been an employee if you were

11   talking to us about his status on May 21.  You must have

12   reemployed people."

13       MR. McKNIGHT:  Judge, what the parties said and did with

14   respect to the treatment of the individuals who were fired

15   will be, we think, corroborative of legal conclusions under

16   the National Labor Relations Act.  And so it's directly

17   relevant.

18       JUDGE BUXBAUM:  Mr. McKnight, I guess what I'm

19   struggling with here -- and your formulation is very

20   thoughtful and helpful -- is what the Labor Board is going to

21   want by way of an evidentiary record here.  I know that the

22   case at its heart is going to be a policy judgment and a

23   legal judgment made by the Board, but I agree that it's my

24   duty to give the Board what it would want.  I have to try to

25   stand in their shoes by way of a factual record.

1    If I err on the side of excluding things that they would
2  have liked, I've really done a harm.  If I err on the side of
3  including things that it subsequently develops they didn't
4  need or even want, while I've done a wrong, it's a lesser
5  wrong.  And I think that's the point you're driving at, and I
6  agree with it.
7    And for that reason, although none of this is free from
8  doubt, and this is an unusual case, I'm going to allow this
9  testimony.  And, again, it's not a universal ruling.
10  Mr. Fraser, I will consider each and every objection you
11  choose to make on its own individual merits.
12    MR. FRASER:  Thank you.
13    JUDGE BUXBAUM:  You may proceed, Mr. Carlson.
14    MR. CARLSON:  Thank you, Judge.
15  Q.  BY MR. CARLSON:  Okay.  So, Mr. Winkle, you raised the
16  subject of Gordon Diamond, and what did you say?
17  A.  I said, "Mr. Diamond was an employee at the time of the
18  strike who was on sick leave, drawing S and A benefits.  His
19  benefits have been cut off, and his health care, and I want
20  to know why."
21  Q.  And did the Company respond to what you said?
22  A.  Yes, they did.
23    JUDGE BUXBAUM:  Now, who's "they"?
24    THE WITNESS:  Bruce Lillie and Paul Viar had a little
25  communicate (sic), and I think -- I believe it was Paul said,

1    "That was a mistake, and we'll correct it.  Get us the

2    information, and we'll correct it."

3    Q.   BY MR. CARLSON:  And did the Company, in fact, correct

4    that?

5    A.   Yes, they did.

6        JUDGE BUXBAUM:  Well, what do you mean by correct it?

7    What did the Company do?

8        THE WITNESS:  They sent a letter to me saying they've

9    reinstated his benefits, and then any monies that we had paid

10    out, the Union had paid out, if we'd get them a bill, they

11    would reimburse us.

12        JUDGE BUXBAUM:  Monies that you had paid out for what?

13        THE WITNESS:  Health care benefits and benefits that he

14    had lost by not engaging in the strike.

15        MR. CARLSON:  Okay.  Maybe this is a good time to do

16    this.  If I may, Your Honor?

17        JUDGE BUXBAUM:  You may.

18    **(General Counsel's Exhibit 16 marked for identification.)**

19    Q.   BY MR. CARLSON:  Mr. Winkle, I'm going to hand you what

20    I've marked as General Counsel's Exhibit 16.  Take a look at

21    that document.  Do you recognize that document?

22    A.   Yes.

23    Q.   What is that?

24    A.   It's a letter to me from -- signed by Paul Viar, that he

25    is reinstating his health care benefits of Gordon Diamond.

1  Q.   And when did you receive this document?

2  A.   It's dated June the 16th.  I'm assuming shortly after

3  that.  There's a fax number at the top, but I can't see if

4  that was -- I received it on the 15th.

5        MR. FRASER:  I'm sorry, I didn't hear that.

6        THE WITNESS:  I received it, I guess, on the -- well, I

7  don't know when I received it actually because it doesn't

8  have a fax number.  There's a fax up there, but it's not my

9  number, so I would --

10 Q.   BY MR. CARLSON:  But this is a document that you

11 received?

12 A.   Yes, that I did receive it, yes.

13       MR. CARLSON:  Okay.  We're going to offer General

14 Counsel's 16.

15       JUDGE BUXBAUM:  Any objection?

16       MR. FRASER:  No objection.

17       JUDGE BUXBAUM:  It'll be received.

18 **(General Counsel's Exhibit 16 received into evidence.)**

19 Q.   BY MR. CARLSON:  Mr. Winkle, when did the Company cut

20 off Mr. Diamond's benefits, after what date?

21 A.   After --

22       JUDGE BUXBAUM:  Now, this is before GC-16?

23       MR. CARLSON:  Yes.  I'm sorry, Judge.

24       JUDGE BUXBAUM:  Okay.

25 Q.   BY MR. CARLSON:  Just going back just to make sure this

1  is clear on the record, when -- after what date did the

2  Company cut off Mr. Diamond's benefits?

3  A.   May 1st, 2008.

4  Q.   Okay.  Mr. Winkle, I'm going to direct your attention

5  now to the -- I believe it's the next bargaining session on

6  the list, June 2nd.  Did you attend that bargaining session?

7  A.   Yes, I did.

8  Q.   And at that time, as of June 2nd, was the Company still

9  utilizing the replacement employees that you've referred to

10 in your earlier testimony?

11 A.   Yes, they were.

12 Q.   And during that June 2nd meeting, was there any

13 discussion about those replacement employees?

14 A.   Yes, there was.

15 Q.   All right.  And how did the subject come up?

16 A.   The subject came up in a sidebar, actually.

17 Q.   Okay.  And who participated in that sidebar discussion?

18 A.   In the sidebar was Mary Ellis, Frank Gruza, myself, Glen

19 Kirk, and Bruce Lillie.

20 Q.   And who raised the subject?

21 A.   I did.

22 Q.   What did you say?

23 A.   I just said that we're hearing rumors, the committee and

24 myself are hearing rumors -- because of the relationship of

25 some of the salaried people in the plant are kin to some of

1    the strikers and the locked out people, we were hearing

2    rumors from inside the plant that the people, these scabs,

3    were being told that they were permanent, that they had a

4    permanent job.   And I asked Bruce if he could comment on

5    that.

6    Q.   And did Mr. Lillie respond to you?

7    A.   Yes, he did.

8    Q.   What did he say?

9    A.   He said, "Phil, those people are temporary, and once we

10   get a contract, they'll go back to work -- everybody goes

11   back to work."

12        JUDGE BUXBAUM:  Well, who'll go back to work?

13        THE WITNESS:  The employees, the locked out people.

14   "Once we get a contract, then the bargaining unit will go

15   back."

16   Q.   BY MR. CARLSON:  And, Mr. Winkle, who did he describe --

17   who was temporary?

18   A.   The scabs.  That was my question.  The workers in the

19   facility -- we were getting reports back that they were being

20   told by the Company that they don't ever have to worry,

21   they're permanent now, they'll never lose their job.

22   Q.   And Mr. Lillie said what?

23   A.   Said they're temporary.  "Once you get a contract, once

24   we get an agreement, you guys come back, they go out."  And

25   the reason I remember that day, specifically, is that's the

1   day they gave us the MOU, the modern operating agreement.

2   Q.   Okay.

3   A.   Or MOA or whatever they call it.

4   **(General Counsel's Exhibit 38 marked for identification.)**

5   Q.   BY MR. CARLSON:  Okay.  Since you bring it up, let me

6   hand you what I've marked as General Counsel's Exhibit 38 and

7   ask you to take a look at that document.

8   A.   Okay, I've looked at it.

9   Q.   Have you had a chance to look at that?

10  A.   Yes, I have.

11  Q.   Okay.  And do you recognize that document?

12  A.   Yes, that's the document that was presented to us on

13  June the 2nd.

14  Q.   Okay.  And it was presented to you by the Company; is

15  that correct?

16  A.   Yes, that's correct.

17       MR. CARLSON:  We'd offer GC-38 at this time.

18       JUDGE BUXBAUM:  Any objection?

19       MR. FRASER:  No objection.

20       JUDGE BUXBAUM:  It'll be received.

21  **(General Counsel's Exhibit 38 received into evidence.)**

22  Q.   BY MR. CARLSON:  Okay.  Mr. Winkle, I'm going to direct

23  your attention now to the June 13th meeting.  Did you attend

24  that meeting?

25  A.   Yes, I did.

1    Q.    And during that meeting, was there any discussion about

2    the locked out employees coming back to work?

3    A.    Yes, there was.

4    Q.    And how did the subject come up?

5    A.    I brought it up.

6    Q.    And who was present when you brought the subject up?

7    A.    The entire bargaining committee and the full complement

8    of the salaried -- or the Company employees.

9    Q.    And taking a look at Joint Exhibit 1, where it says,

10   "6-13-08 negotiations," it would be all of those individuals

11   listed under that heading?

12   A.    Yes.

13   Q.    And you brought up the subject.  What did you say?

14   A.    I said, I asked Bruce, I said, "In the sidebar the other

15   day, you told me that the scabs were temporary.  Would you

16   repeat that again because we're still hearing rumors, in

17   front of the whole committee," and he said, "I'd be glad to."

18   Q.    And were you referring to your testimony a few minutes

19   ago about the sidebar you had on June 2nd?

20   A.    Yes, I was.

21   Q.    Okay.  Very good.  What did Mr. Lillie say?

22   A.    He said, "Let me get it straight.  There seems to be

23   some confusion here, that once we get a contract -- the scabs

24   are temporary, and once we get a contract, everybody goes

25   back to work."  And he put emphasis on, "That's our goal.

1    That's our goal.  Once we get a contract, everybody goes back

2    to work."  And I said, "Thank you.  I appreciate that."

3    Q.    Mr. Winkle, did Mr. Lillie use the word "scab"?

4    A.    No, he did not.

5    Q.    What word did he use?

6    A.    I believe he referred to them as either temps or

7    replacements.

8    **(General Counsel's Exhibit 15 marked for identification.)**

9    Q.    BY MR. CARLSON:  Okay.  Mr. Winkle, I'm going to hand

10   you now what I've marked as General Counsel's Exhibit 15 and

11   ask if you recognize that document.

12   A.    Yes, I do.

13   Q.    Do you recognize -- I'm sorry.  What is that document?

14   A.    It's a letter concerning that the Company is no longer

15   going to take out dues to give to us -- give to the Union.

16   Q.    Okay.  And is that a letter you received?

17   A.    Uh-huh.  Yes, I did.

18   Q.    And when did you receive that letter?

19   A.    On June the 13th.

20   Q.    And how did you receive it?

21   A.    From Glen Kirk.  He handed it to me, presented it.

22        MR. CARLSON:  We're going to offer GC-15 at this time.

23        JUDGE BUXBAUM:  Any objection?

24        MR. FRASER:  No objection.

25        JUDGE BUXBAUM:  It'll be received.

1  **(General Counsel's Exhibit 15 received into evidence.)**

2  Q.    BY MR. CARLSON:  Mr. Winkle, do you recall, was

3  Mr. Lillie present when you received that document?

4  A.    Yes, I believe he handed it to me in a meeting.  When

5  they came in, he said, "I've got something for you."

6        JUDGE BUXBAUM:  So it wasn't Mr. Kirk that handed it to

7  you?

8        THE WITNESS:  Yeah, Glen.  Glen handed it to me.

9        MR. CARLSON:  No, my question was whether or not

10  Mr. Lillie was present when Mr. Kirk handed --

11        JUDGE BUXBAUM:  Okay, yeah, see, now I'm confused.  Glen

12  Kirk is the one who actually handed you the letter?

13        THE WITNESS:  Yes, sir.

14        JUDGE BUXBAUM:  Mr. Lillie was present when Mr. Kirk

15  gave you the letter?

16        THE WITNESS:  Yes, sir.

17        JUDGE BUXBAUM:  Okay.  Thank you.

18        MR. McKNIGHT:  Can I have just one moment, Your Honor?

19  I just wanted to look at something.

20        JUDGE BUXBAUM:  All right.  I'll tell you what.  Well,

21  let's talk scheduling a bit.  It's now approaching quarter to

22  one.  How much longer do you have on your examination of

23  Mr. Winkle?  Looks like a bit.

24        MR. CARLSON:  Possibly an hour.

25        JUDGE BUXBAUM:  Okay.  Then does everyone want to take a

1    lunch break now and do it that way?

2        MR. McKNIGHT:  I do.

3        JUDGE BUXBAUM:  All right.  How long -- again, I don't

4    have a great sense of how many restaurants are around here,

5    how easy it is for people to get lunch.  I would prefer a

6    shorter rather than longer lunch break, but help me out,

7    Mr. Carlson.  Is 45 minutes enough time?

8        MR. CARLSON:  It's enough time for me, but I work here,

9    and I have lunch in the refrigerator.

10        JUDGE BUXBAUM:  Right, I know.  Well, Mr. Fraser, you're

11    a local, too.  You help me out, too.

12        MR. CARLSON:  There are sandwich shops, but things get

13    pretty busy because there's right -- on everything that's

14    close by here, things get pretty busy.

15        MR. FRASER:  We've preplanned.  We have lunches coming

16    over.  We're going to sit here and eat them, so I don't know

17    however long you think --

18        MR. CARLSON:  Yeah, I would defer to the parties.  If

19    they feel --

20        MR. McKNIGHT:  I propose one hour and mean it, since

21    when we say 45, it ends up being one.

22        JUDGE BUXBAUM:  All right.  Okay.  Twenty of two, so

23    1:40 sharp.

24        MR. McKNIGHT:  Thank you.

25        JUDGE BUXBAUM:  All right.  We'll resume, then, at 1:40

1    sharp.

2    **(Whereupon, at 12:40 p.m., a lunch recess was taken.)**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

1          <u>A F T E R N O O N</u>   <u>S E S S I O N</u>

2                                    (Time Noted:  1:45 p.m.)

3          **JUDGE BUXBAUM:  We are back on the record.**

4      Mr. Winkle is back on the stand.  Mr. Winkle, of course,

5   you're still under oath, sir.

6      And, Mr. Carlson, you may proceed.

7      MR. CARLSON:  Thank you, Judge.

8   Q.   BY MR. CARLSON:  Mr. Winkle, I'm going to direct your

9   attention now to the July 2nd bargaining session.  Did you

10  attend that bargaining session?

11  A.   Yes, I did.

12  Q.   And during that meeting, do you recall any discussion

13  about the locked out employees returning to work?

14  A.   Yes, I do.

15  Q.   Okay.  And how did it come up on that occasion?

16  A.   I brought it up again myself.

17  Q.   And who was present when you raised the subject?

18  A.   The entire bargaining committee for the Union and the

19  entire company group and the mediator, Dan Curry.

20  Q.   And so referencing, again, Joint Exhibit 1, under the

21  heading "7-2-08," all those individuals named under there,

22  that's who you're referring to?

23  A.   Yes.

24  Q.   Okay.  And what did you say about the subject, about the

25  locked out employees returning to work?

1    A.    Well, John Canzano had become our spokesperson for the

2    Union --

3    Q.    Okay.  And who is John Canzano?

4    A.    He is an affiliate with the Sam McKnight firm that

5    have -- employed by the Union to help in this case.

6          JUDGE BUXBAUM:  So he's a lawyer?

7          THE WITNESS:  Yes, sir.

8          JUDGE BUXBAUM:  Okay.

9          THE WITNESS:  And I asked John if I could bring up the

10   issue about the temps again.  He said, "Yes, go ahead."  So

11   in this meeting, it had been about a month since we first

12   talked about the rumors of the scabs, and we were still

13   hearing rumors coming out of the plant, so again I asked

14   Bruce Lillie if anything had changed about the workers in the

15   plant, and Paul and Glen Kirk -- I asked Mr. Lillie if they

16   could take that question and field that question, and both of

17   them responded.

18   Q.    BY MR. CARLSON:  Who responded first?

19   A.    I believe, best of my recollection, Paul went first and

20   said that, you know, "We've told you that the replacement

21   workers are temporary.  They're on temporary status.  We have

22   meetings with them all the time, inform them of that.  We

23   have meetings with the supervisor."

24         And then Glen Kirk says, "I would like to add to that,"

25   and he kind of said affirmatively, "We have formulated a

1   transition plan, and we have meetings -- weekly meetings and

2   sometimes every other day with those employees.  They know,

3   when we get a contract and come back to work -- you guys come

4   back to work, they go out.  We have weekly meetings with

5   them, and we've formulated a transition plan."

6       JUDGE BUXBAUM:  And the person you've referred to as

7   Paul is Mr. Viar?

8       THE WITNESS:  Yes, sir, Mr. Viar.

9       JUDGE BUXBAUM:  Thank you.

10  Q.   BY MR. CARLSON:  Do you recall anything else being said?

11  A.   About the --

12  Q.   On this subject, yes.

13  A.   No.

14  Q.   Okay.  I'm going to direct your attention now to the

15  July 31st meeting.  Just tell us, Mr. Winkle, where were the

16  parties at in terms of reaching agreement at this point, as

17  of July 31st?

18  A.   In my own words or --

19  Q.   Yes.

20  A.   As of July 31st, we had had several meetings.  The

21  Company had give us three different proposals.  We had gone

22  back and forth on several different proposals.  We had made

23  great strides to reduce the size of the committee.  The

24  Company was wanting flexibility.  We reduced the

25  classification from 30-some to three.  Lillie said at one

1    point around the 15th or 20th that we were making -- he liked
2    what he heard.  We were making progress to getting an
3    agreement.  But on the 31st, we came in, we had made another
4    proposal, and then Lillie, all of a sudden, said, "We're
5    miles apart.  We're -- you know, we're just -- I don't see,
6    gentlemen, how we're going to get there."
7         And John says, "Well, if you don't like that proposal,
8    we'll give you another one."  So we worked on another
9    proposal.  They left.
10        JUDGE BUXBAUM:  Now, who's John?
11        THE WITNESS:  John Canzano.
12        JUDGE BUXBAUM:  Canzano?
13        THE WITNESS:  Canzano.
14        MR. CARLSON:  C-a-n-z-a-n-o.
15        THE WITNESS:  Canzano.  So the Company came back in
16   after a while and --
17   Q.   BY MR. CARLSON:  Let me back you up.  I mean, that's
18   where you felt the parties were at in terms of reaching an
19   agreement?
20   A.   Yes, sir.
21   Q.   Okay.
22   A.   I thought we were doing -- I thought we were going in
23   the right direction, in my opinion.
24   Q.   Okay.  And then, during this meeting, was there any
25   discussion about the locked out employees being terminated?

1  A.   Yes, there was.

2  Q.   All right.  Now, how did that subject come up?

3  A.   When we worked on a proposal and the Company came back

4  in, in front of the full complement of union and company,

5  Mr. Lillie says that the Company was no longer going to waive

6  their rights under the law, and that it may terminate all the

7  employees.

8  Q.   Okay.  Now, when you say the full complement, again,

9  looking at Joint Exhibit 1, are you referring to all of those

10  individuals listed under the heading of "7-31-08

11  Negotiations"?

12  A.   Yes, sir, I am.

13  Q.   Okay.  When Mr. Lillie said this, did anyone respond to

14  what he said?

15  A.   Our spokesperson, John, did.

16  Q.   Again, this is Mr. Canzano?

17       JUDGE BUXBAUM:  Canzano?

18       THE WITNESS:  Mr. Canzano.

19  Q.   BY MR. CARLSON:  And what did Mr. Canzano say?

20  A.   It was quite -- more or less a rebuking to what

21  Mr. Lillie had said, you know, "Don't go down that road."

22  Something to the effect, "That's a long road.  Let's bargain,

23  let's get a contract."  He tried to advise him that was not

24  the choice, that was not the direction to go, and don't know

25  where you're getting that advisement from, but certainly

1    you're listening to the wrong people.  He certainly wouldn't

2    advise that.

3    Q.    Do you recall anything else being said?

4    A.    No, I don't.

5    Q.    Okay.  When was the next bargaining session scheduled

6    after July 31st?

7    A.    At July 31st, Mr. Lillie was going on vacation and

8    wouldn't be available till August the 14th, so we set an

9    August the 14th date for our next bargaining session.

10    Q.    And how do you know he was going on vacation?

11    A.    He told us he was.

12    Q.    Now, Mr. Winkle, when did you learn that the Company

13    had, in fact, fired all of the locked out employees?

14        MR. FRASER:  I'm going to renew my objection on this.

15    I'm assuming it's standing that whatever counsel says

16    regarding had fired all the employees is simply counsel's

17    statement and not evidence in any regard.

18        JUDGE BUXBAUM:  Clearly, the words chosen in counsel's

19    questions, all counsel, do not constitute evidence in this

20    case.

21        MR. FRASER:  Thank you.

22    Q.    BY MR. CARLSON:  Mr. Winkle, when did you learn that the

23    Company had fired all the locked out employees?

24    A.    On August the 5th, 2008.

25    Q.    Okay.  And how did you learn about that?

134

1    A.    Mary Ellis, the local president, called me from her

2    home.  She had received a letter in the mail that day, that

3    morning, from the Company, saying that they had terminated

4    her.

5    Q.    Mr. Winkle, I'm going to hand you what's been entered

6    into evidence as General Counsel's Exhibit 48.  I want you to

7    take a look at that document.  Do you recognize that

8    document?

9    A.    Yes, I do.

10   Q.    Have you seen that before today?

11   A.    Yes, I have.

12   Q.    Okay.  And when did you see it?

13   A.    One day last week.

14   Q.    Okay.  Who showed it to you?

15   A.    You did, Mr. Carlson.

16   Q.    Okay.  And you've had a chance to review that document?

17   A.    Yes, I did.

18   Q.    Mr. Winkle, taking a look at that, were each of the

19   individuals named on that list active members of Local 822 at

20   the time the strike commenced?

21   A.    Yes, they --

22         JUDGE BUXBAUM:  In other words, on May 1st, 2008?

23         MR. CARLSON:  Yes, sir.

24         THE WITNESS:  Yes.

25   Q.  BY MR. CARLSON:  And were each of the individuals active

1    members of Local 822 as of August 4, 2008?

2    A.    Yes, they were.

3    Q.    And is there any active member of Local 822 as of May

4    1st, 2008 who was not on that list?

5    A.    Not that I know of.

6    Q.    And is there anyone on that list who was not an active

7    member of Local 822 as of August 4th, 2008?

8    A.    No.

9    Q.    All right --

10        JUDGE BUXBAUM:  Let me ask --

11        THE WITNESS:  We had one employee pass away that's on

12   the list, but --

13        JUDGE BUXBAUM:  An employee passed away?

14        THE WITNESS:  Yes, sir.

15        JUDGE BUXBAUM:  I'm sorry to hear that.  Is that after

16   all these events or -- well, who is that --

17        THE WITNESS:  It was in December.

18        JUDGE BUXBAUM:  -- let's find out who that is.

19        THE WITNESS:  That was Carol Chapman.

20        JUDGE BUXBAUM:  Which page is she on?

21        THE WITNESS:  She's the last page.  1755 is her number.

22        JUDGE BUXBAUM:  And when did she pass away?

23        THE WITNESS:  I believe it's the first of December, sir,

24   first week in December.

25        JUDGE BUXBAUM:  Of '08?

```
 1        THE WITNESS:  Of '08.

 2        JUDGE BUXBAUM:  All right.  And I had one question about

 3   the list, too.  I think you were present when this was

 4   discussed.  There's some dispute about an employee named

 5   Beverly Vickers, and I'm not asking you about that, but I

 6   take it there's no dispute that she was a member of the

 7   local?

 8        THE WITNESS:  No, sir, no dispute over that.

 9        JUDGE BUXBAUM:  And she was?

10        THE WITNESS:  Yes, sir.

11        JUDGE BUXBAUM:  Okay.

12   Q.   BY MR. CARLSON:  All right.  Mr. Winkle, I'm going to

13   direct your attention now to the August 14th meeting, the

14   last meeting that's listed on Joint Exhibit 1.  Did you

15   attend that meeting?

16   A.   Yes, I did.

17   Q.   And where did the meeting take place?

18   A.   At the Hampton Inn, in Coldwater, Michigan, on Willow

19   Brook Road.

20   Q.   And what time did the meeting start?

21   A.   Actually, there was not a meeting, but it was due to

22   start at ten.

23   Q.   Okay.

24   A.   I mean a meeting between the parties, per se, not a

25   formal meeting.
```

1  Q.   Okay.  There was a scheduling bargaining session?

2  A.   Yes, sir.  Yes, sir.

3  Q.   Okay.  Tell me what happened.  Tell me what happened on

4  the 14th when you arrived there.

5  A.   When I arrived, the Union committee, along with Sam

6  McKnight, had came in that particular day, around a little

7  after ten.  The union was in their room, the Company was in

8  their caucus room.  We had a new mediator assigned to us that

9  day by the name of Larry Sedrowski who was taking the place

10  for Dan Curry because Dan's daughter or somebody was getting

11  married, I think, and so he was assigned to us.

12      And the Company wanted to caucus, and so we waited in

13  our room and worked on a proposal to give to the Company.

14  And for about, oh, at least till eleven -- after eleven,

15  Larry Sedrowski came back to the room and knocked on the door

16  and told Sam that the Company didn't want to meet with us.

17  Q.   What happened next?

18  A.   Sam said, "Phil, Mary, come with me.  Larry, can you

19  take me to the room?"  And we went to the room, and Larry

20  knocked on the door and asked if we could come in, and the

21  Company said okay, come on in.

22  Q.   Okay.  And then what happened?

23  A.   We walked in the room.  Sam said, "I've got some

24  questions I would like to ask, and first of all, we would

25  like for you to --"

1    Q.    I'm sorry, let me back up.  When you say Sam, to whom

2    are you referring?

3    A.    Sam McKnight.

4    Q.    Okay.  Did anyone else speak on behalf of the Union

5    during this exchange?

6    A.    No.

7    Q.    Okay.  Go ahead.  What did Sam say?

8    A.    Sam started to ask the Company, "We would like for you

9    to come and bargain a contract with us," was his first

10   question.  Mr. Bruce Lillie replied and said, "We're not

11   going to come and bargain.  All the employees have been

12   terminated."

13   Q.    What happened next?

14   A.    Sam asked a series of questions.  The best that I can

15   recall, he said, "Is there any documents that you need from

16   us?" and Lillie says, "No -- wait a minute.  I would like to

17   have a copy of your 8(d) notice or your Form F7 notice."

18   Q.    Okay.  This was Mr. Lillie who said, "Wait a minute"?

19   A.    Yes.

20   Q.    First he said no, and then he said, "Wait a minute"?

21   A.    Yes.

22   Q.    Okay.

23   A.    And then Sam says, "Don't you have a copy?  I thought

24   you had a copy."  And he said, "Yes, but I'd like to see

25   yours," and Sam said, "That's fine."  Then Sam McKnight asked

1    another question, said, "I'd like to know if you guys are

2    hiring," and Paul Viar said, "We're always hiring," and

3    Lillie throwed his hand up like for him to stop, and --

4    Q.    For who to stop?

5    A.    For Mr. Viar.  And he said -- Lillie said, "We'll take

6    that question under consideration."  Sam asked then, "Are you

7    guys hiring any permanent employees?"  First of all, before

8    he asked that, he asked, "What is the status of those

9    employees in the shop?"  And Lillie says, "Well, I can get

10   that information for you."  Then he asked, "Are you hiring

11   any permanent replacement workers?" and he said -- and

12   Mr. Lillie said, "We'll take that under consideration."  Then

13   he asked, "Are you advertising for any permanent replacement

14   workers?" and Lillie says, "I'll take that under

15   consideration."  Then he said --

16   Q.    He, being who?

17   A.    Sam was -- asked him again to come and bargain a

18   contract.  Lillie says no.  Sam McKnight says to Mr. Lillie,

19   "Do you think that the Union condones the use of racial

20   epithets or supports that?"  And Lillie said, "Where's that

21   coming from?" and Sam said, "Well, you've mentioned that in

22   some of your literature."  And so, after that question, he

23   said -- well, he didn't answer it, said, you know, "I'll take

24   that under consideration."  Then the last question Sam had

25   was, "I would like for you to come and bargain a contract,

1  but I can't force you.  If you're not going to come and

2  bargain, then we're going to leave."  And we left.

3     MR. CARLSON:  Nothing further, Judge.

4     JUDGE BUXBAUM:  Mr. McKnight?

5     MR. McKNIGHT:  I have no questions at this time.

6     JUDGE BUXBAUM:  Well, this would be the time.

7     MR. McKNIGHT:  That's correct.

8     JUDGE BUXBAUM:  Okay.  I mean, lawyers say that all the

9  time, and I feel compelled to make sure they know what

10 they're saying.  All right, then, Mr. Fraser, it's your turn.

11 You may cross-exam.

12    MR. FRASER:  Before we do that, Your Honor, we'd like to

13 have any affidavits or other materials or documents that were

14 produced to the Board related to this witness.

15    JUDGE BUXBAUM:  Jencks material?

16    MR. FRASER:  Yes, exactly.

17    MR. CARLSON:  I am handing Mr. Fraser two affidavits

18 that Mr. Winkle gave.  One in case GR-7-CB-16129, and another

19 in case 7-CA-51235.  They both include testimony about events

20 that are pertinent to this case.

21    JUDGE BUXBAUM:  Very well.  They look fairly lengthy.

22    MR. CARLSON:  Actually, they're not as bad as they look.

23    JUDGE BUXBAUM:  Good.

24    MR. CARLSON:  This is about a ten-page typewritten

25 affidavit.  This is about a nine-page handwritten affidavit

1    with a number of attachments, I think bargaining proposals

2    and so forth.

3        JUDGE BUXBAUM:  Oh, okay.  All right.  Okay.

4        MR. CARLSON:  So there's some here, but it's not quite

5    as bad as it looks.

6        JUDGE BUXBAUM:  Let's --

7        MR. FRASER:  I'm trying to key in on the words that were

8    used by Mr. Carlson.  He said affidavits that relate to this

9    case, and I asked for all affidavits.  I don't know that

10   there's a distinction between affidavits prepared for this

11   case and affidavits that have been prepared for all cases

12   prior to cross-examination.  Maybe I'm not hearing you

13   correctly.

14       MR. CARLSON:  Well, I'm not aware of any other statement

15   by Mr. Winkle that pertains to anything having to do with

16   this case.  These are the statements --

17       JUDGE BUXBAUM:  If you'd like to voir dire the witness

18   about that, you're welcome to do so.

19       MR. FRASER:  Yes, I would.

20       JUDGE BUXBAUM:  Sure.

21                    **VOIR DIRE EXAMINATION**

22   Q.   BY MR. FRASER:  Mr. Winkle, good afternoon.  I'm Jeff

23   Fraser, one of the lawyers for Douglas.

24   A.   Good afternoon.

25   Q.   Mr. Carlson has handed me two affidavits.  Have you

1    provided more than two affidavits to the Board?

2    A.    No, I have not.

3    Q.    Have you provided any written materials in your

4    handwriting that are not affidavits to the Board, not

5    something where you signed in front of a notary but other

6    documents that are in your handwriting, to the Board, related

7    to what happened in any case with Douglas?

8    A.    I turned over what notes I had is all.

9    Q.    Notes related to what?

10    A.    To the subpoena.

11    Q.    You turned those over to the Board, or you turned those

12    over to Mr. McKnight?

13    A.    I don't know where they went.  I gave them to

14    Mr. McKnight.

15    Q.    Okay.  So other than those notes and these two

16    affidavits, you've provided no other information to the

17    Board?

18    A.    No, sir.

19        MR. FRASER:  Okay.  Thank you.

20        JUDGE BUXBAUM:  Fifteen minutes, and if you need more,

21    Mr. Fraser, you let me know.  I know you've already

22    demonstrated that you're conscious of the time, and so -- all

23    right.  We'll resume, then, at 3:22.

24        MR. McKNIGHT:  You mean 2:22?

25        JUDGE BUXBAUM:  2:22.  Excuse me.  Thank you, counsel.

1    **(Off the record.)**

2         **JUDGE BUXBAUM:  On the record.**

3         And you may cross-examine, Mr. Fraser.

4                          **CROSS-EXAMINATION**

5    Q.   BY MR. FRASER:  Mr. Winkle, again, I've already

6    introduced myself.  I'm going to ask you some questions.

7    Some of them are going to be very direct, and some of them

8    will be a little bit broad.  If you don't understand a

9    question that I ask you, will you please let me know?

10   A.   Yes, sir.

11   Q.   Okay.  You've bargained contracts for Douglas for two

12   contracts; is that correct?

13   A.   This was the third round of negotiations.

14   Q.   Third round?

15   A.   Yes, sir.

16   Q.   Okay.  So 2002, 2005, and 2008?

17   A.   Yes, sir.

18   Q.   Okay.  Can you describe for me, in 2008, the process

19   that you used to reach tentative agreements in bargaining at

20   Douglas?

21   A.   The process?

22   Q.   Yes.  How were tentative agreements recognized between

23   Douglas and the Union?

24   A.   Both parties have to agree on an article and sign off to

25   reach a tentative agreement.

144

1  Q.    So it's agreed -- initialed in the corner or part of the

2  document?

3  A.    Yes, that's normal process.

4  Q.    Okay.  And you said you reached agreement during 2008 on

5  V-Cap?

6  A.    Yes, sir.

7  Q.    That document was initialed?

8  A.    I believe it was.

9  Q.    Okay.  Is that the same process you used in 2005 and

10  2002?

11  A.    Yes, sir.

12  Q.    Is that your standard process --

13  A.    Yes, sir.

14  Q.    -- you use when you bargain?

15  A.    Yes, sir.

16  Q.    Okay.  And nothing changed in 2008?

17  A.    No, sir.

18  Q.    Okay.  Did you attend -- I'm going to focus you on May

19  1, 2008, until August 14 of 2008.  Were you at each and every

20  session between Douglas and the Union between those two

21  dates?

22  A.    Bargaining sessions?

23  Q.    Yes, bargaining sessions.

24  A.    Yes, I was.

25  Q.    Okay.  Tell me your standard practice for note-taking

1    during bargaining sessions.  What's your normal practice?

2    A.   I don't have a normal practice.

3    Q.   Okay.  Well, then, describe for me what your abnormal

4    practice is.  What do you do?  When do you take notes?  How

5    do you take notes?

6    A.   It all depended on -- in this situation?

7    Q.   Just generally, first, and then we'll get into this

8    situation.

9    A.   Okay.  Generally, it all depends on how many I've got on

10   the bargaining committee, and if I'm the lead spokesperson, I

11   usually assign someone to take notes, and I just jot down

12   ideas or things that I think are relevant.

13   Q.   Okay.  That's in general, correct?

14   A.   Yes.

15   Q.   Okay.  In this set of negotiations in 2008 with Douglas,

16   what, specifically, did you do related to notes during

17   bargaining sessions from May 1 of '08 to August 14 of '08?

18   A.   I took very few notes.

19   Q.   Why?

20   A.   Because we had a specific individual, Kevin Kolassa,

21   that the local had brought in.  He was the recording

22   secretary to handle most of the note-taking.

23   Q.   Okay.  So it was Kevin Kolassa's responsibility during

24   those bargaining sessions to take notes of what took place

25   during those sessions?

1    A.    Yes.

2    Q.    And when he took notes of what took place during those

3    sessions, what was he taking notes of?  Do you know?  I mean,

4    take a day.  I don't care.  Pick a bargaining date.  May 21

5    of 2008.  Kevin Kolassa was there, correct?

6    A.    Uh-huh.

7    Q.    Is that yes?

8          JUDGE BUXBAUM:  You have to say yes or no, so --

9          THE WITNESS:  Yeah, I'm looking.  May -- yes --

10         MR. FRASER:  It's not a trick --

11         JUDGE BUXBAUM:  Well, hold on.  He's looking.  He's

12   looking.

13         THE WITNESS:  Yes, Kevin was there.

14   Q.    BY MR. FRASER:  Yeah, I'm not trying to trick you into

15   saying something that he -- if he wasn't.

16   A.    Oh, okay.

17   Q.    Did you give direction to Mr. Kolassa as to what he was

18   supposed to take notes of that day?

19   A.    No, I did not.

20   Q.    Do you know what his practice was for taking notes

21   during bargaining sessions?

22   A.    No.  I just told him to -- in the very beginning, to

23   take notes at his own style.

24   Q.    Okay.  Do you know if he took notes during the points in

25   time when the parties -- the two committees, the Union's

 1   committee and the Company's committee, were together,

 2   discussing proposals?

 3   A.   I have no idea.  I never saw his notes.

 4   Q.   Okay.  So you don't know, based on your experience

 5   sitting there with Mr. Kolassa, when he does and doesn't take

 6   notes?

 7   A.   No.  There was 10 and 12 of us at the bargaining

 8   committee.  We're at a long table, and we were arranged -- I

 9   was on the end, so -- leading the discussion, so I don't pay

10   attention to a lot of what the committee does.

11   Q.   All right.  If he's your recording secretary for these

12   negotiations, what would you expect him to take notes of?

13       MR. McKNIGHT:  Objection as to expectation.

14       JUDGE BUXBAUM:  Sustained.

15   Q.   BY MR. FRASER:  Is it your testimony today that you did

16   not look at or review Mr. Kolassa's notes in preparation for

17   your testimony?

18   A.   I did not.

19   Q.   And you've provided your notes to Mr. McKnight in

20   response to the subpoena that we provided to you, correct?

21   A.   That's correct.

22   Q.   Okay.  Was I correct in hearing you in your testimony

23   that the only tentative agreement that the Company -- that

24   Douglas, the Company, and the Union reached during all of

25   2008 was on V-Cap?

1   A.   That's correct.

2   Q.   So from May 1 of 2008 through August 14 of 2008, there

3   were no tentative agreements on anything, correct?

4   A.   Other than V-Cap, that's correct.

5   Q.   Well, was the V-Cap reached from May 1, 2008 to August

6   14 of 2008?

7   A.   Oh, no, no, it was not.

8   Q.   Okay.  So no agreements on anything?

9   A.   No -- you're correct.

10  Q.   Okay.  And that would include each and every bargaining

11  session from May 1 of 2008 through August 14 of 2008.  There

12  were no agreements reached, correct?

13  A.   That's correct.

14  Q.   Now, if an agreement is TA'd, it's still subject to

15  union ratification, correct?

16  A.   That's correct.

17       JUDGE BUXBAUM:  But, presumably, not as an individual

18  agreement; only as part of a complete contract, no?

19       THE WITNESS:  Well, I understood his question to be that

20  only those --

21       JUDGE BUXBAUM:  But you wouldn't go back to the

22  membership every time you reach a tentative agreement and get

23  it ratified by them, would you?

24       THE WITNESS:  No, sir.  I didn't understand his question

25  to be that.

1      JUDGE BUXBAUM:  Okay.

2  Q.   BY MR. FRASER:  You understood my question correctly.

3  It's got to be -- you take whatever you decide to take back.

4  It's a combination of TAs that you're making recommendation

5  on to the bargaining unit; is that correct?

6      MR. McKNIGHT:  Objection to relevance.

7      JUDGE BUXBAUM:  Well, I started it, so it's not

8  counsel's fault, but I think we've explored it enough.

9  Q.   BY MR. FRASER:  Let me take some real specifics here.

10  You recall being at a meeting on May 5, 2008, correct?

11  A.   Yes, sir.

12  Q.   With the Union committee, in Lansing, with the

13  Company --

14  A.   Yes, sir.

15  Q.   -- bargaining committee; is that correct?

16  A.   Yes, sir.

17  Q.   Okay.  Do you recall any discussion about the strike

18  being illegal on May 5 of 2008?

19  A.   No, I do not.

20  Q.   If there had been discussion about it, would that have

21  been something that you might have jotted down?

22  A.   I may have.

23  Q.   Okay.  Did you, the Union and Douglas reach a new

24  collective bargaining agreement on May 5?

25  A.   Had we reached a --

1    Q.    Did you reach one on that date in bargaining?

2    A.    No, sir.  We offered to go back unconditionally, and the

3    Company offered an entire agreement.

4    Q.    Okay.  And I'll get to that in a bit, but -- so there

5    was no agreement reached on May 5?

6    A.    No, sir.

7    Q.    On May 5, did you, as the Union, and Douglas reach any

8    agreement on return to work, the conditions for return to

9    work?

10   A.    Yes, when we get a contract, we'd go back to work.

11   Q.    So you reached an agreement that said, if you get a

12   contract, you're going to go back to work?

13   A.    No.  Mr. Viar gave us a letter that said that.

14   Q.    On May 5, he sent you a letter, okay --

15   A.    Yes -- no, he gave -- the cover letter for the synopsis

16   said, once we get an agreement, we will be expeditiously

17   returned to work.

18   Q.    My question, then, again, is did you reach an agreement

19   on May 5?

20         MR. CARLSON:  I'm going to object, Your Honor.  This is

21   asked and answered.  He's already asked --

22         JUDGE BUXBAUM:  Well, it's cross-examination.  But why

23   don't you expand the meaning of your question.

24         MR. FRASER:  Well, you know, I want to be very clear

25   here.  And I understand the frustration that's going to come

1    along with every time I ask these questions.  But to make
2    sure the record is very accurate, I'm going to ask those same
3    three questions as to every bargaining date.  There's been
4    testimony already about, you know, "We were told, if we do
5    this, then we're going to have this," and this is critical in
6    my mind in terms of <u>Fairpreen</u> and <u>Bogosian</u>.  So --
7         MR. McKNIGHT:  I don't understand what counsel is
8    saying, but he should ask a question; we should raise an
9    objection.
10        JUDGE BUXBAUM:  Well, that's right.  Go ahead and ask
11   the question, but phrase it in a way perhaps that the witness
12   can better understand it because my sense is the witness is
13   struggling with it.
14   Q.   BY MR. FRASER:  We're still on May 5, Mr. Winkle.  You
15   with me?
16   A.   Yes, sir.
17   Q.   Okay.  On May 5, did the UAW Local 822 and Douglas reach
18   any agreement on return to work, on May 5?
19        MR. McKNIGHT:  Objection, asked and answered.
20        JUDGE BUXBAUM:  No, I'm going to permit it.
21        You may answer.  Do you have -- you do understand the
22   question?
23        THE WITNESS:  Yes, I think I do.
24        JUDGE BUXBAUM:  All right.  And what is the answer, sir?
25        THE WITNESS:  No.

152

1  Q.  BY MR. FRASER:  Okay.  On May 5, 2008, did the UAW Local

2  822 and Douglas reach any agreement to reinstate the illegal

3  strikers?

4  A.  When we offered the letter of unconditional -- to return

5  to work.  That fixed it in my opinion.

6  Q.  I didn't ask you whether you fixed it.  I asked you

7  whether you reached an agreement between the Local 822 and

8  Douglas to reinstate the illegal strikers on 5-5-08?

9      MR. McKNIGHT:  Objection, Your Honor.  Really, there's

10  no issue here about whether or not they agreed to reinstate

11  the strikers.

12      JUDGE BUXBAUM:  No, I think it's relevant.

13      MR. CARLSON:  And his testimony has already been that

14  they did not reach any agreements after May 1st.  Why are we

15  going through this exercise?  It's already in the record.

16      JUDGE BUXBAUM:  I'll permit it.

17      You may answer.

18      THE WITNESS:  No, we didn't.

19  Q.  BY MR. FRASER:  On 5-21-2008, Mr. Winkle --

20  A.  Yes, sir.

21  Q.  -- did the UAW Local 822 and Douglas reach a new

22  collective bargaining agreement?

23  A.  On 5-21?

24  Q.  5-21.

25  A.  No, we did not.

1  Q.   On 5-21-2008, did the UAW Local 822 and Douglas reach

2  any agreement regarding return to work?

3  A.   No, we did not.

4  Q.   On 5-21-2008, did the UAW Local 822 and Douglas reach

5  any agreement to reinstate the illegal strikers?

6       MR. McKNIGHT:  Same objections, Your Honor.

7       JUDGE BUXBAUM:  Well, I guess, why can't we, Mr. Fraser,

8  ask the witness if the UAW and Douglas ever reached any

9  agreement on these things?

10      MR. FRASER:  Well, because it's clear to me, based on

11 the testimony that Mr. Winkle gave, that he thinks something

12 happened during some of these bargaining sessions, and I'm

13 trying to understand the extent to which he thinks there was

14 some agreement that the parties reached on return to work.

15 So I'm asking him, specifically, to make sure I don't miss

16 anything, in each one of those sessions, those three

17 questions --

18      MR. McKNIGHT:  That's a complete misrepresentation, Your

19 Honor --

20      JUDGE BUXBAUM:  Well, hold on.  Hold on --

21      MR. McKNIGHT:  -- that's a complete -- no, I want to

22 make a record, if I might.  If I might.  That is a complete

23 misrepresentation of this witness's testimony, who didn't

24 testify about what was or was not agreed to; he testified

25 about who said what.  And for this attorney to say, gee, he

 1   just doesn't understand all that and he's exploring some

 2   subjective state of mind about Mr. Winkle is a lot of

 3   nonsense.

 4        MR. FRASER:  I'm not --

 5        MR. McKNIGHT:  And so I want to just make a record.  I

 6   object to that kind of misleading mischaracterization of the

 7   testimony.

 8        JUDGE BUXBAUM:  All right.  I know -- well, all right.

 9   Mr. Winkle --

10        THE WITNESS:  Yes, sir.

11        JUDGE BUXBAUM:  -- looking at the period from May 1st to

12   August 14th, 2008 --

13        THE WITNESS:  Yes, sir.

14        JUDGE BUXBAUM:  -- did you, meaning the Union --

15        THE WITNESS:  Yes, sir.

16        JUDGE BUXBAUM:  -- and the Company reach agreement about

17   anything?

18        THE WITNESS:  No, sir.

19        JUDGE BUXBAUM:  I think that covers it, counsel.

20        MR. FRASER:  Thank you.

21   Q.   BY MR. FRASER:  Now, Mr. Winkle, you testified about, as

22   I understand it, sporadically taking notes during bargaining

23   sessions from May 1 to August 14 of 2008.  In fact, there

24   were times where Mr. Lillie was meeting with others outside

25   of your presence during bargaining, correct?

1      MR. McKNIGHT:  Objection.  There's no foundation that he

2  would know.

3      JUDGE BUXBAUM:  Well, that's true.  Lay a foundation.

4  Q.  BY MR. FRASER:  Well, let's start one date at a time.

5  Mr. Winkle, on 5-5-2008, do you recall whether or not

6  Mr. Lillie met with any of your bargaining team outside of

7  your presence?

8  A.   No.

9  Q.   You don't recall, or you think he did not?

10  A.   He did not, as I know it, yeah.

11  Q.   Okay.  On 5-21-2008, did Mr. Lillie meet with any of

12  your bargaining team or any other representative that was

13  there on your behalf, outside of your presence?

14      MR. McKNIGHT:  How would he know?  Objection.

15      JUDGE BUXBAUM:  Well, again, lay the foundation,

16  counsel.

17      MR. FRASER:  Well, I'm trying to lay the foundation.

18      JUDGE BUXBAUM:  No, you're not, actually.  There is a

19  foundation that needs to be laid here, and Mr. McKnight's

20  told you what it is.

21  Q.  BY MR. FRASER:  Mr. Winkle, do you know whether or not,

22  on May 21, 2008, anyone from your team met with Mr. Lillie

23  outside of your presence?

24  A.   No, I do not.

25  Q.   Do you know on June 2 of 2008 whether or not anyone from

 1  your team met with Mr. Lillie outside of your presence?

 2  A.    I don't recall because then John became the spokesperson

 3  for the Company.

 4  Q.    Well, I'm talking about June 2, not July 1, so we're

 5  June 2, 2008.

 6  A.    Oh, June 2.  Two, okay, June.

 7  Q.    Do you know?

 8  A.    No, they did not, as far as I know.

 9  Q.    Okay.  On June 13, did anyone, to your knowledge, meet

10  with Mr. Lillie outside of your presence?

11  A.    No, not far as I know.

12  Q.    On July 1, 2008, did anyone, to your knowledge, meet

13  with Mr. Lillie outside of your presence?

14  A.    They could have.

15  Q.    Okay.  And who might that have been?

16  A.    John Canzano, if anybody.

17  Q.    You keep saying Cansanto (sic), but I think the name is

18  Canzano, is that -- when you say it Cansanto --

19  A.    You say it the way you want to, and I'll say it the way

20  I --

21  Q.    Okay.  So that we're talking about the same person --

22        JUDGE BUXBAUM:  But the person we're talking about is an

23  attorney that works with Mr. McKnight?

24        THE WITNESS:  Yes, sir.

25        JUDGE BUXBAUM:  Okay.

1  Q.   BY MR. FRASER:  Okay.  Very good.  On July 2, 2008, are

2  you aware of whether any of your team and/or Mr. Canzano met

3  with Mr. Lillie outside your presence?

4  A.   I'm not aware.

5  Q.   Okay.  July 14, same question.

6  A.   Same answer.

7  Q.   So you're not aware?  July 15, same question.

8  A.   I'm not aware.

9  Q.   Okay.  July 24, same question.

10  A.   I'm not aware.

11  Q.   July 25, same question.

12  A.   I am not aware.

13  Q.   July 28, same question.

14  A.   I'm not aware.

15  Q.   July 31, same question.

16  A.   I'm not aware.

17  Q.   And August 14, same question.

18  A.   Could you repeat the question for August 14th?

19  Q.   Yeah, whether, to your knowledge, anyone from your team

20  met with Mr. Lillie outside of your presence.

21  A.   I'm not aware of it.

22  Q.   Okay.  I think you testified that July 31 was the first

23  time that you recall Mr. Lillie making statements about

24  illegal strikes and waiver of rights, am I --

25  A.   Yes, sir.

1    Q.    Did I get that right?

2    A.    Yes, sir.

3    Q.    So it's your testimony today that, at no other time

4    during any bargaining sessions from May 1 of 2008 until

5    August 14 of 2008 did you -- were you present when Mr. Lillie

6    made comments about not waiving rights and illegal strikes?

7         MR. McKNIGHT:  Objection.  That's a compound question

8    and that's a mischaracterization of the witness's testimony.

9         JUDGE BUXBAUM:  Well, break it down into the two

10   components.

11        MR. FRASER:  Okay.  Well, let me -- all right.  I can do

12   that.  Maybe we could just go through this the date at a time

13   again, if that's the way it needs to happen, so let's try

14   that.

15   Q.    BY MR. FRASER:  On 5-5-2008, Mr. Winkle, do you recall

16   whether Mr. Lillie, in your presence, made any comments about

17   the illegal strike and waiver of rights or not waiver of

18   rights by the Company?

19        MR. McKNIGHT:  Same objection as before.

20        JUDGE BUXBAUM:  Well, break it into two parts.

21   Q.    BY MR. FRASER:  Mr. Winkle, on 5-5-2008, do you recall

22   whether Mr. -- in your presence, did Mr. Lillie make any

23   statements about waiver of rights?

24   A.    No, he did not.

25   Q.    On 5-5-2008, did Mr. Lillie, in your presence, make any

1  statements about illegal strike?

2  A.   No, he didn't.

3  Q.   On 5-21-2008, in your presence, did Mr. Lillie make any

4  statements regarding waiver of rights?

5  A.   No, he did not.

6  Q.   On 5-21-2008, in your presence, did Mr. Lillie make any

7  statements about illegal strike?

8  A.   Yes, he did.

9  Q.   And what did Mr. Lillie say about illegal strike on 5-

10  21?

11  A.   He said, "Phil, I don't believe you filed your 30-day

12  notice; and, therefore, I think we're on an illegal strike."

13  Q.   On 6-2-2008, did Mr. Lillie make any statements in your

14  presence regarding waiver of rights?

15  A.   No, he did not.

16  Q.   On 6-2-2008, did Mr. Lillie make any statements

17  regarding illegal strike?

18  A.   No, he did not.

19  Q.   On 6-13-2008, did Mr. Lillie, in your presence, make any

20  statements regarding waiver of rights?

21  A.   No, he did not.

22  Q.   On 6-13-2008, in your presence, did Mr. Lillie make any

23  statements regarding illegal strike?

24  A.   No, he did not.

25  Q.   On 7-1-2008, did Mr. Lillie, in your presence, make any

1  statements regarding waiver of rights?

2  A.   No, he did not.

3  Q.   On 7-1-2008, did Mr. Lillie make any statements in your

4  presence regarding illegal strike?

5  A.   No, he did not.

6  Q.   On 7-2 of 2008, in your presence, did Mr. Lillie make

7  any statements regarding waiver of rights?

8  A.   No, he did not.

9  Q.   And on 7-2-2008, in your presence, did Mr. Lillie make

10  any statements regarding illegal strike?

11  A.   No, he did not.

12  Q.   On 7-14-2008, did Mr. Lillie, in your presence, make any

13  statements regarding waiver of rights?

14  A.   No, he did not.

15  Q.   On 7-14-2008, did Mr. Lillie, in your presence, make any

16  statements regarding illegal strike?

17  A.   No, he did not.

18  Q.   On 7-15-2008, did Mr. Lillie, in your presence, make any

19  statements regarding waiver of rights?

20  A.   No, he did not.

21  Q.   On 7-15-2008, did Mr. Lillie make any statements in your

22  presence regarding illegal strike?

23  A.   No, he did not.

24  Q.   On 7-24-2008, did Mr. Lillie, in your presence, make any

25  statements regarding waiver of rights?

1   A.    No, he did not.

2   Q.    On 7-24-2008, in your presence, did Mr. Lillie make any

3   statements regarding illegal strike?

4   A.    No, he did not.

5   Q.    On 7-25-2008, in your presence, did Mr. Lillie make any

6   statements regarding waiver of rights?

7   A.    No, he did not.

8   Q.    On 7-25-2008, did Mr. Lillie, in your presence, make any

9   statements regarding illegal strike?

10  A.    No, he did not.

11  Q.    On 7-28-2008, did Mr. Lillie make any statements in your

12  presence regarding waiver of rights?

13  A.    No, he did not.

14  Q.    On 7-28-2008, did Mr. Lillie, in your presence, make any

15  statements regarding illegal strike?

16  A.    No, he did not.

17  Q.    And I think you've already testified, on 7-31 --

18  A.    Yes, sir.

19  Q.    -- that's the first time you heard statements about

20  waiver and illegal strike?

21  A.    Yes, sir.

22  Q.    But a second ago, you testified that you heard some

23  similar -- something on 5-21-2008?

24  A.    Yes, sir.

25        MR. CARLSON:  I'm going to object.  That was his

1   testimony on direct, as well, not just a second ago.  That

2   was his testimony on direct, as well.

3       MR. FRASER:  Okay.  That's fine.

4   Q.  BY MR. FRASER:  On August 14, 2008, did you hear -- in

5   your presence, did Mr. Lillie make any statements about

6   waiver of rights?  August 14.

7   A.  No, he didn't.

8   Q.  And on August 14, 2008, in your presence, did Mr. Lillie

9   make any statements regarding illegal strike?

10  A.  No, he did not.

11  Q.  Okay.  Now, I asked you whether or not you looked at

12  Mr. Kolassa's notes in preparation for today's hearing, and I

13  think you told me no, correct?

14  A.  Yes, sir.

15  Q.  Did you look at any of the bargaining committee notes of

16  any other bargaining committee members from Local 822 in

17  preparation for today's hearing?

18  A.  No, sir.

19  Q.  Okay.  And if those notes indicate that there was

20  discussion about waiver of rights and illegal strike during

21  some of the sessions you've indicated that you didn't hear

22  that, is it possible that those discussions were outside of

23  your presence?

24      MR. McKNIGHT:  Objection, no foundation, hypothetical,

25  calls for speculation.

163

1      JUDGE BUXBAUM:  No, no, the way it's phrased, "is it

2   possible," I think is a reasonable way to phrase it.

3      THE WITNESS:  I did not hear it, Mr. Fraser.  If it's in

4   their notes, then -- I don't recall hearing it.

5   Q.   BY MR. FRASER:  Okay.  All right.  Mr. Winkle, between

6   May 1 of 2008 and August 14 of 2008, I think you testified

7   that you had several telephone conversations with Mr. Lillie,

8   correct?

9   A.   A few.

10  Q.   In any of those telephone conversations that you had

11  with Mr. Lilly, did he talk to you about the Company not

12  waiving its rights under the law?

13  A.   No, sir, he did not.

14  Q.   And in any of those telephone conversations with

15  Mr. Lillie, did he indicate to you that he thought the strike

16  was illegal?

17  A.   No, he did not, on the phone.

18  Q.   I've talked about bargaining sessions.  I've talked

19  about on the phone.  Are there any other instances with

20  Mr. Lillie, through any other communication medium, where he

21  told you that the Company was not waiving its rights --

22  A.   No.

23  Q.   -- from May 1, 2008 to August 14 of 2008?

24     MR. McKNIGHT:  Objection as to any other communication

25  medium.  I have no idea what that means.

1    JUDGE BUXBAUM:  Well, it means letter, fax, telegram,

2  e-mail, yeah --

3    MR. FRASER:  E-mail, text message, Twitter, Facebook,

4  you know, you name it.

5    MR. McKNIGHT:  That wasn't calling for a smart aleck

6  response.  I don't understand that question, and I don't

7  think the witness would understand it --

8    JUDGE BUXBAUM:  Well, we just elucidated it.

9    THE WITNESS:  No, sir.  I'm not too much on the

10  computer, so I didn't --

11  Q.   BY MR. FRASER:  Nothing else you can think of?

12  A.   No, sir.

13  Q.   Okay.

14    JUDGE BUXBAUM:  But was there any occasion between

15  August -- between May 1st and August 14th where --

16    MR. McKNIGHT:  His question was May --

17    JUDGE BUXBAUM:  First.

18    MR. McKNIGHT:  -- May 21st.

19    JUDGE BUXBAUM:  May 21st?

20    MR. FRASER:  No, May 1st.

21    JUDGE BUXBAUM:  Yeah, I thought it was May 1st.

22    MR. FRASER:  I believe I said May 1st.

23    JUDGE BUXBAUM:  Which date do you want?

24    MR. FRASER:  May 1st.

25    JUDGE BUXBAUM:  Okay.  Any occasion between May 1st and

1  August 14th where Mr. Lillie communicated with you, by any

2  method, including face to face in a conversation, where he

3  discussed these subjects, that is, first of all, waiver of

4  the Company's rights?

5      THE WITNESS:  No, sir.

6      JUDGE BUXBAUM:  Secondly, the involvement of the Union

7  in what he called an illegal strike?

8      THE WITNESS:  He mentioned illegal strike on the 21st.

9      JUDGE BUXBAUM:  At the bargaining session?

10      THE WITNESS:  The bargaining session, yes, sir.

11      JUDGE BUXBAUM:  But I'm talking about besides that.

12      THE WITNESS:  No, sir.

13  Q.  BY MR. FRASER:  Mr. Winkle, are you from Bronson?

14  A.  No, sir.

15  Q.  You testified about at least one meeting with Local 822

16  president and vice president, Mary Ellis and Frank Gruza.  Do

17  you remember that?

18  A.  Yes, sir.

19  Q.  Were there additional meetings with them from 5-1-08 to

20  8-14-08 to talk about the illegal strike?

21  A.  No, sir.

22  Q.  So it's just that one meeting that you had with them

23  where you talked about the illegal strike?

24  A.  Yes, sir.

25  Q.  And those are my words.  I'm saying illegal strike.  You

1  talked to them about the strike issue only on that --

2  A.   On the Saturday, the 3rd, we informed Mary Ellis and

3  Frank Gruza that I didn't file the 8(d) notice.

4  Q.   Okay.  And that was you and Mr. Cline that did that?

5  A.   Yes, sir.

6  Q.   Okay.  Where was that meeting held with Ms. Ellis and

7  Mr. Gruza?

8  A.   We picked them up at the Union hall and went to the

9  little park outside Bronson, the little community park on

10  US-12.

11  Q.   Okay.  So the Union hall -- the Local 822 union hall in

12  Bronson, and then the four of you left there --

13  A.   Yes, sir.

14  Q.   -- and went somewhere else to discuss that?

15  A.   Yes, sir.

16  Q.   Was there a lawyer present with you during that

17  discussion?

18  A.   No, sir.

19  Q.   Can you tell me what it is that you told Frank Gruza and

20  Mary Ellis?

21  A.   Yeah.

22  Q.   Okay.

23  A.   I says, you know, "I didn't file the 8(d) notice.  And

24  what does that mean?  I don't know.  I just know it's a

25  violation of the law."

1    Q.    Okay.  Did they ask you any questions?

2    A.    Yeah.  "What does all that mean?"  I said, "I don't

3    know."

4    Q.    Did they ask you any questions other than, "What does

5    all that mean?"

6    A.    What kind of ramifications, you know, and I said, "I

7    don't know.  I'm not an attorney.  All I know is that it is a

8    violation of the law.  We need to fix it.  We need to get the

9    people back to work."  And they were in agreement to do that.

10   Q.    Okay.  So that's the extent of the questions that you

11   can recall --

12   A.    Yes, sir.

13   Q.    -- in that meeting with them?

14   A.    Yes, sir.

15   Q.    "What does it mean?"  Okay.  How long you think that

16   meeting lasted?

17   A.    Probably five to ten minutes at the most.

18   Q.    Okay.  Why did you leave the Union hall to go to the

19   park to do that?

20        MR. McKNIGHT:  Objection to relevance.

21        JUDGE BUXBAUM:  I'll allow it.

22        You may answer.

23        THE WITNESS:  Because everybody was hanging around the

24   Union hall, and we needed privacy to inform them.

25   Q.    BY MR. FRASER:  Okay.  Did you decide in that meeting

1   that the way to fix the illegal strike was to make the

2   unconditional offer to return to work?

3   A.   No, we had already decided that.

4   Q.   When had that been decided?

5   A.   Late Friday, the 2nd.

6   Q.   Okay.  And how did you reach a conclusion that that's

7   how you were going to fix the illegal strike?

8   A.   Just common sense.

9   Q.   Why do you say that, common sense?

10   A.   We were out on --

11        MR. McKNIGHT:  Objection, it's argumentative.  Speaks

12   for itself.

13        JUDGE BUXBAUM:  No, I'm going to permit it.

14        Why did you use the choice of words "common sense" in

15   response to the question?

16        THE WITNESS:  Well, sir, we knew that we hadn't filed

17   the 8(d) notice, and common sense said we were in jeopardy.

18   We were on a strike that violated the law, that we need to

19   get the people back in the plant.  You know, and so we

20   offered -- that's why we came up with the unconditional

21   offer --

22   Q.   BY MR. FRASER:  So you said common sense, and I

23   appreciate you explaining to me what that meant, but you knew

24   what an 8(d) violation meant on that Friday, correct?

25        MR. McKNIGHT:  Objection, argumentative.  Asked and

1    answered.

2        JUDGE BUXBAUM:  I'm going to allow it.

3        You may answer.

4        THE WITNESS:  I knew it was a violation of the law.  As

5    to what all the ramifications was of that, I'm not an

6    attorney, and I don't know.

7    Q.   BY MR. FRASER:  Had you been through an 8(d) violation

8    in the past?

9    A.   No, sir.

10   Q.   How did you know it was a violation of the law?

11   A.   I looked it up.

12   Q.   You looked it up on Friday?

13   A.   Yes, sir.

14   Q.   What did you look it up in?

15   A.   In the NLRB stuff.

16   Q.   Where?  I mean, what was your --

17   A.   In a booklet we had at the office.

18   Q.   Do you remember what that booklet is called?

19       MR. McKNIGHT:  Objection, irrelevant.

20       JUDGE BUXBAUM:  Sustained.  Enough with that.

21   Q.   BY MR. FRASER:  That's the only source you looked at?

22       MR. McKNIGHT:  Objection.

23       JUDGE BUXBAUM:  We can move on from this point.

24   Q.   BY MR. FRASER:  Did you contact the Company and let them

25   know that the strike was illegal between 5-1-08 and 5-5-08?

1    A.    Between --

2    Q.    5-1-08 and 5-5-08, did you contact the Company to let

3    them know the strike was illegal?

4    A.    No, sir.

5    Q.    Why not?

6    A.    Why would I?

7    Q.    Unfortunately, I get to ask the questions.

8    A.    Oh.  No, I did not.

9    Q.    Okay.  And I asked again, why not?

10   A.    I didn't think it was prudent.

11   Q.    Didn't think it was prudent?  Is it fair to say that you

12   were trying to protect your rights and your interests in

13   determining what to do because the strike was illegal?

14        MR. McKNIGHT:  Objection, argumentative.

15        JUDGE BUXBAUM:  I don't think so, counsel.  I really

16   don't.

17        Go ahead.  You may answer.

18        THE WITNESS:  I had 146 or 145 people out on strike.  My

19   goal was to get them back to work.  I didn't want to inform

20   the Company that I had screwed up, you know.

21   Q.    BY MR. FRASER:  During the strike -- let's take the

22   period 5-1 to 5-5 -- were there updates that were sent to the

23   members regarding the status of the strike?

24   A.    From 5-1 --

25   Q.    To 5-5.  I know you said you had a meeting.  I'm not

1    asking about that.

2    A.    Okay.  We had the meeting on 5-4.  We made the

3    unconditional offer on 5-5, that morning.  No, we didn't have

4    any updates because we went to Lansing that night.

5    Q.    Okay.  During the strike, was there a system set up by

6    the local or by the international to give bargaining unit

7    members information?

8    A.    We have meetings.  All part of being on a, you know,

9    strike lockout.  We have meetings, communication meetings.  I

10   don't know -- I don't understand your question.

11   Q.    Specifically, what I'm looking for is, was there a

12   system set up so that a bargaining unit member could make a

13   call to an information line or get online to a website and

14   gather information about the strike?

15        JUDGE BUXBAUM:   Information from the Union?

16   Q.    BY MR. FRASER:   From the Union, correct.

17   A.    No, sir.

18   Q.    And so that the -- am I hearing you correctly that the

19   only communication system that was used was actual physical

20   bodies in a meeting room where information was discussed?

21   A.    Yes, sir.

22   Q.    No letters, no correspondence from 5-1-08 to 5-5-08,

23   from the international or the local, to its members about

24   this issue, about the strike?

25   A.    The status of the strike?  I've got no understanding --

1        JUDGE BUXBAUM:  Well, anything about the strike.

2   Q.   BY MR. FRASER:  Any issue relating to the strike at all,

3   any correspondence, any letters, anything, any written

4   document?

5   A.   Yes, yeah, and I gave all that that I had, everything --

6   I searched my files.  Everything I had, I turned over to Sam

7   McKnight.

8   Q.   So tell me what you think it is that was sent to the

9   members from 5-1-08 to 5-5-08.

10  A.   I don't recall anything sent to the members.  There was

11  some things sent from the local up through to the director,

12  to get phones put in, computer put in, shirts for a rally,

13  picnic --

14  Q.   Okay.  But nothing to the members, specifically?

15  A.   No, sir, that I can recall.

16  Q.   After 5-5-08, through 8-14-08, were there written

17  communications provided to your members about the strike, the

18  lockout, the issues that -- the strike, first of all?  5-5-08

19  to 8-14-08, any written communications from the local to

20  members --

21  A.   From 5-5 --

22  Q.   5-5 to 8-14.

23  A.   From the lockout forward, then?

24  Q.   Yeah.

25  A.   Was there any written from the Union?

1  Q.   From the local or the international.

2  A.   To the members?

3  Q.   Yes.

4  A.   No, not that I recall.

5  Q.   Okay.  From 5-5-08 to 8-14-08, any written communication

6  from the international or the local to the members on any

7  topic related to Bronson?

8       MR. McKNIGHT:  Well, objection as to the local or the

9  members.  I mean, those are two different --

10      JUDGE BUXBAUM:  No, he said the local or the

11  international.

12      MR. FRASER:  From the local or the international, to the

13  members.

14      JUDGE BUXBAUM:  To the members.

15      MR. McKNIGHT:  Oh, I misunderstood.

16      THE WITNESS:  Not that I am aware of.

17  Q.   BY MR. FRASER:  Okay.  You didn't put one out?

18  A.   No, sir.

19  Q.   As far as you know, the communication division of the

20  UAW did not put one out?

21  A.   As far as I know.

22  Q.   Okay.  How did Local 822 communicate with you during the

23  strike?

24  A.   By phone.  Mary Ellis or Frank Gruza was on the cell

25  phone, basically daily.

1   Q.   Any e-mails from anyone at Local 822 to you?

2   A.   No, I told you I'm not -- I don't mess with a computer.

3   I've got one, but I don't know about it.

4   Q.   Okay.  So can you think of any communications other than

5   through the cell phone with Local 822, from 5-5-08 --

6   A.   Yes, I mean, those documents that I got for Sam was --

7   again, there was a rally, we ordered some shirts, we had a

8   meal, we put in a line of communication for that local

9   because they had no phone, they had no computer, and that was

10  the things that came through me to the director.  That was my

11  communications with them.

12  Q.   So we were talking about the local.  Now I'm going to

13  ask you about the UAW.  How did the UAW communicate with you

14  during the period 5-1-08 through 8-14-08?

15       MR. McKNIGHT:  Objection.

16       JUDGE BUXBAUM:  How is it relevant?

17       MR. FRASER:  Regarding the strike, the lockout, the --

18       JUDGE BUXBAUM:  I still don't understand its relevance.

19       MR. FRASER:  Well, to me, the relevance is he could have

20  been receiving instructions on what it is that he -- what

21  steps he needed to take in order to try to make sure that the

22  employees, bargaining unit members, were considered to be

23  reemployed.  I mean, I'm just making this up as I go.

24       JUDGE BUXBAUM:  But ask him that, then.  How he got

25  those instructions doesn't seem to me relevant.

1    MR. FRASER:  Well, I guess I started with the general.

2  If the answer is that, "Nobody communicates with me at all.

3  I didn't have any," I wouldn't have to ask him the next

4  question.

5    MR. McKNIGHT:  Well, he works for the UAW.  I think he

6  probably communicates with lots of people within the UAW

7  routinely.  I don't think -- I mean, your question is --

8    JUDGE BUXBAUM:  The means of communication within the

9  UAW, I think is irrelevant.  As to what communications were

10  had --

11    MR. FRASER:  Thank you.

12  Q.  BY MR. FRASER:  Mr. Winkle, were there any

13  communications from the UAW to you between 5-1-08 and 8-14-

14  08, related to Bronson -- or Douglas and the strike?

15  A.  Not that I recall.

16  Q.  So there weren't any phone calls --

17  A.  Yeah, there was phone calls.  I thought you said

18  documents or --

19  Q.  Sorry.  I said communications, I thought.  Maybe I

20  didn't.

21  A.  Oh, okay.

22    JUDGE BUXBAUM:  No, you did.

23  Q.  BY MR. FRASER:  So there were communications by phone?

24  A.  I update my director on where we're at all the time, my

25  boss.

1    Q.    Who is your director?

2    A.    Duane Zigsworth (ph.).

3    Q.    How often were you updating him?

4    A.    As things changed, as -- you know, on a need basis.

5    Q.    Daily?

6    A.    Not daily.  Weekly.

7    Q.    I'm going to go through my other notes in a second.

8    Remind me which day you first realized that the strike at

9    Douglas was illegal.

10   A.    On Friday, May 2nd, in the afternoon.

11   Q.    Are you aware of any document that Douglas sent to you

12   or any other Local 822 member other than the August 4, 2008

13   letter, which you've already testified about, that terminated

14   their status?

15   A.    Am I aware of a letter --

16   Q.    Of any other document that Douglas would have sent to

17   the bargaining unit members, other than the August 4, 2008

18   letter, terminating the status of the bargaining unit

19   members?

20   A.    No, I'm not aware.

21        MR. McKNIGHT:  I just want to say for the record that we

22   started off trying to stipulate to all of these

23   communications.  We --

24        JUDGE BUXBAUM:  Well, but nobody's required to

25   stipulate, counsel.

1      MR. McKNIGHT:  Well, no, no, no.  And at your request

2  and with counsel's request, we -- I want to say short-

3  circuited that portion of our subpoenas duces tecum.  And it

4  seems inappropriate to me now to be going back and asking for

5  other communications about the same topic, when we subpoenaed

6  all that stuff.

7      JUDGE BUXBAUM:  And, Mr. McKnight, I don't understand

8  your vehemence on the point.  It seems like milquetoast

9  stuff.  I mean, is there some other letter that the Company

10  sent, telling the --

11      MR. McKNIGHT:  I have no idea.

12      JUDGE BUXBAUM:  Well, but that's what I'm saying.

13      MR. McKNIGHT:  I've produced everything that you said to

14  do, and that they said they didn't want to produce.

15      JUDGE BUXBAUM:  I understand, but he can explore some of

16  this on cross, just as you're going to be able to when his

17  witnesses testify.

18      You may proceed, counsel.

19      MR. FRASER:  Thank you.

20  Q.   BY MR. FRASER:  Mr. Winkle, how often were you at the

21  picket line, beginning 5-1-08 forward?  How often were you

22  there?

23      MR. McKNIGHT:  Objection.

24      JUDGE BUXBAUM:  Well, let's have a foundation,

25  certainly.

1  Q.  BY MR. FRASER:  Were you at the picket line --

2      JUDGE BUXBAUM:  Well, was there a picket line?

3  Q.  BY MR. FRASER:  Was there a picket line, Mr. Winkle, at

4  Douglas on or after May 1 of 2008?

5  A.  Yes, there was.

6  Q.  Were you, in fact, ever at the picket line at Douglas --

7  A.  Yes, I was.

8      MR. McKNIGHT:  Objection, relevance.

9      JUDGE BUXBAUM:  I'm going to allow it.

10      You may answer.

11      THE WITNESS:  Yeah, I was -- I attended a picket line.

12  Q.  BY MR. FRASER:  How often were you there?

13  A.  I don't know the number of times.  I was at the hall a

14  lot.  I'd walk over to the picket line every once in a while

15  to see how folks were doing, then walk back to the hall.

16  Just across the railroad track.

17  Q.  You testified as to General Counsel 48 that you know

18  that all the individuals on this list were, and I think still

19  are, Local 822 members, correct?

20  A.  Yes.

21  Q.  Do you know them?

22  A.  I know most of them.

23  Q.  You do?

24  A.  Yes.

25  Q.  Okay.  Well, let's take this one at a time.  At any time

1    from May 1 of 2008 to present, have you seen Philip Bowers

2    (ph.) on the picket line?

3        MR. McKNIGHT:  Objection --

4        MR. CARLSON:  I'm going to object to this.  What is the

5    relevance of this?

6        JUDGE BUXBAUM:  Sure.  Why would we engage --

7        MR. FRASER:  Well, here's the issue because the argument

8    that counsel is making is that there are two separate groups

9    of employees.  One of them is those people laid off.  The

10   second --

11       JUDGE BUXBAUM:  I see.  So you're not going to go

12   through three pages; you're going to go through one page?

13       MR. FRASER:  Exactly.

14       JUDGE BUXBAUM:  I see that.  Why can't he do that --

15       MR. FRASER:  The front page because his argument is that

16   there's no participation.

17       JUDGE BUXBAUM:  I get it.  I get it.  Why can't he do

18   that?

19       MR. CARLSON:  My objection is if he goes through one

20   name.  The issue is what the Employer did on August 4th.

21   It's not whether or not Mr. Winkle --

22       JUDGE BUXBAUM:  No, but wait a minute --

23       MR. CARLSON:  -- the issue is what they knew.

24       JUDGE BUXBAUM:  But, Mr. Carlson, wait a minute now.

25   Hold on --

1      MR. CARLSON:  Now he's going to put in testimony about

2  whether or not people were on the picket line?  How is that

3  relevant --

4      JUDGE BUXBAUM:  Because you --

5      MR. CARLSON:  -- to what the Employer did on August 4th

6  whether or not Mr. Winkle saw someone on the picket line?

7      JUDGE BUXBAUM:  Well, whether or not Mr. Winkle saw

8  them, that, I --

9      MR. CARLSON:  That's his question, and what's the

10  relevance of that?

11      JUDGE BUXBAUM:  But, no, no.

12      MR. CARLSON:  The relevance is if the Company saw --

13      JUDGE BUXBAUM:  The question, Mr. Carlson, is, is it

14  relevant and otherwise proper to have evidence as to whether

15  any of the people who were laid off at the time of the strike

16  decided to participate in the strike?  Because in your

17  opening statement, you contended that it was extremely

18  significant that there were people who did not participate in

19  the strike who were, nevertheless, subject to, in your view,

20  unlawful disciplinary action -- or discharge by the Company.

21      MR. CARLSON:  The law, I believe, Your Honor, is that

22  participating in a strike includes withholding labor.

23      JUDGE BUXBAUM:  Right.

24      MR. CARLSON:  With respect to those individuals, they

25  were on layoff status.

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

1          JUDGE BUXBAUM:  They couldn't withhold their labor.

2          MR. CARLSON:  They couldn't withhold labor.

3          JUDGE BUXBAUM:  I think we all get that.

4          MR. CARLSON:  Right.  So whether or not they engaged in

5     a -- whether or not Mr. Winkle happened to see them engaging

6     in any picket line activity --

7          JUDGE BUXBAUM:  So you're saying it's something

8     different -- picketing is different than striking?

9          MR. CARLSON:  What if they were on the picket?  So what?

10          JUDGE BUXBAUM:  Yeah, well, that's my question.  All

11     right.  Let's explore that.  What if they were on the picket

12     line?

13          MR. FRASER:  Your Honor, if they were on the picket

14     line, there are all kinds of objective factors that are used

15     to determine whether or not there was some type of connection

16     to the strike and whether or not they chose not to be part of

17     it or whether, in fact, they chose to engage in it.

18          And so our view is it's completely relevant to go

19     through this entire list as to the laid-off employees to ask

20     whether or not they were there, if they were, what were they

21     doing, how often were they there?  And my next set of

22     questions, which relates to did you pay them, are you paying

23     for their benefits?  I mean, the full panoply of everything a

24     striker gets.

25          MR. McKNIGHT:  Well --

1    JUDGE BUXBAUM:  Go ahead.

2    MR. McKNIGHT:  I was on the picket line, and I wasn't on

3  strike, and we -- the strike lasted from, I guess, the

4  morning of the 1st, 2nd, 3rd, Saturday, Sunday, and ended 7

5  a.m. on the 5th.  I don't think it was conceivable that

6  anybody who was laid off could have withheld services, or

7  who's on sick leave could have withheld services.  And,

8  really, this is just kind of dribbling out the clock here.

9  This has nothing -- it's not possibly relevant.

10    MR. FRASER:  Your Honor, I think that Mr. McKnight is

11  testifying, and we've offered for him to be able to do that

12  in this proceeding later.  If he wants to talk about his time

13  on the line, I would be happy to go through each one of these

14  people and ask him those questions.

15    JUDGE BUXBAUM:  Ignore that.  Get the -- yeah, look, I

16  get that, but get to his point.

17    MR. CARLSON:  Well, Judge, also, I would like to note,

18  also, that I subpoenaed documents, specifically,

19  communications between the Company and any of the alleged

20  discriminatees.  In that box of documents -- I haven't had a

21  chance to review all of them -- I don't see a single recall

22  notice.  I don't see a single communication between the

23  Company and those individuals --

24    JUDGE BUXBAUM:  All right.  But, Mr. Carlson, I --

25    MR. CARLSON:  -- saying they should come back to work.

1  So before we get to the issue of who was on the picket line,

2  I think they need to at least proffer that, at some point,

3  they're going to make an argument that they recalled these

4  people before we start talking about all of them.

5      JUDGE BUXBAUM:  Okay.  Now you're -- but this is helpful

6  to me, Mr. Carlson, so let me make sure I grasp it.  What

7  you're saying is that the only way that -- that the key

8  question in terms of who was on strike is, who was

9  withholding labor?  That other manifestations of support for

10  the strike, such as walking the picket line, are not

11  significant, legally, in terms of whether the laid-off

12  employee -- the people on page 1 were withholding their labor

13  from the Company?

14      MR. CARLSON:  I think that's correct, Your Honor.

15      JUDGE BUXBAUM:  That makes some sense, Mr. Fraser.  Tell

16  me why that isn't right.

17      MR. FRASER:  Well, I suppose it makes some sense, Your

18  Honor, but here's the issue.  That's a circle, and the

19  factual record needs to be developed.  The legal argument

20  which Mr. Carlson is making right now, which may or may not

21  be accurate for all I know -- I haven't had the liberty or

22  the opportunity, as, apparently, Mr. Carlson has to read a

23  bevy of cases -- but we're making some of the same arguments

24  related to reemployment and employee status.  And my

25  understanding of the rulings so far has been we need to

184

1  develop this record to make sure that the factual information

2  is there.  The arguments will come in based on the law.  If

3  Mr. Carlson is correct, then I suppose it won't necessarily

4  matter whether Mr. Winkle saw these people.  If he's wrong,

5  it does.

6      MR. CARLSON:  I would just note a couple points.  Number

7  one, I referred to the Freeman case in our phone

8  conversation --

9      JUDGE BUXBAUM:  All right.  All right.

10     MR. CARLSON:  -- and the Employer's prior counsel in

11 this case cited the Freeman case in its position statement to

12 us.  So the Employer is well-aware of the Freeman case and

13 the propositions for which it stands, which includes what

14 we're discussing:  how you engage in a strike, who engages in

15 a strike.  It talks specifically about those subjects.

16     JUDGE BUXBAUM:  It does, but I'm not sure it does in

17 this precise context.

18     MR. FRASER:  I also recall, Your Honor, a statement that

19 you made previously in response to an objection that I made

20 which said, "I understand that I can err on the side of being

21 more liberal and letting things in, knowing full well that,

22 if they're in, then the objections that are raised later in

23 some proceeding may be --"

24     JUDGE BUXBAUM:  Yeah, I remember my words, Mr. Fraser.

25 I remember them.

1      MR. FRASER:  Thank you.

2      JUDGE BUXBAUM:  The question I still have for you is,

3  let us assume, just to take one as an example, that

4  Mr. Bowers was laid off, was an enthusiastic proponent of the

5  strike, I mean, walked the picket line, floated a big

6  inflated rat over the Company's premises.  Does it matter?

7  In other words, he was never put to the test of whether he

8  was on strike, unless you can demonstrate that he was

9  recalled to work.

10      MR. FRASER:  I don't agree with that, Your Honor, but --

11  I don't agree with that analysis.  Our position again --

12      JUDGE BUXBAUM:  Is it your contention that any of the

13  people on page 1 were recalled to work during the pendency of

14  the strike?

15      MR. FRASER:  Based on what this witness has testified

16  about, there's no evidence about that at all.  My --

17      MR. McKNIGHT:  You're entitled to an answer to that,

18  Your Honor, and so is the record.

19      JUDGE BUXBAUM:  I think so.

20      MR. McKNIGHT:  You asked the question.

21      JUDGE BUXBAUM:  I mean, I think it's already in

22  evidence, isn't it, that they were on the layoff list --

23  well, no, it isn't in evidence.  Do you contend that, between

24  May 1st and May 5th, any of the individuals on page 1 were

25  recalled to work?

1     MR. FRASER:  At this point, Your Honor, I've not

2 explored that possibility with my clients.  For all I know,

3 if they testify -- now that Mr. Winkle has raised some of

4 these issues and it's just dawned on me to ask those

5 questions, I can raise those issues with my client.  As I sit

6 here today, I can't tell you they were or they weren't.

7     JUDGE BUXBAUM:  Well, all right.  Then we're going to

8 leave it at that.  For any of these people that you can show

9 were given an offer of recall, I will look at other

10 demonstrations of their conduct to determine whether they

11 were withholding their labor.

12     But absent that, it doesn't really matter whether these

13 people were enthusiastic in their demonstrations of

14 solidarity with the strikers, as long as they weren't being

15 put on the spot themselves.

16     MR. FRASER:  And, again, Your Honor, then I understand

17 that to mean that you've ruled on a legal issue in making

18 this decision.

19     JUDGE BUXBAUM:  Yeah, that there's a distinction between

20 striking and picketing and that workers who are on layoff

21 can't withhold their labor.

22     MR. FRASER:  Okay.  That's all I was looking for.  Thank

23 you.

24     JUDGE BUXBAUM:  Sure.

25 Q.  BY MR. FRASER:  Mr. Winkle, I think you testified that

1   the reason you made the unconditional offer to return to work

2   was to right the mistake you made with the illegal strike,

3   correct?

4   A.   With the 8(d) notice, sir.

5   Q.   So the answer is yes?

6   A.   Not to your question.

7   Q.   So to right the error in not filing the 8(d) notice; is

8   that correct?

9   A.   That's correct.

10   Q.   And why did you think that would right the error?

11        MR. McKNIGHT:  Asked and answered several times.  And,

12   actually, the witness explained that he did it based on

13   common sense, and then he explained what he understood by

14   common sense.

15        JUDGE BUXBAUM:  Yeah, we have trod this ground before.

16   Q.  BY MR. FRASER:  Why didn't you allow your members to

17   return to work based on the conditions the Company gave you

18   on 5-5-08?

19        MR. McKNIGHT:  Objection.

20        JUDGE BUXBAUM:  Basis?

21        MR. McKNIGHT:  It assumes in evidence something that is

22   not in evidence.

23        JUDGE BUXBAUM:  I think you need to make it clear what

24   you're referring to, counsel.

25   Q.  BY MR. FRASER:  Well, Mr. Winkle, you had attended

1    the -- I would label it a bargaining session -- a meeting on

2    5-5-08, correct?

3    A.    Yes, sir.

4    Q.    And you received a set of conditions from the Company,

5    correct?

6    A.    I received a synopsis proposal.

7    Q.    And my understanding is the Company indicated to you

8    that those were the conditions upon which your members could

9    come back to work, right?

10        MR. McKNIGHT:  Objection.  That is a mischaracterization

11   of what the Company wrote and what the Company gave the

12   witness.

13        JUDGE BUXBAUM:  Well, all right.  Hold on.  Hold on.

14        Rephrase the question.

15        MR. FRASER:  I didn't say that he said that; I said my

16   understanding --

17        MR. McKNIGHT:  And that's -- it's untruthful.

18        JUDGE BUXBAUM:  But that's the part that's

19   objectionable.  Rephrase.

20   Q.    BY MR. FRASER:  Mr. Winkle, did you understand the

21   document you received on 5-5-08 to be the conditions upon

22   which your members needed to return to work?

23   A.    I asked that question.

24   Q.    My question to you is did you understand that those were

25   the conditions upon which your members needed to return to

1  work?

2  A.   No, I asked the Company if they wanted us to return

3  under those conditions, and they said absolutely not.

4  Q.   Okay.  Were you ever given a set of conditions upon

5  which you needed to return?

6  A.   When we get an agreement.

7  Q.   And you never reached an agreement, right?

8  A.   We never reached an agreement.

9       JUDGE BUXBAUM:  And when you say agreement, you mean a

10  collective bargaining agreement --

11      THE WITNESS:  Yes, sir.  That's --

12      JUDGE BUXBAUM:   -- you mean a collective bargaining

13  agreement for the future of the workplace?

14      THE WITNESS:  Yes, sir.  That's what I mean exactly,

15  sir.

16  Q.   BY MR. FRASER:  Now, Bruce Lillie specifically asked you

17  for a copy of the F-7, correct?

18  A.   Yes, he did.

19  Q.   And did you respond to Mr. Lillie?

20  A.   Yes, I did.

21  Q.   Can you tell me specifically -- I want you to think --

22  specifically what you told Mr. Lillie about his request for

23  the F-7?

24  A.   I said, "It's a matter of public record.  You can get

25  one."

1  Q.   Isn't it true that you told him, "You will never fucking

2  get it"?

3  A.   I did not.

4  Q.   You did not say that?

5  A.   I did not.

6  Q.   On May -- I guess it would have been 12:01 a.m., on May

7  1st, when you met with Mr. Viar, you said that Mary Ellis and

8  Frank Gruza were with you, correct?

9  A.   At midnight?

10  Q.   I'm trying to make sure I say this the right way.  It

11  would have been 12:01 a.m., on May 1, 2008, when you met with

12  Mr. Viar --

13  A.   Yes, sir.

14  Q.   -- do you recall that?

15  A.   Yes, sir.

16  Q.   Okay.  And you said -- in your direct testimony, you

17  said, "We told him we were going on strike."  Did you tell

18  him that, or did Mary Ellis or Frank Gruza tell him that?

19  A.   I believe I told him.

20  Q.   Okay.  What else did you tell him in that meeting about

21  the strike?  Anything?

22  A.   I didn't say anything about it.  I just said, "We're

23  going on strike.  Contract's expired."

24  Q.   Okay.  How long do you think that meeting lasted?

25  A.   It didn't last five minutes.

1    Q.    Okay.  Do you recall whether or not Mr. Gruza made any

2    comments about the strike in that meeting?

3    A.    I don't recall.

4    Q.    Do you recall whether Mary Ellis made any comments about

5    the strike in that meeting?

6    A.    I don't recall.

7    Q.    When you handed that strike notice to Mr. Viar, were

8    there already pickets outside, striking?

9    A.    No, sir.

10    Q.    When did the pickets show up?

11        MR. McKNIGHT:  Objection, it's irrelevant.

12        JUDGE BUXBAUM:  How is it relevant?

13        MR. FRASER:  Part of it's going to be relevant based on

14    the types of signs that they were carrying then, the signs

15    that they were carrying when the alleged lockout occurred, so

16    I was trying to make sure that I could show a foundation that

17    there was a picket line and that there were people on a

18    picket line before I asked him about the signs that they had

19    in their hands.

20        JUDGE BUXBAUM:  Well, we've established that there was a

21    picket line.

22        MR. FRASER:  Okay.

23        THE WITNESS:  There was a picket line set up some time

24    that night by the committee and fully manned the next

25    morning.

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

1       JUDGE BUXBAUM:  You're saying the night of April 30th,

2  May 1st?

3       THE WITNESS:  No.

4       JUDGE BUXBAUM:  The night of May 1st, May 2nd?

5       THE WITNESS:  The night -- May 1st, after midnight of

6  May 1st.

7       JUDGE BUXBAUM:  So the early morning of May 1st?

8       THE WITNESS:  Yes, sir.

9       JUDGE BUXBAUM:  Okay.

10 Q.  BY MR. FRASER:  Do you remember what the picket signs

11 said?

12      MR. McKNIGHT:  Objection.

13      JUDGE BUXBAUM:  How is that relevant?

14      MR. FRASER:  Well, again, the next questions I'm going

15 to ask relate to what the signs said on May 5, as the alleged

16 lockout occurred, and how it is that Mr. Winkle knew that

17 there was a lockout.  So I'm trying to set the stage for the

18 distinction between those two things.

19      JUDGE BUXBAUM:  Well, why do we care how Mr. Winkle knew

20 there was a lockout?  There's no dispute that there was a

21 lockout, is there?

22      MR. FRASER:  Well, you know, again, Your Honor, I'm

23 trying to preserve the record.  I still don't understand

24 General Counsel's case, so I'm trying to make sure that

25 there's -- everything that can be in this record is, to

 1  fairly --

 2      JUDGE BUXBAUM:  Well, but now, come on, Mr. Fraser.

 3  Let's be fair.  Your client issued the notice saying that

 4  they were locking out the employees.  It's in evidence.

 5      MR. FRASER:  And, Your Honor, you know when they did

 6  that?  On May 5 --

 7      JUDGE BUXBAUM:  Right.

 8      MR. FRASER:  -- at 6 p.m.

 9      JUDGE BUXBAUM:  Okay.

10      MR. FRASER:  And the testimony so far in this matter is

11  that, at May 5, at 7 a.m., there was a notice to

12  unconditionally return to work.  And the questions I'm going

13  to ask Mr. Winkle are when did the picket signs change?

14  Because they changed immediately thereafter, without getting

15  a notice of a lockout.

16      MR. McKNIGHT:  Well, they wouldn't let us unlock the

17  plant.  That's the evidence.

18      JUDGE BUXBAUM:  Well, hold on, hold on, hold on --

19      MR. McKNIGHT:  You know, I mean, what's the difference

20  whether we wait to get a letter or they lock the gates?

21      MR. FRASER:  Your Honor, I don't know what the

22  difference is, but I'm trying to make this record clear.

23      JUDGE BUXBAUM:  I'm not sure, either.  I'll allow it.

24      MR. McKNIGHT:  I mean, what is the material difference?

25  That's a question.  It's irrelevant.

194

1        JUDGE BUXBAUM:  I will allow it.  I'll allow it.  I'll

2    allow it.  Maybe, maybe not.  Let's see.  We'll find out.

3    The Board will tell us.

4        MR. McKNIGHT:  I got excited.

5        JUDGE BUXBAUM:  Go ahead, Mr. Fraser.  You may ask it.

6    Q.  BY MR. FRASER:  I think we've established there's a

7    picket line.  Do you recall what the picket signs said on May

8    1, 2008?

9    A.  Yes, sir.

10   Q.  What did they say?

11   A.  They were signs that were printed by the UAW, said, "On

12   Strike."

13   Q.  "On Strike."  That's it?

14   A.  Yes, sir.

15   Q.  At any point, did those signs change?

16   A.  Yes, sir.

17   Q.  And when did they change?

18   A.  Probably 7:30, 8:00 on Monday, the 5th.

19   Q.  Okay.  And how did they --

20       JUDGE BUXBAUM:  7:30, 8:00, morning or evening?

21       THE WITNESS:  In the morning, after we had made the

22   offer, we were denied the offer to come back to work, and

23   we --

24   Q.  BY MR. FRASER:  What did the new signs say?

25   A.   "Locked Out."

1    Q.   Were they, in fact, new signs?

2    A.   They were signs that we made up.

3    Q.   When did you make them up?

4    A.   That morning.

5    Q.   Not before that morning?

6    A.   Not that I know of, I can recall.

7    Q.   You don't recall?

8    A.   I don't recall.

9         MR. McKNIGHT:  Objection, irrelevant.

10        JUDGE BUXBAUM:  No, once I've started down this path,

11   I'm certainly going to finish it.

12        Were the signs printed, professionally printed, or hand-

13   lettered, or what --

14        THE WITNESS:  No, we had to order professional printed

15   signs after we were locked out.  We got some professional

16   signs in in a few days, overnighted, and --

17        JUDGE BUXBAUM:  But at the time that you first carried

18   signs saying, "Locked Out," were they professionally printed,

19   or hand-print-made, or --

20        THE WITNESS:  No, sir.  We went back to the hall and

21   printed a few and put them on the line.

22        JUDGE BUXBAUM:  When you say printed a few --

23        THE WITNESS:  With a Magic Marker.  We made them up.

24        JUDGE BUXBAUM:  Okay.  You don't have a printing press

25   back at the hall?

1        THE WITNESS:  No, sir, no, sir.

2        MR. McKNIGHT:  They don't have a phone.

3        JUDGE BUXBAUM:  Yeah, right, right.  Okay.

4   Q.   BY MR. FRASER:  So the order that you're talking about,

5   that you just testified about, was made after May 5, the

6   order for new picket signs?

7   A.   Yes, sir.

8   Q.   Okay.  Do you remember when you received the letter from

9   FMCS that Dan Curry was designated the mediator?

10  A.   It was dated the 7th, and I think I received it the next

11  day, on the 8th.

12  Q.   Okay.  I think you testified that you faxed the -- I'm

13  sorry.  You faxed the unconditional offer to return to work

14  to Paul Viar at Douglas, correct?

15  A.   Yes, I had the secretary fax it to him.

16  Q.   Okay.  Do you have any confirmation that that was

17  received?

18  A.   Yes, on the fax.

19  Q.   Did you actually review that yourself?

20  A.   Yes, I did.

21  Q.   Do you recall when you reviewed that?

22  A.   That evening.

23  Q.   Why did you call Paul Viar that morning -- let me back

24  up a second.  Do you remember what time that fax was sent?

25  A.   It was 7:05, I believe, shortly after seven.

```
 1   Q.    Were you calling your office --

 2   A.    Yes, I was.

 3   Q.    -- to confirm that that actually had gone through and

 4   been received?

 5   A.    Yes, I did.

 6   Q.    You specifically testified about some times on May 5, so

 7   between 7:20 and 7:30 a.m., you know, Bruce Lillie called

 8   you.  How do you remember that?

 9   A.    Because I documented it when he called me.

10   Q.    You documented it where?

11   A.    Just on my tablet.

12   Q.    On your what?

13   A.    On my -- on a piece of paper.  I just put down when he

14   called.

15   Q.    Was that a running list of notes that took place?

16   A.    No.

17   Q.    Did you review those in preparation for your testimony

18   today?

19   A.    No, I did not.

20   Q.    Do those notes still exist?

21   A.    They're not notes.  I just had that Bruce called.

22   Q.    So you jotted it down.  Do you still have it, that note?

23   A.    That folder?  Yes, I think I do.

24   Q.    You have a folder?

25   A.    It just -- I wrote it on a folder thing when he called,
```

1    the day he called.

2    Q.    And you think you still have that folder?

3    A.    I think I do.

4    Q.    What else is inside that folder?

5    A.    Just where I called Paul Viar and left him a message

6    from May 1st that we were willing to meet and negotiate.  I

7    kept calling him every day --

8    Q.    Why did you keep that note?

9    A.    Huh?

10   Q.    Why did you keep that note?  Why did you write that note

11   down to begin with?

12   A.    The note that I talked to Paul -- I mean, to --

13   Q.    Yes.

14   A.    For my record.  For my record.  For recall.  For my

15   personal recall.

16   Q.    Did you think it was an important time to note,

17   important call to note?

18         MR. McKNIGHT:  Objection, argumentative.

19         JUDGE BUXBAUM:  No, you may answer.

20         THE WITNESS:  Yeah, I thought it was, in my personal

21   opinion.

22   Q.    BY MR. FRASER:  Why did you think it was important?

23         MR. McKNIGHT:  Objection.

24         JUDGE BUXBAUM:  I'll allow it.  You may answer.

25         THE WITNESS:  Well, I didn't know for sure -- because

1    Paul had locked us out and signed the letter, I didn't know

2    if Lillie was still their attorney or who I would communicate

3    with, and that's why I faxed the thing to Paul, and then

4    Lillie called me, so I thought that I would just document the

5    time in case I may need it, whatever, at a later date.

6    Q.   BY MR. FRASER:  I don't know if it's the air-

7    conditioning, but I'm losing the last part of what you're

8    saying.

9         JUDGE BUXBAUM:  Keep your voice up, sir.  Yeah, one

10   thing you need to know is this microphone, it doesn't

11   amplify, it just goes to the tape machine, so you do need to

12   keep your voice up.

13        THE WITNESS:  Oh, okay.  Oh, okay.  Yeah, I'm sorry.

14   Q.   BY MR. FRASER:  So I understood you to say -- and if I

15   didn't get this correctly -- you mentioned something about

16   you had gotten a letter; and, therefore, you wanted to

17   document what time you called.  Did I not hear that

18   correctly?

19   A.   No, I didn't get a letter.

20   Q.   Okay.  So you wrote that note down because you thought

21   it was important; is that correct?

22   A.   I just wrote the time down that he called.  That was

23   all.  I didn't make any comments.

24   Q.   And then, again, you've testified specifically that,

25   around 10:20 or 10:30, Bruce Lillie got in touch with you.

1    Is that another note that you wrote down?

2    A.    Yeah, I wrote down that time that he called.

3    Q.    Okay.  Any other notes that you wrote down for that day?

4    A.    No.

5    Q.    And you didn't write anything down on May 5, at the 6

6    p.m. meeting?

7    A.    No, I didn't take any notes.

8    Q.    And then I think you say, at 5:45, you arrived at the

9    meeting on 5-5.  Again, how do you know that date -- or that

10    time?

11    A.    I looked at my watch when I got to the motel.

12    Q.    So that's how you remember it?

13    A.    Yeah.

14    Q.    You didn't make a note of that?

15    A.    No, sir.  Supposed to be there at six, and I got there

16    15 minutes early because I wasn't for sure where the motel

17    was.

18    Q.    I think you testified that, on 5-8-2008, you had a phone

19    conversation with Mr. Lillie where he said to you, "I think

20    you engaged in an illegal strike."

21    A.    No, I didn't say that.

22        MR. McKNIGHT:  Objection.  That's inaccurate.

23        JUDGE BUXBAUM:  That's not what my notes reflect,

24    either.

25    Q.    BY MR. FRASER:  That, "I think you didn't file your 30-

1    day notice."

2    A.   Yes, he did say that.

3    Q.   Okay.  And you said -- and, again, correct me if you

4    don't recall this -- quote, "I filed my paperwork," end

5    quote?

6    A.   Yes, I did.

7    Q.   Okay.  Now, did you understand -- I'm sorry.  What did

8    you understand Mr. Lillie to be asking you when he asked you

9    if you filed your 30-day notice?

10        MR. McKNIGHT:  Objection, relevance.

11        JUDGE BUXBAUM:  Well, I get the point here.

12        Go ahead.  You may answer.

13        THE WITNESS:  He was asking if I had filed the 30-day

14    notice.

15    Q.   BY MR. FRASER:  It wasn't clear to you whether he was

16    asking whether you filed it before the strike or after the

17    strike?

18    A.   Oh, common sense tells me that he was asking before.

19    Q.   Okay.  And yet you answered it by telling him that you

20    filed your paperwork, when, in fact, you hadn't filed it till

21    after the strike, correct?

22        MR. McKNIGHT:  Objection, argumentative.

23        JUDGE BUXBAUM:  Well, that's argumentative, yeah.

24        MR. McKNIGHT:  The testimony is the testimony.

25        JUDGE BUXBAUM:  The reason you phrased it that way was

1    to be purposely evasive, wasn't it?

2         THE WITNESS:  Yes, and I had -- on the 8th, when he had

3    called, I had filed it on the 5th, which was after the fact,

4    but it was filed, so --

5         JUDGE BUXBAUM:  In other words, it wasn't wrong, but it

6    wasn't -- well, you weren't sworn to tell the truth, the

7    whole truth, and nothing but the truth when you made that

8    statement?

9         THE WITNESS:  Yes, sir.  Yes, sir.

10        JUDGE BUXBAUM:  I can think of a president who was

11   accused of similar conduct.  Not the current one, mind you.

12   Q.   BY MR. FRASER:  On May 21, you had a meeting with the

13   Union -- I'm sorry, with the Company's bargaining team,

14   correct?

15   A.   Yes, sir.

16   Q.   And, again, based on my notes, you provided an order of

17   discussion during that meeting, and my understanding was you

18   said you, the Union, made a proposal to the Company first in

19   that meeting, correct?

20   A.   Yes, sir.

21   Q.   Is that your recollection of the way the events

22   occurred?

23   A.   Yes, sir.

24   Q.   Isn't it true that Mr. Lillie actually said during that

25   meeting, almost at the very front of the meeting, "The

 1   Company's not waiving its rights.  We think the strike was

 2   illegal.  We're not waiving any rights or remedies," before

 3   you offered your proposal?

 4   A.    No.

 5   Q.    So you think that happened after --

 6   A.    Yes, sir.  I know it did.

 7   Q.    Do you have any notes to confirm that?

 8   A.    No, I don't.

 9   Q.    And if the notes from your bargaining committee, from

10   Mr. Kolassa and from others, indicates that that order is

11   incorrect, any response to that?

12   A.    Yeah.

13       MR. McKNIGHT:  Objection.  Really, it calls for

14   speculation about if the notes --

15       JUDGE BUXBAUM:  Yeah.  If you want to show him something

16   that you think would alter his recollection, you may do that.

17       MR. McKNIGHT:  Well, then, they're not authenticated

18   notes, Your Honor.

19       JUDGE BUXBAUM:  Well, we'll get to that.  I'm saying

20   if -- well, let's leave it that way.  As it's phrased, it

21   calls for speculation, and the objection is sustained.

22   Q.    BY MR. FRASER:  I think you testified that, on July 2,

23   during the bargaining session, Glen Kirk said that the

24   Company had formulated a transition plan.  Do you recall

25   that?

1   A.   Yes, sir.

2   Q.   Did you ever ask for a copy of that transition plan?

3   A.   No, I didn't.

4   Q.   Was there any discussion beyond that statement during

5   that bargaining session regarding what that transition plan

6   was?

7   A.   He explained it a little bit, which made sense to me.

8   Q.   What did he tell you?

9   A.   He said, "We've formulated a transition plan, and we're

10  having meetings with the supervisors and the temporary

11  people, that once we get an agreement to flow them out and

12  flow you in, they go out, you come in."  That's what I

13  thought he meant by a transition plan.

14  Q.   Okay.  On July 2 of 2008, had there been discussion

15  during your bargaining sessions regarding bringing -- if an

16  agreement was reached bringing any employees, strikers back

17  to work based on skill and ability that you can recall?

18  A.   On the 2nd?

19  Q.   Yeah.

20  A.   Not on the 2nd.  We did have some discussion, I think

21  that was later on, in later meetings, when we did have some

22  discussion about that.

23  Q.   And so there was, in fact, discussion during July that

24  you recall where the Company said, "We'd be willing to bring

25  people back, but the only way we'd do it is if, one, we got

1  an agreement; and, two, if it was by skill and ability,"

2  correct?

3  A.   Yeah, it's --

4       MR. McKNIGHT:  Well, objection.  Again, that's a

5  mischaracterization.  He asked him about July 2, in reference

6  to the transition plan.  And if he wants to -- and the

7  witness answered that question directly, and the answer was,

8  "No, there was no discussion about skill and ability on July

9  2."  And then he completely mischaracterized the testimony,

10  saying, "So, in fact," you know --

11       JUDGE BUXBAUM:  No, that's not what he said.  He said

12  subsequent to July 2, he then asked.

13       MR. FRASER:  That's correct.

14       JUDGE BUXBAUM:  Repeat your question.

15       MR. McKNIGHT:  Then I withdraw my objection.

16       JUDGE BUXBAUM:  No problem.

17  Q.   BY MR. FRASER:  Again, subsequent to July 2, 2008 --

18  because I know you said it didn't happen during July 2 --

19  A.   Yes, sir.

20  Q.   Based on your statement before that, you told me there

21  was some discussion about return to work and skill and

22  ability.

23       MR. McKNIGHT:  Objection, argumentative.

24       JUDGE BUXBAUM:  No, no, that's -- he's right, and the

25  witness readily agreed he was right.

1       Go ahead, Mr. Fraser.  Start from the beginning again,

2  please, and rephrase -- not rephrase, restate your question.

3  Q.   BY MR. FRASER:  Mr. Winkle, it's clear that, after July

4  2, some session during July -- after July 2, that there, in

5  fact, was discussion about returning illegal strikers back to

6  work based on skill and ability, correct?

7  A.   It wasn't put in that way about illegal strikers.  We

8  had some discussion about how people would come back, and the

9  Company wanted to pick and choose, and we said -- with a

10  total disregard to seniority.  That's why we couldn't reach

11  an agreement.

12  Q.   So there was discussion about that topic, correct?

13  A.   Yes, sir.  Yes, sir.

14  Q.   And the Union's position was seniority has got to be the

15  main criteria in that decision, correct?

16  A.   Yes, sir.

17  Q.   Okay.  And the Company's position was skill and ability,

18  according to the modern operating agreement, would be the

19  criteria by which strikers, bargaining unit members, would

20  come back, correct?

21  A.   They wanted to choose who came back.

22  Q.   Prior to July 31, prior to July 31, Bruce Lillie had, in

23  fact, made comments during bargaining that the parties were

24  far apart, hadn't he?

25  A.   Prior to when?

1  Q.    Prior to July 31, 2008.

2  A.    Yes, he had.

3  Q.    Okay.  So his comment on July 31, 2008 that the parties

4  were 10,000 miles apart should not have been a great shock to

5  you, correct?

6  A.    His comments were misleading.  In one meeting, he'd say

7  he liked the movement we were making, we're getting closer.

8  Two meetings later, we're miles apart.  It was hard to read.

9  We thought the Company was wanting us to address flexibility;

10  we address it.  The Company's wanting us to address committee

11  size; we address it.  Everything that we addressed that we

12  thought that the Company wanted seemed to fall on deaf ears.

13  Getting rid of classifications, creating a utility pool.  The

14  Company said, "Hey, we love the idea of a utility pool.

15  Let's move in that direction."  And then the emphasis was on

16  July 31st -- the reason I raised it is that we're miles apart

17  in everything we've done, you know, this looks like we're not

18  going to get agreement, when I thought, in my opinion, we

19  were getting close to getting agreement.  That's what I meant

20  by that.

21  Q.    Now, you're sure it was Mr. Lillie who said, "We're

22  10,000 miles apart," not Mr. Canzano?

23  A.    Yes.

24  Q.    Okay.  Were there sessions during June of 2008 that

25  could not be scheduled because Mary Ellis was, in fact, away

1  on vacation?

2  A.    No, we met without Mary Ellis.

3  Q.    You met without her?

4  A.    Yes, sir.

5  Q.    Did you ever respond to Mr. Lillie's -- you,

6  specifically, you, not Mr. McKnight or the FMCS, but did you,

7  specifically, respond to Mr. Lillie's May 9, 2008 letter

8  asking for the FMCS form?

9  A.    No, I did not.

10  Q.    I'm looking at a copy of your affidavit --

11      MR. CARLSON:  Which affidavit?

12      MR. FRASER:  Dated May 14, 2008.  I don't know if you

13  have a copy of that handy or there's another copy that we can

14  provide the witness?

15      MR. CARLSON:  I only have the one copy I gave you and my

16  copy.

17      MR. FRASER:  Is it possible for us to make a copy of

18  that?

19      JUDGE BUXBAUM:  You're welcome to approach the --

20      MR. CARLSON:  I'd like to see what you're showing the

21  witness.

22      MR. FRASER:  I can describe it to you, or you can stand

23  up here with us if you'd like.

24      JUDGE BUXBAUM:  Well, yeah, come on up if you want to do

25  that.  It's the affidavit, I take it, right?

1        MR. FRASER:  It's the affidavit.

2        JUDGE BUXBAUM:  Yeah, yeah, yeah.

3        MR. CARLSON:  Yes, it's several pages --

4        JUDGE BUXBAUM:  Sure, sure.

5        MR. CARLSON:  -- I just want to see what --

6        MR. FRASER:  I'm on page seven, starting on line 15, and

7   it says, "Thus, we --"

8        JUDGE BUXBAUM:  Well, well, don't read it out loud yet.

9   You want the witness to read some portion of his affidavit?

10       MR. FRASER:  We could do it that way --

11       JUDGE BUXBAUM:  Well, no, you tell me, but I just don't

12   want --

13       MR. FRASER:  I was going to read it to him and ask him

14   questions, but we -- that's my approach, read it to him and

15   ask him questions.

16       JUDGE BUXBAUM:  Sure, go ahead.  All right.  Unless

17   there's an objection, we'll do it that way.

18       MR. McKNIGHT:  Well, what's the -- is there a question

19   before the witness?  I mean, why is he --

20       JUDGE BUXBAUM:  Well, there's going to be.  This is the

21   predicate to a question --

22       MR. McKNIGHT:  Oh, okay, okay.

23       JUDGE BUXBAUM:  -- is what counsel is saying.

24       Okay.  Go ahead.

25   Q.  BY MR. FRASER:  It says on line 15:  "Thus, we thought

 1  that we had played into the Employer's hand and decided to do

 2  something unexpected.  The membership decided to make an

 3  unconditional offer to return to work."

 4        If you'd like to see it, I can show it to you.

 5  A.   No, I understand.

 6  Q.   Do you remember making that statement?

 7  A.   Yes, I do.

 8  Q.   Anyplace in this affidavit did you indicate that the

 9  Union had failed to file the F-7 form timely?

10  A.   I don't recall if I did or not.

11  Q.   Would you like to take a --

12  A.   I don't think I did.

13  Q.   -- look at the affidavit to see?

14        **JUDGE BUXBAUM:  We'll go off the record for a moment**

15  **while you do that, sir.**

16  **(Off the record.)**

17        JUDGE BUXBAUM:  All right.  Have you had an opportunity

18  to look at your affidavit?

19        THE WITNESS:  Yes, I have, sir.

20        JUDGE BUXBAUM:  You may proceed.

21  Q.   BY MR. FRASER:  I think there was a question pending

22  before we left.  I'm sure it was an articulate question that

23  I either have to reformulate or have somebody read back to

24  me.  But I think it was --

25        JUDGE BUXBAUM:  Well, do we have the technology to read

1    back?

2        COURT REPORTER:  I can go back.

3    **(Requested portion was played back.)**

4    Q.   BY MR. FRASER:  At any place in this affidavit,

5    Mr. Winkle, did you provide a statement that the Union had

6    failed to timely file the F-7 form?

7    A.   No, I did not.

8        JUDGE BUXBAUM:  And so I'm clear, who did you give this

9    affidavit to?  Was it to the Labor Board?

10       THE WITNESS:  It was a Board Agent, Dan Molinda (ph.),

11   on the 14th.

12       MR. FRASER:  No other questions.  Thank you.

13       JUDGE BUXBAUM:  Redirect?

14       MR. CARLSON:  I don't have any questions.  I would just

15   like to let the record reflect that the affidavit that

16   Mr. Winkle just testified about is the affidavit for case 7-

17   CA-51235.

18       JUDGE BUXBAUM:  Is that a different case?

19       THE WITNESS:  Yes, sir.

20       JUDGE BUXBAUM:  Yes, it is.  I gotcha.  Okay.  The

21   record will so reflect.

22       All right, then, Mr. Winkle, you may step down.  Please

23   don't discuss your testimony with anyone while the trial

24   continues.  Once it's over, that's a different story, but --

25   **(Witness excused.)**

1      JUDGE BUXBAUM:  All right, then, I guess, Mr. Carlson,

2   there's certainly time for some more work.  Who's your next

3   witness?

4      MR. CARLSON:  Certainly.  Judge, with all due respect, I

5   would like to take maybe a ten-minute bathroom break and get

6   a drink of water myself, if that's okay with the Court.

7      **JUDGE BUXBAUM:  Sure.  All right.  We'll resume at 4:10**

8   **with your next witness.**

9   **(Off the record.)**

10      JUDGE BUXBAUM:  Mr. Carlson, you may call your next

11   witness.

12      MR. CARLSON:  Thank you, Your Honor.  The General

13   Counsel calls John Canzano.

14   (Whereupon,

15                          **JOHN CANZANO**

16   was called as a witness by and on behalf of the General

17   Counsel and, after having been first duly sworn, was examined

18   and testified as follows:)

19      JUDGE BUXBAUM:  Please be seated.  Would you please

20   state your name and spell your last name?

21      THE WITNESS:  My name is John Canzano, spelled

22   C-a-n-z-a-n-o.

23      JUDGE BUXBAUM:  Thank you.

24      You may proceed, Mr. Carlson.

25      MR. CARLSON:  Thank you, Your Honor.

**DIRECT EXAMINATION**

1

2    Q.    BY MR. CARLSON:   Mr. Canzano, what is your occupation?

3    A.    I'm an attorney.

4    Q.    And how long have you been an attorney?

5    A.    Since 1979.

6    Q.    And are you currently employed?

7    A.    Yes, I am.

8    Q.    And by whom are you employed?

9    A.    The law firm of Klimist, McKnight, Sale, McClow and

10   Canzano.

11   Q.    And what are your practice areas with that firm?

12   A.    Pretty much union side labor law.

13   Q.    And how long have you been employed by that firm?

14   A.    Since 1979.

15   Q.    Is the UAW a client of your firm?

16   A.    Yes.

17   Q.    And did you participate on behalf of the UAW in

18   collective bargaining negotiations between the Union and

19   Douglas Autotech in 2008?

20   A.    Yes, I did.

21   Q.    And when did you become involved in the negotiations?

22   A.    July 1st, 2008.

23   Q.    And what was your role during the negotiations?

24   A.    I was one of the spokespeople for the Union and an

25   attorney.

1    Q.    Now, Mr. Canzano, do you have Joint Exhibit 1 in front

2    of you?

3    A.    Yes.

4    Q.    Now, I'm going to direct your attention to where it says

5    the 7-1-08 negotiations.  Do you see that?

6    A.    Yes.

7    Q.    At that session, Mr. Canzano, was the subject of an

8    unconditional offer to return discussed?

9    A.    Yes.

10   Q.    And who raised that subject?

11   A.    I did.

12   Q.    And when did you raise the subject?

13   A.    Near the beginning of my time there, I met with

14   Mr. Lillie.

15   Q.    Okay.

16        MR. FRASER:  Your Honor, I'm having a very, very

17   difficult time hearing this.  I'm not, again, sure whether

18   it's because I've got the vent over my head --

19        JUDGE BUXBAUM:  Well, it's a combination.  You're right,

20   that thing seems to have gotten louder.

21        Mr. Canzano, as you probably know, these don't amplify,

22   they just record, so do keep your voice up.

23        THE WITNESS:  Okay.

24   Q.    BY MR. CARLSON:  So who was present for this discussion?

25   A.    It was just me and Mr. Lillie.

1  Q.   Okay.  And what was said?

2  A.   I reiterated that the Union had made an unconditional

3  offer to return to work, and that that offer was still on the

4  table.  And I said, "Why don't you guys bring these people

5  back under this unconditional offer, and then we can keep

6  bargaining."

7  Q.   And was there any response to that?  Did Mr. Lillie

8  respond to what you said?

9  A.   He said that the Company was concerned that, if the

10 people came back to work under an unconditional offer, there

11 was nothing to stop them from going on strike again.  They

12 could go on strike anytime they wanted.

13 Q.   And did the Union ever respond to the concerns

14 Mr. Lillie raised?

15 A.   I said I understood the concern and that maybe there was

16 something we could do about that when we took a break.

17 **(General Counsel's Exhibit 39 marked for identification.)**

18 Q.   BY MR. CARLSON:  Mr. Canzano, I'm going to hand you what

19 I've marked as General Counsel's Exhibit 39 and ask if you

20 recognize that document?

21 A.   Yes.

22 Q.   What is that document, sir?

23 A.   That's a proposal that the Union made on July 1st.

24 Q.   And did you give this proposal to the Company?

25 A.   Yes, I gave this to Mr. Lillie.  I explained that --

1    what it says, that we would agree, in addition to returning

2    to work unconditionally, to promise not to strike for 60

3    days.  At the end of that period, we'd provide a 7-day notice

4    of any intent to strike.

5    Q.    And did the Company respond to that on July 1st?

6    A.    Mr. Lillie said that he was interested in this and that

7    he was going to take it and talk to the Company

8    representatives, and they would consider it and he would let

9    us know.

10   Q.    And did the Company ever give you a final response to

11   it?

12   A.    They caucused on this for quite some time and,

13   eventually, at the end of the day, Mr. Lillie came back and

14   said that they wanted to sleep on it.

15   Q.    And you're still referring to July 1st?

16   A.    Yes.

17   Q.    Okay.  Was there any discussion of this during the next

18   bargaining session on July 2nd?

19   A.    Yes.

20        MR. CARLSON:  Okay.  I'm going to offer at this time

21   General Counsel's Exhibit 39.

22        JUDGE BUXBAUM:  Any objection?

23        MR. FRASER:  No objection.

24        JUDGE BUXBAUM:  It will be received.

25   **(General Counsel's Exhibit 39 received into evidence.)**

1    MR. McKNIGHT:  Can I have just one minute, Your Honor?

2    **JUDGE BUXBAUM:  Very well.  We'll go off the record for**

3  **a moment.**

4  **(Off the record.)**

5    **JUDGE BUXBAUM:  All right.  We'll go back on the record.**

6    And you were inquiring about July 2nd, I believe.

7  Q.   BY MR. CARLSON:  Okay.  Mr. Canzano, was there

8  discussion of the Union's proposal GC-39 on July 2nd?

9  A.   Yes.

10  Q.   Okay.  And what was said?

11  A.   At the beginning of the day, the Company came in and

12  said they couldn't -- I believe it was Mr. Lillie said they

13  couldn't agree to this.

14    MR. FRASER:  I'm sorry.  Couldn't agree, or could?

15    THE WITNESS:  They could not agree to our proposal.

16  **(General Counsel's Exhibit 18 marked for identification.)**

17  Q.   BY MR. CARLSON:  Mr. Canzano, I'm going to hand you now

18  what I've marked as General Counsel's Exhibit 18 and ask you

19  to take a look at that document.  Do you recognize that?

20  A.   Yes, I do.

21  Q.   What is that document?

22  A.   That's an agreement that we reached on July 2nd.

23    JUDGE BUXBAUM:  Who's we?

24    THE WITNESS:  The Company and the Union, myself and

25  Mr. Lillie.

1  Q.   BY MR. CARLSON:  And who prepared that document?

2  A.   Mr. Lillie typed it on his computer.

3  Q.   Can you tell us, whose idea was this, who proposed this?

4  A.   Well, it was Mr. Lillie's idea.  After he rejected our

5  unconditional offer to return to work, no strike proposal,

6  which was that other exhibit that I just had, he said that he

7  had an alternative, and he proposed a cooling-off period

8  where both sides would withdraw their pending unfair labor

9  practice charges for a fixed period of time, and then we

10  could bargain.

11  Q.   And did the parties agree to that?

12  A.   With some modification.

13  Q.   And is that modification reflected here in the document?

14  A.   Yes, the Union asked for the second paragraph regarding

15  Gordon Diamond.

16      MR. CARLSON:  I'm going to offer GC-18 at this time.

17      JUDGE BUXBAUM:  Mr. McKnight, first of all, let me ask

18  you if there's any objection on behalf of the Charging Party?

19      MR. McKNIGHT:  No.

20      JUDGE BUXBAUM:  Okay.  Well, this one -- and,

21  Mr. Fraser, what about you?

22      MR. FRASER:  If I could just confer with my client for a

23  bit?

24      JUDGE BUXBAUM:  Sure, sure.

25      MR. FRASER:  No objections.

1     JUDGE BUXBAUM:  All right.  Since all of you want it in.

2  I mean, it isn't a -- is sort of a settlement agreement, but

3  I'll certainly -- if everyone's satisfied, it comes in.

4  General Counsel 18 is received in evidence.

5  **(General Counsel's Exhibit 18 received into evidence.)**

6  Q.   BY MR. CARLSON:  Now, staying with the July 2nd meeting,

7  Mr. Canzano, during that meeting, was there any discussion

8  about the replacement employees that were working in the

9  plant at that time?

10  A.   Yes, there was.

11  Q.   And do you recall at what point in the meeting this was

12  discussed?

13  A.   It was near the end of the day.

14  Q.   And how did the subject come up?

15  A.   Near the end of the day, we all convened, both sides,

16  the Union, bargainers, union committee and the Company

17  committee, myself, Mr. Lillie and the mediator -- convened in

18  the main bargaining room.  And near the beginning of that

19  meeting, Phil Winkle said that -- said, "We've been hearing a

20  lot of rumors that the replacements are permanent.  Is that

21  true?"

22  Q.   And did anyone respond to what Mr. Winkle said?

23  A.   Bruce Lillie said, "No, it's not true.  They're

24  temporary."

25  Q.   Was anything else said?

220

1    A.    Glen Kirk, right after that, said -- and was very

2    adamant about this -- that they never tell the replacements

3    that they're permanent, and that whenever they meet with

4    their salaried employees -- and they meet with their salaried

5    employees regularly -- they tell the salaried employees that

6    they are not to refer to the replacements as permanent and

7    that they're only temporary replacements.

8    Q.    Okay.  Anything else that you recall?

9    A.    Mr. Winkle said that it'll be a problem if we have to

10   come back to work with the scabs.

11   Q.    Did anyone respond to that?

12   A.    Then Bruce Lillie said, "We're planning for the

13   transition when the Union workers return to the jobs and the

14   replacements leave, but it won't happen overnight."

15   Q.    Anything else said on the subject of the replacement

16   employees that you recall?

17   A.    Glen Kirk said, "When this is all settled, we're going

18   to have some training."

19   Q.    And anything further?

20   A.    Not that I recall.

21   **(General Counsel's Exhibit 20 marked for identification.)**

22   Q.    BY MR. CARLSON:  Mr. Canzano, I'm going to hand you now

23   what I've marked as General Counsel's Exhibit 20 and ask you

24   to take a look at that.  Do you recognize that document?

25   A.    Yes, I do.

1  Q.   And is that a letter that you received?

2  A.   Yes.

3  Q.   And about when did you receive this letter?

4  A.   It's got a stamp that looks like the stamp from our

5  office of July 9th, and I believe that's when I received it.

6       MR. CARLSON:  We're going to offer GC-20 at this time.

7       JUDGE BUXBAUM:  And there's an enclosure referenced in

8  it, but I take it that you're not offering the enclosure?

9       MR. CARLSON:  I'm not, Your Honor.

10       JUDGE BUXBAUM:  I'm not trying to clutter the record.  I

11  just want it to be clear.

12       MR. CARLSON:  I understand.  No, just the cover letter.

13       JUDGE BUXBAUM:  All right.  Any objection to the receipt

14  of GC-20, with the understanding that the enclosure is not

15  part of the exhibit?

16       MR. FRASER:  Not as long as that understanding that the

17  enclosure is not part of that exhibit, no, there's no

18  objection.

19       JUDGE BUXBAUM:  Very well.  Then General Counsel 20 will

20  be received in evidence.  And I'll note for the record, so

21  that it's crystal clear, that it is a one-page document.

22  **(General Counsel's Exhibit 20 received into evidence.)**

23  Q.   BY MR. CARLSON:  Mr. Canzano, what did you understand to

24  be the purpose of this letter?

25  A.   We were --

1       MR. FRASER:  I'm going to object, Your Honor.

2   Mr. Canzano certainly can't testify as to what Mr. Viar

3   meant.

4       JUDGE BUXBAUM:  Yeah, rephrase that.  Rephrase that.

5   Q.   BY MR. CARLSON:  Okay.  Mr. Canzano, do you know why

6   Mr. Viar was sending you the summary plan description for the

7   salaried health plan?

8   A.   One of the issues in the bargaining was health

9   insurance, and the Company's proposal included that the Union

10  agreed to the salaried health insurance plan, and the Union

11  asked to see that.

12      JUDGE BUXBAUM:  So the enclosure is that?

13      THE WITNESS:  Yes.  We had requested it, and then he

14  sent it to us, the description of the health insurance plan

15  for the salaried employees.

16  **(General Counsel's Exhibit 21 marked for identification.)**

17  Q.   BY MR. CARLSON:  Mr. Canzano, I'm going to hand you now

18  what I've marked as General Counsel's Exhibit 21 and ask you

19  to take a look at that document.

20  A.   All these pages are part of the exhibit?

21  Q.   Yes, sir.

22  A.   Yes, I recognize this.

23  Q.   What is that document?

24  A.   This was something that Mr. Lillie had sent to me,

25  again, at the Union's request.  At the prior meeting, we had

1  asked -- we were discussing the issue of flexibility.  The

2  Company was -- that was a big issue with them, and we wanted

3  some examples, some concrete, specific examples.  And we

4  talked about it at the prior meeting, and then this was a

5  follow-up to that, in writing.

6  Q.  And do you recall receiving that on or about July 10th,

7  2008?

8  A.  Yes, I do.

9     MR. CARLSON:  Okay.  We're going to offer GC-21 at this

10  time.

11     JUDGE BUXBAUM:  Any objection?  And, of course, this

12  time, Mr. Carlson includes the enclosure.

13     MR. CARLSON:  Yes, sir.

14     MR. FRASER:  No objections.

15     JUDGE BUXBAUM:  Then, General Counsel's 21 will be

16  received in evidence, noting that it includes the enclosures.

17  **(General Counsel's Exhibit 21 received into evidence.)**

18  Q.  BY MR. CARLSON:  Mr. Canzano, I'm going to direct your

19  attention now to the meeting of July 14.  Did you attend that

20  meeting?

21  A.  Yes, I did.

22  **(General Counsel's Exhibit 40 marked for identification.)**

23  Q.  BY MR. CARLSON:  I'm going to show you what I've marked

24  as General Counsel's Exhibit 40 and ask you to take a look at

25  that document.

224

1    A.    Yes, I recognize the document.

2    Q.    And what is that document?

3    A.    This was a written proposal that we gave to the Company

4    on July 14th, that the Union gave to the Company.

5    Q.    And is that a proposal you participated in drafting on

6    behalf of the Union?

7    A.    Yes, I think I typed this myself.

8    Q.    And, again, this is a proposal that was presented to the

9    Company; is that correct?

10    A.    Yes.

11    Q.    Did the parties discuss this proposal?

12    A.    Yes.

13    Q.    What, if anything, did the Company say about the

14    proposal?

15    A.    They said a lot of things.  I don't remember all the

16    details of what they said, but we went through the proposal,

17    they asked questions about it, we tried answer their

18    questions.

19        MR. CARLSON:  We're going to offer General Counsel's

20    Exhibit 40.

21        JUDGE BUXBAUM:  Why do we need this in the record,

22    counsel?

23        MR. CARLSON:  Again, Your Honor, this is to show that

24    what happened after May 5th, 2008 was a lockout.  They locked

25    out these employees in support of -- the Company did so in

1    support of their bargaining position, and the parties

2    bargained for three months, consistent with a lockout.

3        JUDGE BUXBAUM:  But do we need to know what course their

4    bargaining took?  In other words, do I need to know what the

5    Union's health care proposal was on this date?

6        MR. CARLSON:  No, I don't think so, Your Honor.  I don't

7    think -- it's not a lot of pages.  I don't think it burdens

8    the record, and it just shows that the parties were -- that,

9    along with Mr. Canzano's testimony, shows that the parties

10   were exchanging proposals, discussing proposals.  They were

11   going back and forth, exchanging proposals --

12       JUDGE BUXBAUM:  Well, in other words, you're admitting

13   it merely to corroborate his testimony that it occurred, that

14   he made a proposal on that date?

15       MR. CARLSON:  I think that's correct, Your Honor, and

16   that there's something in the record that shows that the

17   parties are bargaining toward the collective bargaining

18   agreement.  That's what they're doing at this point.

19       JUDGE BUXBAUM:  Mr. Fraser, what's your position on this

20   exhibit?

21       MR. FRASER:  Well, Your Honor, since we've already

22   admitted almost every bargaining proposal that occurred

23   between May 5 and August 14, my position would be adding the

24   rest of them isn't really going to hurt matters.  There are

25   lots of --

1      JUDGE BUXBAUM:  Well, except when you bend over to pick

2   up the exhibit file.

3      MR. FRASER:  Understood.  But since we brought three

4   dollies and three people to do that this morning, we're fully

5   prepared to lift the record.

6      JUDGE BUXBAUM:  All right.  I guess I just want to be

7   sure everyone agrees with me that this isn't a surface

8   bargaining case or some such creature --

9      MR. CARLSON:  No, sir.

10     JUDGE BUXBAUM:  -- where the content of these proposals

11  is in some way relevant.  It isn't, I take it, at least the

12  Union's proposal, certainly.

13     All right.  With that, I guess, gloss on it, I'll admit

14  General Counsel 40.

15  **(General Counsel's Exhibit 40 received into evidence.)**

16  Q.   BY MR. CARLSON:  Mr. Canzano, with respect -- one last

17  question with respect to General Counsel's Exhibit 40.  Why

18  did the Union draft that proposal?

19  A.   The Company had asked us to give them a proposal.

20  Q.   And when did they ask you to give you a proposal?

21  A.   I think on the 1st, maybe the 2nd of July.

22  Q.   Okay.  I'm going to direct your attention now to the

23  meeting of July 24.  Did you attend that meeting, sir?

24  A.   Yes, I did.

25  Q.   And on that date, did you have occasion to speak alone

1   with Bruce Lillie?

2   A.   Yes, I did.

3   Q.   And how did that conversation come about?

4   A.   Mr. Lillie asked if he could talk to me privately.

5   Q.   And where did the conversation take place?

6   A.   There was a little caucus room where the Company usually

7   caucused, and Mr. Lillie and I met in that room.

8   Q.   And at what point --

9        MR. FRASER:  I'm sorry.  I didn't hear the -- met where?

10       THE WITNESS:  Met in that room.

11       MR. FRASER:  Thank you.

12  Q.   BY MR. CARLSON:  And at what point during the meeting

13  did this conversation occur?

14  A.   I think near the beginning.

15  Q.   And just so it's clear for the record, who was present

16  for the conversation?

17  A.   Just myself and Mr. Lillie.

18  Q.   And what was said during this conversation?

19  A.   Mr. Lillie started, said that he had some bad news.  He

20  said that the Company had been meeting with these other

21  attorneys, that he had been advising the Company all along

22  that they should not try to fire the Union workers, that that

23  was a very, very risky proposition that could take years to

24  be resolved and that -- and he was continuing to give them

25  that advice, but they wanted a second opinion from these

1    other lawyers and that they had met with the other lawyers

2    and that the other lawyers were very persuasive, had a very

3    slick presentation, had said that the Company had an 85

4    percent chance of prevailing if they fired the Union workers,

5    and that he was continuing to advise them that that was too

6    risky, but that he thought that they may take the new

7    attorney's advice.  They were still taking his advice at that

8    time, but he was afraid that he might be losing control of

9    his client.

10   Q.   When he said "they were taking --" whose advice?

11   A.   The Company representatives might be considering taking

12   the advice of the new attorneys, that they wanted a second

13   opinion, but he was still on the case, he was still the

14   attorney, and they were still taking his advice at that time.

15   Q.   Was anything else said?

16   A.   He said that the new attorneys also said that the Union

17   might be liable, the Union might have some liability with

18   regard to the 8(d) notice issue.

19   Q.   Anything else said by Mr. Lillie at that point in the

20   conversation?

21   A.   Not that I recall.

22   Q.   Okay.  Did you respond to what Mr. Lillie said to you?

23   A.   I said to him, "I don't know what you want me to do with

24   this.  Am I supposed to keep this to myself?"  I says, "I

25   have to tell the committee this."

1   Q.    Did you say anything else or did he say anything else?

2   A.    Not that I recall.

3   Q.    After this conversation with Mr. Lillie, did the parties

4   reconvene on July 24?  Did they go back into --

5   A.    Yes, we did.

6   Q.    And was there any further discussion of this?

7   A.    When we reconvened, everybody again in the bargaining

8   room, the Union committee, the Company committee and the

9   mediator.  And I started out by saying that Mr. Lillie --

10  that I had told the committee what Mr. Lillie had said about

11  the new attorneys.  I said this to the Company

12  representatives, I said, "That was very, very risky," that

13  I've been a labor attorney for almost 30 years, that if they

14  were to go down that road, they'd be tied up in litigation

15  for years, they'd be facing huge potential liability, and it

16  was way too risky.

17       I said that, as a labor attorney in Detroit for almost

18  30 years, I'd never heard of these other attorneys.  I says,

19  "I've never heard of these guys," and that, if you guys -- I

20  says, "If you guys aren't any better at running the plant

21  than you are at picking attorneys, I can see why you're

22  having so many problems."

23  Q.    And was there any response to what you said?

24  A.    I also said --

25  Q.    I'm sorry.

1   A.   When I was referring to the other attorneys, I said,

2   "I'm not including Mr. Lillie in this."

3   Q.   Was there any response to what you said?

4   A.   The Company representatives got extremely angry with my

5   comment.

6   Q.   What comment?

7   A.   The comment about running the plant and picking the

8   attorneys, and --

9   Q.   What was said?

10  A.   I believe it was Mr. Viar that said, "We're tired of

11  being called stupid," and there was a lot of heated

12  discussion at that point.  They almost walked out.  The

13  mediator kind of calmed us all down and got everybody back to

14  the table.

15  Q.   Was there any discussion in response to your remarks

16  about the strikers being -- excuse me, the locked out

17  employees being fired?  Was there any further discussion in

18  response -- when you say there was heated remarks, what were

19  their remarks in response to?

20  A.    In response to my comment and about the Company -- it's

21  the Company owns this plant, we own this company, and we're

22  tired of being called stupid.  There was no discussion about

23  the firing of the employees.

24  Q.   Was there discussion about the legal issue of

25  reemployment?

1    A.    Not after -- only -- no, no.

2    Q.    In response to what you had said.  I'm sorry.

3    A.    No, there wasn't.

4    Q.    And you had referenced -- in your testimony, you said

5    that you had never heard of these attorneys.  How did you

6    know their name?

7    A.    In the private meeting with Mr. Lillie, he mentioned

8    their name and he gave me a card, gave me one of the cards of

9    the attorneys, and it was Dan Cohen, I believe was his name.

10   And I still don't actually remember the name of the firm

11   right now, but it was Dan Cohen.

12   **(General Counsel's Exhibit 41 marked for identification.)**

13   Q.    BY MR. CARLSON:  Mr. Canzano, I'm going to hand you now

14   what I've marked as General Counsel's Exhibit 41 and have you

15   take a look at that document.  Have you had a -- I'm sorry,

16   sir.

17   A.    Yes.

18   Q.    Have you had a chance to look at that?

19   A.    Yes.

20   Q.    Okay.  I'm sorry.  I should have done this first.  I'm

21   going to direct your attention now to the meeting of July 25.

22   And did you attend that meeting?

23   A.    Yes, I did.

24   Q.    What is that document that I put before you?

25   A.    That's a proposal that the Company gave to the Union on

1   July 25th.

2       MR. CARLSON:  We'd offer General Counsel's Exhibit 41 at

3   this time.

4       JUDGE BUXBAUM:  Any objection?

5       MR. FRASER:  I'm just counting pages.  No objection.

6       JUDGE BUXBAUM:  General Counsel 41 will be received.

7   **(General Counsel's Exhibit 41 received into evidence.)**

8   **(General Counsel's Exhibit 42 marked for identification.)**

9   Q.  BY MR. CARLSON:  Now I'm going to hand you what I've

10  marked as General Counsel's Exhibit 42 and have you take a

11  look at that.

12  A.  Okay.

13  Q.  And what is that document?

14  A.  That's a written proposal that we gave to the Company on

15  July 25th.

16  Q.  And how did you give it to the Company?

17  A.  I believe we handed it to them across the bargaining

18  table.

19      JUDGE BUXBAUM:  I don't know if it matters, but which

20  one was first, the Company's or this one?

21      THE WITNESS:  I want to look at this for a minute before

22  I answer that.

23      JUDGE BUXBAUM:  Sure.

24      THE WITNESS:  The Company's proposal was first.

25      JUDGE BUXBAUM:  Okay.

1      MR. CARLSON:  I would offer GC-42 at this time, if I

2  haven't done so already.

3      JUDGE BUXBAUM:  Any objection?

4      MR. FRASER:  No objection.

5      JUDGE BUXBAUM:  It'll be received.

6  **(General Counsel's Exhibit 42 received into evidence.)**

7      JUDGE BUXBAUM:  I guess, let me ask you.  Is 42 a

8  response to 41, or were they done in such proximity that

9  they're sort of two ships passing in the night?

10     THE WITNESS:  Forty-two was a response to 41.  There was

11 also -- this part was written.  We also gave them a verbal

12 response that wasn't written down.

13     JUDGE BUXBAUM:  Okay.

14 Q.   BY MR. CARLSON:  Just briefly explain, with respect to

15 General Counsel's 42, just explain what that represents,

16 meaning what's the subject?

17 A.   The subject is job classifications.

18 Q.   And was that a significant subject in the negotiations

19 that you participated in?

20 A.   Yes, it was.  The original contract -- the expired

21 contract had a very large number of classifications, I think

22 about 37.  And the Company's proposal, as you can see, had

23 three classifications.  And this was the Union's effort to

24 try to come close to the Company's proposal.  We had reduced

25 the 37 to 5, (a) through (e).

1  Q.   Now, one last question with respect to the July 25

2  meeting.  Can you tell us, Mr. Canzano, whether or not anyone

3  for the Company said anything at the July 25 meeting about

4  firing the locked out employees?

5  A.   No one from the Company said anything like that.

6  Q.   And directing your attention to the July 28 meeting, can

7  you tell us whether or not anyone for the Company said

8  anything about firing the locked out employees at the July 28

9  meeting?

10 A.   No one from the Company said anything like that.

11 Q.   Now, I'm going to direct your attention to the July 31st

12 meeting.  You attended that meeting, correct?

13 A.   Yes.

14 Q.   All right.  I'm going to back up for a minute,

15 Mr. Canzano.  Mr. McKnight has alerted me to a couple of

16 documents, just so we can sort of keep this in the order of

17 the dates.  I apologize.

18 **(General Counsel's Exhibit 22 marked for identification.)**

19 Q.   BY MR. CARLSON:  I'm going to hand you what I've marked

20 as General Counsel's Exhibit 22 and ask you to take a look at

21 that document.

22    MR. McKNIGHT:  I think that went in already, didn't it?

23 Didn't GC-22 go in?  No?

24    JUDGE BUXBAUM:  No, I don't think so, no.

25    MR. FRASER:  I don't have 22.

 1    MR. CARLSON:  It's very similar to --

 2    MR. McKNIGHT:  I was just checking this log.  Always

 3  optimistic.

 4    JUDGE BUXBAUM:  I'm going to remember that.

 5    THE WITNESS:  Okay.

 6  Q.  BY MR. CARLSON:  What is that document?

 7  A.  This is some questions, a list of questions that

 8  Mr. Lillie had e-mailed to me and Phil Winkle, regarding the

 9  issues that were the subject of negotiation, some of the

10  issues.

11  Q.  And do you recall receiving that document on or about

12  July 21st, 2008?

13  A.  Yes.

14    MR. CARLSON:  We would offer GC-22 at this point, with

15  its attachment.

16    JUDGE BUXBAUM:  Any objection?

17    MR. FRASER:  No.

18    JUDGE BUXBAUM:  It'll be received.

19  **(General Counsel's Exhibit 22 received into evidence.)**

20  **(General Counsel's Exhibit 24 marked for identification.**

21  Q.  BY MR. CARLSON:  A couple of other documents.  I'm going

22  to hand you now, Mr. Canzano, GC-24.  Take a look at that.

23  Do you recognize that document?

24  A.  Yes, I do.

25  Q.  Okay.  And what is that document?

1    A.    This was a letter that I wrote to Mr. Lillie, proposing

2    a number of additional dates for bargaining.

3    Q.    Okay.  And when did you send him that letter?

4    A.    On July 29th.

5    Q.    And how did you send him that letter?

6    A.    By fax.

7         MR. CARLSON:  Okay.  We offer GC-24.

8         JUDGE BUXBAUM:  Any objection?

9         MR. FRASER:  I don't know that it's relevant, Your

10   Honor, so objection to relevance.

11        JUDGE BUXBAUM:  Well, I don't, either, Mr. Fraser.

12        MR. FRASER:  We can certainly --

13        JUDGE BUXBAUM:  I mean, my concern about burdening the

14   record isn't going to apply very much to a one-page document,

15   so --

16        MR. FRASER:  Then, no objection.

17        JUDGE BUXBAUM:  -- if you don't object, I don't object.

18        MR. FRASER:  No objection.

19        JUDGE BUXBAUM:  All right.  It'll be received.

20   **(General Counsel's Exhibit 24 received into evidence.)**

21   **(General Counsel's Exhibit 25 marked for identification.)**

22   Q.    BY MR. CARLSON:  Now, I'm going to hand you,

23   Mr. Canzano, General Counsel's Exhibit 25.

24   A.    Okay.

25   Q.    Do you recognize that document?

1    A.    Yes.

2    Q.    And what is that?

3    A.    That's another letter that I faxed to Mr. Lillie.

4    Q.    And when did you fax that to him?

5    A.    On July 30th.

6          MR. CARLSON:  We'd offer GC-25.

7          JUDGE BUXBAUM:  Any objection?

8          MR. FRASER:  No, Your Honor, no objection.

9          JUDGE BUXBAUM:  It'll be received.

10   **(General Counsel's Exhibit 25 received into evidence.)**

11   **(General Counsel's Exhibit 43 marked for identification.)**

12   Q.    BY MR. CARLSON:  Okay.  Now, I think we can go back to

13   the July 31st meeting.  Mr. Canzano, I'm going to hand you

14   General Counsel's 43 and have you take a look at that.

15   A.    Okay.

16   Q.    Do you recognize that?

17   A.    Yes.

18   Q.    And what is that?

19   A.    That's a written proposal that we gave to the Company --

20   that the Union gave to the Company on July 31st.

21         MR. CARLSON:  We'd offer GC-43.

22         JUDGE BUXBAUM:  Any objection?

23         MR. FRASER:  No objection, Your Honor.

24         JUDGE BUXBAUM:  It'll be received.

25   **(General Counsel's Exhibit 43 received into evidence.)**

1   Q.   BY MR. CARLSON:   And why did you give the Union -- or,

2   excuse me, give the Company that proposal?

3        JUDGE BUXBAUM:   Well, that's a broad question.  What do

4   you mean?

5   Q.   BY MR. CARLSON:   What was the purpose of that -- what

6   happened with that proposal?

7        JUDGE BUXBAUM:   That's a broader question, but that's

8   all right.  Go ahead.

9        THE WITNESS:   That was the product of our prior meeting

10  where we had made a verbal proposal.  The Company complained

11  that it was verbal and it wasn't in writing, and it was

12  difficult that they had to write everything down that I said.

13  So we reduced it all to writing, including the prior proposal

14  regarding the five classifications, and put in -- this was an

15  attempt to have a complete written proposal.

16  Q.   BY MR. CARLSON:   And did the parties discuss this

17  proposal on July 31st?

18  A.   Yes.

19  Q.   How long did the bargaining session on July 31st last?

20  A.   It was a long day.

21  Q.   And do you recall approximately how many hours?

22  A.   I don't remember what time in the morning we started,

23  but it was probably at least eight hours.

24  Q.   At any point on that day, on July 31st, during the

25  meeting between the Union and the Company, was there any

1   discussion about the Company firing the locked out employees?

2   A.   Yes.

3   Q.   And when did that subject first come up on July 31st?

4   A.   Near the end of the day, I had a private conversation

5   with Mr. Lillie.

6   Q.   Okay.  And how did that conversation come about?  Who

7   initiated the conversation?

8   A.   Mr. Lillie came and asked to speak to me privately.

9   Q.   And what was said during that conversation?

10  A.   He said, "Do you think, if we stay longer, that we can

11  get it done tonight?"  They had been caucusing --

12  Q.   They, meaning who?

13  A.   The Company had been caucusing.  He came out and asked

14  if we thought we could get it done.  And I said that I didn't

15  think we could get it done.  We'd made a lot of progress, but

16  we still had a lot of things to talk about, and it was late.

17  Q.   Was anything else said?

18  A.   He said that, then, we should just go in -- he says, "I

19  have some formalities that I have to say."

20  Q.   And did he tell you what those formalities were?

21  A.   No.

22  Q.   And what happened --

23       JUDGE BUXBAUM:  When he said go in, you mean back into a

24  plenary sort of meeting?

25       THE WITNESS:  Yes.  Let's get back together, everybody

1  together, and he had some formalities to say, and then we

2  would break up.

3  Q.    BY MR. CARLSON:  When you responded to him that you

4  didn't think you could get it done, when you say "it," you're

5  referring to reaching a contract?

6  A.    Yes.

7  Q.    Did he respond to what you said, that you didn't think

8  you could get it done?  Did he have any response to that?

9  A.    He said we'd made some progress, but it was like eight

10  or nine o'clock by then, there was still a couple issues

11  like -- there were a couple big issues that we hadn't gotten

12  to yet.  And so he said he didn't think that -- either, that

13  we could get it done tonight, and that he was going on

14  vacation, I think, the next day.

15  Q.    Anything further -- excuse me.  Actually, I think I

16  already asked you that.  What happened next, then?

17  A.    And we all went back into the main meeting room.

18  Mr. Lillie started things out and said, "We've made some

19  progress here today.  I'm going to be on vacation, but we've

20  got another date scheduled, and I just have something I have

21  to say, and that is that, by continuing to bargain, the

22  Company is not waiving its rights to fire people."

23  Q.    Did he say anything else at that point?

24  A.    Not that I recall.

25  Q.    Did anyone respond to what he said?

1  A.    I did.

2  Q.    Okay.  And what did you say?

3  A.    I said, "Just because you say you're waiving your rights

4  doesn't mean you're waiving your rights."  I gave an example

5  of, if you park your car in a car-hire lot, where they have a

6  sign that says, "We're not responsible for items taken from

7  your car," I said, "Just because they put that sign up

8  doesn't mean they're not responsible, and just because you

9  say you're not waiving your rights doesn't mean you're not

10  waiving your rights."

11  Q.    Anything else said?

12  A.    Not that I recall right now.

13       MR. CARLSON:  Nothing further, Judge.

14       JUDGE BUXBAUM:  Mr. McKnight?

15       MR. McKNIGHT:  I'm sorry, we were just conspiring for a

16  second.  I have no questions, Your Honor.

17       JUDGE BUXBAUM:  All right.  Then, Mr. Fraser?

18       MR. FRASER:  We would request any affidavits or other

19  materials that Mr. Canzano provided to the Board.

20       MR. CARLSON:  I'm turning over an affidavit that

21  Mr. Canzano provided to the Labor Board.  It's approximately

22  three typewritten pages with a signature page and an

23  attachment, dated 10-24-08.

24       JUDGE BUXBAUM:  Does that constitute all the Jencks

25  material?

1       MR. CARLSON:  It does.

2       JUDGE BUXBAUM:  All right.  Then, shall we go off the

3  record for a few minutes to let Mr. Fraser read it?

4       Mr. Fraser, my hope is that we can conclude this

5  witness's testimony today, but if that's impossible or

6  unlikely, you let me know.  It's five o'clock now, so --

7       MR. FRASER:  I guess it depends on what time you'd like

8  to go to this evening.

9       JUDGE BUXBAUM:  Well, I'd go to six, certainly.  And I'm

10  not going to hold you to this, you understand, but it'd be

11  nice not to have him come back tomorrow.

12       No offense, now, Mr. Canzano.

13       MR. FRASER:  I guess let me please read this affidavit

14  and see --

15       **JUDGE BUXBAUM:  Yes, of course.  That's fine.  Let's go**

16  **off the record.**

17  **(Off the record.)**

18       **JUDGE BUXBAUM:  On the record.**

19       You may cross-examine, counsel.

20                         **CROSS-EXAMINATION**

21  Q.   BY MR. FRASER:  Mr. Canzano, I'm going to ask you some

22  questions.  If you don't understand them, will you please let

23  me know?

24  A.   Okay.

25  Q.   You, I think, testified that the only bargaining

1   sessions you attended between Douglas and the UAW were those

2   started on and after July 1 of 2008; is that correct?

3   A.   Yes.

4   Q.   Can you tell me the last session you attended?

5   A.   July 31st.

6   Q.   Okay.  So July 1 through July 31st were the sessions

7   that you attended, correct?

8   A.   Yes.

9   Q.   So your testimony today has nothing to do with any

10  sessions that took place before that date, correct?

11  A.   That's correct.

12  Q.   Okay.  On July 1 of 2008, did you have any sidebars with

13  Mr. Lillie where it was just the two of you meeting?

14  A.   Yes.

15  Q.   How many do you think there were?

16  A.   I only recall one.

17  Q.   Okay.  Might have been more?

18  A.   Maybe two.

19  Q.   On July 2, 2008, did you have any sidebar meetings with

20  Mr. Lillie where it was just you and Mr. Lillie by yourself?

21  A.   Yes.

22  Q.   Do you remember how many times that happened on July 2?

23  A.   I only recall one.

24  Q.   Okay.  Is it possible there was more than one?

25  A.   Yes.

1  Q.   On July 14, 2008, did you have any sidebars with

2  Mr. Lillie where it was just the two of you meeting alone?

3  A.   I don't recall any.

4  Q.   You don't recall any?

5  A.   No.

6  Q.   Okay.  On July 15, 2008, did you have any sidebars with

7  Mr. Lillie where the two of you were meeting alone?

8  A.   I don't recall at this time.

9  Q.   Okay.  And I know you're a lawyer, so I'll make this

10 request.  Do I understand, when you say, "I don't recall at

11 this time," that, in fact, it may have happened; you simply

12 can't remember it?

13 A.   Yes.

14 Q.   Okay.  And was that the same response for July 14 of

15 2008, that, in fact, you may have had meetings with

16 Mr. Lillie where you were alone, but you simply can't

17 remember them?

18 A.   I don't recall any other meetings.

19 Q.   On July 24, 2008, did you have any sidebar meetings with

20 Mr. Lillie where just the two of you were together?

21 A.   Yes.

22 Q.   How many do you think you had?

23 A.   I just recall the one.

24 Q.   Okay.  So, again, it could have been more than one, you

25 just -- but you only remember one?

1    A.    I only remember the one.   That was the only thing that

2    was significant in my mind.

3    Q.    Okay.   I think I asked you July 24 and July 25, so I'm

4    on to July 28th.   On July 28th, 2008, did you have any

5    meetings with Mr. Lillie where it was just the two of you

6    alone?

7    A.    I don't recall.

8    Q.    Okay.   Which, again, means to me that it could have

9    happened, but you don't remember it as you're testifying

10   today.   Is that fair?

11   A.    It could have.

12   Q.    Okay.   July -- I may have missed July 25, 2008, so I

13   just want to make sure I double back and ask you that,

14   specifically.   On July 25, 2008, any sidebar meetings with

15   Mr. Lillie where it was just the two of you meeting alone?

16   A.    Nothing significant that I can recall.

17   Q.    I don't understand that answer.   Did you have a meeting

18   with him where it was the two of you alone, where you didn't

19   talk about something significant?   Was that your response?

20   Yes, you did, but it wasn't significant discussion?

21   A.    We were in a hotel lobby.   We were in and out all the

22   time we were there, so there were many occasions where you

23   might just talk to somebody for a minute or two, but I don't

24   remember anything significant.

25   Q.    So the answer to my question is yes, you actually did

1    have at least one meeting and maybe more with him on 7-25-08,

2    where the two of you were alone?

3    A.    No, that's not correct.

4    Q.    So there was never an instance where the two of you were

5    alone?

6    A.    I don't recall any significant meetings.  I don't know

7    if you want to call it --

8    Q.    I didn't ask whether you had a significant meeting --

9          JUDGE BUXBAUM:  Well, but it's this word "meeting" I

10   think that's troublesome.

11   Q.    BY MR. FRASER:  Were you ever with Mr. Lillie alone on

12   July 25, 2008, during bargaining?

13   A.    I may have been.

14   Q.    And on July 31st, I think you talked about at least one

15   time when you were with Mr. Lillie, alone.  Was there more

16   than one time on July 31st, where the two of you were

17   together, by yourselves?

18   A.    There may have been.

19   Q.    May it have been more than five times that session?

20   A.    I don't recall.

21   Q.    You did not bargain on behalf of the Union in any

22   Douglas negotiations prior to July 1 of 2008; is that

23   correct?

24         MR. McKNIGHT:  Objection --

25         MR. CARLSON:  It's asked and answered.

1      JUDGE BUXBAUM:  Well, I'll allow it.

2      You may answer.

3      THE WITNESS:  That's correct.

4   Q.   BY MR. FRASER:  Okay.  Now, do you have a particular

5   system that you used, beginning on or about July 1 of 2008,

6   to formalize agreements during bargaining with Douglas?

7   A.   I don't understand your question.

8   Q.   If you reached a tentative agreement with the Company in

9   July, how would it have been formalized?

10      MR. McKNIGHT:  That calls for speculation.

11      MR. FRASER:  I'm asking him for --

12      JUDGE BUXBAUM:  Well, yeah, but, on the other hand, is

13   it really a problem, I mean, Mr. McKnight?

14      Do you understand the question?

15      THE WITNESS:  I don't really have any system like that.

16   Q.   BY MR. FRASER:  Let me ask it a different way.  On July

17   1 of 2008, did you, on behalf of the Union, Local 822, reach

18   a new collective bargaining agreement with Douglas?

19      MR. McKNIGHT:  Objection.  It's not an issue, Your

20   Honor.  We didn't reach a contract.

21      JUDGE BUXBAUM:  Well, do you want to start with that

22   question and see if there's -- if there's any hesitancy in

23   terms of the response, then I'll let you go through the list.

24      MR. McKNIGHT:  We wouldn't be here if this was -- you

25   know.

1        JUDGE BUXBAUM:  In other words, at any time when you

2   served as a member of the Union's bargaining committee, did

3   the Union and the Company ever reach a collective bargaining

4   agreement?

5        THE WITNESS:  No.

6   Q.   BY MR. FRASER:  All right.  And at any time that you

7   served as the spokesperson for the Union, Local 822, did the

8   Union and the Company reach any agreement on return to work?

9   A.   No.

10  Q.   And at any time you were the representative for --

11  spokesperson for the Union, did you reach an agreement with

12  Douglas on any agreement to reinstate the illegal strikers?

13  A.   I don't agree with your question.

14  Q.   I don't know it's your right to disagree with the

15  question.  But there was no --

16       JUDGE BUXBAUM:  No, but it sure sounds like a lawyer

17  testifying, doesn't it?

18       MR. FRASER:  It certainly does, doesn't it?

19       THE WITNESS:  There was no agreement regarding the

20  return to work of the Union workers.

21  Q.   BY MR. FRASER:  Well, that was the question before.

22  This one was reinstatement -- agreement to reinstating the

23  illegal strikers.  If you'd like me to call them bargaining

24  unit members --

25       JUDGE BUXBAUM:  Was there any agreement as to

1    reinstatement of anyone, however one characterizes them?

2        THE WITNESS:  Not with me, not when I was there.

3    Q.   BY MR. FRASER:  All right.  So during July, there was no

4    reinstatement agreement reached, correct?

5    A.   Correct.

6    Q.   Are you aware of some reinstatement agreement when you

7    worked there that was reached?

8        MR. McKNIGHT:  Judge, you know, we're not back to work.

9    This is irrelevant, this is redundant, this is just

10   cluttering the record with stuff that is argumentative.

11       JUDGE BUXBAUM:  But, you know what, Mr. McKnight?  A lot

12   of -- cross-examination, oftentimes, it's in the eye of the

13   beholder.  I want to allow sufficient latitude so that I'm

14   sure that I'm not just -- that I'm sure that it's clutter.

15   Sometimes, what's at first blush to the judge might be

16   clutter turns out, when I'm reading the transcript two months

17   later, to be decisive.  So I've got to be careful on cross.

18   I give lawyers some latitude, and you'll be one of them.

19       All right.  You want to -- I don't remember the question

20   after that.  I apologize for talking so long.  Do you want to

21   repeat it, Mr. Fraser?

22   Q.   BY MR. FRASER:  Well, yeah, the question was based on

23   Mr. Canzano's response where he said he wasn't aware of any

24   agreement when he was there, and it prompted me to ask him,

25   are you aware of an agreement that was reached on

1   reinstatement when you weren't there?

2   A.   No, I'm not.

3   Q.   Did you take notes during all bargaining sessions?

4   A.   No.

5   Q.   Do you know which bargaining sessions you did not take

6   notes in?

7   A.   No.

8   Q.   Did you make notes of the one-on-one conversations that

9   you've testified you had with Bruce Lillie?

10  A.   I don't think so.

11  Q.   Did you not find that conversation with Mr. Lillie

12  significant?

13       MR. McKNIGHT:   Objection as to "that conversation."

14       JUDGE BUXBAUM:   Sure --

15  Q.   BY MR. FRASER:   The conversation you testified about on

16  July 31st, 2008.  Do you recall that testimony?

17  A.   Can you repeat the question?

18  Q.   My question was, do you recall the testimony you gave

19  about your conversation with Mr. Lillie on July 31st, 2008?

20  A.   The private conversation?

21  Q.   That's what you testified about.

22  A.   And is the question, do I recall that?  Do I recall my

23  testimony?

24  Q.   Yes.

25  A.   Yes.

1    Q.    And my next question to you is, did you not view that as

2    a significant conversation with Mr. Lillie?

3    A.    Yes, I viewed it as significant.

4    Q.    You did not take any notes of that conversation, though,

5    correct?

6    A.    That's right.  I didn't take a lot of notes.  I'm not

7    good at taking notes.

8    Q.    I think you keep answering questions I haven't asked,

9    but I appreciate that.  Was there discussion, Mr. Canzano,

10   during July, regarding returning illegal strikers to work

11   based on ability and skill, as compared to seniority?

12   A.    There was discussion regarding returning the locked out

13   workers along those lines.

14   Q.    On those lines?

15   A.    Along those lines.  There was discussion about ability

16   versus seniority.

17   Q.    Okay.  And the Union, through you as the representative,

18   took offense to the fact the Company was trying to disregard

19   seniority, correct?

20   A.    Yes, but not entirely.

21   Q.    Well, what does that mean?

22   A.    We agreed that there was some validity to the concept of

23   ability, that it shouldn't be strictly seniority.

24   Q.    But seniority should control?

25   A.    They didn't want any seniority.  We wanted seniority

 1  still to be a part of it.

 2  Q.   My question was, but, for you, seniority should control,

 3  isn't that correct?

 4  A.   No, that's not correct exactly, no.

 5  Q.   Should it be the primary factor?

 6  A.   Our proposals included ability and other factors besides

 7  strict seniority.  We were not insisting on strict seniority.

 8  Q.   The Company had given you a proposal that they referred

 9  to as the MOA, the modern operating agreement, right?

10  A.   You're going to have to show me something specific.  I

11  recall the term modern operating agreement, but specifically

12  what was in that --

13      MR. CARLSON:  And I think there's a number of proposals

14  in the record.  I think, if we're going to discuss a specific

15  proposal, we should have it before us.

16      JUDGE BUXBAUM:  Why are we discussing specific

17  proposals, Mr. Fraser?  How is that relevant?

18      MR. FRASER:  Listen, Your Honor, I didn't -- I

19  understand your frustration --

20      JUDGE BUXBAUM:  Well, I'm not frustrated, but I'm

21  curious.

22      MR. FRASER:  So here's my perspective on why it's

23  important to discuss that.  There's been testimony by

24  Mr. Canzano about what it is that people said during these

25  bargaining sessions related to returning people to work and

1    transitioning plans and, you know, when this is all settled,

2    we'll have some training.  And then, to me, that opens the

3    door of let's talk about what was really discussed in

4    order -- leading up to those specific statements, which is

5    what I'm trying to get to.  They're statements out of

6    context, and I'm trying to provide the context by having

7    Mr. Canzano answer the questions related to the proposals

8    that were actually made and the discussion that actually took

9    place.

10        JUDGE BUXBAUM:  All right.  Go ahead.

11    Q.    BY MR. FRASER:  Mr. Canzano, when you came into the

12    bargaining sessions on July 1, did Phil Winkle, the Local

13    822, provide you copies of the proposals that the Company had

14    made prior to that date?

15    A.    At some point, yes.

16    Q.    And, in fact, you studied those proposals to try to

17    determine how to respond to them, correct?

18    A.    Yes.

19    Q.    Didn't the Union provide you what has been marked -- and

20    perhaps you haven't seen -- as General Counsel 38?  I don't

21    know if you have General Counsel 38 up there or not.  If I

22    could --

23    A.    I don't have that.

24        MR. FRASER:  Do you have the witness version of that,

25    Steve?

1       Thank you.

2    Q.    BY MR. FRASER:  Let me show you what's been marked as

3    General Counsel Exhibit 38.  Take a look at that for me,

4    please.

5    A.    Okay.

6    Q.    You've seen that document before?

7    A.    I'm sure I have.  I can't say exactly where it fell in

8    the chronology.

9    Q.    Then you think you may have reviewed that as part of

10   your review process to get up to speed on the July bargaining

11   that you started for the Union?

12   A.    I'm not sure because I don't know when this came in the

13   chronology.

14   Q.    Well, General Counsel admitted it as GC-38 with the

15   representation that it was submitted on June 2 of 2008.  Does

16   that help you?

17   A.    Okay.  I'm sure, then, I've looked at it at some point.

18   Q.    Okay.  And then if you can look at GC-41, which I think

19   you have testified about.

20   A.    Okay.

21   Q.    You have seen GC-41, correct?

22   A.    Yes.

23   Q.    Now, wasn't, in fact, the transitioning that you

24   testified Bruce Lillie and Glen Kirk were talking about was

25   related to bringing back 40 or shortly -- 40 or fewer

1  strikers, and how to transition those strikers back to work

2  if an agreement were reached?

3  A.   No, my testimony about that, I think, was an earlier

4  meeting, and it wasn't about strikers.  It was about locked

5  out employees.

6  Q.   Okay.  And so every time that a comment like that was

7  made, the comment was made with the additional proviso, "If

8  we reach an agreement," correct?

9  A.   Well, I think I only testified about one time when that

10  kind of comment was made, but it was in the context of "if we

11  reach an agreement" or "when we get this settled."

12  Q.   Okay.  Your testimony on GC-40, I think, in answer to

13  the question, "Why did you provide this proposal?" you said,

14  "Because the Company asked us to give a proposal on July 1st

15  or 2nd."  Is that an accurate statement?

16  A.   Yes.

17  Q.   Is it your testimony that the Union was not going to

18  provide a proposal if the Company hadn't asked for one?

19  A.   No.

20  Q.   So, again, just going through your testimony, July 24 of

21  2008, you did have a conversation with Mr. Lillie where he

22  said -- where he mentioned or talked about illegal strike; is

23  that correct?

24  A.   I don't know that I testified about the words "illegal

25  strike."

1  Q.   8(d) liability; is that correct?

2  A.   Yes.

3  Q.   You understood that to mean illegal strike, correct?

4       MR. McKNIGHT:  Objection as to his understanding.  It's

5  irrelevant.

6       JUDGE BUXBAUM:  Very well.  Sustained.

7  Q.   BY MR. FRASER:  What did you understand Mr. Lillie's

8  comment to mean?

9  A.   That their attorneys were saying that the Union could be

10 liable because of the improper 8(d) notice.

11 Q.   Okay.  And Mr. Lillie also said that the Company wasn't

12 waiving their rights in that meeting with you, correct?

13 A.   On July 24th?

14 Q.   Yeah.

15 A.   No, we never said that.

16 Q.   Okay.  Do you have a copy of the affidavit you provided

17 in this matter in front of you?

18 A.   No.

19      MR. FRASER:  Is there a way for us to -- may I approach?

20      JUDGE BUXBAUM:  Yeah, you may.

21 Q.   BY MR. FRASER:  I'm going to read this, and then I'm

22 going to show it to you.  On page 2, paragraph six, your

23 affidavit says:  "And, in fact, once we were back in that

24 session, Lillie stated to us all that he had to say that the

25 Company was not waiving any of its rights and may decide to

1    terminate."

2        See that?  First sentence of paragraph six?

3    A.    Okay, I see that.

4    Q.    Is that your recollection of what Mr. Lillie said on 7-

5    31, in the bargaining session, that they may terminate?

6    A.    Yes.

7    Q.    You're clear as you sit here today and as you gave this

8    affidavit that Mr. Lillie didn't say, "And the Company is

9    going to terminate the employees"?

10   A.    Yes, I'm clear of that.  He did not say that.

11   Q.    Okay.  Was part of the reason that the Company couldn't

12   meet after 7-31-08 for the next bargaining session because

13   you, in fact, were also going on a vacation?

14   A.    No.

15   Q.    At any bargaining session, did you say to the Company,

16   "It appears as though we're 10,000 miles apart"?

17   A.    Could you repeat the question?

18   Q.    Yeah.  At any time during the bargaining session that

19   you attended, did you say to the Company, "It appears as

20   though we're 10,000 miles apart"?

21   A.    I don't think I said that.

22   Q.    Did you say something like that?

23   A.    I don't think so.

24   Q.    Was it your impression from your bargaining in July that

25   the parties were near agreement on July 31st, 2008?

1   A.   I think, on July 31st, we were getting close.

2   Q.   Okay.  Did somebody from the Company tell you they

3   thought that you were close?

4   A.   As I testified, Mr. Lillie said that we had made

5   progress that day, and he wanted to ask if we thought we

6   could get it done, and I think that speaks for itself.  We

7   were close enough that, if we were to stay maybe all night,

8   we could have got it done.

9   Q.   That was your interpretation?

10  A.   Yes.

11  Q.   Okay.  Now, the next page of your affidavit, top of --

12  just before paragraph seven, there's a statement that says,

13  "Aside from these remarks on 7-31-08, I never heard anyone

14  from the Company say that they would fire the strikers."  Do

15  you need to see that in order to --

16  A.   I'd like to see it, yes.

17  Q.   Starts right here.

18  A.   Okay.  What was the question again?  I'm sorry.

19  Q.   That you acknowledge that that's your statement?

20  A.   Yes.

21  Q.   In fact, on 7-31, nobody from the Company did say that

22  they were going to fire the strikers, correct?

23  A.   That's correct.

24  Q.   So this statement is incorrect in the affidavit?

25       MR. McKNIGHT:  Well, objection, Your Honor.  It's taking

1   an excerpt -- and an incomplete and misleading excerpt of

2   several sentences in the affidavit, so --

3       MR. FRASER:  I don't think there's anything misleading

4   at all.  I've compared that --

5       JUDGE BUXBAUM:  Read the statement again --

6       MR. McKNIGHT:  Well, I'm glad he doesn't, Your Honor,

7   but that's the nature of my objection.

8       MR. FRASER:  Yeah.  There are two of them, but one of

9   them that I just read to the witness is --

10      JUDGE BUXBAUM:  Well, that's the one I want to hear.

11      MR. FRASER:  "Aside from these remarks on 7-31-08, I

12  never heard anyone from the Company say that they would fire

13  the strikers."

14      MR. McKNIGHT:  And these --

15      JUDGE BUXBAUM:  I understand, yeah, sustained.  I think

16  it's argumentative.  It's just a matter of interpretation.

17      MR. FRASER:  It's a matter of what?  I'm sorry.

18      JUDGE BUXBAUM:  Interpretation.

19  Q.  BY MR. FRASER:  Okay.  You acknowledge you said in

20  paragraph seven of your affidavit, quote, "Lillie never told

21  me that they were, in fact, going to fire people," correct?

22  A.  Correct.

23      MR. FRASER:  No other questions.  Thank you.

24      JUDGE BUXBAUM:  Redirect?

25      MR. CARLSON:  No, Your Honor.

1    JUDGE BUXBAUM:  Very well.  Then, is Mr. Canzano

2  excused?  Does anyone see a reason for him to return?

3    MR. McKNIGHT:  Could I just ask my buddies here if

4  there's anything I should ask him?

5    JUDGE BUXBAUM:  Well, you don't get redirect.  You

6  didn't have direct.  I'll allow you ask, then.  Hopefully,

7  they won't have a question and I won't have to grapple with

8  this severe problem of whether someone who doesn't have

9  direct can have redirect.  Mr. Sharma, the pressure's on you,

10  now.

11    MR. SHARMA:  I've got nothing.

12    JUDGE BUXBAUM:  All right.

13    MR. McKNIGHT:  See, he agrees with me.  Well, I have no

14  further questions.

15    JUDGE BUXBAUM:  Good.  So you've removed us all from the

16  horns of a dilemma.

17    Can Mr. Canzano be excused?  Does anyone see a reason

18  for him to continue to remain here tomorrow for any purpose?

19    MR. CARLSON:  No, sir.

20    MR. FRASER:  We subpoenaed Mr. Canzano, as well, and,

21  again, frankly, I don't know whether he can be relieved or

22  not because I'm not sure where General Counsel is going with

23  their case.  I can make this commitment, that we certainly

24  can coordinate whether Mr. Canzano really needs to be here

25  tomorrow, depending upon when it is that General Counsel

1  thinks they may or may not be done with their case.

2      JUDGE BUXBAUM:  Right.  And we're going to talk about

3  all that next.

4      MR. FRASER:  Yeah, and I certainly don't want him to be

5  away from clients and work and other things that he has to

6  do, but we're not releasing him from the subpoena --

7      JUDGE BUXBAUM:  No, no.  And I wasn't looking for that.

8  I didn't realize you had subpoenaed him.  All right.  Then,

9  Mr. Canzano, why don't you stand down, although you -- for

10  this purpose, does anyone mind if he stays in the room to

11  discuss tomorrow's scheduling?  All right.  Good.

12      JUDGE BUXBAUM:  And, Mr. Canzano, let me say one other

13  thing, too.  Please, while the trial continues, don't discuss

14  your testimony.

15  **(Witness excused.)**

16      JUDGE BUXBAUM:  All right.  As to tomorrow, I guess,

17  Mr. Carlson, what's your sense?  We've completed two

18  witnesses.  You have how many more?

19      MR. CARLSON:  I have, Judge, one witness that I would

20  anticipate would be about the length of Mr. Canzano.

21      JUDGE BUXBAUM:  Okay.

22      MR. CARLSON:  Possibly two other brief witnesses.

23      JUDGE BUXBAUM:  Okay.

24      MR. CARLSON:  That's it.  I want to -- maybe I'm getting

25  into this before you want to, but, at some point, I think we

1    need to talk about the documents and the subpoenas and --

2    because it is entirely possible that the General Counsel may

3    be in a position tomorrow where we are through putting on

4    evidence and I have yet to have an opportunity to review all

5    of those documents.  So I may be looking to, you know,

6    reserve the right to -- and I can't even say just to put in

7    documents.  It may be to put on witnesses.  So that's a

8    concern I have.  I just want to let you know about that.

9         JUDGE BUXBAUM:  Well, but before I address that, let me

10   get the rundown from the other two lawyers first, and I think

11   it may sort of answer itself.

12        Mr. McKnight, I think you told me long ago, but I'm not

13   holding you to it, that you didn't anticipate calling other

14   witnesses besides those Mr. Carlson called.  Is that still

15   your intent?

16        MR. McKNIGHT:  Probably.

17        JUDGE BUXBAUM:  Probably, okay.  And if you were going

18   to call witnesses, how many do you think it would be?

19        MR. McKNIGHT:  A couple.

20        JUDGE BUXBAUM:  A couple, okay.

21        Mr. Fraser, give me a sense of how long you think your

22   case will take.  How many witnesses do you think you will be

23   calling?

24        MR. FRASER:  We have at least four.

25        JUDGE BUXBAUM:  Four, yeah.  I just don't think we're

1  going to finish it this week, anyway.  Do any of you?

2  Keeping in mind that I've got to travel for a good part of

3  Friday.

4      MR. CARLSON:  What time do you have to leave on Friday?

5      JUDGE BUXBAUM:  Well, the flight I currently have booked

6  is at two o'clock in the afternoon, from Detroit.  I can look

7  about --

8      MR. CARLSON:  Oh, from Detroit, oh.

9      JUDGE BUXBAUM:  Yeah.  Now, see, I have a commitment on

10  Saturday that I just can't avoid, so I'm trying to -- I've

11  got to be careful.

12      MR. CARLSON:  I would agree, Judge.  I don't think

13  there's any way -- and I am --

14      JUDGE BUXBAUM:  I mean, if you think we could finish by

15  noon on Friday, I can look into a later flight, something

16  like that, but --

17      MR. CARLSON:  No.  And I'm concerned about being -- as I

18  think I indicated earlier, you know, the rebuttal in this

19  case --

20      JUDGE BUXBAUM:  I know.  You told me that.  That's

21  right.

22      MR. CARLSON:  This case has a lot to do with the

23  Respondent's affirmative defenses, and so rebuttal is going

24  to be very significant.  And, you know, with all due respect,

25  I don't want to be in a position where we're rushing --

1    JUDGE BUXBAUM:  I don't want anyone to rush.

2    MR. CARLSON:  Right.

3    JUDGE BUXBAUM:  That's why, I mean, this all just

4  confirms my sense, once we got started because there are a

5  number of things involved -- this is not uncommon, but that I

6  just didn't grasp from our conference calls.  You have to

7  sort of start to hear evidence and get a sense of it.

8    So I think we're going to be talking about a resumption,

9  anyway; and, therefore, I think this question about time to

10  read documents is going to resolve itself.

11    Where that leads me, then, is two things right now.  One

12  is I'd like all of you to bring your trial schedules

13  tomorrow, so that we can begin the process of figuring out

14  when to have that resumption.  And given the nature of the

15  case, I'd like it to be sooner rather than later, but I do

16  understand that you've all got other commitments, so I'm

17  hoping we can pick something reasonably soon.  And let's pick

18  a Tuesday and figure that will give us at least three full

19  days.  And let's not pick a week with a holiday.

20    And as to tomorrow, do you want to try to -- I'd like to

21  begin no later than nine.  I'd be happy to begin at 8:30, if

22  you can all do it.  If you can't, we'll start at 9:00.

23    MR. CARLSON:  Yeah, frankly, Your Honor, I don't know

24  that it's going to matter much --

25    JUDGE BUXBAUM:  No, you're probably right.

1    MR. CARLSON:  -- because I'm fairly confident that I

2    will be through putting on witnesses tomorrow.  I'm quite

3    confident about that.

4    JUDGE BUXBAUM:  Yeah, that seems quite reasonable to

5    expect.

6    MR. CARLSON:  And at that point, then I guess we're

7    going to have to make some decisions about where we want to

8    go from there and --

9    JUDGE BUXBAUM:  Well, I'm going to want to go -- I'm

10    certainly going to want to use all day tomorrow.

11    MR. CARLSON:  Okay.

12    JUDGE BUXBAUM:  You know, if you can't rest yet without

13    some reservations, that's okay.  You'll state under what

14    terms you would be resting.

15    MR. CARLSON:  Okay.

16    JUDGE BUXBAUM:  But I certainly want to plan on a full

17    day of work tomorrow.

18    MR. CARLSON:  Okay.

19    JUDGE BUXBAUM:  All right.  At 8:30, 9:00, you tell me,

20    folks?

21    MR. McKNIGHT:  9:00, 9:00, Your Honor.

22    JUDGE BUXBAUM:  All right.  We'll make it 9:00, 9:00

23    sharp.  As I say, be prepared to discuss scheduling.

24    And anything else anyone wants to raise this evening?

25    Mr. Canzano?

1     MR. CANZANO:  Yeah, I may need to consult with my

2  people.  Is that -- I mean, you're probably not going to need

3  me tomorrow.

4     MR. FRASER:  I think, if Steve can tell me who it is

5  that he's putting on -- not that he has any obligation to --

6  that would help me say no, I don't think I need to.  But

7  that's the best I can do.

8     COURT REPORTER:  Do you want this on the record?

9     JUDGE BUXBAUM:  Yeah, yeah, I think so.

10     Mr. Canzano, how far away are you?

11     MR. CANZANO:  I'm in Detroit.

12     MR. McKNIGHT:  Just only two and a half hours.

13     JUDGE BUXBAUM:  Okay.

14     MR. McKNIGHT:  I mean, I'm used to the drive, Your

15  Honor, and so is John, so --

16     JUDGE BUXBAUM:  How do you want to leave it?  Is it

17  possible, Mr. Fraser, that you can have him on call from his

18  office in Detroit?  But, again, I don't want to be sitting

19  here for two and a half hours, waiting for him to drive.

20     MR. CANZANO:  And I can admit that I -- you know, I

21  could leave as soon as somebody called me.

22     JUDGE BUXBAUM:  Yeah, I hear that, but --

23     MR. FRASER:  Again, I'm trying to be reasonable, but I

24  can't --

25     MR. McKNIGHT:  No, he's not.  He's not trying to be

1  reasonable.

2      JUDGE BUXBAUM:  Well, is it absolutely certain that he's

3  going to be testifying for you?

4      MR. FRASER:  Again, Your Honor, I don't know.  I mean,

5  if Steve wants to tell me who his next three witnesses are, I

6  can give an answer to that probably right now.  But I'm

7  assuming he's not going to tell me, and as a result, I can't

8  answer that question.

9      JUDGE BUXBAUM:  Well, I'll leave it to you, gentlemen.

10     MR. McKNIGHT:  Just put him on call.

11     JUDGE BUXBAUM:  Well, now, wait a minute.  As I say, on

12  call is all well and good, but I'm not going to sit here for

13  two hours, waiting for him to drive here.  I can't do that to

14  the taxpayer.  We've got to get some work done.  I mean, I am

15  happy to hear anybody's witnesses.  It doesn't have to be in

16  order, it doesn't have to -- you know, this is no jury trial.

17     I mean, my sense is maybe to have him report back here

18  two o'clock?  Mr. Fraser, will that work?

19     MR. FRASER:  That seems fine to me.

20     JUDGE BUXBAUM:  All right.  Mr. Canzano, I wish we could

21  do it otherwise, but that's the best I can come up with.

22     MR. CANZANO:  Okay.

23     JUDGE BUXBAUM:  All right.  Then you are excused till

24  2:00 tomorrow afternoon.

25     MR. CANZANO:  Maybe that'll change tomorrow and I can --

1        JUDGE BUXBAUM:  Well, obviously, you have a cell phone.

2    I think that Mr. McKnight knows how to reach you.  So if

3    something changes, he will get a hold of you.

4        Okay.  Anything else anyone wants to raise before we

5    close for the evening?

6        MR. CARLSON:  No, Your Honor.

7        MR. FRASER:  No, Your Honor.

8        MR. McKNIGHT:  No.

9        JUDGE BUXBAUM:  Very well.  Then, we are adjourned until

10   9:00 a.m. tomorrow, in this location.

11   **(Whereupon, at 5:55 p.m., the hearing in the above-entitled**

12   **matter was adjourned, to be reconvened on the following day,**

13   **Thursday, June 25, 2009, at 9:00 a.m.)**

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATION**


This is to certify that the attached proceedings before the National Labor Relations Board, Region 7, in the matter of **DOUGLAS AUTOTECH CORPORATION**, Case No. GR-7-CA-51428, at Grand Rapids, Michigan, on June 24, 2009, were held according to the record, and that this is the original, complete, and true and accurate transcript that has been compared to the reporting or recording, accomplished at the hearing, that the exhibit files have been checked for completeness and no exhibits received into evidence or in the rejected exhibit files are missing.


_____
Jeremy Tieking
Official Reporter


_____
Cheri Grissom
Transcriber


Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

In the Matter of:

**DOUGLAS AUTOTECH CORPORATION,**

        Respondent,

    and                       Case No.  **GR-7-CA-51428**

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), AFL-CIO, AND ITS LOCAL 822,**

        Charging Party.

        The above-entitled matter came on for hearing pursuant to notice, before **PAUL BUXBAUM**, Administrative Law Judge, at **National Labor Relations Board Grand Rapids Resident Office, 82 Ionia Street, N.W., Room 330, Grand Rapids, Michigan**, on **Thursday, June 25, 2009, at 9:00 a.m.**

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

# A P P E A R A N C E S

**Counsel for the General Counsel:**

    STEVEN E. CARLSON, ESQ.
    National Labor Relations Board
    82 Ionia Ave. NW, Suite 330
    Grand Rapids, MI  49503
    (616) 456-2270

**On Behalf of the Charging Party:**

    SAMUEL C. McKNIGHT, ESQ.
    Klimist, McKnight, Sale, McClow & Canzano, PC
    400 Galleria Officentre, Suite 117
    Southfield, MI  48034
    (248) 354-9650

    MANEESH SHARMA, ESQ.
    Associate General Counsel
    UAW Legal Department
    8000 E. Jefferson Ave.
    Detroit, MI  48214
    (313) 926-5216

**On Behalf of the Respondent:**

    JEFFREY J. FRASER, ESQ.
    KIMBERLY RICHARDSON, ESQ.
    KELLEY E. STOPPELS, ESQ.
    Varnum, LLP
    333 Bridge St., NW
    P.O. Box 352
    Grand Rapids, MI  49501
    (616) 336-6000

272

## I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|-----------|--------|-------|----------|---------|-----------|
| Robert Paul Viar, Jr. | 274<br>332 | -- | -- | -- | -- |

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

273

# E X H I B I T S

| EXHIBIT NUMBERS | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-26, paragraph 1, 2 and signature | 282 | 291 |
| GC-26, remainder | 282 | Rejected - 291 |
| GC-27 | 292 | 292 |
| GC-28 | 293 | 293 |
| GC-29 | 373 | 374 |
| GC-30 | 373 | 374 |
| GC-31 | 293 | 293 |
| GC-32 | 373 | 374 |
| GC-33 | 373 | 374 |
| GC-34 | 373 | 374 |
| GC-35 | 373 | 374 |
| GC-44 | 294 | 300 |
| GC-46 | 303 | 321 |
| GC-47 | 278 | 281 |
| CHARGING PARTY'S | | |
| CP-1 | 343 | 354 |

1                    P R O C E E D I N G S

2                              (Time Noted:  9:00 a.m.)

3        JUDGE BUXBAUM:  Good morning, everyone.  This is a

4    continuation of the trial in Douglas Autotech Corporation,

5    GR-7-CA-51428.  Unless anyone has any preliminary matters, I

6    think, Mr. Carlson, we'd be up to your next witness.

7        MR. CARLSON:  Thank you, Judge.  General Counsel calls

8    Paul Viar.

9        UNIDENTIFIED SPEAKER:  Excuse me, Your Honor, I must

10   leave.

11       JUDGE BUXBAUM:  Yes.  Could you please raise your right

12   hand?

13   (Whereupon,

14                    **ROBERT PAUL VIAR, JR.**

15   was called as a witness by and on behalf of the General

16   Counsel and, after having been first duly sworn, was examined

17   and testified as follows:)

18       JUDGE BUXBAUM:  Would you please spell your name --

19   state your name and spell your last name?  I got it right,

20   now.

21       THE WITNESS:  Robert Paul Viar, Jr., last name V-i-a-r.

22       JUDGE BUXBAUM:  Thank you.  You may proceed, counsel.

23       MR. CARLSON:  Thank you, Judge.

24                    **DIRECT EXAMINATION**

25   Q.   BY MR. CARLSON:  Mr. Viar, you're currently employed by

1  Douglas Autotech in Bronson, Michigan.  Is that right?

2  A.    Yes.

3  Q.    And how long have you worked for the Company?

4  A.    Approximately four-and-a-half years.

5  Q.    And all that time has been in Bronson?

6  A.    I work in both locations, Hopkinsville and Bronson.

7  Q.    And the other facility is in Hopkinsville.  And what

8  state is that in, sir?

9  A.    No.  Oh, I'm sorry.  I have trouble with my hearing,

10 counsel.

11 Q.    Oh, I'm just --

12       MR. FRASER:  I made a note yesterday.  I apologize.

13 Mr. Viar does have hearing impairment.  It's his left ear?

14 Both?

15       THE WITNESS:  Both, counsel.

16       MR. FRASER:  Okay, and he does not have his hearing aids

17 with him.  So, if there's a way to keep voices up, I'd

18 appreciate that.

19       MR. CARLSON:  Okay.

20       JUDGE BUXBAUM:  Hold on a moment.  Mr. Viar, the other

21 key point with that is that if you don't hear a question,

22 please don't be shy or embarrassed about that.  I need to

23 know that so that I can get counsel to repeat the question.

24       THE WITNESS:  Is it okay if I ask him to repeat it?

25       JUDGE BUXBAUM:  I would prefer that you do that.  That's

1  excellent.

2       THE WITNESS:  Okay.

3       JUDGE BUXBAUM:  The point though is that I don't want

4  you answering a question that you're not sure you heard

5  correctly.  That's not fair to you, and it's not good for the

6  record.

7       THE WITNESS:  I understand.

8       JUDGE BUXBAUM:  All right, you may proceed, counsel.

9       THE WITNESS:  Can you repeat the question?

10  Q.   BY MR. CARLSON:  Yeah, just a second.  All right,

11  Mr. Viar, Douglas Autotech has how many facilities, sir?

12  A.   Two.

13  Q.   Okay, and one is in Bronson, Michigan?  Is that right?

14  A.   Yes.

15  Q.   And the other is in Hopkinsville, you said?

16  A.   Hopkinsville, Kentucky, sir.

17  Q.   Kentucky, thank you.  And the other facility is a

18  nonunion facility; is that correct?

19  A.   Yes.

20  Q.   And what is your current position with the Company?

21  A.   Director of Administration.

22  Q.   And how long have you held that position?

23  A.   Approximately 19 months.

24  Q.   And what position did you hold with the Company prior to

25  that?

1   A.   Director of Human Resources.

2   Q.   And how long did you hold that position?

3   A.   Two-and-a-half years.

4   Q.   Any other positions that you've held with the Company?

5   A.   No.

6   Q.   And can you tell us what are your duties and

7   responsibilities as Director of Administration?

8   A.   I administer all Human Resources policies and programs.

9   I have administrative responsibilities, including managing

10  our litigation.  At times I provide legal counsel to senior

11  management.  I administer our JSOX, Japanese Sarbanes-Oxley,

12  Program Insurance.

13  Q.   Anything else?

14  A.   That covers most of what I do.

15  Q.   Okay, do you have any duties relative to unemployment

16  compensation, unemployment benefits?  Would that be included

17  within your duties?

18  A.   I don't understand the question.

19  Q.   Do you work at all -- do you have any involvement with

20  unemployment benefits through the State of Michigan?

21  A.   Yes.

22  Q.   And what do you do relative to unemployment benefits?

23  A.   When an unemployment claim comes in, I respond to it.

24  Q.   Anything else?

25  A.   No.

1 Q.   Okay, it sounds like everything, doesn't it?  Do you

2 have -- I think you said you have duties with respect to

3 benefits.  That would include 401(k) benefits; is that

4 correct?

5 A.   Yes.

6 Q.   Do you have duties and responsibilities with respect to

7 collective bargaining?

8 A.   I do.

9 Q.   And did you participate in the negotiations of the prior

10 collective bargaining agreement between the UAW and Douglas?

11 When I say the prior, I'm talking about the contract that

12 expired on April 30, 2008.

13 A.   Yes.

14 **(General Counsel's Exhibit 47 marked for identification.)**

15 Q.   BY MR. CARLSON:  Mr. Viar, I'm going to hand you what

16 I've marked as General Counsel's Exhibit 47 and ask you to

17 take a look at that document.  Did you recognize that

18 document?

19 A.   This is a document that I sent to --

20 Q.   Just yes or no.  Do you recognize the document, sir?

21 A.   This is the document that I sent to --

22 Q.   Excuse me.

23     MR. CARLSON:  Your Honor, I'd like him to be directed to

24 answer the question.  I'm just asking if he recognizes it.

25 I'm not asking him to describe the document.  I want him to

1    answer whether or not he recognizes it.

2        JUDGE BUXBAUM:  All right, sir, would you indicate

3    whether or not you recognize it?

4        THE WITNESS:  Yes.

5    Q.   BY MR. CARLSON:  And this is the termination letter that

6    the Company issued on August 4th, 2008; is that correct?

7    A.    No.   This is the document that I sent to members of the

8    bargaining unit confirming their status under the Act.

9        JUDGE BUXBAUM:  This one is addressed to someone named

10   Harold Maurer.  I'm guessing that identical letters were sent

11   to other employees?

12       THE WITNESS:  Yes, Your Honor.

13       JUDGE BUXBAUM:  Okay.

14   Q.   BY MR. CARLSON:  So, here in the last sentence of the

15   document, when it says your employment with Douglas Autotech

16   Corporation is terminated effective immediately, your

17   testimony is that this is not a termination letter?

18       MR. FRASER:  Objection.  The document speaks for itself.

19       JUDGE BUXBAUM:  Well, first of all, let's clear up

20   something procedurally.  This is your witness as it stands

21   now.

22       MR. CARLSON:  Correct.

23       JUDGE BUXBAUM:  Okay, you've got to examine the witness,

24   then, absent some indication to the contrary, you need to

25   examine the witness as your witness, not as his witness.

1    MR. CARLSON:  Oh, then, Judge, I would move to question

2  the witness under 611(c) as an adverse witness.

3    JUDGE BUXBAUM:  Any objection?

4    MR. FRASER:  No.

5    JUDGE BUXBAUM:  All right.

6    MR. CARLSON:  I'm sorry, Your Honor.

7    MR. FRASER:  Which is why we didn't say anything to

8  begin with.

9    JUDGE BUXBAUM:  That's all right.  I'm just making my

10  record clean, counsel.

11    MR. CARLSON:  I understand.

12    JUDGE BUXBAUM:  All right.

13    MR. CARLSON:  Very good.

14    JUDGE BUXBAUM:  Go ahead then.  You were about to say

15  something, Mr. Carlson.

16  Q.  BY MR. CARLSON:  Mr. Viar, is this a document that you

17  authored?

18  A.  No.

19  Q.  Okay, who authored this?

20    JUDGE BUXBAUM:  Your reference is to GC-47?

21    MR. CARLSON:  Yes, I'm sorry, GC-47.

22    THE WITNESS:  Bill Pilchak.

23  Q.  BY MR. CARLSON:  Okay, and who is Bill Pilchak?

24  A.  It's a lawyer hired by the Company.

25  Q.  He -- I'm sorry.  I didn't hear what he said.

1    JUDGE BUXBAUM:  Hired by the Company.  In other words,

2  outside counsel.

3    THE WITNESS:  Yes, Your Honor.

4    MR. CARLSON:  I'm going to offer GC- -- actually I'll do

5  one thing first.

6  Q.  BY MR. CARLSON:  Mr. Viar, I'm going to hand you what's

7  been entered into evidence as General Counsel's Exhibit 48.

8  Take a look at that document.  Have you had a chance to look

9  at that document?

10 A.   Yes.

11 Q.   Okay, and the Company issued the letter GC-47 to all of

12 those individuals listed on GC-48; is that correct?

13 A.   Yes.

14    JUDGE BUXBAUM:  All three pages?

15    THE WITNESS:  Yes.

16    MR. CARLSON:  We offer GC-47 at this time.

17    JUDGE BUXBAUM:  Any objection?

18    MR. FRASER:  No objection.

19    JUDGE BUXBAUM:  It will be received.

20 **(General Counsel's Exhibit 47 received into evidence.)**

21 Q.  BY MR. CARLSON:  All of these letters were issued on the

22 same day; is that correct?

23 A.   I think that's right, yes.

24 Q.   Mr. Viar, I understand from Mr. Fraser that you are also

25 here today in your capacity as custodian of the records for

1    Douglas Autotech Corporation; is that correct?

2    A.   Yes.

3    **(General Counsel's Exhibit 26 marked for identification.)**

4    Q.   BY MR. CARLSON:  I'm going to show you what I've marked

5    as General Counsel's Exhibit 26, which has been distributed

6    to the Judge and Mr. McKnight and Mr. Fraser yesterday.  Do

7    you have that document in front of you?

8    A.   I'm sorry, counsel.  Which one am I looking at, GC-26?

9    Q.   Yes, sir.

10   A.   Yes, I have it in front of me.

11   Q.   And that was a document that was produced pursuant to

12   the General Counsel's subpoena?

13   A.   Can I have a minute to look at it?

14   Q.   Certainly.

15   A.   Okay.

16       MR. FRASER:  And, Your Honor, before we go any further

17   with GC-26, Respondent Douglas would make an objection that

18   it's a settlement document that is not a document that could

19   be entered into evidence in this matter.

20       JUDGE BUXBAUM:  Well, what do you say to that,

21   Mr. Carlson?

22       MR. CARLSON:  I don't think it's a settlement document

23   at all.  I think it's a document informing counsel for the

24   UAW that they had just fired the entire bargaining unit.  I

25   think it goes to that, and I don't think that it's a

1  settlement document.

2      MR. FRASER:  But it is.  The letter itself talks about

3  settlement, providing opportunities for settlement.

4      MR. CARLSON:  I'm not aware of having litigation either

5  at the time this document was issued.  What litigation are we

6  talking about?

7      MR. FRASER:  I don't know that it matters whether there

8  was any pending litigation.

9      JUDGE BUXBAUM:  Well, but I think there's a simple

10  solution here, gentlemen.  I think the answer is that it's

11  both of those things and that we can redact the portion

12  that's a settlement discussion and admit the portion that is

13  a statement as to the Company's legal position.

14      MR. FRASER:  That would certainly be acceptable to us.

15      MR. CARLSON:  There is no portion of this document that

16  is a settlement proposal.  We had no settlement discussions

17  with these attorneys.  I never spoke to these attorneys.

18  This guy's partner was in the room on August 14th and did not

19  speak, and I got this letter.

20      JUDGE BUXBAUM:  But, Mr. Carlson, you understand your

21  statements from counsel table are not ever --

22      MR. CARLSON:  And there's no reference to any litigation

23  in this letter.

24      JUDGE BUXBAUM:  Let me look at it again.

25      MR. CARLSON:  This is not a settlement document.  This

1  is an extortion document.

2      MR. FRASER:  Your Honor, it doesn't matter what Mr. --

3      MR. McKNIGHT:  I make a record of that, Your Honor.

4  This is not a settlement document.

5      JUDGE BUXBAUM:  Well, it's clearly not a document that

6  the recipient would be pleased to receive.  I understand

7  that, Mr. McKnight.  Let me take another look at it.

8      **We'll go off the record for a moment.**

9  **(Off the record.)**

10     JUDGE BUXBAUM:  All right, I've reread the letter, and I

11 still believe that it's both things and that there are

12 important policy reasons to be careful about in not admitting

13 settlement proposals.  Therefore, I think that the

14 appropriate way to do this is I will admit on General

15 Counsel's motion paragraphs 1 and 2 of the letter and, of

16 course, the signature, the Very Truly Yours and signature.

17 And I'll redact paragraphs 3, 4, 5.

18     MR. McKNIGHT:  May I speak to that, Your Honor?

19     JUDGE BUXBAUM:  Yes, hold on a moment.

20     MR. McKNIGHT:  Okay.

21     JUDGE BUXBAUM:  And I will place the redacted portions

22 in a rejected exhibit file as we discussed at the beginning

23 of the trial.  Now, I will hear you, counsel.

24     MR. CARLSON:  Then I will ask you to reconsider

25 paragraphs 3, 4 -- well, paragraph 3 talks about a global

1   settlement or contract.

2       JUDGE BUXBAUM:  Right.

3       MR. McKNIGHT:  Not litigation.  Paragraph 4 and 5 and

4   the following page talk either about the global settlement of

5   a contract and the settlement of an employee 301 lawsuit

6   against the Union.  Mr. Pilchak did not represent employees.

7   And this could not possibly represent a settlement document.

8   This is a threat to encourage employees to serve the Union

9   for breach of duty of their representation and an extortion

10  attempt to persuade the Union to surrender the employees'

11  rights under the National Labor Relations Act and to buy out

12  the Union and to sell out the employees.  That's what this

13  is.  It is not a settlement document, not by any stretch of

14  the imagination.  And, sir, clearly, Mr. Pilchak cannot offer

15  to settle what he claims is an employee, prospective employee

16  lawsuit against the UAW.  It's not a settlement document.

17      MR. FRASER:  Your Honor, if I may respond to that?

18      MR. McKNIGHT:  It's an extortion document.

19      MR. FRASER:  One, you've made a ruling.  Two, the volume

20  of the argument after the ruling doesn't increase the

21  validity of the argument.  It's a settlement document.

22      JUDGE BUXBAUM:  Well, I agree that the volume doesn't

23  help the cause, frankly.  Let me hear, though, your response

24  to the -- that was -- despite its volume, there were some

25  significant points made.

1      MR. FRASER:  I think there --

2      JUDGE BUXBAUM:  What's being settled?

3      MR. FRASER:  The simple answer is that there is an offer

4  of settlement.

5      JUDGE BUXBAUM:  Of what?  That's what I need to know.

6      MR. FRASER:  Of matters that exist between the Company

7  and the Union related to the illegal strike, the perspective

8  apparently by Mr. Pilchak and his opinion, his legal opinion

9  that the Union has violated the Labor Act and that they have

10  liability for violating that Labor Act.  In order to resolve

11  this matter to something that's a favorable, agreeable

12  situation from Mr. Pilchak's perspective, because the Union

13  does have liability from his perspective, he's offering a

14  settlement opportunity to them to resolve that fact.

15      JUDGE BUXBAUM:  Did the Company file charges against the

16  Union?

17      MR. FRASER:  The Company filed numerous charges against

18  the Union.  As a matter of fact --

19      JUDGE BUXBAUM:  Were those charges pending at the time

20  this letter was written?

21      MR. CARLSON:  They were not.

22      MR. FRASER:  Yes, they were.

23      MR. CARLSON:  They were not.  If you pull out the

24  charts --

25      MR. FRASER:  Hang on.

1    JUDGE BUXBAUM:  Well, hold on.  Hold on.

2    MR. FRASER:  Hang on.  My understanding was there was a

3  30-day cooling-off period.

4    JUDGE BUXBAUM:  I was going to ask the -- in fact, let's

5  do that.  I want that on the record.  I need that explained.

6  Mr. Viar, do you understand, and if so, can you explain to me

7  what Mr. Pilchak meant when he said, as you know, the agreed

8  to 30 day cooling-off period has expired.  What's he talking

9  about?

10    THE WITNESS:  Your Honor, we had a cooling-off period

11  between July 1st and July 31st.

12    JUDGE BUXBAUM:  Now, who is we?

13    THE WITNESS:  The Local Union and the Employer.  And the

14  charges were immediately reinstituted by Douglas after the

15  conclusion of the cooling-off period.

16    JUDGE BUXBAUM:  Well, so cooling-off, what was being

17  cooled off?  You're saying the filing of charges before the

18  NLRB?  Is that what was being cooled off?

19    THE WITNESS:  Yes.

20    JUDGE BUXBAUM:  So, the parties agreed, in other words,

21  for 30 days they'd sort of freeze that situation?

22    THE WITNESS:  Correct.

23    MR. FRASER:  Your Honor, if I may add, although

24  counsel's going to --

25    JUDGE BUXBAUM:  Well, again, none of you are testifying.

1      MR. FRASER:  I'm not.  I'm making part of the argument,

2   Your Honor.  You keep asking the question whether or not

3   there was something pending.  From our perspective, from a

4   legal argument, it doesn't matter whether there was something

5   pending.

6      JUDGE BUXBAUM:  It's not dispositive, but it would be

7   interesting to know.

8      MR. FRASER:  I understand.  You're right.  There are

9   often times there are demand letters sent by lawyers that say

10  we are going to sue you.  Instead of suing you, we offer to

11  settle this matter.  We would settle it for -- if it's a

12  tort, you know, a billion dollars if you're Geoffrey Fieger.

13  That document is a settlement document whether there's a

14  lawsuit filed or not, and that cannot be admitted.

15     JUDGE BUXBAUM:  Well, I agree.  I mean --

16     MR. CARLSON:  Of course, the Company is suing them.  Who

17  are they suing, though?

18     JUDGE BUXBAUM:  You don't have to sue.  Administrative

19  proceedings are also subject to the protection of the Federal

20  Rules of Evidence regarding introduction of settlement

21  offers.

22     MR. CARLSON:  There was no pending charge on August 4th,

23  Judge.

24     JUDGE BUXBAUM:  There doesn't have to be a pending

25  charge, counsel.  Mr. --

1     MR. McKNIGHT:  May I respond, Your Honor?

2     JUDGE BUXBAUM:  Go ahead.

3     MR. McKNIGHT:  The Company's bargaining proposals

4  included a proposal to withdraw all charges.  They're not

5  settlement documents; otherwise, they'd be inadmissible by

6  the same argument, number one.  Number two, Mr. Pilchak did

7  not represent the employees.

8     JUDGE BUXBAUM:  I get that.

9     MR. McKNIGHT:  And I really -- this letter is --

10     JUDGE BUXBAUM:  If he were offering to settle unfair

11  representation claims against the Union, then I agree that it

12  wouldn't make any sense to record the status of the

13  settlement offer.  But I do get the fact that if the Company

14  is filing charges under 8(b), then there's a possibility that

15  he could offer a settlement of those charges.

16     MR. McKNIGHT:  It's included in their bargaining

17  proposals.

18     JUDGE BUXBAUM:  But that -- counsel, I mean the letter

19  says this three or four different times, global settlement.

20  It is a letter about a settlement of litigation.  I don't

21  doubt that.

22     MR. McKNIGHT:  How could those portions -- this is my

23  question too.  How could those portions of this letter, in

24  which this attorney says we'll try to -- we'll join with you

25  and get the employees to sign a release of their claims

1  against the UAW for violating its duty of fair representation

2  by not giving a (d)(3) notice?  And we'll help you get a

3  release so you're not liable to the employees.

4      JUDGE BUXBAUM:  But, counsel, the fact that it's a --

5      MR. McKNIGHT:  How could that possibly be a company

6  representing the employees for the purposes of that offer?

7      JUDGE BUXBAUM:  He can't, but you're confusing two

8  concepts.  The concept of what you think is a grossly

9  improper settlement offer with the concept that the law

10  protects even those kind of settlement offers for the reason

11  that we want to encourage parties to engage in a full and

12  frank discussion of settlement of cases.  That policy is

13  implicated by this letter, and I will admit the part that

14  doesn't implicate that policy, and it doesn't -- and my

15  ruling will not discourage people from proposing settlements,

16  and I will protect the part where I believe that those policy

17  considerations are implicated.  Beyond that, I must say,

18  Mr. McKnight, I don't see what -- clearly, I understand the

19  relevance of paragraph 2.  I don't understand as to any issue

20  in this case what the relevance will be of the remaining

21  paragraphs in any event.

22      MR. McKNIGHT:  Well, it corroborates, for example,

23  Mr. Canzano's testimony that Lillie at some point said, for

24  example, hey, they've got these attorneys with this really

25  slick presentation who are trying to persuade them, the

1  Company, to change their course of action.  And instead of
2  treating the folks as employees and try to bargain a
3  contract, fire them because they're coming as the UAW's --
4      JUDGE BUXBAUM:  I'm not sure that any of that is
5  relevant.
6      MR. McKNIGHT:  Well, it's in, and it is relevant.
7      JUDGE BUXBAUM:  I've made my ruling.  To repeat my
8  ruling, I will admit paragraphs 1 and 2 and, of course, the
9  signature portion of Exhibit 26 and will redact the remaining
10 paragraphs and place those in a rejected exhibit file.
11 **(General Counsel's Exhibit 26 paragraphs 1 and 2 and**
12 **signature received into evidence; remaining paragraphs**
13 **rejected.)**
14     JUDGE BUXBAUM:  And I apologize to the reporter for
15 making that complicated.  I guess is it possible,
16 Mr. Carlson, that you could provide, using your xerox machine
17 the redacted version?  The whole letter will be put in the
18 rejected file, but if you would provide a redacted version --
19 in other words, xeroxing, blocking out the remaining
20 paragraphs and xeroxing the paragraphs that I'm going to
21 receive.
22     MR. CARLSON:  And again, that's the first and second
23 paragraph, Your Honor?
24     JUDGE BUXBAUM:  It's the first and second paragraph.
25 And let me just read into the record, the letter concludes

1    Very Truly Yours.  It's signed by William E. Pilchak and

2    copied to P. Viar.  All right, let's proceed.

3    Q.   BY MR. CARLSON:  Mr. Viar, I'm going to hand you now

4    what I've marked as General Counsel's Exhibit 27.

5    **(General Counsel's Exhibit 27 marked for identification.)**

6         MR. CARLSON:  Can I just note for the record that that's

7    a document that was produced pursuant to the General

8    Counsel's subpoena in response to paragraph 2.

9    Q.   BY MR. CARLSON:  Mr. Viar, that's a document that the

10   Company produced in response to General Counsel's subpoena;

11   is that correct?

12        JUDGE BUXBAUM:  In other words, he's now testifying as

13   custodian?

14        THE WITNESS:  Are you asking me?  Is there a question?

15        MR. CARLSON:  Correct.

16        JUDGE BUXBAUM:  Hold on a second, sir.  Any reason that

17   this -- any question as to authenticity of this document?

18        MR. FRASER:  No, there's no question as to the

19   authenticity of this document.

20        MR. CARLSON:  Okay, then we would offer it at this time.

21        JUDGE BUXBAUM:  Any objections?

22        MR. FRASER:  No objections.

23        JUDGE BUXBAUM:  It will be received.

24   **(General Counsel's Exhibit 27 received into evidence.)**

25        MR. CARLSON:  And I'm going to do the same with Exhibits

1    28 and 31.

2    **(General Counsel's Exhibits 28 and 31 marked for**

3    **identification.)**

4        JUDGE BUXBAUM:  All right, let's start with 28, and I'll

5    ask you, Mr. Fraser, if you have any objection to either its

6    authenticity or its admissibility.

7        MR. FRASER:  On 28?

8        JUDGE BUXBAUM:  Yes.

9        MR. FRASER:  No, Your Honor.

10        JUDGE BUXBAUM:  All right, and I take it you want to

11    admit it?

12        MR. CARLSON:  Yes, sir.

13        JUDGE BUXBAUM:  All right, General Counsel 28 will be

14    received.

15    **(General Counsel's Exhibit 28 received into evidence.)**

16        JUDGE BUXBAUM:  And what was the other one?

17        MR. CARLSON:  31.

18        JUDGE BUXBAUM:  31.  Is that in the same packet?  Oh,

19    here it is.  Again, Mr. Fraser, any objection to either the

20    authenticity or the admissibility of General Counsel's 31?

21        MR. FRASER:  No objections to 31.

22        JUDGE BUXBAUM:  General Counsel's 31 will be received.

23    **(General Counsel's Exhibit 31 received into evidence.)**

24    Q.  BY MR. CARLSON:  Mr. Viar, I'm going to hand you now

25    what I've marked as General Counsel's Exhibit 44.  Please

1    take a look at that document.

2    **(General Counsel's Exhibit 44 marked for identification.)**

3         JUDGE BUXBAUM:  Again, is he being shown this as

4    custodian?

5         MR. CARLSON:  No, I'm sorry, Judge.  He is not.

6         JUDGE BUXBAUM:  Okay, yeah, I'd appreciate it if you'd

7    let me know because I'll try to move things along if he is.

8    All right.

9         MR. CARLSON:  I'm sorry, Judge.

10   Q.   BY MR. CARLSON:  Have you had a chance to look at that,

11   Mr. Viar?

12   A.   Yes.

13        MR. FRASER:  Your Honor, before we go any further, we're

14   going to make an objection.  The document that is being

15   proffered as GC-44 is an unemployment document.  It's not

16   relevant to the National Labor Relations Act employee

17   definition or the definition of reemploy.  There are separate

18   statutes.  There are different definitions.  There are

19   different obligations.  They are not coordinated statutes.

20   For instance, nothing in the NLRA says if employees lose

21   their status under this Act, it provides an employer an

22   exemption under every other federal or state statute to act

23   under those statutes.  And essentially, our position is

24   there's no relevance to this document in this proceeding.

25        JUDGE BUXBAUM:  Well, you're a little bit ahead of the

1  game here.

2      MR. FRASER:  I understand, Your Honor.  I'm just trying

3  to make sure that it's very clear at the very beginning.

4      JUDGE BUXBAUM:  Let me, first of all, find out from

5  Mr. Carlson whether he wants to admit it.

6      MR. CARLSON:  Absolutely.

7      JUDGE BUXBAUM:  All right, Mr. Carlson, I'll hear from

8  you.

9      MR. CARLSON:  Judge, this is --

10     JUDGE BUXBAUM:  Well, first of all, I guess we are ahead

11 of ourselves.  Don't you need -- let's get it off -- is there

12 any dispute as to its authenticity?

13     MR. FRASER:  No.

14     JUDGE BUXBAUM:  Okay, then we're up to where we need to

15 be.  Go ahead, Mr. Carlson.

16 Q.  BY MR. CARLSON:  All right, and, Mr. Viar, this is

17 redundant after what Mr. Fraser just said, but this is a

18 document that the Company submitted to the State of Michigan

19 Unemployment Insurance Agency; is that correct?

20 A.  Yes.

21 Q.  And the Company submitted this document to the Michigan

22 Unemployment Insurance Agency by fax on May 20th, 2008,

23 correct?

24 A.  Yes.

25 Q.  All right, would you turn to the last page, Mr. Viar?

1    Do you have that before you?

2    A.    Yes.

3    Q.    Is that your signature?

4    A.    Yes.

5         JUDGE BUXBAUM:  And you dated it May 12th?  That first

6    numeral is a 5?

7         THE WITNESS:  Yes.

8         JUDGE BUXBAUM:  Okay, all right.

9    Q.    BY MR. CARLSON:  So, prior to submitting this document,

10   you signed it, certified to the State of Michigan that it was

11   true and correct?  Is that right?

12   A.    Yes.

13   Q.    Okay, if you could turn five pages from the back.

14   Actually, it's numbered page 7, the top right hand corner.

15   Well, the 7 is cut off.  Can you hold it up so we can look at

16   it?

17   A.    Certainly.

18   Q.    Do you have that before you, Mr. Viar?

19   A.    Yes.

20   Q.    Where it says please see printout sheets, and then the

21   one, two, three pages that follow it, those printout sheets

22   are documents that were created by the Company; is that

23   correct?

24   A.    Yes.

25         JUDGE BUXBAUM:  Are those Social Security numbers on

1  that?

2      THE WITNESS:  Yes.

3      MR. CARLSON:  I think they are, and I'll be happy to --

4      JUDGE BUXBAUM:  Can you get rid of those?  Please submit

5  redacted.

6      MR. CARLSON:  Absolutely, Judge.

7  Q.  BY MR. CARLSON:  And where it says, on that list of

8  employees, on the far right-hand side where there's 1's and

9  2's, the Company assigned those codes, is that correct, for

10  each employee?

11  A.  Yes.

12      MR. CARLSON:  Now, I'd offer GC-44 -- well, one more

13  question.

14  Q.  BY MR. CARLSON:  The Company submitted this document in

15  response to unemployment claims that were made by employees

16  in May of 2008; is that correct?

17  A.  No.

18      MR. CARLSON:  I'm going to offer GC-44 at this time.

19      MR. FRASER:  But we would renew our objection.

20      JUDGE BUXBAUM:  Well, and I've heard you, but let me

21  hear from Mr. Carlson.

22      MR. CARLSON:  Judge, again, we think this goes to two

23  issues, the first issue being the status of the employees

24  after May 5th, which is that they were locked out employees.

25  Again, this is a document that shows that that's how the

1    Company viewed them as locked out employees.  It goes to that

2    issue, first of all.

3        JUDGE BUXBAUM:  Let me ask you this, Mr. Carlson.

4        MR. CARLSON:  The second issue goes to the codes that

5    were assigned to the employees, which distinguish between

6    those employees, who were the 1's and 2's.  If you look at

7    page 7, those codes mean of someone who's unemployed due to a

8    labor dispute as opposed to someone who's unemployed for some

9    other reason.

10       JUDGE BUXBAUM:  Economic reasons.

11       MR. CARLSON:  Right.

12       JUDGE BUXBAUM:  But that I don't think is in dispute, is

13   it?  You folks have all resolved that by giving me the list

14   of who was laid off and who --

15       MR. CARLSON:  Well, I think what this shows --

16       JUDGE BUXBAUM:  Unless there's -- well, there was one

17   person -- no, that was sick leave.  Yeah.

18       MR. CARLSON:  Well, no, what's significant about this,

19   Judge, is that as of May 20th, when this document was

20   submitted, these 30 however many individuals were considered

21   to be unemployed due to some other circumstances other than a

22   labor dispute.  On August 4th, they were fired for

23   participating in a labor dispute.

24       JUDGE BUXBAUM:  Again, again, all right, Mr. Fraser, let

25   me again -- I think I addressed this earlier when you first

 1   brought it up, and I want to again be clear that I am not

 2   making any ruling because I don't think it would be proper,

 3   that because a person is an employee for some other statute,

 4   in like an unemployment insurance statute, that that in some

 5   way is probative on the question of whether a person is an

 6   employee in the unique statutory interpretation circumstances

 7   of this case.  So, no one should view my acceptance of this

 8   document as in any way indicating that that is my view.  It

 9   is not my view.  I think that absolutely this case involves a

10   term of art under the National Labor Relations Act, a couple

11   of terms of art, that is, an employee reemployed and probably

12   some others.  And what other statutes define those concepts

13   as such isn't going to make any difference.

14        Nevertheless, this document contains statements by the

15   Employer about the matters that are in controversy, and in

16   that sense, it's simply a piece of factual evidence, a

17   statement by a party opponent that is appropriately

18   admissible.

19        And let me say that I have had experience with the

20   Board's view on what to do with the proceedings of other

21   administrative agencies.  For example, I've had occasion to

22   address, and been approved by the Board in the way I

23   addressed it, the issue of where you have a Worker's Comp --

24   I mean, an unemployment insurance claim and the state agency

25   adjudicates it finding that the employee was discharged for

1    cause.  That is admissible in Board proceedings.  It

2    actually, more than just being admissible, the Judge is

3    entitled to consider as evidence on the question of whether

4    or not, under Wright Line, for example, the Employer was

5    justified under the Act in discharging an employee.

6        But again, so that we're clear, I'm not admitting it

7    here for any purpose other than that it contains statements

8    by one of the parties regarding facts that are in dispute in

9    this case.  So, I will receive General Counsel 44, and I hope

10   everyone is clear that it isn't some statement about my view

11   of the impact of the meaning of words in other laws on this

12   issue in this case.

13   **(General Counsel's Exhibit 44 received into evidence.)**

14       MR. FRASER:  Your Honor, may I try one more time for 30

15   seconds?

16       JUDGE BUXBAUM:  You can.  You can.

17       MR. FRASER:  And I'll time myself.

18       JUDGE BUXBAUM:  And I know you mean it when you say

19   that.

20       MR. FRASER:  Exactly.  But those statements that you're

21   talking about are in response to the definitions of employee

22   and misconduct and other terms that are under the

23   Unemployment Act, not under the NLRA.  So, to use that

24   evidence to try to gather some meaning as to what the

25   Employer thought under the NLRA, again, I still think is

1    irrelevant.

2        JUDGE BUXBAUM:  I think that's a very worthy argument,

3    and it goes to the weight to be accorded the comments that

4    are in the form.  So, remind me of that in the brief.  I will

5    take that into account.  And, nevertheless, I do think these

6    are statements by a party opponent.

7        MR. FRASER:  Thank you.

8        JUDGE BUXBAUM:  I'll admit General Counsel 44.

9    Q.    BY MR. CARLSON:  Mr. Viar, with respect to the

10   individuals who were assigned the number 1 by the Company in

11   this document in GC-44 on the printout sheets, some of those

12   individuals received unemployment benefits between May 5th

13   and August 4th, 2008.  Is that correct?

14   A.    I don't remember.

15   Q.    You don't remember.  Do you remember if Charles Weller

16   received unemployment benefits between May 5th and August

17   4th, 2008?

18   A.    No.

19   Q.    Do you remember if Mark Holbrook received unemployment

20   benefits between May 5th and August 4th, 2008?

21   A.    No.

22   Q.    And as custodian of the records, you're probably aware

23   that the Company submitted voluminous documents, unemployment

24   documents, in response to the General Counsel's subpoena; is

25   that right?

1    A.    We complied with the subpoena.

2    Q.    Okay, and those documents would include unemployment

3    records for employees between May of 2008 and the present

4    day; is that correct?

5    A.    No.

6    Q.    Okay, what did the subpoena cover, to the best of your

7    recollection?

8    A.    I don't agree with the characterization of employee.

9    That's why I said no.

10    Q.    Okay, the subpoena covered individuals who made claims

11    for unemployment benefits between May of 2008 and the present

12    day; is that correct?

13    A.    I'm sorry, counsel, can you repeat the question?

14    Q.    Sure.

15    A.    I want to make sure I answer it --

16    Q.    I understand.   The General Counsel's subpoena to the

17    Company included a request for unemployment documents; is

18    that correct?

19    A.    That's correct, yes.

20    Q.    Okay, and the unemployment documents included the dates

21    May 1st, 2008, to the present day; is that correct?

22    A.    Yes.

23    Q.    Mr. Viar, does the Company have a 401(k) plan?

24    A.    Yes.

25    Q.    And how long has it had a 401(k) plan?

```
 1   A.   Counsel, I don't know.

 2   Q.   Has it had a 401(k) plan during your entire tenure with

 3   the Company?

 4   A.   Yes.

 5   Q.   Okay, and during your tenure with the Company, were

 6   union employees, did they participate in the 401(k) plan as

 7   well?

 8   A.   Yes.

 9   (General Counsel's Exhibit 46 marked for identification.)

10   Q.   BY MR. CARLSON:  I'm handing you what I've marked as

11   General Counsel's Exhibit 46.  Take a minute to review that

12   document, please.  Have you had a chance to review that,

13   Mr. Viar?

14   A.   Yes.

15   Q.   Okay, I'm going to ask you some questions now, Mr. Viar,

16   and before I do, I guess I just want to set some ground

17   rules.  If you would like to -- if you don't like how I

18   phrase something, can you indicate that in some way, or can

19   we get something --

20        MR. CARLSON:  If Mr. Viar wants to say something, in

21   other words, if he doesn't like the way I said employees or

22   individuals, because it makes it very difficult for me to

23   examine him if he says that's not correct, and the reason why

24   is because I said employee instead of -- at a certain point.

25        JUDGE BUXBAUM:  Well, but you know, he's an adverse
```

1  witness.  I mean, Mr. Canzano and it's -- there's too many

2  lawyer witnesses in this case.  We all have to live with

3  that.  It was no different with Mr. Canzano, and you're just

4  going to have to probe.

5        MR. CARLSON:  Okay, very well, Your Honor.

6  Q.  BY MR. CARLSON:  Mr. Viar, this is the summary plan

7  description that was in effect for the Union employees

8  between May 1st, 2008, and August 4th, 2008?

9  A.  Can you ask the question again, please?

10 Q.  Yeah, is this the summary plan description for the

11 401(k) plan that was in effect for the Union employees

12 between May 1st, 2008, and August 4th, 2008?

13 A.  Yes.

14        MR. CARLSON:  I'm going to offer GC-46 at this time.

15        JUDGE BUXBAUM:  Why?  Why?

16        MR. CARLSON:  Okay, maybe I'll --

17        JUDGE BUXBAUM:  Look, I'm sorry.  I think that's maybe

18 too abbreviated.  What is the relevance of this document?

19        MR. CARLSON:  Well, perhaps I need to get there first.

20        JUDGE BUXBAUM:  All I'm saying is right now, it's not

21 apparent to me why it's relevant.

22        MR. CARLSON:  Okay.

23 Q.  BY MR. CARLSON:  Mr. Viar, between May 5th and August

24 4th, 2008, did you ever speak with anyone regarding the

25 locked out employees' 401(k) accounts?

1  A.    I've talked to our contact in American Funds about the

2  illegal strikers, yes.

3  Q.    And who is that contact?

4  A.    I don't remember her name.  I apologize.  I can get it.

5  I don't remember.

6  Q.    Did you speak with anyone else?

7  A.    About what?

8  Q.    401(k) accounts.

9  A.    Yes.

10  Q.    Who else did you speak with?

11  A.    Diane Hedgecock.

12  Q.    Did you ever speak with Eric France?

13  A.    Oh, yes, of course.

14  Q.    Who is Eric France?

15  A.    Eric France is the investment advisor for the plant.

16  Q.    Anyone else?

17  A.    I believe I spoke with Mary Ellis.

18  Q.    Anyone else?

19  A.    I may have --

20  Q.    Between the -- I don't mean to interrupt you, between

21  May 5th and August 4th.

22  A.    I may have spoken with counsel about the 401(k).  It's

23  probably likely I did, but I don't remember anything

24  specific.

25  Q.    Okay, anyone else that you can recall?

1   A.   No.

2   Q.   Do you recall speaking with Frank Gruza?

3   A.   No.

4   Q.   Do you recall speaking with Mr. Gruza outside the plant

5   on or about June 17th?

6   A.   No.

7   Q.   Do you recall speaking with Ronda Kegler outside the

8   plant?

9        JUDGE BUXBAUM:  When you say outside the plant, do you

10  mean right outside the plant?

11       MR. CARLSON:  That's what I mean.

12       JUDGE BUXBAUM:  Okay.

13       MR. CARLSON:  Yeah, I'm sorry, Judge.

14       JUDGE BUXBAUM:  Well, it could be anywhere in the world.

15  Got it.

16       MR. CARLSON:  I understand, right outside the plant.

17       JUDGE BUXBAUM:  Okay.

18       MR. CARLSON:  I'm sorry, Judge.

19  Q.   BY MR. CARLSON:  All right, about when did you speak

20  with Mr. France?

21  A.   Probably mid-May.  I'm speculating.  I don't remember.

22  Q.   Okay.

23  A.   2008.

24  Q.   Very good.  And tell us what that conversation was.

25  A.   As best as I can recall, Mr. France contacted me

```
 1   concerning the ability of the bargaining unit members to --
 2       MR. FRASER:  I'm going to object on the basis of
 3   hearsay.  I know it's not -- as Mr. France said, but it seems
 4   to me that we're talking about what Mr. France said, and it's
 5   hearsay.  I'm going to object.
 6       JUDGE BUXBAUM:  And Mr. France, I take it, is not an
 7   employee of the Company?
 8       MR. FRASER:  No, he's not.  He's an American Funds
 9   representative.
10       JUDGE BUXBAUM:  Sounds like hearsay to me, too.
11       MR. CARLSON:  Well, I guess, I don't know what the
12   answer is.  So, you know, I don't know what the answer is.  I
13   don't know if we're going to be offering for the truth of the
14   matter.  And he's speaking in the conversation as well.
15       JUDGE BUXBAUM:  Well, but, counsel, you've got to figure
16   that out.
17       MR. CARLSON:  He's a 611(c) witness, Your Honor.  He's
18   an adverse witness.
19       JUDGE BUXBAUM:  Yes, sure.  You can ask him what he
20   said.
21       MR. CARLSON:  Okay.
22   Q.  BY MR. CARLSON:  What did you say during the
23   conversation, Mr. Viar?
24   A.  I recall informing Mr. France at some point that, as I
25   understood it --
```

1        MR. FRASER:  Your Honor, I'm going to -- we're still

2   pending request for admission, and so I'm sitting here with

3   baited breath waiting to make my objection.  Now, we're

4   talking about a different conversation.  So, my objection is

5   relevance as to any conversation regarding 401(k).  It's not

6   relevant to the National Relations Act employee definition or

7   the definition of reemployment.  It's a separate statute with

8   separate obligations with different definitions.  It's not

9   coordinated, and it's absolutely not relevant, from our

10   perspective, to this process.

11        JUDGE BUXBAUM:  Well, and I -- let me just say that your

12   objection is a continuing one, which I grasp, and I think it

13   ought to be clear in the record that it's a continuing one.

14   And again, as to the extent that they're arguing that because

15   this person would qualify as an employee for the purposes of

16   the statutes involving the 401(k), that they are employees

17   under the National Labor Relations Act, I reject that

18   argument.  But to the extent that any testimony is offered

19   that would discuss how the Company viewed the people set

20   forth on GC-48, I'm going to admit it as statements about how

21   the Company viewed the people in GC-48.

22        MR. FRASER:  46 or --

23        JUDGE BUXBAUM:  No, 48, the list of -- that's the, you

24   know, the computer printout.

25        MR. FRASER:  Okay, again, I appreciate you saying it's a

 1   standing objection.  For the clarity of the record, any time

 2   that issue is raised where I feel uncomfortable, I'm going to

 3   raise the objection.  Again, I'll simply refer back to the --

 4        JUDGE BUXBAUM:  I understand.  That's fine.  That's

 5   fine.

 6        MR. FRASER:  Thank you.

 7        JUDGE BUXBAUM:  Now, that's separate, however, from my

 8   concern that I have no earthly idea why the terms of the

 9   401(k) are relevant and would not be burdensome to this

10   record, but we haven't gotten to that yet because counsel

11   wanted to ask some more questions first.

12   Q.   BY MR. CARLSON:  And, Mr. Viar, I think right before

13   Mr. Fraser objected, you were saying, you were telling

14   Mr. France, as you understood it, the bargaining unit

15   members --

16   A.   Can you ask me the question again, counsel?  I

17   apologize.

18   Q.   Sure.  We were talking about your conversation with

19   Mr. France, and you were telling us what you said during that

20   conversation.

21   A.   What's the question?

22   Q.   What did you say during your conversation with

23   Mr. France in mid-May of 2008?

24   A.   As best as I can recall, I indicated to Mr. France that,

25   as I understood it, the bargaining unit members were not

1    entitled to roll their monies out of the 401(k).

2    Q.    And your understanding was based on what?

3    A.    I had a conversation with my contact at American Funds

4    and my review of the summary plan description.

5          MR. CARLSON:  Now we'd offer GC-46.

6          MR. FRASER:  Objection as to --

7          JUDGE BUXBAUM:  Well, hold on.  Hold on.  Why did you

8    come to the conclusion that employees weren't entitled to

9    roll it over?

10          THE WITNESS:  It was my understanding under ERISA that

11    they were not entitled to roll it over.

12          JUDGE BUXBAUM:  But why?

13          THE WITNESS:  I -- that's just what I understood the law

14    to be, Your Honor.  I did not -- that's what I understood the

15    law to be, that they could not roll it over.

16          MR. McKNIGHT:  Judge, could I direct your attention to

17    something?

18          JUDGE BUXBAUM:  Yeah, sure.

19          MR. McKNIGHT:  I'll mark it here, if I can.

20          JUDGE BUXBAUM:  That's all right.  Take your time.  Did

21    you want to add to your answer?

22          THE WITNESS:  No.

23          JUDGE BUXBAUM:  Okay.

24          MR. McKNIGHT:  I don't have the particular page, but

25    this summary plan description, and I think if we discussed it

1  further with Mr. Viar, he'd acknowledge he's the

2  administrator, and he's responsible for interpreting it and

3  administering it.

4      JUDGE BUXBAUM:  Well, let's find that out.  Is that a

5  correct statement, Mr. Viar?

6      THE WITNESS:  My hearing, again, Your Honor, please.

7      JUDGE BUXBAUM:  Well, please --

8  Q.   BY MR. McKNIGHT:  Mr. Viar, the Company and, in this

9  case, you're the person in the Company that's responsible for

10 administering the 401(k) plan.  Is that correct?

11 A.   Yes.

12     JUDGE BUXBAUM:  And you -- are you the administrator?

13     THE WITNESS:  Yes.

14     JUDGE BUXBAUM:  Okay, all right, he's the administrator.

15 We've established that.

16 Q.   BY MR. McKNIGHT:  And that means that you're responsible

17 for day-to-day administration, maintaining plan records,

18 reviewing the plan, answering questions about the plan, and

19 sole discretion to determine all questions arising in

20 connection with the administration interpretation and

21 application of the plan?

22     MR. FRASER:  Objection, clearly compound.

23     JUDGE BUXBAUM:  Well, you're reading from something,

24 aren't you?

25     MR. McKNIGHT:  Yes.

1          JUDGE BUXBAUM:  From the plan?

2          MR. McKNIGHT:  Yes.

3          JUDGE BUXBAUM:  Okay, I'll allow it.  He's the

4     administrator.  Is that -- do you want to show the witness

5     what you're reading from so that he can verify you read it

6     correctly?

7          MR. McKNIGHT:  Oh, sure, page 21.

8          JUDGE BUXBAUM:  So, the heading Administrator

9     Information?

10         THE WITNESS:  I'm the administrator of the plan.  That's

11    correct.

12         JUDGE BUXBAUM:  So, you're the person that it's talking

13    about in this section called Administrator Information?

14         THE WITNESS:  Yes.

15         JUDGE BUXBAUM:  All right.

16         THE WITNESS:  I'm sorry?

17         JUDGE BUXBAUM:  You're that person when it says the plan

18    administrator is responsible, et cetera, et cetera?

19         THE WITNESS:  Yes, yes.

20         JUDGE BUXBAUM:  Okay.

21    Q.   BY MR. McKNIGHT:  And you understand that under the

22    terms of the plan, employees, employee participants are

23    generally not entitled to a rollover of their accounts if

24    they have not been terminated?

25         MR. FRASER:  Objection again, Your Honor, to employee

1    terminated under ERISA not relevant to what we're talking

2    about in the National Labor Relations Act.

3        JUDGE BUXBAUM:  Well, I have a concern first.  I mean,

4    it's clear to me Mr. McKnight wants to examine this witness,

5    and he has every right to do so, but not during the General

6    Counsel's examination.  So, I'm going to defer this.

7    Mr. McKnight, hold your thought.

8        MR. McKNIGHT:  I will.

9        JUDGE BUXBAUM:  All right, then, Mr. Carlson, why don't

10   you continue.  I like things neat and tidy.

11   Q.   BY MR. CARLSON:  Mr. Viar, your testimony earlier was

12   that your understanding of whether or not the bargaining unit

13   members were entitled to access their 401(k) accounts was

14   based on your understanding of ERISA and your interpretation

15   of the plan.  I'm going to direct your attention to page 10

16   of the plan, Article 7.  Can you take a look at that?

17   A.   What page, counsel?

18   Q.   Page 10.

19   A.   Okay.

20   Q.   And again, is that the section you were referring to

21   that you were interpreting or you had consulted to answer his

22   question?

23   A.   I looked at the whole plan.

24   Q.   Including Article 7?

25   A.   Yes.

1  Q.    Do you recall saying anything else to Mr. France during

2  your conversation in mid-May of 2008?

3  A.    No.

4  Q.    Okay, about when did you speak with this unnamed contact

5  at American Funds, the first person you mentioned, the person

6  whose name you couldn't remember?  In particular, she was a

7  female.

8  A.    I don't mean to conceal anything from -- I can get her

9  name.  I just don't remember it.

10  Q.    I understand.  To the best of your -- when did you speak

11  with her?

12  A.    Mid-May, I don't know.

13  Q.    Okay.

14  A.    I don't know.

15  Q.    After May 5th?

16  A.    Yes.

17  Q.    Okay, and to the best of your recollection, what did you

18  say to her?

19  A.    I think I asked her whether the bargaining unit was

20  entitled to roll monies out of the accounts that they had.

21  Q.    And why were you asking her that question?

22  A.    It must have been -- I don't remember in specific.  It

23  must have been in response to questions.

24  Q.    Questions from whom?

25  A.    Participants.  I'm speculating again.  I mean, there was

1   a lot going on.

2        MR. FRASER:  I'm going to object.  The witness certainly

3   is speculating.  Objection, speculation.

4        JUDGE BUXBAUM:  No, I'm going to permit it.

5        MR. CARLSON:  He's answering to the best of his

6   recollection.

7        JUDGE BUXBAUM:  Yeah, he's answering to the best of his

8   ability.

9        THE WITNESS:  I don't remember.  I mean, it would

10  have -- something would have prompted it.  Again, there was a

11  lot going on.

12  Q.   BY MR. CARLSON:  About when did you speak with Mary

13  Ellis?

14  A.   They were about in that same time frame, counsel.  I

15  would think mid-May 2008.

16  Q.   And they're all -- I'm sorry.  I'm sorry, Mr. Viar.  I

17  interrupted you.  Your answer again?

18  A.   About mid-May 2008.

19  Q.   And Ms. Ellis was the Local president at that time?

20  A.   Yes.

21  Q.   And what was your conversation with her?  What did you

22  tell her?

23  A.   I don't remember.  I remember we spoke.  I don't

24  remember what I told her in specific.  We talked about the

25  401(k) too, I think.

1  Q.   Did you tell her consistent with your conversation with

2  Mr. France and your own interpretation of this plan and the

3  law that the locked out bargaining unit members were not

4  entitled to access their 401(k) accounts?

5       MR. FRASER:  Objection, Your Honor.  It has terminology

6  apart from locked out, the other information --

7       JUDGE BUXBAUM:  All right, let me make a suggestion

8  because this is getting troublesome, although I really

9  don't -- I think all of the lawyers are overly sensitive

10  about it and some of the witnesses.  Let's refer to these

11  people as the people listed on GC-48.  We all know what that

12  is, and it's a neutral -- it doesn't imply anything.  Do you

13  want to phrase it that way?  You understand what GC-48 is,

14  Mr. Viar?

15       THE WITNESS:  If I could see it again.

16       JUDGE BUXBAUM:  You sure can.  Here it is.

17       MR. McKNIGHT:  Judge, if the witness told a person that

18  bargaining unit, locked out bargaining unit members were not

19  entitled to access their accounts, he should be able to give

20  that testimony.

21       JUDGE BUXBAUM:  Oh, I agree.  Of course, he should.  Of

22  course, he should.

23       MR. McKNIGHT:  And so, General Counsel should be able to

24  ask him those questions.

25       JUDGE BUXBAUM:  You're absolutely right, given that he's

1    an adverse witness.  You're absolutely right.

2        MR. McKNIGHT:  So, I don't really think it makes sense

3    to refer to an exhibit for the purposes of who said what.

4        JUDGE BUXBAUM:  You're right.  I don't mean to restrict

5    cross-examination now, and I do need to remember that this is

6    cross-examination.  So, I do suggest to all of you in

7    circumstances where you don't want to be leading a witness,

8    it might be useful to refer to GC-48.  But I agree that

9    cross-examination is a different animal.  You may proceed,

10   Mr. Carlson.

11   Q.    BY MR. CARLSON:  Mr. Viar, again in your conversation

12   with Mary Ellis, who initiated that conversation?  Did you

13   call her, or did she call you?

14   A.    I don't remember calling her.

15   Q.    Okay, so to the best of your recollection, she contacted

16   you?

17   A.    Yes.

18   Q.    Okay.  And to the best of your recollection, what do you

19   recall saying to her during that conversation?

20   A.    I don't recall saying anything in specific.  We talked

21   about the 401(k).  That's my recollection.  I may have told

22   her that the monies would be distributed according to what

23   the plan said or words to that effect.  But again, a year-

24   and-a-half ago or here 14 months, 15 months ago, I don't

25   remember.  I remember the call.  I don't remember.

1   Q.   And do you recall when you spoke with Diane Hedgecock

2   about this?

3   A.   Oh, yes, of course.

4   Q.   When was that?

5   A.   Oh, somewhere in that May timeframe.

6   Q.   Somewhere between May 5th and August 4th, 2008?

7   A.   Yes.

8   Q.   Did you have more than one conversation?

9   A.   Absolutely true, yes.

10  Q.   Okay, and when is the first time you recall speaking

11  with her?

12  A.   I don't remember.

13  Q.   Okay.  What do you recall speaking with her about?

14  A.   Hardship withdrawals.

15  Q.   Any other subject?

16  A.   Rollovers.

17  Q.   Okay, any other subject?

18  A.   I don't understand the question.  Did I talk about

19  anything?  Or I don't know what the question is.  I don't

20  understand the question.

21  Q.   Okay, having to do -- I'm sorry.  Having to do with

22  401(k) benefits and the individuals listed on GC-48.

23  A.   No, I don't recall.

24  Q.   Okay, and what was your discussion with respect to

25  hardship withdrawals?

1  A.    I asked her to bring them to me.

2  Q.    Okay, and when you say bring them, what are you

3  referring to?

4  A.    Bring the hardship withdrawal forms to me.

5  Q.    Okay, and why did you need those forms?

6  A.    As the plan administrator, I have to approve of a

7  hardship withdrawal.

8  Q.    And with respect to rollovers, what was your discussion

9  with Ms. Hedgecock?

10  A.    I -- you know, I don't recall, counsel.

11  Q.    Okay.  When you spoke with Eric France, who initiated

12  that call?  Did you call him, or did he call you?

13  A.    I think he called me to my recollection.  He called me.

14  Q.    Okay.  Mr. Viar, was it your interpretation of the law

15  and this plan that employees who were locked out could not

16  access their accounts, their 401(k) accounts on that basis?

17       MR. FRASER:  Objection, calls for a legal conclusion.

18       JUDGE BUXBAUM:  He's a lawyer, isn't he?

19       MR. FRASER:  He's a lawyer, but he's not here in the

20  capacity as a lawyer.  He's here in the capacity as a witness

21  on a 401(k) plan.

22       JUDGE BUXBAUM:  Sure, but he's also here as the plan

23  administrator.  Yeah, I'll allow it.

24       THE WITNESS:  Can you repeat the question?

25  Q.    BY MR. CARLSON:  Yes.  As the plan administrator, was it

1  your interpretation of this plan that employees who were

2  locked out could not access their funds in the 401(k), could

3  not get an in-service distribution of their 401(k) account?

4  A.   After my discussions with the American Funds people, I

5  concluded that this group of people was not entitled to a

6  rollover.

7  Q.   Because locked out employees could not access their

8  401(k) accounts under this plan?

9  A.   No, I discussed it with the American Funds people.  I

10  read the plan language.  I didn't know what people's status

11  was at that point.  They could not get the money.

12  Q.   And that was based on your interpretation of the plan?

13  A.   Yes.

14  Q.   After August 5th, any of the individuals listed on GC-

15  48, they could access their accounts; is that correct?

16  A.   Yes.

17  Q.   All right.

18  A.   Because I had confirmed their status under the Act.

19       MR. CARLSON:  I'm going to offer GC-46.

20  Q.   BY MR. CARLSON:  Under what Act?

21  A.   National Labor Relations Act.

22  Q.   Okay.

23       MR. CARLSON:  I'm going to offer GC-46.

24       MR. FRASER:  If you'd like me to say it again, I can.

25  Otherwise, it's my standing objection, same objection that

1    I've made previously related to unemployment documents and

2    other non-NLRA statutory documents.

3         JUDGE BUXBAUM:  Well, I'm not thrilled with the prospect

4    of admitting it, mainly because of its size and its

5    tangential relevance.  But I'm going to admit it here because

6    it's necessary to elucidate the witness' testimony.

7    Otherwise, when someone, myself or someone else, looking at

8    the record trying to make sense of Mr. Viar's testimony is

9    going to struggle.  So, for that reason, I'm going to admit

10   it again, without any implication that by admitting it I'm

11   suggesting, because I'm certainly not, that if one of the

12   people on GC-48 were found to be an employee for purposes of

13   the 401(k) plan, that that would in some way provide a clue

14   as to their status under the National Labor Relations Act,

15   because it wouldn't.  GC-46 will be received.

16   **(General Counsel's Exhibit 46 received into evidence.)**

17   Q.   BY MR. CARLSON:  Mr. Viar, I'm going to hand you Joint

18   Exhibit 1.

19   A.   Okay.

20   Q.   With respect to the meeting on May 21st, 2008, you

21   attended that meeting; is that correct?

22   A.   Yes.

23   Q.   You didn't take any notes at that meeting?

24   A.   You know, I think I probably did.

25   Q.   And have you provided those pursuant to subpoena?

1    A.    Yes.

2    Q.    To the General Counsel?

3    A.    Yes.

4    Q.    You have?

5    A.    I don't have them here, no.

6          JUDGE BUXBAUM:  No, no, that's not what he said.  He

7    said you have provided them?

8          MR. CARLSON:  You've already provided them to your

9    attorney?

10         THE WITNESS:  Yes, as far as I know.

11   Q.    BY MR. CARLSON:  Were these handwritten notes?

12   A.    I destroyed my handwritten notes.

13   Q.    When did you destroy your handwritten notes?

14   A.    As I put them in the typewritten form.

15   Q.    Let me make sure this is clear.  You personally took

16   handwritten notes at the May 21st, 2008 meeting?

17   A.    I'm sure I did, counsel, yes.  I took some --

18   Q.    And you later --

19         JUDGE BUXBAUM:  Well, hold on.  Let him finish.

20   Q.    BY MR. CARLSON:  I'm sorry.  I apologize.

21   A.    From time to time, I took handwritten notes.

22   Q.    On May 21st?

23   A.    Oh, on May 21st, I'm sure I took some notes, yes.

24   Q.    And then you later you typed up the notes?

25   A.    That was my practice, counsel, yes.

1    Q.    And you typed up your May 21st notes?

2    A.    I typed up my notes, and I looked at Diane Hedgecock's

3    notes and put them into a format that I called minutes.    And

4    I'm pretty confident I did that for May 21st.

5    Q.    And did you provide those in response to the General

6    Counsel's subpoena in this matter, the minutes?

7    A.    You've already asked me, counsel, and my answer is yes.

8    As far as I know, we provided it, yes.

9    Q.    Do you recall when you typed up the May 21st notes?

10    A.    I have no idea.    Sometime after May 21st.

11    Q.    What was your practice with respect to typing up your

12    notes and destroying your handwritten notes?    What was your

13    practice with respect to that between May 5th, 2008, and

14    August 14th, 2008?

15    A.    When time permitted it, sometime after the meetings were

16    held, I would destroy the handwritten notes and type up

17    minutes.    There's a couple of occasions where I did not

18    reduce the typewritten notes or the handwritten notes to

19    minutes.    Some wait in July, but that's what I did.    Sometime

20    after, a few days if time permitted.

21    Q.    And this typewritten -- was this a verbatim

22    transcription of your notes?

23    A.    Just what I remember happened in the meeting, what I had

24    written and what Diane had written.

25    Q.    So, I take it it was not a verbatim transcription of

1    your notes.

2    A.    I don't know.  I don't know.

3    Q.    Do you know whether or not you sat down at a typewriter

4    and typed the words exactly as they were on your handwritten

5    notes?

6        MR. FRASER:  Objection, asked and answered twice.

7        JUDGE BUXBAUM:  Well, where are we going with this,

8    Mr. Carlson?  You've called him as your witness.  I

9    understand he's an adverse witness, but where are we going

10   with this?  In other words, I understand if he calls him and

11   the witness says on May 21st the Union agreed that they had

12   been properly fired, you want to have those notes, and you

13   want to cross-examine him based on those notes.  But in this

14   situation, why do we need to go into it?

15       MR. CARLSON:  Okay, I'll withdraw the question, Your

16   Honor.

17       MR. FRASER:  Your Honor, there's an implication floating

18   here that I want to be very clear about.  Mr. Carlson has

19   those typewritten notes in response to the subpoena request

20   that was made.  He has the 5/21/08 typewritten notes from

21   Mr. Viar.

22       JUDGE BUXBAUM:  All right, again, I'm not --

23       MR. CARLSON:  Okay, let me say something here, then,

24   because this will explain.  This is the reason for the

25   question, Judge, the questions about the notes, Judge,

1    because I'm really confused right now because this isn't what

2    I was told about the notes.  What I was told was that

3    Mr. Viar didn't take any notes.  And the typewritten pages I

4    received, I was told by Mr. Fraser, were transcriptions of

5    Ms. Hedgecock's notes that were made by Mr. Viar.  Now

6    Mr. Viar is telling me something different, so I have some

7    concerns about whether or not they've produced the documents

8    that I've subpoenaed.  That's what my questions are about.

9         JUDGE BUXBAUM:  Okay, all right.

10         MR. CARLSON:  So, that's why I was asking those

11    questions.

12         JUDGE BUXBAUM:  Okay.

13         MR. CARLSON:  But I will leave it alone.  I am going to

14    go back.  I'm going to review the documents produced in light

15    of Mr. Viar's testimony.

16         JUDGE BUXBAUM:  All right, and if you need to readdress

17    it, I'll be happy to hear that.  But obviously, sitting here,

18    I was mystified as to why you were doing it.  All right.

19    Q.   BY MR. CARLSON:  Mr. Viar, as the parties were

20    bargaining in 2008, was the Company's position that the old

21    contract, the one that expired on April 30th of 2008, that

22    that contract had institutionalized inefficiencies and

23    impaired the performance of the Bronson facility?  Is that

24    true?

25    A.   Yes.

1  Q.   And is it also true that after the lockout, management,

2  including yourself, were thrilled with the performance of the

3  plant and with the replacement employees that you had hired?

4  A.   I reject thrilled.  Satisfied.

5  Q.   Satisfied.

6  A.   Not thrilled, good performance.

7  Q.   Okay, so somewhere between thrilled and satisfied?

8       JUDGE BUXBAUM:  Well, it sounds like right smack dab in

9  the middle between thrilled and satisfied.

10      MR. CARLSON:  Okay.

11      JUDGE BUXBAUM:  Well, let me again, so the record is

12  clear, I believe what you said was that the Company's

13  conclusion was that the replacement employees were engaged in

14  good performance?

15      THE WITNESS:  Yes.

16      JUDGE BUXBAUM:  Okay.

17 Q.   BY MR. CARLSON:  And is it true that since the Union

18 strike, the Company believed that the Bronson facility had

19 achieved the team philosophy it sought and was on the path to

20 reversing historical losses?

21      MR. FRASER:  I'm going to object.  The relevance of

22 this, I object to relevance.

23      JUDGE BUXBAUM:  Well, I'd like you to narrow what time

24 you're talking about.  At what point in time?

25      MR. CARLSON:  I said since the Union strike.

1    JUDGE BUXBAUM:  Yeah, but that's really broad.  I'd like

2    you to narrow that down.  In other words, that would include

3    today, right?

4    MR. CARLSON:  Okay, between -- very well, Your Honor.  I

5    understand.

6    Q.  BY MR. CARLSON:  After the Union strike and prior to

7    discharging the employees --

8    JUDGE BUXBAUM:  Okay, rephrase that.  Although I agree

9    it's cross, but I want it to be clear.

10    MR. CARLSON:  The individuals -- the individuals --

11    JUDGE BUXBAUM:  August 4th, is that the date that you're

12    looking at?  In other words, between May 1st and August 4th?

13    MR. CARLSON:  Right.

14    JUDGE BUXBAUM:  Okay, why don't you do it that way,

15    please.

16    Q.  BY MR. CARLSON:  And during this time, the management of

17    the Company was somewhere between satisfied and thrilled with

18    the performance of the replacement employees; is that

19    correct?

20    A.  I can't testify to what other management thought.  I can

21    tell you that things were going along very well, good, very

22    well, yes.

23    Q.  Okay.

24    A.  Some were thrilled, I'm sure.

25    Q.  All right, and this was due to, for a word that we've

1  used and heard a couple of times in this hearing, to

2  flexibility that the Company didn't believe it had under the

3  old contract, under General Counsel's Exhibit 2, that you

4  could do things that you couldn't do under the old contract?

5  A.    I think you're asking me two questions.  I want to be

6  very careful and only answer what you have asked me.  So, can

7  you restate the question?

8  Q.    Okay, sure.  Was this due to the improved flexibility --

9  was this due to flexibility in running the plant that the

10  Company didn't have under the old collective bargaining

11  agreement, under General Counsel's Exhibit 2?

12       MR. FRASER:  Your Honor, again, I'm going to object.

13  I'm not sure what relevance this has to whether somebody is

14  an employee, whether they've been reemployed under the Labor

15  Act.

16       JUDGE BUXBAUM:  Well, again, assuming that your

17  questioning encompasses the time period that we discussed,

18  and I'm going to assume that, the relevance is to one of

19  counsel's alternate theories, that is, a sort of Wright Line

20  type analysis.  So, I'll permit it for that.

21       THE WITNESS:  Yes.

22  Q.    BY MR. CARLSON:  Okay, and it was that kind of

23  flexibility that the Company was trying to achieve at the

24  bargaining table in May, June, and July of 2008?

25  A.    Yes.

1    Q.    For example, less emphasis on seniority?

2    A.    That was an issue, yes.

3    Q.    And fewer job classifications?

4    A.    Yes, and a variety of other factors.

5    Q.    Like what?

6    A.    The ability, if we're restricting to flexibility issues

7    -- is that what you're asking about?

8    Q.    Yeah.

9    A.    The ability to transfer people from position to

10   position, the bidding of jobs, layoffs, there were a number

11   of flexibility issues that we were discussing.

12   Q.    And these were things that the Company was able to do

13   with the replacement employees that it couldn't do, for

14   example, under the old contract?

15   A.    Yes.

16   Q.    And the Company had made in May, June, and July, had

17   made proposals to the Union hoping to achieve the same kind

18   of flexibility with a collective bargaining agreement; is

19   that right?

20   A.    As close as we could get, yes.

21   Q.    And the Union wouldn't agree to some of these proposals

22   that management believed it needed; is that correct?

23   A.    We never reached an agreement, counsel.

24   Q.    And that was, in part, because the Union would not agree

25   to some of these so-called flexibility proposals that the

1    Company had put on the table?

2    A.    I don't know.  I don't understand the question.

3    Q.    The union to some of these flexibility things that were

4    working so well with the replacements and that the Company

5    had brought to the bargaining sessions and proposed to the

6    Union to make part of a collective bargaining agreement with

7    respect to seniority, classifications, as you were saying

8    transferring people, the Union didn't agree to those

9    proposals; is that correct?

10        MR. FRASER:  Objection, Your Honor, compound and

11   confusing.

12        JUDGE BUXBAUM:  Well, let's see what Mr. Viar thinks.

13   Did you understand the question?

14        THE WITNESS:  No.

15        JUDGE BUXBAUM:  Okay.

16   Q.    BY MR. CARLSON:  Did the Union agree to the Company's

17   proposals with respect to seniority that were on the table in

18   May, June, and July of 2008?

19   A.    No.

20   Q.    Did the Union agree with the Company's proposals with

21   respect to transferring people in and out of classifications?

22   Did the Union agree with those proposals in May, June, or

23   July of 2008?

24   A.    No.

25   Q.    Are there any other flexibility proposals that you

1   recall being on the table that the Union did not agree with

2   in May, June, and July of 2008?

3   A.   Boy, I have trouble answering that because there were so

4   many proposals, and that's a long time frame.  I know the

5   core flexibility issues related to classifications, the

6   moving of people from job to job, layoff.  We had some

7   seniority issues we were dealing with, those things.  Those

8   are the things that I recall.  There may have been others.

9   Q.   So, for example, with respect to layoff, just generally

10  speaking, I don't want to speak about a specific proposal,

11  but generally speaking, the Company wanted to lay off not

12  necessarily by seniority but by who it deemed would be the

13  best person to make the plant most efficient?

14  A.   That's one of the things we were talking about.

15  Q.   Right.  And the Union's position during the negotiations

16  was that it believed seniority should be a part of that, or

17  if not the controlling factor, it should be the controlling

18  factor?

19  A.   That's a fair statement, counsel.

20  Q.   Okay.  Mr. Viar, is there, looking back on your

21  testimony, is there any question that I asked you today that

22  you did not hear?

23  A.   I understood your questions.

24  Q.   Okay, very good.  All right, thank you, Mr. Viar.

25       MR. CARLSON:  Nothing further, Judge.

1        JUDGE BUXBAUM:  Mr. McKnight?

2        MR. McKNIGHT:  I would have a few questions, Your Honor.

3        JUDGE BUXBAUM:  I suspected.

4        MR. McKNIGHT:  If I might, I'd just like to approach the

5   witness?

6        JUDGE BUXBAUM:  You may.

7                      **DIRECT EXAMINATION**

8   Q.   BY MR. McKNIGHT:  I just wanted you to take a look at

9   GC-47, Mr. Viar, and I wanted to ask you is that your

10  signature on GC-47?

11  A.   Yes.

12  Q.   That was a letter to Mr. Maurer?

13  A.   Yes.

14  Q.   And you said that Mr. Pilchak assisted in drafting this

15  letter?

16       MR. FRASER:  Your Honor, I'm going to object to this on

17  attorney-client privilege.

18       JUDGE BUXBAUM:  Yeah, sustained.

19       MR. McKNIGHT:  Well, he asked who drafted it, and I'm

20  just --

21       JUDGE BUXBAUM:  Well, but you're not, I don't think.

22       MR. FRASER:  And I'm simply getting to the point that if

23  the next question is going to ask or be related to legal

24  advice or other types of issues, that the objection is on the

25  record.

1    JUDGE BUXBAUM:  All right, at this point, I think you've

2  mischaracterized what the witness testified in response.

3  Q.   BY MR. McKNIGHT:  Who wrote the letter?

4  A.   Bill Pilchak.

5  Q.   Did you read it?

6  A.   Yes.

7  Q.   And then you signed it?

8  A.   I did.

9  Q.   Was the identical letter sent to every individual on GC-

10 48?

11    MR. FRASER:  I think it's been asked and answered, Your

12 Honor.

13    JUDGE BUXBAUM:  Well, it has, and the two of you are on

14 the same side.  I'm not you, obviously.

15    MR. McKNIGHT:  This is preliminary, obviously.

16    JUDGE BUXBAUM:  All right, fine, preliminary.  Go ahead.

17 Q.   BY MR. McKNIGHT:  Is that correct?

18 A.   Yes.

19 Q.   On August 4, 2008, did you notify Mr. Maurer that he had

20 been terminated effective immediately?

21    MR. FRASER:  Objection, Your Honor.  The document speaks

22 for itself.

23    JUDGE BUXBAUM:  It does speak for itself.

24    MR. McKNIGHT:  Your Honor, I'm entitled to some leeway

25 in this.

1        JUDGE BUXBAUM:  This isn't a jury trial, all right.  It

2   speaks for itself.  Sustained.

3   Q.   BY MR. McKNIGHT:  Was Mr. Maurer terminated effective

4   immediately on August 4th, 2008?

5        JUDGE BUXBAUM:  No, I'll permit that.  You may answer.

6        THE WITNESS:  That letter confirmed their status under

7   the Act.

8   Q.   BY MR. McKNIGHT:  Well, let me just ask you if you would

9   read this last line here out loud for us.

10       MR. FRASER:  Your Honor, again, if the document speaks

11  for itself --

12       JUDGE BUXBAUM:  It does, and we've all read it, counsel,

13  and it's not a jury trial.  I get it.

14       MR. McKNIGHT:  I'd like to make a record, Your Honor.  I

15  have not burdened this record, and I would like to make a

16  record.

17       JUDGE BUXBAUM:  No, you certainly haven't, Mr. McKnight.

18  You certainly haven't burdened the record, and I didn't mean

19  any implication that you had.  You may ask the witness

20  questions about the letter, as I've indicated in my prior

21  ruling, but everybody's read it.  Ask the question.

22  Q.   BY MR. McKNIGHT:  Did you advise Mr. Maurer in writing

23  that he was terminated immediately effective August 4, 2008?

24       MR. FRASER:  Objection, Your Honor, the document speaks

25  for itself.

1      JUDGE BUXBAUM:  I'll permit that.  No, I'll permit that.

2      THE WITNESS:  I don't think I did.

3   Q.   BY MR. McKNIGHT:  Well, would you read that sentence to

4   me because I --

5      MR. FRASER:  Objection, Your Honor, the document speaks

6   for itself.

7      JUDGE BUXBAUM:  No, I'm going to allow it now.  I'm

8   going to allow it.

9      MR. FRASER:  Your Honor, may I also suggest, and I've

10  seen this in prior situations, it doesn't seem to me that

11  there's any need for Mr. McKnight to be standing in front of

12  Mr. Viar as his testimony is going on.

13     MR. McKNIGHT:  Counsels approach witnesses numerous

14  times.

15     JUDGE BUXBAUM:  You know, the witness is a lawyer.  I

16  think your concern is peculiar to me given that the witness

17  is a lawyer.  He's not a little old lady who's going to be

18  intimidated.

19     MR. FRASER:  I understand that as well.

20     JUDGE BUXBAUM:  Mr. Viar, do you feel in any way

21  intimidated by Mr. McKnight's presence next to you or in

22  front of the witness stand?

23     THE WITNESS:  I don't want him anywhere near me.

24     JUDGE BUXBAUM:  All right, then step back, counsel,

25  unless you're going to show him something.

1  Q.   BY MR. McKNIGHT:  Well, let's see if we can start.  Do

2  you recall the letter as dated August 4th, 2008?

3  A.   Yes.

4       MR. McKNIGHT:  And I'm going to -- do we have an extra

5  copy of this?

6       JUDGE BUXBAUM:  You can use mine.

7       MR. McKNIGHT:  Okay.

8  Q.   BY MR. McKNIGHT:  I'm going to ask you just to look at

9  the very last sentence.

10      JUDGE BUXBAUM:  But, Mr. McKnight, go back to counsel

11 table, please.

12      MR. McKNIGHT:  Okay.

13      JUDGE BUXBAUM:  In light of what the witness has said,

14 let's all be careful.

15      MR. McKNIGHT:  Sure.

16 Q.   BY MR. McKNIGHT:  Are you looking at the very last

17 sentence immediately before your signature?

18 A.   Yes.

19 Q.   And does the last sentence, can you tell me if I've read

20 this incorrectly.  Provide that your employment with Douglas

21 Autotech Corporation is terminated effective immediately.

22      MR. FRASER:  Objection, Your Honor, the letter speaks

23 for itself.

24      JUDGE BUXBAUM:  No, let's finish it, please.  We've

25 spent too much time worrying about it.

1       THE WITNESS:  I lost the question.  I apologize.

2    Q.   BY MR. McKNIGHT:  Does the last statement -- well, just

3    read it for yourself now.

4    A.   Okay.

5    Q.   Does that -- do you now recall advising Mr. Maurer that

6    his employment with Douglas Autotech was terminated effective

7    immediately?

8    A.   What I recall advising Mr. Maurer and the other people

9    that received the letter was that their status was confirmed

10   under the Act, and they were unprotected.

11   Q.   So, reading these words, your employment with Douglas

12   Autotech Corporation is terminated effectively, that you

13   signed doesn't refresh your recollection that you wrote those

14   words?

15       MR. FRASER:  Your Honor, he's badgering the witness now.

16       JUDGE BUXBAUM:  Well, I've heard a little bit more of

17   it.  Did you write those words?

18       THE WITNESS:  No.

19   Q.   BY MR. McKNIGHT:  Did you sign the letter containing

20   those words?

21       MR. FRASER:  Asked and answered, Your Honor.

22       JUDGE BUXBAUM:  I agree.  Move on.

23   Q.   BY MR. McKNIGHT:  But you've now read the words, have

24   you not, sir?

25   A.   Yes.

1    Q.    Do you disavow those words?

2    A.    No.

3    Q.    Do you agree that you wrote identical words to every

4    other individual on GC-48?

5        MR. FRASER:  Objection, mischaracterizes his testimony.

6    He testified he didn't write the words.

7        JUDGE BUXBAUM:  Slightly, rephrase it.  Did you sign a

8    letter containing those words and send it to everybody on

9    that list?

10       THE WITNESS:  Absolutely, yes, Your Honor.

11   Q.    BY MR. McKNIGHT:  As the administrator of the summary

12   plan description of the 401(k) plan, as the administrator of

13   the 401(k) plan, did you understand that participants were

14   able to receive distributions of their accounts prior to

15   termination of employment only if they satisfied certain

16   conditions?

17   A.    Yes.

18   Q.    Do you agree that the employees, generally speaking, on

19   GC-48 were not allowed to receive distributions from the plan

20   prior to their termination of employment?

21   A.    No.

22       JUDGE BUXBAUM:  Now I'm confused.  You're saying -- I'm

23   not sure I understood the question or the answer.  Can we try

24   that again, please?  I apologize.

25   Q.    BY MR. McKNIGHT:  Do you recall that the employees who

 1    were locked out beginning May 5, who were covered by the

 2    Company's letter stating their lockout on May 5, generally

 3    were not entitled to receive distributions of their accounts

 4    under the 401(k) plan prior to August 4, 2008?

 5         MR. FRASER:  Our objection is to characterization of

 6    individuals on lockout status.

 7         JUDGE BUXBAUM:  No, I'll permit it.  I think it's a fair

 8    characterization.

 9         THE WITNESS:  Counsel, to the best of my ability, I

10    followed what I was required to do under the summary plan

11    description and following my discussions with the bank.  And

12    we did not permit distributions.

13         JUDGE BUXBAUM:  Okay, that helps me.  Thank you.  I

14    understand now.

15    Q.   BY MR. McKNIGHT:  Were the employees who were the

16    subject of the May 5, 2008, letter stating a lockout allowed

17    to receive distributions if they could prove hardship?

18         JUDGE BUXBAUM:  Before August 4th?

19         MR. McKNIGHT:  Yes, prior to August 4th.

20         THE WITNESS:  Oh, we -- I remember approving some

21    hardship withdrawals.

22         JUDGE BUXBAUM:  So the answer is yes?

23         THE WITNESS:  Yes.

24         JUDGE BUXBAUM:  Okay.

25    Q.   BY MR. McKNIGHT:  So, under the terms of the plan, as

1    the administrator, you allowed certain employees who were the

2    subject of the lockout letter to receive distributions by

3    demonstrating hardship prior to August 4, 2008?

4        MR. FRASER:  Objection, it makes the coordination

5    assumption of the implication of the National Relations Act

6    lockout terms and underneath the ERISA plan, which is the

7    exact reason I've been objecting to these questions from the

8    very beginning.  Those two things are not combined, and the

9    question is vague, ambiguous, assumes facts not in evidence,

10   is simply not relevant to what's going on.

11       JUDGE BUXBAUM:  I disagree, counsel.  I think it's a

12   carefully worded, fair question.  You may answer.  Do you

13   want to repeat the question?

14   Q.  BY MR. McKNIGHT:  Ronda Kegler --

15       JUDGE BUXBAUM:  That wasn't in the question.

16   Q.  BY MR. McKNIGHT:  -- is a person.  Is that true?

17   A.  Yes.

18   Q.  Do you know Ronda Kegler?

19   A.  Very well.

20   Q.  You know Ronda Kegler to be a participant in the 401(k)

21   plan prior to May 5, 2008?

22   A.  I don't know.  I don't know.  I suppose.

23   Q.  Do you know Ronda Kegler to be a member of the

24   bargaining unit represented by the UAW and 822?

25   A.  Yes.

1   Q.   Do you know Ronda Kegler to be one of those individuals

2   who is the subject of the May 5, 2008, lockout letter?

3   A.   Yes.

4   Q.   Do you know Ronda Kegler attempted to get a withdrawal

5   of her 401(k) plan account?

6   A.   I don't remember that in specific, counsel, no.

7   Q.   Do you remember that you advised Ronda Kegler that she

8   had not been terminated and could not get a withdrawal of her

9   401(k) account unless she could prove hardship?

10       MR. FRASER:   Objection, he just testified he doesn't

11  recall any hardship withdrawal request by Ronda Kegler.

12       MR. McKNIGHT:   I'm refreshing his recollection.   It's

13  cross-examination.

14       JUDGE BUXBAUM:   I'll permit it.   It's cross-exam.

15       MR. McKNIGHT:   And it's inappropriate for counsel to

16  tell this witness what he doesn't recall.

17       MR. FRASER:   And I'll object to Mr. McKnight telling me

18  how to raise objections.

19       JUDGE BUXBAUM:   Go ahead and proceed, Mr. McKnight.

20  I've overruled the objection.

21  Q.   BY MR. McKNIGHT:   Do you recall telling -- you do now?

22  A.   I do now what?

23  Q.   Oh, I thought there was a recollection --

24       JUDGE BUXBAUM:   Well, you don't know.   You cut him off.

25  Q.   BY MR. McKNIGHT:   Do you recall speaking to Ronda Kegler

1    and telling her that she could not withdraw from her 401(k)

2    account because she had not been terminated?

3    A.    No.

4    Q.    Do you recall speaking to Ronda Kegler and telling her

5    that she could withdraw from her 401(k) account without

6    termination if she could demonstrate hardship?

7    A.    No.

8         JUDGE BUXBAUM:  And so that I'm clear, you're not saying

9    that you didn't say those things.  You're saying that you

10   don't remember whether or not you said those things?

11        THE WITNESS:  Exactly.

12        JUDGE BUXBAUM:  Okay, I wanted to be clear.

13        THE WITNESS:  Again, I mean, there was a lot going on.

14   I don't remember every conversation I had.

15   Q.    BY MR. McKNIGHT:  Did anyone assist you communicating

16   with -- any other employee of Douglas assist you in

17   addressing questions that came up with employees who were the

18   subject of the May 5, 2008, lockout letter and their request

19   for distributions of their 401(k) accounts?  Did anyone

20   assist you?

21   A.    Yes.

22   Q.    Who would that person be?

23   A.    Diane Hedgecock and this person who I forgot her name at

24   the bank.

25   Q.    Okay.

1    A.    But that person is not an employee.  I apologize.

2    Q.    So, at Douglas, your assistant would be Diane Hedgecock?

3    A.    Yes.

4    Q.    Okay, I think this would be Charging Party Exhibit 1.

5          JUDGE BUXBAUM:  Very well.  Have you written that on it?

6          MR. McKNIGHT:  I have not.

7          JUDGE BUXBAUM:  Well, let me ask you to do that, please.

8          MR. McKNIGHT:  Okay, I'll check that part.

9    **(Charging Party's Exhibit 1 marked for identification.)**

10         JUDGE BUXBAUM:  Have you got one for me?  You don't have

11   to.  I can share with the reporter, but --

12         MR. McKNIGHT:  That would be --

13         JUDGE BUXBAUM:  All right.

14         MR. McKNIGHT:  I thought I made one.

15         JUDGE BUXBAUM:  Now, Mr. Reporter, don't forget to get

16   it back from me.  And actually, the witness, I believe, still

17   has my General Counsel 47.  If that's up there, let me get

18   that.  Thank you, Mr. Viar.

19   Q.    BY MR. McKNIGHT:  Mr. Viar, was Candy Bercaw one of the

20   individuals who was the subject of the Employer's May 5,

21   2008, lockout letter?

22   A.    Yes.

23   Q.    Was Tony Barone one of the individuals in the bargaining

24   unit who was the subject of the Employer's May 5, 2008,

25   lockout letter?

1  A.  Yes.

2  Q.  Was Paul Sicinski one of the unit personnel who was the

3  subject of the Employer's May 5, 2008, lockout letter?

4  A.  Yes.

5  Q.  All right, I'm going to hand you a copy of the document

6  that's marked CP, Charging Party Exhibit, or proposed Exhibit

7  1 and ask you if you would just look down that column

8  beginning with Bercaw and Barone, and without identifying the

9  document, just if you could tell me if all of the individuals

10  on page 1 to your knowledge were the subject of the

11  Employer's May 5, 2008, lockout letter.

12      JUDGE BUXBAUM:  Are you going to be doing the same for

13  all of these?

14      MR. McKNIGHT:  Yes.

15      JUDGE BUXBAUM:  Then let's do it this way because

16  that's -- we'll do it that way if we have to, but let's take

17  a recess and see if you and opposing counsel can reach a

18  stipulation about that.

19      MR. McKNIGHT:  I have not had any success with these

20  efforts.  I'd rather just take the recess and let the witness

21  figure it out.

22      JUDGE BUXBAUM:  Counsel?

23      MR. FRASER:  Recess and figure it out is fine with me if

24  Mr. McKnight doesn't want to try and work something out.

25  That's completely his prerogative.

1      JUDGE BUXBAUM:  I mean, look, bottom line Exhibit 48 is

2  in the record.  Why wouldn't -- why do we need any of this?

3  I mean, I can sit down and see whether Joy Heitger, for

4  example, that's on CP-1 is also on Exhibit 48.  Do we need to

5  clutter the record and waste our time with this?

6      MR. McKNIGHT:  No, I just want to find out if there's

7  somebody on here who really isn't.  I haven't compared them

8  all, and I was going to just --

9      JUDGE BUXBAUM:  All right, I guess, let's do it by

10  having Mr. Viar -- we'll go off the record, take a recess.

11  Mr. Viar will have to compare the lists and do this homework

12  assignment.

13  **(Off the record.)**

14      MR. McKNIGHT:  I was just going to proceed by asking

15  some specific questions about specific people.

16      JUDGE BUXBAUM:  I appreciate that, counsel.

17      MR. McKNIGHT:  And then we can do our comparisons with

18  other documents later.

19      JUDGE BUXBAUM:  Exactly.

20      MR. McKNIGHT:  Okay.

21      MR. FRASER:  May I make the request again to have

22  Mr. McKnight raise his voice just a little bit so that Mr. --

23      MR. McKNIGHT:  Oh, yes, I'll raise it, absolutely.

24      JUDGE BUXBAUM:  Oh, thank you, yeah.  And, in fact, I

25  think that thing is noisy again.  So --

1    Q.   BY MR. McKNIGHT:  Okay, so just to sort of put this,

2    recapture what was going on with respect to your

3    administration of the 401(k) plan, after consulting with

4    others, you made a determination that employees or

5    individuals who were the subject of the May 5, 2008, lockout

6    announcement were, as a general rule, not entitled to a

7    rollover of their 401(k) accounts under the plan documents

8    that said you only get these monies under certain

9    pretermination circumstances, right?

10   A.   I've testified, counsel, that based on my review of the

11   summary plan description and my conversations, we did not

12   permit the rollovers.

13   Q.   Right, and you understood that you were looking at the

14   plan document and interpreting the plan document which

15   provided what circumstances you could get a rollover prior to

16   termination of employment?

17   A.   The plan document says those conditions, yes.

18   Q.   Okay, so, directing your attention, for example, to

19   Mr. Barone, number two here, was he an individual, and he may

20   not be, was he an individual, to the best of your knowledge,

21   who was the subject of the May 5, 2008, lockout letter?

22   A.   Yes.

23   Q.   Okay.  Now, Mr. Barone, looking across here, did

24   eventually, if I'm reading this document correctly, receive a

25   rollover of his 401(k) account into an IRA.  Is that right?

1   A.   Yes.

2   Q.   And by the way, this is a report generated by the 401(k)

3   plan, right?

4   A.   I don't recognize this report.

5       MR. McKNIGHT:  Well, counsel, I guess I'll say it to

6   you.  It was produced by you in response to the subpoena

7   duces tecum from me to you?  Would you agree to that,

8   counsel?

9       MR. FRASER:  I would agree that we produced the

10  document.  You asked him whether he recognized it, and he

11  testified he doesn't.

12      MR. McKNIGHT:  I'm just asking you to agree to that --

13      JUDGE BUXBAUM:  Well, hold on.  Hold on.  Let's see if

14  we can get an agreement among the attorneys as to what this

15  is, and then we won't have to worry about it.  Is it agreed

16  that this is an employee distribution report prepared by the

17  Company and provided under subpoena to the Union?

18      MR. FRASER:  I wish I had my two lawyers with me who

19  actually reviewed all of the documents, and I can get them if

20  need be, but my understanding is that we supplied this

21  document in response to one or both of the subpoenas that not

22  only Mr. McKnight made but perhaps Mr. Carlson made.

23  Q.   BY MR. McKNIGHT:  Okay, with that representation on the

24  record, we now know that this is a document, I think,

25  produced in response to the subpoena, and it's a report of

1    distributions by the 401(k) account.

2    A.    We produced it.

3        JUDGE BUXBAUM:  But, Mr. McKnight, I don't think that

4    there's a dispute here, is there?

5        MR. McKNIGHT:  And I just want to ask if you could

6    describe what this means?

7        JUDGE BUXBAUM:  Let me see if I can't short circuit

8    this.  Mr. Fraser, is there any dispute here that the

9    Company, during the period between May 5th and August 4th,

10   did, as a general practice, refuse to permit withdrawal from

11   the 401(k)'s but did grant hardship withdrawals to certain

12   employees on a case-by-case basis?

13       MR. FRASER:  Again, my understanding is they complied

14   with the requirements of the plan and with ERISA, and yes,

15   based on this report, it looks like some hardships were

16   granted and rollovers were granted at a certain point.

17       JUDGE BUXBAUM:  And am I right that when it says

18   complete date in the report, that column means the date on

19   which -- for example, let's look at Earlean Mate.  She was

20   given a hardship distribution in the amount of 3,000-some

21   dollars.  Am I right that the complete date means that that

22   distribution was given to her on June 19th, 2008?

23       MR. FRASER:  Your Honor, I don't know the answer to

24   that.  You'll have to ask Mr. Viar.

25       JUDGE BUXBAUM:  Do you know, Mr. Viar?

1     THE WITNESS:  Your Honor, I don't.  And my confusion

2  over this document is just related to I don't know if this is

3  a Douglas document or if the bank did this.  I don't

4  recognize this document.

5     JUDGE BUXBAUM:  All right, well.

6     THE WITNESS:  There are 10,000 documents that we've --

7     JUDGE BUXBAUM:  All right, well, Mr. McKnight, I don't

8  think it's worth spending a lot of time on when the witness

9  doesn't know the document.  I also observe to you that I

10 think it's undisputed thus far, at least in the record, that

11 what I said is correct, that in other words, the Company,

12 through the testimony of its own administrator of the 401(k),

13 has said that they did not grant the sort of --

14    MR. McKNIGHT:  Rollover.

15    JUDGE BUXBAUM:  Right, rollover, except on a case-by-

16 case basis for hardship during the period in question.  So, I

17 think you've already established that in the record.  This is

18 simply corroborative of that.

19    MR. McKNIGHT:  Did you -- can I ask another question?

20    JUDGE BUXBAUM:  Yes, you may.

21 Q.  BY MR. McKNIGHT:  Do you agree that after employees

22 received the letter dated August 4, 2008, containing the

23 words you are terminated effective immediately, they were

24 entitled to receive rollovers of their 401(k) accounts?

25 A.   I agree that after I confirmed their status under the

 1   Act, the rollovers were permitted.

 2   Q.   Do you agree that that occurred after August 4, 2008,

 3   sir, yes or no?

 4        MR. FRASER:  Objection.

 5        JUDGE BUXBAUM:  No, I'll allow that.

 6        MR. FRASER:  He can't direct the witness to answer yes

 7   or no.

 8        JUDGE BUXBAUM:  In this particular instance, I think he

 9   can.

10        THE WITNESS:  Yes.

11        JUDGE BUXBAUM:  And the person after that date didn't

12   have to show hardship?

13        THE WITNESS:  To get the money out?

14        JUDGE BUXBAUM:  Right.

15        THE WITNESS:  No.

16        JUDGE BUXBAUM:  Okay.

17        THE WITNESS:  Oh, yes, yes, if they wanted a hardship.

18   I followed the plan.  If they wanted to get the money out for

19   hardship, they had to show a hardship.

20   Q.   BY MR. McKNIGHT:  What if they wanted to get a rollover?

21        JUDGE BUXBAUM:  Right.

22        THE WITNESS:  Oh, no.

23        JUDGE BUXBAUM:  Okay, all right.

24   Q.   BY MR. McKNIGHT:  And at least on this document, this

25   would be my understanding of this document --

1          MR. FRASER:  Your Honor, I'll renew my request.  Unless

2     there's a document being handed to the witness, that counsel

3     go back to his table.

4          JUDGE BUXBAUM:  Mr. McKnight, give --

5          MR. McKNIGHT:  I was going to point to a word.

6          JUDGE BUXBAUM:  All right, point to the word and then go

7     back to the table.

8          MR. FRASER:  Your Honor, does the witness have the

9     document in front of him?

10          JUDGE BUXBAUM:  I assume, yeah.

11          MR. FRASER:  Then I think it would be pretty easy to

12     describe where that word is.

13          JUDGE BUXBAUM:  Not on this document.  No, not on this

14     document.

15          MR. FRASER:  Perhaps he could point to it and then back

16     just to behind counsel table?

17          JUDGE BUXBAUM:  I just think that a brief contact is not

18     going to be intimidating.  And let the record reflect that

19     while Mr. McKnight sometimes is loud, he has certainly never

20     behaved in a way that I would characterize as intimidating.

21          THE WITNESS:  It's not a matter of intimidation,

22     counsel, or Judge, I'm sorry.  I just don't know why we're

23     going through this game with him up here.

24          JUDGE BUXBAUM:  Mr. McKnight, if you want to show him

25     something, you show him something, and then go back to

1    counsel table.

2        MR. McKNIGHT:  Well, I'll just pace back here then, Your

3    Honor.

4        JUDGE BUXBAUM:  All right, don't trip on those wires

5    now.

6    Q.   BY MR. McKNIGHT:  Let's see if we can just -- if I can

7    find out a few things about some of the expressions on this

8    document.  Do you understand looking at Candy Bercaw that the

9    expression hardship means hardship withdrawal?

10   A.   Yes, absolutely.

11   Q.   Do you understand that looking at Mr. Barone, the

12   expression roll IRA means rollover into IRA?

13   A.   Yes.

14   Q.   Do you understand on the next column that the expression

15   sep service means separation of service from the Company?

16   A.   Yes.

17   Q.   Looking at the next column to the right, do you

18   understand that the expression full WD means full withdrawal?

19   A.   Yes.

20   Q.   Looking at the next column, do you understand that which

21   says complete date 8/26/2008, do you understand that that's

22   the date that the money was sent or approximate date when the

23   money was furnished to Mr. Barone or the rollover was

24   furnished?

25   A.   Yes.

1      JUDGE BUXBAUM:  Well, it wouldn't be the approximate

2  date, would it?  That's the date, isn't it?

3      MR. McKNIGHT:  Well, I don't know if they mailed the

4  check that date or --

5      JUDGE BUXBAUM:  Well, I'm asking Mr. Viar.

6      THE WITNESS:  And I don't either, Your Honor.  I

7  think -- I'm not -- I think that's when it was completed.

8  That's when the transaction was completed, yes.

9      JUDGE BUXBAUM:  All right, okay.

10      THE WITNESS:  Yes.

11      JUDGE BUXBAUM:  All right.

12      MR. McKNIGHT:  I would like to offer Charging Party

13  Exhibit 1.

14      JUDGE BUXBAUM:  Any objections?

15      MR. FRASER:  Same objections I've made, Your Honor, that

16  the document relates to 401(k) ERISA benefits, separate

17  statute, separate definitions, separate obligations, not

18  coordinated, and not relevant to this matter.

19      JUDGE BUXBAUM:  Well, and again I need to, I think,

20  encapsulate.  My view of it is that that, I think, is a

21  legitimate point to be made to the weight but not the

22  admissibility, since these -- well, but, Mr. McKnight, the

23  one thing that does trouble me here is that the witness

24  hasn't really adopted this document.  How do I hold the

25  Company accountable for the statements made in it absent some

1    agreement that it's a company document?

2        MR. McKNIGHT:  Counsel, I thought that was the point of

3    you were asking counsel and counsel made a representation.

4        JUDGE BUXBAUM:  No, counsel said that they supplied it

5    to you.  Are you representing that this is a document

6    produced by Douglas Autotech?

7        MR. FRASER:  Yes, Your Honor.

8        JUDGE BUXBAUM:  Oh, fine, okay.  Then it will be

9    received and the objection will go to the -- I will consider

10   the objection to the weight to be accorded it.

11       MR. FRASER:  Thank you.

12       JUDGE BUXBAUM:  Charging Party 1 is admitted.

13   **(Charging Party's Exhibit 1 received into evidence.)**

14   Q.   BY MR. McKNIGHT:  What was Mr. Kirk's title?

15   A.   Director of Finance and Sales.

16   Q.   Did Mr. Kirk have responsibilities with respect to

17   collective bargaining and Local 822 and the UAW during the

18   period May through August 2008?

19   A.   Yes.

20   Q.   With respect to collective bargaining responsibilities,

21   did Mr. Kirk act under your direction or on his own

22   direction?

23   A.   Both.

24   Q.   Do you recall Mr. Kirk sending any written

25   communications to the UAW?

1  A.   Yes.

2  Q.   And do you recall that he sent written communications to

3  the UAW during the period May 2008 through August 4, 2008?

4  A.   Yes.

5  Q.   Did you review with Mr. Kirk any written communication

6  he sent to the UAW?

7  A.   I don't remember.

8  Q.   Do you know whether or not you would have ordinarily

9  reviewed a written communication from Mr. Kirk to the UAW

10  regarding matters of labor relations between the Company and

11  the UAW?

12  A.   Yes, I would have ordinarily done that, yes.

13  Q.   And would you have ordinarily reviewed that

14  communication before it was sent?

15  A.   Oh, yes.

16  Q.   And if you disagreed with that communication, you would

17  have -- what would you have done?

18  A.   I have no idea.

19  Q.   Or if Mr. Kirk answered to you, would you allow him to

20  send a communication you disagreed with?

21      MR. FRASER:  Objection, it mischaracterizes the

22  testimony.  There's no testimony that Mr. Kirk --

23      JUDGE BUXBAUM:  Well, you would need to lay that

24  foundation.

25  Q.  BY MR. McKNIGHT:  Well, I thought you told me that

1    Mr. Kirk would do things at your direction?

2         JUDGE BUXBAUM:  Were you his boss?

3    Q.   BY MR. McKNIGHT:  Well, in terms of responsibility for

4    labor relations, were you his boss?

5    A.   No.

6    Q.   Did you have -- did he -- okay, so he could send

7    communications to the Union about labor relations matters

8    whether or not you agreed with them?

9    A.   No.

10   Q.   He would have to clear it with you, correct?

11   A.   We would have agreed on anything that went out.

12   Q.   Okay, I think that's a fair statement.

13   A.   Ordinarily.

14   Q.   Just directing your attention to General Counsel Exhibit

15   15.  Do you recognize that as the communication from Mr. Kirk

16   to the UAW?

17   A.   Yes, sir.

18   Q.   Do you agree that that was provided to the UAW on or

19   about June 13, 2008?

20   A.   Yes.

21   Q.   And Mr. Kirk reviewed that with you?

22   A.   I don't recall.  He probably did.  I don't recall.

23   Q.   Do you have any reason to believe that this

24   communication was not handled internally between you and

25   Mr. Kirk as you would normally handle such communications by

1  consultation and agreement prior to communication?

2  A.   My testimony, counsel, I have no specific recollection

3  of reviewing that document with Mr. Kirk.  He would

4  ordinarily review any document with me.

5  Q.   And you've certainly seen that document before today,

6  correct?

7  A.   Yes.

8  Q.   Did you ever send any communication disavowing that

9  document?

10  A.   No.

11      MR. McKNIGHT:  Can I have just a minute, Your Honor?

12      JUDGE BUXBAUM:  You may.

13      **We'll go off the record for a moment.**

14  **(Off the record.)**

15      JUDGE BUXBAUM:  Go ahead.

16  Q.   BY MR. McKNIGHT:  GC -- what did it get up to?  GC-26,

17  do you have a copy of that?  I don't want to get too close.

18      MR. McKNIGHT:  Could you give the witness a copy of

19  GC-26?

20      MR. FRASER:  Just so I know this is the paragraph 1 and

21  2 and signature line letter you're referring to?

22      MR. McKNIGHT:  That's correct.

23      JUDGE BUXBAUM:  That's correct.

24      MR. CARLSON:  There is not -- yeah, there is not a

25  redacted copy.

1      JUDGE BUXBAUM:  No, no, not yet, but I assume we don't,

2  given the situation.  I'm not worried.

3      MR. FRASER:  I understand.

4      JUDGE BUXBAUM:  Okay.  But it's on my list of things to

5  bug you about, Mr. Carlson, but it's just silly.

6      MR. CARLSON:  I wouldn't think so.

7      JUDGE BUXBAUM:  Yeah, it's too soon.  You couldn't have

8  done it now, yeah.  You couldn't have done it.

9      THE WITNESS:  Okay.

10  Q.   BY MR. McKNIGHT:  Do you agree, Mr. Viar, that you

11  produced this document without any redactions in compliance

12  with my subpoena duces tecum?

13  A.   Yes.

14  Q.   And did you receive a copy of this document when it was

15  mailed to me or mailed to my law firm?

16  A.   Yes.

17  Q.   Do you know if Mr. Kirk received a copy of this

18  document?

19  A.   No.

20  Q.   Do you know if Ms. Hedgecock saw a copy of this

21  document?

22  A.   No.

23  Q.   You don't know whether or not --

24  A.   I don't.

25  Q.   Did you make any effort to prevent the dissemination of

1  this document to Ms. Hedgecock?

2  A.    No.

3  Q.    Did you make any effort to prevent the dissemination of

4  this document to Mr. Kirk?

5      MR. FRASER:  Your Honor, I'm going to object.  Counsel

6  is now trying to get around your ruling as to admissibility

7  of this document and trying to assume some --

8      MR. McKNIGHT:  I'm just trying to make a record.

9      JUDGE BUXBAUM:  You understand, Mr. McKnight, that I'm

10  not redacting it because it's privileged.  I'm not granting

11  it admission because admitting it would violate the Federal

12  Rules of Evidence.  It's not a privilege situation.  It's not

13  competent evidence under the federal system because it's an

14  offer of settlement.  It's a policy judgment by Congress.

15  But go ahead, you can make your record.  I've got no problem

16  with that.

17      MR. McKNIGHT:  I understand you've made a ruling, and I

18  just want to make a record.

19      JUDGE BUXBAUM:  Sure.

20  Q.    BY MR. McKNIGHT:  Did you make any effort to prevent the

21  dissemination of GC Exhibit 26 to any other persons besides

22  Mr. Canzano and my law firm?

23  A.    No.

24  Q.    Did you authorize the sending of GC-26 to Mr. Canzano?

25  A.    I don't remember.

1    Q.   Mr. Canzano, at least as of August 4, 2008, was the

2    Union's primary spokesperson in collective bargaining; is

3    that true?

4    A.   Yes.

5    Q.   You were the Company's principal bargainer as of August

6    4, 2008, were you not?

7    A.   Yes.

8    Q.   Would you have authorized -- well, were communications

9    to the UAW regarding matters of collective bargaining, to

10   your knowledge, sent without your authority on behalf of the

11   Company?

12   A.   I'm sorry, counsel, I don't understand the question.

13   Q.   As the Company's Director of Administration and what was

14   the other -- Director of Human Relations?

15   A.   Yes.

16   Q.   You were the principal officer in charge of collective

17   bargaining, correct?

18   A.   Yes.

19   Q.   And as the principal officer in charge of collective

20   bargaining, were you the person who authorized communications

21   on behalf of the Company pertaining to collective bargaining?

22   A.   Yes, absolutely, sometimes with Mr. Kirk, but yes.

23   Q.   Is it possible Mr. Kirk authorized this communication?

24   A.   I don't know.

25   Q.   Do you recall whether or not you saw this communication?

1  A.   I think I did, yes.

2  Q.   Did you authorize this communication?

3  A.   I don't remember specifically talking to the law firm

4  about go ahead and send it.  I think I saw -- I think I knew

5  the letter was going out.  I think we talked about it.  As I

6  sit here today, I can't remember whether I said something to

7  Mr. Pilchak about go ahead and send it.  I just don't

8  remember.  That was our standard practice.  I would have

9  reviewed it.

10  Q.   If he was going to send the Union something about

11  collective bargaining, you would review it, would you not?

12  A.   That's my testimony, sir.

13  Q.   Just like the letter in which you told employees, dated

14  August 4, 2008, that they were terminated effective

15  immediately, you reviewed it, didn't you?

16      MR. FRASER:  Objection, the letter speaks for itself.

17      JUDGE BUXBAUM:  Overruled.  You may answer.

18      THE WITNESS:  I reviewed the letter confirming the

19  employee status under the Act, yes.

20  Q.   BY MR. McKNIGHT:  And you approved?

21  A.   Yes.

22  Q.   And you reviewed GC-26, did you not?

23      MR. FRASER:  Asked and answered three times.

24      JUDGE BUXBAUM:  We've proceeded far enough,

25  Mr. McKnight.  Move onto something else.

1  Q.   BY MR. McKNIGHT:  Was it your expectation or hope that

2  this would change the Union's position in collective

3  bargaining?

4      MR. FRASER:  Objection, Your Honor, it's not relevant.

5      JUDGE BUXBAUM:  To the extent that it attempts to evade

6  my ruling about settlement offers, I'm going to sustain the

7  objection.

8      MR. McKNIGHT:  It only attempts to make a record, Your

9  Honor.  I'm not going to revisit --

10     JUDGE BUXBAUM:  But you've made that record,

11 Mr. McKnight.  Move on now.

12     MR. McKNIGHT:  Has this witness provided any <u>Jencks</u>

13 statements to the Board?  And if so, I'd like a chance to

14 review them.

15     JUDGE BUXBAUM:  Does the Charging Party have that right?

16 That's a new one on me.

17     MR. CARLSON:  Yeah, my understanding --

18     JUDGE BUXBAUM:  Well, first of all, it doesn't matter as

19 long as you're agreeable.  If you object, I'll have to figure

20 that out.  But you're agreeable, that's fine.

21     MR. CARLSON:  I am agreeable.  And my understanding is

22 that under the <u>Septor Volkswagen</u> (ph.) case, that Charging

23 Party is entitled to utilize pre-trial affidavits given by

24 Respondent witnesses.

25     JUDGE BUXBAUM:  Very well.  All right.  Let me -- well,

1  you're only going to have the originals, aren't you?  I was

2  trying to be efficient, but no, go ahead.  Go ahead.

3        **We'll go off the record, and Mr. McKnight will have an**

4  **opportunity to review the <u>Jencks</u>.**

5  **(Off the record.)**

6        JUDGE BUXBAUM:  We're on?  That's fine.  We'll wait

7  until Mr. Carlson indicates what he's providing.

8        MR. FRASER:  Are we on the record?

9        JUDGE BUXBAUM:  We are on the record.

10       MR. FRASER:  While that process is taking place, I'm

11  trying to think through since this is an adverse witness

12  called by General Counsel, it seems to me that the

13  appropriate time for <u>Jencks</u> material is if we call the

14  Respondent, Douglas calls this witness as our witness, and

15  then cross-examination is permitted, not under 611(c).  Until

16  we call him as a witness and he is up for cross, then the

17  <u>Jencks</u> rule would apply.

18       JUDGE BUXBAUM:  Mr. Fraser, if Mr. Carlson is agreeable

19  to providing it, I'm not getting into the middle of that.

20  You don't have any standing to complain about that.  There's

21  no issue before me.  The only thing I'm doing essentially --

22       MR. FRASER:  Your Honor, because I'm putting an issue

23  before you.

24       JUDGE BUXBAUM:  No, but you're not.  You have no

25  standing to get in the middle of whether the General Counsel

1    wants to provide the --

2        MR. FRASER:  General Counsel sent me a very nice letter

3    when I asked for documentation related to witness statements,

4    and that letter indicated that General Counsel makes a

5    commitment to all witnesses that may testify, to anybody who

6    comes to provide an affidavit, that they will comply with the

7    Jencks rule, as I understood the letter.  And the Jencks

8    rule, I think, states essentially we call someone as a

9    direct, not as an adverse cross, and the documentation then

10   is allowed on cross-examination.

11       MR. McKNIGHT:  I think the Jencks rule is that the

12   General Counsel calls a witness.  Parties, including the

13   Charging Party, have the right to ask if they'd produced

14   statements.  The Judge's handbook says it is the General

15   Counsel's policy on request to furnish the Jencks affidavit

16   or statement to the Charging Party whose interests are

17   aligned with the General Counsel for use in questioning the

18   witness.

19       JUDGE BUXBAUM:  What page are you on, counsel?

20       MR. McKNIGHT:  103 at the bottom.

21       MR. FRASER:  For use in questioning the witness on

22   cross-examination when called as a 611 witness or after

23   direct?

24       MR. McKNIGHT:  Just --

25       JUDGE BUXBAUM:  Well, hold on.  Let's -- I'll tell you.

1  Why don't you share it with Mr. Fraser, and I'll read it too.

2  Where on the page are we?

3      MR. McKNIGHT:  Very bottom, Your Honor.

4      JUDGE BUXBAUM:  Very bottom, okay.

5      MR. McKNIGHT:  13803 and then at the bottom.

6      JUDGE BUXBAUM:  I think that's clear because as it

7  indicates, whose interests are aligned with the General

8  Counsel for use in questioning the witness before the witness

9  is referred to the Respondent for cross-examination.  I guess

10  it isn't that clear.

11      MR. FRASER:  It's not clear at all.  It's for cross-

12  examination purposes, just like I stated.  And I would agree

13  that if we put him on as a direct witness, they certainly can

14  ask for that material and use it to cross, and they can have

15  it at that point instead of having it days or months ahead of

16  time to try and prepare themselves, unlike we are able to do

17  until the witness actually testifies on direct.

18      MR. McKNIGHT:  I have a thought.  I believe that there's

19  no question whatsoever that I'm entitled to this affidavit,

20  but I have a thought.  I was startled also by what this

21  witness said with respect to his notes and what's been

22  produced, and obviously, we have a massive amount of

23  documents to review.  We're trying diligently to review them.

24  I am certainly going to call Mr. Viar as a 611(c) witness

25  myself, and I would be happy to wait until then to request

1  his <u>Jencks</u> statement.  And I know that there's no question

2  that I'm entitled to it in that circumstance as well as this

3  circumstance.  And I'll certainly just wait until I do that.

4      JUDGE BUXBAUM:  Well, then you're withdrawing your

5  request without prejudice?

6      MR. McKNIGHT:  Yes, if I'm -- and after I review the

7  documents, I'll call him.

8      JUDGE BUXBAUM:  All right, and then beyond that, I'm

9  only going to make the observation that what happens between

10  the Charging Party and the General Counsel off the record is

11  none of mine concern, okay, unless somebody raises it as my

12  concern.  So, certainly, the portion of the Bench Book that

13  we just read indicates what we all know, which is that the

14  Charging Party is a party whose interests are aligned with

15  the General Counsel.  Anyway, the request having been

16  withdrawn without prejudice, there's nothing before me at the

17  moment.

18      MR. FRASER:  Your Honor, that's not it.  Thank you very

19  much for that.  My concern now is again making the record on

20  I understood your statement essentially to be if General

21  Counsel provides these affidavits to Mr. McKnight outside of

22  your presence before we resume any testimony from Mr. Viar,

23  that that's their concern, not yours.  I'm raising an

24  objection that, in fact, if that happens, I would like to

25  know that they've provided it because I think I'm entitled to

 1  know that, and we will raise the proper legal objection at

 2  that time.

 3      MR. McKNIGHT:  I'll make the request on the record, Your

 4  Honor.  I'm going to recall Mr. Viar as a 611(c) witness

 5  after I've reviewed the documents.  I'll make the request on

 6  the record.  I believe I'm entitled to them in this

 7  circumstance, and I'm entitled to them in that circumstance,

 8  and I will just reserve it until that point.

 9      JUDGE BUXBAUM:  All right, very good.  That's good.

10  Very well.  Very well.

11      MR. CARLSON:  I would also like to make a brief note for

12  the record that it is my understanding of the General

13  Counsel's policy that the point we turn over Jencks

14  statements are after we've called a witness, the Government

15  has called a witness, and a party has made a motion for

16  production of Jencks statements.  I understand now that

17  Mr. McKnight's motion has been withdrawn, and that's the end

18  of the matter as far as the General Counsel is concerned

19  until there's another motion made.

20      MR. McKNIGHT:  Well, I'll make the motion then.  That's

21  why we have --

22      MR. CARLSON:  I understand.  That's why I testified on

23  the record --

24      MR. McKNIGHT:  That's why we have a hearing.

25      MR. CARLSON:  I think he just made the implication is

1  that I'm going to be turning over documents to Mr. McKnight,

2  or Mr. Fraser has some concern with respect to that.

3      JUDGE BUXBAUM:  Yeah, and I'm sorry I raised it.  The

4  bottom line is I understand that Mr. McKnight has now on the

5  record assured Mr. Fraser that he's not going to seek this

6  document in any way other than before me in open court.

7      MR. CARLSON:  Well, and the reason I raised that is

8  because under the Board's rules and regulations, there's very

9  strict rules about what the General Counsel can and cannot

10  do.

11      JUDGE BUXBAUM:  Well, then, I wasn't inviting you to

12  violate your policies, of course.

13      MR. CARLSON:  And that's what I raised with Mr. Fraser

14  because he had asked for production of affidavits prior to

15  the trial.  And I told him that I could not do that under the

16  Board's rules and regulations, and I don't want there to be

17  any implication that I am doing anything with respect to this

18  matter that is not in accordance with the Board's rules and

19  regulations.

20      MR. FRASER:  And again so the record is ultimately

21  clear, the exception was under Mr. Carlson's letter, that if

22  he obtained consent from General Counsel in Washington, D.C.,

23  to release those, then it was acceptable.  I invited him to

24  obtain consent in a verbal conversation, and he declined.

25      MR. CARLSON:  You did not ask me to because if you did,

1   I would have said that's ridiculous because I don't obtain

2   consent.  You do because you're the one asking for it.

3      JUDGE BUXBAUM:  Gentlemen, I guess let me just leave

4   this by taking your time and reciting very quickly a story

5   from my past when I first became a Judge.  I was assigned for

6   a temporary purpose the courtroom of the Judge I most

7   admired.  And it was kind of a thrill for me to sit behind

8   his bench and in his chair and see how he had his stuff laid

9   out.  And it so happens that he had hand lettered in front of

10   him where he could see it at all times a little note that

11   said a closed mouth gathers no foot.  I violated that rule,

12   and I regret it.  In any event, there is nothing more before

13   me on this <u>Jencks</u> issue at the moment.  Mr. McKnight, where

14   do you stand with Mr. Viar's testimony?

15      MR. McKNIGHT:  I just wanted to ask him a few more

16   questions.

17      JUDGE BUXBAUM:  You may.

18   Q.  BY MR. McKNIGHT:  There were unemployment issues with

19   respect to bargaining unit employees during the period May 5,

20   2008, through August 4, 2008, correct?

21   A.   Yes.

22   Q.   You produced many documents pertaining to unemployment

23   during that period in response to my subpoena duces tecum to

24   you, correct?

25   A.   Yes.

1  Q.   Who was the person who is most familiar with the

2  unemployment documents and the Company's submissions and

3  receipts from unemployment during that period?

4  A.   Me.

5  Q.   Did you delegate any of those duties to anyone else?

6  A.   Yes.

7  Q.   Who?

8  A.   Diane Hedgecock.

9  Q.   From an administerial or clerical point of view, who

10  would be most familiar with the documentation?

11  A.   Diane Hedgecock.

12  Q.   Did the Company in June of 2008 state that some

13  employees who were the subject of the May 5 lockout letter

14  had filed fraudulent unemployment claims?

15  A.   I recall Bruce Lillie said -- I don't recall the date in

16  specific.

17  Q.   I'm not asking what Bruce Lillie said; I'm asking you

18  about the Company's position.  Did the Company ever take the

19  position that some of the employees who were the subject of

20  the May 5, 2008, lockout letter had filed false or fraudulent

21  unemployment claims?

22  A.   Yes.

23  Q.   Yes?  In fact, you took that position on behalf of the

24  Company, did you not, Mr. Viar?

25  A.   Yes.

1  Q.   And you stated, Mr. Viar, that the employees had not

2  been terminated, did you not?

3      MR. FRASER:  Objection on relevance again, Your Honor,

4  renewing my objection on the unemployment issues and all the

5  other not relevant to the NLRA definition of employer or

6  employees, separate statutes, different definitions,

7  different obligations, not coordinated, simply not relevant

8  here.

9      JUDGE BUXBAUM:  Overruled.  You may answer.

10      THE WITNESS:  When?  I don't know.

11  Q.   BY MR. McKNIGHT:  In about June of 2008, did you state

12  that some of the employees had filed false or fraudulent

13  claims for unemployment when they had not, in fact, been

14  terminated?

15  A.   Yes.

16  Q.   Did you threaten to take disciplinary action or legal

17  action against those locked out employees who you claimed had

18  filed false unemployment claims?

19      MR. FRASER:  Objection, compound question.

20      JUDGE BUXBAUM:  All right, break it in half.

21  Disciplinary or legal, that's the compound.

22  Q.   BY MR. McKNIGHT:  It's not -- okay, did you threaten

23  action against employees who were the subject of the lockout

24  letter with respect to -- action against them with respect to

25  their unemployment claims?

1   A.    Through counsel, we let them know that their legal --

2   Q.    Yes or no?

3   A.    I'll answer the question the way I want to answer it.

4         JUDGE BUXBAUM:  Yeah, go ahead answer it.

5         THE WITNESS:  There were legal ramifications for filing

6   false or fraudulent unemployment claims.

7   Q.    BY MR. McKNIGHT:  Were the ramifications you threatened

8   disciplinary or legal?

9   A.    Legal is my recollection.  I reject the threat

10  description, but legal.

11        MR. McKNIGHT:  There are, for the record, a number of

12  communications regarding bargaining or information requests

13  between myself, Mr. Lillie, and Mr. Pilchak between I'm going

14  to say August 15 and September 3.  I had anticipated they

15  would be part of our stipulation or that they would be

16  offered by General Counsel, and they haven't been.  My

17  thought at this time is to see if I could show them to

18  counsel, and we could just agree and put them in the record

19  to complete the correspondence.  If not, I will offer --

20        JUDGE BUXBAUM:  Does that have anything to do with this

21  witness?

22        MR. McKNIGHT:  It would because I think he could

23  authenticate them otherwise.

24        JUDGE BUXBAUM:  Okay, Mr. Carlson, do you plan to

25  introduce them later?

1       MR. CARLSON:  If Mr. McKnight wants to see if he can

2    work out a stipulation, that's fine.  We certainly have no

3    objection to the exhibit.

4       JUDGE BUXBAUM:  All right.

5       MR. McKNIGHT:  I didn't bring multiple copies, and I --

6       JUDGE BUXBAUM:  I know, that's why I'm hoping

7    Mr. Carlson --

8       MR. CARLSON:  No, I think we're set with respect to

9    that.

10       JUDGE BUXBAUM:  All right, did you want to take a brief

11    recess?

12       MR. McKNIGHT:  I would like to take a brief recess.

13       **JUDGE BUXBAUM:  We'll go off the record for a few**

14    **moments.**

15    **(Off the record.)**

16       JUDGE BUXBAUM:  All right, and where do things stand?

17       MR. CARLSON:  The request was made for Exhibits 29, 30,

18    32, 33, 34, 35.  Am I right about that, Sam?

19    **(General Counsel's Exhibits 29, 30, 32, 33, 34, and 35 marked**

20    **for identification.)**

21       MR. McKNIGHT:  Yes.

22       JUDGE BUXBAUM:  Let me -- hold on.  Let me repeat that

23    to make sure I've got it right.  29, 30, 32, 34 --

24       MR. CARLSON:  29, 30, 32, 33 --

25       JUDGE BUXBAUM:  Oh, 33, I missed that.

1        MR. CARLSON:  34 --

2        JUDGE BUXBAUM:  And 35, okay.

3        MR. McKNIGHT:  We have no objection.

4        JUDGE BUXBAUM:  All right, and did Mr. Carlson?

5        MR. CARLSON:  General Counsel offers those exhibits.

6        JUDGE BUXBAUM:  Thank you.  That actually cleans up the

7   record nicely.  All right then, General Counsel's exhibits

8   29, 30, 32, 33, 34, and 35 will be received into evidence.

9   **(General Counsel's Exhibits 29, 30, 32, 33, 34, and 35**

10  **received into evidence.)**

11       JUDGE BUXBAUM:  And give me a moment, please.

12       MR. FRASER:  And let the record reflect that

13  Mr. McKnight and I were able to work out a stipulation.

14       JUDGE BUXBAUM:  The record will reflect it with the

15  Judge's gratitude.  All right then, Mr. McKnight, where do we

16  stand?

17       MR. McKNIGHT:  I'm just double checking.

18       **JUDGE BUXBAUM:  Sure.  We'll go off the record for a**

19  **moment.**

20  **(Off the record.)**

21  Q.   BY MR. McKNIGHT:  I just want to make sure I understand

22  what your practice was with respect to notes.  And you stated

23  that at every meeting you went to, you would take notes?

24  A.   I would take --

25  Q.   Contemporaneous notes?

 1  A.    It was my practice.  I had a practice from 2005 wherein

 2  Diane Hedgecock would take notes.  It was her job.  I tried

 3  to focus in on the conversation and keep my head clear.  I

 4  took notes from time to time, and from time to time, I would

 5  combine those notes with what Diane Hedgecock gave me and

 6  combine them into that written record.

 7  Q.    Right, okay, so --

 8  A.    I'm sorry, I misspoke myself.

 9  Q.    Into the typed record?

10  A.    Yes.

11  Q.    Okay, so that's what I'm trying -- and so, you would

12  take some contemporaneous notes of a bargaining session, and

13  Ms. Hedgecock would take notes of a bargaining session,

14  correct?

15      MR. FRASER:  Objection to mischaracterizing.  He said

16  from time to time he would take contemporaneous notes.

17      MR. McKNIGHT:  Oh, no, no, I didn't say -- if I did, I

18  misspoke.  I'll rephrase.

19  Q.    BY MR. McKNIGHT:  At a bargaining session, it would be

20  your practice to take some, I'm not saying detailed, some

21  notes to jot down things during the course of a bargaining

22  session?

23  A.    From time to time, absolutely, yes.

24  Q.    So, you wouldn't be writing continuously during a

25  bargaining session, but periodically or time to time during

1    the bargaining session, you would write -- you would make

2    some notes or jot down some notes?

3    A.    At those meetings where I took notes, yes.

4    Q.    And then at some later date, you would take what you had

5    jotted down and what Ms. Hedgecock had taken contemporaneous

6    with the conduct of the meeting and type up some document you

7    would call minutes?

8    A.    Yes.

9    Q.    And at that point, you would destroy your jottings, I'll

10   call them?

11   A.    Not all of them.  I mean, there are some documents in

12   the record that have some jottings on them that I made, but

13   yes, general rule, yes.

14   Q.    Well, when you say documents in the record, you say you

15   may have some jottings on a proposal that was in there?

16   A.    Exactly.

17   Q.    But in terms of -- I'm using the term jottings to mean a

18   piece of paper which would have some periodic entries or

19   commentaries during the course of a meeting.  That's what you

20   would destroy?

21   A.    Yes.

22   Q.    Now, did anybody else on the Company's bargaining

23   committee during the period May 1, 2008, through August 14,

24   2008, have a similar practice to your knowledge?

25   A.    No, I don't know.  I don't know.  I certainly provided

1  no direction for the group about how to take notes beyond

2  Diane.

3  Q.   Would you know if somebody else on your bargaining team

4  was destroying bargaining notes?

5       MR. FRASER:  Objection.  Implication is that there is

6  some nefarious activity going on with destruction of notes of

7  bargaining sessions, and that's just not the record.

8       JUDGE BUXBAUM:  Well, this, of course, is the advantage

9  of present in person rather than reading a cold transcript

10  because there's no implication in the words.  There was

11  perhaps in the tone of voice, but I'm going to allow it.

12  It's -- the implication is just that.  I mean --

13       THE WITNESS:  Can you restate the question?

14  Q.   BY MR. McKNIGHT:  To your knowledge, was anybody else on

15  your bargaining team destroying their contemporaneous notes

16  or jottings made during the course of bargaining meetings?

17  A.   I don't know what they did.  Well, that's not -- I know

18  that Diane Hedgecock kept everything she wrote.  I know that.

19  But I don't know what Mr. Kirk did with his notes per se, and

20  I don't know what Bruce Lillie did with whatever notes he

21  took.

22  Q.   So, okay.

23  A.   I think they kept them.

24  Q.   Okay.  Now, when you took your notes -- and I say your

25  notes.  I'll call them the jottings if that's okay.  Did you

 1  go into the meeting with a piece of paper to do that or a pad

 2  of paper?

 3  A.    I typically brought a pad of paper to most every

 4  session.

 5  Q.    How about Mr. Lillie, would he have a piece of paper or

 6  a pad of paper?

 7  A.    Both is my recollection.

 8  Q.    Okay, how about Mr. Kirk?  Would he have a piece of

 9  paper or a pad of paper?

10  A.    I -- sometimes a pad of paper, sometimes a piece of

11  paper, same as the rest.  I don't --

12  Q.    Okay, and how about Ms. Hedgecock?

13  A.    Consistent with my operating pattern with Diane, and she

14  was super at it, from 2005 Diane took notes of what I call

15  bargaining sessions.  She didn't recap sidebar meetings or

16  caucus room meetings.  When that group got together, Diane

17  kept copious notes on a pad of paper.

18  Q.    Do you recall producing any notes of the conversation

19  between Mr. Lillie and myself on August 14, 2008, with

20  Mr. Winkle and Ms. Ellis and the mediator present?

21  A.    No.

22  Q.    You don't recall producing any notes with respect to

23  that?

24  A.    No.

25  Q.    Who else was present for your company there?

```
 1   A.   Dan Cohen, Diane Hedgecock, Bruce Lillie, myself, Glen
 2   Kirk, Frank Gruza, Mary Ellis, and yourself, to my
 3   recollection.
 4   Q.   How about Phil Winkle?
 5   A.   I don't remember.
 6   Q.   Okay.
 7   A.   Probably.
 8   Q.   Okay.
 9   A.   I don't recall.
10   Q.   Sir, did you search for Mr. Lillie's notes of that
11   exchange?
12   A.   No.
13   Q.   Did you -- you didn't?
14   A.   I didn't search for Mr. Lillie's notes.
15   Q.   Did you search for Mr. Cook's notes of that exchange?
16   A.   I asked him to produce whatever notes he had to counsel.
17   Q.   You didn't ask him to produce them to you?
18   A.   No, I told him to give them to Mr. Fraser.
19   Q.   And what did Mr. Kirk say to you?
20   A.   Okay.
21   Q.   Did you -- well, did you search for Ms. Hedgecock's
22   notes of that exchange?
23   A.   They're consistent with what I just testified to.  I
24   don't believe she took notes of that exchange.  I had her
25   complete record of notes, so yes, I searched for whatever
```

1 notes she had, but I don't believe she took notes on that

2 date.

3 Q.   Did you search for your notes of that exchange?

4 A.   I don't think I took notes on that day.  Yes, yes, but I

5 didn't have any.

6 Q.   How about Mr. Cohen's notes of that exchange, did you

7 search for those?

8 A.   No, I don't believe Mr. Cohen took notes during that

9 exchange.

10 Q.   So, you didn't look for or search for or give any

11 directions to Mr. Lillie with respect to his notes?  You

12 don't think you took any notes?  You don't think that

13 Mr. Cohen took any notes, and if he did, you didn't ask him

14 for them?  You don't think Ms. Hedgecock took any notes, and

15 you told Mr. Kirk to give his notes to counsel?  Have I

16 summarized it?

17      MR. FRASER:  I think all of those questions have been

18 asked and answered.

19      JUDGE BUXBAUM:  Yeah, that's a --

20      THE WITNESS:  There's eight questions there too.  I

21 don't know.

22      MR. McKNIGHT:  I withdraw the question.

23      JUDGE BUXBAUM:  Very well.  Very well.

24      MR. McKNIGHT:  Your Honor, I have no further questions

25 at this time.  As I said, I need to review the documentation

1    that's been produced, and then I'm not sure what General

2    Counsel's plan is, but my plan would certainly be to call

3    Mr. Viar as a 611(c) witness myself.

4        JUDGE BUXBAUM:  All right, but at this time you've

5    concluded your questions?

6        MR. McKNIGHT:  No further questions, Your Honor.

7        JUDGE BUXBAUM:  Mr. Fraser?

8        MR. FRASER:  No questions from me at this time.

9        JUDGE BUXBAUM:  Very well.  Then, Mr. Viar, you may step

10   down.  Please don't discuss your testimony during the trial.

11   All right, Mr. Carlson, what's next?

12       MR. CARLSON:  At this point, Judge -- just a moment to

13   speak with --

14       **JUDGE BUXBAUM:  Sure, we'll go off the record for a**

15   **moment.**

16   **(Off the record.)**

17       JUDGE BUXBAUM:  Okay, Mr. Carlson?

18       MR. CARLSON:  Your Honor, at this time, there are -- we

19   are not prepared to go any further because I've not had an

20   opportunity to review the subpoenaed documents.  We did not

21   get full compliance with any item of the subpoena until

22   yesterday morning after 9:00.  I have not had a chance to

23   review those documents.  I would like to review those

24   documents, go through those documents.  With that said, we

25   have no objection to Respondent going forward and presenting

1    its case; however --

2        JUDGE BUXBAUM:  In other words, you're not planning on

3    calling any witnesses at this time?

4        MR. CARLSON:  That's absolutely correct, but I do need

5    to go through those documents, and so I absolutely cannot say

6    at this point definitively that we're through until I've had

7    a chance to review those documents.  So, with that

8    reservation of rights, we would rest.

9        JUDGE BUXBAUM:  I got it.  I've got it, all right.

10       MR. CARLSON:  As long as it's clear also, I just want to

11   make it clear on the record that I'm not resting only to

12   perhaps put in a document later.  I don't know what the

13   documents say.  I may need to call a witness or witnesses.

14       JUDGE BUXBAUM:  That's understood.

15       MR. CARLSON:  But with that, we wouldn't have any

16   objection if Respondent --

17       JUDGE BUXBAUM:  Well, as you know, all along I've said,

18   you know, at conference calls before the trial that this is

19   not a jury trial, and I'm not concerned about confusing a

20   jury.  I'm certainly not concerned about confusing the very

21   experienced lawyers that I've got in this case.  And I know

22   that when the trial is over and the dust settles, we'll all

23   have transcripts and jumbles of evidence, and we can put

24   things in their proper order.  So, I guess then the next

25   question is, Mr. McKnight, since they have conditionally

1  rested, I next turn to you.

2      MR. McKNIGHT:  All right, I don't know if I would use

3  that term.  I'm definitely not resting, but I need to look at

4  those documents.  I mean, there's no point in me --

5      JUDGE BUXBAUM:  Yeah, but you're not prepared to call a

6  witness now?

7      MR. McKNIGHT:  Not at this time.

8      JUDGE BUXBAUM:  Okay.

9      MR. McKNIGHT:  It would be incredibly inefficient to do

10  that.  I can run around and bang out a few questions, but

11  it --

12      JUDGE BUXBAUM:  I don't want you wasting time.

13  Everybody, I'm sure, would agree to that.  Mr. Fraser?

14      MR. FRASER:  Your Honor, Douglas is not obligated to put

15  its case on until General Counsel puts its case on and

16  Mr. McKnight puts his case on.  I have no interest given the

17  rules or the way the system works to give them yet another

18  advantage to hear from my witnesses before they put on the

19  rest of their case.  So, until General Counsel and

20  Mr. McKnight finish their cases, I'm going to hold on making

21  an opening and putting our witnesses on.

22      MR. CARLSON:  I'd like to make two points to that.

23  Number one, I think it's an incredible advantage to hear

24  virtually the General Counsel's entire case, take a three

25  week break, review a transcript, and prepare a defense.  I

1  don't know what advantage the Charging Party and the General

2  Counsel have with respect to that, number one.  Number two,

3  this is a situation that was created by the Respondent.  I

4  sent my subpoena on June 3rd.  On June 3rd, I sent a letter

5  with my subpoena asking Mr. Fraser to produce documents, that

6  we get together, we attempt to reach stipulations.

7       JUDGE BUXBAUM:  But, Mr. Carlson, to be fair, your

8  subpoena required their production on what date?

9       MR. CARLSON:  On the day of the hearing, that is

10  correct.

11       JUDGE BUXBAUM:  Now, I mean, this is -- and there's no

12  implication there that you did something wrong or stupid or

13  inefficient.  You followed the Board's 70-year-old traditions

14  and procedures, and usually they work efficiently despite the

15  risks inherent in them.  This is a case perhaps where they

16  haven't worked efficiently.

17       MR. FRASER:  But I'm saying we made effort -- Your

18  Honor, there is a witness here who's been called back by both

19  Mr. Carlson and the Company who continues, when I walk by

20  her, to say can I please testify today.  My suggestion would

21  be that Mr. Carlson call Ms. Hedgecock, who's come down two

22  days in a row to be told that she's not going to testify.  If

23  that happens, the Company would be prepared then after that

24  testimony to put her on, if it's acceptable to General

25  Counsel, as a witness direct testimony for us so we can get

1    her notes into the record.  That may provide some efficiency

2    here today.

3         JUDGE BUXBAUM:  Yeah.

4         MR. CARLSON:  No, I disagree, Judge.  You know, I

5    apologize to Ms. Hedgecock, and I'm willing to explain to her

6    that I can't put her on today because I haven't had a chance

7    to review the documents that counsel didn't provide to me

8    until yesterday morning.

9         JUDGE BUXBAUM:  All right, okay, all right, look,

10   it's -- okay, look, this is not a routine, run-of-the-mill

11   case.  We all understand that.  Therefore, efficiency can't

12   be exalted over everyone's right to do it in a way that makes

13   a complete record.  I would be the biggest loser if I do it

14   in such a way that you don't make a complete record.  So,

15   Mr. Carlson, how long do you need to review the documents?

16        MR. CARLSON:  It's a lot of paper, Judge.

17        JUDGE BUXBAUM:  Well, I hear that, but, you know, I've

18   got to get an answer from you.

19        MR. FRASER:  But maybe I can help with the number of

20   bodies and the number of legal assistants again that went

21   through all of the documents Friday, Saturday, Sunday,

22   Monday, Tuesday, until 2:00 a.m. and two people, 14 hours a

23   day, to go through the documents, four legal assistants to

24   write up the privilege log.  You probably could divide that

25   in half and figure out how many person hours you need.

1    JUDGE BUXBAUM:  I just don't think it's the same task,

2  Mr. Fraser.  I mean, your task was to comply with a broad

3  subpoena.  Mr. Carlson's task is to look through records,

4  which we suspect 99% are worthless, and to find those

5  nuggets, the 1% that he's going to want to make use of.  It's

6  different.

7    MR. CARLSON:  I would agree that it's different, Your

8  Honor, but I would stress that it is with respect to every

9  single item of my subpoena.  It's not just a bunch of

10  documents pertaining to one area.  It is the entire case.

11  And the documents trickled in.  Yes, Mr. Fraser provided some

12  a week ahead of trial.  I got a few more the day before

13  trial, and then I got a huge box yesterday morning.  Judge, I

14  have not had a chance to look at any of them other than the

15  cursory review I did yesterday morning just to basically see

16  what was there.  That's it.

17    MR. McKNIGHT:  I could give a hint because of time.  I

18  mean, I stayed with it until 12:30 last night, and I got up

19  at 5:30 this morning, and I got about one-third through.

20  It's going to take about a -- I mean, my documents are a

21  little bit bigger.  I'm going to just tell you that I think

22  it's two or three days to -- or a couple of days.  That's

23  probably it, you know, to do it justice without having us

24  killing the job.

25    JUDGE BUXBAUM:  All right, I think the consensus among

 1    all of you is that we need to pick a date for resumption at
 2    this point, that we've gone as far as we can go?
 3        MR. McKNIGHT:  I think so.  I mean, I understand what
 4    Jeff's saying, and I --
 5        JUDGE BUXBAUM:  Yeah, I mean, I think we all do.  And
 6    again, I think we have to be realistic that he complied with
 7    the timing in the subpoena, even though, you know, maybe it
 8    would have been helpful if he had done earlier.  He wasn't
 9    required to do earlier.
10        MR. FRASER:  And again, for the record, we did comply
11    with pieces of it earlier.  And I can suggest to the Board
12    and to others all the time, and I'd love to have the subpoena
13    months ahead of time.
14        JUDGE BUXBAUM:  I know.  I know.  I know.  And the truth
15    is that Mr. McKnight's subpoena was later anyway.  So, I
16    know.  All right, I do want to put all of this on the record.
17        MR. McKNIGHT:  I think we are on the record.
18        JUDGE BUXBAUM:  Yeah, I know.  Mr. McKnight, you've
19    indicated for the record that you do feel that we've gone as
20    far as we can go today?
21        MR. McKNIGHT:  Yes, Your Honor.
22        JUDGE BUXBAUM:  Mr. Carlson?
23        MR. CARLSON:  That's correct, Judge.
24        JUDGE BUXBAUM:  And Mr. Fraser?
25        MR. FRASER:  Yes, Your Honor.

1    JUDGE BUXBAUM:  All right, and I think we've explored it
2  to the extent that I just don't see a way around it.  So,
3  let's -- while we discuss scheduling, does anyone mind if we
4  go off the record until we pick the date?
5    MR. CARLSON:  No, Your Honor.
6    MR. FRASER:  No, sir.
7    JUDGE BUXBAUM:  All right, let's go off the record.
8  We'll save some tape.
9    **Off the record.**
10  **(Off the record.)**
11    JUDGE BUXBAUM:  All right, Mr. McKnight, would you
12  repeat what you just said?
13    MR. McKNIGHT:  I was -- what I said was that I had some
14  thoughts about what we might do with the resumption of the
15  hearing, and that is that, given the size of the privilege
16  log, which is 26 pages, and the scope, which is 9 different
17  law firms and 19 different attorneys, I do anticipate there
18  will certainly be some issues.  And so maybe before we
19  actually came back and resumed the introduction of evidence,
20  we could deal with those by telephonic conference, or we
21  should highlight if there is five, or ten, or fifty things
22  that we think we would like you to examine before we actually
23  get back in the courtroom here, because I think there will be
24  some time that will be associated with that undertaking.
25    JUDGE BUXBAUM:  You're saying that in terms of when we

1  schedule the resumption?

2      MR. McKNIGHT:  Right, so, I mean, starting on a Monday

3  afternoon or a Monday morning, I mean, if we come back here,

4  we're going to spend a half-day with this or perhaps more.

5      JUDGE BUXBAUM:  Well, you're saying unless perhaps we

6  could accomplish it beforehand?

7      MR. McKNIGHT:  That's correct, Your Honor.  So, I mean,

8  I think if we had four days of trial, we'd be done.  That's

9  my thought.  Now, Jeff, you may feel differently.

10      MR. FRASER:  Yeah, you know, I'm shooting in the dark

11  because I don't -- you know, I anticipated Steve would

12  have -- he told me there was a couple of more witnesses, and

13  that's maybe the case.  And then, Sam, you indicated now that

14  you're going to have witnesses.  I know I'm going to have at

15  least four witnesses.

16      MR. McKNIGHT:  Monday morning, let's go.

17      JUDGE BUXBAUM:  Yeah, Monday morning, I agree.  And I

18  think that --

19      MR. McKNIGHT:  We still should try to do this.

20      MR. FRASER:  Well, I agree to try to do that.  But again

21  for the record, that privilege log goes with three separate

22  boxes of documents.  And again, if you can identify for us,

23  because I'm just going to share with you the mechanics of how

24  those banker boxes are set up, there ain't no order.  It's

25  just documents with four legal assistants who were going as

1   fast as they could to put that together.  So, if you can

2   identify for us ahead of time which documents, we can

3   actually have legal assistants go through them, find them so

4   that we can give them to the Judge, let the Judge look at

5   them and make a determination as to --

6       MR. McKNIGHT:  Of course, that's exactly what I

7   anticipate.

8       MR. FRASER:  Great.

9       MR. McKNIGHT:  You know, is there --

10      JUDGE BUXBAUM:  And again, as much of this as you can

11  work out -- by that I mean if you agree that the letter of

12  January 12th should be subject to in camera inspection,

13  that's great with me.  Obviously, I will then proceed to do

14  that in camera inspection.  If there is dispute, as I've

15  indicated, the presumption here is that something privileged

16  shouldn't be inspected.  So, you've got to give me some

17  specific, articulable reason why I should.  Because even the

18  in camera inspection does constitute some invasion of the

19  privilege.  I suppose if you thought about it as going to the

20  priest and making confession and then learning that, well,

21  some neutral is going to hear what you've said that won't

22  disclose it to anyone else unless they should, it's already

23  invaded.  So, I certainly want to be protective of the

24  privilege, but I know there are circumstances where there

25  needs to be a neutral looking at it.  I guess what I'm saying

1   is keep those, I hope, to a minimum.  Be careful with it.  We

2   all, as members of the bar, want to respect the privilege as

3   appropriate.

4       All right, then I think where we are with this is two

5   places:  one, not to set the resumption too darn quickly,

6   although I'm concerned that we get this thing done; and

7   number two, when we set it, to set it for bright and early on

8   a Monday morning.  So, now, does anyone mind if we go off the

9   record to talk dates?

10      MR. CARLSON:  No.

11      MR. FRASER:  No.

12      **JUDGE BUXBAUM:  All right, off the record.**

13  **(Off the record.)**

14      JUDGE BUXBAUM:  All right, we have all conferred

15  regarding dates, and the agreed upon date for the resumption

16  of this case is Monday, August the 17th, 2009, at 9:00 a.m.

17  in this same location, that is the resident office in Grand

18  Rapids, Michigan.  And in the interim, my understanding is

19  that all counsel will work diligently on issues related to

20  the subpoenas, including, of course, issues involving

21  privilege.  Is there anything anybody else wants to add at

22  this time?  Then the hearing is adjourned until August 17th.

23  **(Whereupon, at 12:20 p.m., the hearing in the above-entitled**

24  **matter was adjourned, to be reconvened on August 17, 2009.)**

25

## CERTIFICATION

This is to certify that the attached proceedings before the National Labor Relations Board (NLRB), Region 7, in the matter of **DOUGLAS AUTOTECH CORPORATION**, Case No. GR-7-CA-51428, held at Grand Rapids, Michigan, on June 25, 2009, were held according to the record, and that this is the original, complete, and true and accurate transcript that has been compared to the reporting or recording, accomplished at the hearing, that the exhibit files have been checked for completeness and no exhibits received in evidence or in the rejected exhibit files are missing.


_____
Jeremy Tieking
Official Reporter


_____
Debbie Mizell
Transcriber


Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

In the Matter of:

**DOUGLAS AUTOTECH CORPORATION,**

      Respondent,

  and                             Case No. **GR-7-CA-51428**

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), AFL-CIO, AND ITS LOCAL 822,**

      Charging Party.

        The above-entitled matter came on for hearing pursuant to notice, before **PAUL BUXBAUM**, Administrative Law Judge, at **Gerald R. Ford Federal Building, 7th Floor Courtroom, 110 Michigan, N.W., Grand Rapids, Michigan**, on **Tuesday, August 18, 2009,** at **9:00 a.m.**

<u>A P P E A R A N C E S</u>

**Counsel for the General Counsel:**

    STEVEN E. CARLSON, ESQ.
    National Labor Relations Board
    82 Ionia Ave. NW, Suite 330
    Grand Rapids, MI  49503
    (616) 456-2270

**On Behalf of the Charging Party:**

    SAMUEL C. McKNIGHT, ESQ.
    Klimist, McKnight, Sale, McClow & Canzano, PC
    400 Galleria Officentre, Suite 117
    Southfield, MI  48034
    (248) 354-9650

    MANEESH SHARMA, ESQ.
    Associate General Counsel
    UAW Legal Department
    8000 E. Jefferson Ave.
    Detroit, MI  48214
    (313) 926-5216

**On Behalf of the Respondent:**

    JEFFREY J. FRASER, ESQ.
    KIMBERLY RICHARDSON, ESQ.
    KELLEY E. STOPPELS, ESQ.
    Varnum, LLP
    333 Bridge St., NW
    P.O. Box 352
    Grand Rapids, MI  49501
    (616) 336-6000

### I  N  D  E  X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Robert Paul Viar, Jr. 560 | | -- | -- | -- | 563 |
| Robert Paul Viar, Jr. 597 | | 703 730 | 768 | -- | 650 690 701 |
| Diane Hedgcock | 778 | 787 | 805 | -- | -- |

# E X H I B I T S

| EXHIBIT NUMBERS | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| GENERAL COUNSEL'S | | |
| GC-19 | 670 | 670 |
| GC-55(a) and 55(b) | 545 | 546 |
| GC-56 | 551 | 552 |
| GC-57 | 553 | 554 |
| GC-58 | 704 | Not Offered |
| GC-59 | 715 | Not Offered |
| GC-60 | 718 | Not Offered |
| GC-61 | 723 | Not Offered |
| GC-62 | 727 | Not Offered |
| CHARGING PARTY'S | | |
| CP-6 | 562 | 563 |
| CP-7 | 733 | Not Offered |
| CP-8 | 762 | Not Offered |
| RESPONDENT'S | | |
| R-1 | 649 | 651 |
| R-2 | 689 | -- |
| R-3 | 700 | 702 |
| R-4 | 783 | 786 |

1                        P R O C E E D I N G S

2                                   (Time Noted:  9:00 a.m.)

3          JUDGE BUXBAUM:  On the record.

4      Good morning, everyone.  This is a resumption in the

5  case of Douglas Autotech, GR-7-CA-51428.  All counsel are

6  present.  I should say all lead counsel are present, let me

7  put it that way.  And, Mr. Carlson, I think we are still at

8  what I hope is the tail end of your case.

9      MR. CARLSON:  That's right, Judge.  And I just have a

10  few housekeeping items to address this morning.  First, I

11  want to note for the record that I did replace General

12  Counsel's 49 with a redacted copy which takes out the Social

13  Security numbers.  I provided two copies to the Court

14  Reporter and copies to all the parties of that Exhibit.

15          JUDGE BUXBAUM:  Excellent.  Thank you.

16      MR. CARLSON:  And also, at this time, I am going to

17  offer some additional exhibits into the record, the first

18  being General Counsel's 55(a) and 55(b), copies of the

19  General Counsel's subpoena 562027 and a copy of the Union

20  subpoena 562003, and that's the subject of the discussion we

21  had yesterday about the attorney-client privilege issues.

22  I'm going to offer those into the record at this time.

23  **(General Counsel's Exhibits 55(a) and 55(b) marked for**

24  **identification.)**

25          JUDGE BUXBAUM:  Sure.  All right, I assume there's no

1  objection.

2      MR. FRASER:  No objection.

3      JUDGE BUXBAUM:  They'll be received.

4  **(General Counsel's Exhibits 55(a) and 55(b) received into**

5  **evidence.)**

6      MR. CARLSON:  Could I just ask --

7      JUDGE BUXBAUM:  Sure.

8      MR. CARLSON:  Judge, I think also for the record, I

9  would want to note a couple of things with respect to the

10 subpoenas, specifically on the General Counsel's subpoena

11 item number 1.  And now that I think this, it might be

12 helpful for you to have a copy in front of you.

13     JUDGE BUXBAUM:  All right.

14     MR. FRASER:  Steve, we're looking at 55(a) or 55(b)?

15     MR. CARLSON:  At 55(a), and this would be page 4 of that

16 document, and I'm referring to item number 1.  That during

17 pretrial discussions, the parties agreed to limit that or

18 revise that request for documents for bargaining sessions for

19 meetings that took place between May 1, 2008, and August 14,

20 2008.

21     JUDGE BUXBAUM:  Right.  Mr. Fraser, I think that's your

22 understanding too, isn't it?

23     MR. FRASER:  That's my understanding.

24     JUDGE BUXBAUM:  All right, and I'm glad you're putting

25 that on the record because, otherwise, it will just have the

1  January 24th date.

2      MR. CARLSON:  Item number 6, I think, Judge, at your

3  suggestion, I think that item number 6 in the subpoena, we

4  revised that to be all employment-related correspondence

5  between Respondent and any external person or entity

6  pertaining to any alleged discrimination.

7      JUDGE BUXBAUM:  That sounds right to me.  Mr. Fraser, is

8  that your --

9      MR. FRASER:  I don't recall, Your Honor.  It doesn't

10  sound unreasonable.  I simply don't recall whether that was

11  specifically what we said or not.

12      MR. CARLSON:  I think these two directed a concern you

13  had raised on a petition to -- without being overbroad.

14      JUDGE BUXBAUM:  Yeah, I recollect it, yes.  Mr. Carlson

15  is right.

16      MR. FRASER:  Whatever the record reflects is what we

17  agreed to.

18      JUDGE BUXBAUM:  I assume you're also, Mr. Carlson, going

19  to note for the record, which I think again is -- well, maybe

20  it isn't on the record, so let's note it.  That in light of

21  the company's agreement that Mr. Viar was a supervisor, an

22  agent, that you withdrew paragraph 11.

23      MR. CARLSON:  I was just looking at that.  That's

24  correct, Your Honor.  That's absolutely right.  And I think

25  it might be on the record, but I'm not sure either, so I'm

 1   glad you noted that.

 2        JUDGE BUXBAUM:  Yeah.  And, Mr. Fraser, that's your

 3   understanding too, isn't it?

 4        MR. FRASER:  Again, Your Honor, that's my understanding.

 5   The record, I think, is clear with what we did based on the

 6   agency and supervisory status of Mr. Viar.  I just didn't

 7   want to make a statement now that somehow conflicts with

 8   whatever we agreed to back in June, so that's my

 9   understanding.  But I think the record will be clear about

10   what that is.

11        JUDGE BUXBAUM:  I think it is too.

12        MR. CARLSON:  I think one last thing, Judge, just so

13   it's clear also.  The claim of privilege or attorney-client

14   privilege, the Respondent raised that in its petition to

15   revoke.  Also with Respondent to item 1, the parties agreed

16   that with respect to bargaining notes that they would -- each

17   party would redact the notes in their discretion, and the

18   parties would be on their honor, so to speak, with respect to

19   that item.  And so, my understanding is that there's no claim

20   of privilege with respect to item 1.

21        MR. FRASER:  I'm not sure, Steve, what point you're

22   trying to make.

23        MR. CARLSON:  Because I think we limited that just to

24   bargaining notes.

25        MR. FRASER:  We produced documents responsive to your

1  request in number 1, and I don't believe that we raised any

2  privilege as to bargaining notes.

3        MR. CARLSON:  No, you did.

4        MR. CARLSON:  There were clearly <u>Berbiglia</u> issues as to

5  bargaining notes as you redacted, and we didn't redact any of

6  the notes we provided to you because we didn't find <u>Berbiglia</u>

7  privilege in those notes.  There are other notes that we

8  didn't give you because they were <u>Berbiglia</u>.  So, I think

9  that that's correct.

10       MR. CARLSON:  Okay.  So, it would be correct that the

11 privilege log that we're having a discussion about does not

12 pertain to item 1 in the General Counsel's subpoena, which is

13 55(a)?

14       MR. FRASER:  I believe that that's absolutely correct.

15       MR. CARLSON:  Okay, that was the only thing that I was

16 trying to make clear.  Okay, I think that covers that.

17       JUDGE BUXBAUM:  By that you mean subpoena and privilege

18 issues?

19       MR. CARLSON:  No.

20       JUDGE BUXBAUM:  Okay.

21       MR. CARLSON:  Almost.  I think it covers any changes

22 that were made to the subpoena.

23       JUDGE BUXBAUM:  Oh, to the subpoena, yeah, to 55(a), all

24 right.

25       MR. CARLSON:  Right.

1     JUDGE BUXBAUM:  Mr. Fraser, can you think of anything

2  else that needs to be done to address 55(a)?

3     MR. FRASER:  Again, Your Honor, not as I sit here this

4  morning.  And I think we had all of those discussions on the

5  record, so whatever it is that the record says.  If for some

6  reason I've made some error in my recollection, I'm standing

7  by whatever the record said on the 24th and 25th so that that

8  doesn't get rammed in my ear at some point later on in these

9  proceedings.

10     JUDGE BUXBAUM:  You're being very cautious today,

11  Mr. Fraser.

12     MR. FRASER:  I'm trying to be.

13     MR. CARLSON:  The reason I raised it, Judge, is that I

14  think some of these discussions were clearly off the record.

15     JUDGE BUXBAUM:  Yes, and we should make plain that what

16  I think you're referring to are the off-the-record telephone

17  conferences before trial began, probably back in -- those

18  conferences probably back in early June.

19     MR. CARLSON:  That's right.

20     MR. McKNIGHT:  What happened to 55(b)?  Did we put that

21  in?

22     MR. CARLSON:  Yes.

23     JUDGE BUXBAUM:  It's in, yes.

24     MR. McKNIGHT:  Oh, I'm sorry.

25     JUDGE BUXBAUM:  Yes, yes.

1    MR. McKNIGHT:  My slippage, thank you.  Well, with

2  respect to 55(b), I would say that the same representations

3  that we made with respect to item 1 in 55(a) also apply to

4  item 1 in 55(b), which is the privilege log.  It has nothing

5  to do with those documents pertaining to what occurred during

6  negotiations from May 1, 2008, until the present.  That was

7  handled in the same fashion as Mr. Fraser described for item

8  1 in General Counsel Exhibit 55(a).

9    MR. FRASER:  Yes, that's my recollection of what we

10  agreed to do.  After last night's 15th review of those notes,

11  sometimes I wonder whether we should have agreed to that, but

12  that's exactly what we agreed to do.

13    JUDGE BUXBAUM:  Okay.  Now you're not being cautious,

14  Mr. Fraser.

15    MR. FRASER:  Well, that clearly is my feeling this

16  morning.

17    JUDGE BUXBAUM:  All right, Mr. Carlson, what next?

18    MR. CARLSON:  In a related matter, I'm going to offer

19  into the record General Counsel's Exhibit 56, which was or is

20  a joint letter from Mr. -- well, actually, it's a letter from

21  myself to Mr. Fraser regarding the privilege log.  It was

22  sent out August 13th, 2009.

23    **(General Counsel's Exhibit 56 marked for identification.)**

24    JUDGE BUXBAUM:  Any objection to that, Mr. Fraser?

25    MR. FRASER:  The letter speaks for itself.

1    JUDGE BUXBAUM:  It does, and, of course, we all -- well,

2    I can't say we all.  I certainly did receive the copy that's

3    reflected at the bottom.  All right, I'll admit it.

4    **(General Counsel's Exhibit 56 received into evidence.)**

5    MR. CARLSON:  And then I did ask Mr. Fraser this morning

6    about the, I guess for lack of a better phrase, amended

7    privilege log.

8    JUDGE BUXBAUM:  Yes, that's on my list of questions too,

9    Mr. Fraser.  I do want to have that in the record.  I'll make

10   it ALJ Exhibit 2.

11   MR. FRASER:  It's clearly in my to-do notes.  There were

12   a few other more pressing matters last evening to attend to

13   for today, but before this proceeding is over, you will have

14   that document.

15   JUDGE BUXBAUM:  All right, I'm hoping tomorrow morning

16   then?

17   MR. FRASER:  I'm hoping as well.  We'll see how the day

18   goes, but you'll have it before the close of the proceeding.

19   JUDGE BUXBAUM:  Okay, move it higher up on your list of

20   priorities.

21   MR. FRASER:  I've been doing my very best, Your Honor.

22   JUDGE BUXBAUM:  All right.  And I guess, Mr. Fraser, the

23   only other thing on my little list is the bill of particulars

24   motion, and that I don't think it's high on anybody's list.

25   MR. FRASER:  Understood.  It's in the pleading book,

1   Your Honor, but I was trying to prepare for the opening and
2   the direct of the witnesses.
3       JUDGE BUXBAUM:  Not to worry.  If you don't get it to me
4   before we leave here, just include it with your brief,
5   however you want to do it.  I mean, this is not a big
6   problem.
7       MR. FRASER:  You'll have it tomorrow sometime, Your
8   Honor.
9       JUDGE BUXBAUM:  Okay, although remember, of the two
10  things that I want, I'm more concerned with the other one.
11      MR. FRASER:  I understand the first priority is the
12  amended privilege log.
13      JUDGE BUXBAUM:  That's right.  All right, Mr. Carlson,
14  what else have you got?
15      MR. CARLSON:  Judge, I'm going to put in a copy of the
16  original privilege log.  I'm going to offer that into
17  evidence or make that a part of the record, I guess I should
18  say.
19  **(General Counsel's Exhibit 57 marked for identification.)**
20      JUDGE BUXBAUM:  So, that's going to be -- have you
21  labeled it GC-57?
22      MR. CARLSON:  I'm sorry, GC-57, sir.
23      JUDGE BUXBAUM:  Any objection?
24      MR. FRASER:  No, Your Honor.
25      JUDGE BUXBAUM:  It will be received.

1    **(General Counsel's Exhibit 57 received into evidence.)**

2         MR. CARLSON:  Judge, I think with that the General

3    Counsel is ready to rest.  Before I do rest, I just want to

4    make it clear that, in light of the subpoena issue that arose

5    yesterday, that the General Counsel is resting now, but we

6    are not conceding that the dispute over the enforceability of

7    the subpoena, we don't think that's moot.  And we rest now

8    recognizing that the parties, that both General Counsel and

9    the Charging Party, have a right to request reopening of the

10   record in the event that the continued pursuit of allegedly

11   privileged information yields information that the General

12   Counsel or the Charging Party wish to offer into evidence to

13   support their position, and in light either before you, as

14   this case is before you, or in light of the possibility that

15   the Board could decide to adopt some or all of your

16   recommendations in your decision in this case following

17   consideration of any exceptions that might be filed.

18        JUDGE BUXBAUM:  Your reservations are noted, and I've

19   already observed, but I think, for what it's worth, I think

20   they're consistent with what the Board held in CNN.  Now,

21   does that mean that the General Counsel rests?

22        MR. CARLSON:  Yes, sir.

23        JUDGE BUXBAUM:  All right.

24        MR. McKNIGHT:  I just have one question.

25        JUDGE BUXBAUM:  Before they rest?

1         MR. McKNIGHT:  Well, I think it would be -- yes.

2         JUDGE BUXBAUM:  All right.

3         MR. McKNIGHT:  And that is is it, and I don't know the

4    answer to this, but is it clear on the record that you

5    directed counsel for Respondent to produce the documents for

6    in camera inspection that he described?

7         JUDGE BUXBAUM:  In the event that there's any ambiguity

8    about it, I did indeed.  What I directed was that Mr. Fraser

9    had identified 23 items on GC-57.  That number's right, isn't

10   it, Mr. Carlson?  That's the privilege log?

11        MR. CARLSON:  Yes, sir.

12        JUDGE BUXBAUM:  Okay, 23 of the entries on GC-57 as

13   falling within the parameters of my order to produce

14   documents related to the issue of Mr. Viar's status, given

15   that he wears two hats, or at least is alleged to wear two

16   hats.  And so, I directed the production of those 23

17   documents to me forthwith for in camera inspection, and

18   Mr. Fraser declined to produce them.  So, the record should

19   reflect that state of events.

20        MR. CARLSON:  And is also clear, it should be clear on

21   the record, that there are no other outstanding issues with

22   respect to Respondent's petition to revoke, other than the

23   attorney-client privileges.  In other words, any issues that

24   have been raised about relevancy or overbroad or over-

25   burdensome or those kinds of things, those have all been

1  resolved.  The only outstanding issue with respect to those

2  documents is the privilege claim?

3     MR. FRASER:  I don't think that that's accurate at all.

4     JUDGE BUXBAUM:  Yeah, I'm going to leave that alone,

5  Mr. Carlson.  The record is going to speak for itself on all

6  of that.

7     MR. FRASER:  To me the process is if the in camera

8  review goes forward, you review those, then you determine

9  whether or not the documents are relevant and necessary and

10  whatever the other criteria are.  And again in good faith, we

11  looked through reams of documents and put them on the

12  privilege log.  I'm not going to make a representation to you

13  of those 23 documents and how many of them I think are

14  actually relevant to anything in this case.

15     JUDGE BUXBAUM:  And, as I said, I'm going to leave it

16  alone other than to observe, Mr. Fraser, that this was an

17  issue actually in CNN in which the Federal District Judge was

18  conducting the subpoena enforcement proceeding, and I held

19  the view that some of the issues should be resolved before

20  you got to privilege, and my sense was the Board didn't

21  agree.  But it's -- all I'm doing is directing your attention

22  to the fact that there's some paper trail here in terms of

23  precedent on that very point.

24     MR. FRASER:  Your Honor, again, if this is an issue --

25     JUDGE BUXBAUM:  But it isn't right now.

1        MR. FRASER:  If it is, and you would like to try and

2   resolve that now -- not that I want a delay because I really

3   want to get this case resolved and at least the proofs in by

4   the end of the day tomorrow -- you want us to go through

5   those 23 documents and give you our version of how many of

6   them are actually relevant to anything in this case, I don't

7   know.

8        JUDGE BUXBAUM:  No, because what can I do with it

9   without having the documents?  Yeah, it's the same problem as

10  the idea of you were policing some sort of produced sanction

11  when no one has the documents except you.

12       MR. FRASER:  Understood.

13       JUDGE BUXBAUM:  All right, then, Mr. Carlson, have you

14  now -- I'm going to let you speak the words, hopefully once

15  and forevermore silent after this.

16       MR. CARLSON:  General Counsel rests, Your Honor.

17       JUDGE BUXBAUM:  Very well.  All right, Mr. McKnight, I

18  will hear from the Charging Party.

19       MR. McKNIGHT:  Okay, I had one housekeeping matter with

20  respect to the transcript.  There may be others, but I

21  noticed one what I believe is a typographical error on page

22  256.

23       MR. FRASER:  Is that the first day, Sam, or the second

24  day?

25       MR. McKNIGHT:  Yeah, the first day, line 15.

1     JUDGE BUXBAUM:  Now, I don't have my copy with me, so

2   I'm going to wait and see, Mr. McKnight.  If all of you

3   agree, I'm going to be happy.  Have you all had a chance to

4   look at it?

5     MR. McKNIGHT:  I believe line 15 should read no, he

6   never said that, not we never said that.

7     MR. FRASER:  I'm trying to get the context of his

8   testifying here, Sam.  Is it --

9     MR. McKNIGHT:  It was John Canzano was testifying.  The

10  question was Mr. Lillie also said that the company wasn't

11  waiving their rights in that meeting with you, correct.

12  Answer:  On July 24th?  Yeah.  Answer:  No.  And the

13  transcript reads we never said that.  I believe his testimony

14  was he never said that.

15    MR. FRASER:  Your Honor, it's a -- I can't agree to

16  change that.  It's a substantially significant matter.  For

17  me to do that means that we're putting words in Mr. Canzano's

18  mouth that the transcriptionist didn't find, and I can't

19  agree to that.

20    JUDGE BUXBAUM:  Mr. McKnight, I don't have any

21  recollection of what he said either.  Am I right that

22  Mr. Canzano's going to be testifying further?

23    MR. McKNIGHT:  I have no idea.

24    JUDGE BUXBAUM:  Oh, okay.  Well, in any event, I agree

25  with Mr. Fraser that that's one of those things that unless

 1   there's agreement, I don't recollect it, and it is

 2   substantive, and therefore, I'm loath to make alterations in

 3   the transcript without agreement or my own recollection.  In

 4   any event, your caveat will certainly appear in the record.

 5   Does the Charging Party wish to present testimony or

 6   documentary evidence?

 7       MR. McKNIGHT:  Yes.  In review of the state of the

 8   record at this point, I find it necessary to recall Mr. -- or

 9   to call Mr. Viar briefly.

10       JUDGE BUXBAUM:  Very well.  Mr. Viar?

11       UNIDENTIFIED SPEAKER:  I'll see you, Judge.

12       JUDGE BUXBAUM:  Oh yes, thank you.  I appreciate it.

13       And I take it no one, at least on your side, is planning

14   to call Mr. Winkle further since he's staying in?

15       MR. McKNIGHT:  No.

16       JUDGE BUXBAUM:  All right, very good.

17   (Whereupon,

18                  **ROBERT PAUL VIAR, JR.,**

19   was called as a witness by the Charging Party and, having

20   been previously duly sworn, was examined and testified as

21   follows:)

22       JUDGE BUXBAUM:  Mr. Viar, you are under oath from

23   yesterday.

24       MR. CARLSON:  Judge, I'm sorry, Judge.  I just want to

25   note for the record Mr. Winkle is here in his capacity as a

1   representative.

2        JUDGE BUXBAUM:  Oh, that's right.  I'm sorry.  It's the

3   fact that he's not sitting with you.  All right, very good.

4   Thank you.  I appreciate it.  You may proceed, Mr. McKnight.

5        MR. McKNIGHT:  All right, and may I examine Mr. Viar

6   under 611(c), Your Honor?

7        JUDGE BUXBAUM:  You may.  Mr. Fraser, I assume there's

8   no objection.

9        MR. FRASER:  No objection.

10       JUDGE BUXBAUM:  Sorry about that.  I should have asked

11   first.

12       MR. FRASER:  That's okay.  We're getting to know each

13   other so well.

14       JUDGE BUXBAUM:  How about that?

15                    **DIRECT EXAMINATION**

16   Q.   BY MR. McKNIGHT:  Mr. Viar, who is Amy Abrey, A-b-r-e-y?

17   A.   It's Abrey.  Amy works at Douglas in the sales and

18   production control area.

19   Q.   Do you know what her title is?

20   A.   Sales coordinator.

21   Q.   Do you recall whether or not Ms. Abrey had any

22   responsibility with respect to communicating to coworkers

23   about what had happened to the employees who were the subject

24   of the blackout letter in about August or September of 2008?

25   A.   Again, I don't think they were employees at that point,

1  but Amy had no responsibility to communicate anything

2  regarding the status to anyone beyond -- because of her

3  responsibilities in shipping and production control, she

4  talked to freight people.

5  Q.   Freight people --

6      JUDGE BUXBAUM:  By freight people do you mean employees

7  in the --

8      THE WITNESS:  I'm sorry, Your Honor.  Amy worked in

9  shipping, shipping and receiving production control.  So,

10 from time to time, trucking companies --

11     JUDGE BUXBAUM:  So, outside?  When you say shipping

12 people, you're talking about outside personnel not personnel

13 employed by Douglas?

14     THE WITNESS:  But she would work with the shipping

15 people inside too, the replacement workforce.

16     JUDGE BUXBAUM:  Okay.  But going to Mr. McKnight's

17 question about communicating these items of information?

18     THE WITNESS:  I -- no.  I mean, very plainly she has no

19 responsibility in that area.

20 Q.   BY MR. McKNIGHT:  All right, are you a supervisor over

21 Amy Abrey?

22 A.   No.

23 Q.   Okay.  Is she responsible to adhere to your directions

24 if you provide her with directions?

25 A.   On issues concerning her communication to our shipping

1  folks, yes.

2  Q.   And shipping folks would include the employees in the

3  shipping department that she works with?

4  A.   Yes.

5  Q.   And would shipping folks include third parties or

6  vendors who provide shipping services to the company?

7  A.   Yes.

8       JUDGE BUXBAUM:  This, you haven't marked it -- oh, there

9  it is.  I've got it.  Thank you.  This is Charging Party's 6

10  for identification?

11      MR. McKNIGHT:  Yes, Your Honor.

12  **(Charging Party's Exhibit 6 marked for identification.)**

13      JUDGE BUXBAUM:  Thank you.

14  Q.   BY MR. McKNIGHT:  Mr. Viar, this is a document that was

15  produced by you in response to the subpoena duces tecum,

16  either or both from General Counsel and myself.  Do you

17  recognize this as an e-mail authored by you?

18  A.   Yes.

19  Q.   What's the date of that e-mail?

20  A.   September 26th, 2008.

21  Q.   And to whom is that e-mail directed?

22  A.   Amy Abrey.

23  Q.   And did you author the content of this e-mail?

24  A.   Yes.

25      MR. McKNIGHT:  I offer Charging Party Exhibit 6.

1       JUDGE BUXBAUM:  Mr. Carlson?

2       MR. CARLSON:  No objection.

3       JUDGE BUXBAUM:  Mr. Fraser?

4       MR. FRASER:  No objection.

5       JUDGE BUXBAUM:  It will be received.

6  **(Charging Party's Exhibit 6 received into evidence.)**

7       MR. McKNIGHT:  I've handed the witness a copy of General

8  Counsel Exhibit 44, and looking at the first page, I'm

9  reminded of something, Your Honor.  Carolyn Chapman, this

10 happens to be a form letter sent to Carolyn Chapman.  It all

11 involved -- we had a discussion about Ms. Chapman yesterday.

12      JUDGE BUXBAUM:  Yes.

13      MR. McKNIGHT:  And Ms. Chapman passed away, I believe,

14 December 1st, 2008.

15      JUDGE BUXBAUM:  All right, is there any objection to a

16 stipulation to that effect?

17                    **VOIR DIRE EXAMINATION**

18 Q.   BY MR. FRASER:  Paul, do you have any idea of whether

19 that's accurate or not?

20 A.   I think that's true.

21      MR. FRASER:  Then no objection.

22      JUDGE BUXBAUM:  All right, the record will reflect a

23 stipulation then that Carolyn Chapman passed away on December

24 1st, 2008.  And thank you, Mr. McKnight, for tidying up the

25 record in that regard.

1       MR. McKNIGHT:  Thank you, Your Honor.

2                    **DIRECT EXAMINATION (cont.)**

3  Q.    BY MR. McKNIGHT:  I'm sorry for the digression there.

4  Just looking at, I want to say, page -- I'm using the number

5  in the top right hand corner, page 8 of General Counsel

6  Exhibit 44.

7  A.    We're dealing with Social Security numbers here again,

8  counsel.

9       JUDGE BUXBAUM:  Yeah, we sure are.  Thank you, Mr. Viar.

10      MR. McKNIGHT:  Oh, I'm sorry.  There is a redacted copy

11  in the record.  That's my personal copy of it which remains

12  unredacted.

13      JUDGE BUXBAUM:  Okay, so when we're finished, I guess,

14  Mr. McKnight, let's collect these back up and return them to

15  Mr. Carlson.

16      MR. McKNIGHT:  Yes.

17      JUDGE BUXBAUM:  We won't need to worry then about them

18  being in the public domain.

19  Q.    BY MR. McKNIGHT:  Looking at that page, can you tell me,

20  for example after the name Myrna F. Blair, what the letter D

21  indicates?

22  A.    Direct employee.

23  Q.    Okay, or direct laborer as we discussed yesterday?

24  A.    Direct laborer, direct --

25  Q.    And then, for example, under next to the name Scott

1    Fuller, can you tell us what the letter I indicates?

2    A.    Indirect.

3    Q.    Okay, and that's indirect laborer in the same fashion as

4    we discussed on another exhibit yesterday where those

5    initials D and I appeared; is that correct?

6    A.    Yes.

7    Q.    Could you tell us what the initial I in the acronym I

8    MACH RPR means after the name Larry Burkhard?

9    A.    Indirect Machine Repair.

10    Q.    Okay, could you tell us what the initials LO 1/2/07

11    indicate after the name Mary Therese Hilyard?

12    A.    Layoff.

13    Q.    And what does the 1/2/07 indicate?

14    A.    The date of the layoff.

15    Q.    Okay.  Would that be the same for every person who has

16    an LO after their name?

17    A.    Yes.

18    Q.    And can you tell us what the initials OCC DESC mean at

19    the very top of that page?

20    A.    I'm pretty sure that's occupational description,

21    shorthand for occupational description.

22         JUDGE BUXBAUM:  And DAC is Douglas?

23         THE WITNESS:  Yes, Your Honor.

24         JUDGE BUXBAUM:  Okay.

25    Q.  BY MR. McKNIGHT:  Turning to the next page, page 9 up in

1  the right hand corner, next to the name Draper, Michael T.,

2  could you tell us what the initial I and then the acronym

3  MAINT means?

4  A.    Indirect maintenance.

5  Q.    And the same would be true for other people who have 1

6  MAINT after or next to their name?

7        JUDGE BUXBAUM:  Well, it's not 1, is it?  It's I.

8        MR. McKNIGHT:  I, correct, Your Honor.  Thank you.

9        THE WITNESS:  Yes.

10 Q.    BY MR. McKNIGHT:  Looking at the name of Diamond Gordon,

11 could you tell us what the initials SL mean?

12 A.    Sick leave.

13 Q.    Okay, and what does the date 3/14/08 represent?

14 A.    The beginning date of the sick leave.

15 Q.    Next to the name Manifold, can you tell us what the date

16 8/25/08 indicates?

17 A.    Similar, counsel, to the other individuals listed on

18 this document with the LO next to their name, that means

19 layoff and then the date of the layoff.

20       JUDGE BUXBAUM:  Mr. McKnight, next to that is a

21 handwritten notation.  It's illegible in my copy.  Is it of

22 any significance?

23       MR. McKNIGHT:  I don't know.  I can't read it in my

24 copy.

25       MR. FRASER:  And, Your Honor, I think for the record

1  Mr. McKnight referenced this as 8/25/08.  I think it's

2  8/25/06.

3       JUDGE BUXBAUM:  Well, that's a good question too.

4       MR. McKNIGHT:  I guess I --

5       JUDGE BUXBAUM:  Mr. Viar, do you have an opinion on

6  that?

7       THE WITNESS:  It looks like 6 to me.

8       JUDGE BUXBAUM:  Does it?  Well, I don't know.  The top

9  loop is filled in.  Does it matter?  I mean, I don't know --

10       MR. McKNIGHT:  It may, Your Honor.

11       MR. FRASER:  Your Honor --

12       MR. McKNIGHT:  Can we have one second?  I'll see if I

13  can check a more legible copy of this.

14       JUDGE BUXBAUM:  Well, do you know, Mr. Viar, when this

15  list was prepared?

16       MR. McKNIGHT:  It's got to be '06.  You're correct.  It

17  was prepared May 20, '08.

18       JUDGE BUXBAUM:  Okay, very good.

19       THE WITNESS:  Then I'd say yes, I do.

20       JUDGE BUXBAUM:  When was it prepared?

21       THE WITNESS:  I'm pretty sure it was prepared in

22  conjunction with this document to the unemployment agency,

23  which was dated 5/12.

24       JUDGE BUXBAUM:  Of?  5/12 of what?

25       THE WITNESS:  2008.

1    JUDGE BUXBAUM:  Well, that fits with what we were

2  discussing.

3    THE WITNESS:  So, I'm pretty sure it's within that time

4  frame.

5    JUDGE BUXBAUM:  So, Mr. Fraser is clearly correct then.

6  It's 8/25/06.  Anybody disagree with that conclusion?

7    MR. McKNIGHT:  I do not disagree with that, Your Honor.

8    JUDGE BUXBAUM:  Okay, all right, good.  And I think then

9  what we're going to indicate regarding the handwritten

10  notation is that it's, I take it, illegible on everybody's

11  copy.  Mr. Viar, you don't know what it says?

12    THE WITNESS:  I can't read it.

13    JUDGE BUXBAUM:  Yeah, so I'm just not going to include

14  it as part of the document because we don't know what it

15  says.

16  Q.  BY MR. McKNIGHT:  Mr. Viar, do you know what the little

17  lines next to the code number 1, for example let's look at

18  page 8 again, where you have Hilyard, Mary Therese Hilyard,

19  there's a little line by or immediately under the 1, and it

20  looks as if there's a little line by every 1, on every number

21  1, either under it or directly next to it.  Do you know what

22  those little lines mean?

23  A.  No.

24  Q.  Turning to the next page, again it appears that every

25  person who has the code 1 following their name has a line

1    under it or next to it.  Do you know what those little lines

2    mean?

3         MR. FRASER:  Counsel, are you on page 9?

4         MR. McKNIGHT:  Yes.

5         MR. FRASER:  Thank you.

6         THE WITNESS:  No.  I didn't write the lines on the

7    document, so I don't know what they mean.

8    Q.   BY MR. McKNIGHT:  Would those lines -- you signed the

9    document, correct?

10   A.   I didn't sign this document, no.

11   Q.   Well, would you turn to the last page and tell me if

12   that's your signature?

13   A.   The document that I'm looking at, counsel, is the

14   seniority list.  I didn't -- my signature is not on the

15   seniority list.  I signed the accumulated document at the

16   end, 5/12/08.  I didn't just --

17   Q.   You didn't sign every page; you signed the last page?

18   A.   Exactly.

19   Q.   Would that be your practice if you sent somebody a

20   communication to sign the last page of the communication?

21   A.   It depends on the document.  Sometimes I sign every

22   page.  Sometimes I sign the last page.  Sometimes I initial

23   pages.  It depends.  General practice, absolutely, sign the

24   last page.

25   Q.   Do you -- who do you believe would be able to explain

1   the meaning of those lines under or next to the 1's?

2   A.   Perhaps Diane Hedgcock.  I'd say almost certainly Diane

3   Hedgcock.

4   Q.   Now, looking at page 10, William Green, next to his

5   name, can you tell us what you understand to be the date of

6   his layoff?

7        JUDGE BUXBAUM:  Second from the bottom?

8        MR. McKNIGHT:  Um-hmm.

9        THE WITNESS:  2/18/06.  I -- well, '08, I don't know.

10  That looks like an 8.

11       MR. McKNIGHT:  But, Mr. McKnight, do we care?  In other

12  words, am I right, Mr. Viar, that whether it's '06 or '08, it

13  is indisputable, is it not, if I understand this document

14  right, that as of May 1st of '08, he was laid off?

15       THE WITNESS:  That's correct, Your Honor.  I don't know

16  what significance --

17       JUDGE BUXBAUM:  We don't care if he was laid off in

18  1944, as long as he was laid off as of '08.  I think he's

19  laid off.

20       THE WITNESS:  I -- I don't know.  He's laid off.

21       JUDGE BUXBAUM:  I think he cares, yeah, yeah.  Oh, I

22  agree.  No doubt, but we don't for purposes of this hearing,

23  right, Mr. McKnight?  I mean, you tell me.

24       MR. McKNIGHT:  Well, I'm not entirely sure, Your Honor,

25  but I think you can compare this to other documents, and it

1    would clarify that date.

2        JUDGE BUXBAUM:  But I am curious, Mr. McKnight, because

3    you're spending a lot of time on this document.  We don't

4    care whether somebody is laid off in February of '06 or

5    February '08.  We do care whether they were on layoff status

6    as of, let us say, May 1st of '08.

7        MR. McKNIGHT:  That's true.

8        JUDGE BUXBAUM:  Okay.  So, I don't want to break my

9    brain over something that doesn't matter.

10       MR. McKNIGHT:  I haven't decided whether I would ask you

11   to break your brain over that, Your Honor.

12       JUDGE BUXBAUM:  All right.

13   Q.  BY MR. McKNIGHT:  And, Mr. Viar, this was true as of May

14   1st, and it was also true with respect to Mr. Modert -- or,

15   I'm sorry, Mr. Green and others who have the LO after their

16   name, that it was true as of May 12th when you signed the

17   last page of GC Exhibit 44, correct?

18       MR. FRASER:  Objection, Your Honor.  It's vague and

19   ambiguous.  I'm confused.

20       JUDGE BUXBAUM:  Let me try it this way.  As of the date

21   that you signed this, which is May 12th of '08, were the

22   people who are listed on the list with the LO designation and

23   a date on layoff status?

24       THE WITNESS:  Your Honor, my assistant, if memory

25   serves, produced this document, a very reliable person.  I

1    have no reason to think that there's anything that's

2    inaccurate.  If it says layoff on there, they were absolutely

3    laid off.

4        JUDGE BUXBAUM:  And we can -- but here's the point I

5    think that there's still a little ambiguity that I'd like you

6    to clear up.  Nowhere on the document does it show somebody,

7    although I'm sure this must have happened, an employee who

8    was laid off let's say January 1st, 1999, and rehired

9    December 10th, 1999.  In other words, it doesn't show any

10   rehire dates, return from layoff.  Therefore, I'm assuming

11   that everybody who's got that LO and a date was not yet

12   returned to work as of the date you signed the last page,

13   barring a human error on the part of the person who compiled

14   the document.

15       THE WITNESS:  No, none of those people had returned to

16   work.  They were on layoff.

17       JUDGE BUXBAUM:  Okay.

18       THE WITNESS:  And then there was a strike in between

19   there.

20       JUDGE BUXBAUM:  Well, yeah, I am sure.  I understand the

21   parties varying contentions about what happened in May.  But

22   what didn't happen is, for example, on April 30th, William

23   Green wasn't recalled to work.

24       THE WITNESS:  Oh, that's right.

25       JUDGE BUXBAUM:  Okay.

1   Q.   BY MR. McKNIGHT:  Mr. Viar, as Director of

2   Administration for Douglas Autotech, did you contest the

3   unemployment, any unemployment claim by Mr. Green?

4   A.   I contested all of them, yes.

5        JUDGE BUXBAUM:  By all of them, you mean all the people

6   on this list?

7        THE WITNESS:  Everyone who filed.

8        JUDGE BUXBAUM:  Who filed, okay.

9   Q.   BY MR. McKNIGHT:  Do you know whether or not

10  Mr. Green -- well, who filed when, sir?  Were you talking to

11  at any time?

12  A.   The -- I contested -- if you look at the designation on

13  the document, we have unfortunately, dealing with Carolyn

14  Chapman, but she was an exemplar of our blanket contest of

15  the claims that were filed.  It says Carolyn Chapman and all

16  involved, and those are the ones that I contested in early

17  May 2008.

18  Q.   Following the strike of May 1, 2008, and following also

19  the letter of May 5, 2008, using the word lockout; is that

20  correct, sir?

21  A.   I don't remember exactly when the unemployment claims

22  came in, but that sounds about right.

23  Q.   So, just directing your attention to Mr. Green then,

24  this would indicate, I think, that his layoff, if I can find

25  that now --

1       JUDGE BUXBAUM:  Second to the bottom.

2   Q.   BY MR. McKNIGHT:  His layoff occurred on February 18th,

3   2008.

4   A.   Okay.

5   Q.   Three months before the strike of May 1, 2008 -- well,

6   approximately three months, and approximately three months

7   before the letter of May 5 of 2008 using the words lockout.

8   Did you contest Mr. Green's unemployment when he was laid off

9   on February 18, 2008?

10  A.   Let me explain.  During this period of time, it's early

11  May 2008, I was under enormous pressure and time constraints.

12  I don't know whether Mr. Green had even filed for

13  unemployment at that point.

14  Q.   You do know --

15  A.   So, can I finish my answer?

16  Q.   Oh, I'm sorry, surely.

17  A.   So, I, with Diane's help, I filed a blanket objection to

18  the unemployment claims and took all the time I could to make

19  sure the record was clean with the unemployment agency as my

20  schedule permitted.  It's possible that we contested

21  unemployment claims for people who weren't even filed -- had

22  not even filed unemployment claims.  That's possible.

23  Meaning under that, all involved, or under this seniority

24  list, there may have been someone on there that they had

25  found another job or something like that.  So, I don't know

1  about Mr. Green in particular.  I don't know.

2  Q.   Well, the code 1 next to Mr. Green's name, I believe --

3  let me direct your attention to page 7.  Well, could you tell

4  us what code 1 represents next to Mr. Green's name?

5  A.   I'm sorry, counsel.  Where?

6  Q.   Look on page 7.  It has an explanation of codes.

7  A.   Well, Mr. Green is not on this list.  Do you want me to

8  read what it says next to number 1?  Is that what you want me

9  to do?

10  Q.   Yes, what does that code represent, code 1?  It says --

11  A.   It says --

12  Q.   Right, it says if reason for unemployment is, and then

13  it says use code.

14  A.   Layoff for lack of work not caused by a labor dispute.

15  Q.   Right, so the code 1, now turning back to Mr. Green on

16  page 10, would indicate, I think maybe not though, but I

17  think layoff for lack of work not caused by labor dispute.

18  A.   That's wrong.

19  Q.   Well, what would that code represent to you?

20  A.   I think that's a shift designation.  I don't know.  Just

21  ask Diane.

22  Q.   Okay.

23  A.   You know what, counsel?  It's too many people to be on a

24  shift designation.  So, I just have to ask Diane, I guess.  I

25  signed the document, of course, but it must -- I don't know.

1    Q.    I think you -- I'm really actually just trying to

2    refresh your recollection about this piece.  I think you

3    previously indicated what that code indicated.  If you look

4    at the worksheet on page 7 again, it says please see printout

5    sheet, employee name, and then Social Security number --

6    something we're going to redact -- plant or job title.  I

7    guess that would be occupational description.  And then it

8    says -- I can't actually make it out -- something another

9    class of worker, and then reason for unemployment, use code

10   numbers.  Do you see that?

11   A.    Yes.

12   Q.    Would that refresh your recollection or help you

13   understand the entry of those codes?

14   A.    Yeah, I had to look.  The document must, as I review it,

15   reference codes 1 and 2, and 1 and 2, as I have read into the

16   record, say what they say.

17   Q.    Okay, so, was the company at this point trying to

18   challenge the continuing unemployment of Mr. Green, who was

19   laid off in February for lack of work unrelated to a labor

20   dispute?

21   A.    Yes.

22   Q.    But you did honestly represent to the unemployment

23   commission that Mr. Green's layoff had nothing to do with the

24   labor dispute?

25   A.    I did.  Mr. Green could have come back to work because

1  the place was open for business starting May 1st, 2008.

2  Q.   Is there anything in here that indicates Mr. Green

3  refused to work?

4  A.   No, but I submit to you, counsel, that the place was

5  open for business, and Mr. Green and everyone on this list

6  could have petitioned to come back to work.

7  Q.   Do you have -- is there anything in the company's filing

8  with the Michigan Unemployment Security Commission that would

9  indicate that the employees on the layoff list had refused an

10  offer to return to work?

11  A.   No.

12  Q.   So, you never thought of telling the unemployment

13  commission that, did you?

14      JUDGE BUXBAUM:  Telling them what?

15      MR. McKNIGHT:  That the employees on the layoff list had

16  refused an opportunity to return to work.

17      JUDGE BUXBAUM:  Well, what he thought of telling -- did

18  you -- you never told them that, did you?

19      THE WITNESS:  I don't think so.

20      JUDGE BUXBAUM:  And the reason being because there was

21  no refusal of an offer to return to work because there was no

22  offer to return.  There was no solicitation for them to

23  return to work on the part of management?

24      THE WITNESS:  Judge, the place was open for business.  I

25  accepted applications from all comers.  So, I don't know what

1  that means.

2      JUDGE BUXBAUM:  I do, Mr. Viar.  I do.  Go ahead,

3  Mr. McKnight, I think we're done with this line of

4  questioning, aren't we?

5      MR. McKNIGHT:  May I have just one second?

6      JUDGE BUXBAUM:  You may.

7      MR. McKNIGHT:  Thanks.

8  Q.  BY MR. McKNIGHT:  The code 2 -- this is a different line

9  of questioning.

10      JUDGE BUXBAUM:  That's all right.

11  Q.  BY MR. McKNIGHT:  By my understanding of the document,

12  it indicates involved in the labor dispute at the plant of

13  jobsite.  Have I got that correct?

14  A.  Yes.  You know, counsel, if I could back up, this

15  document is very old, but it may have been our communication,

16  and perhaps Diane can speak to this.  It may have been our

17  communication to not contest the -- I'm confusing myself.  It

18  may have been our contention, you know, the people that were

19  laid off, we were not contesting their unemployment prior to

20  the layoff.  I, you know, as I look at it, I don't know.

21  Q.  Okay.

22  A.  But that's that 1 and 2 designation.

23  Q.  But you did undoubtedly contest the unemployment of the

24  individuals who had been working and went out on strike on

25  May 1, correct?

1  A.   Oh, there's no doubt of that.

2  Q.   And you continued to contest their unemployment after

3  the letter of May 5 announcing a lockout, correct?

4  A.   We contested it, the unemployment, until I think

5  September or October of '08, yes.

6  Q.   You continued to contest it after the letter of May 5

7  announcing a lockout, correct?

8  A.   I answered that, counsel, yes.

9  Q.   And you were successful in contesting their entitlement

10  to unemployment all the way through May and June and July of

11  2008, correct?

12  A.   I don't believe they collected unemployment for those

13  months.  I don't know.  I'd say that's true, yes.

14  Q.   And then after those individuals got a letter, those

15  individuals who went out on strike on May 5, 2008 --

16       JUDGE BUXBAUM:  No, you don't mean that.

17       MR. McKNIGHT:  I mean on May 1, 2008.

18  Q.   BY MR. McKNIGHT:  After they got a letter dated August

19  4, 2008, each of those individuals stating words that --

20  well, stating that they were each of them was terminated

21  effective immediately August 4, 2008, after those individuals

22  got that letter stating their termination, they received

23  unemployment, correct?

24       MR. FRASER:  Objection.  Counsel is referring to General

25  Counsel Exhibit 47.  He's only read part of that document.

1    The rest of the document is -- it mischaracterizes GC-47.

2        MR. McKNIGHT:  I'll withdraw that question.

3        JUDGE BUXBAUM:  Okay.

4        MR. McKNIGHT:  I'll withdraw that question.

5        JUDGE BUXBAUM:  Fair enough.

6    Q.   BY MR. McKNIGHT:  After each of those individuals who

7    struck on May 1, 2008, received a copy of or were mailed GC-

8    47 dated August 4, 2008, did those individuals then begin to

9    receive unemployment benefits?

10       MR. FRASER:  Objection, Your Honor.

11       JUDGE BUXBAUM:  Sustained.  We don't care whether the

12   Agency thought that they were then entitled.  If you want to

13   ask him what position the company took with respect to their

14   unemployment, certainly that goes again to the subjective.

15   Q.   BY MR. McKNIGHT:  What position did the company take

16   with respect to their unemployment?

17   A.   I made a strategic decision in the fall of '08 not to

18   contest the unemployment claims anymore, unrelated to their

19   status at that time.

20       MR. McKNIGHT:  If I could just look through my

21   paperwork, I think I might be --

22       **JUDGE BUXBAUM:  Sure, we'll go off the record for a**

23   **moment.**

24   **(Off the record.)**

25       JUDGE BUXBAUM:  Mr. McKnight?

1     MR. McKNIGHT:  No further questions.

2     JUDGE BUXBAUM:  Mr. Carlson, do you wish to inquire

3  further of this witness?

4     MR. CARLSON:  No, sir.

5     JUDGE BUXBAUM:  Mr. Fraser?

6     MR. FRASER:  Just a clarification, does that mean that

7  Mr. McKnight has rested?

8     JUDGE BUXBAUM:  No, it means he's finished examining

9  this witness.

10    MR. FRASER:  Okay, thank you.  No, I have no questions

11 for Mr. Viar.

12    JUDGE BUXBAUM:  All right, thank you, Mr. Viar.  You may

13 step down.

14    THE WITNESS:  Thank you, Your Honor.

15 **(Witness excused.)**

16    JUDGE BUXBAUM:  Mr. McKnight?

17    MR. McKNIGHT:  I rest.

18    JUDGE BUXBAUM:  All right, Charging Party has now

19 rested, Mr. Fraser.

20    MR. McKNIGHT:  Subject to the same reservation that

21 General Counsel made with respect to the subpoena and

22 enforcement issues.

23    JUDGE BUXBAUM:  Then, Mr. Fraser, I think that brings us

24 to your opening statement, if you wish to make one.

25    MR. FRASER:  I do, and I'd like to have Mr. Kirk here to

1   hear that.

2       JUDGE BUXBAUM:  Sure.  Well, I say sure.  Is there any

3   objection?  I shouldn't have said sure so quickly.

4       MR. McKNIGHT:  Yeah.

5       JUDGE BUXBAUM:  Yeah?

6       MR. McKNIGHT:  Yes, I'm sorry.

7       JUDGE BUXBAUM:  No, that's fine.  I'm not complaining

8   about your choice of words.  I want to understand.  What is

9   your objection?

10      MR. McKNIGHT:  Well, isn't the opening statement going

11  to contain representations regarding the testimony of

12  witnesses?

13      JUDGE BUXBAUM:  I expect it will.  Is Mr. Kirk going to

14  testify?

15      MR. FRASER:  Yes, he is, but it's not testimony in and

16  of itself, and the sequestration means that he can't be here,

17  to have other people hear other people testify.

18      JUDGE BUXBAUM:  No, I don't agree with that, Mr. Fraser.

19  He's not your representative, I don't think, is he?

20      MR. FRASER:  Well, I tried that, Your Honor, but you

21  didn't permit it, so --

22      JUDGE BUXBAUM:  Yeah, I know.  I know.  But he isn't,

23  right.  Yeah, no, I don't think he can hear it.

24      MR. FRASER:  Your Honor, for the record, I disagree with

25  that ruling, but thank you very much.

1    JUDGE BUXBAUM:  All right, you may proceed.

2    MR. FRASER:  Your Honor, on May 1, 2008, at 12:01 a.m.,

3  the UAW led the Local 822 members out on an illegal strike.

4  It was an illegal strike when they went out.  The UAW failed

5  to file the required F-7 -- we've referred to that as a 30-

6  day notice in some of the testimony -- with FMCS.  I don't

7  want to belabor this, but I want it to be clear that the NLRA

8  states an employee who engages in the strike within any

9  notice period specified in this subsection shall lose his

10  status as an employee of the employer engaged in the

11  particular labor dispute for the purposes of Sections 8, 9,

12  and 10 of this Act.  It then goes on to say, but such loss of

13  status for such employee shall terminate if and when he is

14  reemployed by such employer.  Now, despite the fact that I

15  don't agree with the he versus the he and she from an

16  antiquated statute, that's what it says.

17    The UAW Local 822 members, Your Honor, from our

18  perspective terminated themselves by engaging in an illegal

19  strike.  They engaged in an illegal strike.  They lost their

20  status under the Act according to the statute.  Another way

21  of looking at that, Your Honor, is that the UAW terminated

22  its own bargaining unit members under the Act when it didn't

23  file the required 8(d) 30-day notice and then sent the Union

24  workers out on strike.  The Labor Act specifically assigns a

25  strict penalty for failure to file that 8(d) 30-day notice,

1  loss of status as an employee of the employer.  We wouldn't

2  be here if it was clear as to what that means.

3      JUDGE BUXBAUM:  I appreciate you saying that,

4  Mr. Fraser.  I think it's in the better traditions of our

5  profession that you would say that, and that's right.

6      MR. FRASER:  And so, it also is not at all clear that

7  the Act is self-effectuating, not at all clear that the Act

8  is self-effectuating.

9      JUDGE BUXBAUM:  I think that's a very significant point.

10  I agree.

11      MR. FRASER:  They could have fired themselves.  The UAW

12  could have fired them.  They could have simply lost their

13  status under the Act until somebody said to them, hey, you

14  lost your status.  You're not employed with us anymore.

15  You're not our employees.  It's very unclear as to what that

16  statute means and the timing of all of those events.  And I

17  think again that's why we're here.

18      JUDGE BUXBAUM:  And, Mr. Fraser, I have engaged in

19  exactly that sort of mental thought exercise that you just

20  went through about 100 times during this period between our

21  first week and today.  I think you're absolutely right that

22  these are the reasons we're here.

23      MR. FRASER:  Your Honor, every run I go on starts with

24  what are the possibilities and continues until I get back as

25  to what the possibilities are, and some of those are

1  included.  Again, it's not at all clear.  But it is very

2  clear in Douglas' mind, position, statement of the law, that

3  the only way for that loss of employment status to be changed

4  under the Act is if and when the Employer, not the employees,

5  not the Union, not the Union International, not Mr. Winkle,

6  not anybody else, but the Employer reemploys the employees,

7  an affirmative act by the Employer.  It's again not in our

8  position relevant at all what the Union does to try to fix

9  their error.  It's not relevant what they do to try and fix

10 their error; it's what the employer does.  The General

11 Counsel's theory is that the lockout was the reemployment.

12    JUDGE BUXBAUM:  Let's narrow that in.  Mr. Carlson,

13 that's right, isn't it, what he just said?  That's your

14 theory.  So that I'm clear, I understand, I think that's your

15 theory, too, but let's find out.

16    MR. CARLSON:  The theory, yes, that the lockout is an

17 affirmative act by the Employer that resulted in the

18 reemployment of the individuals who went out on strike.

19    JUDGE BUXBAUM:  Well, can we amend that a little bit?

20 Would you agree that your theory is that the lockout letter,

21 let's say in Mr. McKnight's phrase, that the lockout letter

22 was an affirmative action by the Employer that constituted

23 reemployment within the meaning of the Act?

24    MR. CARLSON:  Yes, Judge, yes, that's an accurate

25 statement.

 1      JUDGE BUXBAUM:  I think we're all in agreement as to

 2   what General Counsel's position is.

 3      MR. FRASER:  And that's fine, Your Honor.  I think it

 4   bears --

 5      JUDGE BUXBAUM:  Well, it helps, yeah.

 6      MR. FRASER:  -- it bears further in the opening

 7   statement because I've read and re-read and read again

 8   General Counsel's statement in the transcript to make sure

 9   that I understand, at least I think I understand, exactly

10   what he's saying.

11      JUDGE BUXBAUM:  Me too.  Me too.

12      MR. FRASER:  And I've read Mr. McKnight's statements

13   over and over again.  The General Counsel went on to state

14   after he made that position, the theory, the legal theory,

15   that the Union made an unconditional offer to return to work

16   on 5/5/08.  He also said that Douglas and the UAW bargained

17   for three months, making the employees think that they were

18   reemployed.  He then said that Douglas assured the locked-out

19   employees that they would return to work once an agreement

20   was reached.  And finally, he said Douglas treated the

21   employees as if they were reemployed under the unemployment

22   statutes, 401(k) access, and other employment terms and

23   conditions, I guess was my view.  And then further, General

24   Counsel stated, and this one I've got a picture in my mind of

25   an employee with a mantel on their shoulders because he

1    said -- and I'm not trying to be facetious.  I'm just trying

2    to draw that analogy here.  The General Counsel further

3    specifically stated reemployment means to bring the illegal

4    strikers back within the protective mantle of the Act and

5    that Douglas' lockout brought the employees back within the

6    protective mantle of the Act.  So, what I want to do as I

7    talk about the facts is examine each one of those factual

8    bases a little closer.

9        General Counsel's theory is number one, Union made an

10   unconditional offer to return to work.  Our position is that

11   that's not accurate at all.  There was no unconditional offer

12   to return to work on 5/5/08.  There was a feigned

13   unconditional offer.  Employer Douglas provided the

14   conditions upon which these individuals could come back to

15   work.  The door was open for the Union to come back to work.

16   They chose not to do it.  There were offers made on 5/5/08;

17   specifically, here are the return-to-work conditions.  Here

18   are the return-to-work conditions.  You may take them and

19   come back.  The Union rejected those return-to-work

20   conditions.  It was not an unconditional offer to return to

21   work.  They never really ended their illegal strike.  In the

22   words of Mr. Canzano or Canzano or whatever his name is, you

23   can say it, but just because you say it doesn't mean it's

24   really true.  All right, and that's exactly what happened

25   here.  They said we're unconditionally offering to return to

```
1   work.  When they were given the conditions upon which they
2   could come back into the plant, they said no.  The strike
3   never ended, Your Honor.  That's part of our position.  This
4   is just like Bohezi and Raisin (ph.) or however you pronounce
5   the case.  Same, nearly identical facts, Your Honor.
6       Second, Douglas and the UAW bargained for three months,
7   making the employees think that they were reemployed.  I
8   guess the first issue is I don't know that it matters what
9   the employees thought.  It's did the Employer reemploy the
10  employees?  Whether they thought they were reemployed or not,
11  I don't know that that's relevant, but let's assume for a
12  minute that it is.  Bohezi specifically says the Employer has
13  to continue bargaining.  In good faith, that's what they did.
14  All they wanted to do was reach an agreement.  They wanted to
15  reach an agreement, and our testimony is going to show this
16  consistent with the terrible financial condition that they
17  were in, which they showed the Union, which they gave to the
18  International.  They were trying to reach a deal, Your Honor.
19  That's what they wanted.  That's what they were trying to do,
20  and that's what our evidence is going to show.  The Union
21  could have accepted those return-to-work conditions and end
22  their illegal strike, but they didn't do that.  Douglas, the
23  testimony will show, specifically told the Union on 5/5, and
24  this gets to what we view is a clear and unmistakable
25  statement about waiver, the Union -- Mr. Winkle, the
```

1  testimony is going to show, and I think it already has, knew
2  on 5/2 that his strike was illegal.  He knew it, and I think
3  he testified, my paraphrasing, that there was no way he was
4  going to share that information with the company.  He tried
5  to fix his mistake by making an unconditional offer to return
6  to work.  Our view is that's deceitful and perhaps unlawful
7  by not sharing that in direct response to the questions that
8  the company asked on 5/5, the first day after the illegal
9  strike theoretically ended due to the unconditional offer,
10 and Mr. Winkle wouldn't confirm.  There were letters sent to
11 Mr. Winkle.  He wouldn't answer them.  There was a question
12 asked on whether he filed his F-7.  He said I filed my
13 paperwork, through his testimony.  Our testimony is going to
14 be a little bit different than that.  Again, Your Honor, the
15 Employer specifically said we are not waiving our rights.  We
16 don't know what's going on here.  We're asking you; you won't
17 tell us.  We're not waiving any rights or remedies we have
18 under the Act, and we're going to continue to bargain with
19 you.  Here are the return-to-work conditions that you can
20 come back under.  The Union rejected those.
21     Number three, that Douglas assured the locked-out
22 employees they would return to work once an agreement is
23 reached.  You know, again very, in my view, exaggerated
24 attempt to try and fit this in within the Fairprene facts
25 where a deal was reached.  They agreed to return to work.

1    There was a schedule implemented.  Counsel for the General

2    Counsel, and I understand why, is trying to stretch this case

3    into those facts.  But the key words here, Your Honor, is

4    once an agreement is reached.  And the testimony from our

5    witnesses is going to be very clear.  There was never an

6    agreement reached on anything but for a cooling down period

7    perhaps.  No agreement reached at any point during

8    negotiations from May through August.

9        That Douglas treated the employees as if they were

10   reemployed under other statutes.  You know, look, Your Honor.

11   Let's assume for a moment that on May 1 of 2008 that Douglas

12   knew the strike was illegal and terminated all of these

13   individuals who were participating in the illegal strike.  If

14   they had done that on May 1, they would still have an

15   obligation under ERISA.  They would have an obligation under

16   COBRA.  They would have an obligation under unemployment.

17   They would have an obligation under any Federal or state

18   statute that applies.  If they terminated them appropriately,

19   they would have that obligation.  To be able to argue, and

20   our facts will show, that they complied with all those

21   statutes.  It doesn't matter that they complied with the

22   statutes, whether the strike was illegal or not.  They had to

23   comply if they had terminated on May 1, or if they had told

24   them on May 5 you lost your status, or if they told them on

25   August 4 they lost their status.  Compliance with those

1    statutes was an obligation that the Employer had, and we're

2    going to testify that we met those obligations.  It has no

3    bearing on reemployment under the Act.

4        So, back to the facts, Your Honor.  On May 1 Thursday,

5    May 2 Friday, May 3 Saturday, May 4 Sunday, the Employer did

6    not know the strike was illegal.  On May 5, Mr. Viar used the

7    testimony, and he'll testify again, he surmised, suspected,

8    or thought that the strike might be illegal.  Mr. Kirk and

9    Mr. Lillie are going to testify to the same exact issues.

10   That's the day that they specifically told the Union they

11   weren't waiving their rights when they knew that that was the

12   issue.  But Winkle knew the strike was illegal, but Winkle

13   hid that from DAC.  Phil Winkle tried to fix his grave error

14   with what he claims was an unconditional offer to return to

15   work.  Again, Your Honor, that was ineffective.  It was not

16   unconditional.  Phil Winkle rejected DAC's return-to-work

17   conditions, and he told us, he told Douglas that he was

18   rejecting them.  Douglas was unsure of the Union's striker

19   status on 5/5.  Again, on 5/5 Douglas made sure that they

20   didn't waive any rights.  They reiterated this on May 21, the

21   second time they met after May 5.  And the bargaining notes,

22   not only our bargaining notes which we'll introduce as

23   evidence, but bargaining notes from the individuals for the

24   Union say the same thing, that we weren't waiving our rights,

25   that it was an illegal strike.  And at that point, we thought

1    we knew it was an illegal strike.

2        JUDGE BUXBAUM:  At what point?

3        MR. FRASER:  At on or about at least May 21, sometime

4    shortly before that.  We got confirmation or what we believed

5    was confirmation from FMCS through exchange of phone

6    information.  We didn't get a letter until shortly

7    thereafter, but we were pretty confident, or Douglas was

8    pretty confident on May 21.  Douglas had the right to press

9    its economic advantage through bargaining.  Bohezi and Raisin

10   again very clearly says that.  It did.  Douglas followed the

11   law.  They wanted an agreement.  They bargained with the

12   Union in good faith.  They didn't hide a thing from the Union

13   during all those discussions, including the fact that they

14   thought the strike was illegal, that they thought that the

15   employees/illegal strikers needed to be very careful about

16   whether they agreed to the terms and conditions because there

17   were issues that were going on that could impact their

18   relationship with the company.  Surely, bargaining with the

19   employees/illegal strikers, the Union is not an act of

20   reemployment.  Douglas did not assure anyone that Union

21   members would return to work except if they reached an

22   agreement.  Douglas told the Union if the contract terms were

23   reached, then they would talk about how to return those

24   employees.  Douglas abided by its obligations under 401(k),

25   ERISA, COBRA, unemployment, workers' compensation.  And

1   whether there was an illegal strike where they terminated all

2   of the illegal strikers on May 1 or not, Douglas had an

3   obligation to continue abiding by those obligations.

4        Douglas has not withdrawn its recognition, and you're

5   going to hear testimony about that.  Douglas has indicated,

6   and it indicated this to the Union and Mr. McKnight on August

7   14th, essentially that they would continue to bargain effects

8   related to those illegal strikers who no longer had status

9   with the Employer.  They have not heard any request to

10  bargain about effects, I suppose, because if that happened,

11  the Union in some way might be acknowledging that these

12  people weren't working for the company anymore.  Douglas is

13  waiting for the Union to tell them if it believes, if the

14  Union believes that it represents the current replacement

15  workers.  Now, that creates quite a political dilemma for the

16  Union, but the Union has not sent a letter to Douglas saying

17  we want to continue to bargain.  Douglas has offered to

18  continue to bargain.  Douglas is ready, willing, and able to

19  continue to bargain, but the Union has not made that request,

20  and so we simply left that that way.  Bottom line, Your

21  Honor, an Employer and Douglas here cannot reemploy in our

22  view when it doesn't know the strike is illegal because the

23  Union has hid information.  You can't -- an Employer can't

24  reemploy through a lockout, where Douglas particularly

25  preserved its rights and remedies under the Act.  It can't

1  reemploy by following Board case law to press its bargaining

2  advantage.  And, Your Honor, the illegal strike continued

3  because the unconditional offer was not genuine.  It was not

4  in good faith, and the terms and conditions that were offered

5  to bring people back simply were not accepted.

6      JUDGE BUXBAUM:  Well, but, counsel, let me ask you about

7  that.  And it clearly bears further research on my part, but

8  I assume an unconditional offer to return to work, of course,

9  is a term of art.  And it doesn't mean, for example, we will

10  return to work no matter what you decide, for instance, to

11  pay us.  We'll come back for ten cents an hour.  Doesn't it

12  mean that we will come back on the same terms and conditions

13  that we left?

14      MR. FRASER:  Interestingly enough, Your Honor, Bohezi

15  and Raisin addresses that exact issue, because the Union said

16  we will return to work unconditionally on the same conditions

17  that we had before, and the Employer -- apparently the case

18  doesn't address this in any detail -- either didn't say

19  anything or implicitly said get stuffed.  We're not bringing

20  you back, which in my mind is a lockout and therefore didn't

21  bring them back.  Two or three days later, the Union says

22  again, heck, now we'll come back on the last best final offer

23  that you made to us.  We're happy to come back, and the Union

24  said -- or the company said no, you're not coming back until

25  you can show us that you weren't on an illegal strike.  So,

1   it's very similar to what happened here, except in this

2   instance -- I don't know if that case really got into the

3   words lockout or not -- we sent a letter conditionally

4   locking people out because if we didn't do that, we were

5   afraid we'd get an unfair labor practice charge saying you've

6   done nothing.  My God, you've reemployed us.  So, in this

7   case, we're doing all that we have to to try and make sure

8   that we abide by the Act, and now we're getting punished for

9   that.

10      So, my final statements, Your Honor, are in our view,

11   the General Counsel's theory is misguided.  This is not

12   supported by the current case law.  General Counsel's clear

13   intent, again in my mind, it's my political statement, is

14   that they want the NLRB to rewrite the current Board law, to

15   extend the Board law given Member Liebman's dissent in Bohezi

16   and Raisin, since she's now the Chairperson of the Board,

17   pending two more --

18      JUDGE BUXBAUM:  But wasn't this case filed while

19   Schaumber was the Chair?

20      MR. FRASER:  Yeah, knowing full well where we would be

21   with President Obama and that there'd be two additional

22   Democratic-appointed members.  Our view again, there's no

23   reasonable basis for us even to be here, but since we are,

24   we're doing our very best to make sure that you know what our

25   theory is.

1       JUDGE BUXBAUM:  I think you've done a good job at that,

2   counsel.  Thank you.  I appreciate your opening statement,

3   and it's now, I think, time for you to present evidence.

4       MR. FRASER:  Very good.  I'm just listening out of the

5   corner of my ear that there's whispering going on.

6       JUDGE BUXBAUM:  Well, I'm sure you are, but don't admit

7   it.

8       MR. FRASER:  Sorry.

9       **JUDGE BUXBAUM:  We'll go off the record for a moment.**

10  **(Off the record.)**

11      **JUDGE BUXBAUM:  We're on the record.**

12      Then you, Mr. Fraser, you're calling Mr. Viar as your

13  first witness?

14      MR. FRASER:  Yes, we're calling Mr. Viar as our first

15  witness, please.

16      JUDGE BUXBAUM:  Very well.

17      MR. FRASER:  And, Your Honor, Mr. Viar is still under

18  oath, as I understand it.

19      JUDGE BUXBAUM:  He is.  Mr. Viar, you acknowledge that,

20  don't you?

21      MR. VIAR:  Yes, Your Honor.

22      JUDGE BUXBAUM:  All right, that's fine.

23      MR. FRASER:  And, Your Honor, in order to make this

24  easier, at least for the witness, I prepared a couple of

25  binders of General Counsel's exhibits.

1       JUDGE BUXBAUM:  Sure, as long as they're just exhibits,

2   that's fine.

3       MR. FRASER:  I'd like to put those -- they are the

4   exhibits that have been entered, and I'll have a few more

5   that we'd like to find out about, but I'm going to put those

6   in front of the witness if that's all right.

7       JUDGE BUXBAUM:  Sure.

8       MR. FRASER:  And I also need to take one moment.  I need

9   to back up and get a joint exhibit that is in the

10  sequestration room.

11      **JUDGE BUXBAUM:  All right, we'll go off the record.**

12  **(Off the record.)**

13      JUDGE BUXBAUM:  You may proceed, counsel.

14      MR. FRASER:  Great, thank you.

15  (Whereupon,

16                      **ROBERT PAUL VIAR, JR.**

17  was re-called as a witness by the Respondent and, having been

18  previously duly sworn, was examined and testified as

19  follows:)

20                      **DIRECT EXAMINATION**

21  Q.   BY MR. FRASER:  Good morning, Mr. Viar.

22  A.   Good morning.

23  Q.   Could you please state your name for us?

24  A.   Robert Paul Viar, Jr.

25  Q.   Spell your last name.

1    A.    V-i-a-r.

2    Q.    And just confirm for us who you work for.

3    A.    Douglas Autotech Corporation.

4    Q.    What does Douglas do?

5    A.    We are in the steering column and shifter business for

6    auto, truck, and heavy industry application.

7    Q.    And how many facilities does Douglas have in the U.S.?

8    A.    Two facilities, counsel, one in Michigan in Bronson and

9    one in Hopkinsville, Western Kentucky.

10    JUDGE BUXBAUM:  Douglas is a corporation?

11    THE WITNESS:  Yes, Your Honor.

12    JUDGE BUXBAUM:  Where is it incorporated?

13    THE WITNESS:  Delaware.

14    JUDGE BUXBAUM:  Delaware, okay.  And how old is it?

15    THE WITNESS:  100 years old.

16    JUDGE BUXBAUM:  100 years old?

17    THE WITNESS:  Yes, sir.

18    JUDGE BUXBAUM:  And I'm assuming I'd recognize some of

19    the cars and trucks whose steering is your product.  Can you

20    give me an idea of who, just out of curiosity?

21    THE WITNESS:  We do some Tier 1 and 2 tier work on the

22    auto side, Nissan, Toyota, Toyota Corolla, Nissan Ultima,

23    Nissan Quest, some Subaru products, Mitsubishi.  And on the

24    truck side, the whole catalog, PACCAR, International, Bendix

25    is a Tier 1 supplier.  We have agricultural applications,

1    John Deere.  We do some work for a snowmobile.

2        JUDGE BUXBAUM:  Okay, interesting.  I'm sorry,

3    Mr. Fraser.

4        MR. FRASER:  That's okay.

5        JUDGE BUXBAUM:  But the truth is, it does make it more

6    interesting to know something about the company, and I

7    appreciate the fact that you opened that up.

8        MR. FRASER:  That's okay.  It does.  I agree.

9    Q.   BY MR. FRASER:  Mr. Viar, can you tell us who the parent

10   corporation is?

11   A.   Fuji Kiko Company, Limited, in Japan, F-u-j-i, one word,

12   Kiko, K-i-k-o.

13   Q.   Great, thank you.  Tell me what your current position is

14   at Douglas.

15   A.   Director of Administration.

16   Q.   And how long have you been in that position?

17   A.   Approximately 15 or 16 months.

18   Q.   Okay, can you tell me all of your duties in that

19   position, please?

20   A.   I administer all of the Human Resources policies and

21   programs.  I have administrative responsibilities for our

22   JSOX, that's Japanese Sarbanes-Oxley Compliance, insurance

23   coverage, and I handle or manage all of the litigation and

24   legal work that comes in, the company contract review, a

25   number of responsibilities related to legal work.

1    Q.    Can you specifically give us some examples of the legal

2    work that you've been involved in?

3    A.    Counsel, I was on the job perhaps -- I've been there

4    five years in December.  The first month or so I was on the

5    job, the then president asked me to help the company prepare

6    and attend a facilitated mediation in Grand Rapids,

7    ironically, for an employment case.  I did that.  I served as

8    a legal advisor to the company in that case.  Soon after

9    that, I helped with a high dollar employment claim out of an

10   individual in Hopkinsville.  I attended depositions.  I met

11   with the judge.  I review contracts, provide advice to the

12   sales group, the purchasing group, looking at purchase order

13   language.  When we have litigation within the organization, I

14   manage and participate in the defense of the company.  That

15   might include drafting deposition questions.  Certainly, I

16   attend the depositions.  I suggest questions.  I help draft

17   the defense strategy for all of the litigation that we have.

18   We have unfortunately been subject to some recall campaigns,

19   three of them in the last five years.  I have managed that

20   process from compliance, through defense, through hiring

21   counsel, through working with counsel, through meeting with

22   the companies.

23        JUDGE BUXBAUM:  And by recall, you're talking about

24   product safety allegations?

25        THE WITNESS:  Product recall.

1        JUDGE BUXBAUM:  Yeah, okay.

2        THE WITNESS:  Yes.

3    Q    BY MR. FRASER:  Anything else you can think of?  That's

4    a fairly large description.

5    A.    No, I think that's -- well, you know, as it relates to

6    this particular dispute, I provide legal advice to the

7    organization, right.  I have advised senior management both

8    here and in Japan about what our exposure is, my sense of the

9    law, my understanding of risk and opportunity, the strength

10   of our case, weakness of our case.  I do that not only for

11   the commercial matters and the employment matters and the

12   insurance coverages, but also for the whole gamut of

13   employment law and this particular dispute.

14   Q.    By this particular dispute, you're talking about this

15   case?

16   A.    Yes, this case.

17   Q.    What about bargaining?

18   A.    And I was the chief company person in charge of

19   bargaining.  Two straight bargaining sessions beginning in

20   2005, we asked Bruce Lillie to help us, sort of a dual role

21   there.  But I am responsible for collective bargaining within

22   the organization.

23   Q.    Do you have a state bar card?

24   A.    I do.

25   Q.    Is it up to date?

1      JUDGE BUXBAUM:  And the state we're talking about is

2  Michigan?

3      THE WITNESS:  State of Michigan.  And I've been -- I'm

4  licensed to practice in Federal Court.

5  Q.   BY MR. FRASER:  In the state of Michigan?

6  A.   Yes.

7  Q.   In any other states?

8  A.   No.

9  Q.   I think you mentioned, but how long have you worked for

10  Douglas?

11  A.   About five years, and it will be five years in December.

12  I started December 20th, 2004.

13  Q.   And have you had any prior positions at Douglas?

14  A.   I was Human Resources Director up until when I got

15  promoted and got these additional duties back about 18 months

16  ago or 16 months ago, whenever it was.

17  Q.   Did you engage in private practice before you became an

18  employee at Douglas, private legal practice?

19  A.   Yes, yes.

20  Q.   When was that?

21  A.   I practiced law for approximately four years in private

22  practice.  I worked at an outfit called Vandaveer Garza (ph.)

23  in Detroit.  I then did corporate work for two employers, and

24  I've been working with the UAW in Human Resources roles since

25  about 1998.

1   Q.   At employers other than Douglas?

2   A.   Yes.

3   Q.   I think you've already given me your job description

4   currently.  How long were you an HR Director at Douglas?

5   A.   Two-and-a-half years, counsel.  I don't know what you

6   mean by job description.  I mean, I --

7   Q.   You've given me your duties, my mistake.

8   A.   Yeah, I mean, I don't have a job description.  I do what

9   the president asks me to do.  That's my job description.

10   Q.   Okay.

11   A.   And very often, he asks me, and this is -- I've had

12   three presidents now at Douglas.  They want help with the

13   legal work.  They want help with these Human Resources

14   issues.  They want help with these collective bargaining

15   issues.  And two of those presidents were Japanese guys, and

16   this is an area that requires a lot of work, and recently,

17   it's taken a lot of my time.

18   Q.   Okay, tell me which union is that at Douglas?  Which

19   union is it?

20   A.   UAW Local 822.

21   Q.   Okay, and have you been involved in collective

22   bargaining at Douglas?

23   A.   As I testified, counsel, when I started back in 2004, we

24   had the round of negotiations beginning that spring in 2005.

25   I had the same lead role for the company in negotiations in

1    2005 as I had in negotiations beginning in February or so in

2    2008.

3    Q.   Have you had other collective bargaining experience

4    other than Douglas?

5    A.   Yes.

6    Q.   Can you tell me what that is?

7    A.   I worked at Rouge Steel Company in the late '90s, now

8    SeverStal as a labor relations representative.  I had

9    collective bargaining responsibilities --

10       MR. McKNIGHT:  I'm sorry, I couldn't hear which company

11   he said.

12       JUDGE BUXBAUM:  Would you repeat the name of that

13   company?

14       MR. FRASER:  I think he said Rouge Steel now called --

15       THE WITNESS:  Rouge Steel, Ford Steel division, Rouge

16   Steel Company at Miller Road.  It's now a Russian-owned

17   company called SeverStal, S-e-v-e-r-S-t-a-l-l, whatever the

18   name, counsel, I worked there in 1997, 1998.  And I

19   handled -- we had a round of negotiations while I was there.

20   I worked in a research and bargaining role.  It really was my

21   first taste of collective bargaining, and I fell in love with

22   it, and I started that work then.  I had -- I helped

23   negotiate the first contract at my next job at Eagle Picher

24   Automotive, Hillsdale Tool Division.  It was the first

25   contract there.  I helped negotiate that.  I was at the

1  bargaining table.  And then at Batavia Transmission, later
2  Ford Motor Company in Batavia, Ohio.  I had a little less of
3  a role but did help a little bit with the local negotiations,
4  making proposals, discussing language.  And then my work at
5  Douglas.
6  Q.    Okay.  When did the most recent Douglas/UAW contract
7  expire?
8  A.    April 30th, 2008.
9  Q.    Okay, and I think you testified you were involved in the
10  Douglas 2008 negotiations?
11  A.    Yes.
12  Q.    Can you tell us just briefly the financial condition
13  that Douglas was in when 2008 negotiations began?
14  A.    We were in horrific financial shape, really bad
15  financial shape, going into the negotiations.
16  Q.    Can you put some numbers on that for us?
17  A.    If memory serves, we had lost approximately $35 million
18  over the previous two years.
19  Q.    Okay.
20  A.    Before the negotiations started late in 2008, we needed
21  a cash injection of in excess of $20 million from Fuji Kiko
22  to keep the organization.
23      JUDGE BUXBAUM:  You mean late 2007, don't you?
24      THE WITNESS:  I'm sorry, 2007, that's right, Your Honor.
25  Q.    BY MR. FRASER:  Did you share that information with the

1    Union?

2    A.    I did.    Through Mr. Kirk, we provided audited statements

3    from 2006 and 2005, I believe -- you have to clarify with

4    Mr. Kirk -- at least audited statements from 2006 and the

5    unaudited statements from 2007 to the auditors from the

6    International Union pursuant to an information request by the

7    Local Union.

8    Q.    Who was on, again just briefly -- I know we have a

9    stipulated document to this, but who was on the Douglas

10   bargaining team on or after May 1 of 2008?

11   A.    Myself, Glenn Kirk, Diane Hedgcock, my assistant Bruce

12   Lillie, counsel.    We had one session with Dan Cohen, lawyer.

13   Q.    He was a lawyer for who?

14   A.    A lawyer for Douglas, and I think that's it.

15   Q.    Okay, and again, did Douglas have a chief spokesperson

16   on or after May 1 of 2008?

17   A.    That duty was shared between Bruce and myself.

18   Q.    Bruce Lillie?

19   A.    Yes, Bruce Lillie and myself.

20   Q.    Okay.

21   A.    If there can be two chiefs, that's what we had.

22   Q.    Okay, and again, just of the four people you identified,

23   and we'll exclude Mr. Cohen for the time being, were there

24   duties assigned to any of them for bargaining, duties or

25   tasks?

1  A.   Yes.

2  Q.   Can you just take each person and describe the duties or

3  tasks assigned?

4  A.   My role was to coordinate our strategy and to get the

5  best deal that we could in order to survive.  That was my

6  role.  Bruce Lillie's role was to provide his sound business

7  judgment, his sound legal judgment on all of the issues that

8  presented themselves after May 1st, 2008, plus help me

9  implement the strategy.  As I testified, Mr. Kirk helped with

10 the financial implications of the proposals and demands but

11 also helped with the strategy.  It was really a partnership

12 between Glenn and myself thinking about our strategy and

13 trying to implement it.  And Diane's role, as it was, dating

14 back to 2005 --

15 Q.   Diane Hedgcock?

16 A.   I'm sorry, Diane Hedgcock's role was to take notes at

17 our joint sessions, right.  She wasn't there for all the

18 sidebars and conversations while smoking cigarettes and

19 discussions in the hallway, but when we got together, I had

20 directed her, and we had an operating pattern from 2005, that

21 when we met as a group, she took notes.

22 Q.   So again, tell me when you said joint sessions or met as

23 a group, who are you talking about meeting as a group?

24 A.   Well, what I'm talking about, counsel, is during the

25 negotiations process, while some of it occurred in sidebars

1   and in meeting rooms, the bulk of the work was when the two

2   bargaining teams got together.  That's the four of us who I

3   identified and then the representatives from the Local Union.

4   Late in the process, John Canzano, Phil Winkle, Mary Ellis,

5   Frank Gruza, Shannon Bevard, Chris Withington, Kevin Kolassa,

6   Pam Swanson, Gary Nettleman, and I may be missing one or two

7   in there, but nine people from the Local Union.

8   Q.   I think you may have missed Swift and Kegler.

9   A.   Oh, yeah, Ronda Kegler and Mike Swift.

10  Q.   Okay, so when those joint sessions occurred, that's when

11  Diane Hedgcock took notes?

12  A.   Yes.

13  Q.   Now, prior to May 1, 2008, where did Douglas conduct

14  negotiations, bargaining negotiations?

15  A.   Michigan Works in Coldwater, the unemployment office, we

16  had a conference room there.

17  Q.   Okay, and after May 1 of 2008, where did Douglas conduct

18  bargaining negotiations?

19  A.   Partly due to scheduling, but partly because so much had

20  changed after May 1, we met at the Hampton Inn in Coldwater

21  in a conference room.

22      JUDGE BUXBAUM:  What do you mean by so much had changed?

23      THE WITNESS:  After May 1, they were on strike.

24      JUDGE BUXBAUM:  But why would that influence where you

25  would meet?

1    THE WITNESS:  It was a completely new set of
2  circumstances.  I wanted to make sure that if the
3  negotiations were going to carry on, we would have a place to
4  stay.  There was better facilities for us.  I mean,
5  everything had changed.  I didn't want anything associated
6  with that Michigan Works anymore.  The world had changed.  We
7  communicated that to the Local Union, and part of that was
8  changing the scenery.
9  Q.    BY MR. FRASER:  And that was a judgment that you made
10  with your team?
11  A.    Yes.
12  Q.    And again, I don't want you to belabor this, but in
13  general, were there times set for negotiations on and after
14  May 1 of 2008?
15  A.    There were, counsel.  We met around 8:00 in the morning.
16  Now, we would not always meet as a group right at 8:00, but
17  we were scheduled to meet about 8:00, and we went into the
18  late afternoon, 4:30, 5:00.  We would break for lunch.
19  Q.    Okay, were there some times when you met just in the
20  evenings?
21  A.    Yes, late in the process, we met beginning at 6:00 a
22  couple of times, I think, because of scheduling constraints.
23  Q.    Okay, you've got some binders in front of you, and I'd
24  like you to look at Joint Exhibit 1.  It should be that small
25  binder, and perhaps you're right at the page that you need to

1  be currently.

2  A.   Yes.

3  Q.   Can you just take a look at that?  We stipulated to it,

4  but I want to ask you a few specific questions about it.

5  Just make sure you refresh your recollection on those dates,

6  please.

7  A.   Okay, I've seen this document before.

8  Q.   Okay, and you reviewed that in preparation for testimony

9  in this case?

10  A.   Yes.

11  Q.   I want you to look at the date, I believe -- I don't

12  have two copies, so I need to come up there.  Look at the

13  date of June 2, 2008, for me, please.

14  A.   Yes.

15  Q.   The one dispute that the parties have about that

16  document is related to who was there.  Can you tell me

17  whether you were at the June 2, 2008, bargaining session?

18  A.   One hundred percent, yes, I was there.

19  Q.   Okay, can you tell me your recollection of who was there

20  on behalf of the company?

21  A.   Diane Hedgcock, myself, and Bruce Lillie.

22  Q.   All right, and why do you -- I mean, how do you recall

23  that?

24  A.   I recall this because Mr. Kirk was furious about being

25  excluded from that meeting.  And we excluded him from that

1    meeting because that's what the Union requested.  I didn't

2    want to fight the issue.  I didn't care so much.  It was a

3    one-time request that he not go.  I didn't really delve into

4    why, where, who, when.  We had not met for a couple of weeks,

5    and I remember this because Glenn said that's the last time.

6    Q.   Glenn Kirk?

7    A.   I'm sorry, Glenn Kirk said that's the last time I'm

8    missing a session.

9    Q.   Okay, do you remember who from the Union asked that

10   Mr. Kirk not be there?

11   A.   No, I think it came from Phil Winkle through counsel,

12   Mr. Lillie, but I don't know.  Their request never went to

13   me.

14   Q.   Okay.

15       MR. CARLSON:  Excuse me.  I just wanted to note

16   something for the record.  I apologize.  I don't mean to

17   interrupt.  But Mr. Fraser raised an issue with respect to

18   this document that I didn't know was in dispute, and that's

19   with respect to Ms. Hedgcock, and I just want to make sure

20   Mr. Viar spoke correctly.  Is there an issue with whether or

21   not Ms. Hedgcock was at that meeting?

22       MR. McKNIGHT:  Look at that date again.  You said that

23   Ms. Hedgcock was there.  We stipulated that Ms. Hedgcock was

24   not there.  Do you recall?  From my understanding, she was

25   not there.

1      MR. CARLSON:  And I assume he misspoke.  I don't have

2  any other indication that she was there either.

3      THE WITNESS:  I -- okay.

4      JUDGE BUXBAUM:  Well, no, no, don't let them convince

5  you of something that --

6      THE WITNESS:  Look, I remember being there.

7      MR. CARLSON:  Okay, okay, fair enough.  I just wanted to

8  confirm that that was his recollection.

9      MR. FRASER:  Okay.

10      MR. CARLSON:  Thank you.  I apologize.

11      MR. McKNIGHT:  May I just have one second?  I just want

12  to look and see where I put that.

13      **JUDGE BUXBAUM:  All right, we'll go off the record for a**

14  **moment.**

15  **(Off the record.)**

16      MR. FRASER:  We're back on the record, Your Honor?

17      JUDGE BUXBAUM:  We are.

18  Q.  BY MR. FRASER:  Mr. Viar, we were talking about a

19  specific date, and I think we've worked through that.  In

20  general, how often did you take notes during bargaining from

21  May 1, 2008, forward?

22  A.  Very rarely.

23  Q.  Why is that?

24  A.  Because I had Diane there who I trusted implicitly to

25  get a clean record of what happened in the meeting.  So, I

1    wanted to focus on what I heard.  I wanted to keep my mind

2    clear.  After having done this for ten years or so, a lot of

3    what I'm trying to accomplish is based on reading tone of

4    voice and body language and things like that, just the

5    general give and take in negotiations, and I didn't want to

6    be encumbered by taking notes.

7    Q.    Did you miss any of the bargaining sessions that you can

8    recall from May 1, 2008, forward?

9    A.    Yes.

10   Q.    Do you remember which date that was?

11   A.    June 13th, 2008.

12   Q.    Okay, and again I don't want to belabor this next

13   question, but if you could briefly tell us, what was Douglas

14   trying to accomplish during the 2008 negotiations?

15   A.    From the beginning of the negotiations, we were trying

16   to get an agreement that would help us survive.  We had some

17   horrible financial results, and we needed concessions.  We

18   needed systematic across-the-board improvements on how we did

19   business in order to keep the doors open.

20   Q.    Okay.

21   A.    And I tried as best I could to communicate that to the

22   Local Union.  I tried as best I could to negotiate a package

23   that would help us keep the doors open.  I did that after I

24   learned the strike was illegal.

25   Q.    And again in general, what was the Union reaction to

 1    Douglas' proposals?

 2    A.    From the day we started negotiations until today, we

 3    reached a tiny tentative agreement on an administrative item

 4    of no consequence to anything.  And each and every time we

 5    sought out the Union's help in helping us survive, it was a

 6    barrage of no and different forms of no and equal and

 7    contemporaneous barrage of how stupid the company was.  That

 8    usually went in conjunction with no.  No, because the

 9    company's stupid.

10    Q.    Okay.  Did the Douglas UAW contract expire?

11    A.    Yes.

12    Q.    And again, I don't want to belabor this, but I'd like

13    you to briefly tell me the last two sessions before the

14    contract expired, do you remember any significant events that

15    occurred?

16         MR. CARLSON:  I'm going to object to this.

17         JUDGE BUXBAUM:  What's the relevance?

18         MR. FRASER:  Your Honor, it's preliminary to a number of

19    issues that are going to come up during bargaining.  It

20    relates to the good faith nature of what the client Douglas

21    was doing since Mr. Carlson, one of his premises is that we

22    bargained and tried to get them to capitulate to issues, and

23    because we couldn't get them to capitulate to issues, we

24    terminated them.  I think it clearly shows where we were on

25    those last two days as a preliminary to why we bargained in

1  good faith and where we tried to go.  It's going to be very

2  brief, Your Honor.

3     JUDGE BUXBAUM:  Well, I'll allow some of it.  I mean, my

4  concern here too, as I think is Mr. Carlson's, and I think

5  you're aware of it because you have been prefacing your

6  questions in a way that suggest to me that you are aware of

7  it, so I'm not -- there's no criticism implied here, is that

8  this is not a surface bargaining case.

9     MR. FRASER:  I understand.

10     JUDGE BUXBAUM:  So, I know there are issues about

11  certain specific things that happened in bargaining sessions

12  that I want you to explore fully because they are directly at

13  the heart of this case.  But I don't want us to turn it into

14  a surface bargaining case.

15     MR. FRASER:  Not going to surface bargaining at all,

16  Your Honor.

17     JUDGE BUXBAUM:  Not a problem.  You may proceed.

18  Q.   BY MR. FRASER:  Just very briefly, Mr. Viar, 4/29,

19  4/30/2008, any significant events occur those two days?

20  A.   There were two significant events from the 29th and the

21  28th and the 29th and 30th in the bargaining.  I'll take them

22  in order.  On the morning of the 28th, our company president

23  Q-san attended a bargaining session, a previously scheduled

24  bargaining session to ask for an extension of the agreement,

25  meaning some more time for us to continue talking under the

1    old terms of the contract.  Q-san, as I recall, spoke for

2    approximately fifteen minutes and, at the end of that, asked

3    for more time.  I remember, and you asked significant, I

4    remember this is significant for me and the organization,

5    Mr. Winkle rose up in his chair and shouted 1941 at the

6    Japanese president.  I took this to mean a deliberate racial

7    slur.  So did the president.  And we very soon after that

8    exited that meeting.

9    Q.    Was the extension request granted?

10   A.    No.

11   Q.    Next day, anything significant happen?

12   A.    Yes, very, very concerned that the president had failed

13   in his effort to get an extension, the CEO, Mr. Hasegawa, CEO

14   of Douglas, Chairman of the Board, came to the next scheduled

15   session, asked for an extension I believe of for 6 months,

16   then 60 days, and then 19 days.

17        MR. McKNIGHT:  Objection.  I'd like to interject here.

18   We started off -- and I would actually make a motion to

19   strike here.  We don't have and have not subpoenaed, in fact

20   at the agreement of the parties and at your suggestion,

21   bargaining materials from dates prior to May 1, 2008.  And

22   frankly, we're really in no position to litigate and test the

23   truth at all of what Mr. Viar has to say, which I think is

24   frankly not at all truthful, but that's not the point.

25        JUDGE BUXBAUM:  Well, of course, that's not.  I mean,

1   your opinion of it isn't relevant.

2        MR. McKNIGHT:  The point is that it's irrelevant, and I

3   move that this testimony be struck.

4        MR. CARLSON:  And I would make the same objection.  It

5   is irrelevant, and it is going beyond preliminaries with

6   respect to where the parties were at in bargaining a

7   contract.  This is things that were shouted back or

8   allegations of things that were said and representations of

9   what they meant of things that were said at the bargaining

10  table that really seem to have very little to do with the

11  positions of the parties with respect to reaching a contract

12  and where they were in terms of that.  This is far beyond

13  that.  And we did make a specific agreement to limit this.

14       JUDGE BUXBAUM:  Well, even if it were related to

15  reaching a contract, why do I care, Mr. Fraser?  What does

16  this have to do with the issues before me?

17       MR. FRASER:  Your Honor, I suppose if General Counsel

18  will withdraw their argument that somehow we are trying to

19  force the Union to capitulate to our evil terms and

20  conditions, which is one of their theories, and we're simply

21  trying to produce evidence which shows not only did we not

22  try to get anyone to capitulate to anything, we offered to

23  extend the terms and conditions as they were previously, and

24  the Union declined to do that on multiple occasions.  I think

25  it's clearly relevant.  Secondly, Your Honor, I made some

1    foundational objections related to Mr. McKnight --

2        JUDGE BUXBAUM:  Well, hold on, Mr. Fraser.  I'm going to

3    permit it.  You've persuaded me.  And certainly,

4    Mr. McKnight, as to the argument that you're somehow helpless

5    to defend against it, I mean, Mr. Winkle is sitting right

6    behind you.  I don't want to have a side trial on a

7    peripheral issue, but the idea that you're helpless to defend

8    against this testimony doesn't cut any ice.

9        MR. McKNIGHT:  It's not -- I just want to make a record.

10    We started off with that premise that we were going to limit

11    this to May 1, 2008, forward.  And no, we are certainly

12    significantly handicapped in making a record on that and

13    testing what this witness has to say, and it's outside the

14    premise of the whole scope of what we were allowed to

15    subpoena in this case.

16        JUDGE BUXBAUM:  Well, I disagree with you, Mr. McKnight.

17    I'll permit it, but, Mr. Fraser, let's not go much further,

18    all right.

19        MR. FRASER:  I'm almost finished, Your Honor.

20    Q.    BY MR. FRASER:  So, Mr. Viar, just to try and conclude

21    here, was there an agreement to extend the contract on that

22    last day of negotiations?

23    A.    No.

24    Q.    Okay, when did you learn of the strike?

25    A.    In my office midnight on April 30th, I got a letter

1   from -- I don't remember who handed it to me, maybe

2   Mr. Winkle.

3   Q.   Let me back you up and make sure that we do this in the

4   sequential order the best way you can.  So, where were you

5   just prior to midnight on April 30th, 2008?

6   A.   In my office.

7   Q.   Okay, and where is your office?

8   A.   In Bronson, Michigan, at the plant.

9   Q.   Okay, and you're there.  What happens next?

10  A.   Frank Gruza, Mary Ellis, and Phil Winkle come to my

11  office, which was open, and handed me a letter telling me

12  that they were going on strike.

13  Q.   Okay.

14  A.   As I said, I don't recall who handed it to me.

15  Q.   Before we look at that letter a minute, why were you

16  there at midnight on April 30th, 2008?

17  A.   I was holding out hope that we were going to get a call

18  to continue talking or extend the agreement.  And I had to

19  prepare for the very real possibility of a walkout that night

20  at midnight.

21  Q.   Okay, you have a book of exhibits in front of you.  It's

22  the book on your left, not the one you have opened right now,

23  and I'd like you to look at what's Tab number 6, General

24  Counsel's Exhibit No. 6.  Can you look at that for me for a

25  minute?

1   A.   Okay.

2   Q.   Have you seen that document before?

3   A.   Yes, it's the --

4   Q.   Hang on, Paul.  I want to make sure everybody's got that

5   document in front of them.

6        MR. FRASER:  We're okay?

7   Q.   BY MR. FRASER:  Okay, good.  Go ahead, Paul.  What is

8   General Counsel's 6?

9   A.   It's the strike letter I referenced a few moments ago.

10  Q.   Okay, now, I interrupted you when you were telling me

11  about what happened.  Do you recall who handed that to you?

12       JUDGE BUXBAUM:  He already said he didn't, counsel.

13       THE WITNESS:  I don't.  I'm sorry.

14  Q.   BY MR. FRASER:  Then tell me what happens next.  Any

15  discussion between you and Gruza, Ellis, and Winkle?

16  A.   No, I may have asked Frank Gruza to go around the plant

17  and turn some lights off, and he said yes.  I don't remember

18  anything else.

19  Q.   Okay.  Describe your office for me, please, just

20  briefly, particularly whether there's a window in it.

21  A.   Yeah, there's a window in it.  It's about 8 by 12

22  office.

23       MR. McKNIGHT:  Objection.  It's irrelevant.

24       JUDGE BUXBAUM:  It certainly sounds it, Mr. --

25       MR. FRASER:  But it's not irrelevant, Your Honor,

1    because I'm going to ask him next as a foundational matter --

2    that's what I'm laying the foundation for, whether he looked

3    out his window and what he saw.

4        JUDGE BUXBAUM:  Well, that doesn't tell me much, but on

5    your representation that it's foundational, I'll permit it.

6        MR. FRASER:  I think that he already answered the

7    question.  He has a window.

8        JUDGE BUXBAUM:  Well, he answered the part you weren't

9    getting at, I think, that he had a window.

10       MR. FRASER:  All right.

11       THE WITNESS:  I looked out the window soon after they

12   exited -- they, Frank, Mary, and Phil.  I looked out the

13   window, and my office is about 100 yards or so, maybe less,

14   from the street.  And I saw some people.  It was dark.  It

15   was midnight.  I saw some people outside with signs.  I

16   couldn't see what they said.  There were some people out

17   there, maybe 20 or 30.  I don't recall how many.

18   Q.   BY MR. FRASER:  What did you do next after you received

19   this strike notice?

20   A.   I phoned the company president and let him know that the

21   Union had gone on strike.  I phoned Glenn Kirk and let him

22   know that the Union had gone on strike, and I prepared a

23   phone message, a call-in message, and then started thinking

24   about, you know, mapping out in my head how we were going to

25   start making parts the next day with the salary group.  And I

1    was very concerned about safety.  I went over some safety

2    issues.  I started thinking about that.  I talked with

3    security group.  They were already there -- a number of

4    things.

5    Q.   Okay, did you want the Union to go on strike?

6    A.   Absolutely not, never, no.

7    Q.   Why not?

8    A.   Because I was afraid it would kill us if they did.

9    Q.   Okay, did you operate the Douglas Bronson facility

10   during the strike?

11   A.   Yes.

12   Q.   And how did you operate that facility?

13   A.   The first thing we did was, on the morning of May 1st,

14   assign the salary group to the floor.  We moved the clerks

15   and engineers and quality people, everyone we had onto the

16   floor, to start making parts, training them and then making

17   parts.

18   Q.   Okay, what else did you do?

19   A.   Then I immediately began recruiting that day replacement

20   work force.  I traveled to Trillium Staffing that day and

21   started interviewing replacement candidates.  We really had

22   four separate sources of people seeking work or working in

23   the factory.  First, as I mentioned, the people who were

24   working in the salary ranks.

25   Q.   Okay.

 1   A.    Second was we had referrals from that group, family

 2   members, friends, who wanted to work.  We had local

 3   candidates simply appear at the plant and apply for work.

 4   Then plus -- I think that's four, plus the employment agency.

 5   Q.    Okay, in front of you, if you'd look at General Counsel

 6   Exhibit 48, please.

 7   A.    Yes.

 8   Q.    My question to you is, and maybe General Counsel Exhibit

 9   48 will help you, did you know how many bargaining unit

10   members there were at Douglas on April 30th, 2008?

11   A.    Counsel, if memory serves, approximately 145, 115 of

12   which were active or working on April 30th, 2008, and the

13   rest of which were laid off.

14   Q.    Okay, and those would be considered inactive?

15   A.    Laid off, inactive, yeah.

16         JUDGE BUXBAUM:  Laid off?  Weren't there also a couple

17   that were in other statuses, sick leave, workers' comp?

18         THE WITNESS:  You know, the way we categorized it on

19   this exhibit, Your Honor, is we had the sick leave people in

20   the active group.

21         JUDGE BUXBAUM:  Okay, all right.

22         THE WITNESS:  Right, the comp person, the sick leave.

23   You know, we had Dusty Modert, for example, is on this list,

24   on this exhibit as WC 10/14/05.  She's on the active list.

25         JUDGE BUXBAUM:  So, your figure of 145 includes

```
 1   everybody, including people on sick leave and workers' comp?
 2        THE WITNESS:  Yes.
 3        JUDGE BUXBAUM:  Okay, but the 115 figure only includes
 4   people who were actually -- who weren't on sick leave,
 5   weren't on workers' comp, weren't laid off?
 6        THE WITNESS:  I'm sorry, Your Honor.  It's confusing the
 7   way we did it.
 8        JUDGE BUXBAUM:  Well, it's fine, as long as I -- I just
 9   want to make sure I understand it.
10        THE WITNESS:  Yeah, it is what it is.
11        JUDGE BUXBAUM:  But am I right that that 115 --
12        THE WITNESS:  No.
13        JUDGE BUXBAUM:  No, okay.  What's the 115?
14        THE WITNESS:  The laid off people is approximately 30.
15   That's on one list.
16        JUDGE BUXBAUM:  Okay.
17        THE WITNESS:  On the list of 115 are the people who are
18   on sick leave, the people who were on workers' comp, I think
19   that's one.  We have one open leave, two open sick leaves,
20   plus the people who were working.
21        JUDGE BUXBAUM:  Okay, all right, so the 30, in other
22   words, 115 plus 30 on layoff equals 145.
23        THE WITNESS:  145.
24        JUDGE BUXBAUM:  Got it.  Thank you.
25   Q.  BY MR. FRASER:  How long did the UAW -- well, let me ask
```

1    it a different way.  Between May 1 and May 4, did you have

2    any direct contact from the UAW related to the strike?

3    A.    No.

4    Q.    Were you contacted by anyone on May 5, 2008, related to

5    the strike, anyone from the UAW?

6    A.    Mr. Winkle attempted to contact me.  We never spoke

7    until late in that evening, 6:00 or so on May 5.

8    Q.    Okay, I want to ask you some more questions about that,

9    but before I do, I want to direct your attention to a

10   different topic.  On January 1 of 2008 -- and again I don't

11   want anyone freaking out yet.  It's a very simple question.

12   Can you tell me what your hiring process was for new

13   employees?

14   A.    Yes, we had a sign on the front of the facility

15   directing applicants for employment to go to Michigan Works

16   and fill out an application.  So, in the event that we didn't

17   have somebody on layoff to call back, and we had an opening,

18   Michigan Works HRDI would take an application.  They would

19   talk to the people.  Diane would phone her contacts at

20   Michigan Works, and then we would interview the people from

21   Michigan Works.  We also took -- we had college kids who

22   worked in the factory.  They did not typically go through

23   Michigan Works for summer.  We would take referrals from time

24   to time, but our chief way of recruiting was through Michigan

25   Works.  And the process was when we had an opening, Diane

626

1    would phone them.  The people would come in.  We would talk
2    to them, and then Diane in turn, if we had an opening, we had
3    a candidate who fit the opening, Diane would direct them when
4    to show up, typically on second shift.
5    Q.    Okay, now, in prior testimony in this case, you've
6    talked about direct and indirect labor, so I want to use the
7    terms that have been defined by you in this proceeding
8    regarding direct and indirect labor.  After the strike began,
9    how many employees in direct and indirect, how many employees
10   were operating the facility at Douglas Bronson?
11        MR. McKNIGHT:  Objection.  It's irrelevant.
12        JUDGE BUXBAUM:  I'm not sure.  I'm going to allow it.
13        THE WITNESS:  It changed from time to time, counsel, but
14   we ran the factory with approximately 60 people, and then
15   it's much lower now with about the same in sales.
16   Q.    BY MR. FRASER:  Okay, and what is it now?
17   A.    42 or 44 people, indirect and direct.
18   Q.    Between May 1 and May 5, 2008, how often were you at the
19   Bronson facility?
20   A.    I don't think I left for more than a few hours.  I was
21   there nearly around the clock.
22   Q.    Okay, so before we went into this little offshoot of our
23   testimony, you were talking about Mr. Winkle attempted to
24   contact you on May 5.  Tell me what happened, what you
25   recall.

1  A.    The security guard contacted me by phone.

2  Q.    Do you remember when that was, what time of the day?

3  A.    Early morning May 5th, 6:30 or so.

4  Q.    Okay.

5  A.    And he told me that someone -- I don't know -- someone

6  from the Union, is how he explained it, wanted to talk to me

7  and hand me some papers, is what he said.

8  Q.    What happens next?

9  A.    I told the guard that I was not going to take any papers

10  from anybody, that I was very, very busy.  And he conveyed

11  that message to whoever it was.  I know now that it was

12  Mr. Winkle.

13  Q.    Okay, how do you know that?

14  A.    Just through the course of the case and by what happened

15  later.

16  Q.    Okay, so --

17  A.    And by nature of a phone mail message that I received

18  soon after the security guard comment or question.

19  Q.    So, on May 5 you got a phone mail message?

20  A.    Yes, on my office --

21  Q.    What -- from whom and what was said?

22  A.    It was about the same time frame, maybe before 7:00 or

23  so on that Monday.  It was from Mr. Winkle.  And if memory

24  serves, the message said Paul, it's Phil Winkle.  You're in

25  violation of the Act by not meeting with me.  I need to talk

```
 1  to you, words to that effect.  I don't remember 100 percent.

 2  Q.   Okay, did you talk to Mr. Winkle that morning?

 3  A.   No, I immediately, as Phil knew, during the course of

 4  our negotiations, contacts like this typically went through

 5  counsel.

 6  Q.   Who was counsel?

 7  A.   Bruce Lillie.

 8  Q.   Okay.

 9  A.   And I phoned Bruce soon after I heard that message.  I

10  talked to Glenn Kirk about it.  I called the lawyer and asked

11  him to contact Phil and find out what was going on.

12  Q.   Again, you said lawyer, and I want to make sure the

13  record is clear.  Which lawyer?

14  A.   I contacted Bruce Lillie by phone.

15  Q.   Okay.  Did you have any contact with the Union any part

16  of the rest of that day, May 5, 2008?

17  A.   We did, and here in these -- not here.  We're in Grand

18  Rapids.  In East Lansing.

19  Q.   Okay, so tell me between the time that these

20  conversations between you and Mr. Kirk and Mr. Lillie occur,

21  what happens the rest of that day to get that meeting?

22  A.   Well, it was funny, because as Glenn Kirk and I were

23  trying to digest this thing that had happened, I had -- while

24  I had never been through a strike before, I was shocked that

25  we had this request to talk.  I couldn't believe it.  It came
```

1    as a bolt out of the blue, and I was trying to decipher what
2    all this meant with Mr. Kirk in his office.   And I
3    remember -- I don't know who it was -- someone from the
4    salaried staff, have you noticed that the signs have changed.
5    Q.   What signs are you referring to?
6    A.   Well, I didn't know what he was talking about.   I
7    assumed the picket signs because there were pickets out at
8    that point.   And I looked out the window, and the pickets
9    said UAW locked out.
10   Q.   Do you remember about what time that was?
11   A.   It was about 9:00 a.m.
12   Q.   Okay, had you had any conversation with Mr. Winkle or
13   anyone from the Union indicating that sentiment?
14   A.   No.
15   Q.   All right, so what happens next?
16   A.   We got a recall, counsel.   This was the first Monday
17   after the strike.   I had a hell of a lot on my plate.   I went
18   into the factory.   I had to make sure, as was my job, make
19   sure people were safe.   I made sure we were still making
20   parts.   I talked to the management group.   I was working with
21   Mr. Kirk.   We started getting ready for what was in front of
22   us, which we didn't know what it was.   We were still
23   speculating at what all this meant.   We talked with Bruce
24   Lillie at length during that day two or three times.   And
25   Bruce told us that -- Bruce Lillie told us that we had set up

1  a meeting.  The Union had requested, or we had requested, I

2  don't remember which, a meeting in East Lansing that evening

3  at 6:00.

4  Q.   So, that evening being which date?

5  A.   May 5th, 2008, and this was my first mention, first

6  hearing of unconditional offer to return or offer to return

7  that I got through Mr. Lillie.

8  Q.   Okay, I want to have you look at the binder again in

9  front of you.  This time, turn to Tab 7, if you would,

10  General Counsel Exhibit 7.  Do you have that in front of you?

11  A.   Yes.

12  Q.   Okay, now, I want you to listen to this question very

13  carefully.  Do you recall whether you received that document,

14  GC-7 from anyone prior to the meeting you had with the Union

15  on 5/5?

16  A.   I don't remember when I got this, counsel.  I think that

17  I got it --

18       MR. McKNIGHT:  Objection.

19       JUDGE BUXBAUM:  Basis?

20       MR. McKNIGHT:  He doesn't remember.

21       JUDGE BUXBAUM:  I'll let him finish his answer.

22       THE WITNESS:  I think I got it late in the day on May

23  5th at the meeting in East Lansing.

24  Q.   BY MR. FRASER:  Okay, so tell me then about that

25  meeting.  And again, I want you to be as specific as you can

1    about the sequence of events, who's there, what's said.

2        JUDGE BUXBAUM:  Well, can I back up for a moment,

3    Mr. Fraser?  You said something about the first time you

4    heard unconditional offer to return to work was from

5    Mr. Lillie?

6        THE WITNESS:  Yes.

7        JUDGE BUXBAUM:  What do you mean by that?  Tell me how

8    that came about.  What did Mr. Lillie say?

9        THE WITNESS:  As I recall it, Bruce said something about

10   Phil wants to come back to work, something like that.

11       JUDGE BUXBAUM:  Okay, that's what I needed to

12   understand.  Thank you.  In other words, it wasn't Mr. Lillie

13   sort of guessing that maybe they want to make an

14   unconditional offer?

15       THE WITNESS:  Oh, no, no, it was that, counsel.  Phil --

16   Bruce -- Judge, I'm sorry.  Judge, Bruce was unclear.  He

17   didn't know what -- I mean, as I recall it, Bruce said maybe

18   the UAW wants to come back to work.  They want to come back

19   to work.  Let's talk about it.  Let's give them the

20   conditions.  We were batting all of this around, and this was

21   a year-and-a-half ago, and I --

22       JUDGE BUXBAUM:  But did he indicate to you that he had

23   some -- I mean, why did he think maybe they wanted to return

24   to work?

25       THE WITNESS:  They had spoken on the phone.

1        JUDGE BUXBAUM:  Who's they?

2        THE WITNESS:  Bruce Lillie and Phil Winkle.

3        JUDGE BUXBAUM:  Okay, that's what I was trying to

4    understand.

5        THE WITNESS:  Yes, they had spoken on the phone, and I

6    was not present for that conversation.  They spoke on the

7    phone I know the morning before noon on May 5th.  They spoke

8    on the phone.

9        JUDGE BUXBAUM:  Okay, Mr. Fraser.  I'm sorry.

10       MR. FRASER:  That's okay.

11   Q.   BY MR. FRASER:  So, we are back at May 5th.  You

12   testified there was a meeting.  I think you already testified

13   it's in East Lansing.  Why are you in East Lansing?

14   A.   We needed Bruce's help.

15   Q.   Again, I'm going to try to make sure --

16   A.   I'll refer to him as Mr. Lillie.  We needed Mr. Lillie's

17   help with this meeting.  And Mr. Lillie had a previous

18   engagement that day and could not get out to our regular

19   meeting place.  He was tied up all day with a prior

20   commitment.  So, we met the soonest we possibly could and in

21   the most efficient place to meet, which was in East Lansing

22   where Bruce Lillie was.

23   Q.   Do you remember about what time that meeting was

24   scheduled to take place?

25   A.   Glenn and I got out there about 5:30, 5:15, and we met

1   probably around 6:30.  So, --

2   Q.   When you say we met, you met with whom?

3   A.   I met first with -- Mr. Kirk and I met with Mr. Lillie

4   probably around 5:30 and talked for 45 minutes or so.

5   Q.   Okay.

6   A.   And then I think soon after that, we met -- we, the

7   three of us, Lillie, Kirk, and myself, met with the

8   bargaining team, as I have outlined it before, the nine

9   members of the bargaining team and Mr. Winkle, in a

10  conference room.

11  Q.   Okay, so I want you to tell me, you're now in the

12  conference room, what happens in order of sequence the best

13  you can recall?

14  A.   As I recall it, Bruce Lillie, Mr. Lillie, opened the

15  meeting by saying this is an unfortunate time.  Sorry we have

16  to meet like this.  He very pointedly said we're not waiving

17  any of our rights or remedies in meeting with you.  And then

18  we began talking about this unconditional offer to return

19  idea.

20  Q.   Okay.

21  A.   At that point, the chronology is a bit fuzzy to me, but

22  we provided -- and this was part of what I was working on

23  with Bruce Lillie and Glenn Kirk, was return-to-work

24  conditions.

25  Q.   Let me hold you up there.

1  A.    Go ahead.

2  Q.    Because I'm going to show you an exhibit in a second,

3  but let me -- I've got two other questions I want to ask you.

4  Did you have any conversations with Phil Winkle from May 1,

5  2008, through May 5, up to the point when this meeting

6  started?

7  A.    No.

8  Q.    And did you have any conversations with any UAW

9  committee member from May 1, 2008, up to the point when this

10  meeting started on May 5?

11        MR. McKNIGHT:  Objection, leading.

12        JUDGE BUXBAUM:  No, it's not.  Why is it leading?

13        MR. McKNIGHT:  I withdraw the objection.

14        JUDGE BUXBAUM:  Thank you.

15        THE WITNESS:  No.

16  Q.    BY MR. FRASER:  All right, so, you were telling me --

17  you were beginning to tell me about this meeting.  I want to

18  show you, if you can turn to General Counsel Exhibit No. 8

19  for me, please.

20  A.    Okay.

21  Q.    And I want to make sure you look at all the pages there.

22  A.    Um-hmm.

23  Q.    Have you seen that before?

24  A.    I have.

25  Q.    Tell me what happens as this meeting continues on May 5,

1    2008, with the Union.

2    A.   I handed this letter with the return-to-work conditions

3    on it to Mr. Winkle.  I think -- no, I remember exactly, we

4    maybe spent a couple or five minutes in there sort of looking

5    at each other while they leafed through the document.

6    Q.   When you say they leafed through the document --

7    A.   The Local Union.

8    Q.   Okay, did you provide a copy of this for each member?

9    A.   I think so, yes.

10   Q.   Okay, and do you recall handing it out?

11   A.   No, no, I mean, it was either Bruce or myself.  I don't

12   remember.

13   Q.   Okay, that's fine.  What happens then?

14   A.   We took a short caucus at the Union's request.  They

15   wanted some time to look at what had been presented to them,

16   and we did that.

17   Q.   Okay, do you have any recollection of how long that

18   caucus was?

19   A.   It was probably about 20 minutes to a half-an-hour.

20   Q.   Okay, I want you to be as specific as you can about when

21   this document was handed out, whether it was by you or

22   Mr. Lillie, did you say anything to the Union as this was

23   handed out regarding the document?

24   A.   I don't believe so.

25   Q.   Did Mr. Lillie say anything to the Union regarding the

1  document?

2  A.   Yes.

3  Q.   Can you tell me what you recall him saying?

4  A.   He said the bargaining unit is locked-out.  These are

5  the terms and conditions for your return to work.  They're

6  attached.

7  Q.   Okay, did the Union make any response?

8  A.   They asked for a few minutes to look at the document.

9  Q.   When you say they, who asked?

10  A.   Phil Winkle did, as I recall it.

11  Q.   Okay.

12  A.   And then committed to give us an answer tomorrow.

13  Q.   Okay, what did you understand tomorrow to mean?

14  A.    I understood that we would get an answer whether they

15  were coming back to work on these provisions that we had

16  provided that evening the next day, May 6th.  We would get

17  answer on whether they were coming back to work as we

18  outlined the conditions to come back to work.

19  Q.   Okay, do you remember when General Counsel Exhibit 8 was

20  prepared?

21  A.   We prepared it that day.

22  Q.   All right, when you say we, who are you talking about?

23  A.   Bruce Lillie, Glenn Kirk, and myself.

24  Q.   Okay.  When you met with the Union on May 5, did you

25  know the strike was illegal?

1  A.   No.

2  Q.   When you met with the Union on May 5, did you have any

3  suspicion about whether the strike was illegal?

4  A.   Well, I got tied up yesterday in surmise, so I

5  suspected, surmised, that something was very wrong, yes.

6  Q.   What were those things that you suspected or surmised

7  could be wrong?

8  A.   Because Bruce Lillie had raised the possibility with me,

9  and we had had a discussion that day about a mediator not

10  being involved in any of our discussions, I suspected that

11  the strike was illegal and that the F-7 notices had not been

12  filed.

13      JUDGE BUXBAUM:  So, when you say because a mediator was

14  not involved, am I understanding correctly that what you're

15  saying is that the FMCS had not contacted the company and

16  said we've got a mediator that we'd like to make available,

17  something like that?

18      THE WITNESS:  Judge, it dawned on me as I was sitting

19  there on the 5th, where is the mediator.

20      JUDGE BUXBAUM:  And just to flush it out, I mean, the

21  reason that dawned on you was because what, in the ordinary

22  course, what did you think would happen?

23      THE WITNESS:  Yes, in the ordinary course of my

24  negotiations, at least at Hillsdale Tool, we had a mediator

25  there at the end.  And it dawned on me that we had not

1  been -- I had not been contacted.  Where is the mediator?

2  Which I didn't know exactly what it meant at that point.  It

3  just -- it was fishy.  Where's the mediator?  Oh, yeah,

4  where's the mediator?  Like that.

5  Q.  BY MR. FRASER:  Okay, I want to be real careful about

6  this question because I don't want you to get into bargaining

7  strategy or attorney-client privilege, but when you met with

8  Mr. Kirk and Mr. Lillie prior to that session with the Union

9  on 5/5, were there any other generic subjects that were

10 discussed that you can recall?

11     JUDGE BUXBAUM:  Other than what?

12 Q.  BY MR. FRASER:  Well, any other generic subjects other

13 than potential F-7 illegal strike that related to why the

14 Union might be asking to come back to work?

15 A.  I can't recall, counsel.

16 Q.  Okay, that's fine.  I'd like you to look at General

17 Counsel's Exhibit No. 9, so it's Tab 9 of that binder in

18 front of you, please.  Let me ask you a question before that.

19 After the caucus took place, what happened in that 5/5/08

20 meeting?

21 A.  We reconvened in the conference room.

22 Q.  Okay.

23 A.  And, as I testified, Mr. Winkle said we'll let you know

24 tomorrow whether these terms and conditions are acceptable.

25 Q.  Okay.

1      MR. FRASER:  Your Honor, I'd like to ask for a two

2  minute break, and I'd like to ask the witness to leave the

3  room while I ask a legal question here before I ask my next

4  question, because I want to make sure I do this the right

5  way.

6      JUDGE BUXBAUM:  In other words, you want to have a

7  sidebar, except --

8      MR. FRASER:  Yes.

9      JUDGE BUXBAUM:  Sure, I don't have any problem with

10  that.  Does anybody have any problem with -- in other words,

11  it will be on the record.

12      MR. FRASER:  Yes, please, on the record but without the

13  witness being here.

14      JUDGE BUXBAUM:  Sure.  Mr. Viar, would you please step

15  outside the courtroom.  Don't discuss your testimony, of

16  course, while you're out.  All right, he's left the room.

17      MR. FRASER:  So, Your Honor, my issue right now is I

18  would like to ask Mr. Viar some responses to rebuttal

19  questions without having to wait to call him twice.  I mean,

20  do you want to do it now?

21      JUDGE BUXBAUM:  Well, I certainly sympathize with that

22  desire.

23      MR. FRASER:  I'd like to do it now.  And in order to ask

24  him those questions, I need to identify for him what it was

25  that another witness said.  He's been here, and he's heard

1  it.  This is the same protocol I'd like to use for other

2  witnesses, so my intention would be, and I just want to make

3  sure that I'm not raising any ethical or other issues, would

4  be to say to this witness there's been testimony in this case

5  that X witness said this occurred at the meeting.  Do you

6  recall being there?  Do you recall hearing that?  And I'm

7  just looking for -- again, I don't want to start down that

8  road.  I'd rather have the objections raised now to formulate

9  the basis on which to raise that issue.

10      JUDGE BUXBAUM:  Well, let me say this.  And nothing in

11  our discussion should be interpreted, at least from me, as

12  meaning that I would not want to hear objections if there is

13  some reason to object to a question if this occurs.  With

14  that statement having been made, I like the idea of avoiding

15  some rebuttal.  Do either of you see any overall philosophic

16  problem with doing that while retaining the right to make

17  specific objections?

18      MR. McKNIGHT:  I don't think I understand.  They're

19  putting on a defense, and he's going to have his witnesses

20  react to the General Counsel's case.  That seems fine to me.

21  It seems appropriate what you would do as defense counsel,

22  but I'm certainly going to object to leading questions.  I

23  still think he needs to examine the witness as his witness.

24  So, you know, there's a little bit of a gray area.  So, if

25  he's going to ask his witnesses to respond to the General

 1    Counsel's case, I think that's what he's here for, and I

 2    understand that.   But I, you know, I will certainly reserve

 3    the right, as you said, object to the form of the question.

 4        JUDGE BUXBAUM:   I mean obviously, Mr. Fraser, you're not

 5    going to ask, and lawyers sometimes do, you heard Mr. Smith

 6    testify that the car was yellow.   Was Mr. Smith lying?

 7    You're not going to do that.

 8        MR. FRASER:   No, my specific question in this instance

 9    will be Mr. Winkle testified that Bruce Lillie indicated in

10    response to Mr. Winkle's question, are these the terms and

11    conditions that you want us to return on, no, absolutely not.

12    Were you at that meeting?   Did that in fact occur?

13        MR. McKNIGHT:   I think that is leading.

14        JUDGE BUXBAUM:   Yeah, it is leading.   It is leading.

15        MR. CARLSON:   I think it is too.   I think you're

16    repeating what was said.

17        MR. FRASER:   That's why I'm raising --

18        MR. McKNIGHT:   No, was there any discussion of this?

19        MR. FRASER:   That's why I'm raising the issue now to

20    make sure we --

21        MR. McKNIGHT:   That is not -- I mean, never mind.   It's

22    done.

23        JUDGE BUXBAUM:   It's leading.   It's leading.   Yeah, you

24    can't -- I mean, he is your witness, so you can't --

25        MR. FRASER:   I'll call him back.

1    JUDGE BUXBAUM:  All right, we're still on the record,

2  and Mr. Viar has resumed the witness stand.  And, Mr. Fraser,

3  you may proceed.

4    MR. FRASER:  Great.  Thank you.

5  Q.  BY MR. FRASER:  Mr. Viar, I think you testified -- I

6  think you were testifying as to how this meeting on May 5,

7  2008, concluded, but because my memory is so bad, I don't

8  recall whether you indicated how it ended.  Could you just

9  recount how this session on May 5 ends?

10    MR. McKNIGHT:  Objection, asked and answered.

11    JUDGE BUXBAUM:  I'll allow it because I don't remember

12  it either, counsel.  I guess my memory is the same as

13  Mr. Fraser's.

14    THE WITNESS:  Your Honor, counsel, it was a very

15  emotional meeting.  I remember Mr. Lillie being very

16  emotional, very pointed.  You know, he advised the Local

17  Union that we thought that the strike was illegal.  We had

18  not waived any rights.  We had provided some terms and

19  conditions for them to come back to work.  The Local Union

20  indicated through Mr. Winkle that they would let us know the

21  next day, and then that was it.

22  Q.  BY MR. FRASER:  Okay, the parties dispersed?

23  A.  Yes.

24  Q.  Okay, now, look at again General Counsel Exhibit No. 9,

25  please.

1    A.    Yes.

2    Q.    Do you remember receiving a copy of that?

3    A.    Yeah.

4    Q.    Do you remember how you received it?

5    A.    No, probably by fax, but I don't know.

6    Q.    Okay, did you have any other communication from

7    Mr. Winkle on May 6th, 2008?

8    A.    No.

9    Q.    Okay, did you receive a response from Mr. Winkle to the

10   return-to-work conditions provided to him on May 5, 2008?

11   A.    Only later in the process, counsel, but not on May 6th,

12   no.

13   Q.    When you received this document, GC-9, what did you do

14   with it?

15   A.    I talked to Glenn Kirk about it and Bruce Lillie, and

16   then started working on responding.

17   Q.    Okay, and when you say working on responding, and again

18   I don't want you to get into bargaining strategy or

19   privilege, what did you do?

20   A.    Well, we had provided -- we had made these provisions

21   for return to work, and the Local Union was requesting some

22   financial data behind that, how we came up with it.  So, we

23   started working on that, Glenn and myself.

24   Q.    Okay, you can look at General Counsel Exhibit No. 10 for

25   me.  On May 6th, 2008, did you know whether the strike was

1  illegal?

2  A.    No.

3  Q.    Okay, how did you start to -- what did you start to do,

4  or what information came to you related to whether the strike

5  was illegal?  Did you receive General Counsel Exhibit No. 10?

6  A.    Yes, I think we got that on the 8th.  It's dated May

7  7th.  I think we got that on May 8th.

8  Q.    What did you do with it when you received it?

9  A.    I reviewed the document, again spoke with my partner,

10  Mr. Kirk, and spoke to counsel about what it meant.  It was

11  becoming --

12      JUDGE BUXBAUM:  By counsel, that's Mr. Lillie?

13      THE WITNESS:  Mr. Lillie.  It was becoming clear at this

14  point that something was going on.  We were unsure of what.

15  We, Mr. Kirk and myself, even counsel, Mr. Lillie, at that

16  point, we scheduled a meeting in Mr. Lillie's office, I

17  believe, for May 8th.

18  Q.    BY MR. FRASER:  And again, I want you to be very careful

19  when you're talking about these issues.  I don't want you to

20  disclose attorney-client privilege or bargaining strategy.

21  So, you scheduled a meeting to talk about what generic

22  topics?

23  A.    The legality of the strike, the legality of the lockout.

24  If memory serves, I think even in that May 5th meeting, there

25  was an exchange between Mr. Lillie and Mr. Winkle, and maybe

1    it was later in the process, about whether -- well, we think

2    your strike is illegal, and in response, well, we think your

3    lockout is illegal.  That may have come later, but there was

4    a question about whether the lockout was legal.  We started

5    looking at that.  We looked at -- this was again a real time-

6    intense period.  We were looking at a lot of different issues

7    in Lansing with Mr. Lillie.  I think it was on the 8th is

8    when we met.

9    Q.   Let me show you, if you'd look to Tab number 12, General

10   Counsel Exhibit No. 12, and then I'll have you look at 13 as

11   well.  After that meeting, were there any decisions made

12   about what to do, the meeting on May 8th you had with

13   Mr. Lillie, Mr. Kirk, and yourself?

14   A.   Yeah, we responded to the information request.

15   Q.   And can you tell me, when you say responded, when you

16   look at General Counsel Exhibit No. 12?

17   A.   Yes, this was our response through Mr. Lillie to

18   Mr. Winkle's information request.

19   Q.   Okay, anything else you decided to do?

20   A.   If memory serves, there was a specific information

21   request back to Mr. Winkle to produce the F-7 paperwork.

22   Q.   Will you look at General Counsel Exhibit No. 13, please?

23   Is that what you're referring to?

24   A.   It is.

25   Q.   Okay.

1   A.   I remember directing Mr. Lillie to do this.  Well, let's

2   find out.  Send them an information request and which, of

3   course, he will comply.  He has to.  Let's find out whether

4   the F-7 was filed on time.

5   Q.   Did you get a response to your information request to

6   Mr. Winkle in GC-13?

7   A.   Never from Mr. Winkle, no.

8   Q.   Okay, what did you do next?

9       JUDGE BUXBAUM:  Well, hold on.  From anybody on behalf

10  of the Union?

11      THE WITNESS:  We got, I believe, August 14th, 2008, we

12  got this answered through Mr. McKnight.

13      JUDGE BUXBAUM:  All right, thank you.

14  Q.   BY MR. FRASER:  What did you do next to try and

15  determine whether the F-7 had been filed?

16  A.   I knew from Mr. Lillie, because he was making phone

17  calls, told me he was, with the FMCS, with the Board, trying

18  to find out about this F-7 issue.  And Mr. Lillie used the

19  phrase with us cat and mouse, that the government was playing

20  cat and mouse with him.  The FMCS was playing cat and mouse

21  with him.

22      MR. McKNIGHT:  Objection, unless we're going to waive

23  the privilege here, and it's hearsay as well.

24      JUDGE BUXBAUM:  Yeah, it sounds like hearsay to me.

25      MR. FRASER:  Well, it's -- I don't think that Mr. Viar

1  has testified that Mr. Lillie said the government said cat

2  and mouse.  I think it's Mr. Lillie's characterization of

3  what the government was doing.  So, we're specifically not

4  saying what the government said because it is hearsay.

5      MR. McKNIGHT:  Well, Mr. Lillie is not the witness.

6  It's Mr. Lillie's statement.  He's saying Mr. Lillie said.

7  That's the hearsay.

8      MR. FRASER:  Well, Mr. Lillie is an agent of the

9  organization.  There's a hearsay exception.  If I need to

10  pull that out, I can do it.  He's an agent.

11      MR. McKNIGHT:  What's the hearsay exception?

12      MR. FRASER:  He's an agent of the organization.

13      JUDGE BUXBAUM:  Yeah, but that applies to a party

14  opponent, doesn't it?

15      MR. McKNIGHT:  So, Mr. Viar can testify for him?

16  That's --

17      MR. FRASER:  Certainly.

18      MR. McKNIGHT:  No, he can't.  What hearsay exception is

19  that?

20      MR. FRASER:  Right, I suppose it's irrelevant.

21  Mr. Lillie will be here, so we can move along.

22      JUDGE BUXBAUM:  That's the good selection.

23      THE WITNESS:  Yeah, exactly.

24      JUDGE BUXBAUM:  All right, so for the record, I'm

25  sustaining the objection.

1        MR. FRASER:  Thank you.

2        THE WITNESS:  Well, because of what happened --

3        JUDGE BUXBAUM:  Hold on.  There's no question before you

4   right now.

5        THE WITNESS:  Okay.

6        MR. FRASER:  Well, I think there was, but again, I don't

7   remember what it was.

8        JUDGE BUXBAUM:  Well, yeah, but I sustained the

9   objection to it, so ask a different one.

10        MR. FRASER:  I don't remember what it was, so we'll

11   start again.

12        JUDGE BUXBAUM:  Right.

13   Q.   BY MR. FRASER:  What steps did you take next to

14   determine whether or not the F-7 was filed?

15   A.   Glenn Kirk and I phoned the FMCS in Washington to

16   request a copy of the FMCS form.

17   Q.   Okay, and did you get an FMCS form from the government?

18   A.   We did.

19   Q.   Do you -- how many attempts did you make with FMCS to

20   get that F-7 form?

21   A.   There were at least two that I was a part of by phone,

22   phone conversation on the speakerphone that I was a part of.

23   There may have been more.  You'll have to ask Mr. Kirk.  And

24   we eventually, Mr. Kirk did, filed a FOIA request.  Because

25   of the response we got from the government on the request, we

649

1    FOIA'd the form.

2    Q.   Okay, and do you recall receiving that form?

3    A.   Yes.

4        MR. FRASER:  I don't think we've tried to introduce any

5    exhibits at this point.

6        JUDGE BUXBAUM:  I don't think you have.  This is a new

7    one.  Respondent's 1 for identification.

8    **(Respondent's Exhibit 1 marked for identification.)**

9        MR. FRASER:  Yeah, and our exhibit tabs say Defendant's,

10   but --

11       JUDGE BUXBAUM:  That's fine.  I'm an old criminal

12   lawyer, so it will make me feel right at home.

13       MR. FRASER:  All right.

14   Q.   BY MR. FRASER:  Mr. Viar, I've provided to you what's

15   been marked as Employer's Exhibit 1.  Can you tell me whether

16   you've seen that before?

17   A.   I have.  This is the response from FMCS to Mr. Kirk, who

18   had FOIA'd the F-7 form.

19   Q.   Okay, the date is May 21, 2008.  Do you remember when

20   that document was received?

21   A.   We received this by regular mail no earlier than the

22   23rd.  It may have been the 24th.  If I had a calendar, I

23   might be able to -- I know we didn't get it on the 21st.

24   Q.   Okay, so sometime after the 21st?

25   A.   Yes.

1    MR. FRASER:  We'd ask for this document to be admitted.

2    JUDGE BUXBAUM:  Any objection?

3    MR. CARLSON:  May I have some brief voir dire, Your

4  Honor?

5    JUDGE BUXBAUM:  You certainly may.

6                    **VOIR DIRE EXAMINATION**

7  Q.    BY MR. CARLSON:  Mr. Viar, can you turn to the first

8  page of the document?  What's that number?  The handwritten

9  appears to be number four.  Can you tell me what that is?

10  A.    No idea.

11  Q.    And on the next page, number five, do you know what that

12  is?

13  A.    No.

14  Q.    On the bottom of the page, the portion that appears to

15  be cut off, do you have any knowledge as to what that said?

16  A.    No.

17  Q.    Okay.

18    JUDGE BUXBAUM:  Do you recall whether it was on there

19  when you got the information from FMCS?

20    THE WITNESS:  I don't, Your Honor.  I'm sorry.

21    JUDGE BUXBAUM:  Okay.  That's all right.

22    MR. CARLSON:  I don't have any objection to the

23  document.

24    JUDGE BUXBAUM:  Mr. McKnight?

25    MR. McKNIGHT:  No objection.

1      JUDGE BUXBAUM:  It will be received, Respondent's 1.

2  **(Respondent's Exhibit 1 received into evidence.)**

3                    **DIRECT EXAMINATION (cont.)**

4  Q.   BY MR. FRASER:  Did you have any meetings with the Union

5  after May 5, 2008?

6  A.   We did.

7  Q.   I think again you've got Joint Exhibit 1 somewhere up

8  there in front of you.  We stipulated to that.  It looks like

9  the next meeting date would have been May 21 of 2008; is that

10  your recollection?

11  A.   Yes.

12  Q.   Okay, again, I want to ask you a series of questions,

13  and I want you to be as specific as you can.  Were you

14  present that date?

15  A.   Yes.

16  Q.   Can you describe your recollection of how that session

17  starts, please?

18  A.   Mr. Lillie again advised the Local Union that we believe

19  the strike was illegal.  We were not waiving any of our

20  rights in meeting with the Local Union.  We intended to

21  bargain in good faith, and we needed an agreement that would

22  help us survive.  I think that was the preface.  If I had

23  some notes or something from that meeting, I might be able to

24  recall a little bit more in specific what happened.

25  Q.   Okay, well, let me try and help refresh your

 1  recollection.  There was an affidavit, I think, that was

 2  provided to you yesterday by Mr. McKnight that has a series

 3  of dates and information on that.

 4      MR. FRASER:  I want to make sure I have the right --

 5  it doesn't have -- I don't remember which one.  It doesn't

 6  have any date at the top of it.  If I could just show you

 7  this to you, Steve, maybe that would help confirm.

 8      JUDGE BUXBAUM:  Well, Mr. Fraser, I'm somewhat at a loss

 9  at what you're trying to do here.  The witness is --

10      MR. FRASER:  He just indicated he doesn't remember all

11  the things that occurred on May 21.

12      JUDGE BUXBAUM:  Right, but he --

13      MR. McKNIGHT:  No, the question before him is what was

14  discussed at the beginning of the meeting, and then he led on

15  to another --

16      JUDGE BUXBAUM:  Yes, he answered the question before him

17  quite precisely, so before we see whether his recollection

18  needs to be refreshed as to something you are interested in

19  eliciting, let's have your next question.  What do you want

20  him to talk about?

21  Q.   BY MR. FRASER:  Any other issues that occurred that day,

22  Mr. Viar, related to the topic you just discussed?

23      MR. McKNIGHT:  I'm going to object.  That's vague.

24      JUDGE BUXBAUM:  Which is -- yeah, that's too vague.  You

25  mean related to Mr. Lillie's statement about waiver?

1       MR. FRASER:  Let me try it again.  I'll withdraw the

2  question.

3  Q.   BY MR. FRASER:  Mr. Viar, was there any response from

4  the Union to Mr. Lillie's comments that you just testified

5  about?

6  A.   The Union, through Mr. Winkle, rejected the return-to-

7  work conditions explicitly during that meeting.

8  Q.   Okay, and so I need you to tell me what Mr. Winkle said

9  and what the company said related to that return to work --

10 A.   As I recall it, Mr. Lillie asked, I assume, that the

11 provisions for the return to work outlined to you on the 5th

12 are rejected; is that right?  And Phil Winkle said yes,

13 that's right.

14 Q.   Okay, did you reach a collective bargaining agreement

15 during the May 21, 2008, meeting?

16 A.   No.

17 Q.   Do you recall whether there were any return-to-work

18 issues discussed on May 21, 2008?

19      MR. McKNIGHT:  Objection, leading.

20      JUDGE BUXBAUM:  I'll allow it.  You may answer.

21      THE WITNESS:  No.

22 Q.   BY MR. FRASER:  You don't recall or --

23 A.   There were none.

24 Q.   Okay.  Did you reach any agreements on May 21, 2008,

25 regarding reinstating illegal strikers?

1    MR. McKNIGHT:  Objection, leading.

2    JUDGE BUXBAUM:  Overruled.

3    THE WITNESS:  No.

4  Q.  BY MR. FRASER:  Let me show you what's been marked as

5  General Counsel's Exhibit No. 37.  If you could take a look

6  at that for me.

7  A.  Okay.

8  Q.  Do you remember receiving that document during the May

9  21, 2008, session?

10  A.  I do now, yes.

11  Q.  All right, tell me what you recall.  Who provided it, if

12  you can recall, and what was said?

13  A.  This was a proposal from the Local Union.  I think it

14  was provided through Mr. Winkle.  And I was shocked to get

15  it.  I couldn't believe it.

16  Q.  Why were you shocked?

17  A.  Well, we were three weeks into the strike, and we were

18  operating, and I got a proposal here which addressed zero of

19  the core issues that I had been talking about since February,

20  and, in fact, was proposing wage increases for year two and

21  year three and an increase in classifications and an increase

22  in pension and an increase in holidays.  Almost everything on

23  this document was going the other way.  And, as memory

24  serves, VCAP was the one tentative agreement we had reached

25  that I had testified about before.

1  Q.    Okay, so the document says VCAP STA.  That's what you

2  were referring to previously?

3  A.    Yes, that was the one agreement tentatively we had

4  reached prior to the strike.

5  Q.    Do you recall any other events that occurred on May 21,

6  2008?

7  A.    No.

8  Q.    If you look at Joint Exhibit No. 1 again, I think the

9  next bargaining session that we stipulated to was June 2 of

10  2008.  Let me back you up.  Did you have any sidebar

11  discussions with anyone on May 21, 2008, you yourself?

12  A.    I don't believe so.

13  Q.    Okay.  So, now we're at June 2.  Were you present at

14  that bargaining session?

15  A.    Yes.

16  Q.    Tell me what you recall of that session.

17  A.    As I recall it, sir, this session was held exclusively

18  in a side room, in an office, a small office behind the desk

19  at the Hampton Inn.  And the purpose of this meeting was to

20  outline what we called a modern operating agreement for the

21  Local Union.

22  Q.    Okay, I know I've asked you this before, but I want to

23  reiterate, was Glenn Kirk present?

24  A.    No.

25  Q.    Look at General Counsel Exhibit No. 38 for me, please.

 1    Have you seen that document before?

 2    A.   Yes.

 3    Q.   You just called -- you said -- you started a discussion

 4    about modern operating agreement.  Is this the document you

 5    were referring to as a modern operating agreement?

 6    A.   It is, counsel.  This is what Mr. Lillie presented to

 7    Frank Gruza, Mary Ellis, and Phil Winkle in that side room I

 8    described.

 9         JUDGE BUXBAUM:  Now, it characterizes itself as a

10    proposed collective bargaining agreement.  Is that what it

11    was intended to be?

12         THE WITNESS:  It was our proposed modern operating

13    agreement, collective bargaining agreement, absolutely.

14         JUDGE BUXBAUM:  Okay, in other words, in your mind then,

15    it sounds like modern operating agreement in this context

16    right now is synonymous with your proposed collective

17    bargaining agreement?

18         THE WITNESS:  Yes, Your Honor.

19         JUDGE BUXBAUM:  Okay.

20         THE WITNESS:  With this.

21         JUDGE BUXBAUM:  With GC-38?

22         THE WITNESS:  Yes.

23         JUDGE BUXBAUM:  Right.

24    Q.   BY MR. FRASER:  So, you have just mentioned GC-38,

25    modern operating agreement.  Walk me through the mechanics of

```
 1   what happens the rest of that meeting with the Union.
 2   A.   Well, unfortunately it was a very short meeting.  Bruce
 3   Lillie presented the document.  Now, we're a month into the
 4   strike.  I remember the group looking at the document for
 5   less than five minutes.
 6   Q.   When you say the group looking through, who was looking
 7   through?
 8   A.   I specified, counsel, I apologize.  Frank Gruza was in
 9   the room.  Mary Ellis was in the room.  Phil Winkle was in
10   the room.  I was in the room.  Diane was in the room, as I
11   recall it.  Maybe that's not true.  And Bruce Lillie, I know
12   Bruce Lillie and I were there.
13   Q.   Okay, and you said they looked at the proposal.
14   A.   Yeah, that's Frank Gruza, Mary Ellis, and Phil Winkle.
15   Phil Winkle leafed through perhaps four pages and said I've
16   seen enough.  GM would not have accepted this in 1938.  I'm
17   not talking about this document anymore.  Bruce urged him,
18   Bruce Lillie urged him to read the entire document, to look
19   at what was from Bruce's perspective positives in the
20   agreement, a grievance procedure, profit sharing, some other
21   items.  They, Mr. Winkle, refused to do so.  They got up and
22   left.
23   Q.   To the best of your knowledge, was there any discussion
24   in your presence about illegal strike?
25   A.   I don't recall that day, but I do recall that Mr. Lillie
```

1   was speaking with Mr. Winkle in private that day.

2   Q.   You're aware of a sidebar?

3   A.   Yeah, I saw them talking, if that's what a sidebar is.

4   Q.   Were you in that?

5   A.   No.

6   Q.   And how did you see them?

7   A.   I just saw them talking.  I don't know what --

8        JUDGE BUXBAUM:  Am I correct in concluding that you

9   didn't hear them talking?

10       THE WITNESS:  That's correct.

11       JUDGE BUXBAUM:  Okay.

12  Q.   BY MR. FRASER:  Did you reach a collective bargaining

13  agreement with the Union on June 2, 2008?

14  A.   No, sir.

15  Q.   Did you discuss any return-to-work issues with the Union

16  on June 2, 2008?

17  A.   No.

18  Q.   Did you reach any agreements on June 2, 2008, regarding

19  reinstating illegal strikers?

20  A.   No.

21       MR. McKNIGHT:  Objection.

22       JUDGE BUXBAUM:  I don't understand the objection,

23  Mr. McKnight.  How is it leading?  It doesn't suggest that

24  the answer is yes, and it doesn't suggest that the answer is

25  no.  It seems entirely neutral.  I mean, a leading question

1   is one which suggests its own answer.  The car was yellow,

2   wasn't it?

3       MR. McKNIGHT:  I object, Your Honor, only to the

4   characterization of the strikers at this point.  The strike

5   has ended.

6       JUDGE BUXBAUM:  Oh, all right.  I'm going to overrule it

7   for reasons we've discussed I think in the first week of

8   trial.  Again, the statements made by counsel aren't

9   evidence.  So, Mr. Fraser using his choice of words isn't

10  going to sway me one way or another.

11      MR. McKNIGHT:  And it's just that -- I understand that,

12  Your Honor, but it's one thing to elicit testimony about what

13  people said, and that may have -- I mean, what people said

14  and what they did has a bearing on facts.  But it's a

15  completely different thing to cloud a record with counsel's

16  characterizations of people, which has nothing to do with

17  what people said.  And so, I object to the question for that

18  reason.  And neither General Counsel nor myself were clouding

19  the record with words people did not use.  We asked what

20  words were used.

21      JUDGE BUXBAUM:  Well, but the genius in our system,

22  Mr. McKnight, is that you're going to be given the

23  opportunity to elucidate it further through cross-

24  examination.  I think it's all right.  Overruled.

25  Q.   BY MR. FRASER:  Mr. Viar, I think you already testified

1  you were not at the June 13th, 2008, meeting.  Do you

2  remember why you weren't there?

3  A.    I don't.  It may have been something at the plant.  I

4  just don't recall.

5  Q.    Okay, the next session, according to the joint

6  stipulation, is July 1, 2008.  Do you recall being there?

7  A.    What's the question?

8  Q.    Do you recall being at the July 1, 2008, meeting?

9  A.    Yes, I was there.

10  Q.    Okay, to the best of your recollection, do you recall

11  having any private meetings between yourself and any Union

12  representative on that day?

13  A.    No.

14  Q.    Do you recall whether or not any member of your team,

15  the Douglas team, had any meetings with the UAW outside of

16  your presence?

17  A.    Yes.

18  Q.    And how do you recall that?

19  A.    As was his practice, Mr. Lillie would often -- we were

20  in the side room.  And Mr. Lillie would walk into the

21  bargaining unit room and say hello.  And I recall him meeting

22  with Mr. Canzano this day as well, on July 1st.

23  Q.    Okay, were there any different participants in this July

24  1 meeting compared to others?

25  A.    Mr. Canzano from the Local Union.

1  Q.   Did you have any joint sessions on July 1, 2008?

2  A.   You know, we did not.  And as time went on, I was

3  becoming more and more alarmed that -- look, we had not met.

4  We're two months in.  We have not met.

5       MR. McKNIGHT:  Objection, objection, question was asked

6  and answered.

7       JUDGE BUXBAUM:  Well, it was.

8       THE WITNESS:  Can I answer the question?

9       JUDGE BUXBAUM:  No, I think we'll wait for counsel's

10  next question.  Sustained.

11  Q.   BY MR. FRASER:  Were you surprised by the fact that

12  there weren't any joint sessions on July 1, 2008?

13       MR. McKNIGHT:  Same objection.  That's leading.

14       JUDGE BUXBAUM:  Yeah, I agree with you this time.  It is

15  leading.

16       MR. FRASER:  Your Honor, if I said you were surprised by

17  the fact that there weren't any joint sessions, weren't you,

18  Mr. Viar.

19       JUDGE BUXBAUM:  No, I think they're both -- it's the

20  planting of the word surprised.  What was your reaction to

21  what occurred at the meeting on July 1st?

22  Q.   BY MR. FRASER:  Mr. Viar, what was your reaction to what

23  occurred on July 1, 2008?

24       JUDGE BUXBAUM:  You know, Mr. McKnight, you know this

25  happens all the time in court.  There's just nothing one can

1    do about it.  And you've just got to move along.

2         MR. McKNIGHT:  Well, usually -- it doesn't matter.

3         JUDGE BUXBAUM:  Here's the good news, Mr. McKnight.  The

4    good news is that I'm cognizant of the weight to be accorded.

5    It depends on the general context, including the manner in

6    which questions were asked.

7         MR. McKNIGHT:  I understand that.  I appreciate that.

8         THE WITNESS:  Look, shocked, we had not met for two

9    weeks.  I had information that one of the reasons we had not

10   met for two weeks was that the Local Union president had to

11   go to Florida.  I couldn't believe that.

12        MR. McKNIGHT:  Objection, that's hearsay.

13        THE WITNESS:  Here we are --

14        JUDGE BUXBAUM:  Hold on, hold on.  What do you say to

15   that, Mr. Fraser?

16        MR. FRASER:  Well, my response is hearsay is trying to

17   introduce evidence about what another person said.  Here,

18   there's no indication that Mr. Viar is saying that somebody

19   said they had to go on vacation.  He's just giving you his

20   reaction to why he was surprised.

21        JUDGE BUXBAUM:  It was your understanding that --

22        MR. McKNIGHT:  No, no, his testimony was he had

23   information.  That is obviously testimony about what somebody

24   else said.

25        MR. FRASER:  No, testimony about what somebody else said

1  is I told -- my name is Mary Ellis, and I'm telling you I'm

2  going on vacation.  She's not here.  She's not testifying.

3  That's not hearsay when he says I have information that

4  somebody had to go on vacation, so we couldn't have a

5  session.

6      JUDGE BUXBAUM:  I'll permit it, although, Mr. Fraser, I

7  don't want to go much further than what his subjective

8  reaction to things was.

9      MR. FRASER:  Your Honor, understood.

10     THE WITNESS:  I don't either.  I guess to move this

11  along, counsel, beyond -- we were encouraged at first that --

12  and I'm talking about Mr. Kirk, Mr. Lillie, and myself.  We

13  were encouraged that UAW had retained counsel, very

14  encouraging.  We sat there the entire day and never met.  So,

15  that just added to my shock and disbelief about the process.

16  I couldn't believe it.

17  Q.  BY MR. FRASER:  And again, this may seem an unusual

18  question, but sometimes these things happen.  Did you reach

19  an agreement with the Union on July 1, 2008?

20  A.  A collective bargaining agreement, no.

21     JUDGE BUXBAUM:  Any agreement about anything?

22     THE WITNESS:  It was either the July 1st or July 2nd we

23  entered into a cooling-off period agreement.

24     JUDGE BUXBAUM:  Okay.

25  Q.  BY MR. FRASER:  And we're going to get to that.  Did you

1    discuss any return-to-work issues on July 1, 2008?

2    A.    No.

3    Q.    Did you reach any agreement on July 1, 2008, regarding

4    reinstating illegal strikers?

5    A.    No.

6    Q.    Do you remember whether there were any proposals

7    exchanged on July 1 at all?

8    A.    Only, and I'm not sure, counsel, about the date, only

9    this handwritten proposal from Mr. Canzano.

10   Q.    Let me show you, if you'd look at Tab GC-39.

11   A.    Yes, I remember this document.  It was July 1st, 2008.

12   Q.    So, this is the document you referred to when you said

13   Mr. Canzano provided one?  Tell me what you recall of that

14   document.

15   A.    Yeah, as I remember, counsel, we simply cooled off, to

16   coin a phrase, in our caucus room all day.  And at the end of

17   that day, we got this through Mr. Canzano.

18   Q.    Okay, and again, did Douglas agree to that GC-39?

19   A.    No.

20   Q.    Okay, I'm going to take you to the next session, which

21   was July 2.  Based on your recollection while looking at

22   Joint Exhibit 1, can you tell me whether you were present on

23   July 2?

24   A.    I was.  I was there.

25   Q.    Okay, do you recall whether you were part of any private

 1  conversations with any Union representative that day?

 2  A.   I don't believe so.

 3  Q.   Do you know if Mr. Lillie participated in any private

 4  conversations with the UAW that day?

 5  A.   No.

 6       JUDGE BUXBAUM:  No, he didn't, or no, you don't know?

 7       THE WITNESS:  No, I don't remember.

 8       JUDGE BUXBAUM:  Okay.

 9  Q.   BY MR. FRASER:  To the best of your recollection, was

10  there any discussion in your presence regarding the illegal

11  strike?

12       MR. McKNIGHT:  Again, this is leading examination, Your

13  Honor.  And it does completely change the nature of this

14  witness' testimony.

15       JUDGE BUXBAUM:  I don't see it, Mr. McKnight.  For one

16  thing, I don't believe there's any dispute that there was an

17  illegal strike in this fact pattern.  So, I just don't see

18  why it's an objectionable question.

19       MR. CARLSON:  Well, the question before the witness is

20  whether or not there was any discussion of illegal strike.  I

21  think that's a pretty significant fact, Your Honor, whether

22  or not there was discussion of -- whether the parties

23  discussed it and whether or not there was any reservation of

24  rights.  I think that's a very significant fact that's in

25  dispute in this case.

1      MR. FRASER:  I'm trying to figure out whether that means

2  you're trying to jump onto Mr. McKnight's bandwagon to object

3  or whether you think --

4      JUDGE BUXBAUM:  Yeah, is that an argument in favor of

5  Mr. Fraser or Mr. McKnight?

6      MR. McKNIGHT:  I think the discussion just makes it

7  worse.

8      MR. CARLSON:  No, I think I'm just trying to make a

9  point for the record.

10      JUDGE BUXBAUM:  Okay, well, the record reflects your

11  comment.  Mr. Fraser, the objection is overruled.  You may

12  proceed.

13      MR. CARLSON:  Well, I'm sorry, Judge.  I'm sorry, Judge,

14  I just want to clarify.

15      JUDGE BUXBAUM:  Go ahead.

16      MR. CARLSON:  So, I am jumping on Mr. McKnight's

17  bandwagon.  I think it is a leading question, and I think if

18  he's going to ask questions about what was discussed at this

19  meeting, he can ask open-ended questions.  What was discussed

20  at the meeting, he can say, but not lead the witness.

21      JUDGE BUXBAUM:  Well, now, come on now.  He can do more

22  than that, Mr. Carlson.  We'd be here for a month.  I mean,

23  he can focus the witness as to what -- we don't want to hear

24  about whether they talked about the fact that it was raining

25  outside during the meeting.

1      MR. CARLSON:  I understand, Your Honor.  I'm sorry.  I

2  withdraw the objection.

3      JUDGE BUXBAUM:  You may proceed, counsel.

4  Q.   BY MR. FRASER:  So, the question, I think, was was there

5  any discussion in your presence about the illegal strike on

6  July 2, 2008?

7  A.   It's my recollection that there was.  Again, Mr. Lillie

8  reminded the Local Union that the strike was illegal and that

9  we were not reserving our rights in meeting with them.

10 Q.   You said not reserving your rights?

11 A.   Oh, I'm sorry, not waiving our rights.  Let me be very

12 clear.  We were not waiving our rights in meeting.  That was

13 the word he used, waive.

14 Q.   Did you reach a collective bargaining agreement with the

15 Union during the July 2, 2008, meeting?

16 A.   No, sir, we did not.

17 Q.   Do you recall any discussion regarding return-to-work

18 issues during the July 2, 2008, meeting?

19 A.   No.

20 Q.   Did you reach any agreements regarding reinstating the

21 illegal strikers during the July 2, 2008, meeting?

22 A.   We did not.

23 Q.   I'm going to show you, if you'd look at General Counsel

24 18 for me, please.

25 A.   Yes.

1    Q.    Are you familiar with that document?

2    A.    I am, and it refreshes my recollection of the meeting on

3    July 2nd.

4    Q.    Tell me how that --

5    A.    You know, I don't believe we ever met as a -- I'm trying

6    to think.  This document was a product of Mr. Lillie's

7    meetings with Mr. Canzano to, as I testified before, cool off

8    and try and reach an agreement.  I was very encouraged by

9    this.  I thought this was significant.  We were going to pull

10   the heat off both sides, because we had a series of unfair

11   labor practice charges going on both ends, and really go at

12   this for 30 days and try to get an agreement.  So, this was a

13   sort of a break in the logjam for me.  I thought this was

14   great.

15   Q.    Okay.  Do you recall whether this was done in joint

16   session or your sidebars?

17   A.    This was sidebar.

18   Q.    Okay.

19   A.    I know that because this document was produced off of

20   Bruce Lillie's computer.  I hate this font that he uses, and

21   I remember him printing it off.

22   Q.    All right, if you could look at General Counsel Exhibit

23   No. 19 for me, please.

24   A.    Yes.

25   Q.    Do you recall whether there were any other issues

1  discussed on July 2?  Are you familiar with GC-19?

2  A.   Yeah, yeah.

3  Q.   When did you see that?

4  A.   Yeah, that day.  You know, --

5  Q.   That day being July 2?

6  A.   That day, July 2nd, because, of course, we had to let

7  the Board know that we were going to -- both sides were going

8  to pull their charges down without prejudice for 30 days.

9  Q.   Okay.

10     MR. FRASER:  Your Honor, in the review of the transcript

11  up to this point, I'm not sure that General Counsel 19 ever

12  was offered into admission.  And so, I'm just raising that as

13  a procedural question now.  We certainly have no objection to

14  it.  We can offer it ourselves, but I don't recall.  My notes

15  show it was talked about but never offered and never

16  accepted.

17     JUDGE BUXBAUM:  I think you're exactly right.  I'm

18  looking at my list.  I don't show it either.

19     MR. McKNIGHT:  That's correct.

20     MR. FRASER:  I don't know if that was intentional or

21  not, Your Honor.

22     JUDGE BUXBAUM:  Mr. Carlson, I think Mr. Fraser is

23  inviting you to make a motion for its admission, if you're

24  seeking its admission.

25     MR. CARLSON:  I don't have any problem with GC-19 coming

1    in, and I'll so move.

2         JUDGE BUXBAUM:  All right, any objection, Mr. McKnight?

3         MR. McKNIGHT:  No.

4         JUDGE BUXBAUM:  Mr. Fraser?

5         MR. FRASER:  No.

6         JUDGE BUXBAUM:  Then General Counsel 19 will be

7    belatedly received into evidence.

8    **(General Counsel's Exhibit 19 marked for identification and**

9    **received into evidence.)**

10        THE WITNESS:  Before we move on, can I ask a procedural

11   question?

12        JUDGE BUXBAUM:  What do you think about -- no, best not.

13        THE WITNESS:  Well, I -- it's about lunch.

14        JUDGE BUXBAUM:  Oh, oh, oh, well, let me hear you then.

15   We're going to have lunch.

16        THE WITNESS:  Are we going to break for lunch?

17        JUDGE BUXBAUM:  We certainly are going to break for

18   lunch.  Is it a health issue?

19        THE WITNESS:  No.

20        JUDGE BUXBAUM:  I certainly want to know if it's -- I

21   mean, sometimes you have people, for instance, with diabetes

22   or something, and I don't want to --

23        THE WITNESS:  No, Your Honor, I just want to know how

24   long we're going to keep going.

25        JUDGE BUXBAUM:  All right, and I guess maybe in aid of

1  that, Mr. Fraser, how long do you anticipate your direct will

2  be?

3      MR. FRASER:  You know, Your Honor, unfortunately I need

4  to move through all the dates of bargaining and probably

5  another hour to do that, maybe 30 minutes.  I mean, I don't

6  know.

7      JUDGE BUXBAUM:  Well, see, let's shoot for 12:30.  We'll

8  see.  But somewhere between 12:30 and 1:00, Mr. Viar.

9      MR. FRASER:  Great.  I'll just keep plugging along.

10     JUDGE BUXBAUM:  Yes.

11     MR. McKNIGHT:  Just one moment, please, Your Honor.

12     **JUDGE BUXBAUM:  All right, we'll go off the record for a**

13  **moment.**

14  **(Off the record.)**

15     JUDGE BUXBAUM:  You may proceed, counsel.

16     MR. FRASER:  Thank you, Your Honor.

17  Q.  BY MR. FRASER:  Mr. Viar, do you recall specifically any

18  of the topics that were discussed, other than those you've

19  already talked about, on July 2, 2008, at the bargaining

20  session?

21  A.  No, I don't.

22  Q.  Okay, I'm going to mark another Exhibit Employer 2, if I

23  could.

24     JUDGE BUXBAUM:  Mr. Fraser, I guess just to keep things

25  consistent, let's call them Respondent.

1      MR. FRASER:  Okay, that's fine.  So, Respondent 1 and

2  Respondent 2.

3      JUDGE BUXBAUM:  Very well.

4  Q.  BY MR. FRASER:  Mr. Viar, can you take a look at that

5  document for me, please?

6  A.  Okay.

7  Q.  Have you seen that before?

8  A.  I have.

9  Q.  Can you tell me what that is?

10     MR. McKNIGHT:  May I interject here?  My notes would

11  indicate that this is GC Exhibit 21.

12     JUDGE BUXBAUM:  Well, that would be helpful.  Let's see.

13     MR. FRASER:  Yeah, I guess maybe I was confused because

14  there was an e-mail cover page, but that makes it even

15  easier.

16     JUDGE BUXBAUM:  Okay, all right, very good.  Well, I'm

17  grateful to you, Mr. McKnight, for sparing the record some

18  extra pages.

19     MR. McKNIGHT:  Do you want to keep it?  Do you want to

20  get it back?

21     MR. FRASER:  It's completely up to you.  This doesn't

22  save a tree.

23     JUDGE BUXBAUM:  No, that's true.

24  Q.  BY MR. FRASER:  Mr. Viar, can you look at GC-21 for me,

25  please?

1  A.    Yes.   This document was generated in response to a

2  request from the Local Union for elaboration or more

3  information on what we had proposed.

4  Q.    Proposed when?

5  A.    On July 2nd, 2008.

6  Q.    Okay, the next --

7  A.    So, just to further answer the question, I mean, these

8  are the core issues that we have been discussing sort of, you

9  know, all along, our flexibility concerns, our wage concerns,

10  classification issues, subcontracting, management rights,

11  some elaboration on our proposal.

12  Q.    Okay.   The next bargaining date I have is July 14, 2008.

13  A.    That's correct.

14  Q.    Do you recall whether you were there?

15  A.    I was there.

16  Q.    Okay.   Do you recall whether you had any private

17  meetings with any UAW representative during that on that

18  date?

19  A.    I did not.

20  Q.    Do you know whether any other representative of Douglas

21  had any private meetings with any UAW representative on that

22  date?

23  A.    In this July, mid-July time frame, I recall Mr. Lillie

24  meeting with Mr. Canzano in private, yes.

25  Q.    Okay, do you --

1        MR. McKNIGHT:  Objection.

2        JUDGE BUXBAUM:  Basis?

3        MR. McKNIGHT:  It's not responsive to the question.  He

4    asked him whether or not he recalls whether or not Mr. Lillie

5    had a meeting private -- anybody from the company had a

6    private meeting with the UAW on July 14th.

7        JUDGE BUXBAUM:  Can you say with certainty whether the

8    discussions that you just testified about were on the 14th?

9        THE WITNESS:  No.

10       JUDGE BUXBAUM:  Okay.

11   Q.   BY MR. FRASER:  Was there a discussion in your presence

12   during any, I'm going to call it, joint session, as you've

13   defined it, on July 14th, 2008, about the illegal strike, if

14   you recall?

15   A.   I don't recall, counsel, not on the 14th.  I don't

16   recall on that particular day.

17   Q.   Did you reach a collective bargaining agreement with the

18   Union on July 14th, 2008?

19   A.   No.

20   Q.   Did you discuss any return-to-work issues on July 14th,

21   2008, with the Union?

22   A.   No.

23   Q.   Did you reach any agreements on reinstating the illegal

24   strikers during the July 14th, 2008, session?

25   A.   No.

1    Q.    I'll show you what's been marked as General Counsel's

2    Exhibit 40.  Can you take a look at that for a minute?

3    A.    Yes.

4    Q.    And can you tell me whether you've seen that before?

5    A.    I have.

6    Q.    When do you recall seeing that?

7    A.    This was a proposal prepared by the Local Union and

8    Mr. Canzano on the 14th of 2008, July 14th.

9    Q.    Okay, was there discussion about that during the meeting

10   on July 14th?

11   A.    You know, there was.  Really what this was, counsel, was

12   the UAW's response.  That's the numbers, you know, 1 through

13   20.  I think those are issues or paragraphs from the MOA,

14   Modern Operating Agreement.  And then there's some additional

15   proposals at the end.  For example, the Local Union was

16   proposing that we pay a $1,000 bonus for individuals who came

17   to work nine out of ten days.

18   Q.    Do you recall whether the company made any responses to

19   this proposal?

20   A.    We went through it line by line and dissected it.  We

21   were still looking at that point at wage increase proposals,

22   extraneous issues like probation period -- it didn't

23   matter -- life insurance increases, short term disability

24   increases, increases in the vacation entitlement, no changes

25   to our management's rights clause, no response at all to the

676

```
 1  need for us to reduce the classifications.  We had 38

 2  classifications in the orange book.  This what I viewed as an

 3  insult, after we had spoken from February about the

 4  attendance in the factory, to propose a $1,000 bonus for

 5  people who, as I said, worked nine days out of ten.  This was

 6  a very, very intense conversation over all these issues.

 7  Q.   Let me move you to the next date, July 15th of 2008.

 8  A.   Okay.

 9  Q.   That's my understanding based on our Joint Exhibit.  Do

10  you recall being at that session?

11  A.   I was at that session.

12  Q.   Do you recall having any private conversations with any

13  UAW representative that day?

14  A.   I did not.

15  Q.   Are you aware of whether or not anyone else from

16  Douglas' bargaining team had any private conversations with

17  UAW representatives that day?

18  A.   I can only provide you a general recollection that --

19       MR. McKNIGHT:  Objection.

20       MR. FRASER:  Okay, if you can't recall, that's fine.

21       THE WITNESS:  No.

22       JUDGE BUXBAUM:  No, okay, all right, your answer is no?

23       THE WITNESS:  No.

24  Q.   BY MR. FRASER:  No, you can't recall?

25  A.   I can't recall.
```

1   Q.   In general, during bargaining from May 1, 2008, through

2   August 14th, 2008, were there private conversations that

3   occurred between Douglas representatives and UAW

4   representatives?

5   A.   Almost always.

6        MR. McKNIGHT:  Objection, leading.

7        JUDGE BUXBAUM:  Now, why was it leading?  Again, how

8   does it suggest --

9        MR. McKNIGHT:  Well, I think it suggests the answer.

10       JUDGE BUXBAUM:  I don't think it suggested the answer.

11  The answer could just as easily be yes or no.  Overruled.  I

12  think you had answered it, hadn't you, Mr. Viar?

13       THE WITNESS:  Almost always.  I remember some days in

14  specific where Mr. Lillie had private conversations with

15  counsel, July 1st and July 2nd.  Other dates stand out in my

16  mind, but I can tell you they almost always spoke in private

17  before or at some point during the scheduled sessions.

18  Q.   BY MR. FRASER:  When you say they, who are you talking

19  about?

20  A.   I apologize, counsel.  Mr. Lillie and Mr. Canzano or

21  Mr. Lillie and Mr. Winkle.

22  Q.   So, we're on July 15th.  Were there any statements on

23  July 15th in your presence about the illegal strike?

24  A.   I don't recall on the 15th in specific that we talked

25  about the illegal strike.

1  Q.   Okay, on July 15th, did you reach a collective

2  bargaining agreement with the Union?

3  A.   We did not.

4  Q.   On July 15th, 2008, did you discuss any return-to-work

5  issues with the Union?

6  A.   No.

7  Q.   Did you reach any type of an agreement with the Union on

8  July 15th, 2008?

9  A.   No.

10  Q.   Did you reach -- I'm sorry.  I already covered that.  Do

11  you recall whether there were any proposals exchanged during

12  the July 15th, 2008, session?

13  A.   I think we were still talking about the July 14th sort

14  of counter-proposal off of the MOA on the 15th.

15  Q.   Okay.

16      MR. FRASER:  Your Honor, I think I asked this question,

17  and I think the answer was I don't recall, but I want to make

18  sure that I -- I don't know whether I can hear the record

19  back or how best to do this because I want to refresh this

20  witness' recollection with one of his affidavits.  So, maybe

21  I can try it again.

22  Q.   BY MR. FRASER:  On July 15th, 2008, Mr. Viar, do you

23  recall whether there was any discussion in your presence

24  regarding the illegal strike?

25  A.   As I said earlier --

 1      MR. McKNIGHT:  Objection, he just answered that.  I

 2  recall that exactly.

 3      JUDGE BUXBAUM:  Yeah, he did.  He did, sustained.

 4      MR. FRASER:  Did he say I don't recall though?  I don't

 5  recall.

 6      JUDGE BUXBAUM:  Can we get that read back?

 7  **(Off the record.)**

 8      **JUDGE BUXBAUM:  We're on the record.**

 9      Mr. Fraser, I think we reached an agreement that

10  everyone is content with the record reflecting that Mr. Viar

11  had responded to the question by stating that he didn't

12  recall.

13      MR. FRASER:  I'd like to refresh the witness'

14  recollection, if I could, please.

15      JUDGE BUXBAUM:  Very well.

16      MR. FRASER:  I'm going to show him an affidavit that he

17  discussed yesterday, prepared -- I don't know, but it was

18  signed on September 3, 2008.  If you could look at the --

19      JUDGE BUXBAUM:  That's his own affidavit?

20      MR. FRASER:  It's his affidavit.

21  Q.  BY MR. FRASER:  If you could look at page 4, paragraph

22  17, and see if that helps you refresh your recollection.

23  A.  This affidavit --

24  Q.  Hang on.  Hang on.

25  A.  What's the question.

1  Q.    So, the first question is does that help refresh your

2  recollection as to what occurred on July 15th of 2008?

3  A.    Yes.

4  Q.    Okay, I'm going to ask you to hand that back to me,

5  please.  I'm going to ask you a question again.  Do you

6  recall whether there was any discussion on July 15th, 2008,

7  during joint session regarding illegal strike?

8  A.    Yes.

9  Q.    And what is it that you recall?

10  A.    We restated to the Local Union --

11  Q.    When you say we, who are you --

12  A.    Mr. Lillie.

13  Q.    Okay.

14  A.    That our belief, our conviction, that the strike was

15  illegal, and we were not waiving any of our rights in

16  continuing to meet with them.  The time was running out, so

17  we were trying to express to the Union that the strike was

18  illegal.

19  Q.    Okay.

20      JUDGE BUXBAUM:  What do you mean time was running out?

21      THE WITNESS:  Our 30 day cooling-off period was running

22  out.

23      JUDGE BUXBAUM:  Oh, okay, the cooling off.  I got it.

24  Thank you.  That helps.

25      THE WITNESS:  We only had one more session scheduled at

1  that point on July 15th.  We ended up scheduling another

2  session on the 31st, but at that point, we only had the 28th.

3  It was going to be the last day, but we added another day.

4      MR. FRASER:  All right, I'd like to mark, and maybe Sam

5  and Steve can tell me it's already been marked.  There's a

6  document dated July 21, 2008 -- I'm sorry, has July 21, 2008,

7  at the top of the page.  It says hello, John and Phil.  I

8  don't know if that's something you already introduced.

9      MR. McKNIGHT:  Could it be GC-22?

10      MR. FRASER:  Perhaps.  It'd be great if it was.  There

11  it is right behind that e-mail cover sheet again.  So, we're

12  good.

13  Q.  BY MR. FRASER:  Mr. Viar, could you look at GC-22 for

14  me, please?

15  A.  Yes.

16  Q.  Are you familiar with that document?

17  A.  I am.

18  Q.  Can you tell me what that is?

19  A.  When we got the proposal on July 14th --

20  Q.  Which proposal?

21  A.  The proposal from the Local Union.

22  Q.  Okay.

23  A.  And it's redundant when I hear myself say it, but I was

24  again surprised.

25  Q.  Okay.

1  A.    And I was surprised at the nature of the proposal.  I

2  was surprised at --

3      MR. McKNIGHT:  Is there a question?

4      JUDGE BUXBAUM:  Yeah, I agree.  And, Mr. Fraser, avoid

5  narratives here, please.

6  Q.   BY MR. FRASER:  Have you seen this document, GC-22?

7  Have you seen this document before?

8      JUDGE BUXBAUM:  Mr. Viar, let me explain to you.  The

9  trial practice doesn't call for narrative answers because

10 when you give a narrative answer, you can wander off into all

11 sorts of areas that can cause problems either for the lawyers

12 or for me.  So, do confine your answers strictly to the

13 question that the lawyer is asking.

14     MR. FRASER:  Your Honor, I think I asked him what is it,

15 and I think he was in the process of describing to me what it

16 was.

17     JUDGE BUXBAUM:  Well, but he was describing the

18 background and his thought process and so forth, and that's

19 not what you had asked for.

20 Q.   BY MR. FRASER:  Mr. Viar, did you help prepare this

21 document?

22 A.    Yes.

23 Q.    Why?

24 A.    Because I was trying to, in light of what had been

25 proposed, and in light of my mission which was to get an

1    agreement, I needed to have some sort of understanding of

2    what motivated, what was behind the Union proposal of July

3    14th, 2008, with some questions.

4    Q.    That was, in part, why you prepared this document?

5          MR. McKNIGHT:   Objection to as in part.

6          JUDGE BUXBAUM:   Sustained.

7    Q.    BY MR. FRASER:   Why did you prepare this document?

8    A.    I had questions about the Union's proposal, and I needed

9    those questions answered in order to get the agreement.

10   Q.    Did you provide this to the Union?

11   A.    Bruce Lillie did.

12   Q.    Do you recall whether that was during a session or

13   outside of a session?

14   A.    I think it was an e-mail.  It was outside of the session

15   almost certainly.

16   Q.    Did you get answers to those questions?

17   A.    I think we did, yeah.

18   Q.    Do you remember when you received those answers?

19   A.    At the next session, July 28th, if memory serves.

20   Q.    Let's talk about the next session.  On the joint

21   stipulation, we have it as July 24, 2008.

22   A.    July -- let me look at the record.

23   Q.    It's Joint 1.

24   A.    July 24th, okay.

25   Q.    Were you at that session?

1  A.   Yes.

2  Q.   Do you recall having -- whether you had any private

3  conversations with anyone from the Union that day?

4  A.   I did not.

5  Q.   You did not, or you don't recall?

6       MR. McKNIGHT:  Objection, asked and answered.

7       JUDGE BUXBAUM:  I'm going to allow it because it's not

8  clear to me too.

9       THE WITNESS:  I didn't talk to anybody in private, no.

10 Q.   BY MR. FRASER:  Are you aware of whether or not Douglas,

11 any Douglas representative, had any sidebar private

12 conversation with a Union representative that day?

13 A.   I don't recall.

14 Q.   Okay.  Do you recall whether there were any joint

15 sessions that day?

16 A.   You know, without looking at the notes, if there are

17 any, I don't recall.

18      MR. FRASER:  I'd like to refresh this witness'

19 recollection, if I could, please.

20      JUDGE BUXBAUM:  Very well.

21 Q.   BY MR. FRASER:  I'm going to show you the same affidavit

22 I showed you a few moments ago.  And we're at page 4,

23 paragraph 18, if you could just briefly look at only

24 paragraph 18 for me.

25      MR. McKNIGHT:  Excuse me one second while I -- if I

1  might just find out what he's looking at.

2      JUDGE BUXBAUM:  Sure, sure.

3      MR. McKNIGHT:  Thanks.

4      MR. FRASER:  Page 4, paragraph 18.

5  Q.  BY MR. FRASER:  I asked you to look over that paragraph

6  18.

7      MR. McKNIGHT:  Hang on one second, counsel.  I'm just

8  trying to find it.  It's in the middle of this fact

9  collection of documents?

10     MR. FRASER:  It's marked as Exhibit 2 on the document

11  that I think you guys gave me yesterday.

12     **JUDGE BUXBAUM:  Let's go off the record a moment.**

13  **(Off the record.)**

14     **JUDGE BUXBAUM:  We'll go back on.**

15     You may proceed, Mr. Fraser.

16     MR. FRASER:  Thank you, Your Honor.  I asked the witness

17  to refresh his recollection by reading paragraph 18.  I'd

18  like him to read paragraph 19 as well to see if that helps

19  refresh his recollection.  They both deal with that

20  particular bargaining date.

21     JUDGE BUXBAUM:  All right, sure, sure.

22  Q.  BY MR. FRASER:  Having reviewed this affidavit, your

23  affidavit, Mr. Viar, does that help refresh your

24  recollection?

25  A.  It does.

1  Q.    Can you tell me whether there were any joint sessions on

2  July 24, 2008?

3  A.    There were, yes.

4  Q.    Okay, do you recall any topics that were discussed

5  during those joint sessions?

6  A.    Yes.

7  Q.    Can you tell me what they were?

8  A.    On health care, job classifications, wages, how many

9  employees might be returned to work, discussion of suing the

10  organization, the stupidity of the company -- that was a main

11  topic.  We discussed the answers.  Some of them from the

12  company's query back to the Union on the July 14th proposal.

13  Q.    Okay, did you reach a collective bargaining agreement

14  with the Union on July 24?

15  A.    No.

16  Q.    Did you discuss any return-to-work issues on July 24,

17  2008?

18  A.    As I mentioned, counsel, just then it was a question of

19  how many people -- we're talking about 50 people and how many

20  people were working in the factory, but nothing about

21  returning people to work, no.

22  Q.    Okay.  Did you reach any agreement on return-to-work

23  issues on July 24, 2008?

24  A.    No, we did not.

25  Q.    Did you reach any agreements on reinstating the illegal

1  strikers during the July 24, 2008, session?

2  A.   We did not.

3  Q.   The next day, according to our joint exhibit, is July

4  25.  Can you look at that joint exhibit for a minute?

5  A.   Yes.

6  Q.   Were you there?

7  A.   I was.

8  Q.   Can you recall whether you had any private meetings with

9  any Union representatives that day?

10  A.   No, we did not -- I did not.

11  Q.   Do you recall whether any other Douglas representative

12  had any private meetings with a Union representative that

13  day?

14  A.   I don't recall in specific.

15  Q.   Was there any discussion on July 25, 2008, in your

16  presence regarding the illegal strike?

17  A.   I don't recall.  It's possible.

18  Q.   So, if you'd look for me at General Counsel's Exhibit

19  No. 41, please.

20  A.   Okay.

21  Q.   Have you -- are you familiar with that document?

22  A.   I am.

23  Q.   Was this document or proposal discussed during the July

24  25, 2008, session?

25  A.   Yes.

1    Q.    Did you reach a collective bargaining agreement with the

2    Union on July 25, 2008?

3    A.    No.

4    Q.    Did you discuss any return-to-work issues with the Union

5    on July 25, 2008?

6    A.    Only in the context of what's in -- what's marked on

7    this exhibit as page 2.  No.

8    Q.    And when you say only in the context of what's described

9    in the exhibit as page 2, what are you referring to?

10   A.    Well, we were talking about the possibility of returning

11   some of the illegal strikers to work, but it never happened.

12   Q.    Did the company and the UAW reach any agreement on July

13   25, 2008?

14   A.    No.

15   Q.    If you could look at General Counsel Exhibit No. 42 for

16   me, please.

17   A.    Yes.

18   Q.    Have you seen that document before?

19   A.    Yes.

20   Q.    When did you see that first?

21   A.    The evening of July 25th, 2008, I think.

22   Q.    Okay, what is that document?

23   A.    I think it was a response off of our last proposal that

24   we just reviewed.

25   Q.    Do you recall any specific discussion about that

1  document?

2  A.   Oh, yeah, we had a lengthy discussion about this

3  document.  We, in specific, discussed the classifications.  I

4  didn't know what it meant, what the different groups mean.

5  We kicked that around a bit, and then I discussed -- we

6  discussed how it was we were still dealing with a wage

7  increase proposal.

8  Q.   I'm sorry.

9  A.   Go ahead.

10  Q    The next session that I have listed in our joint exhibit

11  is July 28, 2008.  Do you remember whether you were there?

12  A.   I was.

13      MR. FRASER:  I'm going to mark an exhibit.  My last two

14  attempts have resulted in GC Exhibits.  Are we at three?

15      JUDGE BUXBAUM:  No, no, no, stay with 2.

16      MR. FRASER:  With 2?

17      JUDGE BUXBAUM:  There hasn't been a 2.

18      MR. FRASER:  All right, so Respondent's Exhibit 2.

19  **(Respondent's Exhibit 2 marked for identification.)**

20  Q.   BY MR. FRASER:  Mr. Viar, can you look at that for a

21  minute, please?

22  A.   Okay.

23  Q.   Have you seen that before?

24  A.   Yes.

25  Q.   Can you tell me what that is, please?

1    A.    I think this is the Union's response -- or actually --

2    boy, I think this is the company's response to Union

3    proposals of 7/25 and 7/28 on some of the issues we

4    discussed.

5    Q.    And do you recall whether you submitted this to or

6    provided this to the Union on 7/28?

7    A.    Through Mr. Lillie, I believe we did, yes.

8         MR. FRASER:  And we ask for admission.

9         JUDGE BUXBAUM:  Any objection?

10        MR. McKNIGHT:  Wait a second.  Let me see the joint

11   exhibit.

12        **JUDGE BUXBAUM:  Yeah, we'll go off the record.**

13   **(Off the record.)**

14        JUDGE BUXBAUM:  Mr. Carlson, you wanted to voir dire the

15   witness about the document?

16        MR. CARLSON:  Yes, sir.

17        JUDGE BUXBAUM:  You may.

18                    **VOIR DIRE EXAMINATION**

19   Q.    BY MR. CARLSON:  Mr. Viar, did you prepare this

20   document?

21   A.    I don't believe so, no.

22   Q.    And are you certain this was a document that was given

23   by Mr. Lillie to the Union at some point?

24   A.    Certain, no.

25   Q.    Okay.

1    MR. FRASER:  I'll tell you what.  We'll withdraw our

2  request to introduce this exhibit for the time being.

3    JUDGE BUXBAUM:  I appreciate that, Mr. Fraser.  I think

4  all of us are puzzled about the exhibit.  So, hopefully, we

5  can get some clarification if you want to admit it.  We'll

6  leave it then as Respondent's 2 for identification, and it

7  will just sit in at least temporary limbo perhaps to be

8  revived later.

9                  **DIRECT EXAMINATION (cont.)**

10 Q.  BY MR. FRASER:  There are so many dates, I'm trying to

11 remember the series of questions that I always ask, and if

12 I've done this for July 28th, then please remind me.

13    JUDGE BUXBAUM:  You haven't, I don't believe.

14 Q.  MR. FRASER:  Mr. Viar --

15 **(Phone rings.)**

16    **JUDGE BUXBAUM:  Let's go off the record for a moment.**

17 **(Off the record.)**

18    JUDGE BUXBAUM:  All right, Mr. Fraser, you may proceed

19 with your set of questions.

20    MR. FRASER:  Thank you.

21 Q.  BY MR. FRASER:  Mr. Viar, do you recall having any

22 private meetings on July 28th, 2008, between yourself and any

23 Union representative?

24 A.  I did not.

25 Q.  Do you know whether or not Mr. Lillie or any other

1    Douglas representative had any private meetings with any UAW

2    representative on July 28, 2008?

3    A.   I remember Mr. Lillie did meet with Mr. Canzano in

4    private, yes.

5    Q.   On July 28th, 2008, was there any discussion in your

6    presence about illegal strike?

7    A.   Yes, I think there was.

8    Q.   Okay, what do you recall?

9    A.   As I recall it, Mr. Lillie again reminded the Local

10   Union that the strike was illegal, and we were not waiving

11   any of our rights or remedies under the Act.

12   Q.   Did you reach an agreement --

13       MR. McKNIGHT:  Excuse me just one second while I get

14   this out.

15   Q.   BY MR. FRASER:  Did you receive a collective bargaining

16   agreement with the Union on July 28th, 2008?

17   A.   No.

18   Q.   Did you reach any agreement on any return-to-work issues

19   in July 28th, 2008, session?

20   A.   No.

21   Q.   Again, forgive me if I've asked this, did you reach a

22   collective bargaining agreement on July 28th, 2008, with the

23   Union?

24   A.   We did not.

25   Q.   Did you reach any agreements with the Union on July

1   28th, 2008, regarding reinstatement of any illegal strikers?

2   A.   No.

3   Q.   The next session was July 31, 2008?

4   A.   Yes.

5   Q.   Were you there?

6   A.   I was.

7   Q.   Do you recall any private sessions that you had with any

8   Union representative that day?

9   A.   I did not speak privately with the Union that day.

10  Q.   Do you recall whether or not Mr. Lillie or any other

11  Douglas representative had any private sessions with the

12  Union on July 31st, 2008?

13  A.   I remember asking Mr. Lillie to do that very thing, yes.

14  Q.   Okay.

15       JUDGE BUXBAUM:   And did he do so?

16       THE WITNESS:   He did.

17  Q.   BY MR. FRASER:   On July 31st, 2008, was there any

18  discussion in your presence during a joint session about

19  illegal strike?

20  A.   Yes.

21  Q.   Can you tell me what that was, when that was, and who

22  said what?

23  A.   Mr. Lillie -- we had left the meeting room.

24  Q.   Who's we?

25  A.   That's Diane Hedgcock, Bruce Lillie, myself, and Glenn

1    Kirk.  We had left the bargaining session to sort of cool

2    off, and we returned.

3    Q.    I'm sorry, when you say bargaining session, joint

4    session?

5    A.    Yes.

6    Q.    Okay.

7    A.    We returned, and Bruce Lillie again very pointedly

8    reminded the group that the strike was illegal, and this

9    touched off an argument.  I recall in response Mr. Canzano

10   said just because you say so doesn't make it true.  Your

11   assertion is similar to signs in a restaurant about not being

12   responsible for lost clothing.  And we had that discussion

13   towards the tail end.  You asked me when it was, toward the

14   tail end of that meeting on the 31st.

15   Q.    Okay, what happens next in that session, if you can

16   recall?

17   A.    We broke off discussions.  We had a debate internally

18   about, you know, how close are we, something like that.  And

19   we broke for the day.

20   Q.    Were there any other comments from any other Union

21   representatives other than Mr. Canzano that day regarding the

22   topic you just discussed and testified about?

23         JUDGE BUXBAUM:  Well, which topic, how close they were?

24   Q.    BY MR. FRASER:  No, I'm sorry, regarding the illegal

25   strike and not waiving rights.

1  A.    It may have been in this session again a sprinkling of

2  how stupid the company was.  I remember that from the 31st.

3      MR. McKNIGHT:  Objection.

4  Q.  BY MR. FRASER:  It's fine if you don't recall.

5  A.    I'm sorry?

6      JUDGE BUXBAUM:  No, but he's saying he does recall.

7  Repeat what you just said.

8      THE WITNESS:  I remember a discussion from the Union

9  about how stupid the company was in reference to this issue

10  about the strike being illegal.  That's what I recall.  I

11  don't know if that was responsive to the question.  I guess

12  I'd have to hear the question again.  I'm sorry.

13  Q.  BY MR. FRASER:  How about we try another one?  Did you

14  reach a collective bargaining agreement with the Union during

15  the 7/31/08 meeting?

16  A.    No.

17  Q.    Did you discuss any return-to-work issues with the Union

18  during this 7/31/2008 meeting?

19  A.    No.

20  Q.    Did you reach any agreement on reinstating any or all of

21  the illegal strikers during the 7/31/2008 meeting?

22  A.    We did not.

23  Q.    Okay, do you recall when the next bargaining date was?

24  A.    We met again on August 14th, 2008.

25  Q.    Okay.

```
 1        JUDGE BUXBAUM:  Let me interrupt for a second.
 2   Mr. Fraser, how close are you?
 3        MR. FRASER:  Almost, I'm on the last page.
 4        JUDGE BUXBAUM:  Oh, good.  No, that's fine then because
 5   I noticed you were looking at your watch, and I was wondering
 6   if that was a bad sign.  All right, very good.  Very good.
 7        MR. FRASER:  No, just trying to get this done here.
 8   Q.  BY MR. FRASER:  You said August 14th?
 9   A.  Yes, sir.
10   Q.  Were you there?
11   A.  I was.
12   Q.  Any new individuals present at this session?
13   A.  Yes.
14   Q.  Can you tell me who they were?
15   A.  Sam McKnight from the Local Union and Dan Cohen, who was
16   a lawyer representing the company.
17   Q.  Okay, were there any joint sessions that day?
18   A.  No, sir.
19   Q.  Tell me what happened, as best to your recollection, on
20   August 14th.
21   A.  For some reason that day, I don't remember why, we were
22   in a room, an actual hotel room.  When I say we, that's Glenn
23   Kirk, Diane Hedgcock, Bruce Lillie, myself, and Dan Cohen.  I
24   remember Mr. McKnight with Mr. Winkle, Frank Gruza and Mary
25   Ellis knocked on the door and entered the room, and there was
```

1    an exchange between Mr. McKnight and Mr. Lillie.

2    Q.    Tell me what you recall being said?

3    A.    Mr. McKnight asked Mr. Lillie whether we would --

4    Mr. McKnight stated that he was there to reach a responsible

5    collective bargaining agreement with the people.  Would we

6    meet to discuss that?  Mr. Lillie responded I know what

7    you're trying to do, Sam, something like that.  Mr. Lillie

8    indicated that we would talk about effects with that group,

9    but their status was unprotected under the Act or words to

10   that effect.  I don't remember what he said exactly,

11   Mr. Lillie now.  But we were not talking to that group about

12   anything other than effects.

13   Q.    Okay.

14   A.    Then there was an exchange on picket line misconduct.

15   Q.    What was said, as best you can recall?

16   A.    Mr. McKnight asked whether anyone in that room thought

17   the UAW condoned racial epithets being launched at employees

18   of the organization, and Mr. Lillie reminded Mr. McKnight

19   that the UAW was responsible for what people did on the

20   picket line.  There may have been an issue -- I recall a

21   third issue, but the two chief ones were the picket line

22   misconduct and this question of effects.

23   Q.    Okay, do you know whether any Douglas representative had

24   any private meetings with the Union representatives that day?

25   A.    I know that they did because I watched Mr. Lillie leave

1    and speak with Mr. McKnight in the parking lot.  And

2    Mr. Lillie recounted that conversation to me later.

3    Q.   Okay.  Did you reach a collective bargaining agreement

4    with the Union on August 14th, 2008?

5    A.   We never did, no.

6    Q.   Did you discuss any return-to-work issues on August 14,

7    2008?

8    A.   No.

9    Q.   Did you reach any agreement with the Union on

10   reinstating any or all of the illegal strikers during the

11   8/14/08 session?

12   A.   No.

13   Q.   Did you have any bargaining sessions with the Union

14   after August 14, 2008?

15   A.   We had some settlement discussions, as you know,

16   counsel, after.  I don't know bargaining or not, but yeah, we

17   met twice.

18      MR. McKNIGHT:  Objection, Your Honor.  That's a

19   discussion about litigation settlement discussions that were

20   monitored under the --

21      MR. FRASER:  Let me ask it this way.

22      JUDGE BUXBAUM:  Well, you're not going to inquire,

23   Mr. Fraser, about settlement discussions?

24      MR. FRASER:  Absolutely not, and he's answered the

25   question the way I asked it.  Let me ask a different

1   question.

2   Q.   BY MR. FRASER:   Other than those discussions where there

3   were settlement issues raised --

4        MR. McKNIGHT:   Objection, other than the confidential

5   settlement discussions, that's the discussions about the

6   settlements.   They were confidential settlement discussions

7   under Rule 408.

8        JUDGE BUXBAUM:   But he's not asking about those, and I

9   don't want you to tell me about those, Mr. Viar.

10       MR. FRASER:   Sometimes I'm lost, Mr. McKnight with

11  your --

12       THE WITNESS:   Okay.

13       JUDGE BUXBAUM:   All right.

14       MR. FRASER:   I'll try again.

15       JUDGE BUXBAUM:   Yes.

16  Q.   BY MR. FRASER:   Other than those confidential settlement

17  discussions under Rule Federal Evidence 408 -- I don't want

18  you to talk about those -- were there any other sessions with

19  the Union related to bargaining?

20  A.   No.

21  Q.   Has the Union requested to meet with the company since

22  August 14 of 2008?

23  A.   No.

24  Q.   Did any of your negotiations with the Union after May 1

25  of 2008 result in a collective bargaining agreement?

1  A.   No, sir.

2  Q.   Did any of the bargaining unit members cross the picket

3  line?

4  A.   They did not.

5  Q.   Did any of the bargaining unit members return to work?

6  A.   No.

7  Q.   Did any of the bargaining unit members after May 1,

8  2008, make application to come back to work?

9  A.   No.

10      MR. FRASER:  One more --

11      JUDGE BUXBAUM:  You're going to mark this as 3?

12      MR. FRASER:  Respondent 3.

13 **(Respondent's Exhibit 3 marked for identification.)**

14 Q.   BY MR. FRASER:  Could you look at that document in front

15 of you, please?  Can you tell me what that is?

16 A.   It's my letter to the MESC.

17 Q.   Did any of the bargaining unit members file for

18 unemployment on or after May 1 of 2008?

19 A.   I think they all did, counsel.

20 Q.   Okay, and did the company, did Douglas respond to that

21 filing, that unemployment filing?

22 A.   Yes.

23 Q.   And the document in front of you, is that at least the

24 initial response to the unemployment filing?

25 A.   Yes.

1  MR. FRASER:  We ask that Respondent 3 be admitted,

2 please.

3  JUDGE BUXBAUM:  Any objection?

4  MR. CARLSON:  I'd like to voir dire.

5  JUDGE BUXBAUM:  Very well.

6     **VOIR DIRE EXAMINATION (cont.)**

7 Q.  BY MR. CARLSON:  Mr. Viar, when did you send this

8 document?

9 A.  It would have been the week of May 5th, 2008.

10  JUDGE BUXBAUM:  How come you didn't date it?

11  THE WITNESS:  You know, I don't know.

12  JUDGE BUXBAUM:  Okay.

13  THE WITNESS:  That's a clerical error on my part.

14 Q.  BY MR. CARLSON:  Can I ask you one more question,

15 Mr. Viar?  Were you -- it says here there are no other

16 divisions or subdivisions impacted by this labor dispute.

17 Can you just explain that?  What were you intending to --

18 A.  I think, if memory serves, that was in response to a

19 questionnaire from the state, right.  Are there other like

20 Union groups or, you know, different locals, and it was in

21 response to that.  That's what it was.

22 Q.  Okay.

23 A.  Divisions or subdivisions would have been of the people

24 that were unemployed at that time.

25 Q.  Okay.

1        MR. CARLSON:  No objection, Judge.

2        JUDGE BUXBAUM:  Mr. McKnight?

3        MR. McKNIGHT:  No objection.

4        JUDGE BUXBAUM:  It will be received.  That's

5   Respondent's 3.

6   **(Respondent's Exhibit 3 received into evidence.)**

7        MR. FRASER:  I'm finished.

8        JUDGE BUXBAUM:  Excellent.  All right, can we resume at

9   1:45?  Is that agreeable to everyone?

10       MR. FRASER:  It's agreeable to us.

11       MR. McKNIGHT:  I have five to 2:00, and I left a number

12  of materials inadvertently back in my hotel.  Can we just

13  have until 2:00?  Or five to 1:00 right now.

14       JUDGE BUXBAUM:  Let's make it five to 2:00.

15       MR. McKNIGHT:  Thank you.

16       JUDGE BUXBAUM:  All right, then we'll recess until 1:55.

17  Mr. Viar, of course, it's particularly important that you not

18  discuss your testimony over the lunch break.

19       THE WITNESS:  I understand.

20       **JUDGE BUXBAUM:  Off the record.**

21  **(Whereupon, at 12:55 p.m., a lunch recess was taken.)**

22

23

24

25

1          <u>A F T E R N O O N   S E S S I O N</u>

2                                    **(Time Noted:  1:56 p.m.)**

3          **JUDGE BUXBAUM:  All right, we're on the record.**

4     Mr. Viar is back on the witness stand, and, Mr. Carlson,

5     I believe we're up to your cross-examination.

6          MR. CARLSON:  Thank you, Judge.

7                         **CROSS-EXAMINATION**

8     Q.   BY MR. CARLSON:  Mr. Viar, you testified that at the May

9     5th meeting that took place in Lansing between the company

10    and the Union around 6:00 p.m., that Mr. Lillie stated that

11    the company believed the strike was illegal and that the

12    company was not waiving its rights?  Was that your testimony?

13    A.   As I recall it, yes.

14    Q.   Okay.  And there's no doubt in your mind about that?

15    A.   No.

16    Q.   Isn't it true, Mr. Viar, that you or Mr. Lillie or

17    Mr. Kirk, none of you suspected any issue with the Union's

18    30-day notice until May 9th?  Isn't that true?

19    A.   No.

20    Q.   Okay.  Mr. Viar, I'm going to show you a copy of an

21    affidavit you gave to the National Labor Relations Board on

22    September 4th, 2007.  Is that your signature, sir?

23    A.   Yes.

24    Q.   And your signature appears right under the line that

25    says you've read this statement and you fully understand its

1  contents and certify that it is true and correct to the best

2  of your knowledge and belief; is that true?  Does it say

3  that?

4  A.  Yes.

5  Q.  Okay, I'm going to read into the record in paragraph 2,

6  the second to the last sentence, we first surmised on or

7  about May 9th that there was no 30-day notice when the strike

8  began.  Did I read that correctly?

9      MR. FRASER:  Can I interrupt you for a minute?  I'm

10  sorry.  I'm not sure if I --

11      JUDGE BUXBAUM:  Sure, if you need to find it, I

12  certainly will give you a chance to do that.

13      MR. FRASER:  I'm not sure if I gave that back to you.

14      **JUDGE BUXBAUM:  Let's go off the record for a moment.**

15  **(Off the record.)**

16      MR. CARLSON:  I'm going to show the witness this

17  document.

18      MR. FRASER:  That's not a marked exhibit?

19      MR. CARLSON:  I will mark it.  I'm going to show it to

20  him, though.  I'm just showing it to you first.

21      JUDGE BUXBAUM:  What number will this be, counsel?

22      MR. CARLSON:  What number are we up to, please?

23      JUDGE BUXBAUM:  I think you're at 58 should be next, but

24  let's see.  Yep, the reporter agrees, 58.

25  **(General Counsel's Exhibit 58 marked for identification.)**

1    Q.   BY MR. CARLSON:  Mr. Viar, I'm going to hand you what

2    I've marked as General Counsel's Exhibit 58.  Could you

3    please take a look at that document, please?

4         MR. FRASER:  Steve, do you have a copy of that for me?

5         MR. CARLSON:  I do not.

6         MR. FRASER:  Again, I would try to -- it would be

7    helpful for me to have it while this discussion is going on,

8    so I'm not sure how we work that out.  If there's a way to

9    take a break and get a copy, it'd be great.

10        JUDGE BUXBAUM:  Well, I don't want to take that much

11   time.  Let's see if maybe the two of you can share.  It's not

12   clear to me how crucial this is going to be, obviously.

13        MR. CARLSON:  What the document is is it's the

14   Employer's position statement that was given to the Board in

15   this case during the investigation of this case.

16        JUDGE BUXBAUM:  All right, well, I would think you would

17   have that.

18        MR. FRASER:  At a time when we weren't counsel, Your

19   Honor, so it makes it a little more difficult for me to have

20   that.

21        JUDGE BUXBAUM:  Okay, yeah.  Are you just going to seek

22   to admit it?

23        MR. CARLSON:  I can't say that, Your Honor.  I'm not

24   sure yet.

25        JUDGE BUXBAUM:  Okay, all right, well, let's see what --

1  I guess right now you're just asking the witness to do what?

2      MR. CARLSON:  To review the document.

3      JUDGE BUXBAUM:  The whole thing?

4      MR. CARLSON:  Just I'm asking if he recognizes it.

5  That's all I've asked.

6      JUDGE BUXBAUM:  Okay, all right, that's what I wanted to

7  get.  Mr. Viar, do you know what that is?

8      THE WITNESS:  This is a 27-page position statement sent

9  to the Board regarding charge number 7A-51428.

10     JUDGE BUXBAUM:  And who wrote it?  Does it say?  Who

11  signed it, let me put it that way?

12     THE WITNESS:  Dan Cohen.

13     JUDGE BUXBAUM:  Okay, thank you.

14  Q.  BY MR. CARLSON:  And Dan Cohen was an attorney working

15  for the company at that time, is that -- or not working for

16  but --

17     JUDGE BUXBAUM:  Retained by.

18     MR. CARLSON:  Retained by the company?  Thank you,

19  Judge.

20     THE WITNESS:  Yes.

21  Q.  BY MR. CARLSON:  Thank you.  And this was submitted to

22  the Board on or about October 14th, 2008; is that true?

23  A.  Yes.

24  Q.  And I notice on the final page that it appears you were

25  cc'd on this document?

1  A.    Yes.

2  Q.    And in your role as counsel for the company and being

3  involved in litigation and so forth, did you participate in

4  the preparation of this document?

5  A.    Yes.

6  Q.    And how did you participate?

7  A.    Reviewed drafts, I organized materials.  I talked with

8  the lawyer about, Mr. Cohen, about what to contain, what to

9  leave out.

10  Q.    Okay, and I don't want to get into any privilege matter,

11  but did you discuss -- you don't have to tell me what you

12  discussed, but did you discuss the facts underlying the

13  dispute, the unfair labor practice dispute?

14       MR. FRASER:  Objection, Your Honor.  It's still,

15  regardless of whether he gets into the facts, it's

16  conversation that took place with counsel, and it's

17  privileged information.

18       JUDGE BUXBAUM:  Boy, I don't know.  It's borderline,

19  isn't it, Mr. Carlson?

20       MR. CARLSON:  The question is merely whether or not they

21  had a discussion, but I'll move on.  That's fine.

22       JUDGE BUXBAUM:  Yeah, I think --

23  Q.    BY MR. CARLSON:  Mr. Viar, I'm going to direct your

24  attention to -- excuse me, I just want to show this to

25  Mr. Fraser first.

1     MR. FRASER:  So again, it would be very helpful, Your

2  Honor, if I could have a copy of that document.

3     JUDGE BUXBAUM:  Yeah, I know.  Is there any capability

4  of providing counsel with a copy?

5     MR. CARLSON:  Yes, we can go right downstairs and get a

6  copy.

7     JUDGE BUXBAUM:  All right.

8     MR. CARLSON:  Can I finish my examination of this one

9  single question?

10     JUDGE BUXBAUM:  Oh, well, one question, let's see what

11  it is.

12  Q.   BY MR. CARLSON:  Mr. Viar, isn't it true that this

13  document submitted to the Board, prepared by Mr. Cohen and

14  yourself, states that only after May 5 did Douglas come to

15  suspect that the Union had committed an 83 violation?  Did I

16  read that accurately?

17  A.   Yeah.

18  Q.   Thank you.

19     JUDGE BUXBAUM:  Well, did you complete your answer?

20     THE WITNESS:  No.

21     JUDGE BUXBAUM:  You can complete your answer.

22     THE WITNESS:  As I recall it, on May 5th, 2008, during

23  the phone conversation we had with Mr. Lillie, that's Glenn

24  Kirk and I, Bruce asked me to find 60-day notice in the

25  record, and then he asked for the first time something he

1  called 30-day notice.  And we had a discussion about the

2  potential impact of that 30-day notice not being in the

3  record.

4      JUDGE BUXBAUM:  I think that the 60-day notice was in

5  the record?

6      THE WITNESS:  Yes, Judge.

7      JUDGE BUXBAUM:  Okay.

8      THE WITNESS:  Suspected, surmised, we knew something, as

9  I've testified, was wrong because I couldn't find it.

10     JUDGE BUXBAUM:  The 30 --

11     THE WITNESS:  The 30-day notice.

12     JUDGE BUXBAUM:  When you say you couldn't find it, where

13  would you have looked for it?

14     THE WITNESS:  I have a record binder with my bargaining

15  materials, and that's what I went to.  And that's where I

16  found the 60-day notice.  And then Bruce Lillie described

17  what this document would look like, and I said no, not in the

18  record.  Don't have it.

19     JUDGE BUXBAUM:  And what was your expectation in looking

20  through your records?  Why did you assume you would have a

21  copy?

22     THE WITNESS:  Counsel asked me to see if I had it, and I

23  didn't have it.

24     JUDGE BUXBAUM:  Okay.

25  Q.   BY MR. CARLSON:  All right, then, I'm going to try to

1  get some clarification, Mr. Viar.  When did the company first

2  surmise or suspect, and I take those two words to mean the

3  same thing, that the Union had not filed its 30-day notice

4  prior to the strike?

5  A.    The first indication we had was May 5th of 2008, and I

6  got that speculation or that idea from Mr. Lillie.  Later on

7  that week, as is consistent with my affidavits, we surmised

8  that it had not been filed by the Local Union.

9  Q.    I don't mean it to be disrespectful at all by saying

10  this, when you signed this affidavit on September 23rd, did

11  you -- were you aware of the meaning of the word surmise?

12  And I'm not trying at all to be disrespectful.

13      MR. FRASER:  Objection, Your Honor.  He said September

14  23rd as compared to September 4th.  Am I looking at the wrong

15  affidavit?

16      MR. CARLSON:  I apologize.  September 4th, thanks, Jeff.

17      JUDGE BUXBAUM:  Why don't you restate it, the question?

18  Why don't you restate the question?

19  Q.    BY MR. CARLSON:  On September 4th, 2008, when you signed

20  this affidavit certifying that it was true and correct to the

21  best of your knowledge and belief, did you know the meaning

22  of the word surmised?

23  A.    Yes.

24  Q.    Mr. Viar, you also provided an affidavit to the Board on

25  May 23, 2008.  Will you take a look at that?

1    MR. CARLSON:  Should I mark that for identification,

2    Judge.

3    JUDGE BUXBAUM:  Well, if it's Jencks material, I don't

4    know.  Mr. Fraser, do you have an ax to grind on that?  Do

5    you care?  If it's going to be admitted, obviously, it's got

6    to be marked for identification.  If it's not --

7    MR. CARLSON:  I don't have any intention of admitting

8    it.

9    JUDGE BUXBAUM:  Yeah, if it's not going to be admitted,

10   we know it's Jencks, therefore it is identified in the

11   record.  I don't have a strong feeling.

12   MR. FRASER:  I don't either.

13   JUDGE BUXBAUM:  All right, then as long as -- and you

14   have been doing this, of course, counsel, as long as you say

15   this is the affidavit such and such a date, and, of course,

16   we know it's Jencks material, that will be all right.

17   Q.   BY MR. CARLSON:  So, have you had an opportunity to

18   review that, Mr. Viar?

19   A.   Yes.

20   Q.   And do you recognize that as an affidavit that you gave

21   to the National Labor Relations Board on May 23rd, 2008?

22   A.   I think it's in reference to a surface bargaining

23   charge.  It's an affidavit in one of the cases, yes.

24   Q.   Okay, and in this affidavit, there is discussion about

25   the meeting that occurred on May 5th.  Is that true?

1  A.   I'll have to see it again.

2  Q.   I'm going to direct you to page 3, the paragraph that

3  starts on line 3.

4  A.   Yes.

5  Q.   Okay.  And I'm going to read this into the record.  Make

6  sure that I read this correctly.  I attended the meeting with

7  the Union's bargaining committee at 6:00 p.m. that evening.

8  Attorney Lillie provided the Union with a letter stating that

9  they were locked out.  Attached to the letter was a synopsis

10  of the Employer's bargaining position.  Attorney Lillie asked

11  the Union if they were willing to return under the conditions

12  stated in the synopsis.  UAW representative Winkle stated

13  that he would let the Employer know.  I am not aware of the

14  Union offering to return under the conditions laid out in the

15  synopsis, and that's the end of the affidavit.  Did I read

16  that correctly?

17  A.   Yes.

18  Q.   And you would agree that there's no discussion in here

19  about any statements made about a strike being illegal or any

20  reservation of rights by the company at the May 5th meeting?

21  A.   That affidavit speaks for itself, counsel.

22  Q.   Thank you.

23     MR. McKNIGHT:  Right, I think he has to say whether or

24  not it says that because the affidavit isn't in evidence.

25     JUDGE BUXBAUM:  Well, that's a fair point.  Have you

1  read the entire affidavit, Mr. Viar?

2      THE WITNESS:  I'd like to review the whole thing.

3      JUDGE BUXBAUM:  Sure.

4  **(Pause.)**

5      JUDGE BUXBAUM:  Have you had a chance to read it?

6      THE WITNESS:  I have.  Can I hear the question again?

7      JUDGE BUXBAUM:  Yes.

8  Q.   BY MR. CARLSON:  Mr. Viar, it's true, is it not, that in

9  that affidavit, there is no discussion of any statements made

10 at the May 5th meeting by Mr. Lillie or anyone else

11 representing the company that the strike was illegal or that

12 the company was reserving its rights?  The affidavit doesn't

13 say that, does it?

14 A.   No.

15 Q.   I think there was also testimony -- you've also

16 testified that at the July 2nd meeting, again I think it was

17 that Mr. Lillie made a statement that the Union strike was

18 illegal and that the company was reserving its rights.  That

19 was your -- is that your testimony?

20 A.   As far as I recall, yes.

21 Q.   Okay, do you recall at what point in the meeting

22 Mr. Lillie said that?

23 A.   No.

24     MR. CARLSON:  I'm sorry, what are we up to?

25     COURT REPORTER:  59.

1    MR. FRASER:  Your Honor, if I could just remind General

2  Counsel that I still need a copy of General Counsel 58, and

3  I'm hoping that I'll get that sometime before the day's over.

4    JUDGE BUXBAUM:  That's the position statement?

5    MR. FRASER:  Yes.

6    MR. CARLSON:  Very well, Judge.

7  Q.   BY MR. CARLSON:  Mr. Viar, did you take notes at the

8  July 2nd meeting?

9  A.   I don't remember.

10  Q.   Okay.

11  A.   I doubt it.

12  Q.   Okay.

13    MR. FRASER:  I still -- I understand this is cross-

14  examination, but there was prep time before the cross.  I'm

15  really at a disadvantage to have these cross-examination

16  questions flying without having copies of these documents.

17  So, you know, Steve, if you've got one for me, I'd like to

18  have it.  If you don't, then I guess maybe we ought to take a

19  time out and get the documents that I need to see while

20  you're doing your cross.

21    MR. CARLSON:  This is a company document.  It was

22  produced pursuant to subpoena.  It's the notes that Mr. Viar

23  testified that he typed up regarding the July 2nd meeting.  I

24  would assume counsel would have it.

25    MR. FRASER:  Yeah, I do.  I've got eight boxes of

1  documents back in my office, none of which did I bring with

2  me.

3      JUDGE BUXBAUM:  I understand the problem.  I mean,

4  typically the way to resolve it, it seems to me, is to have

5  you show it to him.  He can look at it, and then you go on

6  with what you're doing.  It's not ideal, but, you know,

7  trials would take years if we pursued ideal conditions.

8      MR. FRASER:  So, Your Honor, am I to understand then

9  that even though there's a perfectly simple mechanical way to

10 be able to see all of these documents while the cross-

11 examination is going on, that we're going to have me read

12 them?

13     MR. CARLSON:  I can take five minutes and go downstairs

14 and copy them.

15     **JUDGE BUXBAUM:  All right, we'll recess for five**

16 **minutes.**

17 **(Off the record.)**

18 **(General Counsel's Exhibit 59 marked for identification.)**

19     JUDGE BUXBAUM:  You may proceed, Mr. Carlson.

20 Q.  BY MR. CARLSON:  Mr. Viar, I'm going to hand you General

21 Counsel's 59.  The number got cut off there a little.  There

22 was a problem when we were making copies.

23 A.  Okay.

24 Q.  And do you recognize this document?

25 A.  Yes.

1   Q.    And this is the document that in your prior testimony,

2   this was the typewritten notes that you made, from what I

3   understand about your testimony, that you made using Diane

4   Hedgcock's notes and any notes you may have taken from time

5   to time during the bargaining session.  Is that true?

6   A.    That's accurate, yes.

7   Q.    Okay.

8         JUDGE BUXBAUM:  This is what you, I think, termed in

9   June as minutes.

10        THE WITNESS:  Yes.

11        MR. CARLSON:  Very good.  Thank you, Judge.

12  Q.  BY MR. CARLSON:  And, Mr. Viar, it's true, is it not,

13  that nowhere in this document does it say, does it show that

14  Mr. Lillie stated during this meeting or made any statements

15  about the strike being illegal and about the company

16  reserving its rights with respect to the strike?

17  A.    That's right.

18  Q.    Okay.  And also during the July 2nd meeting, there was

19  some discussion with respect to the temporary employees and

20  some concerns raised by Mr. Winkle about rumors that they had

21  become permanent employees.  There was some discussion about

22  that, was there not?

23  A.    As I review this, yeah, I think we had that discussion.

24  That's right.

25  Q.    And during that meeting, Mr. Kirk made the statement

1    that at no time were these temporary employees told that they

2    were permanent.

3    A.    The fair statement, counsel, it says no timers has been

4    couched as permanent replacements.  I think that's a fair

5    description of what he said, something like that.

6    Q.    And that Mr. Lillie said in this meeting that there were

7    plans for how to bring back work force is already being

8    discussed?

9    A.    That's what it says.

10   Q.    Okay, did you make this -- when you would transcribe

11   these notes, for lack of a better word, when you would make

12   your minutes, did you do this soon around the time of the

13   meeting?

14   A.    You know, it varied.  I don't remember when I did this,

15   sometime after.

16   Q.    Okay, can you tell me to the best of your recollection,

17   what was the variance?  I mean, was it within hours to weeks

18   or --

19   A.    It was at least a couple of weeks.

20   Q.    At least a couple of weeks?

21   A.    Yes.  I don't -- again, I don't remember.  There was

22   a -- I did a lot of them at one time, to my recollection.

23   Q.    But having reviewed these minutes, can you still -- are

24   you still sure that at the July 2nd meeting, Mr. Lillie made

25   any statement about the strike being illegal or of the

1  company reserving its rights?

2  A.   I have testified on that.  Yes, I'm sure.

3  Q.   When you typed up these minutes, were you concerned that

4  Ms. Hedgcock's notes didn't reflect Mr. Lillie's statement?

5  A.   I was concerned mostly with getting sort of a synopsis

6  of what happened to senior management.  I wanted to be as

7  accurate as possible, sure.

8  Q.   Did you think it was significant what Mr. Lillie had

9  said at the meeting?

10  A.   Yes.

11  Q.   Did you ever reprimand Diane Hedgcock for not writing

12  down what Mr. Lillie had said about the strike being illegal

13  and about the company reserving its rights?

14  A.   I, without looking at her notes, I don't know what she

15  wrote down for that day.  But no, I didn't reprimand her, no.

16  Q.   Okay.  Mr. Viar, I've handing you now what I've marked

17  as General Counsel's Exhibit 60.  And I ask you to take a

18  look at that document.

19      MR. CARLSON:  Oh, I'm sorry, Judge.  That's my copy.

20      JUDGE BUXBAUM:  No problem.  It didn't have any nasty

21  comments about the judge written in the margins, did it?

22      MR. CARLSON:  Just some highlighting, so for whatever

23  it's worth, which I don't know how much it's worth, probably

24  not much of nothing.

25  **(General Counsel's Exhibit 60 marked for identification.)**

```
 1       THE WITNESS:  I recognize this document, yes.
 2  Q.   BY MR. CARLSON:  Okay, and do you recognize this
 3  document as the minutes that you prepared from the July 15th,
 4  2008, meeting that you testified about?
 5  A.   Yes.
 6       JUDGE BUXBAUM:  I'm sorry to interrupt, counsel.  You
 7  gave me a second July 2nd.  I thought it looked familiar.
 8  And this is going to be 60?
 9       MR. CARLSON:  Yes, sir.
10       JUDGE BUXBAUM:  Oh, you've got it.  Okay.
11  Q.   BY MR. CARLSON:  And again, you typed these minutes in
12  the same -- using the same procedure using Ms. Hedgcock's
13  notes and any notes that you may have taken at the July 15th
14  meeting?
15  A.   Yes.
16  Q.   Okay.  And do you recall when or about when you typed
17  this document?
18  A.   No.
19  Q.   And it is true, Mr. Viar, is it not, that this document
20  does not reflect any statements by Mr. Lillie at this meeting
21  regarding the strike being illegal or the company reserving
22  its rights with respect to the strike?
23  A.   That's right.
24  Q.   I'm sorry?
25  A.   That's right.  I don't see it.
```

1   Q.   Mr. Viar, prior to -- I'm sorry, let me take that

2   document there.  Thank you.  Prior to the strike, what was

3   the usual procedure for the company calling laid-off

4   employees back to work?  How would that work?

5   A.   The management group would, and by that I mean the plant

6   management group, would indicate some business reason for

7   calling people back, increased order or something like that.

8   Talk to the HR group, Diane and myself, and we would call the

9   people back according to the agreement.

10      JUDGE BUXBAUM:  By the agreement, the collective

11  bargaining agreement?

12      THE WITNESS:  Yes, I understood we're in the context of

13  prior to the strike.

14      JUDGE BUXBAUM:  Sure, sure.

15  Q.   BY MR. CARLSON:  And would you contact people?  How

16  would you contact people, or how would the communication

17  regarding the recall, how would that occur in the usual

18  process?

19  A.   Diane would typically -- in my parlance, counsel, I

20  guess, you know, Diane served as hourly personnel person.

21  And it was her role on something like this to contact the

22  people.  She would do that by phone or by letter, typically

23  by phone.

24  Q.   And was that the same procedure used for the entire time

25  you've been at Douglas Autotech?

1  A.   No.

2  Q.   Okay, prior to May 1st of 2008, was that the same

3  procedure that was used?

4  A.   Yes.

5  Q.   Thank you.  Mr. Viar, it's true, isn't it, that the

6  company presumed that the laid-off employees -- and by laid

7  off, I mean those employees on General Counsel's Exhibit 48,

8  who have been indicated previously in the record as employees

9  who were on layoff at the time the strike began -- did the

10 company presume that those employees had joined the strike?

11 Is that a fair statement?

12 A.   Yes.

13 Q.   And is it also true that the company presumed that

14 Gordon Diamond had joined the strike?

15 A.   Yes.

16 Q.   And that Marcy Schorey had joined the strike?

17 A.   Yes.

18 Q.   And the company presumed that Dusty Modert had joined

19 the strike?

20 A.   No, I mean, Dusty had not been at the facility for

21 nearly two years.  Her leave was continuing.  I don't know

22 that we made any specific discussion or thinking about Dusty.

23 I guess, I don't know.  To answer your question straight off,

24 I don't know what we thought about Dusty Modert.

25 Q.   But the company discharged Dusty Modert on August 4th,

1  2008; is that correct?

2      MR. FRASER:  Objection, it presumes facts not in

3  evidence.  It characterizes --

4      JUDGE BUXBAUM:  All right, rephrase it.  Rephrase it.

5      MR. CARLSON:  Presumes facts not in evidence?  Actually,

6  it already is in evidence.

7      MR. FRASER:  Well, the evidence, Your Honor, is that the

8  letter, in addition to stating information about

9  termination --

10      JUDGE BUXBAUM:  Well, but I don't want to get into a

11  semantic game here.  I assume what you're getting at is that

12  the company sent her a letter on August 4th, and we all know

13  what the letter says.

14      MR. CARLSON:  That's right, right.  I'm sorry, Judge.

15  If that's an easier way to do it, I can try to --

16      JUDGE BUXBAUM:  Yeah, sure, let's do it that way.

17      MR. CARLSON:  I'm not trying to do anything cute here.

18      JUDGE BUXBAUM:  Right, and I know that.  I mean, look,

19  everyone -- nobody's doing anything cute.  Everyone is trying

20  to protect their respective client's interests in an

21  appropriate way.  I have no trouble with it.  I just don't

22  want to get tied up in semantics if we can avoid it.

23      MR. CARLSON:  Right.

24      JUDGE BUXBAUM:  So, why don't you do it that way?

25  Q.  BY MR. CARLSON:  Well, Mr. Viar, was Dusty Modert among

1    the employees that the company sent a letter to on August 4,

2    2008, the letter that's been admitted into evidence, I

3    believe, as GC-47?

4    A.    I'd say yes.  I think that's right.

5    Q.    Okay.

6         MR. CARLSON:  Your Honor, can we go off the record for

7    one minute?

8         JUDGE BUXBAUM:  Very well.

9    **(Off the record.)**

10   Q.    BY MR. CARLSON:  Mr. Viar, I'm going to show you what

11   I've marked for identification as General Counsel's Exhibit

12   51 and ask you --

13        JUDGE BUXBAUM:  61.

14   Q.    BY MR. CARLSON:  -- 61, and ask you if you recognize

15   that document.

16   A.    Yes.

17   **(General Counsel's Exhibit 61 marked for identification.)**

18   Q.    BY MR. CARLSON:  And what is that document?

19   A.    To avoid the games we've been playing here, it's the

20   letter I sent out on August 4th, 2008.

21   Q.    And to whom did you send this particular letter?

22   A.    Ms. Modert.

23   Q.    Dusty Modert?

24   A.    Yes.

25   Q.    Thank you.  Mr. Viar, you testified earlier about a

1  meeting that occurred, and to the best of my recollection, I

2  think it was late April.  Correct me if I'm wrong.  And it

3  was a meeting where one of the Japanese senior management was

4  present at, and you testified that Mr. Winkle made a

5  statement or said during the meeting 1941.  Do you recall

6  that testimony?

7  A.    I do.

8  Q.    Okay, and, Mr. Viar, it's true, isn't it, that the Union

9  has represented employees at the company since about 1941?

10 That's true, isn't it?

11 A.    As far as I know, counsel, that's about right.  There

12 were 1,000 ways to convey that history other than standing up

13 and waiving the book at the company president, who stands

14 about 5 foot 4 and shouting 1941 at him.

15     MR. McKNIGHT:  Can you tell us what the book was?

16 Q.    BY MR. CARLSON:  And what book are you referring to?

17 A.    Contract book.

18 Q.    So, at the time Mr. Winkle yelled or stated 1941, he was

19 holding a copy of the collective -- the old collective

20 bargaining agreement, or the about to expire collective

21 bargaining agreement?

22 A.    That's right.

23 Q.    Thank you.  Mr. Viar, you participated in the decision

24 to terminate the employees on August 4th; is that correct?

25     MR. FRASER:  Objection, Your Honor, it calls for an

1    argument.  And it also is again getting into the term issue,

2    which we've had multiple discussions about.

3        MR. McKNIGHT:  I would like to make a record on this,

4    Your Honor, if I might, and I understand your desire to avoid

5    semantics.  During counsel's direct examination of his

6    witness, he repeatedly used the word --

7        JUDGE BUXBAUM:  I know.  The thought crossed my mind

8    too, Mr. McKnight.

9        MR. McKNIGHT:  Words that were not found anywhere, and

10   these are words that are in their documents.

11       JUDGE BUXBAUM:  It's sauce for the gander.  You may use

12   the term.

13       MR. McKNIGHT:  It's not only that, Your Honor.  These

14   are -- I really wish to make the record.  These words

15   terminated and discharged and employees are the words of the

16   writings of this witness.  And those words, illegal strikers

17   are the words of an attorney.

18       JUDGE BUXBAUM:  I'm aware of it, Mr. McKnight.

19   Mr. McKnight, I've ruled in your favor.  Take it easy.  Go

20   ahead, Mr. Carlson.

21       MR. FRASER:  Your Honor, another objection.  It's

22   outside the scope of our direct examination.  This witness

23   has been on the stand umpteen times.  This clearly -- the

24   termination, alleged termination, as counsel as stated,

25   anything relating to the document dated August 4th was not

1    provided during direct examination.

2        JUDGE BUXBAUM:  No, I don't think it was.  Tell me about

3    that, Mr. Carlson.

4        MR. CARLSON:  I'm sorry.  I'm sorry.  I didn't hear the

5    last of his objection.

6        JUDGE BUXBAUM:  That's all right.  Counsel's point is

7    that you're asking now about the decision that was made

8    that's reflected in the August 4th letter, and his point is

9    that in his direct exam, he never inquired about that entire

10    decision or the letter, et cetera.

11        MR. CARLSON:  Right, I understand that, Judge.  And I

12    would acknowledge that it is outside of the scope.  However,

13    I think it's certainly under 611(b), it's within your

14    discretion to allow this questioning.  I think it's often

15    allowed to go beyond the scope.  And I think in a case where

16    what's at issue is the discharge of 145 people, a witness who

17    participated or perhaps made that decision, I think we should

18    be able to ask him a few questions.  I would ask for a little

19    bit of leeway with respect to that.

20        MR. FRASER:  And, Your Honor, if I may respond.  Let me

21    try and count the number of times Mr. Viar has been on the

22    stand.  He's been on the stand during June.

23        JUDGE BUXBAUM:  You don't have to.

24        MR. FRASER:  He's been asked multiple questions by both

25    counsel on cross-examination, recross, redirect, 611(c).  I

1  think they've had about as much leeway as they ought to be

2  entitled to.

3      JUDGE BUXBAUM:  Well, close to it, Mr. Fraser, close to

4  it.  I'm going to give them just a tad, but I'm going to do

5  it, obviously, with the understanding that I'm going to give

6  you an opportunity to redirect.  Otherwise, it will certainly

7  be unfair.  Mr. Carlson, a little bit, no more.

8      MR. CARLSON:  Okay.

9  Q.  BY MR. CARLSON:  So, you participated in that decision,

10  Mr. Viar?

11  A.  I did not hear the question.  I apologize.

12  Q.  You participated in the decision to terminate the

13  employees on August 4th, 2008?  You participated in that

14  decision; is that correct?

15  A.  No, I don't think that's what happened.

16  Q.  Okay.

17      MR. CARLSON:  I'm sorry, am I up to 62?

18      COURT REPORTER:  Yes.

19  **(General Counsel's Exhibit 62 marked for identification.)**

20  Q.  BY MR. CARLSON:  Mr. Viar, I'm going to hand you what

21  I've marked for identification as General Counsel's Exhibit

22  62.  Can you take a look at that?

23  A.  Yes.

24  Q.  And can you read line 3 of that affidavit into the

25  record, please?

1   A.   I participated in the decision to terminate 115

2   employees.

3   Q.   And it's true, is it not, that Mr. Kirk also

4   participated in the decision to terminate the employees?

5   A.   Again, I think we confirmed their statutes under the

6   Act.  I know what the affidavit says.  It's plain.  Mr. Kirk

7   absolutely helped in our deliberations to decide what to do

8   with that group of people.  That's a fair statement,

9   absolutely.  I think it's a legal conclusion you're asking me

10  to make, and I'm not qualified to do that.

11  Q.   Okay.  I'm going to read line 4 into the record.  Glenn

12  Kirk, the Douglas Autotech Director of Finance, also

13  participated in the decision to terminate the employees.  Did

14  I read that correctly?

15  A.   Yes.

16  Q.   And is it true, Mr. Viar, that during your cooling-off

17  period that's been discussed in the hearing, that during that

18  period, you looked for any -- excuse me.  I'm sorry.  I

19  withdraw that question.  Were there other factors with

20  respect to your decision besides the illegal strike that you

21  considered when making the decision to terminate the

22  employees on August 1st?  Were there other factors besides

23  the illegal strike?

24  A.   Well, again, I reject the description of terminate the

25  employees.  With that objection or with that statement, that

1  was the chief factor, but there were other factors.  There

2  was a lot going on in our decision making process.

3  Q.   And what were those factors?

4  A.   I was trying desperately to get a competitive collective

5  bargaining agreement.  I had picket line misconduct issues I

6  was dealing with.  A lot of different things were going on.

7  The business was in rough shape.  We had economic issues we

8  were dealing with.  Our business was continuing.  That was a

9  factor.  There were a variety of factors we looked at, but

10 chief among them was the illegal strike.

11 Q.   So, one of the factors was activities that occurred on

12 the picket line?  That was something that went into your

13 decision to fire or, excuse me, terminate the employees on

14 August 1st, 2008?

15 A.   I don't think I did that, terminate or fire the people,

16 but yes, picket line -- the racism that reared its head in

17 late April continued on the picket line.  The threats to our

18 people, the violence, yes, I could not ignore what was going

19 on on the picket line.  People with baseball -- a person with

20 a baseball bat, some very ugly racist chants, watermelon,

21 slant eyes, real ugly stuff, bomb threats, a lot of things

22 going on that were in my mind about how to proceed with the

23 Local Union.

24 Q.   And this was part of your decision to -- I withdraw the

25 question.  And, Mr. Viar, given -- this is my final question.

1    Given the magnitude of the decision, you took your time and

2    carefully weighed all of the pros and cons in the decision;

3    is that correct?

4    A.    Yes, with advice of counsel, business associates.  I

5    talked to a lot of people.  I thought about it long and hard,

6    yes.

7    Q.    Okay, what did you consider to be the pros in

8    terminating the employees on August 1st, 2008?  What were the

9    pros?

10   A.    Again, I don't think the effect of what happened was a

11   termination of the employment.  But the business was

12   operating at that point, and I was unsure about their status.

13   I certainly had no objection to working with the Union.  I

14   thought -- I still think they represent the people inside the

15   factory today.  I thought one of the pros was I could operate

16   with that group of people.

17   Q.    With what group, the group of people who were working in

18   the plant at that time?

19   A.    Yes.

20   Q.    The temporary employees?

21   A.    Yes.

22        MR. CARLSON:  Okay, nothing further.

23        JUDGE BUXBAUM:  Mr. McKnight?

24        MR. McKNIGHT:  Yes.

25                          **CROSS-EXAMINATION**

 1   Q.   BY MR. McKNIGHT:   Mr. Viar, you said just a few second

 2   ago that racism reared its head in late April of 2008?

 3   A.   Yes.

 4   Q.   And you were referencing Mr. Winkle's comment about

 5   1941?

 6   A.   Yes.

 7   Q.   Holding the book, which you have identified as the

 8   collective bargaining agreement; is that correct?

 9   A.   Yes.

10   Q.   And he did that in the presence of Q-san?

11   A.   Yes.

12   Q.   Is it correct that this occurred at the meeting of April

13   29th, 2008?

14   A.   Yes, sir.

15   Q.   Do you recall that it was, in fact, the UAW bargaining

16   team that asked for Mr. Q-san to come to the bargaining

17   session on April 29?

18   A.   I think they asked for him, sure, yeah.

19   Q.   They'd been asking for that, and you told them that you

20   would take that under consideration, correct?

21   A.   If memory serves, yes.

22   Q.   And then Mr. Q-san came to the bargaining session on

23   April 29, correct?

24   A.   He came because he asked to come.  He wanted to talk to

25   the group.

1  Q.   Well, then, and the UAW bargaining team had asked for

2  him to come, correct?

3  A.   Yes.

4  Q.   Now, so after that bargaining session, you had some

5  jottings, correct, as you normally would?

6  A.   I'm sorry?

7  Q.   Did you have some jottings or notes?

8  A.   Yeah, probably.

9  Q.   I don't intend to mark this as an exhibit, but I was

10  going to show the witness something.

11      JUDGE BUXBAUM:  Do you want to --

12      MR. McKNIGHT:  This is my only copy, counsel, but it was

13  produced under subpoena.

14      MR. FRASER:  Is there any specific place, or do you want

15  me to read the whole thing while you're standing there?

16      MR. McKNIGHT:  You can -- I'm going to show him several

17  places.

18      JUDGE BUXBAUM:  Well, it's not a Jencks material, I take

19  it?

20      MR. McKNIGHT:  No, it's one of the documents that

21  Mr. Viar produced as a custodian of the records.

22      JUDGE BUXBAUM:  Mr. Fraser, what's your view?  Do you

23  want it marked for identification?  It certainly doesn't cost

24  anything to do that, if you want.

25      MR. FRASER:  Yes, we would like it marked.

1    JUDGE BUXBAUM:  All right, that will be Charging Party's

2  No. 7, I believe.

3  **(Charging Party's Exhibit 7 marked for identification.)**

4    MR. FRASER:  Maybe it would expedite things if I could

5  stand, since we have one copy.

6    MR. McKNIGHT:  I'm not going to stand next to him.  I'm

7  just going to ask him to take a look at it, and this will be

8  marked as Charging Party Exhibit 7.

9  Q.  BY MR. McKNIGHT:  I'm handing you what's been marked as

10  Charging Party Exhibit 7, Mr. Viar.  Would you please just

11  take a look at the first page?  That's a document that was

12  produced by you under subpoena.  Do you recognize that as the

13  typed -- first page only, sir.  Do you recognize that as the

14  company's typed minutes of the April 29, 2008, bargaining

15  session?

16  A.  Yes.

17  Q.  Now, I'd like you to turn to the second page -- well, I

18  mean, don't turn there yet.  Did you review bargaining notes

19  before you testified, sir?

20  A.  I testified to that yesterday.  I did review some

21  yesterday morning, Diane's notes, Diane Hedgcock.

22  Q.  And you certainly reviewed, or maybe you didn't, your

23  typed minutes of her notes?

24  A.  No, I did not.

25  Q.  Oh, you didn't.  So, you reviewed -- you never did

1  review your typed minutes?

2  A.   Never?

3  Q.   Well, before the trial started, did you review your

4  typed minutes?

5  A.   Only when I produced them to comply with the subpoena.

6  I don't think I went through them line by line.

7  Q.   Okay.

8  A.   I had Diane's record, which I trusted.

9  Q.   Well, don't the typed minutes reflect your application

10  of your recollection and your jottings to her notes that she

11  took during the bargaining session?

12  A.   Yes.

13  Q.   So, you mistrust your typed notes?

14  A.   No, I mistrust them.  I --

15  Q.   I haven't asked you to look at the second page yet, sir.

16  A.   I can't look at them?

17  Q.   Can I have that back?  Now, isn't it true, Mr. Viar,

18  isn't it true that you typed up notes after the April 29th

19  session that show Mr. Winkle holding up the UAW collective

20  bargaining agreement and saying that we have had a collective

21  bargaining agreement with the company since 1941?  Isn't that

22  true?

23  A.   I'd have to look at what the minutes say.  I don't have

24  them in front of me.

25  Q.   Do you have any recollection, sir?

1    A.    I testified in specific and graphic terms about what

2    Mr. Winkle said.

3    Q.    And isn't it true that Mr. Winkle said since 1941, there

4    has been a contract with DAW and the UAW?

5    A.    He stood very --

6    Q.    Did he say that, sir, yes or no?

7        MR. FRASER:  Objection, Your Honor.  He clearly has the

8    right to answer the question.

9        JUDGE BUXBAUM:  Let's hear his answer.

10       THE WITNESS:  He shouted his answer, and with all

11   respect, counsel, I'll answer the question in the form I want

12   to answer it, not in your yes or no formulation.

13       MR. FRASER:  Mr. Viar, just please, we've made an

14   objection.  Answer the question.

15   Q.    BY MR. McKNIGHT:  Well, let me just ask you to read this

16   sentence out loud into the record and tell me what you typed

17   up about what Mr. Winkle said about 1941.

18   A.    Since 1941, there's been a contract with the DAW and the

19   UAW.

20   Q.    Do you understand DAW to refer to Douglas Auto?

21   A.    It's probably a typo.  DAC, it should say.

22       JUDGE BUXBAUM:  DAC?

23       THE WITNESS:  Yes, Douglas Autotech.

24   Q.    BY MR. McKNIGHT:  Now, looking at your typed notes or

25   minutes of that meeting, do you find any reference to 1941

1    anywhere other or any other place in those notes?

2    A.   No.

3    Q.   And after stating words to the effect that the UAW and

4    Douglas Autotech have had a contract since 1941, didn't

5    Mr. Winkle go on to say that he was embarrassed at these

6    negotiations because of the very harsh bargaining position

7    the company had taken.

8    A.   If you're reading from the document, I don't have it in

9    front of me.  I don't recall that.

10   Q.   Didn't Mr. Winkle go on to say that the Union and the

11   company had always worked together?

12   A.   I remember something like that, yeah.

13   Q.   And didn't Mr. Q-san respond that he agreed there are

14   problems?

15   A.   I don't remember in specific.  It sounds like something

16   he may have said, yes.

17   Q.   Do you want to examine these notes, or are you willing

18   to agree that there is no derogatory comment about people of

19   Japanese descent in these notes?

20   A.   I'd say there's nothing in those notes of that nature.

21   Q.   There's no reference to Pearl Harbor in these notes?

22   A.   1941 was the reference to Pearl Harbor.

23   Q.   Excuse me, sir.  Do the words Pearl Harbor appear in

24   these notes?

25   A.   1941 is the reference to Pearl Harbor.  That's my

1    answer.

2    Q.    So, when Mr. Winkle says since 1941, there has been a

3    contract with the company and the UAW, you take that as a

4    reference to Pearl Harbor; is that correct, sir?

5    A.    I absolutely take that as a reference to Pearl Harbor,

6    just as I would take, if the owners of the company were of

7    Arabic descent, a reference to 9/11 as a reference to

8    9/11/01.  It's an absolute pointed, purposeful reference to a

9    terrible event in our history with a Japanese expatriate

10   sitting in the room.  As I testified, there are 100 ways to

11   convey the lengthy, positive collective bargaining agreement

12   that we had with the UAW besides mentioning 1941.

13   Q.    Which just happened to be the date that the UAW and the

14   company first entered into a collective bargaining agreement;

15   is that correct?

16        MR. FRASER:  Objection, asked and answered.

17        JUDGE BUXBAUM:  I'll permit this one, and then we'll

18   move on.

19        THE WITNESS:  I agreed with Mr. Carlson's assertion on

20   or about 1941.  I don't know the date.

21        JUDGE BUXBAUM:  The testimony was April of 1941.

22   Q.    BY MR. McKNIGHT:  Did you ask Mr. Winkle if --

23        JUDGE BUXBAUM:  In June, counsel, in June.

24   Q.    BY MR. McKNIGHT:  Did you ask Mr. Winkle if he intended

25   to insult Mr. Q-san?

1    A.    No.

2    Q.    Did you ever write Mr. Winkle about whether or not he

3    intended to insult Mr. Q-san by stating the date when the UAW

4    and the company started a collective bargaining relationship?

5    A.    No.

6         JUDGE BUXBAUM:  Mr. McKnight, I think we've explored it

7    now as far as we need to go.

8    Q.    BY MR. McKNIGHT:  On May 5, 2008, about what time of the

9    day did you first hear from Mr. Lillie?

10   A.    At around 9:00 a.m. we talked, maybe a little earlier,

11   counsel.  I think I phoned him and left a message.  And

12   around -- I began my contact around 7:00 a.m. or so and

13   probably got to him around 9:00, 8:30, something like that in

14   the morning.

15   Q.    Did Mr. Lillie indicate to you that he had spoken to

16   Mr. Winkle?

17   A.    I think in one of the conversations that day, yes, he

18   indicated they had spoken.

19   Q.    Now, your letter to Mr. Winkle on that day says, among

20   other things, earlier today, the company received the Union

21   request to return from the strike.  The offer to return to

22   work was unconditional.  Do you recall that?

23   A.    That's in the letter, yes.  I recall that language.

24   Q.    What time of the day was this letter prepared, GC

25   Exhibit 8?

1    A.    Late in the day, I think, at the hotel in East Lansing.

2    Q.    It appears to be on company letterhead.  How would you

3    have accomplished that?

4    A.    Our counsel has letterhead inside of his computer.

5    Q.    Okay.  And then --

6    A.    I recognize the font, because again, I think it's funny.

7    No one else does.  I hate that font he uses.  That's our

8    letterhead.  He drafts letters for us all the time.

9    Q.    And then when was this document that's attached to the

10   letter prepared?

11   A.    When was it attached?

12   Q.    No, when was it prepared?

13   A.    Oh, that day.

14   Q.    Okay, do you recall what time of that day?

15   A.    Throughout the day.

16   Q.    Well, throughout the day, you and who else prepared

17   this?

18   A.    If that's the attachment, I think we finalized that at

19   the hotel.

20   Q.    Okay, when did you begin working on the attachment to

21   the letter?

22   A.    Probably after we got it at the hotel.

23   Q.    You mean you didn't even start to work on that until

24   5:30?

25   A.    That's right.  I think we started -- we were having

1  general discussions about, you know, conditions for return to

2  work during the day, and then we looked at this when we got

3  to the hotel.  That we is Glenn Kirk and I.

4  Q.   You say you looked at this, so you already had this when

5  you got to the hotel?

6  A.   If memory serves, I think Mr. Lillie printed it off.

7  Q.   What did he print it off of?

8  A.   He's got a -- many lawyers have them, a printer, a

9  little Wal-Mart printer that we bought in 2005.  Actually,

10  Diane bought it.

11  Q.   Wouldn't he have to have something that would have the

12  content of this on it?

13  A.   I had a computer.

14  Q.   Well, when was this typed up?  When was it created?

15       MR. FRASER:  Your Honor, objection.  Objection.

16       THE WITNESS:  During --

17       MR. FRASER:  Objection.  It relates to bargaining

18  strategy.  It relates to attorney-client issues.  When they

19  prepared it is as much a question of tell us your thoughts

20  about how you prepared it and why you prepared it, so there's

21  attorney-client privilege and Berbiglia bargaining strategy

22  issues, which is the objection that we're making.  He's not

23  required to answer that question.

24       JUDGE BUXBAUM:  Mr. McKnight, what do you say?

25       MR. McKNIGHT:  Well, he's told us quite a bit about the

1    sequence of events on May 5, and I think we're entitled to

2    know when they prepared what they call conditions for

3    returning to work.

4        JUDGE BUXBAUM:  I do too.  Overruled.  You may answer.

5    When was this document created?

6        THE WITNESS:  Your Honor, I'm trying to --

7        JUDGE BUXBAUM:  Oh, okay, I'm sorry.  No problem.

8        THE WITNESS:  I'm trying to remember exactly when we

9    prepared that.

10       JUDGE BUXBAUM:  You take your time.

11       THE WITNESS:  I know for sure that we looked at that

12   document, that's Glenn Kirk and myself, at the hotel.  I

13   don't know how much prep work Mr. Lillie did on that or what

14   we did.  It was a crazy day.  I don't remember in specific

15   when we worked on that that day, but I'm certain we discussed

16   the ideas and the concepts beyond getting a document to them

17   earlier in the day, before 6:00.  That's not a very clear

18   answer, I suppose.

19   Q.   BY MR. McKNIGHT:  Well, the cover letter uses the phrase

20   please advise the company as soon as possible if the Union

21   accepts the proposal.

22       MR. FRASER:  Your Honor, may I make a request?  All of

23   these documents are labeled in a big, black binder in front

24   of my client.  If Mr. McKnight simply references GC-8, my

25   client can look at that document, Mr. McKnight can be a

1  respectful distance away from my client, and the questions

2  can be answered.

3      MR. McKNIGHT:  I'm not in disrespect, Your Honor.

4      JUDGE BUXBAUM:  No, you're not being disrespectful,

5  Mr. McKnight.  On the other hand, it's helpful to the record

6  if you do direct his attention to the GC number if it's a

7  document that's in evidence.  So, I would appreciate your

8  doing that.

9      MR. McKNIGHT:  Absolutely.  I didn't realize he had a

10 binder in front of him.

11 Q.  BY MR. McKNIGHT:  Looking at GC Exhibit 8, Mr. Viar, the

12 cover letter says please advise the company as soon as

13 possible if the Union accepts the proposal and when an

14 agreement has been reached so that employees can be

15 expeditiously returned to work.  What is that word proposal

16 referring to?

17 A.  The conditions that are attached on the --

18 Q.  It's referring to --

19     JUDGE BUXBAUM:  Well, let him answer, then, because this

20 is important.  I want to hear this.

21     MR. McKNIGHT:  I'm sorry.

22     JUDGE BUXBAUM:  What is the proposal referenced in the

23 first page of GC-8?

24     THE WITNESS:  The attachment, Your Honor.  It's

25 described as company proposal/general synopsis on various

1  topics.  It's the rest of GC-8.  Those were the conditions to

2  return to work, the provisions that we provided.

3      JUDGE BUXBAUM:  Okay.  Do you mind if I inquire of the

4  witness about this further because this has been perplexing

5  me?

6      MR. McKNIGHT:  Yes, I do at this point.

7      JUDGE BUXBAUM:  All right, we'll come back to it.  Go

8  ahead.

9  Q.  BY MR. McKNIGHT:  Now, do the words conditions for

10  return to work appear on the cover page of the attachment to

11  the cover letter or proposal?

12  A.  No.

13  Q.  Excuse me?  I couldn't hear you.

14  A.  On the cover letter?

15  Q.  I said do they appear on the first page of the

16  attachment?

17  A.  No.

18  Q.  So, now, does the proposal attached to the cover letter

19  state that the term of the contract will be three years?

20  A.  Yes, that's what it says on this document.

21  Q.  And on page 2 of this proposal, does it state what the

22  wages will be effective upon ratification?

23  A.  Yes.

24  Q.  So, this proposal required ratification; is that

25  correct?

 1  A.    It required the Local Union to agree to those terms and
 2  conditions.  I don't know if they had to ratify it or not.
 3  Q.    Well, did your --
 4  A.    Okay, yeah, okay, upon ratification, sure, they had to
 5  ratify it.  That's what it says.
 6  Q.    In fact, this proposal contains a no-strike clause,
 7  doesn't it?
 8  A.    If you could help me, counsel, it's been a while.  Do
 9  you want to direct me somewhere in the document?
10  Q.    Page 14.
11  A.    Yes.
12  Q.    This proposal contains a no lockout clause, doesn't it?
13  A.    This document -- let me look --
14  Q.    Page 15.
15  A.    Yes, it says this document says no lockouts by the
16  Employer.
17  Q.    Under the terms of this proposal, if it were ratified by
18  the Union, how long would the employees be prohibited
19  contractually from striking?
20  A.    Three years.
21  Q.    Now, we've looked at page 1 of the proposal.  Do the
22  words conditions for return to work appear on page 2?
23        MR. FRASER:  Objection, Your Honor.  The document speaks
24  for itself.  I've been raising an objection --
25        JUDGE BUXBAUM:  I agree with that.  It's not a jury

1  trial, counsel.  But, Mr. McKnight, let me know when you're

2  finished asking about the document because I want to, too.

3  Q.   BY MR. McKNIGHT:  Under the terms of this proposal, if

4  it were ratified by the Union, would the parties, both Union

5  and Employer, have the contractual right to arbitrate

6  grievances?

7      MR. FRASER:  Again, Your Honor, while my client is

8  paging through the document, I would make the same objection.

9  Wherever it is in the document, if it's there, the document

10  speaks for itself.

11      JUDGE BUXBAUM:  Well, Mr. McKnight, I'm not going to

12  sustain that objection in this instance, but it would be

13  helpful if you'd direct the witness perhaps to -- in other

14  words, it's cross.  You can ask a leading question.  Isn't it

15  a fact that --

16      MR. McKNIGHT:  I could, but I think that that seems to

17  be rather difficult with Mr. Viar.

18  Q.   BY MR. McKNIGHT:  But I'll just ask you this, Mr. Viar.

19  This proposal indicates which sections of the predecessor

20  collective bargaining agreement were to be deleted and

21  replaced, correct?

22  A.   There is a series of boxes on this document, counsel,

23  deleting language and replacing it with others, yes.  I guess

24  that I don't understand the question.

25  Q.   Does this proposal indicate which sections of the

1  recently expired collective bargaining agreement would be

2  deleted and replaced with new words?

3  A.   Yes.

4  Q.   What would happen to those sections of the previously

5  expired collective bargaining agreement that were not

6  deleted?

7  A.   Boy, I guess I don't know.  I think this was -- again,

8  as memory serves, these were the conditions we had to return

9  to have the people come back to work.

10 Q.   I see that you say that.  Can you find those words

11 anywhere in here, Mr. -- well, never mind.  That's -- it will

12 speak for itself.

13 A.   Yeah, maybe six times you've asked me that.

14      JUDGE BUXBAUM:  Yeah, he's withdrawing it.

15 Q.   BY MR. McKNIGHT:  Well, isn't it true if the Union

16 couldn't strike, and the Employer couldn't lockout, that the

17 grievance and arbitration provisions of the contract that had

18 recently expired would be part and parcel of this proposal?

19 A.   I don't know.

20 Q.   Okay.

21 A.   It might be a better question for Mr. Lillie.

22 Q.   That's okay.  I'll accept your answer, sir.  Now, I

23 don't think this was marked, but you looked at a particular

24 affidavit.  I'm refreshing your recollection.  I'm going to

25 just show it to you.

1      JUDGE BUXBAUM:  Mr. McKnight, does this still relate to

2    GC-8?

3      MR. McKNIGHT:  No.

4      JUDGE BUXBAUM:  Will you forgive me?  I'm going to --

5      MR. McKNIGHT:  Oh, I'm sorry.  Yes.

6      JUDGE BUXBAUM:  Well, and I know it's obnoxious of the

7    Judge to do it, but I truly -- I think your examination and

8    Mr. Viar's answers were of great help to me in understanding

9    the document, which I have been puzzling over, and I want to

10   sort of finish it off so that in my mind I'm a bit clearer.

11   Mr. Viar, General Counsel's 8 is really three things, isn't

12   it?  It's a one-page letter to the Union, to Mr. Winkle.

13     THE WITNESS:  Yes.

14     JUDGE BUXBAUM:  Then it's got two pages after that, and

15   that is separate from what follows, in other words, the

16   remaining pages, isn't it?  That's a synopsis of what's going

17   to follow in the remaining pages?

18     THE WITNESS:  Correct.

19     JUDGE BUXBAUM:  So, it's kind of almost like a summary

20   and index of what's -- of all the other language in the

21   remaining pages?

22     THE WITNESS:  That's fair, Your Honor, yes.

23     JUDGE BUXBAUM:  Okay, so it's three different things.

24   That helps me.  I guess one of the questions I had is what

25   would you have anticipated the Union would have done in terms

1    of accepting the company's lockout bargaining position with

2    at page 2 of the synopsis where it says letters of agreement,

3    discuss Employer reserves the right to make a proposal on

4    these topics.  How, in your view, would the Union have

5    expressed its assent to that?  What does it mean?

6        THE WITNESS:  On something like that, whatever letters

7    of agreement we were talking about or had open at that point,

8    well, they would remain open.  We would make a proposal on

9    that, have a letter of understanding, move forward.  To tell

10   you the plain truth, Your Honor, I don't know that we had

11   side letters of agreement at that time.  We didn't, like a

12   letter of understanding in the traditional sense, we didn't.

13   I don't know.

14       JUDGE BUXBAUM:  And then coming now to the third part,

15   and counsel has already, I think, answered it, but I just

16   want to be 100 percent sure.  Let's look at the first page of

17   third part.  Now, the third part is entitled proposal

18   elaboration.  Am I right?  That's the title of the whole

19   remaining document?

20       THE WITNESS:  Yes, yes.

21       JUDGE BUXBAUM:  Okay, then it starts Section 14, and it

22   gives some contract, I assume, contract language.  Am I

23   right?

24       THE WITNESS:  Yes.

25       JUDGE BUXBAUM:  And that language is from the old

1    collective bargaining agreement?

2        THE WITNESS:  Yes.

3        JUDGE BUXBAUM:  And it's struck through?

4        THE WITNESS:  Yes.

5        JUDGE BUXBAUM:  So, that means that that language is

6    deleted from the old collective bargaining agreement?

7        THE WITNESS:  Yes.

8        JUDGE BUXBAUM:  Now, Mr. McKnight I think asked this,

9    but I want to ask is again because I want to be sure I

10   understand it.  What would be the status of language in the

11   old collective bargaining agreement that isn't struck

12   through, if the Union agreed to the company's lockout

13   bargaining?

14       THE WITNESS:  It would be still be good.

15       JUDGE BUXBAUM:  Okay, then there's language that are in

16   boxes, like --

17       THE WITNESS:  I'm sorry, Judge.  If I were -- I mean,

18   it's confusing sometimes, but to answer that question, I

19   think I understood your question a little better that you

20   just asked.

21       JUDGE BUXBAUM:  And then the next thing below that is a

22   box.  And in the box is, first of all, an instruction which

23   says delete Section 14 and replace with the following, so

24   that refers, of course, to the Section 14 that's printed

25   right above; am I right?

1        THE WITNESS:  Yes, Your Honor.

2        JUDGE BUXBAUM:  Okay, so that's, in other words, just

3    consistent with the strikethrough?

4        THE WITNESS:  Yes.

5        JUDGE BUXBAUM:  Okay, and then replace with the

6    following.  What does that mean replace with the following?

7    Am I right in assuming that it means add the following to a

8    new collective bargaining agreement in replacement to the old

9    Section 14 that's struck through?

10        THE WITNESS:  Yes, Your Honor.

11        JUDGE BUXBAUM:  Okay, and then the same, then, procedure

12    throughout the rest of the document?

13        THE WITNESS:  Yes.

14        JUDGE BUXBAUM:  Mr. McKnight, are there more questions

15    you'd like to ask about that, this GC-8 business?

16        MR. McKNIGHT:  No.

17        JUDGE BUXBAUM:  Okay, then you may proceed with your

18    cross-examination, and I apologize again.

19    Q.   BY MR. McKNIGHT:  So, I was just -- I'm looking at this

20    one affidavit that you looked on to refresh your

21    recollection, and I think that that was subscribed and sworn

22    to before.  Was that Kathy --

23    A.   Kathy Hewsts.

24    Q.   Okay, and she's a notary, and she works in your offices,

25    correct?

1    A.    Yes.

2    Q.    And where was that affidavit typed?

3    A.    I think that one was drafted by counsel.  I'd have to

4    take -- can I take another look again?

5    Q.    Sure.  It's not the top one.  Here, it's this one.

6    A.    If I have the time frame right, this was drafted by

7    counsel in the Cullen Hillcheck Law Office (ph.).

8    Q.    Okay, and so they drafted that.  And where are their

9    offices at?

10   A.    Farmington Hills, Michigan.

11   Q.    And then this affidavit was subscribed and sworn to on

12   September 3, 2008?

13   A.    Yes.

14   Q.    So, the Cullen Hillcheck firm drafted the affidavit, and

15   then they brought it to your office?

16   A.    They sent it to me electronically.

17   Q.    Okay.

18   A.    So, no, they didn't bring it to me.  That didn't happen.

19   Q.    And I think you testified, and tell me if I've got this

20   correct, that this affidavit drafted by counsel refreshed

21   your recollection that on July 15th, 2008, the Employer

22   reiterated its belief that the strike was illegal and the

23   strikers were not protected by the NLRA?  Is that right?

24   A.    Yes.

25   Q.    Now, GC-60 is your typed minutes of that meeting.  I

1    just want to ask you -- I don't think that's in the exhibit

2    book because I don't think this was offered.

3        JUDGE BUXBAUM:  Right, you're right.

4    Q.   BY MR. McKNIGHT:  I just want to ask you if those words

5    appear anywhere in your minutes?

6    A.   I think Counsel for the General Counsel asked me the

7    same question.  I don't think so, no.  It's not in here.

8    Q.   Okay, thank you.  So, your typed minutes do not refresh

9    your recollection that those words were spoken that I quoted

10   from the affidavit prepared by counsel about what was said on

11   July 15th, 2008, do they?

12   A.   Can you ask the question again?  I don't understand the

13   question.

14   Q.   Do your typed minutes refresh your recollection that the

15   Employer reiterated its belief that the strike was illegal

16   and the strikers were not protected by the NLRA?

17       MR. FRASER:  Objection, Your Honor.  The question

18   essentially has been asked and answered.  He identified there

19   is nothing in that document, and he's asking him to

20   essentially state a negative.  It doesn't make any sense.

21       JUDGE BUXBAUM:  Yeah, it's argumentative.  Sustained.

22   Q.   BY MR. McKNIGHT:  Did you type your minutes after

23   counsel drafted this affidavit for you about the meeting on

24   July 15th, 2008?

25   A.   I don't recall.

1    Q.   So, you don't know if you prepared your typed minutes of
2    the July 15th, 2008, meeting before or after your attorneys
3    prepared an affidavit about what was said at the meeting of
4    July 15th, 2008; is that correct?
5        MR. FRASER:  Asked and answered, Your Honor.
6        JUDGE BUXBAUM:  I'll allow it.  It's cross.  You may
7    answer.
8        THE WITNESS:  I don't recall when I typed the minutes.
9    I would think -- I'd be speculating.  I don't know.
10   Q.   BY MR. McKNIGHT:  Well, would it be your practice to try
11   to type the minutes within weeks or so after a bargaining
12   session?
13   A.   Yeah, I'm not trying to play games with you, counsel.
14   It's a long gap between September and July 15th, so I
15   probably typed them up before the affidavit.  I don't know.
16   I don't know for sure.
17       **JUDGE BUXBAUM:  Let's go off the record for a moment.**
18   **(Off the record.)**
19   Q.   BY MR. McKNIGHT:  Do you agree that you did not produce
20   any notes for the exchanges that took place on August 14th,
21   2008?
22   A.   That's correct, yeah.
23   Q.   And do you agree that the mediator, Mr. Sedrowski (ph.)
24   came in the room with the other Union representatives on
25   August 14, 2008?

1    A.    I think that's right.  I neglected to mention him.

2    Q.    Did you forget that earlier when you testified?

3    A.    I did.

4    Q.    Okay.  Do you agree that Mr. Gruza did not come in the

5    room?

6    A.    I remember seeing him in the end.  I don't know why

7    we're parsing this, but I'll answer the question.  I saw him

8    in the doorway.  That's my recollection.

9    Q.    You're sure of that?

10   A.    Yeah, I remember seeing him.

11   Q.    Now, when I say you didn't produce any notes for the

12   exchanges that took place on August 14, 2008, you understand

13   that to mean you didn't produce any notes by yourself,

14   correct?

15   A.    I didn't produce any notes.  I didn't take any notes.

16   Q.    You produced no notes by Attorney Cohen, did you?

17   A.    I don't believe so, no.

18   Q.    You produced no notes by Attorney Lillie, correct?

19   A.    I don't know.  Maybe he produced it.

20   Q.    But you didn't produce any, correct?

21   A.    No.

22   Q.    You produced no notes by Mr. Kirk; he was present?

23   A.    No.

24   Q.    And you produced no notes by your official note taker,

25   Ms. Hedgcock, did you?

1    A.    My official note taker took notes during joint sessions,

2    and that was not a joint session, so there were no notes.

3    Q.    Well, at least two or three Union representatives were

4    present, and your bargaining team was present, correct?

5    A.    Counsel, I've testified ad nauseam that Diane Hedgcock

6    took notes at my direction both in 2005 and in 2008 when the

7    entire group got together.  That's when she took notes.

8    Q.    Did you direct the other people present, Attorney Cohen,

9    Attorney Lillie, Mr. Kirk, not to take notes?

10   A.    No.

11   Q.    Did you direct Ms. Hedgcock not to take notes?

12   A.    What time frame?

13   Q.    August 14, 2008.

14   A.    No, I made no such direction.  In her normal course of

15   business, she wouldn't take notes during a meeting like that.

16   Q.    Directing your attention to GC Exhibit 38, would you

17   take a look at that?

18   A.    Okay.

19   Q.    What is that, in your words?

20   A.    Seniority list.

21   Q.    I think we're looking at the wrong piece of paper.

22        JUDGE BUXBAUM:  Are you looking at this?

23        MR. FRASER:  Thirty-eight, Paul, not 48.

24        THE WITNESS:  My hearing again, counsel.  I'm sorry, 48.

25   I was looking at 48.  Thirty-eight?

1   Q.   BY MR. McKNIGHT:  Yes.

2   A.   I'm pretty sure this is the MOA, Modern Operating

3   Agreement, we submitted to the Local Union on June 2nd, 2008.

4   Q.   Is that a contract proposal?

5   A.   Yeah.

6   Q.   Directing your attention to page 18, does that require

7   ratification?

8   A.   Page 18?

9   Q.   Um-hmm.

10       MR. FRASER:  Objection, Your Honor.  The document speaks

11   for itself.

12       JUDGE BUXBAUM:  Well, is this a foundational question?

13       MR. McKNIGHT:  Well, I was just trying to get this

14   witness' understanding of what a contract proposal is, and I

15   think this helps.

16       JUDGE BUXBAUM:  So, it is a foundational question?

17       MR. McKNIGHT:  Yes.

18       JUDGE BUXBAUM:  All right, I'll allow it.

19       THE WITNESS:  What's the question, please?

20   Q.   BY MR. McKNIGHT:  Would the acceptance of this contract

21   proposal by the UAW require ratification by the membership of

22   the Local 822?

23   A.   As far as I knew, yes.

24   Q.   That was the UAW's standard practice was that contract

25   proposals would be submitted to the membership for

1  ratification, correct?

2      MR. FRASER:  Objection, Your Honor, it requires Mr. Viar

3  to state something that the UAW does or doesn't do, and he's

4  not qualified to make that statement.

5      JUDGE BUXBAUM:  All right, you need to lay a foundation.

6  Q.  BY MR. McKNIGHT:  Did you know that the UAW had a

7  practice with respect to submitting collective bargaining

8  agreements, for tentative collective bargaining agreements to

9  their membership for ratification?

10  A.  I didn't know what their --

11      MR. FRASER:  Objection, speculation.

12      THE WITNESS:  I didn't know what their practice was.

13      JUDGE BUXBAUM:  Okay.

14      THE WITNESS:  UAW International -- this Union, I'm

15  assuming you're restricting it to Local 822?

16  Q.  BY MR. McKNIGHT:  Well, I was -- well, let's talk

17  generally.

18  A.  The UAW -- oh, I think everyone's different.

19  Q.  All right, okay then, did you bargain the 2005

20  collective bargaining agreement with the UAW?

21  A.  Yes, yes, absolutely.

22  Q.  Was that presented to the membership for ratification?

23  A.  Yes.

24  Q.  Did you -- and is that why you used the words

25  ratification in this contract proposal, which is GC-38?

 1        MR. FRASER:  Objection, relevance, Your Honor.

 2        JUDGE BUXBAUM:  I'll allow it.  I understand its

 3    relevance.  You're referring now to page 18?

 4        MR. McKNIGHT:  Yes.

 5        THE WITNESS:  I anticipated that once we reached a

 6    tentative agreement on all the terms and conditions with

 7    group, that provided we brought that group back, provided a

 8    lot of different things happened, that they would submit the

 9    proposal to the bargaining unit for ratification.

10    Q.   BY MR. McKNIGHT:  Directing your attention to GC Exhibit

11    41.

12    A.   Yes.

13    Q.   Is GC-41 a proposal for a collective bargaining

14    agreement?

15    A.   Yes.

16        JUDGE BUXBAUM:  Company proposal?

17        THE WITNESS:  Yes.

18    Q.   BY MR. McKNIGHT:  What was the term of the proposed

19    collective bargaining agreement in GC-41?

20    A.   Six years.

21    Q.   What caused you to increase the contract term from three

22    years on May 5, 2008, to six years by late July of 2008?

23        MR. FRASER:  Objection, Your Honor, again relevance.

24        JUDGE BUXBAUM:  Make me a proffer, counsel.  If you want

25    to do it outside the hearing of the witness, that's fine.

1    MR. McKNIGHT:  Yes.

2    JUDGE BUXBAUM:  All right, sir, would you please leave

3  the courtroom.  Don't go far, though, because we'll have you

4  back.

5  **(Witness exits.)**

6    JUDGE BUXBAUM:  All right, the witness has left the

7  room.

8    MR. McKNIGHT:  I was asking this question because I

9  think it would elicit an answer that both documents are

10  proposed contracts.  One has a three-year term, and one has a

11  six-year term.

12    JUDGE BUXBAUM:  Okay.

13    MR. FRASER:  The specific question was what made the

14  company change its mind to go from three years to six years.

15    MR. McKNIGHT:  That's correct.  It's a leading question.

16    JUDGE BUXBAUM:  How will the answer be relevant?  I'm

17  still struggling with that.

18    MR. McKNIGHT:  Okay, it isn't going to make or break my

19  day, Your Honor.

20    JUDGE BUXBAUM:  All right.

21    MR. McKNIGHT:  I think the answer is relevant because I

22  think that this witness' contention that the May 5, 2008,

23  document was terms for conditions for returning to work is

24  phony testimony, just like his testimony that the letter says

25  employees were unprotected by confirming their status is

1    phony.

2        JUDGE BUXBAUM:  Well, I --

3        MR. McKNIGHT:  And I'm trying to make a record of that.

4        JUDGE BUXBAUM:  All right.

5        MR. McKNIGHT:  I think these are legal constructs that

6    this witness or somebody thought up for this hearing.  That's

7    my thing.

8        MR. FRASER:  Aside from my prior juriation, I'll state

9    it again.  I take great offense to the statement that someone

10   thought things up related to this testimony.  The letter that

11   was sent out on August 4th clearly states almost identical

12   words to what had been testified related to losing --

13       JUDGE BUXBAUM:  Well, look, I don't want to get into

14   this with you gentlemen.  It's late in the day.  There's no

15   need to.

16       MR. FRASER:  I understand.

17       JUDGE BUXBAUM:  Let's get the witness back.

18       MR. FRASER:  I'm just tired of this, that's all.

19       JUDGE BUXBAUM:  We all are.  We all are.

20       Thank you, incidentally, for getting the witness.  I

21   appreciate it.  You're now my unpaid bailer.

22       COURT REPORTER:  Thank you.

23   **(Witness returns.)**

24   **(Off the record.)**

25       JUDGE BUXBAUM:  And I sustained the objection.  You may

1  proceed.

2  Q.   BY MR. McKNIGHT:  On August 14, 2008, were you asked to

3  come to the bargaining table?

4  A.   I don't think those words were used.  I think I

5  distinctly recall you stating you wanted to negotiate a

6  responsible collective bargaining agreement.

7  Q.   Do you have a recollection whether or not I said please

8  come to the bargaining table and meet with the Union

9  bargaining committee?

10  A.   I apologize.  I do not, no.

11  Q.   You do not recall whether or not I said that?

12  A.   No, I recall you saying --

13  Q.   I don't have a question pending, sir.

14  A.   I'm sorry?

15       MR. FRASER:  I don't think he finished answering the

16  question.

17       JUDGE BUXBAUM:  No, I thought he had.

18       MR. FRASER:  He did?

19       JUDGE BUXBAUM:  Yeah, I thought he had.

20  Q.   BY MR. McKNIGHT:  I'm going to show you something else

21  that was produced in response by you in response to the

22  subpoena duces tecum with respect to bargaining notes and ask

23  you if -- please ignore the yellow highlighting if you could.

24  That's my highlighting.  Is that your handwriting?

25  A.   It is.

1    Q.    Okay, and the date that appears on that?

2    A.    7/26/08.

3    Q.    Okay, now looking at Joint Exhibit 1, can you tell me if

4    there was a bargaining meeting on 7/26/08?

5    A.    No, I think that's a misprint, and I meant 7/28.

6    Q.    Right, okay.  Now, so we have -- these are your

7    jottings, these four pages, I guess, are your jottings for

8    7/26/08?

9          JUDGE BUXBAUM:  Should we -- let's get these marked for

10    identification.  It just makes for a cleaner record.  That

11    will be Charging Party's 8 for identification.

12    **(Charging Party's Exhibit 8 marked for identification.)**

13    Q.    BY MR. McKNIGHT:  Are those your jottings that were

14    marked as --

15          JUDGE BUXBAUM:  Do you want them shown to the witness?

16          MR. McKNIGHT:  Sure.

17          JUDGE BUXBAUM:  All right, and this again is Charging

18    Party's 8 for identification.

19          THE WITNESS:  In Diane's absence --

20    Q.    BY MR. McKNIGHT:  I was going to ask you a question.

21    A.    I, in Diane's absence --

22    Q.    Sir, sir, I was going to ask you a question.

23          JUDGE BUXBAUM:  Hold on, Mr. Viar.

24          THE WITNESS:  I thought he asked me a question.

25          JUDGE BUXBAUM:  Well, let's let him ask his next one.

1    Q.    BY MR. McKNIGHT:  I'm sorry, are those your jottings for
2    7/25/08?
3    A.    In Diane's absence, I took these notes.
4    Q.    You'll be able to answer more elaborately.  I'd just
5    like you to answer yes or no to that part.
6         JUDGE BUXBAUM:  No, I think you can answer it, Mr. Viar.
7         THE WITNESS:  Because Diane wasn't there, which is right
8    at the top of the notes, I took notes for this day, which was
9    not my standard practice.  These are my notes.  I don't know
10   what jottings -- I don't know what you mean.  I mean, I took
11   some jottings from other sessions when Diane was there, but
12   these are more extensive because Diane wasn't there.
13        MR. FRASER:  Your Honor, for the record, I think
14   Mr. McKnight said 7/25.  Maybe I misheard that.
15        MR. McKNIGHT:  I meant 7/28/08, excuse me.  Thank you,
16   counsel.
17   Q.    BY MR. McKNIGHT:  So, because Diane Hedgcock was not
18   there on 7/28/08, you made more detailed notes?
19   A.    That's correct.
20   Q.    But you made no notes whatsoever for May 5, 2008, did
21   you, sir?
22   A.    I don't believe I did, no.
23   Q.    Was Diane Hedgcock present on May 5, 2008?  Look at
24   Joint Exhibit 1.
25   A.    No.

1  Q.   Now, I have actually an addition -- no, I have these

2  from the General Counsel.  These are an additional four pages

3  that followed, and I see now they were all together.  Mine

4  have yellow markings.

5       JUDGE BUXBAUM:  So, you're saying they actually are a

6  part of Charging Party's No. 8?

7       MR. McKNIGHT:  Yes.

8       JUDGE BUXBAUM:  All right, we'll attach them.  Have you

9  shown them to opposing counsel?

10      MR. FRASER:  Your Honor, all of these documents that

11 have been marked and not offered into evidence, not admitted,

12 we would request that counsel would prepare them to the

13 extent that they haven't given us a copy, to either make them

14 available for us to copy or provide a copy to us since

15 they've been marked as exhibits.  We'd like to at least make

16 sure we have a record of what's going on here.

17      JUDGE BUXBAUM:  All right, certainly the way you've

18 suggested it is entirely reasonable.  Do you want to give

19 them a list of which ones you don't have?

20      MR. FRASER:  Certainly.

21 Q.   BY MR. McKNIGHT:  So, this is July 28.  And I'm going

22 to -- it's been marked --

23      MR. FRASER:  Where has this been marked?

24      MR. McKNIGHT:  On the back.

25      JUDGE BUXBAUM:  Just to keep you guessing.  Just to keep

1  you guessing.

2      MR. McKNIGHT:  Then I'm going to substitute this one

3  which doesn't have any yellow lines on it.

4      JUDGE BUXBAUM:  Excellent.  I'm glad you're doing that.

5  Q.   BY MR. McKNIGHT:  This is the document that was

6  previously marked as Charging Party Exhibit 8, and now this

7  looks -- I think it's complete.  It's the original five pages

8  I showed you numbered one through five at the top, and then

9  four more pages that are numbered one through four, and just

10  tell me if that is, as far as you know, the complete set of

11  your notes for July 28, 2008?

12  A.   These notes marked one through four are from a different

13  day.

14  Q.   Oh, okay.  So, looking at your notes for July 28, 2008,

15  I guess would be the first five pages then?

16      JUDGE BUXBAUM:  So, is that right, Mr. Viar?  Is that

17  the first five pages?  Those are your notes from --

18      THE WITNESS:  One through five is from 2008, July 28th.

19      JUDGE BUXBAUM:  Okay.

20      THE WITNESS:  I don't know what one through four is

21  from.  It has to be --

22      JUDGE BUXBAUM:  All right, well, then I think,

23  Mr. McKnight, are you going to take those back?

24      MR. McKNIGHT:  Yes, I will.

25      JUDGE BUXBAUM:  Yeah, let's do that so we're not

1  confused.

2      THE WITNESS:  It has to be after 7/25.

3      JUDGE BUXBAUM:  Hold on.  Hold on.  Now, the other thing

4  is, though, I do want to take these five pages and substitute

5  them for the ones with your yellow marks on them, so the

6  reporter still needs to mark the five pages as Charging

7  Party's No. 8.

8      MR. McKNIGHT:  That's correct.

9      MR. FRASER:  And there are four pages?

10     JUDGE BUXBAUM:  The four pages are nothing.  We're not

11 going to worry about it.  All right, the record will reflect

12 they are now being marked.

13 Q.  BY MR. McKNIGHT:  Can you identify in your notes of the

14 meeting of July 28, just by pointing, any statement in those

15 notes by Mr. Lillie saying that the strike is illegal and the

16 company is not waiving any of its rights or remedies under

17 the Act?

18     MR. FRASER:  Your Honor, before the answer comes in, I'm

19 objecting.  I don't think those facts are in evidence.  I

20 think the testimony was that that statement was made 7/31.

21     MR. McKNIGHT:  The testimony is that that statement was

22 made July 28.

23     MR. CARLSON:  My notes reflect that it was made on July

24 28th as well.

25     MR. McKNIGHT:  And July 31, Your Honor.

1    JUDGE BUXBAUM:  Hold on.  Yeah, I've got it in my notes
2  too.  Overruled.
3    THE WITNESS:  That language is not in the notes.
4    MR. McKNIGHT:  I think I'm almost there, Your Honor.
5  I'd just like to go through my notes and talk to my
6  colleague.
7    **JUDGE BUXBAUM:  That's perfectly reasonable.  We'll take**
8  **a brief recess.**
9  **(Off the record.)**
10 Q.   BY MR. McKNIGHT:  I think you told us that at one of the
11 bargaining sessions, you were getting pretty hot.  Do you
12 recall which session that was at?
13 A.   It was the session where counsel for the UAW took a
14 swipe at the smartness of the company, July 25th or July
15 28th.  I -- both sides were very animated.
16 Q.   Did you get hot at any other sessions?
17 A.   I'd say it's a distinct possibility, yes.  Yes,
18 throughout the preamble.
19 Q.   Do you recall on August 14 that I asked if the company
20 was advertising for new hires?
21 A.   Yes, I do recall that.
22 Q.   Do you recall that you said yes, we are always looking
23 for new employees?
24 A.   You asked if we were advertising, and I said no.  And I
25 said we are always looking for employing.  I absolutely used

1    that phrase, we are always looking for employing.

2         MR. McKNIGHT:  No further questions.

3         JUDGE BUXBAUM:  Mr. Fraser, you may redirect.

4                    **REDIRECT EXAMINATION**

5    Q.   BY MR. FRASER:  Mr. Viar, you were shown an affidavit by

6    Mr. Carlson.  At this point in the day, I'm not sure if I

7    remember whether Mr. McKnight showed it to you, GR-7-CB-

8    16129.  And that's still up there.  I'm going to show you

9    what I've highlighted.  Just look at the entire document for

10   me, please.

11        MR. McKNIGHT:  Is that Exhibit 2, Jeff?

12        MR. FRASER:  You know, I don't --

13        JUDGE BUXBAUM:  Is it Jencks?

14        MR. FRASER:  I think it's Jencks.

15        JUDGE BUXBAUM:  Yeah, if it's Jencks, it probably

16   doesn't have a number.

17        MR. FRASER:  No, there was an affidavit.  It's two

18   pages, and it doesn't have an exhibit number at the bottom of

19   it, and it's got --

20        MR. McKNIGHT:  Oh, I've got you.  Okay, that's for two

21   pages.  I've got you.  Okay, this could not be the one that

22   we showed him.  It's the one Steve showed him.

23        MR. CARLSON:  I did show him that one.

24        JUDGE BUXBAUM:  Okay, very good.  All right.

25        THE WITNESS:  Okay.

1   Q.   BY MR. FRASER:  Mr. Viar, do you see the words illegal

2   strike in that affidavit anywhere?

3        MR. McKNIGHT:  Objection.

4        JUDGE BUXBAUM:  Why?

5        MR. McKNIGHT:  Because it's beyond the scope of anything

6   that he was asked by cross.

7        JUDGE BUXBAUM:  Well, I don't know that because I don't

8   have the document.  I mean --

9        MR. McKNIGHT:  Well, neither I nor Mr. Carlson asked

10  this witness about those words.

11       JUDGE BUXBAUM:  That's not true, counsel.  I mean, you

12  certainly asked the witness about the waiver language from

13  Mr. Lillie which contained those words, at least in some

14  witness' recounting of it.  Clearly, part of his testimony

15  involved the term illegal strike.

16       MR. McKNIGHT:  No, counsel's testimony.

17       JUDGE BUXBAUM:  No, I think this witness' testimony.

18       MR. FRASER:  Your Honor, again, as frustrating as it is

19  to sit and listen to Mr. McKnight say things like that, I've

20  almost had my limit.  I'm going to go off here soon.

21       JUDGE BUXBAUM:  Well, don't do that, Mr. Fraser.  Do not

22  do that.

23       MR. FRASER:  If Mr. Viar suggests that he does.  I'm

24  tired of that.

25       JUDGE BUXBAUM:  Well, I've sided with you in this

1    instance, and let's move on.

2        MR. FRASER:  Thank you, Your Honor.

3    Q.  BY MR. FRASER:  So, the question, Mr. Viar, is whether

4    anywhere on that affidavit appear the words illegal strike.

5    A.  I don't see them, no.

6    Q.  Is there any part of that affidavit where you state

7    anything about your belief regarding whether what occurred on

8    5/1/05 by the Union was an illegal strike?

9        MR. McKNIGHT:  Objection, leading.

10       JUDGE BUXBAUM:  I'll permit it.  You may answer.

11       THE WITNESS:  No, counsel.  This was about surface

12   bargaining.

13       MR. McKNIGHT:  Objection, no question pending.

14       JUDGE BUXBAUM:  All right, the answer will be stricken.

15   Q.  BY MR. FRASER:  Now, I'm sorry, I should have taken this

16   away from you.

17       JUDGE BUXBAUM:  Mr. McKnight, are you standing for some

18   reason?

19       MR. McKNIGHT:  Oh, yes, just that my back is bothering

20   me.

21       JUDGE BUXBAUM:  Oh, fine, okay, all right.  Thanks for

22   telling me that.

23   Q.  BY MR. FRASER:  Again, I'm still on the document I

24   showed you, the affidavit.  I'm at paragraph 2, the last

25   sentence.  Could you read the first one, two, three, four,

1    five, six, seven words and/or numbers in that last sentence?

2    A.    Okay, okay.

3        MR. McKNIGHT:  I'm going to object.  What is the purpose

4    of this?  Are you refreshing his recollection, or, I mean,

5    what's the -- he's asking if he can read an affidavit.

6        MR. FRASER:  It's a foundation to the next question.

7        JUDGE BUXBAUM:  All right, I'll allow it.

8        THE WITNESS:  We first surmised --

9        MR. CARLSON:  Well, he asked him the question.  He's

10    putting an affidavit before him and soliciting testimony?

11    That's his witness.  It doesn't matter if this is redirect.

12        JUDGE BUXBAUM:  It's a -- I'll allow a foundational

13    question, Mr. Carlson.  You went on your objection.  If it

14    turns out that --

15        MR. CARLSON:  The foundation is he's put his affidavit

16    before him.

17        JUDGE BUXBAUM:  Mr. Carlson, I've given everybody

18    latitude on foundational questions.  If it turns out that

19    we've been misled in that regard, you renew your objection.

20    I'll strike it.  But let's see where counsel is going.  We'll

21    give him some opportunity to make his point, to develop his

22    right.  All right, will you read the portion designated by

23    counsel?

24        THE WITNESS:  We first surmised on about May 9th.

25    Q.    BY MR. FRASER:  Does your affidavit state a specific

772

1    date on which you surmised?

2    A.    No, no.

3        MR. McKNIGHT:    Objection, that's leading and

4    argumentative.    It's his affidavit.    He read what his

5    affidavit says.

6        JUDGE BUXBAUM:    Well, I'll confess, gentlemen, that when

7    this was raised in cross-examination, I also took note that

8    it said on or about.    So, it is -- it would have been well

9    served to put it in a brief, but I'm not going to get excited

10    about it.    He's made his point.    Now, Mr. Fraser, you'll move

11    on, I trust?

12        MR. FRASER:    Absolutely.

13        JUDGE BUXBAUM:    Very good.

14    Q.    BY MR. FRASER:    Mr. Viar, you were also shown a

15    document, affidavit 5-CA-51235.    Do you recall seeing that

16    document?

17        JUDGE BUXBAUM:    Well, that's a hard question, counsel,

18    when it's just a docket number.    If he says yes, I'd really

19    wonder.

20    Q.    BY MR. FRASER:    I'm showing you that particular

21    affidavit.

22    A.    Yes.

23    Q.    Are you familiar with that?

24    A.    Yes.

25    Q.    For what purpose was that affidavit provided?

```
 1        MR. McKNIGHT:  Objection as to purpose.

 2        JUDGE BUXBAUM:  No, I'll allow it.

 3        MR. FRASER:  May I have just one moment, Your Honor?

 4        JUDGE BUXBAUM:  Yes.

 5        THE WITNESS:  May I answer him?

 6        JUDGE BUXBAUM:  No, no, he's asked for a moment.  Just

 7   hang on.

 8        MR. FRASER:  Thank you, Your Honor.

 9        JUDGE BUXBAUM:  Okay.  Now, you had asked a question.

10   Q.   BY MR. FRASER:  For what purpose did you provide that

11   affidavit to the NLRB?

12   A.   This affidavit was prepared in defense of an unfair

13   labor practice charge, a surface bargaining unfair labor

14   practice charge filed by the Local Union.

15   Q.   Did you provide any information in that affidavit

16   regarding the illegal strike?

17        MR. McKNIGHT:  Objection.

18        JUDGE BUXBAUM:  No, I'll allow it.

19        THE WITNESS:  No, counsel.

20        JUDGE BUXBAUM:  No, don't do that, especially at this

21   hour.

22   Q.   BY MR. FRASER:  On May 5, 2008, when you were meeting

23   with the Union regarding what you've testified were the

24   return-to-work conditions, did Mr. Winkle ask you any

25   questions about that document?
```

1       JUDGE BUXBAUM:  GC-8?

2   Q.   BY MR. FRASER:  GC-8.

3   A.   No, counsel.

4   Q.   At any point after May 5, 2008, did Mr. Winkle ask you

5   any questions about that document?

6   A.   No.

7       MR. FRASER:  No further questions, Your Honor.  Thank

8   you.

9       JUDGE BUXBAUM:  You may step down, sir.

10      MR. CARLSON:  I have a question, Your Honor.

11      JUDGE BUXBAUM:  Well, I generally don't do recross.

12   It's not really in the play book.  What -- I'll listen if

13   there's some reason why I should permit it here.

14      MR. CARLSON:  Because he brought up an issue with

15   respect to the affidavit, and Mr. Viar has further testified

16   about it, and I would like to recross on it.

17      MR. FRASER:  We'll object to that.

18      MR. CARLSON:  It is one area of questioning, Judge.

19      JUDGE BUXBAUM:  You know, but, I mean, that's -- it is

20   not normal practice because, otherwise, this can go on

21   endlessly.  The point is that during direct exam, you get

22   your shot at a witness.  There's cross.  If there's an

23   objection to a question on redirect that's beyond the scope

24   of -- well, it's so late in the date, I'm getting myself all

25   mixed up.  The point is that I need some specific reason why

1  recross is required here, and the fact that counsel asked

2  questions on redirect is always true.  Of course he asked

3  questions on redirect.  Why should I permit recross here?  Do

4  you want to answer, Mr. McKnight?  You can.

5      MR. McKNIGHT:  Well, sure.  The affidavit, which this

6  witness testified, was not -- first of all, I objected.

7      JUDGE BUXBAUM:  The so-called surface bargaining

8  affidavit.

9      MR. McKNIGHT:  I objected to the question as to the

10  purpose of the affidavit.

11     JUDGE BUXBAUM:  And, you know, your objection truly

12  puzzled me because I just don't understand why it isn't

13  apparent.

14     MR. McKNIGHT:  And I objected, and you overruled the

15  objection.

16     JUDGE BUXBAUM:  I did.

17     MR. McKNIGHT:  And the witness then testified that the

18  purpose of this affidavit had nothing to do with their

19  allegation regarding the legality of the strike.

20     JUDGE BUXBAUM:  I'd say that's a fair characterization.

21     MR. McKNIGHT:  Yeah, the affidavit on its cover page

22  indicates the cases with respect to which it pertains.

23     JUDGE BUXBAUM:  Right.

24     MR. McKNIGHT:  And one of those two cases is 7-CB-16049,

25  the unfair labor practice charge in this -- that the company

1  filed against the Union for engaging in surface bargaining

2  and an illegal strike on May 19, 2008.  So, that would

3  directly contradict this witness' testimony regarding the

4  purpose of this affidavit.

5      MR. FRASER:  And, of course, Your Honor, the point is

6  that there are multiple cases going on simultaneously, and

7  this affidavit related to the surface bargaining case that is

8  one of the two --

9      JUDGE BUXBAUM:  Yeah, I think it's all very remote.  I'm

10  not going to permit that.  Mr. Carlson, did you want to ask

11  something else?

12      MR. CARLSON:  No.

13      JUDGE BUXBAUM:  Okay.

14      MR. CARLSON:  I want the record though to reflect that

15  this is an affidavit in case of 7-CA-51235 and 7-CB-16049, 7-

16  CB-16049 being a charge filed by the company on May 19, 2008,

17  alleging in part that on May 1st, 2008, the Union engaged in

18  an illegal strike rendering the striking employees

19  unprotected.

20      JUDGE BUXBAUM:  All right, and you're basing this on

21  your knowledge of the records of the General Counsel in Grand

22  Rapids?

23      MR. CARLSON:  I just read the charge form.  That's what

24  I read into the record.  Yes, sir.

25      JUDGE BUXBAUM:  Right, okay, and, Mr. Fraser, it seems

1   to me appropriate to let the record reflect that, unless you

2   have some concern that the information is wrong.

3       MR. FRASER:  Your Honor, to the extent that that's

4   accurate information, I have no problem with letting the

5   record reflect that.

6       JUDGE BUXBAUM:  Very well.  Mr. Viar, you may step down.

7       THE WITNESS:  Thank you, Your Honor.

8   **(Witness excused.)**

9       MR. FRASER:  I would love to call and hopefully finish

10   with Diane Hedgcock today.

11       JUDGE BUXBAUM:  Sure.

12       **JUDGE BUXBAUM:  Oh yeah, we can go off for a moment,**

13   **sure.**

14   **(Off the record.)**

15       JUDGE BUXBAUM:  Please stay standing.  All right, would

16   you please raise your right hand?

17   (Whereupon,

18                   **DIANE HEDGCOCK**

19   was called as a witness by the Respondent and, after having

20   been first duly sworn, was examined and testified as

21   follows:)

22       JUDGE BUXBAUM:  Please be seated.  Would you please

23   state your name and spell your last name?

24       THE WITNESS:  Diane Hedgcock, H-e-d-g-c-o-c-k.

25       JUDGE BUXBAUM:  Thank you.  You may proceed, counsel.

```
 1        MR. FRASER:  Thank you.
 2                   DIRECT EXAMINATION
 3   Q.   BY MR. FRASER:  Ms. Hedgcock, good afternoon.  Could you
 4   please tell us who you currently work for?
 5   A.   Michigan Works HRDI in Coldwater.
 6   Q.   What is that, just briefly?
 7   A.   Michigan Works helps people find jobs, and also it's the
 8   No Worker Left Behind program for helping displaced workers
 9   going back to school.
10        JUDGE BUXBAUM:  Is it a government organization?
11        THE WITNESS:  It's funded through the federal and then
12   state and then county.
13        JUDGE BUXBAUM:  But it's a private company?
14        THE WITNESS:  Yeah.
15        JUDGE BUXBAUM:  Okay, so, you don't get a government
16   paycheck?
17        THE WITNESS:  No.
18        JUDGE BUXBAUM:  Okay, got it.
19   Q.   BY MR. FRASER:  And who did you work for prior to
20   working for Michigan Works?
21   A.   Douglas Autotech.
22   Q.   And how long did you work for Douglas?
23   A.   Over 36 years.
24   Q.   When did you leave Douglas?
25   A.   January 23rd, 2009.
```

1  Q.   2009?

2  A.   Yes.

3  Q.   Okay, when you left Douglas, what position did you hold?

4  A.   Human Resource Assistant.

5  Q.   And how long have you held the Human Resource Assistant

6  position?

7  A.   I think around 14 years.

8  Q.   Okay.  And I want to try to ask you a few questions

9  about your duties, but I want to have a very narrow focus, at

10 least for my purposes.  Did you have any involvement in

11 collective bargaining negotiations for Douglas?

12 A.   I took the notes during negotiations.

13 Q.   Okay, and how many sets of negotiations -- well, I'm not

14 going to ask you that.  In 2008, were you involved in the

15 negotiations?

16 A.   Yes.

17 Q.   When you say you took the notes, describe for me, if you

18 would, when you took notes, how you took notes during those

19 sessions.

20 A.   When we met together at the table, the bargaining unit

21 and the company as a whole in the group, then I was taking

22 notes.

23 Q.   Okay, and did you take notes at any time when -- I'm

24 going to call those joint sessions -- when you were not in a

25 joint session?

1  A.    No.

2  Q.    Okay, at whose direction were you taking those notes, at

3  least in 2008?

4  A.    Mr. Viar.

5  Q.    Okay, was Mr. Viar the person that you reported to at

6  Douglas?

7  A.    Yes, he was my boss.

8  Q.    Okay.  And could you just describe in general, if you

9  were in a joint session during bargaining, how it is that you

10 took the notes?  Just what was your protocol, your own

11 protocol for doing that?

12 A.    When we would meet together as a group, I would try to

13 write down at the top of the page the date, the names of the

14 people that were there, and the time that we started.  When

15 we'd break for either caucuses or breaks or, you know, break

16 out sessions, I wouldn't, of course, take any notes.  And

17 then when we'd meet again, quite often I would try to put the

18 time in that we met again.

19 Q.    Okay, if you were at a session, at a bargaining session

20 and there was a joint session, do you recall any times where

21 you did not take notes?

22 A.    There were times that I wasn't there due to having to be

23 at the plant and getting some work done or on vacation.  On

24 those days, I would not have had any handwritten notes.

25 Q.    Okay, if you had been at a session and you took notes,

1   what did you do with them after that session?

2   A.   They were all -- it was like a legal pad that would come

3   off across the top.  They were all on that legal pad.

4   Eventually, I'd get the notes typed up, but in the meantime,

5   they were all on that pad.  And they would be locked up in my

6   briefcase.

7   Q.   Okay, let me show you -- there were two binders up

8   there, but we put one of them back.  If you could take a

9   minute and look at this Joint Exhibit 1 for me briefly.

10  A.   Okay.

11  Q.   Did you have a chance to look at that a minute?  Does

12  that look to accurately reflect the bargaining that took

13  place, and we're focusing on May 1, 2008, forward, to the

14  best of your recollection?

15  A.   There were some times that I wasn't there during these

16  ten sessions.

17  Q.   Okay, do the sessions look like the dates that

18  bargaining took place?

19  A.   I guess they could very well be.

20       JUDGE BUXBAUM:  But this has been stipulated to,

21  Mr. Fraser.  Why do we need it?

22       MR. FRASER:  Your Honor, I'm going to now introduce

23  notes through Ms. Hedgcock, but my request is this.  I have

24  the originals, and I'm always, since I'm a lawyer, very

25  skeptical about giving my originals up.  I will introduce

1  those as the documents if that's the way you prefer it.  I'm

2  just trying to --

3      JUDGE BUXBAUM:  These are the notes you're talking

4  about?

5      MR. FRASER:  These are Ms. Hedgcock's original notes.

6      JUDGE BUXBAUM:  I'm perfectly happy to accept copies if

7  it's agreeable to everyone, as long as they're exact copies.

8  In other words, there's nothing, I presume, about the actual

9  physicality of the notes that's going to be important, is it?

10     MR. FRASER:  No.

11     JUDGE BUXBAUM:  It's not, you know, criminal cases you

12  think about that.  If there are drops of blood on the check,

13  that would be -- you want the original.  But nothing like

14  that here, I assume?

15     MR. FRASER:  Not that I'm aware of.

16     JUDGE BUXBAUM:  Any problem, Mr. McKnight, with taking

17  copies?  All right, then, copies will be fine.

18     MR. FRASER:  Are we up to --

19     JUDGE BUXBAUM:  Four.

20     MR. McKNIGHT:  Are you going to do this one after

21  another?

22     MR. FRASER:  Yeah, it seemed to me to be the easiest way

23  to do it, but if you want me to --

24     JUDGE BUXBAUM:  You can do it all at once.

25     MR. McKNIGHT:  Why don't you just give us a collection?

1    Let's look at them.

2        JUDGE BUXBAUM:  Yeah.

3        MR. FRASER:  That sounds even better to me if we make it

4    one bulk exhibit as Respondent 4.

5        JUDGE BUXBAUM:  Yeah, that's fine.

6    **(Respondent's Exhibit 4 marked for identification.)**

7        **JUDGE BUXBAUM:  We'll go off the record for a moment.**

8    **(Off the record.)**

9    Q.   BY MR. FRASER:  Ms. Hedgcock, if you could take a look

10   at Respondent's Exhibit 4, which is the set of documents I

11   just provided to you, and look through those, please.

12   A.   Okay.

13       JUDGE BUXBAUM:  She's ready.

14   Q.   BY MR. FRASER:  Have you had a chance to look at those?

15   A.   No.

16   Q.   Oh, still looking.

17       JUDGE BUXBAUM:  Oh, I thought you said you were --

18       THE WITNESS:  That's fine.

19   Q.   BY MR. FRASER:  Have you had a chance to look at those?

20   A.   Yes.

21   Q.   Okay, can you tell me what they are, please?

22   A.   They're copies of the meeting notes that I took.  It's

23   all my handwriting.

24   Q.   Okay, and we look at the front page of this exhibit,

25   upper left-hand corner has a date of 5/21?

1   A.   That's correct.

2   Q.   Can you tell me, then, following that until we reach a

3   new date of 7/2, what are those?

4   A.   They're the notes from the 5/21 date.

5   Q.   Okay, and again, I'm not going to do this with every

6   document, I suppose, but the top of that first page, it says

7   12:05 with a list of names.  Why did you put that information

8   down?

9   A.   I normally tried to do that.

10  Q.   Okay, what does it represent?

11  A.   Who was there at the meeting at that time.

12  Q.   Okay, and as I go down the list, the left side of the

13  front page on this exhibit, it has sometimes it'll be a name

14  and then information written next to that.  Tell me what you

15  were doing there.

16  A.   As people were making comments or talking, I was trying

17  to put down notes as to what they were saying and put the

18  name of the person next to those notes for that particular

19  statement.

20  Q.   Okay.

21       JUDGE BUXBAUM:  Mr. Fraser, I'm sorry to interrupt you,

22  but I'm completely lost.  Do I have all of the exhibit?

23       MR. FRASER:  You ought to have --

24       JUDGE BUXBAUM:  I have just 7/2, 7/14, 15.

25       MR. FRASER:  The first set of documents I gave you

 1  before we went to bulk exhibit was 5/21.

 2       JUDGE BUXBAUM:  I don't have it.

 3       MR. FRASER:  Well, let me give you a 5/21.

 4       JUDGE BUXBAUM:  Thank you.  Ms. Hedgcock, can you tell

 5  me what are the other dates?  It starts with 5/21.  What's

 6  the next one and so forth?

 7       THE WITNESS:  7/2.

 8       JUDGE BUXBAUM:  7/2, I don't have 7/2 either.

 9       THE WITNESS:  7/14.

10       JUDGE BUXBAUM:  Okay, I've got 7/14.

11       MR. FRASER:  Your Honor, this is 7/2, 5/21 and 7/2,

12  7/14, 7/15, 7/24, 7/25, 7/31.

13       JUDGE BUXBAUM:  Excellent, thank you.  Okay, now I'm on

14  track.

15  Q.   BY MR. FRASER:  And again, Ms. Hedgcock, I don't want to

16  belabor this.  The dates that you've just recounted, do you

17  recall taking notes on those dates?

18  A.   These are all my notes.

19  Q.   Okay, and do you have any belief that you would have

20  taken notes anywhere other than at a joint session?

21  A.   No.

22  Q.   And did your system or protocol change on the dates that

23  are identified here for how you took notes between May 21 and

24  July 31st?

25  A.   No.

1  Q.   In those sessions, did you try to take notes that were

2  accurate reflections of what the parties said?

3  A.   Yes.

4       MR. McKNIGHT:   Objection, the notes are the notes.

5       JUDGE BUXBAUM:   Well, no, I'll permit that.   Overruled.

6  She's answered.

7  Q.   BY MR. FRASER:   And based on what you heard during those

8  sessions?

9  A.   Yes.

10      MR. FRASER:   We would move to admit Respondent 4.

11      JUDGE BUXBAUM:   Any objection?

12      MR. CARLSON:   I have no objection to Respondent 4.

13      JUDGE BUXBAUM:   Mr. McKnight?

14      MR. McKNIGHT:   No.

15      JUDGE BUXBAUM:   All right, then Respondent's 4 will be

16 received.

17 **(Respondent's Exhibit 4 received into evidence.)**

18      MR. FRASER:   One moment, Your Honor.

19      **JUDGE BUXBAUM:   All right.   We'll go off the record for**

20 **a moment.**

21 **(Off the record.)**

22      MR. FRASER:   Your Honor, we don't have any other

23 questions for Ms. Hedgcock.

24      JUDGE BUXBAUM:   Mr. Carlson?

25      MR. CARLSON:   Thank you, Judge.

1                    **CROSS-EXAMINATION**

2    Q.   BY MR. CARLSON:  Good afternoon, Ms. Hedgcock.

3    A.   Good afternoon.

4    Q.   Ms. Hedgcock, would you agree with me that with respect

5    to the bargaining sessions that took place between the UAW

6    and the company in May, June, and July of 2008, that taking

7    notes, that was the main reason that you attended those

8    meetings?

9    A.   That's correct.

10        JUDGE BUXBAUM:  You weren't a negotiator?  You didn't

11   say well, how about a $10 an hour raise, something like that?

12        THE WITNESS:  No, sir.

13   Q.   BY MR. CARLSON:  And do you recall, Ms. Hedgcock, in

14   November of 2008 meeting with an agent of the National Labor

15   Relations Board?

16   A.   I don't recall.

17   Q.   Okay, do you recall giving an affidavit?

18   A.   In November of 2008.

19   Q.   Right.

20   A.   I may have.  I don't --

21   Q.   If I showed you a copy of a sworn statement from

22   November of 2008, might that help refresh your recollection?

23   A.   That might help.

24   Q.   Okay, let me show you that.

25        JUDGE BUXBAUM:  Now, again, I notice there's yellow

 1   underlining.  I assume that would not have been on it at the

 2   time that she --

 3        MR. CARLSON:  That's correct.

 4        THE WITNESS:  I do remember you coming then, yes.

 5   Q.   BY MR. CARLSON:  Thank you.  And when you say you

 6   remember me coming --

 7   A.   I remember somebody coming, and we met in the one

 8   office.

 9   Q.   Okay.

10   A.   Yes.

11   Q.   And they asked you questions about what took place

12   during the bargaining sessions between the UAW and the

13   company in May, June, and July of 2008?

14   A.   That's correct.

15   Q.   And the Board Agent asked you about statements made

16   during those bargaining sessions about the strike being

17   illegal and the company reserving its rights; is that

18   correct?

19        MR. FRASER:  Objection, Your Honor.  It's hearsay.  He's

20   asking if the Board Agent asked her.  It's hearsay.  If the

21   Board Agent wants to be here to testify about what he did or

22   didn't say, I suppose the Board Agent can come in and do

23   that.  He's asking her to produce hearsay information.

24        JUDGE BUXBAUM:  What do you say to that, Mr. Carlson?

25        MR. CARLSON:  I can rephrase the question.

1        JUDGE BUXBAUM:  All right.

2   Q.   BY MR. CARLSON:  Did you tell the Board Agent about

3   statements that were made during the bargaining sessions in

4   May, June, and July of 2008 by Mr. Lillie and others

5   regarding the strike being illegal and waiving rights and

6   things like that?

7   A.   What I actually said back in November, I can't tell you

8   word for word now.  I had to sign whatever it is that you

9   have there, that document.  You know, I had to read it and

10  agree to it at that time.  I can't remember what I did then.

11  Q.   Okay.  Do you recall the Board Agent asking you to

12  review your notes for any statements regarding the strike

13  being illegal and waiver of rights and so forth?

14  A.   Yes, we did have to make copies of those particular

15  items.

16       JUDGE BUXBAUM:  And the notes we're talking about now

17  are the ones that you've been shown just a few moments ago,

18  the handwritten.

19       THE WITNESS:  They would have been handwritten notes,

20  yes.

21       JUDGE BUXBAUM:  But, in other words, the thing that

22  we've marked Respondent's Exhibit 4 that Mr. Fraser showed

23  you, are those the notes that you showed to the Board Agent

24  or that the Board Agent asked you to review?

25       THE WITNESS:  It could have been these.  It could have

1  been others from the whole sessions because we had, you know,

2  we had negotiating prior to that also.

3      JUDGE BUXBAUM:  Okay.

4  Q.  BY MR. CARLSON:  So, do you have a recollection whether

5  or not you reviewed your notes as part of that interview with

6  the Board Agent?

7  A.  I do remember going through that and looking for that

8  terminology in all the notes, yes.

9  Q.  Okay, and the Board Agent asked you to pull out those

10 pages where there was that terminology about the strike being

11 illegal and waiver of rights and so forth?

12 A.  Yes.

13 Q.  And you complied with his request; is that correct?

14 A.  Yes, and I made copies of those.

15 Q.  And those were attached to your affidavit; isn't that

16 true?

17 A.  Yes.

18 Q.  Okay.  Now, I'm going to hand you your affidavit.  Do

19 you recall what dates -- of what dates were of the notes that

20 you gave him?

21 A.  No.

22 Q.  And if I handed you your affidavit now, would that help

23 refresh your recollection as to what you gave him at that

24 time?

25 A.  Yes.

1       JUDGE BUXBAUM:  So your question, Mr. Carlson, is what

2  particular notes did she give the Board Agent?

3       MR. CARLSON:  Right, reflecting statements about made at

4  the bargaining table between May, June, and July regarding

5  the illegal strike and waiver of rights and so forth,

6  reservation of rights.

7  Q.   BY MR. CARLSON:  Have you had a chance to look at that?

8  A.   Yes, yes, yes.

9  Q.   Okay.  And does that refresh your recollection as to the

10  dates that your notes reflected statements about illegal

11  strike and reservation of rights and so forth?

12  A.   It is my handwriting, so I had to make --

13  Q.   And what were those dates?

14  A.   Was that the 5/21?  I couldn't read behind the staple,

15  sorry.  Yes, it was the 5/21 is one of them.  This attachment

16  2 doesn't have a date on it.

17  Q.   Okay, and would it help refresh your recollection if you

18  had a chance to review your affidavit referencing that second

19  attachment?

20  A.   Probably, yes.  Like I said, that was back in November.

21  Q.   Let me direct your attention to paragraph 6.

22  A.   Paragraph 6.

23  Q.   Okay, don't answer my question.  Have you had a chance

24  to review that?

25       JUDGE BUXBAUM:  Well, I'm not --

1    MR. CARLSON:  I'm just -- she's just refreshing her
2    recollection.
3    JUDGE BUXBAUM:  Yeah, I'm not sure she had a -- she may
4    have had a question to you about what she was supposed to
5    look at.
6    MR. CARLSON:  Oh, I'm sorry.
7    THE WITNESS:  No, that's okay.
8    JUDGE BUXBAUM:  Oh good, okay.
9    Q.  BY MR. CARLSON:  Tell me when you've had a chance to
10   review that.
11   A.  Okay.
12   Q.  Okay.  And does that refresh your recollection about the
13   date of the second page of the attachment?
14   A.  Yes, yes.
15   Q.  And what was that date?
16   A.  7/31/08.
17   Q.  And it's true, is it not, Ms. Hedgcock, that those were
18   the only two dates that your notes reflected any statements
19   made at the bargaining table about reservation of rights or
20   about the strike being illegal?
21   A.  Yes.
22   Q.  And you specifically reviewed for the Board Agent your
23   notes from July 15th, 2008; is that correct?
24   A.  Correct.
25   Q.  And those notes did not reflect any statements about

1  reservation of rights or about the strike being illegal?

2  A.    Correct.

3  Q.    Is that correct?

4  A.    Correct.

5  Q.    Now, Ms. Hedgcock, you testified that, and correct me if

6  I'm wrong, I think your testimony was that part of your

7  practice was to type your notes?

8  A.    After we got done and as time allowed, yes, I would get

9  the notes typed up also so that we had them.  But these were

10 the ones that were done when we were doing the bargaining.

11 Q.    I understand.

12     JUDGE BUXBAUM:  Well, when you say you would get the

13 notes typed up, by you or by somebody else?

14     THE WITNESS:  I would do them.

15     JUDGE BUXBAUM:  You would do them, okay.

16 Q.    BY MR. CARLSON:  Did anyone else ever type notes?

17 A.    No, not that I'm aware of.

18 Q.    Did you ever type Paul Viar's notes?

19 A.    No.

20 Q.    Were you aware that Paul Viar had a practice of

21 destroying his notes once he would type them?

22     MR. FRASER:  Objection, Your Honor, outside the scope of

23 direct.

24     JUDGE BUXBAUM:  Sustained.

25 Q.    BY MR. CARLSON:  What would you do with your typed

1   notes?  Did you leave your typewritten notes with the

2   company?

3   A.   Yes, I left everything with the company when I left.

4   Q.   Okay.

5        MR. CARLSON:  Can we have just a minute, Your Honor?

6        **JUDGE BUXBAUM:  Very well.  We'll go off the record.**

7   **(Off the record.)**

8        MR. CARLSON:  Okay, and I would like to ask Mr. Fraser

9   on the record whether or not he's produced Ms. Hedgcock's

10  typewritten notes.

11       MR. FRASER:  Your Honor, perhaps we could, if General

12  Counsel is done with his questions, we'd be happy to do a

13  redirect to try and clarify the mystery that has arisen here,

14  because there's a very simple solution.  We've produced

15  everything that we've been provided.  General Counsel and

16  Mr. McKnight have all of those, despite the implication that

17  they haven't been given something.  That's just not accurate.

18  So, yes, we have given them everything that they've asked

19  for.

20       JUDGE BUXBAUM:  All right.

21       MR. McKNIGHT:  Well, I would just ask, counsel, if you

22  could show me, this would perhaps expedite things.  Which

23  documents -- your copies of the documents that you would

24  represent are Ms. Hedgcock's typed notes?

25       MR. FRASER:  And again, Mr. McKnight, we'll be able to

1    do that through the witness so that the mystery is resolved.

2         JUDGE BUXBAUM:  All right, I'm going to give you

3    recross, though, on that topic when he does.

4         MR. McKNIGHT:  You're supposed to -- we made a -- I'm

5    only interested in my production request at this time, Your

6    Honor.  I'm not interested --

7         MR. CARLSON:  This is a subpoena issue, Judge.

8         JUDGE BUXBAUM:  Yes, but we're in the middle of the

9    examination of a witness, and let's finish that.

10        MR. FRASER:  Your Honor, again the answer is yes, we

11   provided everything that was consistent --

12        JUDGE BUXBAUM:  All right, then go ahead.

13        MR. McKNIGHT:  All I'm asking --

14        JUDGE BUXBAUM:  But, Mr. McKnight, you're not asking

15   anything.  Mr. Carlson has the floor, and, Mr. Carlson, you

16   may proceed with your cross-examination of the witness.

17        JUDGE BUXBAUM:  Mr. Carlson?

18        MR. CARLSON:  Yes, Judge, I'm afraid I'm having a hard

19   time understanding -- well, just one moment, please.

20        JUDGE BUXBAUM:  Look, I don't mean to make this more

21   difficult than it needs to be.

22        MR. CARLSON:  Well, I mean, I was going to explain to

23   you, Judge.  We received a set of typewritten notes, and the

24   representation and the testimony has been that they were

25   Mr. Viar's typewritten notes.  Now, it appears that there's

1    other typewritten notes made by Ms. Hedgcock, but we haven't

2    received them.

3        JUDGE BUXBAUM:  Well, we don't know that.  Why don't you

4    show the witness the ones you got?  You're making an

5    assumption.

6        MR. CARLSON:  No, I'm not.  Based on his provided

7    testimony, that's not an assumption.

8        JUDGE BUXBAUM:  Oh, all right.

9        MR. CARLSON:  And it's based on -- well, it's based on

10    Mr. Viar's testimony and what was told to us at the time of

11    the production with respect to the subpoena, and now it

12    sounds as if there's additional notes.  And you're telling me

13    I need to go ahead with my examination, and this witness is

14    saying that there's documents that she typed.

15        JUDGE BUXBAUM:  All right, here's what I'm going to do.

16    I couldn't help but hear the witness say may I clear this up.

17    And is there any objection to her clearing it up?

18        MR. FRASER:  None from me because if she doesn't do it

19    now, I'm going to do it on redirect.

20        JUDGE BUXBAUM:  Well, that's why I'm just trying to

21    figure out a way to -- I want you to have effective

22    opportunity for both of you to cross-examine, but we don't

23    need to go off on a tangent if it's just a tangent.  Let's

24    see whether it can be cleared up.  Ms. Hedgcock, how do you

25    feel you can clear it up?  Help us out.

1    THE WITNESS:  Okay, I'll try.  These notes from these

2  dates or any other dates that I had taken notes during

3  negotiations, I would go back later and retype them so that

4  somebody could read them, you know, not having to go through

5  my hen scratching.  What I typed on those was exactly what is

6  on these handwritten notes.

7    JUDGE BUXBAUM:  So, they were word for word?

8    THE WITNESS:  I might have added in and, the, but to

9  make it more readable, but they were word for word for what's

10  on here.

11    JUDGE BUXBAUM:  Okay.

12    THE WITNESS:  Does that help?  That's what these --

13    MR. McKNIGHT:  So, where are they?  That's my question.

14    JUDGE BUXBAUM:  Okay, Mr. Fraser, where are they?

15    THE WITNESS:  These are the originals.  These are my

16  originals.

17    MR. FRASER:  Reopen direct so that I can try and clear

18  this up now, or should we just --

19    MR. McKNIGHT:  No, no, I'm next here.

20    MR. FRASER:  -- for that to occur.

21    MR. McKNIGHT:  I would just like to know where they are.

22    MR. FRASER:  And again, Your Honor, I'm happy to try and

23  show where they are by asking a couple of more questions.  If

24  that's not appropriate, that's fine.  I'll sit and wait.

25    JUDGE BUXBAUM:  Well, all right, all right, all right,

 1  you wait.  You wait.

 2      MR. McKNIGHT:  We've had a legion of attorneys looking

 3  at all of these records.

 4      JUDGE BUXBAUM:  Hold on.  Hold on.  Mr. Carlson, resume

 5  your cross-examination.

 6      MR. CARLSON:  My cross-examination is complete pending

 7  production of Ms. Hedgcock's notes.

 8      JUDGE BUXBAUM:  All right, and my understanding,

 9  Ms. Hedgcock, is you've testified those notes are not within

10  your possession?

11      THE WITNESS:  No.

12      JUDGE BUXBAUM:  No, they're not?

13      THE WITNESS:  No, nothing.

14      JUDGE BUXBAUM:  Okay, all right.  Mr. McKnight?

15      MR. McKNIGHT:  I would like to request counsel to

16  identify which of the notes, the documents they produced in

17  response to our request for bargaining notes that are the

18  typed notes by Ms. Hedgcock.

19      JUDGE BUXBAUM:  Mr. Fraser?

20      MR. FRASER:  It's awful difficult for me to do that,

21  Your Honor, with the eight boxes that are in my office, or

22  however many boxes there are.  If that's what we need to do,

23  then I suppose we can call yet another time out.  I can go

24  back to my office, and I can pull those documents together.

25      JUDGE BUXBAUM:  Well, are you representing to me that

1    you have provided them previously to opposing counsel?

2        MR. FRASER:  I have represented prior to you asking me

3    now that we have produced all of the information that our

4    client Douglas has given to us, and my understanding based on

5    my conversation with the client just one moment ago is yes,

6    we have provided all of Ms. Hedgcock's typewritten notes

7    related to the handwritten notes that she has put together.

8        JUDGE BUXBAUM:  Well, that's pretty definitive.

9    Mr. McKnight, what more do you want?

10       MR. McKNIGHT:  It is, Your Honor, and I've looked

11   through everything they've produced, including everything

12   that they produced in response to subpoena item number 1,

13   which, in fact, was the very first thing that was produced,

14   and I have not found any documents that purport to be typed

15   notes by Ms. Hedgcock.  So, so, if the answer is they didn't

16   produce them because they don't have them or they've pitched

17   them, then they should say that.

18       JUDGE BUXBAUM:  Well, sure, he didn't say that.

19       MR. McKNIGHT:  But if they represent that they have

20   them, I would like to see them because I can represent on the

21   record I have not seen them.

22       JUDGE BUXBAUM:  That's not it, Mr. Fraser.

23       MR. FRASER:  And I guess I can't counter what

24   Mr. McKnight represents that he's seen, and I'm sure that the

25   documents wouldn't have said Dear Sam, these are typewritten

1    notes from Diane Hedgcock, enjoy the reading.  But there are

2    clearly typewritten notes that were provided by Ms. Hedgcock

3    to Mr. Viar that are in counsel, both counsels' possession.

4    And those are the notes that we're talking about.

5         JUDGE BUXBAUM:  Mr. Carlson, what do you say about that?

6    I mean, it's curious to me that both of you would take that

7    position.  Do you say you don't have these?  I mean, he may

8    have -- Mr. McKnight may have missed them somehow.

9         MR. CARLSON:  Judge, no, I'm completely confused by this

10   testimony because the representation that was made to me was

11   that these were typewritten notes --

12        JUDGE BUXBAUM:  What were typewritten notes?

13        MR. McKNIGHT:  The typed notes we have are Mr. Viar's

14   minutes.

15        MR. CARLSON:  And some of these have been -- we looked

16   at --

17        JUDGE BUXBAUM:  Well, show them -- why don't you show

18   them to the witness?

19        MR. CARLSON:  But I would like to finish, Judge.  That

20   these were typewritten notes by Mr. Viar.  That was what was

21   represented to me by Mr. Fraser, and that was consistent with

22   Mr. Viar's testimony.

23        JUDGE BUXBAUM:  It was.

24        MR. CARLSON:  That he typed Diane's notes.

25        JUDGE BUXBAUM:  It was, so?

1          MR. CARLSON:  So, I don't have any notes --

2          JUDGE BUXBAUM:  I mean, that's certainly interesting,

3     but so what?

4          MR. McKNIGHT:  Those are the only typed notes we have,

5     Your Honor.

6          MR. CARLSON:  Those are the only typed notes I have.

7          JUDGE BUXBAUM:  But unless you show them to the witness

8     and see what she says about them, you haven't closed the

9     circle.  Do you want to close the circle?  It's up to you.

10    Don't you find it interesting to see what the witness says

11    when shown those?  Let's see what she says.  She can only say

12    one or two things.

13         MR. McKNIGHT:  Well, then, I don't understand.

14         JUDGE BUXBAUM:  Well, I think either one would be very

15    interesting, Mr. McKnight.  I'm puzzled you don't --

16         MR. McKNIGHT:  I'm just taking Mr. Fraser at his word

17    and saying where is it.

18         JUDGE BUXBAUM:  But let's not worry about Mr. Fraser.

19    Let's worry about the witness.

20    Q.   BY MR. CARLSON:  Ms. Hedgcock, I'm going to show you

21    what's been previously marked for identification as General

22    Counsel's Exhibit 59.  Do you recognize that document?

23    A.   I've seen notes like this before, Mr. Viar's, yes.

24    Q.   Are those your typewritten notes?

25    A.   Do you mind if I look at my other ones to check and

1   verify?

2        JUDGE BUXBAUM:  Sure, sure.

3        MR. CARLSON:  No, ma'am.

4        THE WITNESS:  Can I explain maybe?

5        JUDGE BUXBAUM:  Sure, go ahead.

6   Q.   BY MR. CARLSON:  Let me back you up before you explain,

7   if I might.

8        I mean, are those your notes?  Are those the typewritten

9   notes that you referred to a few moments ago in your

10  testimony?  Are those your typewritten notes?

11  A.   They look to be near what was on here, and if I could

12  explain.  When I would type from these notes, I would send or

13  e-mail them to Mr. Viar.  Mr. Viar would then put them into

14  the format that he wanted them with the headings and

15  everything on them.  Does that help clarify anything?

16  Q.   I think it does.  Thank you.

17       MR. McKNIGHT:  So, again, Judge, I would note for the

18  record that Respondent has not produced all the notes.

19       THE WITNESS:  Yes.

20       JUDGE BUXBAUM:  Well, hold on.  What were you going to

21  say, ma'am?

22       MR. McKNIGHT:  This is Mr. Viar's notes.

23       JUDGE BUXBAUM:  Hold on.  Ms. Hedgcock, what were you

24  going to --

25       THE WITNESS:  These are the notes.

1        JUDGE BUXBAUM:  Well, okay.  Yeah, that's different, all

2   right.

3        MR. McKNIGHT:  It's not about you, Ms. Hedgcock.

4        MR. FRASER:  Here is the answer to the question, which

5   has already been answered.  Ms. Hedgcock typed up notes.

6        JUDGE BUXBAUM:  Right.

7        MR. FRASER:  She forwarded them to Mr. Viar.

8        JUDGE BUXBAUM:  Right.

9        MR. FRASER:  Mr. Viar took those notes, which is very

10  easy to do from an e-mail.

11        JUDGE BUXBAUM:  Right.

12        MR. FRASER:  He reviewed those notes.  He added things.

13  He subtracted things.  He made changes.  He put them in this

14  format and sent them on.  There are no additional notes that

15  were sent on.

16        JUDGE BUXBAUM:  Well, did you keep a copy of your

17  original typed version of the notes, or did you just send it

18  off to Mr. Viar and forget about it?

19        THE WITNESS:  The originals of these.

20        JUDGE BUXBAUM:  No, not the handwritten.

21        THE WITNESS:  No, no, the typed ones, I just e-mailed

22  those to him.

23        JUDGE BUXBAUM:  Now, when you say typed, I mean, of

24  course that's an old-fashioned word.  You did them on a word

25  processor?  And then you sent them as an e-mail, an

1 attachment to an e-mail?

2     THE WITNESS:  Yes.

3     JUDGE BUXBAUM:  To Mr. Viar?

4     THE WITNESS:  Yes.

5     JUDGE BUXBAUM:  And what did you then do after you had

6 just done that?  You're sitting at your computer screen.

7 What did you do with them beyond sending them to Mr. Viar?

8     THE WITNESS:  Nothing.

9     JUDGE BUXBAUM:  Would they have stayed in your hard

10 drive or on a disc or some other storage device?

11     THE WITNESS:  They should have been.  Yeah, they would

12 have been saved on that.

13     MR. FRASER:  All I can represent to you, Your Honor, is

14 what's been represented to me.  These are the notes.  They

15 were typewritten.  They were forwarded on to Mr. Viar.  He

16 took the notes, made changes, sent them on to whoever he sent

17 them on to, and that was the end of the process.

18     JUDGE BUXBAUM:  But the point here first that I want to

19 drive at is there is no point, Mr. Fraser, then in saying to

20 you go back to your office, look through those boxes, and

21 find what the witness --

22     MR. FRASER:  Certainly not going to be there.  These are

23 the notes that I'm talking about.

24     JUDGE BUXBAUM:  Okay, all right, so there is no point in

25 that.  I wanted to get that out of the way first.

1    MR. FRASER:  Correct.

2    JUDGE BUXBAUM:  Beyond that, I think the record has now

3  been developed as to what's occurred, and I leave it to the

4  lawyers to characterize it in their briefs.

5    MR. CARLSON:  I don't have any further questions for

6  Ms. Hedgcock.

7    JUDGE BUXBAUM:  Mr. McKnight?

8    MR. McKNIGHT:  Does the witness have her <u>Jencks</u>

9  affidavit?

10    MR. CARLSON:  I'm handing to Mr. McKnight an affidavit

11  that Ms. Hedgcock provided to the Board on November 3rd,

12  2008, in case GR-7-CA-51428.  It is a two-page -- well, two

13  typewritten pages and then two pages of attachments.

14    JUDGE BUXBAUM:  Well, all right, it's short, in other

15  words.  Oh, okay.

16    **All right, we'll go off the record while Mr. McKnight**

17  **reviews it.**

18  **(Off the record.)**

19    JUDGE BUXBAUM:  Mr. McKnight, do you wish to ask further

20  questions?

21    MR. McKNIGHT:  I have no questions.

22    JUDGE BUXBAUM:  Very well.  Then redirect.

23                    **REDIRECT EXAMINATION**

24  Q.   BY MR. FRASER:  Ms. Hedgcock, Respondent's Exhibit 4, I

25  want you to please carefully, as quickly as you can but

1    carefully, look at each one of those pages and tell me
2    whether you see any changes to your notes or any other
3    alterations that you're not familiar with.
4        MR. McKNIGHT:  Objection.
5        JUDGE BUXBAUM:  Well, it seems beyond the scope of the
6    cross, yeah.  This is a new --
7        MR. FRASER:  Well, Your Honor, I don't think that it
8    does.  The implication from all the argument that's been
9    going on is that somehow there's been a change of notes or
10   documents and we didn't provide documents the way we should
11   have.
12       JUDGE BUXBAUM:  Well, now, that's two different things.
13   The implication is, and you gentlemen correct me if I've got
14   it wrong, the implication is that there was a third edition
15   of these notes that was not turned over.
16       MR. FRASER:  Then you know what, Your Honor, my
17   assumption then, based on the testimony, is that they are
18   accurate.  So, I withdraw the question.
19       JUDGE BUXBAUM:  I don't think there's been any issue
20   raised that they are not accurate.
21       MR. FRASER:  Wonderful.
22       JUDGE BUXBAUM:  Am I right in that, gentlemen, the
23   handwritten Respondent 4?  In other words, I don't mean that
24   they're not accurate in terms of her ability to capture what
25   happened at the sessions.  I mean in terms of the fact that

 1  they are what she has purported them to be, that is her

 2  handwritten notes.

 3      MR. McKNIGHT:  I didn't ask any questions about them.

 4      JUDGE BUXBAUM:  You sure didn't.

 5      MR. FRASER:  That was the implication I was --

 6      JUDGE BUXBAUM:  No, I didn't get that implication.

 7      MR. FRASER:  That's great.  If it's cleared up, I

 8  withdraw the question.

 9      JUDGE BUXBAUM:  All right, good.  Okay, any other

10  questions?

11  Q.   BY MR. FRASER:  Ms. Hedgcock, there aren't notes from

12  May 5.  Did you attend a May 5 session?

13      MR. McKNIGHT:  Objection.

14      JUDGE BUXBAUM:  Well, you know what, you're right, but

15  I'm curious.  I'd like to know why there aren't notes from

16  May 5.

17      MR. McKNIGHT:  She didn't attend.

18      JUDGE BUXBAUM:  Well, then, let her say so.

19      MR. McKNIGHT:  It's already on the record.  It's been

20  stipulated to.

21      JUDGE BUXBAUM:  Oh, that's right.  It is in the record.

22  Yeah, that's right.

23      MR. FRASER:  I don't have any other questions.

24      JUDGE BUXBAUM:  All right.  So, we're done with

25  Ms. Hedgcock?

1     MR. FRASER:  I am.

2     JUDGE BUXBAUM:  All right, Ms. Hedgcock, thank you very

3  much.  You may step down.

4     THE WITNESS:  Thank you.

5     JUDGE BUXBAUM:  Is there any reason that she needs to

6  remain during the rest of this trial?  I'd love to see her

7  excused if she could be.

8     MR. FRASER:  I'm perfectly happy to have her excused.

9     JUDGE BUXBAUM:  Mr. Carlson's smiling broadly, so I know

10  he's good with it.  Mr. McKnight?

11     MR. McKNIGHT:  You never know.

12     JUDGE BUXBAUM:  I'm not hearing him demand your

13  presence, so thank you very much, ma'am.

14     THE WITNESS:  Okay, thank you.

15  **(Witness excused.)**

16     JUDGE BUXBAUM:  All right, obviously, this is a good

17  breaking point for us.

18     **Let's just go off the record a moment.**

19  **(Off the record.)**

20     **JUDGE BUXBAUM:  Well, let's go off again.**

21  **(Off the record.)**

22     JUDGE BUXBAUM:  All right then, we will resume tomorrow

23  morning at 9:00 a.m. in this location.  Have a good evening,

24  everybody.

25  **(Whereupon, at 5:04 p.m., the hearing in the above-entitled**

 1    matter was adjourned, to be reconvened on the following day,

 2    Wednesday, August 18, 2009 at 9:00 a.m.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

## <u>CERTIFICATION</u>

This is to certify that the attached proceedings before the National Labor Relations Board (NLRB), Region 7, in the matter of **DOUGLAS AUTOTECH CORPORATION,** Case No. GR-7-CA-51428, held at Grand Rapids, Michigan, on Tuesday, August 18, 2009, were held according to the record, and that this is the original, complete, and true and accurate transcript that has been compared to the reporting or recording, accomplished at the hearing, that the exhibit files have been checked for completeness and no exhibits received in evidence or in the rejected exhibit files are missing.


_____
Jeremy Tieking
Official Reporter


_____
Debbie Mizell
Transcriber


Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21409
(410) 974-0947

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

In the Matter of:

**DOUGLAS AUTOTECH CORPORATION,**

      Respondent,

   and                             Case No.  **GR-7-CA-51428**

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), AFL-CIO, AND ITS LOCAL 822,**

      Charging Party.

The above-entitled matter came on for hearing pursuant to notice, before **PAUL BUXBAUM**, Administrative Law Judge, at **Gerald R. Ford Federal Building, 7th Floor Courtroom, 110 Michigan, N.W., Grand Rapids, Michigan**, on **Monday, August 17, 2009**, at **9:50 a.m.**

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

<u>A P P E A R A N C E S</u>

**Counsel for the General Counsel:**

    STEVEN E. CARLSON, ESQ.
    National Labor Relations Board
    82 Ionia Ave. NW, Suite 330
    Grand Rapids, MI  49503
    (616) 456-2270

**On Behalf of the Charging Party:**

    SAMUEL C. McKNIGHT, ESQ.
    Klimist, McKnight, Sale, McClow & Canzano, PC
    400 Galleria Officentre, Suite 117
    Southfield, MI  48034
    (248) 354-9650

    MANEESH SHARMA, ESQ.
    Associate General Counsel
    UAW Legal Department
    8000 E. Jefferson Ave.
    Detroit, MI  48214
    (313) 926-5216

**On Behalf of the Respondent:**

    JEFFREY J. FRASER, ESQ.
    KIMBERLY RICHARDSON, ESQ.
    KELLEY E. STOPPELS, ESQ.
    Varnum, LLP
    333 Bridge St., NW
    P.O. Box 352
    Grand Rapids, MI  49501
    (616) 336-6000

<u>I  N  D  E  X</u>

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Robert Paul Viar, Jr. | 462 491 | -- | -- | -- | -- |

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

## E X H I B I T S

| EXHIBIT NUMBERS | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| **GENERAL COUNSEL'S** | | |
| GC-49 | 461 | 465 |
| GC-50 | 465 | 467 |
| GC-51 | 467 | 469 |
| GC-52 | 469 | 471 |
| GC-53 | 471 | Rejected - 477 |
| GC-54 | 477 | 486 |
| **CHARGING PARTY'S** | | |
| CP-2 | 502 | 509 |
| CP-3 | 515 | 523 |
| CP-4 | 525 | 527 |
| CP-5 | 530 | 535 |

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

1                     P R O C E E D I N G S

2                              (Time Noted:  9:50 a.m.)

3        JUDGE BUXBAUM:  Good morning, everyone.  This is a

4   resumption of trial before the National Labor Relations Board

5   in the case of Douglas Autotech Corporation and the United

6   Auto Workers, Local 822, case GR-7-CA-51428.

7        Let me ask lead counsel to please identify themselves

8   for the record, starting with you, Mr. Carlson.

9        MR. CARLSON:  For the General Counsel, Steven Carlson.

10       JUDGE BUXBAUM:  Mr. McKnight?

11       MR. McKNIGHT:  Sam McKnight of Klimist, Knight, Sale,

12   McClow and Canzano, for the UAW, together with Maneesh

13   Sharma, Associate General Counsel of the UAW.

14       JUDGE BUXBAUM:  And Mr. Fraser?

15       MR. FRASER:  Jeff Fraser from Varnum, for Douglas

16   Autotech.

17       JUDGE BUXBAUM:  Thank you.

18       As I said just before we went on the record, I've got a

19   little list of preliminaries, and then I'm going to give each

20   of you an opportunity to raise those preliminaries that are

21   on your list.

22       I guess let me start with mine that there are -- the

23   transcript of the first set of proceedings I thought was

24   rather accurate, and I was glad to see that.  There were a

25   couple of things I did want to fix.  Do you have your

1    transcripts with you?  And I should tell you that I don't,

2    because it's too much to carry on the plane, so I'm hoping

3    you do, but I did take notes of the areas that I thought

4    ought to be fixed.

5        If you would look at page 283, from line 15 to line 25,

6    I believe that the references there are to Mr. McKnight, not

7    Mr. Carlson.  And I wonder if you'd take a look and tell me

8    if I remember it correctly.

9        MR. McKNIGHT:  Which lines?

10       JUDGE BUXBAUM:  15 to 25.

11       MR. McKNIGHT:  That's correct.

12       MR. FRASER:  Yes, Your Honor, that's correct.

13       JUDGE BUXBAUM:  Mr. Carlson, you in agreement?

14       MR. CARLSON:  That is correct, Judge.

15       JUDGE BUXBAUM:  All right.  Then the record will reflect

16   that, in other words, that the speaker is Mr. McKnight, on

17   page 283, lines 15 to 25.

18       If you'll look at page 285, line eight, I believe that

19   the word "serve" should actually be the word "sue."

20       MR. FRASER:  That's correct, Your Honor.

21       JUDGE BUXBAUM:  Anyone disagree with that?

22       MR. McKNIGHT:  No.

23       JUDGE BUXBAUM:  Mr. McKnight and Mr. Carlson, you're

24   good with that?

25       MR. CARLSON:  Yes, sir.

1      JUDGE BUXBAUM:  All right.  Then we'll make that change.

2      Page 289, line 12, the phrase, "to record the status

3  of," should actually be, "to accord it the status of a

4  settlement offer."  Anyone have a quarrel with that?

5      MR. FRASER:  No, Your Honor.

6      MR. CARLSON:  No, sir.

7      MR. McKNIGHT:  No, Judge.

8      JUDGE BUXBAUM:  All right.  And the last one is actually

9  the most significant.  If you'll look at page 374, line

10  three, I think that, there again, the names have been mixed

11  up, and it's not Mr. McKnight, it's Mr. Fraser.  And

12  Mr. Fraser, that's important, of course, because it has the

13  speaker saying that there's no objection to General Counsel's

14  29, 30, 32, 33, 34 and 35, and I certainly want to be sure

15  that the transcript accurately reflects at least what my

16  recollection is, that you're the speaker and that you have no

17  such objection.

18      MR. FRASER:  It looks like that's accurate, Your Honor.

19      JUDGE BUXBAUM:  Okay.  All right.  Those are the

20  transcript issues.  And as I say, actually, I think we were

21  fortunate to have had such an accurate transcript.

22      Does anyone else have any transcript issues?

23      MR. McKNIGHT:  You know, I have one, and I can't locate

24  the page right now.

25      JUDGE BUXBAUM:  Well, then, please do before we close

1   the record.

2       MR. McKNIGHT:   Thank you.

3       MR. CARLSON:   I have just something to clarify from the

4   transcript, and that's at page 53, line 22, and this is

5   actually from the General Counsel's opening statement.  At

6   page 53, line 22, I stated "discharged the former strikers,"

7   and I think I said 116 of the employees, and, actually, I

8   misspoke and that should be 112 of the employees.

9       JUDGE BUXBAUM:   All right.   Any objection to my having

10  the transcript reflect that?  Well, you're saying you

11  misspoke.   Then it isn't really --

12      MR. CARLSON:   I misspoke, so it's not a motion to --

13      JUDGE BUXBAUM:   Okay.   So the record will reflect what

14  you've just said --

15      MR. CARLSON:   The transcript is correct.

16      JUDGE BUXBAUM:   -- but the transcript is correct.  Got

17  it.  All right.

18      Any other transcript issues on behalf of any of the

19  attorneys?  Okay.

20      Next on my list is, Mr. Carlson, have you submitted a

21  redacted copy of General Counsel 44, removing the Social

22  Security numbers?

23      MR. CARLSON:   Yes, I submitted that to the court

24  reporter at the close of the first part of the hearing.

25      JUDGE BUXBAUM:   Mr. Carlson, look at General Counsel

1    1(g).  On the set of formal papers that I received in the

2    official record, I think it's incomplete.  Mr. Fraser, it's

3    your motion for a bill of particulars, and I strongly doubt

4    that you just ended it sort of in mid-air on page two.  So I

5    suspect there's a page three, at least.  It's 1(g) as in

6    George.  And it may just be my set that's missing it.

7         MR. FRASER:  My set looks like it's missing a page

8    three.

9         JUDGE BUXBAUM:  Yeah, and there could be more.  I don't

10   know.  I guess if you could, yeah, give us a copy that's

11   complete, we'll just add it in.  Mr. Carlson, you see what

12   I'm talking about?

13        MR. CARLSON:  I do, Judge, and my copy is missing at

14   least a page as well.

15        JUDGE BUXBAUM:  Yeah, that's right.  I mean, it could be

16   ten pages for all we know.

17        MR. CARLSON:  Okay.

18        JUDGE BUXBAUM:  All right.  Mr. Fraser, at your

19   convenience, then, if you'd provide a full copy of that, I'll

20   see to it that it gets put in the record appropriately.

21        MR. FRASER:  Thank you.  We will.

22        JUDGE BUXBAUM:  All right.  The next thing I had -- oh,

23   I had a question.  I suppose this goes under the heading of

24   evidence, and if it's an evidentiary issue, please tell me

25   and I'll shut up about it.  But I was just curious whether

1    the company, at that time, that is, in May of 2008, operated

2    on the weekends.  Did it have production on the weekends?

3        MR. FRASER:  Yes, apparently, they did, on both

4    Saturdays and --

5        JUDGE BUXBAUM:  Okay.  So it was a seven-day-a-week

6    operation?  Mr. Viar is shaking his head yes.  Okay.

7        MR. VIAR:  Yes.

8        JUDGE BUXBAUM:  Okay.  Thank you.

9        I don't know if this is going to be an issue or not.  We

10   left it a bit up in the air, and it just gave me a little bit

11   of concern being up in the air, and that is that I was

12   informed, sadly, that Carolyn Chapman had passed away.  And

13   I'd like to get a date of death, if it can be obtained,

14   because it could conceivably become significant.

15       MR. McKNIGHT:  I'll get the exact date, Your Honor.  It

16   was December.

17       JUDGE BUXBAUM:  That would be helpful.  Thank you.

18       All right.  I think that brings me largely to subpoena

19   and privilege issues, of which I know there are at least

20   several.  And maybe the best way to proceed is, Mr. Carlson,

21   to start with you and ask you what you'd like to raise under

22   the general topics of subpoenas and privileges.

23       MR. CARLSON:  Judge, I guess I would like to start with

24   the General Counsel's most recent subpoena, which is 562063.

25       JUDGE BUXBAUM:  That's the one seeking documents

1    regarding Mr. Viar's job description, et cetera?

2    MR. CARLSON:  Correct.  And there were two items of that

3    subpoena, and the other item in that subpoena were documents

4    related to return dates for three -- or, excuse me, four

5    employees, Gordon Diamond, Marcy Schorey, Susan Burlew and

6    Dusty Modert.  And I had offered a stipulation to Mr. Fraser

7    with respect to those employees, and I think he wishes to

8    respond to that offer.

9    JUDGE BUXBAUM:  Would you put that proposed stipulation

10   on the record?  Why don't you repeat it on the record,

11   because we were off the record, I believe, when you offered

12   it.

13   MR. CARLSON:  Yes.  The General Counsel stipulation

14   proposed was that Gordon Diamond, Marcy Schorey and Dusty

15   Modert -- none of these employees was scheduled to return to

16   work from their leave prior to May 6, 2008.

17   JUDGE BUXBAUM:  Mr. Fraser, is that stipulation

18   acceptable to the Respondent?

19   MR. FRASER:  Your Honor just triggered another thought

20   that I need to talk with --

21   **JUDGE BUXBAUM:  Okay.  Take a moment.  We'll go off the**

22   **record for a moment.**

23   **(Off the record.)**

24   MR. FRASER:  Your Honor, General Counsel's stipulation

25   is that, prior to May 6th, none of these individuals were

1  scheduled to return to work.  We can agree to that

2  stipulation as to Schorey and Diamond.  We cannot agree to

3  that stipulation as to Modert.  She was scheduled to return

4  to work; she just didn't return to work.

5      JUDGE BUXBAUM:  Okay.  All right.  Then that's an issue

6  of fact.  So we have a stipulation as to Diamond and Schorey?

7      MR. FRASER:  Yes.

8      JUDGE BUXBAUM:  All right.  Mr. Carlson?

9      MR. CARLSON:  That's fine, Judge.  I don't think I have

10  any further issue with respect to item one of the subpoena.

11      JUDGE BUXBAUM:  Very good.  What's next on your list?

12      MR. CARLSON:  Well, Judge, I think there's two issues.

13  There's the outstanding subpoena request that you have the

14  petition to revoke before you, on the job description and so

15  forth for Mr. Viar, which is, of course, related to the

16  privilege claim with respect to the General Counsel's and the

17  Union's subpoenas in this matter.  I don't know how you wish

18  to --

19      JUDGE BUXBAUM:  Well, I agree with you, Mr. Carlson.

20  They need to be addressed together --

21      MR. CARLSON:  Right.

22      JUDGE BUXBAUM:  -- and probably the log issue first

23  because I'm right, am I not, in the assumption that if, for

24  example, I refused your request for in camera inspection of

25  the Viar documents, you then no longer would care about what

1  his precise job duties are?  I mean, you would care, perhaps,

2  to get me reversed on appeal, but I'm saying, in terms of an

3  immediate need for those documents.  They relate strictly to

4  this question of whether there should be an in camera

5  inspection, I believe.

6      MR. CARLSON:  I think that's right, Judge.  I mean, I

7  think that would be the most efficient way to handle it.

8      JUDGE BUXBAUM:  Yeah, I thought so, too.

9      Mr. Fraser, I think you would agree with that, too,

10  wouldn't you?  In other words, you correctly note that the

11  only other conceivable use for them would have been

12  supervisory status and agency and that that was taken off the

13  table.

14      MR. FRASER:  Yes, Your Honor.  We would agree that

15  that's probably the best way to proceed.

16      JUDGE BUXBAUM:  All right.  I guess let me ask

17  Mr. Carlson, and to the extent that there's anything

18  different in the Charging Party's position, Mr. McKnight,

19  what your position is regarding the issues of privilege.

20      MR. CARLSON:  I'll speak to it first.  I would say, as a

21  preliminary matter, I guess I would be looking -- the General

22  Counsel would be looking for some clarification with respect

23  to the privilege log.  And my understanding from Mr. Fraser

24  and from correspondence I received from Mr. Fraser in

25  response to the subpoena request is that the only matter, the

1  only item in the General Counsel's subpoena as to which he's

2  claiming the privilege is item number nine of the General

3  Counsel's subpoena, which is a request for documents related

4  to the decision to discharge.

5      And I guess that's a significant issue for me to know

6  because I can't tell from the privilege log what documents or

7  what items of the subpoena he's talking about.  So if you ask

8  me, for example, "What do you hope to get from these

9  documents, or what do you hope these documents will show?" I

10  don't know --

11      JUDGE BUXBAUM:  Well, you know, I don't think I'm going

12  to ask that, Mr. Carlson, because I don't think that's my

13  business.

14      MR. CARLSON:  Okay.

15      JUDGE BUXBAUM:  I think what I'm going to ask is why

16  should I not accept -- and I'm going to put Mr. Fraser on the

17  hot seat a bit because I want the record to be very clear

18  that I'm correct in my belief -- and it's just a belief at

19  this point -- that when the Respondent's attorneys created

20  this privilege log, they were certifying to me and to the

21  Board that they have made a diligent search of the documents

22  listed on that log, and they have made a legal judgment that,

23  in their professional opinion, these documents are covered by

24  their respective privileges.

25      And I'm going to want to know from you, if you seek to

1    go behind that, why you want to go behind that.  What causes

2    you concern?  But let's maybe do that.  Shall I do that

3    first?  Let's be sure Mr. Fraser is prepared to stand behind

4    his log.

5        MR. CARLSON:  I think that may be the best way to

6    proceed because Mr. McKnight and I received the same log.

7    You know, we did not issue the same subpoena in this case, so

8    it's difficult to tell.  I may go through this -- and I don't

9    want to spend a significant amount of time arguing for a

10   document that I haven't even requested, for example.  And

11   it's impossible to tell from this log --

12       JUDGE BUXBAUM:  Well, yes, but I'm sympathetic, as I

13   think you are, too, to Mr. Fraser in the sense that what he

14   was doing was creating a very detailed, lengthy document, and

15   he was trying to sort of conserve his client's resources by

16   putting the two logs -- by doing one log rather than two.  I

17   don't think that was a bad idea, although I understand the

18   problem it creates for you.

19       But, Mr. Fraser, I do want to put you on the hot seat

20   because that's where we start here.  And let me maybe observe

21   that this is really no different than what's gone on for 70

22   years in the Board's proceedings in terms of compliance with

23   subpoenas.

24       In other words, as an example, in any case, the General

25   Counsel is going to issue a subpoena to the -- that's going

1    to be handled by the attorney for a company, let's say.  That

2    attorney is professionally obliged, by virtue of his or her

3    status as a member of the bar, to go through his client's

4    records, to pull the documents that he believes in -- or he

5    or she, in his or her professional judgment, are responsive

6    to that subpoena, and to provide them to the General Counsel.

7         Now, ordinarily -- and, of course, vice versa if it's

8    the Respondent's subpoena to a Charging Party, for example.

9    Ordinarily, that's where it stops.  And, indeed, in 99 out of

10   100 cases, I think it does stop there.  In other words, we

11   all assume that the attorney who is saying, "This box

12   contains the documents," is putting his or her law license on

13   the line -- and they are, in my opinion -- by saying, "I have

14   made a diligent search.  These are the documents that respond

15   to the subpoena, in my professional judgment as an attorney."

16        Now, we're all human.  There may be a mistake made, but

17   it's, I think, essential to the functioning of the system

18   that there is a representation, which we all must take

19   seriously from a member of the bar, that he or she has done

20   the job up to the professional standards that our profession

21   demands.  So this is no different, I think, than what happens

22   in all other cases where there's a subpoena.

23        And, Mr. Fraser, in this case, what I do need from you

24   as the predicate to this discussion is your -- what's the

25   word? -- representation to me formally on the record that --

1   and I know you're not the only attorney who worked on this,

2   so I'm going to phrase it this way -- that your firm, the

3   attorneys in your firm, went through the subpoenas,

4   identified the documents on the log as responsive to the

5   subpoenas but protected by privilege, and that this

6   represents a good faith, professional judgment about those

7   documents, based on the application of our understood

8   standards of what constitutes attorney-client and work

9   product privilege.

10      Are you prepared to make such a representation to me?

11      MR. FRASER:  Yes, Your Honor.  I'm prepared, as the

12   supervising lawyer in this matter, to confirm that the

13   statements you have made are accurate.  There were two other

14   lawyers and a number of paralegals who examined these

15   documents, consistent with our directives on what privilege

16   was, what Berbiglia was, to make sure that they met those

17   obligations.  So, yes, we will acknowledge, confirm that that

18   is an accurate statement.

19      JUDGE BUXBAUM:  All right.  That's the predicate.  Now,

20   Mr. Carlson, Mr. McKnight, I guess let me make a little bit

21   of an implication to both of you before we go down this road.

22   We now have that on the record.  Their law license, I think,

23   is on the line, as it is with all attorneys whenever we

24   engage in our profession.  But it is now very clearly on the

25   record.

1          Before you go further, I want you to take a deep breath

2     here, not just because I do believe it's a profession and

3     that I've seen nothing that would persuade me in any way thus

4     far that the standards of that profession are not being

5     upheld by all counsel in this case, but for another reason,

6     quite frankly.  And I guess I feel a little bit more

7     comfortable in making this argument to you -- and it is an

8     argument -- because I know and all of you know that, yes, I'm

9     going to make the first call on this question of statutory

10    construction, which really is the heart of this case, but I'm

11    surely not going to make the last call on it.  None of us, I

12    think, would think for a moment that that will be my final

13    decision.  It's going to be decided by the Board, certainly,

14    and perhaps by the federal courts, appellate courts.

15         But that is the heart of this case.  Having seen the

16    evidence thus far, which is most of the General Counsel's

17    case, I believe, it seems to me that there isn't a lot in

18    dispute by way of facts.  Sure, there are some things at the

19    outer edges, but, essentially, this case is going to come

20    down to an authoritative determination of what Congress meant

21    in that section of the National Labor Relations Act.

22         The only way that the bargaining unit members are either

23    going to get their jobs back or get compensation is going to

24    be if you get to an authoritative determination of the

25    meaning of that statutory language and, obviously, if that

1    determination is favorable.  But those are the risks of

2    litigation.

3        What's not going to get you there is wandering down a

4    side path that might seem interesting in the heat of battle

5    but is, in my estimation, unlikely to produce any significant

6    alteration in the outcome because the outcome is driven by

7    the statutory language, not by some hope of a smoking gun or

8    even a smoking water pistol in these privileged documents.

9        This is not a case where you could hope that there's a

10   memo saying, "Yeah, fire Smith because he's a union pain in

11   the neck."  It's just not a case that's going to turn on

12   that.  But going down this road might very well create a

13   fertile field for a litigant who wanted to litigate side

14   issues, and perhaps if things don't work out well on the main

15   issue, have other ways of attacking any eventual outcome that

16   might be favorable to the bargaining unit members.

17       Therefore, I urge you -- and I'm going to take a recess

18   because I'd like the two of you to take a moment and think

19   about it.  Do you want to go down this path, recognizing that

20   -- I will faithfully go down this path with you.  I will do

21   what I think the Board would require in terms of analyzing

22   your issues on the privilege log, but I think you have to

23   recognize it's a distraction and a potentially dangerous one.

24   And the question is, does this case, given that it's a

25   uniquely statutory language-driven case, require and justify

1  your taking the inherent risks involved in going down that

2  path?

3  **Let's take a two-minute recess, and I will then gladly**

4  **hear from both of you how you wish to proceed.**

5  **(Off the record.)**

6  JUDGE BUXBAUM:  Mr. Carlson, what have you decided?

7  MR. CARLSON:  Your Honor, I appreciate your comments and

8  your concerns with respect to the subpoena.  I would like to

9  begin by saying that, you know, we received close to 30 pages

10  of privileged documents, and Mr. McKnight and I sat down and

11  made, I think, a very diligent effort to go through this very

12  carefully and to not raise any frivolous claims with respect

13  to the privilege, that we worked very hard to minimize this

14  to the extent possible.  And we did that, and I think that

15  the documents we've raised concerns about, I think they're

16  valid concerns, and we would like to have these documents

17  reviewed.

18  There is the issue with respect to Mr. Viar and our

19  concerns with respect -- or, excuse me, I speak for myself,

20  the government, the General Counsel's concerns with respect

21  to Mr. Viar's status as an attorney for the company.  And

22  there are several documents in which they're claiming

23  privilege where Mr. Viar is an author or recipient of a

24  document --

25  JUDGE BUXBAUM:  More than several, now?  A fair number,

 1    I think, isn't it?

 2        MR. CARLSON:  Well, I'll say several -- there's a fair

 3    number.  There's also issues with respect to the claim of the

 4    Berbiglia privilege.  The Berbiglia privilege is claimed for

 5    time periods, for example, where there was no bargaining

 6    going on between the parties.  There's the Berbiglia

 7    privilege claimed, and the purpose of the document talks

 8    about the strength of case, the strength of the case.

 9    Berbiglia goes to documents related to negotiation strategy.

10        So these are our concerns.  And I agree with you

11    generally that this case is largely about statute

12    interpretation.  I think that's true.  I think, also, Judge,

13    though, as you indicated, yours is not going to be the last

14    word on this case, and the Board is going to look at this

15    case, and I think quite certainly the Court of Appeals will

16    look at this case.  And this is an area of the law where

17    there is not a lot of guidance.  It is possible that there

18    are facts that may not appear to me or to you or to any

19    attorneys in this case to be necessarily the most significant

20    facts in these, but that doesn't mean that, at some point,

21    someone on the Board may think that they are significant

22    cases.  I mean, you've made clear on the record, for example,

23    that --

24        JUDGE BUXBAUM:  But, Mr. Carlson, that argument goes to

25    every case, doesn't it?

1       MR. CARSON:  Pardon?

2       JUDGE BUXBAUM:  That's always inherent in our work.  I

3  mean, in any trial, sure, somebody out there -- one

4  dissenting justice in an eight-to-one Supreme Court decision

5  thought something was significant, but there has to be more

6  than that to invade the privilege.  And my in camera review

7  is an invasion of the privilege.

8       MR. CARSON:  Well, I think the standard for the subpoena

9  is whether or not the documents are relevant.  If the

10 privilege exists and you determine that the privilege exists,

11 then so be it, but --

12      JUDGE BUXBAUM:  But you've got to grasp now that --

13 look, you have to come to grips with the real question here,

14 which isn't does the privilege exist?  Because that's what I

15 would determine in the in camera review.  The issue is why

16 should I go -- what is there about this specific situation

17 that would cause me to go behind our fellow member of the

18 bar's representation that these documents that he's made --

19 he and his fellows -- although his fellows are female, I

20 should hasten to add -- made a diligent review and a good

21 faith, professional judgment that they're privileged?  Why

22 should I go behind that to look at documents which may very

23 well prove to be privileged?  In other words, why should I

24 then, for those documents, destroy the privilege?

25      MR. CARLSON:  Well, I think I've raised my two main

415

1  concerns, and I'll let Mr. McKnight speak for his concerns.
2  My main concerns are, again, with respect to the claim of
3  privilege as to Mr. Viar.
4      JUDGE BUXBAUM:  That one, I grasp, and I'm going to turn
5  to Mr. Fraser on that.  Tell me the second one again.
6      MR. CARLSON:  And the claim of the Berbiglia privilege
7  with respect to documents during time periods where there is
8  no bargaining going on, where there was no negotiating going
9  on.  That's what Berbiglia goes to is negotiation strategy.
10      And, again, other documents where Berbiglia is claimed
11  where the purpose of the document says things like strength
12  of case.  That isn't Berbiglia.  That may be a claim of
13  attorney-client privilege, and, you know, if they made
14  attorney-client privilege and they were talking about the
15  strength of the case, then we haven't touched that unless
16  it's an issue with Mr. Viar or some other question with
17  respect to the assertion of the attorney-client privilege.
18      But those are my concerns, that the assertion of
19  Berbiglia in situations where I do not believe it applies,
20  and the assertion of the attorney-client privilege with
21  respect to documents where I do not -- I have a good faith
22  doubt as to whether or not an attorney was involved in the
23  communication.  And I think it's even more difficult with
24  respect to --
25      JUDGE BUXBAUM:  I'm sorry, I want you to backtrack --

1    MR. CARLSON:  It's even more difficult with respect to

2 Mr. Viar because he wears two hats.  Even if he is, indeed,

3 acting as an attorney for the company, that doesn't mean that

4 every document that goes through Mr. Viar is privileged.

5 Certainly, any documents related to business decisions and so

6 forth are not privileged.  It's only those decisions -- where

7 there's not also a Berbiglia privilege, I should say.  So it

8 becomes more complicated with documents involving Mr. Viar,

9 even if he is an attorney.

10    And, again, Judge, I'm operating under the assumption

11 that these are documents that relate to the decision to

12 discharge the employees because as far as I'm aware, that's

13 the only item of my subpoena to which they're claiming

14 privilege.  So I have to look at this and think every one of

15 these -- because this is all I have to go on -- every one of

16 these documents is related to the decision to discharge

17 because that's what I have to go on.  And they're claiming

18 privilege with respect to these -- on communications between

19 management officials.

20    JUDGE BUXBAUM:  One of whom happens to be a lawyer.

21    MR. CARLSON:  One of whom happens to be an attorney.

22    JUDGE BUXBAUM:  I got it.  I got it.

23    Mr. McKnight?

24    MR. McKNIGHT:  Well, I have very little to add to what

25 Mr. Carlson said, except that I think it's appropriate for

1    attorneys to be diligent to ask for an in camera inspection

2    of documents that may or may not be privileged.  And in this

3    case, since Mr. Viar's official capacity with the company is

4    not as counsel, it's really a burden for the Employer and for

5    Your Honor to determine whether or not the communications

6    they assert are attorney-client privileged, to determine

7    whether or not, in fact, they fall within that attorney-

8    client privilege.  It's not -- I mean, for those -- anything

9    issued by one of the many, many, many attorneys they had

10    working for this company, no request was made for production

11    and inspection.

12        JUDGE BUXBAUM:  I grasped that.

13        MR. McKNIGHT:  And for those communications sent

14    directly to an attorney, of the many attorneys who work for

15    this company, no request was made for production.  But simply

16    the fact that somebody copied an attorney on a communication

17    that went to people who were making, ostensibly, corporate

18    decisions about what was going on doesn't make it privileged.

19    And I think it's appropriate and diligent for us to ask that

20    there be an inspection.  It doesn't mean that we're going to

21    clutter the record.

22        JUDGE BUXBAUM:  No, no, none of this would come in the

23    record ipso facto, of course.  I grasp that, too.

24        MR. McKNIGHT:  Yeah.  And then, secondly, I would say

25    that I think at least there's a prima facie case that the

1  company did, in fact, repudiate a bargaining relationship on

2  August 14, 2008.  And I think that that certainly calls into

3  question a <u>Berbiglia</u> privilege for any post-August 14, 2008

4  communications about bargaining.

5      JUDGE BUXBAUM:  I guess let me say this before turning

6  to Mr. Fraser.  Mr. McKnight, I do agree and understand what

7  you've said about the professional obligations of a diligent

8  attorney, and I guess it puts me in mind of the health care

9  debate, which, you know, this whole question of defensive

10  medicine.  And I recognize it as also -- and I'm not saying

11  that's what you've done here, but there is the defensive

12  practice of law, and I guess what I am saying is this:  While

13  that, I think, does -- the concerns about getting every last

14  piece of evidence explored are genuine, legitimate concerns

15  for trial counsel, I'm not sure that they are concerns that I

16  should necessarily or the Board should necessarily defer to.

17  I've still got to weigh into it, understanding your desire to

18  get every last piece of paper, whether the system will

19  function best if that desire is accommodated.

20      I think we can see, certainly, in the medical field the

21  system hasn't functioned best when that desire is

22  accommodated.

23      MR. McKNIGHT:  I just want to correct one thing.  It's

24  not my desire to get every last piece of paper.  We're only

25  asking for the pieces of paper that, on there facially do not

1  appear to be privileged and relate to core issues in this

2  case.

3    JUDGE BUXBAUM:  You're right, Mr. McKnight.  And let me

4  again recognize very clearly that you're not seeking

5  everything on the log, that you and Mr. Carlson have made a

6  determined effort to narrow your request, and I do appreciate

7  it.

8    Well, Mr. Fraser, I guess Mr. Carlson in particular

9  articulated two sort of broad categories.  I'd like you to

10  address them perhaps individually.

11    MR. FRASER:  Well, Your Honor, and I'm happy to do that,

12  and I've made a few notes.  I've been sitting here silently,

13  and it's now my opportunity to speak on the record, and I

14  intend to do that until you make me be quiet, and so here

15  goes.

16    You know, I listened to General Counsel complain about

17  30 pages of privilege log.  I didn't send the subpoena out.

18  Mr. Carlson did.  Mr. McKnight sent subpoenas out.  We gladly

19  would have not spent the hundreds of hours we did putting

20  that documentation together, but we did it, and we did it in

21  good faith, and we provided 30 pages, and I confirmed when I

22  provided the log back in June that we didn't create two

23  separate logs.  We would never have gotten the documentation

24  to counsel on the day of the trial if we had done it that

25  way.  So there's no deceit or misunderstanding from anyone in

1    that respect.

2        I'm glad that they diligently and carefully went through

3    the log.  I certainly didn't want to feel as though we had

4    wasted our time and effort providing it to them.  I'm

5    infuriated -- and I'll say that carefully -- I'm infuriated

6    that my name and conversations that Mr. Carlson and I

7    allegedly had during a time before the trial is somehow used

8    to get to the point where he has now articulated a specific,

9    articulable reason to get behind these documents.

10        First off, I have all 130 documents that he has

11    mentioned.  Small number, I suppose, if you think of the

12    world of documents as 15,000 or however many there were on

13    those 30 pages.  But my understanding of your standard is he

14    has to provide, along with Mr. McKnight, a specific,

15    articulable reason as to each one of those documents, not in

16    general --

17    JUDGE BUXBAUM:  Well, now, I think -- not in general.  I

18    agree with that, Mr. Fraser, but not necessarily as to each

19    one.  In other words, one reason could cover a multitude of

20    documents.

21    MR. FRASER:  It may, but I think that that bears a

22    document at a time, trying to determine what their specific

23    and articulable reason is.  The attorney-client privilege is

24    significant.  We didn't identify those documents in that way

25    because we were trying to prevent counsel from seeing

1  something they were entitled to.  If I'm as nefarious as

2  these gentlemen perhaps think I am, we simply wouldn't have

3  put them on the attorney-client log, and then I could breach

4  my obligations that way.  We didn't do that.  We included

5  everything, and so I'm frustrated by that sentiment that is

6  being raised.

7      Secondly or thirdly, whatever number I'm on, my view is

8  this case has not gone well for General Counsel.  This is a

9  fishing expedition to try and find something --

10     JUDGE BUXBAUM:  Well, now you're doing what you've

11 complained from him.

12     MR. FRASER:  I understand that, and so --

13     JUDGE BUXBAUM:  Don't do it, Mr. Fraser.  Don't worry

14 about that.  Don't characterize his case.  Tell me why I

15 should tell them to get lost.

16     MR. FRASER:  Well, specifically, Your Honor, Mr. Viar

17 has testified that he provides legal counsel to this company,

18 okay.  In his testimony -- counsel has cited his transcript

19 in their response to the petition to revoke -- he provides

20 legal advice.  The documents that we have identified either

21 relate to information that was provided by outside counsel

22 in-house -- it's a Japanese transplant company, so there's

23 another issue that comes into this.  If that documentation

24 comes from me, it goes to Mr. Viar.  If it comes from another

25 lawyer, it goes to Mr. Viar.  Mr. Viar then has to take that

1  documentation and turn that into a document that his Japanese

2  management can understand.  In the context of sharing that

3  attorney-client privilege documentation with them --

4      JUDGE BUXBAUM:  Well, I don't know what you mean by

5  that.  You don't mean translated into Japanese?

6      MR. FRASER:  If I send a document to Paul Viar, I don't

7  send it directly to Eddie Ogusu -- is the operating manager

8  of Douglas Autotech.  Mr. Viar deals with Mr. Ogusu on a

9  daily basis.  Mr. Viar, essentially, legally translates that

10  into a means by which Mr. Ogusu can even understand -- and I

11  don't know which documents that that relates to -- the legal

12  advice being provided.

13      JUDGE BUXBAUM:  But, Mr. Fraser, you're not saying he

14  translates it into Japanese?

15      MR. FRASER:  No.

16      JUDGE BUXBAUM:  You're saying he paraphrases it?

17      MR. FRASER:  Yes.

18      JUDGE BUXBAUM:  Okay.

19      MR. FRASER:  Yes.

20      JUDGE BUXBAUM:  Okay.

21      MR. FRASER:  And that relates to some of the documents.

22      The other issue that General Counsel raised is

23  Berbiglia.  The thought or at least the proofs that

24  Mr. Carlson believes he's put on relate to us repudiating --

25  repudiating the bargaining relationship.  That's not the case

1    at all, Your Honor.  Our testimony is going to be just the

2    opposite.  We continue to have an obligation to bargain.  We

3    have provided that information to Mr. McKnight and

4    Mr. Canzano and anyone else who'll listen to us.  They

5    haven't responded as to whether or not they want to bargain

6    about the replacement workers that are in the facility.  And

7    we've offered to bargain effects with them.  Our obligation

8    to continue to strategize and plot as to how we're going to

9    continue is ongoing.  It hasn't ended.

10        So for them to argue somehow that Berbiglia ended on

11   August 14th because they say or they believe somehow that the

12   bargaining had stopped is ludicrous.  Not the case.

13   Berbiglia continues then, now and today.  We still have that

14   obligation to bargain with them.  Our proofs are going to

15   show that we know we do.

16        They simply have chosen, for whatever reason, not to get

17   into how it is that they want to proceed.  I understand that

18   dilemma.  They don't want to represent scabs or replacement

19   workers, as they call them.  Our obligation is to try and

20   figure out who represents them.  The union's not stepping up.

21   We're not quite sure.  So that hasn't ended for us.

22        JUDGE BUXBAUM:  Let me ask a question.  You've

23   identified that a subset of the Viar documents are documents

24   where essentially he's paraphrasing you and other outside

25   counsel's opinions?

424

1     MR. FRASER:  I'm trying to be careful, Your Honor

2  because, again, every time I make a general statement,

3  apparently that's going to be held against me.  I can't make

4  that comment today.  What I can say is there are 130

5  documents, some of which -- all of which I've looked at, some

6  of which appear to be, to me, documents that are legal

7  advice.  Then Mr. Viar, their in-house HR Director of

8  Administration and providing legal advice, according to his

9  testimony, on occasion takes those documents, which are

10 privileged, and translates them into a format that Mr. Ogusu

11 or other individuals can understand because they speak

12 English well but not exceedingly well.

13    JUDGE BUXBAUM:  Something to the effect that, "We've had

14 a letter from Mr. Fraser about the case.  Mr. Fraser's

15 opinion about X is Y."

16    MR. FRASER:  Exactly.  That what I'm --

17    JUDGE BUXBAUM:  But that's not all the Viar documents.

18 Am I right?  That's part of them?

19    MR. FRASER:  That's correct.

20    JUDGE BUXBAUM:  Tell me what -- about the others.  What

21 should I conclude about the other -- and let me maybe preface

22 it by this.  You know, this is relatively uncharted water for

23 the Board but not entirely uncharted, and the one area where

24 I think that your opposing counsel, in plural, are on their

25 strongest ground is this problem which not only the Board but

1   in the general scheme of things with privilege, where a

2   company hires an attorney to wear more than one hat.  And the

3   Board has specifically addressed that in the CNN case with

4   a -- I think it was Vice President Patrick was her name, a

5   high corporate official who was also an attorney, and they

6   did order in camera inspection of that limited class of

7   documents in CNN.

8        I get the paraphrase point, and I'm going to think about

9   that.  Beyond those, why I shouldn't I do what the Board did

10  in CNN?

11       MR. FRASER:  A couple of things, Your Honor.  One,

12  Mr. Carlson and Mr. McKnight have narrowed down these 130

13  documents to their belief that they relate to the decision

14  regarding termination.  That's what I understood them to say.

15  If I'm incorrect about that, then I suppose they should raise

16  an issue because they couldn't fight through our 30 pages of

17  attorney-client documents.  Many of these documents aren't

18  related to that issue at all, number one.

19       Number two, Mr. Viar has an obligation internally.  I

20  didn't put Mr. Viar up yet.  He'll be part of our case.

21  Mr. Carlson, if he had this issue, should have asked him

22  those questions when he had him on the stand --

23       JUDGE BUXBAUM:  Which questions?

24       MR. FRASER:  The questions about what his duties are.

25       JUDGE BUXBAUM:  Well, he did ask him.

1     MR. FRASER:  And the response was, "I provide legal

2  counsel to management on occasion."

3     JUDGE BUXBAUM:  But, Mr. Fraser, now let's be fair.  One

4  doesn't have to accept an opponent's witness' response --

5     MR. FRASER:  Exactly.  Mr. Carlson certainly could have

6  asked him specifically, "What have you done, when did you do

7  it, how did you do it, why did you do it that way?"

8     JUDGE BUXBAUM:  Well, but now -- but this goes to the

9  point of his subpoena that you're seeking to revoke, in terms

10  of documents either corroborating or impeaching Mr. Viar's

11  testimony about his role.

12     MR. FRASER:  We have given you our statement on the

13  record, based on the attorney-client privilege in Berbiglia,

14  that we have looked at these documents, and to the best of

15  our knowledge and legal ability, these documents conform with

16  those obligations.  I have gone back through the documents --

17     JUDGE BUXBAUM:  And to be clear, now, you're certifying

18  to me that the documents involving Mr. Viar were -- first of

19  all, let me ask this.  Are there documents written by

20  Mr. Viar that you provided that you didn't claim privilege

21  for?

22     MR. FRASER:  I think there were a ton of documents that

23  were provided by Mr. Viar that we didn't claim privilege on.

24     JUDGE BUXBAUM:  Okay.  Well, I don't know that

25  obviously.  All right.  In other words, documents written in

1  his hat as HR person --

2       MR. FRASER:  In some role that was unrelated to legal

3  privilege, exactly, legal advice, legal privilege, legal

4  issues.  We provided a multitude of documents.  Again, I

5  don't know how many -- there were boxes of them.  How many of

6  them related to Mr. Viar, I don't know.  I didn't look at

7  each one of them.  Counsel behind me did.

8       JUDGE BUXBAUM:  Well, but Mr. Carlson, is it accurate to

9  say you've received correspondence written by Mr. Viar

10  relating to his corporate duties?

11       MR. CARLSON:  I've seen documents.  I think it's

12  difficult for me to say precisely what they were relating to

13  because I think we get into this very murky area of exactly

14  what Mr. Viar's duties are and whether or not this -- I have

15  received things that I think might fall under the umbrella of

16  what Mr. Fraser seems to be raising with respect to other

17  documents.  Communications between Mr. Viar and the upper

18  management, for example.  So it's --

19       JUDGE BUXBAUM:  Well, that's what I wanted to know.

20       MR. CARLSON:  Right.

21       MR. McKNIGHT:  It would be -- I would just interject,

22  but to call these tons of communications from Mr. Viar to

23  others would be a lot more than what I recollect.

24       JUDGE BUXBAUM:  Well, and I'm glad we don't have tons of

25  documents.

428

1    MR. McKNIGHT:  We received a lot of paper, but most of

2    it had to do with form materials from unemployment and things

3    of that nature, duplicates of bargaining proposals and things

4    of that nature.  But I just wanted to say for the record --

5    JUDGE BUXBAUM:  Well, okay.  But the point is Mr. Fraser

6    is correct in saying that they didn't say, "If it's got

7    Viar's fingerprints on it, don't turn it over."

8    MR. FRASER:  No, we did an analysis, Your Honor, of

9    whether or not the documentation, the substance of it, fit

10   within those privileges that we think apply.  And we provided

11   those things that didn't to counsel and Mr. McKnight, and to

12   those things that we thought applied, we created the

13   document, the privilege log, and put them on.

14   JUDGE BUXBAUM:  All right.  But, Mr. Fraser, now,

15   distinguish CNN for me.  Let me understand where I can draw a

16   distinction between what the Board ordered regarding Patrick

17   in CNN --

18   MR. FRASER:  Your Honor, I don't know.  I didn't look in

19   camera at those documents, so I can't tell you whether or

20   not --

21   JUDGE BUXBAUM:  Well, no, and neither did I, of course.

22   MR. FRASER:   -- what the substance of those documents

23   were.

24   JUDGE BUXBAUM:  But the Board didn't, either.  When the

25   Board issued its order, of course, it didn't know what was in

1   those documents.

2       MR. FRASER:  Right.  Which is why that issue ultimately

3   goes to the Court of Appeals, which is why you then have to

4   review this.  And I hope that that's not where we're headed

5   here, but it's certainly one of the options that we have.

6       JUDGE BUXBAUM:  Well, I made that point, Mr. Fraser.  I

7   made that point.

8       MR. FRASER:  Again, our point is we made a good faith

9   judgment as to whether those documents were within the

10  privilege.  Having looked at all those documents again, there

11  are a couple of cover pages that really, you know, say

12  Mr. Viar's name on them and go to other people.  That is the

13  substance of the document.  It has his name on it.  So of the

14  130, I'm going to say maybe three or four are a simple

15  forwarding of an e-mail, which I think counsel and General

16  Counsel acknowledge that may not fit strictly within that

17  definition.

18      As to the rest of them, Your Honor, having reviewed

19  them, I'm not comfortable that they merit allowing you to

20  look at them in camera to breach our privilege to begin with.

21  I mean, just showing them to you breaches the privilege.

22      JUDGE BUXBAUM:  Well, I recognize that.  You know, I

23  think it's unrealistic to conclude otherwise.  Of course.

24      MR. McKNIGHT:  Well, I wanted to just correct one thing

25  that counsel said.  I did not make an effort to categorize

1   which of the documents with respect to which they assert a

2   privilege concerned communications to third parties about the

3   labor dispute, concerned the decision to discharge people,

4   concerned the issue of the status of replacements, concerned

5   the decision to refuse to bargain.

6       They didn't discriminate between production requests,

7   nor did I, in looking at the documents.  I assumed that what

8   they had on the consolidated privilege log is documents that

9   were responsive to requests by myself or Counsel for the

10  General Counsel, for materials that were arguably relevant,

11  and tried to disseminate which documents, arguably, without

12  challenging anybody's good faith, as a matter of law, are

13  worthy of an in camera inspection.

14      An in camera inspection may disclose that a particular

15  document is actually somebody being a conduit for legal

16  advice.  And I would expect that you would make a decision

17  about whether or not such a document is privileged.  But, you

18  know, that doesn't require that Mr. Viar be an attorney,

19  necessarily.  It may depend on who he's giving that -- who

20  he's communicating that to.

21      But an in camera inspection will certainly tell you in

22  some respects -- well, first of all, I guess the production

23  to the subpoena will tell us in some respects whether or not

24  Mr. Viar's responsibilities included legal services to the

25  company, right?  And we don't have that yet.

1     MR. FRASER:  Your Honor, that is provided already, at

2  page 247 of the transcript -- or 277.

3     JUDGE BUXBAUM:  Well, yeah.  What Mr. McKnight is really

4  saying is that the production under the subpoena will test

5  the contentions made by the witness.

6     MR. FRASER:  Not necessarily --

7     JUDGE BUXBAUM:  Well, no, no, of course, not

8  necessarily.  It may corroborate it.

9     MR. FRASER:  And the theory -- no, the theory is that,

10  if a document is produced in accordance with that subpoena,

11  in governmental fashion, that there'll be some job

12  description that says X, Y or Z.

13     JUDGE BUXBAUM:  Yes, well, I wondered about that, too.

14     MR. FRASER:  May be, may not be.  May be that there are

15  no job descriptions at this company, so we may be arguing

16  about something that has no production, anyway.

17     JUDGE BUXBAUM:  Well, Mr. Fraser, I hope you'd tell me

18  that because we don't need to waste time arguing about things

19  that don't exist.

20     MR. FRASER:  Well, Your Honor, we seem to be interested

21  in wasting time, and so, if you'd like to go through all 130

22  of these documents so I can get the articulable basis on

23  which we should provide them to you, instead of this global,

24  "We think Mr. Viar isn't a lawyer, we think he doesn't

25  provide legal advice to the company, we think these documents

1  relate to termination decision," I'm happy to take a document
2  at a time and try to have them explain that to us, to get
3  past that attorney-client privileges, which is critical.  We
4  don't make these documents up, so that they can be disclosed
5  to counsel, so that they can see the inner workings of the
6  theories that we have when we go forward in these matters.
7      JUDGE BUXBAUM:  Believe me, counsel, as a former private
8  practitioner or a former government lawyer, for that matter,
9  I am acutely sensitive to your concern.  And I think, you
10  know, I've opined in my Special Master Report, by footnote,
11  at least, that I think the whole area is fraught with peril
12  for the Board and threatens to turn what was a good, solid,
13  efficient, effective system of litigation into a nightmare.
14  But that's just a personal opinion.
15      And I guess where that leaves me is this.  I am a
16  creature of the Board.  I do what I believe the Board would
17  want done in the situation, and I think that the Board would
18  want me to act consistently with what it's done in CNN, and I
19  am going to say no further than that.  In other words, thus
20  far, and I'm not going a step further.
21      What that means is that I will direct, Mr. Fraser, that
22  you provide for my in camera inspection documents that
23  involve this dual-hat situation with Mr. Viar, but I think
24  your representations have weight, that where he was simply
25  paraphrasing what you or some other outside counsel said, I

1  don't want those.  I think that's just too much of an

2  invasion of the privilege, and I'm trying to balance things

3  out here.  But those where he is speaking for himself that

4  have been identified by Mr. Carlson and Mr. McKnight on the

5  privilege log because of what the Board has done in CNN,

6  which I take as binding precedent in a similar situation --

7  and this is a similar situation -- I will require that those

8  be submitted for my inspection.  I'm hopeful it's not a huge

9  quantity of documents.

10     MR. FRASER:  Your Honor, so I understand your ruling,

11  let me respond in two ways.  I think you're violating your

12  own statement in this trial transcript, page 390, which

13  requires a specific, articulable reason.  And my

14  understanding of that is that it requires that specific,

15  articulable reason as to each document that --

16     JUDGE BUXBAUM:  No, I think you're going too far,

17  Mr. Fraser --

18     MR. FRASER:  Please may I make the record?  Please let

19  me finish.

20     JUDGE BUXBAUM:  Go ahead.

21     MR. FRASER:  And my understanding is that, in no way,

22  shape, or form, whether it's as to any specific document or

23  even as to specific reason -- all I've heard is, "We think

24  Mr. Viar may not be a lawyer; therefore, we want to see the

25  documents or have you look at them in camera."  I don't find

1  that to be specific or articulable under that standard --

2     JUDGE BUXBAUM:  Well, that's where we disagree,

3  Mr. Fraser.  That's where we disagree.

4     MR. FRASER:  I understand that.  So that now is on the

5  record.  Number two, I'll need to confer with my clients to

6  determine whether or not we have the means -- and we will

7  look through these documents.  It is not going to be five

8  minutes; it's going to be a lengthy period of time to look at

9  each one of these documents and see whether it fits within

10  that requirement that you just laid out.

11     JUDGE BUXBAUM:  I think that's reasonable.  I mean, an

12  appropriate period of time is certainly reasonable.  I didn't

13  expect you to whip them out.

14     MR. FRASER:  Well, and lastly, Your Honor, again, just

15  so that no one can accuse me of sandbagging, after we have

16  done that, we will then make a determination as lawyer to

17  client as to whether or not we're going to produce those

18  documents to you.

19     JUDGE BUXBAUM:  I expected to hear that as well.

20     MR. FRASER:  Okay.  Thank you.

21     JUDGE BUXBAUM:  And, again, Mr. Carlson, Mr. McKnight,

22  this is the road you're choosing to trod.  Are you sure you

23  want to trod it, or would you rather get this case tried, get

24  a decision from me, and get up to the Board during the

25  lifetime of the bargaining unit members?  Other than poor

1    Ms. -- what was her name?  You know who I mean.

2        Mr. Carlson?

3        MR. CARLSON:  With all due respect, Your Honor, I think

4    this is part of trying the case.

5        JUDGE BUXBAUM:  Well, it was part of trying the CNN

6    case.  I understood why.  I don't frankly understand it here,

7    but that doesn't matter.  I don't have to understand it.  It

8    is your case.  All right.  Then, Mr. Fraser, you have my

9    order.  I will expect to hear from you periodically while

10   we're here as to where you stand in complying with it.  And,

11   obviously, once you have complied with it, I'll review the

12   documents.  If I disclose any to your opposing parties, and

13   if they then want to seek permission to admit some or all of

14   those documents into evidence, I'm going to permit them to do

15   it, even if they've rested otherwise.

16       MR. FRASER:  Your Honor, will you please articulate just

17   one more time the documents that you're asking us to provide,

18   just to make sure I don't have that --

19       JUDGE BUXBAUM:  Yes.  Documents in which you're claiming

20   a privilege related to Mr. Viar's role as attorney and in

21   which he's not simply paraphrasing the opinions of outside

22   counsel for his superiors.

23       MR. FRASER:  Right.  Thank you.

24       MR. McKNIGHT:  Your Honor, what about post-August 14th

25   Berbiglia privileges?

 1      JUDGE BUXBAUM:  I just don't think it's worth getting

 2   into.  I do not think you've met your burden of showing me

 3   that they're even to the degree -- and I don't think "even"

 4   is the right word.  I don't think you've demonstrated that I

 5   should invade what I have no reason to think is other than a

 6   good faith representation of privilege for documents other

 7   than the one class where the Board has spoken plainly and

 8   where I'm obliged to follow, and that is the Viar situation.

 9      Now, if the Board chooses to see it differently and says

10   that, when there's a raised Berbiglia defense, the judge

11   should do an in camera inspection, I will gladly defer to

12   that.  But I'm not going to -- I'm not opening that door; I

13   want the Board to open that.

14      MR. McKNIGHT:  Your Honor, just for clarification, I'm

15   not challenging the assertion of a Berbiglia, quote, defense

16   prior to August 14th, but I do think that at least there's a

17   prima facie case that, as of August 14th, the Employer

18   repudiated the bargaining relationship, and the complaint so

19   alleges that.  And that seems to me that that would put the

20   assertion of that whole privilege in a different category.

21      JUDGE BUXBAUM:  Mr. McKnight, it's a balancing test, and

22   I just don't think you've overcome, in my mind -- and I'm

23   looking at those proverbial scales of justice.  There's a

24   strong policy interest we all share as members of this

25   profession in vindicating the attorney-client privilege.  Any

1    in camera inspection does violence to that strong societal

2    and professional interest.  I don't think, when I balance it

3    out, that the argument related to Berbiglia is sufficiently

4    strong to overcome the strength of that policy interest.

5        MR. McKNIGHT:  Oh, no, I'm only talking about those

6    privileges where they don't assert attorney-client privilege

7    with those documents.

8        JUDGE BUXBAUM:  Well, sure, but -- you're right.  I

9    didn't say that well, but the same point applies, that I just

10   don't think that there's a justification sufficient for me,

11   at least, to make them producible for inspection.  Again, the

12   Board may see it differently, and this case may come back to

13   me in a year or whenever, saying, "Take a look at these

14   things," and I will certainly do so.

15       MR. McKNIGHT:  So that those documents where they assert

16   Berbiglia would still be produced for in camera inspection if

17   it was dual-role, attorney and administrator?

18       JUDGE BUXBAUM:  Yeah, that sounds right to me.

19   Mr. Fraser, yes, I think that's right.

20       MR. McKNIGHT:  So you're still looking at -- I guess

21   that's what I didn't understand.

22       JUDGE BUXBAUM:  Yeah, in other words, what I'm --

23       MR. McKNIGHT:  Whether or not they categorize it as

24   Berbiglia or attorney-client, what you're looking for is

25   documents where it's --

1    JUDGE BUXBAUM:  Implicit in their inclusion on the log,

2  Mr. Fraser, is your conclusion that they are relevant to the

3  subpoena.  In other words, they're responsive to the

4  subpoena.  Therefore, yes, the only thing I'm concerned about

5  is the dual-hat issue.  If they fit within the dual-hat

6  issue, then they should be produced to me.  If they don't,

7  then -- again, I'm only concerned because that's the only

8  area the Board has spoken on with the dual-hat issue.

9    MR. FRASER:  Then, again, Your Honor, we'll respond to

10  that by saying that, as to Berbiglia, whether Mr. Viar is a

11  lawyer or not is irrelevant.  He doesn't have to be a lawyer

12  to claim Berbiglia privilege --

13    JUDGE BUXBAUM:  True, true.

14    MR. FRASER:  -- so the dual-hat issue has no bearing on

15  whether or not a Berbiglia document is one that you ought to

16  review in camera.  He can be a non-lawyer and claim

17  Berbiglia.

18    JUDGE BUXBAUM:  Well, yeah, yeah, I see.

19    MR. FRASER:  Mr. Kirk can do the same --

20    JUDGE BUXBAUM:  Yeah, yeah, yeah.

21    MR. FRASER:  -- Mr. Ogusu can claim the same --

22    JUDGE BUXBAUM:  Yeah, yeah.

23    MR. FRASER:  -- it's irrelevant as to the dual-role

24  issue.

25    JUDGE BUXBAUM:  Yeah.  Look, Mr. McKnight, again, I

       1    guess I've been deferential in terms of my view that there's

       2    a certain amount of distraction here going on, and that it's

       3    going to -- it may be ultimately harmful to the individual

       4    human beings who care most deeply about this case.  I'm

       5    drawing the line.  I'll do what the Board has done.  That's

       6    the dual hat.  I'm not doing any more.  If the Board wants to

       7    do more, I'll gladly look at it.

       8         MR. McKNIGHT:  Can I ask one question about just how

       9    that would apply?  I'm just looking at a privilege asserted,

      10    I'm not -- and there'll be something that says, "Berbiglia

      11    and documentation at direction of counsel."  Would you expect

      12    Mr. Fraser to examine that document, in view of your

      13    instructions, in terms of whether or not you would have an

      14    opportunity to inspect that?

      15         JUDGE BUXBAUM:  Mr. Fraser, it says the word "counsel"

      16    in it.  I think so, don't you?

      17         MR. FRASER:  Your Honor, I'm going to review all 130 of

      18    these documents --

      19         JUDGE BUXBAUM:  Yes, I want you to.

      20         MR. FRASER:  -- very carefully --

      21         JUDGE BUXBAUM:  I want you to.

      22         MR. FRASER:  -- to make sure that I meet all the

      23    obligations that you've laid out.

      24         JUDGE BUXBAUM:  All right.

      25         MR. FRASER:  And I can guarantee you that.

1    JUDGE BUXBAUM:  And are you satisfied that I've made my

2  position clear in terms of what your standard is to review?

3    MR. FRASER:  I am satisfied that I understand what

4  you're asking me to do.

5    JUDGE BUXBAUM:  Excellent.  All right.  I think, then,

6  that that's where we'll leave it, except, of course,

7  Mr. Fraser, that I put the obligation on you, and I'll raise

8  it, of course, during the course of the next few days to keep

9  us posted where you stand.  And I know you'll do this as

10  diligently as possible and hopefully deploy some

11  reinforcements to assist you.

12    MR. FRASER:  And so, Your Honor, are we proceeding,

13  then, and --

14    JUDGE BUXBAUM:  Yes, sure, sure.

15    MR. FRASER:  Okay.  We're proceeding with our case, and

16  we're simply reviewing these as time permits?

17    JUDGE BUXBAUM:  Yes, although, as time permits and

18  diligently and to the best of your ability --

19    MR. FRASER:  Yeah, I understand that, and I know you

20  understand, during the trial, that the time you wake up until

21  you wake up again --

22    JUDGE BUXBAUM:  You can't do two things at once.  But

23  you do have reinforcements now, Mr. Fraser?

24    MR. FRASER:  I do, Your Honor, but now that you've

25  raised the license issue -- and I take that very seriously --

1    JUDGE BUXBAUM:  Yes, indeed.

2    MR. FRASER:  -- I think I ought to be the one.

3    JUDGE BUXBAUM:  Yeah, you know what?  I don't have any

4    quarrel with that.

5    MR. FRASER:  They'll review those documents, but, you

6    know what?  I'm going to review each one of those documents.

7    JUDGE BUXBAUM:  It is -- I agree a hundred percent.  I

8    guess my thought was that your colleagues could perhaps do a

9    preliminary search and --

10    MR. FRASER:  Certainly.

11    JUDGE BUXBAUM:  -- you know, that kind of thing.

12    MR. FRASER:  Yeah.

13    JUDGE BUXBAUM:  But it is your license.  You're the guy

14    on the record.

15    MR. FRASER:  Right.

16    JUDGE BUXBAUM:  All right.  Mr. Carlson, what other

17    preliminaries, if any, do you have?

18    MR. CARLSON:  I'm not sure that I have anything else,

19    Judge.

20    JUDGE BUXBAUM:  Well, if something comes up later, I

21    know you won't be shy.

22    MR. CARLSON:  No, no, I won't.

23    JUDGE BUXBAUM:  Mr. Mc -- oh, go ahead.

24    MR. CARLSON:  Frankly, I think that, you know, I think

25    we might find ourselves at the same point we were last time

1  when we stopped, which is that -- there are a couple of loose

2  ends that I can call another witness for, or I mean frankly

3  I'm going to recall Mr. Viar for, but it almost seems as if

4  we should go through the examination of the documents before

5  putting Mr. Viar back on, to do it at one time.

6     JUDGE BUXBAUM:  Mr. Carlson, again, I just -- there's

7  how many did you say? -- 112 people out there who want to

8  know the outcome of this case, not to mention the management

9  people who I know want to know it, also.  I want to get this

10  thing done.  It doesn't do -- you're not doing a favor to

11  those people.  You can't let the perfect be the enemy of the

12  good here.  And this is not a particularly fact-intensive

13  case; it's a law-intensive case.

14     MR. CARLSON:  I understand that, Judge.  I guess my

15  point is -- and maybe I'm not making it clear.  My point is

16  that I think we're going to find ourselves in the same

17  place --

18     JUDGE BUXBAUM:  Well, I intend to do everything I can

19  not to have us find ourselves in that place.

20     MR. CARLSON:  Okay.

21     JUDGE BUXBAUM:  I've already said I'm going to allow you

22  -- if the materials are submitted for in camera inspection,

23  and if I determine that, let us say, a particular letter

24  should be turned over to you as a properly subpoenaed and

25  non-protected document, and if you review it and you believe

1  that it is also relevant and material and admissible in the

2  record of this case, I'm going to allow you to do that,

3  whenever, again, assuming I agree with you that it's

4  relevant, material and admissible.

5      So I don't want you to think that, by continuing to move

6  this litigation forward, I am precluding you from making use

7  of any document you might eventually receive.

8      MR. CARLSON:  Okay.

9      JUDGE BUXBAUM:  To the contrary, I'm preserving that

10  right for you and for Mr. McKnight.

11      MR. CARLSON:  Okay.

12      JUDGE BUXBAUM:  Again, I've said this before in this

13  case, and it's important to stress it.  This is not a jury

14  trial.  I don't have to worry that I'm going to confuse a

15  jury by taking things out of order.  All of us will put

16  things in the right order, even if they came in at an odd

17  point in the trial.

18      Any other preliminaries, Mr. Carlson?

19      MR. CARLSON:  No, sir.

20      JUDGE BUXBAUM:  Mr. McKnight?

21      MR. McKNIGHT:  No, Your Honor.

22      JUDGE BUXBAUM:  Mr. Fraser?

23      MR. FRASER:  Your Honor, I keep reacting to those things

24  that you've said.  I don't have any specific issues, but I

25  have a question.

1      JUDGE BUXBAUM:  Sure.

2      MR. FRASER:  And that question now, as I understand your

3  ruling, is unless Mr. Carlson desires to put witnesses on

4  this morning, he'll have an opportunity after this process

5  with review of the attorney-client privilege, Berbiglia-

6  privilege documents occurs.  Am I correct in hearing that?

7      JUDGE BUXBAUM:  That he'll have an opportunity to do

8  what?

9      MR. FRASER:  Put on witnesses to deal with any document

10  that you determine in camera, if we get to that point, ought

11  to be provided to counsel.  My concern is this, Your Honor,

12  trying to paraphrase this.  I'm concerned about putting my

13  case on --

14      JUDGE BUXBAUM:  I know.

15      MR. FRASER:  -- without Mr. Carlson having an

16  opportunity to finish his case --

17      JUDGE BUXBAUM:  I know, I know.

18      MR. FRASER:  I don't have any obligation to move

19  forward, as I understand it, until he's finished his case.

20  And now we've got this delay of, you know, when I can get to

21  these documents along with my colleagues.  We'll look at

22  them, and if he determines he wants to put somebody on to

23  deal with that document, he can.  I have no idea who that

24  would be, and so I'm concerned that, until he's done that and

25  we've reviewed the documents, my case may change.  So does

1    that mean I go forward, he gets a chance to do what he wants,

2    then I'll get to come back and keep my direct open, as well?

3        JUDGE BUXBAUM:  If necessary.  If necessary.

4        MR. FRASER:  So that's a commitment that the direct for

5    myself, when we finish, is not closed --

6        JUDGE BUXBAUM:  Yes.  Put it this way.  I certainly --

7    because it only harms my process in this case, which is to

8    try to come to an accurate, legally and factually -- a

9    factually and legally accurate decision -- is I don't want

10   you sandbagged, Mr. Fraser, so if he puts on -- if he reopens

11   his case because of something that's been turned over to him,

12   I'm going to give you a chance to reopen your defense with

13   respect to that matter, of course.

14       MR. FRASER:  So, Your Honor, again, I'm the lawyer, I'm

15   not the client.  To me, that means I need to confer with my

16   client about whether I stand up and say, I'm sorry, Your

17   Honor, with all due respect, we need to look at these 130

18   documents, have the in camera review, make the determination

19   as to whether or not Mr. Carlson gets any of them, let

20   Mr. Carlson finish his case, and then put our case on because

21   that's the normal way the process works; or whether we want

22   to go through this legal jujitsu that you've just described

23   to --

24       JUDGE BUXBAUM:  Well, I don't think it's that

25   complicated, Mr. Fraser.  It's not jujitsu.  This happens in

1    many trials.

2         MR. FRASER:  Well, Your Honor, I don't think it's that

3    complicated, either.  I don't think it's that complicated

4    either, but I've got a system that's the Board system, that

5    at least to my client, seems rife with unfairness, and it's

6    another example today of their perception, based on my

7    conversations with them, how that unfairness works.  And in

8    this instance, they may determine that we simply need to look

9    at the documents and do this in an orderly way, so that

10   Mr. McKnight and Mr. Carlson can put their cases on before we

11   decide to put our case on.  I don't know any other way to

12   describe it.

13        JUDGE BUXBAUM:  Well, again, the Board's rules are clear

14   that it's my duty to control the course of the trial.  I've

15   expressed my view.  I am anxious that the trial be concluded.

16   I will certainly give you a moment to confer with your

17   clients, no question about that.  I guess that I want

18   everyone to understand that it may well be that I'm going to

19   say to Mr. Carlson, "I need you at this point to either

20   present more evidence or rest," subject to the one condition

21   that I've outlined, and the same with Mr. McKnight.  If those

22   two rest, I'm going to give you an opportunity to present

23   your case.  It's your call whether you take advantage of that

24   opportunity.

25        MR. FRASER:  Again, Your Honor, I understand that.  I

1  think there are legal implications from all of those

2  statements you've just made, and I certainly will share those

3  with our client.

4      JUDGE BUXBAUM:  There are, indeed.  And Mr. Carlson and

5  Mr. McKnight, I draw those implications to your attention

6  because this is the very problem I feared.

7      MR. FRASER:  Well, particularly where I'm offering on

8  the record to review these documents, to disclose to you

9  those things that meet your requirement, and then to have you

10 review them so that counsel can finish its case before we're

11 obligated to put our case on.  That is something that I want

12 to be very clear about.  We're offering that opportunity.

13 Other than -- we've set a week for this trial, not that I

14 want to be here through Friday, doing this, but we've set a

15 week.

16     JUDGE BUXBAUM:  How long do you think it'll take,

17 Mr. Fraser?

18     MR. FRASER:  You know, Your Honor, I've been looking at

19 these documents all weekend.  I would think within the next

20 two or three hours, we would be through every one of them.

21     JUDGE BUXBAUM:  Sound good?

22     MR. CARLSON:  Yes.

23     JUDGE BUXBAUM:  All right.  Now, there is one other

24 point, which is this.  Are you in a position to tell me --

25 because I don't want to waste even two or three hours if it's

1  a waste -- whether if your search reveals that there are

2  documents that need to be produced, then, under the terms of

3  my directive -- and I think we can guess that there will be

4  at least some -- are you going to produce them?

5      MR. FRASER:  Your Honor, I'm not -- I can't answer that

6  question right now without talking with my client, without

7  looking --

8      JUDGE BUXBAUM:  All right.  Talk to your clients, but I

9  want to know that before I give you three hours to review.

10     MR. FRASER:  Hang on.  Well, and without looking at

11 those documents.

12     JUDGE BUXBAUM:  Well, but you know those documents.

13     MR. FRASER:  I don't know those --

14     JUDGE BUXBAUM:  You just told me you've been looking at

15 them all weekend, and I'm sure you have.

16     MR. FRASER:  I understand that.  I understand that, but

17 I want to be very careful about each and every one of those

18 documents, to make sure whether or not it meets the standard

19 you've set out and whether or not we would have an obligation

20 to produce that.  Once I get to that spot, I will know very

21 well whether or not we're going to object and say, "Your

22 Honor, this is clearly an attorney-client privilege document;

23 and, therefore, we can't give it to you."  Your in camera

24 inspection ruins that privilege, and we're not willing, under

25 the standard that you've set out for us, to provide it.  I

1    can't tell you that right now.  And, again, I'm not going to

2    be committed to yes, I will, because I can't make that

3    commitment.

4        JUDGE BUXBAUM:  Mr. Fraser or Mr. McKnight, what would

5    you like me to do here?

6        MR. FRASER:  For the record, Mr. Carlson, Mr. McKnight.

7        JUDGE BUXBAUM:  I'm sorry.  Thank you.  Now I'm

8    confusing the transcript.  Forgive me.  What would you

9    gentlemen like me to do?  And if you want a minute to confer,

10   I'm happy to give it to you.

11       MR. CARLSON:  I don't think we need -- I think that's

12   the best way to proceed, Judge.

13       JUDGE BUXBAUM:  All right.  So you want me to recess

14   now, until -- Mr. Fraser, give me a time.

15       MR. VIAR:  One o'clock.

16       JUDGE BUXBAUM:  I like that, Mr. Viar.  Works for me.

17       MR. FRASER:  If that's a representation that he's acting

18   as a lawyer in this proceeding, and we can use it as a base

19   for the documents --

20       JUDGE BUXBAUM:  No, no, no, no, no.

21       MR. FRASER:  We'll attempt for 1:00, at the latest,

22   1:30.

23       JUDGE BUXBAUM:  Well, let's make it 1:30, to give you

24   the time you need.  All right, then, we will recess -- well,

25   hold on.  Before we recess, anything else we can accomplish

1    right now?

2        I'll tell you what I'd like to accomplish, Mr. Fraser.

3    I think I have accomplished it, but let's be sure.  I don't

4    think you indicated you had any other preliminary matters?

5        MR. FRASER:  No, Your Honor.  I believe that --

6        JUDGE BUXBAUM:  You have an opening statement, but we're

7    not there yet.

8        MR. FRASER:  We're not to the opening statement --

9        JUDGE BUXBAUM:  Right.

10       MR. FRASER:  -- and I believe that we've hit all those

11   issues that I suspected might come up.

12       JUDGE BUXBAUM:  There is one loose end, which is the

13   subpoena request for Mr. Viar's position description.  I

14   guess -- and let me -- because it may factor into my in

15   camera review.  Mr. Fraser, is the -- you're right, that's

16   governmentese.  I agree with you.  Is there such a thing?

17       MR. FRASER:  Is there a job --

18       JUDGE BUXBAUM:  Yeah, does Mr. Viar have a job

19   description provided by his employer?

20       MR. FRASER:  My understanding is there's no job

21   description, there are no performance reviews, there are no

22   evaluations.  There is one document, one page, which I

23   think -- well, it's a paragraph long, which meets the request

24   of the subpoena.  That's it.

25       JUDGE BUXBAUM:  Any objection to providing it?

```
 1        MR. FRASER:  No.

 2        JUDGE BUXBAUM:  All right.  Then, in other words, what

 3   you'll represent to me when you provide it is that that's

 4   compliance with the demand?

 5        MR. FRASER:  As I understand it, that's correct.

 6        JUDGE BUXBAUM:  All right.  Okay.  All right.  Then,

 7   let's do it that way, and that eliminates the last loose end.

 8        And Mr. Carlson, Mr. McKnight, if you think it will

 9   facilitate my in camera inspection, when we get to that

10   point, I'll hear from you about that, whether it's something

11   I should see.

12        All right.  Then, we are in recess until 1:30.

13   (Whereupon, at 10:27 a.m., a lunch recess was taken.)

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          A F T E R N O O N   S E S S I O N

 2                              (Time Noted:  1:35 p.m.)

 3          JUDGE BUXBAUM:  We're back on the record after our

 4     recess.

 5          Mr. Fraser, how did you labors proceed?

 6          MR. FRASER:  We carefully looked through all of the

 7     documents.  Of the 130 documents that were identified,

 8     consistent with your stated review standard protocol, we

 9     found 23 documents that fit the definition that you provided.

10     I have to say, and give my colleagues a plug, they did an

11     excellent job of putting this material together and were very

12     accurate in a very short period of time, so we're very

13     comfortable with the documentation as provided in the

14     privilege log.

15          I also have to say -- and I don't know if you want me to

16     go any further at this point.  Twenty-three documents is what

17     we found.

18          JUDGE BUXBAUM:  And are you prepared to submit them to

19     me for in camera inspection?

20          MR. FRASER:  And trying to be respectful yet, at the

21     same time, acknowledging that the attorney-client privilege

22     is one of those sacred standards, we are not prepared to

23     provide those 23 documents to you today.  And if

24     Mr. Carlson --

25          JUDGE BUXBAUM:  Well, today.  That's lawyer talk.  You

1  mean --

2      MR. FRASER:  We are not --

3      JUDGE BUXBAUM:  -- absent some further order --

4      MR. FRASER:  Order compelling us to do it.

5      JUDGE BUXBAUM:  It's not just today, it's --

6      MR. FRASER:  That's correct.

7      JUDGE BUXBAUM:  If I ask you tomorrow, you're not going

8  to change your --

9      MR. FRASER:  Well, you could ask me.  I suppose we could

10 change our mind, but I doubt it.

11     JUDGE BUXBAUM:  All right.  Mr. Carlson and

12 Mr. McKnight, where does that leave the two of you?

13     MR. CARLSON:  Can I have a moment to confer with

14 Mr. McKnight?

15     JUDGE BUXBAUM:  I hope, during your discussion, you will

16 be mindful of those 112 people out there who want an answer.

17     MR. CARLSON:  145, Judge.

18     JUDGE BUXBAUM:  Very good.  You enhance my point.

19     COURT REPORTER:  Are we off the record?

20     **JUDGE BUXBAUM:  Yes, let's go off for a moment.**

21 **(Off the record.)**

22     **JUDGE BUXBAUM:  We're back on the record.**

23     Mr. Carlson, I'll hear from you.

24     MR. CARLSON:  Your Honor, the General Counsel is

25 prepared to continue going forward with its case today.  We

1  may, however, seek enforcement of the subpoena in federal

2  court.  Mr. McKnight has informed me on behalf of the Union

3  that the Union, indeed, may make a request of the General

4  Counsel that it seek enforcement of the subpoena on its

5  behalf in federal court.  But we are prepared to continue

6  going forward with our case.  In light of this issue, we may

7  not be able to officially rest, given that there will be this

8  outstanding issue, but we will do --

9      JUDGE BUXBAUM:  Well, Mr. Carlson, there's a precedent

10  here which I draw to your attention, which I think you

11  needn't be overly troubled by that concern.  CNN, of course,

12  is this situation played out, although I guess the bone I'd

13  pick with you, Mr. Carlson, is in a very different factual

14  context.  And I commented in my report in CNN on why it was

15  so important to the General Counsel to get the materials at

16  issue in CNN.  A very, very, very different kind of case,

17  although not a -- certainly, this case is as important.  I'm

18  not saying that.  Great number of people involved, just like

19  in CNN.  But a fact-intensive case; whereas, in my view, this

20  is a law-intensive case.

21      But, in any event, what happened, as you'll recall, is

22  that CNN steadfastly refused to comply with the in camera

23  submission and argued that, once Judge Amchan issued his

24  decision, that it was moot.  And the Board ruled that it was

25  most certainly not moot because there were exceptions pending

1  before the Board and that the Board retained the right under
2  its procedures to reopen the record, either to take evidence
3  themselves or to remand it to the judge in light of the
4  submission of new evidence.

5       So I think, really, the procedure you're contemplating
6  is that you will rest.  Certainly, I'm going to need you at
7  some point to rest so that I can proceed to write a decision.
8  And, nevertheless, you will have the option, if the federal
9  court enforces your subpoena and it produces documents or
10 leads to other evidence that you believe warrants reopening
11 the record, even after my decision has issued, there's
12 precedent for that, clear and recent precedent, from the
13 Board.

14      MR. CARLSON:  I understand what you said, Judge.

15      MR. McKNIGHT:  I'm going to ask him what you said.

16      **JUDGE BUXBAUM:  Let's go off the record a moment.**

17 **(Off the record.)**

18      MR. CARLSON:  Okay.  Judge, I also have one other -- a
19 motion to make with respect to this subpoena issue and with
20 respect to Mr. Fraser's decision not to provide the documents
21 for in camera inspection.  The General Counsel would move for
22 an order that you bar Respondent from asking questions on
23 direct or cross-examination about the subject matter sought
24 by the subpoena, under the authority of Purdue Farms and
25 Packaging Techniques, Incorporated.

1      JUDGE BUXBAUM:  Mr. McKnight, do you want to be heard on

2  that?

3      MR. McKNIGHT:  No.  I join.

4      JUDGE BUXBAUM:  Mr. Fraser?

5      MR. FRASER:  I suppose that the bench book and the case

6  law provides a remedy like that, at your option, Your Honor.

7  The problem with that request is that there's no idea here

8  today as to what it is that the subject matter of those

9  documents pertains to.

10      JUDGE BUXBAUM:  Well, except for you.  You know.

11      MR. FRASER:  That's right.  So I suppose I can try to

12  enforce it myself, against myself, but that'd be kind of

13  difficult to do.  I'm not sure how you -- how that can play

14  out until you know what the documents are.

15      MR. CARLSON:  I can say this.  I mean, what I've asked

16  for, Judge, is an order barring noncompliance from asking

17  questions about the subject matter sought by the subpoena.

18  This was the issue I brought up earlier.  As far as I'm

19  aware, or as far as I can tell, it related to item nine of

20  the subpoena, which was all documents related to the decision

21  to discharge.

22      Now, I don't know what the specifics of the Union

23  subpoena are.  I think they're much broader than that.  I

24  also take it from what Mr. Fraser said earlier today -- and

25  he can correct me if I'm wrong.  Perhaps I am -- but that

 1  perhaps their assertion of the privilege is broader than I

 2  think it is.  Perhaps it goes to more items of my subpoena

 3  than item nine.  So I don't know -- it goes to the issue of

 4  the subpoena, not necessarily what's in the documents, but

 5  how broad the subpoena is because only he knows what is in

 6  the documents.  But he's asserted that privilege with respect

 7  to a wide variety of areas.

 8      So the motion goes to the subject matter sought by the

 9  subpoena.

10      JUDGE BUXBAUM:  Mr. Carlson, again, I am desirous of

11  getting an end to this litigation.  I know you are, too.

12  Don't misunderstand me.  But perhaps I'm more focused on it

13  for this -- and I don't mean to suggest what that end is.

14  Frankly, I think that everyone involved in this case is

15  desirous of having an end, recognizing that they may like it,

16  they may dislike it.

17      But I just think what you're suggesting is impractical

18  and will interfere with our ability to get this thing to an

19  end in a way that your strategy regarding enforcement of the

20  subpoena is not.  I endorse your way of proceeding because it

21  balances your objectives.  I think imposing sanctions here in

22  an area of law which is not without doubt -- let us be

23  forthright here.  I apply Board law.  But you should be

24  aware -- I suspect you are -- and I don't think Mr. Fraser is

25  hearing anything he's not aware of -- that the authority

 1  relied on by CNN, in a case that's eventually, I assume,

 2  going to end up in the Second Circuit, is Detroit Newspaper,

 3  which, as you can guess from the title, raises implications

 4  for a case being heard in Michigan.

 5      So I'm going to deny your motion because I think that

 6  it's a sufficiently gray area, and I'm concerned that it

 7  would be impractical and potentially harmful to the effort to

 8  get this case adjudicated.  In your brief, if you want to

 9  suggest some of these possible Purdue Farm sanctions, I'll

10  certainly read it.

11      Again, I guess the last thing I'm going to say is what

12  I've been saying all along, which is that I don't think this

13  is a fact-driven case.  I think, based on the record we

14  already have, subject to whatever I hear in the defense case,

15  the facts aren't the issue.  I'm hoping, certainly, in your

16  briefs, gentlemen, that you're going to focus laser-like on

17  the very interesting legal issue here.  That's really where I

18  think all of us are going to earn our pay.

19      You know, it interested me that the D.C. Circuit, in

20  1952, I think it was, when I was pretty much in diapers,

21  said -- apparently, some lawyer -- and I may be anticipating

22  Mr. Fraser's argument here -- said, "Well, the language is

23  plain in 8(d)."  And the Circuit said, "There is nothing

24  plain in the language of Section 8(d)."  In 1952.  So I hope

25  that's what you will focus on.

1     All right.  Then, Mr. Carlson, having, I think, perhaps

2  less than satisfactorily, but having resolved the subpoena

3  issue as much as it can be resolved today, how do you wish to

4  proceed?

5     MR. CARLSON:  I'm sorry.  I think Mr. McKnight -- it

6  sounds as if he wishes to be heard on this, and I don't want

7  to jump ahead of him, if he did.

8     JUDGE BUXBAUM:  Okay.

9     MR. McKNIGHT:  Only briefly.  I just wanted to say for

10  the record that the counsel for the Respondent elected to

11  prepare a privilege log, which did not categorize the

12  documents which are purportedly privileged by any production

13  request or subpoena request submitted by either the General

14  Counsel or by the Charging Party, and then has elected to

15  withhold or refused to produce for in camera inspection

16  documents on the same basis.  And I understand your ruling

17  with respect to excluding evidence at this stage, but I did

18  want to say for the record, and I do intend to brief it, if

19  we do not seek enforcement in the meantime, that when you

20  make those kinds of choices, they have legal consequences.

21     JUDGE BUXBAUM:  There's no doubt.  Thank you, counsel.

22     And I guess that brings me to one thing I had forgotten.

23  Mr. Fraser, I do want you, please, to submit into the record

24  a privilege log that is just the 23 documents.  In other

25  words, just extract them from your big privilege log so that

1    they're all in one place, and if there are enforcement

2    proceedings or Board proceedings, that the decision maker or

3    makers will have a nice, concise document that lists the 23.

4        MR. FRASER:  Yes, Your Honor, we can do that.  If I may

5    briefly respond, since the lawyers love to talk in this

6    matter.

7        JUDGE BUXBAUM:  Go ahead.

8        MR. FRASER:  I don't create the process by which the

9    Board has the right to subpoena documentation.  We've been

10   through a little bit of this.  I suggested early on in the

11   case, and I suggest with every Board case I'm in, that we'd

12   love to see the subpoena four months ahead of time, since the

13   Board usually knows what they need.  Instead, we get the same

14   old same old, which is give me documentation the day of.  We

15   did our best to comply, and we produced the privilege log the

16   best way we could.  To the extent that that is a problem for

17   the other counsel, I understand, but we've done all we could

18   to make sure that we took care of the issues as required

19   under the law.

20       JUDGE BUXBAUM:  All right.  Well, it is with some

21   anticipation that I hope we can now move past these issues

22   and back to the merits of the case.  Mr. Carlson, how do you

23   wish to proceed on the merits?

24       MR. CARLSON:  Your Honor, the General Counsel is going

25   to call Paul Viar again.

1       JUDGE BUXBAUM:  Very well.

2       MR. FRASER:  We're asking that Mr. Kirk leave the

3  courtroom.

4       JUDGE BUXBAUM:  Yes, that's a good point.  We, of

5  course, still have the sequestration rule in effect.  So any

6  other potential witnesses will need to excuse themselves.

7       Mr. Viar, would you please stand?  It has been long

8  enough I'm going to re-administer the oath.  Would you raise

9  your right hand?

10 (Whereupon,

11                   **ROBERT PAUL VIAR, JR.**

12 was re-called as a witness by and on behalf of the General

13 Counsel and, after having been first duly sworn, was examined

14 and testified further as follows:)

15      JUDGE BUXBAUM:  Please be seated.

16      Mr. Carlson, you may proceed.

17      MR. CARLSON:  Thank you, Judge.

18      Could I just ask the court reporter -- I think I'm up to

19 GC-49, but I just want to confirm that.

20      COURT REPORTER:  This would be GC-49.

21      MR. CARLSON:  This would be GC-49.  Thank you.

22 **(General Counsel's Exhibit 49 marked for identification.)**

23      MR. CARLSON:  Just for the record, Judge, I just want to

24 make it clear that my motion to examine Mr. Viar under 611(c)

25 still -- and your ruling with respect to that still stands.

1       JUDGE BUXBAUM:  It does.  Mr. Fraser, I assume that's

2  unproblematic.

3       MR. FRASER:  Understood, Your Honor.  Thank you.

4       JUDGE BUXBAUM:  Right.

5                          **DIRECT EXAMINATION**

6  Q.   BY MR. CARLSON:  Mr. Viar, do you know who Dusty Modert

7  is?

8  A.   Yes.

9  Q.   Okay.  And who is she?

10  A.   She used to work at Douglas.

11  Q.   And would she receive -- or have a workers' compensation

12  case with Douglas?

13  A.   Yes.

14  Q.   And do you recall what year it was that she was injured?

15  A.   I'm struggling, counsel.  Probably 2005.  I don't know.

16  Q.   Okay.  And after 2005, did she work in the facility at

17  all?  Did she come into work?

18  A.   I don't believe she did, no.

19  Q.   Mr. Viar, I'm going to hand you what I've marked as

20  General Counsel's Exhibit 49.

21       MR. FRASER:  Judge Buxbaum, just for the record, again,

22  I failed to state this last time, and Mr. Viar started having

23  difficulty hearing the questions.  It's just a reminder that

24  Mr. Viar sometimes has difficulty.  If we could keep our

25  voices up, that'd be great, please.

1        JUDGE BUXBAUM:  I appreciate that reminder.  And

2   Mr. Viar, let me again remind you that I don't want you to be

3   shy or embarrassed about indicating that you haven't heard a

4   question.  So if that should happen at all, please let me

5   know that because it does neither you nor me any good if you

6   are answering a question that you're not sure you heard.

7        THE WITNESS:  Understood, Your Honor.

8   Q.   BY MR. CARLSON:  Mr. Viar, have you had an opportunity

9   to review General Counsel's Exhibit 49?

10  A.   Yes.

11  Q.   And this is a document that was produced to the General

12  Counsel pursuant to its subpoena in this matter.  Could you

13  describe this document?  What is this?

14  A.   It looks like a seniority list that my assistant, Diane

15  Hedgcock, sent to me in October of 2008.

16  Q.   And did she compile this list at your request?

17  A.   I don't remember.  Probably.  I have no idea.

18  Q.   And do you recall the purpose for her compiling this

19  list?

20  A.   No.

21  Q.   And on the final page of the list, at the very bottom,

22  where it says "Dusty Modert," and then it says, "WC,

23  10/14/05," what is that meant to indicate?

24  A.   Workmen's compensation.  I believe that's her Social

25  number.

1        JUDGE BUXBAUM:  Oh.  Well, now, wait a minute.  It --

2        THE WITNESS:  Which should probably be redacted.  It is

3   a Social number, and --

4        JUDGE BUXBAUM:  Are you planning to admit this, counsel?

5        MR. CARLSON:  Yeah.  I can provide redacted copies,

6   Judge.  I'm sorry.

7        JUDGE BUXBAUM:  Yeah, please do that.

8   Q.   BY MR. CARLSON:  Go ahead, Mr. Viar.

9   A.   I think the date reference is when the leave began.  I

10  don't know.

11  Q.   And if you can turn back to the first page of the list,

12  which would be the second page of the document, where it says

13  at the top, "Walked off job, layoff, sick leave, work comp."

14  What are those titles meant to indicate?

15  A.   You know, counsel, it's Diane's document to me.  I think

16  it simply means what it says.  Those people walked off their

17  job.  That means they walked off their job.

18       MR. CARLSON:  Judge, I'm going to offer GC-49 at this

19  point, with the understanding that I'll provide redacted

20  copies of this and take the other copies with the Social

21  Security numbers and destroy those.

22       JUDGE BUXBAUM:  Mr. McKnight, any objection?

23       MR. McKNIGHT:  No objection.

24       JUDGE BUXBAUM:  Mr. Fraser?

25       MR. FRASER:  No objection, Your Honor.

1          JUDGE BUXBAUM:  All right.  Then, GC-49 will -- a

2     redacted copy of GC-49 will be received in evidence, and it

3     is Mr. Carlson's burden to get us that redacted copy.

4     **(General Counsel's Exhibit 49 received into evidence.)**

5          MR. CARLSON:  And let me take those back, just to make

6     sure that --

7          JUDGE BUXBAUM:  Yes, please do that.

8          MR. FRASER:  Do you mind if I hold mine until you get

9     the replacement?

10         MR. CARLSON:  Certainly not.

11         MR. FRASER:  Thank you.

12         MR. McKNIGHT:  Should I get the court reporter's copy?

13         JUDGE BUXBAUM:  Yes, right.  We don't want that floating

14    around, either.  Thank you, Mr. McKnight.

15    **(General Counsel's Exhibit 50 marked for identification.)**

16    Q.   BY MR. CARLSON:  Mr. Viar, I'm going to hand you now

17    what I've marked as General Counsel's Exhibit Number 50.  Did

18    you have a chance to look at this document?

19    A.   Yes.

20    Q.   And, again, this is a document that was provided to the

21    General Counsel pursuant to subpoena.  Is this document what

22    it purports to be, an e-mail sent from you, to the

23    recipients, on or about Tuesday, June 3rd, 2008, at 4:28

24    p.m.?

25    A.   Yes.

1  Q.   And with respect to the recipients of the document,

2  could you just go through real quick and describe who are

3  those individuals?  Who is Toru Hasegawa?

4  A.   Chief Executive Officer, Douglas Autotech Corporation,

5  board member.

6  Q.   And who is the next individual?

7  A.   Koichi Kawakyu is the president of Douglas Autotech,

8  board member.

9  Q.   And the next gentleman?

10  A.   Eddie Ogusu, Vice President of Operations, at that time,

11  and Glenn Kirk, Director of Finance.

12      MR. CARLSON:  I'm going to offer General Counsel's 50 at

13  this time.

14      JUDGE BUXBAUM:  Mr. McKnight?

15      MR. McKNIGHT:  No objection.

16      JUDGE BUXBAUM:  Mr. Fraser?

17      MR. FRASER:  Relevance, Your Honor.  I'm not sure that

18  there's any relevance that relates to an unemployment issue,

19  which we've previously objected on the basis of it's not

20  relevant to the National Labor Relations Act, it doesn't

21  impact the issue on reemployment, different definitions,

22  different obligations, different statutes, not coordinated.

23  We don't see that it's relevant.

24      MR. CARLSON:  Your Honor, this goes to the --

25      JUDGE BUXBAUM:  Well, Mr. Carlson, let me hear you as to

1  why it's -- of course, I've already ruled that these kinds of

2  types of evidence would be relevant to the extent that they

3  express something in terms of the company's subjective view

4  of the status of these individuals.  Using that as the

5  decisional standard here, what does this tell me?

6      MR. CARLSON:  I think it does.  I think, Your Honor, it

7  says that, as of June 3rd, the company considered the

8  discriminatees in this case, I will call them, to be locked-

9  out employees.

10     JUDGE BUXBAUM:  I see.

11     MR. CARLSON:  I'll remind you, Judge, that the Employer

12 has denied the locked-out allegation in the complaint.

13     MR. FRASER:  And, again, I would argue that, to the

14 extent it is relevant, Your Honor, it says strike/lockout

15 employees.  It doesn't say lockout employees, so I'm not sure

16 that that argument makes any sense, but I would still argue

17 it's not relevant.

18     JUDGE BUXBAUM:  Well, I think it passes the test,

19 Mr. Fraser, although you make a point that it certainly goes

20 to the weight that one would accord it as an expression of

21 the company's opinion as to the status of the employees.  I'm

22 going to admit it.  As I say, weight is another matter.

23     General Counsel's 50 will be received.

24 **(General Counsel's Exhibit 50 received into evidence.)**

25 **(General Counsel's Exhibit 51 marked for identification.)**

1  Q.   BY MR. CARLSON:  Mr. Viar, I'm now going to hand you

2  what I've marked for identification as General Counsel's

3  Exhibit 51 and ask if you can look at it.

4  A.   Okay.

5  Q.   And what is this document?

6  A.   It's an e-mail message from me to Mary Brown, at USFC,

7  which I don't even remember what company that is.

8  Probably -- or not probably.  It's a transport company.

9  Q.   Okay.  And who is Mary Brown?

10 A.   I don't know.

11 Q.   Who is Barb Skinner?

12 A.   She -- former employee of Douglas.  Used to work in

13 shipping.  Shipping supervisor.

14 Q.   And you sent this to Ms. Brown and Ms. Skinner on or

15 about Tuesday, December 2nd, 2008, at 4:55 p.m.; is that

16 correct?

17 A.   Yes.

18     MR. CARLSON:  I'm going to offer GC-51 at this point.

19     JUDGE BUXBAUM:  Was Ms. Brown -- I guess am I correct in

20 making an assumption that USFC employees were making

21 deliveries or pickups at Douglas?

22     THE WITNESS:  That's correct, Your Honor.

23     JUDGE BUXBAUM:  Was it both, or one or the other?

24     THE WITNESS:  I don't remember.

25     JUDGE BUXBAUM:  You don't know, either.  All right.

1      THE WITNESS:  It could have been.  I don't know.

2      JUDGE BUXBAUM:  But that was the reason you were

3  providing this information?

4      THE WITNESS:  Yes.

5      JUDGE BUXBAUM:  Mr. McKnight?

6      MR. McKNIGHT:  No objection.

7      JUDGE BUXBAUM:  Mr. Fraser?

8      MR. FRASER:  Object on the basis, again, of relevance,

9  outside the time scope, as well, of the matters we're talking

10  about.  We don't believe that it's probative of any issue.

11      JUDGE BUXBAUM:  I think it's sufficiently related in

12  time.  I'm going to admit it.  General Counsel's 51 will be

13  received.

14  **(General Counsel's Exhibit 51 received into evidence.)**

15  **(General Counsel's Exhibit 52 marked for identification.)**

16  Q.   BY MR. CARLSON:  Mr. Viar, I'm going to hand you now

17  what I've marked for identification as General Counsel's

18  Exhibit 52 and ask you to look at that document.

19  A.   Okay.

20  Q.   And what is this document, Mr. Viar?

21  A.   The subject line on the e-mail references a salary

22  meeting at 18:45 p.m., which is a communication meeting that

23  we had from time to time, after the advent of the strike, and

24  it's some talking points for that meeting.  It's my

25  responsibility to handle communication -- part of my

1    responsibility was to handle communication for the entire

2    organization, and this was sort of a summary or a talking

3    point list for that meeting.

4    Q.   And did you prepare the talking points?

5    A.   Yes.

6    Q.   Okay.  And that's in the bottom half of the e-mail,

7    where it says, "From:  Viar, Robert Paul."  Those are the

8    talking points you're referring to; is that correct?

9    A.   Yes.

10    Q.   And who is Greg Cannon?

11    A.   He's a Director of Supply Chain Management and IT at

12    Douglas.

13    Q.   And who is Jim Kenny?

14    A.   Jim Kenny was working in the plant at that time.  These

15    are fellow staff or leadership guys I was trying to

16    communicate to.

17    Q.   And you sent your e-mail, the talking points, on or

18    about Tuesday, May 13, 2008, at 12:57 p.m.; is that correct?

19    A.   I'm sorry, I didn't hear that question.

20    Q.   Sure.  You sent your e-mail, the bottom half where the

21    line is on that page, you sent your e-mail to those

22    individuals listed on the two part of the address, you sent

23    that on Tuesday, May 13, 2008, at 12:57 p.m.; is that

24    correct?

25    A.   Yes.

1        MR. CARLSON:  I'm going to offer GC-52.

2        JUDGE BUXBAUM:  Mr. Viar, I want to be sure I understand

3   it.  I think I do, but let me be clear.  It's your voice

4   that's speaking in the entire portion of the e-mail that

5   you've sent.  In other words, these are -- let's take Glenn,

6   for example.  These are points that you are saying to Glenn.

7   You're not recapping points Glenn made to you?

8        THE WITNESS:  No, these are my points, Your Honor.

9        JUDGE BUXBAUM:  That's what I wanted to know.  All

10  right.  Mr. McKnight, any objection?

11       MR. McKNIGHT:  No.

12       JUDGE BUXBAUM:  Mr. Fraser?

13       MR. FRASER:  No objection.

14       JUDGE BUXBAUM:  General Counsel's 52 will be received.

15  **(General Counsel's Exhibit 52 received into evidence.)**

16  **(General Counsel's Exhibit 53 marked for identification.)**

17  Q.   BY MR. CARLSON:  Mr. Viar, I'm going to hand you now

18  what I've marked for identification as General Counsel's

19  Exhibit 53 and ask you to take a look at that document.

20  A.   Okay.

21  Q.   What is this document, sir?

22  A.   It's an update to Hasegawa-san, Q-san, Eddie, Mr. Kirk

23  and Mr. Cannon on the status of the unemployment claims.

24  Q.   Did you send this document?

25  A.   Yes.

1   Q.   And you sent it through e-mail?

2   A.   Yes.

3   Q.   And you sent it on Tuesday, June 10th, 2008, at

4   approximately 1:40 p.m.?

5   A.   Yes.

6        MR. CARLSON:  I'm going to offer GC-53.

7        JUDGE BUXBAUM:  Mr. McKnight?

8        MR. McKNIGHT:  No objection.

9        JUDGE BUXBAUM:  Mr. Fraser?

10       MR. FRASER:  Objection on relevance, Your Honor.  It

11  clearly doesn't have any bearing on the issue at hand.  It

12  certainly doesn't talk about subjective intent of the

13  company --

14       JUDGE BUXBAUM:  I don't think it does, either,

15  Mr. Carlson.  How does it talk about the subjective intent?

16       MR. CARLSON:  Well, I think it does, Your Honor.  I

17  think, if you'll recall, there is testimony in this case

18  that, at the May 21st meeting, there was a discussion between

19  the Respondent's counsel, Mr. Lillie, and the Union, about

20  the status of the employees.  And, specifically, one of the

21  topics discussed at that meeting was whether or not employees

22  had falsely claimed that they had been terminated.  And the

23  testimony was that Mr. Lillie said the employees had not been

24  terminated, and this goes to what their status was at that

25  point.  Their status was that they were locked out.  This

1  corroborates that testimony, and it shows that the company's

2  position was that they were locked-out employees.  And,

3  again, this goes to the issue --

4       JUDGE BUXBAUM:  Where does it say that, Mr. Carlson?

5       MR. CARLSON:  It says that they lied on their

6  applications by saying that they were laid off, fired, or

7  they were off work for -- the reason was a lack of work.  And

8  none of those were true.  They were locked out.  So, again,

9  it goes, also, to show what their status was.  Again, they've

10  denied that -- the lockout has been denied.  That's an

11  element I need to prove.  This is a piece to prove that

12  allegation.

13       MR. FRASER:  Your Honor, all it states it that they

14  said, they claimed they were laid off.  It doesn't make any

15  statement as to what DAC or Douglas' contention is regarding

16  these employees.

17       JUDGE BUXBAUM:  You know, Mr. Carlson, I think that's

18  right.  It makes two statements.  One, it characterizes what

19  the bargaining unit members were stating; and, two, it tells

20  us what the State of Michigan concluded about the bargaining

21  unit members' statements.  I don't see where it tells me what

22  Douglas thought about any of that.

23       MR. CARLSON:  They're saying -- they're calling the

24  claims fraudulent.  That goes to what their position was with

25  respect to whether or not they were laid off, fired, or off

1  of work for reason of a lack of work.  They're calling those

2  claims fraudulent.  They weren't any of those things.  They

3  were locked out.  I admit, Judge, you have to make a bit of

4  an inference.  It doesn't specifically say, "We locked out

5  the employees."  That doesn't mean -- it doesn't make it any

6  less probative.

7       JUDGE BUXBAUM:  Well, I think you have to make more than

8  a bit of inference.

9       MR. FRASER:  Yeah, it's about a 50-foot jump over a huge

10  chasm to get there.

11       JUDGE BUXBAUM:  Well, I don't know if it's 50 feet, but

12  it's more feet than I'm willing to go.  I'm going to sustain

13  the objection to it.

14       MR. McKNIGHT:  Your Honor, if I might.  If you later

15  receive documents that indicate the employees were denied

16  unemployment because they were locked out, would you -- as

17  opposed to fired, would you --

18       JUDGE BUXBAUM:  No, I don't think so because my problem

19  with it, Mr. McKnight, is that it doesn't really state what

20  Douglas thinks; it states what Michigan thought, and it

21  states what the employee -- the bargaining unit members said.

22  But, again, there's -- you certainly, Mr. Carlson, introduced

23  a number of documents that do, even though they're in context

24  of other kinds of employment law litigation, reflect -- are

25  probative on the issue of the subjective state.  I just think

1   this one's a bridge too far.  If you'd like, I'll put it in

2   the rejected exhibit file.

3        MR. McKNIGHT:  I think we should --

4        MR. CARLSON:  Well, I certainly want it put in the

5   rejected exhibit file.

6        JUDGE BUXBAUM:  Very well.  That's what I will do.

7        MR. McKNIGHT:  If it might be -- just for the record, I

8   wanted to say that that was actually -- the record, I think,

9   clearly reflects that Douglas threatened to take action

10  against --

11       JUDGE BUXBAUM:  The record does reflect it.

12       MR. McKNIGHT:  -- against employees because they had

13  lied on their unemployment claims, claiming they had been

14  terminated or fired.

15       JUDGE BUXBAUM:  Again, Mr. McKnight, my concern isn't

16  with the general principle of this type of evidence; it's

17  with the fact that this specific document is, in essence,

18  simply a report saying that no person -- none of the

19  bargaining unit members are collecting unemployment, and

20  giving some of the background of that.  It isn't --

21       MR. CARLSON:  But the background is the significant part

22  of the document, Your Honor.  Let me make -- could I make one

23  more shot -- take one more shot at it?  I believe Mr. Viar's

24  testimony at the prior hearing was that the discharge letter

25  that was sent to the employees on August 4th was, in his

1  position or in his words, merely confirming their status,

2  okay.  So that's very different.  This is showing that, as of

3  June 10th, he's not confirming any status that they had as of

4  June 10th because as of June 10th, he's saying they were

5  locked-out employees.  They weren't fired employees, they

6  weren't laid-off employees, they weren't employees who were

7  absent for a lack of work.

8      JUDGE BUXBAUM:  My problem, though, Mr. Carlson, still

9  is that I don't see this as Mr. Viar making any assertion

10  about their status.  He's reporting what they asserted about

11  their status and what the state of Michigan concluded about

12  their status.  I just don't see this as any statement by the

13  company as to what the company thought the status was.  Yes,

14  you might infer it from the document, but I think that's too

15  remote.

16      MR. McKNIGHT:  Doesn't the document say that employees

17  who claimed that they had been fired were lying?

18      JUDGE BUXBAUM:  Well, it says that the State concluded

19  that.

20      MR. McKNIGHT:  No, no, it says, "the State denying the

21  fraudulent claims," and then on the next sentence, "even the

22  employees who lied to the State."  It's not the State saying

23  they lied.  It's Mr. Viar saying they lied, just as

24  Mr. Lillie said at the bargaining session.

25      JUDGE BUXBAUM:  Mr. Fraser, what do you think?

1      MR. FRASER:  Mr. Viar isn't confirming anything other

2   than what he has seen that the unemployment -- that the

3   bargaining unit members provided to the unemployment agency.

4   They're the ones who lied.  He read the documents confirming

5   they lied.  He's not stating that -- making any statement at

6   all about the company's position on this.  He's recounting

7   what bargaining unit members did or said to the unemployment

8   agency.

9      MR. McKNIGHT:  Well, he's recounting his evaluation of

10   the untruthfulness of a representation that an employee had

11   been terminated.

12      JUDGE BUXBAUM:  Not with sufficient clarity to have it

13   be meaningful, I don't think.  I'm going to reject it.  And

14   as I say, we can put it in a rejected exhibit file.

15      MR. CARLSON:  We'd ask that you do that, Judge.  Thank

16   you.

17      JUDGE BUXBAUM:  Sure.

18   **(General Counsel's Exhibit 53 rejected.)**

19      JUDGE BUXBAUM:  Do you need a moment, Mr. Carlson?

20      MR. CARLSON:  No, I think I'm okay, Judge.

21      JUDGE BUXBAUM:  Oh, oh, good, great.

22   **(General Counsel's Exhibit 54 marked for identification.)**

23   Q.   BY MR. CARLSON:  Mr. Viar, I'm handing you General

24   Counsel's Exhibit 54.  Will you take a look at that document,

25   please?

1   A.   Yes, I recognize it.

2   Q.   And that is a document that the company produced in

3   response to the General Counsel's subpoena 562063, paragraph

4   two; is that correct?

5   A.   It was produced as part of the request, from my

6   personnel file.  It's in my personnel file.

7   Q.   And that's a document that was subpoenaed by the

8   government in this case; is that right?

9   A.   As far as I understand, yes.

10      JUDGE BUXBAUM:  And I take it this is the most recent of

11  your subpoenas?

12      MR. CARLSON:  That's correct, Judge.

13      JUDGE BUXBAUM:  Okay, okay.

14  Q.   BY MR. CARLSON:  And Mr. Viar, I just want to make sure

15  that it's clear on the record that that is the only document

16  in the possession of the company stating your job duties and

17  functions for the period May 1, 2008 to the present; is that

18  correct?

19  A.   Yes.

20  Q.   So there is no other document in the possession of the

21  company that states that one of your functions as Director of

22  Administration for Douglas Autotech Corporation is to provide

23  legal counsel?

24  A.   You know, I don't know, counsel, because there's

25  probably hundreds of e-mails referencing my work as legal

1    counsel for the company.

2        MR. McKNIGHT:  Objection, Your Honor.  If they're not

3    going to produce them, certainly, this witness can't start

4    telling us what they say.

5        JUDGE BUXBAUM:  Well, he hasn't done that, but I'll keep

6    it in mind, Mr. McKnight.  Let's see where we're going.

7        MR. CARLSON:  Well, I guess I would want to make it

8    clear on the record right now, I'm not sure there's been any

9    claim of privilege with respect to General Counsel's

10   subpoena --

11       JUDGE BUXBAUM:  That's right, there hasn't.

12       MR. CARLSON:  -- so I'm not sure what Mr. Viar's --

13       JUDGE BUXBAUM:  There hasn't, Mr. Fraser, has there?

14   Let me be sure now.  Did you update your privilege log in

15   response to the latest two-part subpoena?

16       MR. FRASER:  I'm sorry, Your Honor, I was trying to read

17   this while you were asking me that question.

18       JUDGE BUXBAUM:  Not a problem.  Mr. Carlson makes the

19   observation, which I think is correct, that the materials

20   that have been submitted to him in response to the most

21   recent subpoena, what I'll call the little subpoena --

22       MR. FRASER:  Right.

23       JUDGE BUXBAUM:  -- are not met with any contention that

24   there's any privilege?

25       MR. FRASER:  Yeah, the documents that we provided in

1    response to 562063, the request was those documents including

2    but not limited to job descriptions, performance reviews, and

3    evaluations stating the job duties and functions of Paul Viar

4    for the period May 1, 2008 to the present.  We complied with

5    that request.  I just --

6         JUDGE BUXBAUM:  And you did not conclude that anything

7    that was responsive to that request was covered by a

8    privilege?

9         MR. FRASER:  No, based on the documentation provided to

10   me from the client, no privileged documents existed.

11        If I may respond to what I heard Mr. McKnight say, it

12   sounded to me as though the witness was about to describe

13   potential e-mails where he acted in that capacity, not

14   documents which defined job descriptions, performance

15   reviews, et cetera.

16        JUDGE BUXBAUM:  Well, all right.  We'll let that go.  I

17   mean, that's a subject for -- grist for all of your mills

18   when examining the witness.

19        MR. CARLSON:  I just want to --

20        JUDGE BUXBAUM:  And, Mr. McKnight, I can't help but

21   observe that, of course, if he testified about these

22   privileged materials, he would, I think, be relinquishing the

23   privilege; would he not?

24        Go ahead, Mr. Carlson.

25        MR. McKNIGHT:  But I don't think we'd be getting the

1  materials.  I think he's already relinquished the privilege,

2  Your Honor.

3      MR. FRASER:  Relinquished the privilege, Your Honor, by

4  simply saying that there may be other documents?

5      JUDGE BUXBAUM:  No, no, by describing their contents.

6      MR. FRASER:  He hasn't described their contents.

7      JUDGE BUXBAUM:  No, I know.  Mr. Fraser, you're ahead of

8  us.  We're aware of that.

9      MR. FRASER:  I just heard Mr. McKnight say he's already

10  relinquished the attorney-client --

11     JUDGE BUXBAUM:  No, no, no, no, no, no, no, no.

12     MR. McKNIGHT:  I don't think, Your Honor, for the

13  record, I don't think that Mr. Viar has established an

14  attorney-client privilege, much less had to relinquish it.

15     JUDGE BUXBAUM:  I understand your position.  I

16  understand.

17     Go ahead, Mr. Carlson.

18     MR. CARLSON:  I want to clarify the record, too, because

19  I think Mr. Fraser stated that they provided documents,

20  plural, in response of paragraph two, and I just asked

21  Mr. Viar a question about what was provided in response to

22  General Counsel's subpoena, and he had testified that that

23  was the only document they provided.  So there was a single

24  document --

25     JUDGE BUXBAUM:  Right.  You want to correct your

1    statement, Mr. Fraser?

2        MR. CARLSON:  -- there are no other documents, and I'm

3    trying -- I want the record to be clear as to that.

4        MR. FRASER:  Your Honor, and for fear that I'll see

5    another document with my name in it, confirming that I, in

6    fact, had multiple documents, I'll be very clear for the

7    record right now.  There was one document that I provided to

8    Mr. Carlson in response to his subpoena.

9        JUDGE BUXBAUM:  Well, that paragraph.

10       MR. FRASER:  One document in response to paragraph two

11   request of his subpoena.

12       JUDGE BUXBAUM:  Right, okay.  All right.  You may

13   proceed.

14       MR. CARLSON:  Thank you, Judge.

15   Q.   BY MR. CARLSON:  Mr. Viar, do you contend that you were

16   functioning as an attorney for Douglas Autotech Corporation

17   during the negotiations with the UAW that took place between

18   May 1st, 2008 and July 31st, 2008?

19   A.   I didn't hear the tail end of the question.  I missed

20   when the date -- can you ask -- I'm sorry, I didn't hear you.

21   Q.   Sure.  Do you contend that you were functioning as an

22   attorney for Douglas Autotech Corporation during the

23   negotiations, the collective bargaining meetings that took

24   place between Douglas and the UAW between May 1st, 2008 and

25   July 31st, 2008?

1  A.    I had a dual role, counsel, which I have testified to.

2  Part legal counsel, and I was the chief internal strategist

3  and decision maker for the negotiations.  So two roles.

4  Q.    So that would be yes, you were functioning as an

5  attorney?  One of those roles was as an attorney?

6  A.    I tried to answer the question.

7  Q.    Was there a Director of Administration at Douglas

8  Autotech before you held that position?

9  A.    No, I -- no.

10  Q.    Was there a human resources director or manager at

11  Douglas before you took that position?

12  A.    Yes.

13  Q.    Was that person an attorney?  Do you know?

14  A.    Yes.

15  Q.    That person was an attorney?

16  A.    It was me.

17  Q.    No, prior to you -- I'm sorry.  Prior to you taking the

18  position of -- or holding the position of human resources

19  manager.  Was there someone else who was the human resources

20  manager at Douglas?

21  A.    Oh, I don't know for sure.  I don't believe he was an

22  attorney, no.

23  Q.    Okay.  Fair enough.  Mr. Viar, does Douglas Autotech

24  Corporation have a document retention policy?

25  A.    Yes.

484

1    Q.    What is that policy?

2    A.    Well, it's pretty long.  It's in our TS documents.  We

3    hold onto our personnel files for seven years.  We follow all

4    of the legal requirements for document control.  We've been

5    audited several times.  We're in pretty good shape there.  We

6    have an archive area where we keep documents.

7    Q.    And as the Director of Administration, are you

8    charged -- is that one of your duties is overseeing that

9    policy and making sure that people comply with it?

10    MR. FRASER:  Your Honor, I'm going to object to the --

11    on relevance grounds.  We've provided all the documents that

12    counsel's asked for.  I'm not sure how this is relevant to

13    anything in this case.

14    JUDGE BUXBAUM:  Well, are you laying a foundation for

15    something?  That's what it struck me as, but maybe not.

16    MR. CARLSON:  You know, well, it is, Judge.  And, again,

17    this is actually my final area of inquiry --

18    JUDGE BUXBAUM:  Okay.  I'll let you lay a foundation.  I

19    will let you lay a foundation without signaling where you're

20    going.

21    THE WITNESS:  In conjunction with the quality people,

22    that is one of my responsibilities, yes.

23    Q.    BY MR. CARLSON:  And does the -- I'm sorry.  The name,

24    again, of the parent corporation of Douglas, is it Fuji --

25    I'm sorry, can you tell me?

1  A.    Fuji Kiko Company, Ltd.

2  Q.    Okay.  And are you aware, do they have a document

3  retention policy?

4  A.    I've never seen it.  I don't know.

5  Q.    Okay.

6  A.    I assume so.

7       MR. CARLSON:  I don't have any further questions for

8  Mr. Viar at this time.

9       JUDGE BUXBAUM:  Mr. Carlson, are you seeking anything

10  with regard to GC-54?

11       MR. CARLSON:  I'm sorry, Judge.  I need to take a look

12  at --

13       JUDGE BUXBAUM:  Sure.  It's the -- well, go ahead and

14  look at it.

15       MR. CARLSON:  Yeah.  I'm sorry, Judge.  I'm going to

16  offer GC-54.

17       JUDGE BUXBAUM:  Mr. McKnight?

18       MR. McKNIGHT:  No objection.

19       JUDGE BUXBAUM:  Mr. Fraser?

20       MR. FRASER:  Your Honor, before we get there, I raised a

21  relevance objection to the line of questioning related to

22  document retention, and Mr. Carlson responded, when you

23  rejected my objection, that he was laying a foundation for

24  something.  It never seems to me that Mr. Carlson reached

25  that place, so I'm renewing my objection on relevance, that

1    that line of questioning be stricken.  It's not relevant to

2    anything.

3        JUDGE BUXBAUM:  Was the foundation for questions you

4    were going to direct to this witness, or for something else?

5        MR. CARLSON:  It actually goes to an issue with the

6    subpoena that I'd like to raise before I rest my case, but --

7        JUDGE BUXBAUM:  All right.  We'll leave it at that and

8    we'll see where it goes.

9        MR. FRASER:  No objection as to Number GC-54.

10        JUDGE BUXBAUM:  It'll be received.  Thank you, counsel.

11    **(General Counsel's Exhibit 54 received into evidence.)**

12        JUDGE BUXBAUM:  And, let's see, you had finished with

13    your direct examination and --

14        MR. CARLSON:  Yes, sir.

15        JUDGE BUXBAUM:  Okay.  Mr. McKnight?

16        MR. McKNIGHT:  I would like to ask for the production of

17    any Jencks statements by Mr. Viar.

18        JUDGE BUXBAUM:  And, of course, all of you have educated

19    me about that topic, so now I'm up to speed.

20        THE WITNESS:  I didn't hear -- I'm sorry, Your Honor, I

21    didn't hear what he said.

22        JUDGE BUXBAUM:  Mr. McKnight just asked for the Jencks

23    material related to your testimony.

24        THE WITNESS:  Oh.

25        **JUDGE BUXBAUM:  Let's go off the record for a moment.**

1    **(Off the record.)**

2        JUDGE BUXBAUM:  All right.  My understanding,

3    Mr. Carlson, is you're now going to state for the record what

4    Jencks material you are providing to Mr. McKnight.

5        MR. CARLSON:  Yes, Your Honor.  I am providing to

6    Mr. McKnight an affidavit that Mr. Viar gave in cases 7-CA-

7    51235 and 7-CB-16049.  It's a single affidavit, applicable to

8    both of those cases.  It's approximately three and a half

9    pages.  It's dated May 23rd, 2008.  I'm turning that over to

10   Mr. McKnight at this time.

11       I'm also turning over to Mr. McKnight an affidavit he

12   gave in case number GR-7-CB-16128.  It is a three-page Board

13   affidavit, with a single page -- another affidavit signed by

14   Mr. Viar, single page, as an attachment, and another two

15   single-page attachments.  Turning that over to Mr. McKnight

16   at this time.

17       MR. FRASER:  Just to make sure.  I don't have that

18   document, Steve.

19       MR. CARLSON:  I'm also turning over to Mr. McKnight an

20   affidavit that Mr. Viar provided to the Board in case number

21   GR-7-CB-16129.  It is a two-page affidavit with numerous

22   attachments, one of the attachments being -- well, I guess I

23   shouldn't get into that -- with a number of attachments to

24   it.  And I'm turning that over to Mr. McKnight at this time.

25       Mr. McKnight has also made me aware that there is

1  another charge that was filed by the company.  I believe it

2  was January 30th of 2009, in case GR-7-CB-16349.

3  Mr. McKnight has requested that I take a look at that file to

4  see if there's any statements from Mr. Viar.  I have agreed

5  to do that, and I will do that at this time.

6        JUDGE BUXBAUM:  Oh, you have it with you?

7        MR. CARLSON:  Yeah, it's actually -- yes, downstairs.

8  Downstairs.  Yeah, it's not --

9        JUDGE BUXBAUM:  Oh, good, good, good, good, okay,

10  because I was wondering how you were going to do that.  All

11  right.  So while Mr. McKnight reads what you've already

12  provided, you will find out whether there's anything more?

13        MR. CARLSON:  Yes, sir.

14        MR. FRASER:  And, Your Honor -- I don't want to cut

15  Mr. Carlson off.  Do you have more to say?  I thought I heard

16  you --

17        MR. CARLSON:  I don't think I have any more to say.

18        JUDGE BUXBAUM:  Okay.

19        MR. FRASER:  I don't have the second two affidavits that

20  Mr. Carlson referred to, so we would request, likewise, a

21  copy of those materials for review.  He rattled off the

22  numbers so quickly, I -- 16129, and the second one he

23  referenced, I don't -- the only one I have is the one dated

24  May 23, 2008, of the ones that he referenced.

25        JUDGE BUXBAUM:  All right.  It looks like he's getting

1    ready to provide it to you.

2        MR. CARLSON:  No, I don't have any more copies of it.

3        JUDGE BUXBAUM:  Oh, oh, I see.

4        MR. CARLSON:  I have a single copy of it.

5        JUDGE BUXBAUM:  All right.  Well, then, I guess I can't

6    be surprised at that.  All right.  You'll have to wait your

7    turn, Mr. Fraser.

8        MR. FRASER:  That's not a problem.

9        JUDGE BUXBAUM:  Mr. McKnight won't put any candy bar

10   stains or anything on them before you get to them, will you,

11   Mr. McKnight?

12       MR. McKNIGHT:  No, I will not, Your Honor.

13       JUDGE BUXBAUM:  I had a feeling you wouldn't.  All

14   right.  Then, we're going to take a ten-minute recess for

15   Mr. McKnight to review the Jencks.

16       MR. McKNIGHT:  I was up to 15 now that I'm looking at

17   this, okay?

18       JUDGE BUXBAUM:  You know, I'm not arguing with you.

19       **All right.  We'll resume at 10 after 3:00.**

20   **(Off the record.)**

21       **JUDGE BUXBAUM:  Let's go back on the record.**

22       Mr. Carlson, you wish to be heard?

23       MR. CARLSON:  Yes, Judge.  I just want the record to

24   reflect that I've -- in addition to the affidavits that I

25   mentioned before, I've also provided the parties with an

1    affidavit -- or Mr. McKnight with an affidavit that Mr. Viar

2    gave in case 7-CB-16067.  It's a three-page, typewritten

3    affidavit, dated June 12, 2008.

4        And then let the record also reflect that I've provided

5    to Mr. Fraser, at his request, Mr. Viar's affidavits in Board

6    cases case GR-7-CB-16128 and GR-7-CB-16129.  And it's my

7    understanding from Mr. Fraser that he has all of Mr. Viar's

8    other statements that Mr. Viar has provided to the Board.

9        JUDGE BUXBAUM:  All right.  Well, first of all,

10   Mr. Carlson, I want to thank you for not standing on ceremony

11   and being efficient about it.  I appreciate it.

12       MR. CARLSON:  Yes, sir.

13       JUDGE BUXBAUM:  Secondly, Mr. Fraser, then, you're good

14   as far as Jencks?

15       MR. FRASER:  I understand I have all the affidavits that

16   Mr. McKnight has, so, yes.

17       JUDGE BUXBAUM:  Excellent.  And, Mr. McKnight, are you

18   ready to proceed?

19       MR. McKNIGHT:  Yes, I am, Your Honor.

20       JUDGE BUXBAUM:  And you've received the Jencks, of

21   course.

22       MR. McKNIGHT:  I have.

23       JUDGE BUXBAUM:  Excellent.  You may proceed.

24       MR. McKNIGHT:  May I approach, Your Honor?

25       JUDGE BUXBAUM:  Very well.

1    MR. FRASER:  Your Honor, again -- and I hate to start

2  this over again, but if there's a way, based on the last

3  testimony, where Mr. Viar asked that Mr. McKnight stay a

4  healthy, respectful distance away from him during testimony,

5  we'd ask that that continue in this proceeding.

6    JUDGE BUXBAUM:  Well, let me say a couple of things

7  about that.  I do recall it.  I know Mr. McKnight -- well,

8  I'm assuming because he's got papers in his hands, wishes to

9  show the witness something.  Am I right, Mr. McKnight?

10    MR. McKNIGHT:  That's correct.

11    JUDGE BUXBAUM:  Yes.  You won't linger once you have --

12  you are free to approach the witness as needed to show the

13  witness something.  I also do want to let the record reflect,

14  because I don't want there to be any implication here, that

15  Mr. McKnight has been nothing but gentlemanly in all his

16  interactions, even though he sometimes speaks in a loud

17  voice.  So I don't want there to be any implication to the

18  contrary.  But let us use the procedures we used the last

19  time.

20    MR. McKNIGHT:  Okay.  Your Honor, if I might, just in

21  terms of the logistics is that, okay, instead of returning

22  all the way across the room to my desk, I just step back.

23    JUDGE BUXBAUM:  Yes, absolutely, absolutely.

24                   **DIRECT EXAMINATION**

25  Q.   BY MR. McKNIGHT:  Good afternoon, Mr. Viar.

1    A.    Good afternoon.

2    Q.    I'm going to hand you this document, which appears to be

3    an affidavit in NLRB case number 7-CB-16067.  Would you look

4    at that and tell me if you signed that document?

5    A.    Okay.

6    Q.    Did you sign that document?

7    A.    Yes.

8    Q.    And did you swear that that document was the truth when

9    you signed that document?

10    A.    Yes, I swore an oath on the -- it's the first line of

11    the affidavit.

12    Q.    What date did you sign that document?

13    A.    June 12th, 2008.

14    Q.    Now, I'd like to just direct your attention -- well, let

15    me ask you.  Do you recall what job description you gave

16    yourself when you signed that document?

17    A.    Yes.

18    Q.    What was your job description?

19    A.    I identified myself as HR Manager and Director of

20    Administration for Douglas Autotech.

21    Q.    Could you tell us whether or not, anywhere in that

22    affidavit, dated June -- I think you said June 8th, 2008 --

23    you stated that you were also counsel or provided legal

24    counsel to management at Douglas Autotech?

25    A.    I don't think I included that language.

1    Q.    Thank you.  I'm going to hand you another document which

2    purports to be an affidavit in NLRB case number 7-CA-51235

3    and 7-CB-16049.  Would you please look that over and tell me

4    if you signed that document?  I think your signature would

5    appear on page three, Mr. Viar.  Did you sign this document?

6    A.    Yes.

7    Q.    Oh, excuse me.  It's page four.  And on what date did

8    you sign that document?

9    A.    May 23rd, 2008.

10   Q.    And what job description did you provide for yourself on

11   that document?

12   A.    On the front, it says HR Manager and Director of

13   Administration.

14   Q.    In this sworn affidavit, did you, at any point, say that

15   you also performed legal services from time to time for

16   management at Douglas Autotech?

17   A.    No, because that had no -- I wasn't asked about that,

18   so, no.  Truth be told, counsel, I don't even remember what

19   this -- I remember the affidavit.  I don't remember what case

20   it -- whether it was picket line misconduct -- I don't even

21   remember what case this referenced.

22   Q.    What's the date you gave the sworn statement?

23   A.    May 23rd, 2008.

24   Q.    Thank you.

25        **JUDGE BUXBAUM:  Let's go off the record a moment.**

1    **(Off the record.)**

2    Q.    BY MR. McKNIGHT:  Okay.  Mr. Viar, I'm going to hand you

3    another document which purports to be an affidavit in NLRB

4    case number 7-CB-16128 and ask you if you could look at page

5    three and tell me if you signed that document?

6    A.    Yes.

7    Q.    And, again, was that a sworn statement?

8    A.    Yes.

9    Q.    And what date did you swear to the contents of that

10   document?  It would be on page three, I think.

11   A.    September 4th, 2008.

12   Q.    And what job description did you provide when you signed

13   this sworn affidavit?

14        MR. FRASER:  Objection, Your Honor.  I don't think

15   there's a job description attached to this affidavit.

16        JUDGE BUXBAUM:  Well, I don't think he's using it with a

17   capital D, but what you're asking, in other words, counsel,

18   is how did he characterize his job?

19        MR. McKNIGHT:  That's correct.

20        JUDGE BUXBAUM:  You may answer.

21        THE WITNESS:  Same way in which counsel -- HR Manager

22   and Director of Administration.

23   Q.    BY MR. McKNIGHT:  At any place in that sworn statement,

24   did you state that you also performed or provided legal

25   advice to Douglas Autotech management from time to time?

1  A.   No.

2  Q.   Now, this particular affidavit has another document

3  attached to it.  Can you tell us what that is?

4  A.   You know, I don't remember what this is.  It looks like

5  an appendix or an appendage to the other affidavit.  I don't

6  know why we did this.

7  Q.   What's the title of this document?

8  A.   Oh, Robert Paul Viar, Jr. affidavit.

9  Q.   And is that document subscribed and sworn before a Kathy

10 -- I can't read that last name -- Hewsts (ph.)?

11 A.   Yes.

12 Q.   Okay.  And what's the date of that document?

13 A.   September 3rd, 2008.

14 Q.   Do you agree that that's your signature on that

15 document?

16 A.   Yes.

17 Q.   And do you know where Kathy Hewsts is employed?

18 A.   She works at Douglas, in the Accounting Department.

19 Q.   And in that particular attachment to the affidavit in 7-

20 CB-16128, how do you describe your job?

21 A.   HR Manager and Director of Administration.

22 Q.   And what's the date -- excuse me if I forgot -- of that

23 affidavit that's attached to the NLRB affidavit?

24 A.   September 3rd, 2008.

25 Q.   Is there anyplace in that affidavit, the one notarized

1  by Ms. Hewsts, in which you state words to the effect that

2  you also provide legal counsel to Douglas management from

3  time to time?

4  A.   No, counsel.  I was simply trying to convey to the Board

5  that I was being threatened with an ass-kicking by members of

6  the local union, so I did not contain that -- I didn't write

7  that language in there.

8  Q.   Well, isn't that an affidavit that was typed in your

9  office, sir?

10  A.   I'm sorry?

11  Q.   Isn't that affidavit, the one you're directing your

12  attention to right now that was notarized by Ms. Hewsts --

13  wasn't that prepared in your office?

14  A.   Yeah, yes.  As I said, I just didn't think it was

15  relevant.  I was being threatened, and I outlined that here

16  in the affidavit.

17  Q.   You did think it was relevant to advise the reader of

18  this affidavit as to what your position was at Douglas, did

19  you not?

20  A.   You know, counsel, the affidavits were, most of them,

21  prepared by counsel, and that was the language that was in

22  there.  It was truthful, it was identifying what I did, so I

23  didn't pay too much attention to it.

24  Q.   Thank you.  I'm going to hand you another document which

25  purports to be an affidavit in NLRB case number 7-CB-16129.

1  Could you just look at the first two pages of that and tell

2  me if you signed that affidavit?

3  A.   Okay.

4  Q.   Did you sign that affidavit?

5  A.   I did.

6  Q.   Did you swear to the truth of that affidavit?

7  A.   Yes.

8  Q.   What date did you sign and swear to the truth of that

9  affidavit?

10  A.   It says 2007, but I don't think that's accurate.   I

11  think it's 2008.

12  Q.   And what date in 2008?

13  A.   September 4th.

14  Q.   September 4th, 2008?

15  A.   Yes.

16  Q.   Okay.

17  A.   No way it was 2007.   I can say that without fail, but

18  that's what it says.

19  Q.   I thought that was in error.

20  A.   Yeah, I think so.

21  Q.   As of May 9, 2009, Mr. Viar, did you and other company

22  officials surmise that the Union had failed to give notice

23  for going on strike on May 1?

24  A.   Did we surmise that they failed to give notice?

25  Q.   That the Union had failed to give notice for going on

1   strike on May 1, 2008?

2       MR. FRASER:  Your Honor, I'm going to object on the

3   basis of -- and this may sound unique, but this -- I believe

4   that Mr. McKnight has the right -- and our objection would be

5   outside the scope of direct or redirect or whatever it was as

6   of the third day of the hearing.  He had his opportunity in

7   June to ask those questions.  That's outside the scope of

8   what we've talked about today.

9       JUDGE BUXBAUM:  Well, I assume you're entering this line

10  of inquiry rather than call him as your own witness, which

11  you had indicated you were intending to do.

12      MR. McKNIGHT:  That's correct, Your Honor.

13      JUDGE BUXBAUM:  I'm going to permit it.

14      MR. FRASER:  Then, Your Honor, might we clarify that

15  Mr. McKnight asked as of 5/9/09.  I'm just trying to clarify

16  whether that's really the date he's asking for.

17      JUDGE BUXBAUM:  Thank you, counsel.  That is a very

18  valuable point.

19  Q.  BY MR. McKNIGHT:  Yes.  Mr. Viar, as of May 9, 2008, did

20  company representatives, including yourself, surmise that the

21  Union had struck on May 1, 2008, without giving proper

22  notice?

23      MR. FRASER:  Objection.  Calls for speculation.  Company

24  representatives other than yourself?

25      JUDGE BUXBAUM:  You're going to need to narrow it a bit,

1  in terms of what the witness knew about other

2  representatives' views.

3  Q.   BY MR. McKNIGHT:  Mr. Viar, did you surmise, by May 9,

4  2008, that the Union had failed to give 30-day notice when

5  the strike began?

6  A.   Counsel, I guess I don't know how to answer the question

7  because I don't know what "surmise" means.  I apologize.  I'm

8  not playing games.  I'm a smart guy, but I don't know what

9  you mean.

10  Q.   Okay.  Well, let me just direct your attention to

11  paragraph two here and ask if you could read this sentence in

12  your sworn statement.  Could you read that sentence --

13  A.   "We first surmised on May 9th that there was a 30-day

14  notice when the strike began."

15  Q.   That there was no 30 --

16  A.   Oh, "there was no 30-day notice when the strike began."

17  Q.   Okay.  That's in your sworn affidavit; is that correct?

18  A.   Yes.

19  Q.   Okay.  What did you think you were saying when you swore

20  to that?

21  A.   As I read that and I go back now a year or so, we

22  speculated, we thought, we surmised that the notice had not

23  been filed.

24  Q.   And who is "we"?  In addition, is there any -- who is

25  "we"?

1  A.   I can speak for myself and Mr. Kirk.

2  Q.   Okay.  Now, in this affidavit, which should correctly be

3  dated September 4, 2008, as you point out, how did you

4  describe your job position at Douglas?

5  A.   Human Resources Manager and Director of Administration.

6  Q.   Is there anyplace in that affidavit where you state

7  words to the effect that you performed or provided legal

8  counsel to Douglas management from time to time?

9  A.   No.

10  Q.   Now, directing your attention to what is labeled Exhibit

11  2 to this affidavit, would you take a look at that document?

12  And this affidavit, again, refers to the affidavit in NLRB

13  case number 7-CB-16129.  Could you tell us what Exhibit 2 to

14  that affidavit is?

15  A.   This is some supplementary material to a charge that was

16  pending before the Board, I believe our charge, and it's my

17  affidavit.

18  Q.   It's a supplementary affidavit; is that correct?

19  A.   Yes.

20       JUDGE BUXBAUM:  And when you say it was the company's

21  charge, in other words, the company was the charging party?

22       THE WITNESS:  Yes.

23       JUDGE BUXBAUM:  Thank you.

24  Q.   BY MR. McKNIGHT:  And what's the date of that Exhibit 2,

25  which is a supplementary affidavit?  What's the date on which

501

1  you signed that?

2  A.   September 3rd, 2008.

3  Q.   And who notarized your sworn statement that that

4  affidavit was true?

5  A.   Kathy Hewsts.

6  Q.   Again, and her title is --

7       JUDGE BUXBAUM:  Well, was she doing this as a notary

8  public?

9       THE WITNESS:  Yes.  She works in accounting.  She's an

10  accounts payable clerk in the Douglas facility in Bronson.

11       JUDGE BUXBAUM:  But her authority to administer an oath

12  was from her status as a notary?

13       THE WITNESS:  Yes.

14       JUDGE BUXBAUM:  Okay.

15  Q.   BY MR. McKNIGHT:  And in that supplementary affidavit,

16  which is Exhibit 2 to your NLRB affidavit in case number 7-

17  CB-16129, how did you describe your job position at Douglas

18  Autotech?

19  A.   Human Resources Manager and Director of Administration.

20  Q.   Would you examine that supplementary affidavit, which is

21  several pages, and tell us if there is any point in that

22  affidavit where you say words to the effect that you provided

23  legal counsel to Douglas management from time to time?

24  A.   It's not there, counsel.  I think the purpose of this

25  affidavit was to provide some chronological context for what

1   was going on between the parties, so it's not there.

2   Q.    Thank you, sir.  Mr. Viar, you're, as I recollect, the

3   administrator of the 401(k) plan at Douglas Autotech for the

4   hourly employees; is that correct?

5   A.    Am I the administrator of a plan?

6   Q.    Yes.

7   A.    Yes.

8   Q.    And is that also sometimes called the Defined

9   Contribution Plan and Trust?

10  A.    Yes.

11        MR. McKNIGHT:  I would just like to show counsel

12  something, if I might, Your Honor.

13        JUDGE BUXBAUM:  Very well.  You are distributing

14  Charging Party's Exhibit 2 for identification?

15        MR. McKNIGHT:  That's correct.  And, once again, I'm one

16  copy short.

17  **(Charging Party's Exhibit 2 marked for identification.)**

18  Q.    BY MR. McKNIGHT:  Mr. Viar, I've handed you a document

19  with a little notation in the bottom right-hand corner called

20  Charging Party Exhibit 2.  Just looking at the first page, do

21  you recognize that as the cover sheet of the Defined

22  Contribution Plan and Trust plan document?

23  A.    Yes.

24  Q.    Okay.  And directing your attention to the second page,

25  Article 14, which is actually page -- well, first of all, do

1  you recognize that as what appears to be page 46 of that plan

2  document?

3  A.   Yes.

4  Q.   What's the difference between the plan document and the

5  summary plan description for the 401(k) plan?

6  A.   Well, just that, counsel, the summary plan description

7  is a summary, and then there's a basic plan document or plan

8  document, which is what we have an excerpt of that in front

9  of us.

10  Q.   Okay.  And do you recognize Article 14 of the plan

11  document, beginning on page two?

12  A.   I recognize the -- yes, in what you've provided to me,

13  yes.

14  Q.   Okay.  And what does Article 14 deal with?

15  A.   Participant loans.

16  Q.   Now, the individuals who went on strike on May 1, 2008

17  were covered by this plan document, including provisions

18  dealing with participant loans; were they not?

19  A.   Yes.

20  Q.   And they continued to be covered by this plan document

21  after you wrote them or wrote the Union on May 5, regarding

22  their status; is that correct?

23  A.   As far as I know, they're still covered by this

24  document.

25  Q.   Under the 401(k) plan, if an employee is terminated and

1  has an outstanding loan from the plan, what happens?

2  A.   You know, counsel, I would have to review the language

3  here.  I'd speculate and say they'd have to pay it back.

4  Q.   Under the plan and the loan program, is it not true

5  that, if you are severed or terminated when you have an

6  outstanding loan, the plan customarily applies the balance on

7  your outstanding loan against the balance in your account?

8  A.   You know, that sounds better, yes.

9  Q.   Okay.  Do you know whether or not any of the employees

10 who were the subject of the Employer's May 5, 2008 letter,

11 using the words "lockout," became delinquent in their loans

12 between May 5, 2008 and August 4, 2008?

13 A.   Well, I -- can you rephrase the question?  I don't

14 understand the question.

15 Q.   Do you know whether or not any employees represented by

16 the UAW at Douglas Autotech, who were the subject matter of

17 the May 5, 2008 -- I'll call it lockout letter for the sake

18 of this question -- had outstanding loans at that time?

19 A.   With the exception of the characterizing them as

20 employees, I would say I'm sure that there were people who

21 had outstanding loans on May 5th, 2008, yes.

22 Q.   And do you know whether or not Douglas, between May 5,

23 2008 and before August 4, 2008, declared those employees

24 terminated or severed and applied the outstanding loans

25 against the balance of their 401(k) account?

1  A.   We made no such designation.

2       MR. McKNIGHT:  I would offer CP Exhibit 2.

3       JUDGE BUXBAUM:  Mr. Carlson?

4       MR. CARLSON:  No objection.

5       JUDGE BUXBAUM:  Mr. Fraser?

6       MR. FRASER:  Relevance, Your Honor.  It's trying to use

7  one statute to determine the definition under NLRA --

8       JUDGE BUXBAUM:  Well, it seems like that is what you're

9  offering it for, Mr. McKnight, isn't it?  In other words, I

10 very much understand your point that it is potentially

11 relevant what Douglas concluded regarding the requirements of

12 its 401(k).  Whether they were right in so concluding isn't

13 material, is it?  In other words, you're introducing this to

14 show here's why Douglas took the position it did,

15 subjectively?

16      MR. McKNIGHT:  I'm just introducing it to show how

17 Douglas treated the former strikers during the period of the

18 lockout.

19      JUDGE BUXBAUM:  In other words, that it was consistent

20 with the plan?

21      MR. McKNIGHT:  Consistent with the plan and the fact

22 that they continued to be employees and not ex-employees who

23 had been terminated.

24      JUDGE BUXBAUM:  Why don't you ask the witness that, in

25 terms of -- and I'll do it.

1      Mr. Viar, regarding this question of outstanding loans

2  and the fact that the company did not then subtract the loan

3  amounts from those persons' balances, was the reason that the

4  company didn't engage in that subtraction because it was of

5  the view at that point that that subtraction would not have

6  been permitted by the summary -- or by the plan itself?  I

7  guess it's called what, basic plan document?

8      THE WITNESS:  Your Honor, I didn't know what their

9  status was on May 5th.  I had no idea.  I tried my best to

10  follow what the plan document did, and I did that because

11  that's what I thought I was obligated to do.  I talked to the

12  people at the American Funds, and we had not confirmed their

13  status under the Act at that point, so that guided the

14  decisions that we made.  The loans, I don't know.  I don't

15  know what we did.  I don't -- as I sit here today, I don't

16  know what we did with the loans.

17      MR. McKNIGHT:  I have some documents that will help him

18  remember what they did with the loans.

19      MR. FRASER:  Your Honor, I don't think that the

20  relevance objection's been ruled on at this point.  We would

21  renew that objection.

22      JUDGE BUXBAUM:  I'm going to sustain it without

23  prejudice, Mr. McKnight.  Let's see if, as you -- since

24  you're still on this topic, I'll revisit it if there's some

25  reason to; but right now, I do think this is an example of

1  where counsel for the company's argument about different

2  statutes and so forth makes some sense.

3      MR. McKNIGHT:  This has nothing to do with the statute,

4  Your Honor.  This has to do with the administration of a

5  plan, and Mr. Viar is the administrator of that plan.  I have

6  not raised any issue with respect to ERISA or any other

7  statute.  This conduct is covered within the four corners of

8  that document.

9      MR. FRASER:  As prescribed, Your Honor, by ERISA, by a

10  federal law which mandates the Employer's obligations,

11  whether the employees engaged in an legal strike or illegal

12  strike, whether they were terminated and lost their status,

13  the Employer, DAC, had an obligation to abide by the statute

14  and by this plan.

15      MR. McKNIGHT:  Strike me down if I have used the word

16  "ERISA" in examining Mr. Viar or anyone else.

17      JUDGE BUXBAUM:  You have not, counsel, you have not.

18      MR. McKNIGHT:  This has to do with how the parties

19  acted, Your Honor, and how the parties acted has everything

20  to do with this case.

21      JUDGE BUXBAUM:  Mr. Fraser, I'm going to exercise my

22  prerogative to change my mind.  He's right that this isn't

23  the statute.  This is the company's plan.  It doesn't -- I

24  mean, its probative value is small, but it's sufficient, I

25  think, to pass the test.  In other words, what he's going to

508

1  argue, I presume in his brief, is that the company's actions

2  regarding these loans would have been consistent with a

3  subjective conclusion on the company's part that these were

4  employees.

5      Am I right, Mr. McKnight?

6      MR. McKNIGHT:  I'm not sure if I entirely agree with

7  your characterization, but I would say that if the

8  individuals walk like, talk like, look like and quack like

9  employees in the company's mind, they were employees.  That's

10  correct.  They were treated as employees in every respect, I

11  believe, Your Honor.

12      MR. FRASER:  Your Honor, again, we --

13      MR. McKNIGHT:  And so that's the purpose for which I

14  offer it.

15      JUDGE BUXBAUM:  Well, without endorsing Mr. McKnight's

16  avian analogy, which I have some concerns about --

17      MR. FRASER:  But my response is --

18      JUDGE BUXBAUM:  Well, no, I mean real serious concerns

19  because I'm not sure I agree or understand with the point

20  you've made just then, but I do think this passes,

21  marginally, the test for relevance.

22      MR. FRASER:  Again, Your Honor, the only objection that

23  we have is relevance, and it's irrelevant because, again, DAC

24  has an obligation to follow a separate statute apart from the

25  NLRA.  There's no exemption in that statute which says, "Hey,

1   boys, if it's an illegal strike, you don't have to comply

2   with ERISA or your plan which is governed by ERISA."  So,

3   again, I understand your ruling --

4       JUDGE BUXBAUM:  And I guess I'm back to where we often

5   find ourselves in this debate, which is that that goes to the

6   weight, and it is weighty, but I think this meets the test

7   for admissibility because it's probative in that it permits

8   the drawing of certain inferences which would arguably be

9   favorable to Mr. McKnight's position in this trial.

10      So I will receive Charging Party's Number 2.

11   **(Charging Party's Exhibit 2 received into evidence.)**

12   Q.   BY MR. McKNIGHT:  Did you previously state that Diane

13   Hedgcock was your administrative assistant?

14   A.   Yes.

15   Q.   And do you know who Beth Tibbetts is?

16   A.   Beth Tibbetts is the representative of American Funds

17   who I could not remember her name during the June testimony.

18   Q.   Okay.  And did Diane Hedgcock assist you with respect to

19   matters of unemployment?

20   A.   Yes.

21   Q.   Did she assist you with respect to the preparation of

22   seniority lists?

23   A.   Yes.

24   Q.   Did she assist you with respect to carrying out your

25   administration of the 401(k) plan?

1  A.   She did, yes.

2  Q.   Did she perform that particular function for you during

3  the period from May 5, 2008 until August 4, 2008?

4  A.   Yes.

5  Q.   In fact, did she perform that particular function for

6  you during the period beginning May 1, 2008, forward?

7       MR. FRASER:  Objection, Your Honor.  I'm not sure which

8  function we're talking about.  As it goes to the 401(k) or

9  seniority list or unemployment?

10 Q.   BY MR. McKNIGHT:  Well, it was assisting in the 401(k).

11 I'm sorry if I was unclear about that.

12 A.   Everyone in that office assisted me with the

13 administration of the 401(k) plan.

14 Q.   Was Diane Hedgcock one of the people who assisted you

15 during May 1, 2008, forward, in the administration of the

16 401(k) plan?

17 A.   Yes.

18 Q.   Who is William Hill?

19 A.   I have no idea.  Maybe a guy from the bargaining unit.

20 I don't recognize the name.

21 Q.   You recognize him as a person who was in the bargaining

22 unit represented by the UAW, Local 822, as of May 1, 2008,

23 correct?

24 A.   I -- no, I don't recognize the name.

25 Q.   Okay.

1   A.   It's entirely possible.

2   Q.   I thought you said he might be captain of what?  Maybe I

3   misunderstood you.

4        JUDGE BUXBAUM:  I didn't hear that.

5        MR. CARLSON:  I don't think he said anything --

6        MR. McKNIGHT:  Oh.  Maybe I misunderstood.

7   Q.   BY MR. McKNIGHT:  I'm going to just show you GC Exhibit

8   48, which has already been introduced.  And I'll point to the

9   second page.  Might help.

10  A.   Okay.

11  Q.   Looking at that exhibit, does that refresh your

12  recollection or inform you that Mr. William Hill --

13  A.   I don't know who -- I'm sorry.

14  Q.   If that's correct -- and it was produced by the company

15  in response to somebody's subpoena duces tecum and introduced

16  as a seniority list.  Does that include the name of William

17  Hill?

18  A.   Yeah, he's on the list.  I'm just telling you I don't

19  know who that guy is.

20  Q.   Okay.

21  A.   He's on the list.

22  Q.   Then he's a member of the bargaining unit, correct?

23  A.   Yes.

24  Q.   And does that list indicate what Mr. Hill did on May 1,

25  2008?

1  A.    It's got his department designation.

2        MR. McKNIGHT:  Oh, it's a different list.  I'm sorry.

3  Wrong list.  I'm sorry.  I don't mean to confuse you.  This

4  is the one I thought I was referring to.

5        And it needs to be redacted, Your Honor.

6        JUDGE BUXBAUM:  Oh, oh, oh, you haven't done that yet,

7  counsel.  There's no hint of reproach in that, but, okay,

8  that's a problem, isn't it?  Because it's been admitted into

9  evidence, but -- do you have -- I guess we can use an

10 unredacted copy for purposes of Mr. McKnight's examination,

11 can't we?

12       MR. CARLSON:  Yeah.

13       MR. McKNIGHT:  I'm sorry for the confusion.

14       THE WITNESS:  Your Honor, can we take a quick break?  Is

15 that okay?

16       **JUDGE BUXBAUM:  Very well.  Five-minute recess.**

17 **(Off the record.)**

18 Q.    BY MR. McKNIGHT:  I now have a redacted -- and the only

19 redacted copy of GC-49.  I think you still have one -- the

20 unredacted version.  And this was produced and it purports to

21 be an October 13, 2008 employee list, prepared by, I think,

22 Diane Hedgcock, and I thought somewhere on this document --

23 oh, yes, there it is, on page one, two -- second page of the

24 document but third page including the cover sheet -- I

25 located the name of William A. Hill.  Could you tell us what,

1  according to that document prepared by Ms. Hedgcock, Mr. Hill

2  did on about May 1, 2008?

3  A.   Indirect.  That's all it says.

4  Q.   Well, what did he do on about -- oops, excuse me -- May

5  1, 2008?  Oh.  He was indirect labor, though, right?

6  A.   Yes.

7  Q.   Thank you.  I'll come back to that.

8      JUDGE BUXBAUM:  Yeah, I hope you're going to explain

9  that, yes.

10     THE WITNESS:  What did he do?  I didn't understand --

11     MR. McKNIGHT:  Okay.  I'll come back to that.

12     JUDGE BUXBAUM:  Yeah, I -- this is --

13     THE WITNESS:  What did he do?

14     MR. McKNIGHT:  No, you raise a very good point.

15     THE WITNESS:  I didn't know what he was asking.  What'd

16  he do?  Yeah, I don't know what he did.

17     JUDGE BUXBAUM:  Yeah, it's -- the English language is a

18  wonderful thing, isn't it?

19     MR. McKNIGHT:  Okay.  First of all, let's start off --

20     JUDGE BUXBAUM:  So why don't you start over, yeah.

21  Q.   BY MR. McKNIGHT:  What does the "I" next to Mr. Hill's

22  name indicate?

23  A.   Indirect.

24  Q.   Indirect labor, correct?

25  A.   Yes.

514

1          JUDGE BUXBAUM:  Now, what is that, so I understand?

2          THE WITNESS:  This guy is probably a tradesman, like a

3    machine repair or worked on the --

4          JUDGE BUXBAUM:  So, in other words, direct means

5    actually on the production line, and indirect would be

6    something like maintenance or --

7          THE WITNESS:  Like a support group.

8          JUDGE BUXBAUM:  A support, okay.  Got it.  Got it.

9          THE WITNESS:  Freight guy might be indirect.

10         JUDGE BUXBAUM:  Okay.

11   Q.    BY MR. McKNIGHT:  So on this document there's sometimes

12   the initial "D" and sometimes the initial or the letter "I"

13   after a person's -- or next to a person's name.  And what

14   would the "D" indicate?

15   A.    Direct.

16   Q.    So one would be a category of bargaining unit employees

17   involved in direct labor, as you've described it, and the

18   other would be employees involved in indirect labor, as

19   you've described it?

20   A.    Yes.

21   Q.    Okay.  Now, a number of these employees have this

22   particular "X" under a particular column, and that's because

23   they did what on about May 1, 2008?

24   A.    Walked off the job.

25   Q.    Okay.  That would include Mr. Hill, right?

1  A.   Yes.

2  Q.   Thank you.  Do you know or have you heard of an employee

3  named Rex Bercaw?

4  A.   Yes.

5  Q.   Who also -- and Mr. Bercaw -- did he also walk off the

6  job on about May 1, 2008?

7  A.   Yes.

8  Q.   And was Mr. Bercaw one of the employees or individuals

9  who was covered by the company's letter of May 5, 2008, using

10  the word "lockout"?

11  A.   Yes.

12  Q.   And was Mr. Hill one of the employees or individuals

13  covered by the company's letter of May 5, 2008, using the

14  word "lockout"?

15  A.   Individuals, yes.

16  **(Charging Party's Exhibit 3 marked for identification.)**

17  Q.   BY MR. McKNIGHT:  I'm now going to hand you a document

18  marked Charging Party Exhibit 3, which was produced in

19  response to the subpoena duces tecum, either by the Union or

20  by the General Counsel or perhaps both.  Just looking at the

21  first page, do you recognize that as the letterhead of

22  Douglas Autotech?

23  A.   Yes.

24  Q.   And you recognize that as a fax from Diane Hedgcock to

25  Beth Tibbetts?

516

1   A.   Yes.

2   Q.   And the date of that fax?

3   A.   July 8th, 2008.

4   Q.   Okay.  Would that be during the period covered by the

5   company's letter using the word "lockout," the May 5, 2008

6   letter?

7   A.   I'm sorry?

8   Q.   I don't think I need to ask that question.  I'm sorry.

9   What's the subject matter of this fax transmission?

10  A.   Default loans.

11  Q.   Directing your attention to page two, what's the date of

12  that -- do you recognize that as -- I guess that's an e-mail

13  transmission, correct?

14  A.   Yes.

15  Q.   And that's from Ms. Tibbetts to Ms. Hedgcock, right?

16  A.   Yes.

17  Q.   And that's responding to apparently an e-mail from

18  Ms. Hedgcock to Ms. Tibbetts about loan defaults for certain

19  individuals, correct?

20  A.   Yes.

21  Q.   And who are the individuals who are the subject of the

22  possible loan defaults?

23  A.   William Hill, Rex Bercaw, and Virginia Cox.

24       MR. McKNIGHT:  For the record, I would like to state

25  that -- and I have the materials of -- Ms. Cox works in the

1  plant in Kentucky, so I didn't think it was pertinent to put

2  it in here --

3      JUDGE BUXBAUM:  Well, yeah, that's important to note,

4  okay.

5      MR. McKNIGHT:  -- but if counsel would like that, I

6  would certainly be willing to provide that.

7      JUDGE BUXBAUM:  Well, you're not seeking to make any

8  point regarding Ms. Cox, I take it?

9      MR. McKNIGHT:  No.

10      JUDGE BUXBAUM:  Okay.  Sure.

11      THE WITNESS:  She works in Hopkinsville.  It's not in

12  dispute.

13  Q.  BY MR. McKNIGHT:  And directing your attention to the

14  next page, is that a communication from American Funds to

15  Douglas Autotech, regarding Mr. Bercaw's loan?

16  A.  Yes.

17  Q.  And on what date was Mr. Bercaw found to be in default?

18  A.  July 2nd, 2008.

19  Q.  That's the date of the communication.  What's the date

20  of the default, if you can help us?

21  A.  June 30th, 2008.

22  Q.  Okay.

23      JUDGE BUXBAUM:  This document is somewhat mysterious to

24  me in the sense that it's addressed to Douglas; am I right?

25      THE WITNESS:  Yes.

1    JUDGE BUXBAUM:  And it's from American Funds?

2    THE WITNESS:  Yes.

3    JUDGE BUXBAUM:  But the body of the letter is actually

4    talking to Mr. Bercaw, isn't it?  It's saying, "Please notify

5    us if you've had a distributable event," and, "You should

6    check with your plan administrator regarding the rules

7    applied."

8    THE WITNESS:  I think, sir, it's simply a copy of the

9    letter that they sent to Mr. Bercaw.

10    JUDGE BUXBAUM:  Okay.  Now, that makes sense, yeah,

11    because it says, "For Rex A. Bercaw," as well.  So this is --

12    in other words, American is sending you a copy of what they

13    sent Mr. Bercaw so that you were in the loop?

14    THE WITNESS:  Yes.

15    JUDGE BUXBAUM:  Okay.

16    Q.   BY MR. McKNIGHT:  Now, directing your attention to the

17    next page, is that a loan payment change request, with

18    respect to Mr. Bercaw?

19    A.   Yes.

20    Q.   And is that a request that the loan be re-amortized?

21    A.   Yes.

22    Q.   Did you authorize the re-amortization of the loan for

23    Mr. Bercaw?

24    A.   I did.

25    Q.   And does that appear to be your signature on the next

1   page?

2   A.   Yes.

3   Q.   And what date did you authorize the re-amortization of

4   Mr. Bercaw's loan?

5   A.   I'm sorry, what's the question again?

6   Q.   What date did you --

7   A.   Oh, what date?

8   Q.   -- authorize the re-amortization of Mr. Bercaw's loan?

9   A.   July 8th, again, counsel, simply trying to follow what I

10  thought were my obligations under the plan, under ERISA.

11  But, yeah, July 8th.

12  Q.   Is there anything on this piece of paper that mentions

13  the word "ERISA"?

14  A.   No.

15  Q.   But you certainly were trying to administer your

16  obligations under the plan, were you not?

17  A.   Absolutely.

18  Q.   Okay.  Directing your attention to the next page, does

19  that appear to be a default notice, or at least the Douglas

20  Autotech copy of a default notice with respect to Mr. Hill,

21  another employee who walked off the job on May 1, 2008?

22  A.   Yes.

23  Q.   And what was the date of Mr. Hill's default?

24  A.   June 30th, 2008.

25  Q.   And directing your attention to the next page, is that a

1  request to change the loan and re-amortize the loan for

2  Mr. Hill?

3  A.   Yes.  You know, counsel, as I look at this document --

4  to complete my answer, I think Diane Hedgcock must have

5  filled out the change request at the participant's request

6  because the writing's the same.  Just a point of interest, I

7  guess.

8  Q.   And directing your attention to the very last page, did

9  you authorize the re-amortization of Mr. Hill's loan during

10  the period following the May 5, 2008 lockout letter?

11  A.   Yes.

12  Q.   And on what date did you authorize the re-amortization

13  of Mr. Hill's loan?

14  A.   July 8th, 2008.

15      MR. McKNIGHT:  I offer Charging Party Exhibit 3.

16      JUDGE BUXBAUM:  Mr. Carlson?

17      MR. CARLSON:  No objection.

18      JUDGE BUXBAUM:  Mr. Fraser?

19      MR. FRASER:  Two objections, actually.  The first one is

20  related to the statement at page two of this document.

21  Creates an interesting question where there's an e-mail

22  exchange -- it's a hearsay problem for Ms. Tibbetts.  She's

23  not our employee.  She's not a representative of the company.

24  At least the first half of that document, second page, should

25  be stricken.  And then our usual objection to it's a document

1    related to a 401(k).  It's not relevant to the NLRA, employee

2    definition of re-employed.  So we'd ask that the whole thing

3    not be admitted, but if that's not going to be accepted, we'd

4    argue the hearsay objection for page two, top of the page.

5        JUDGE BUXBAUM:  In other words, up through but not

6    including the word "Beth," about two-thirds down?

7        MR. FRASER:  It would start right underneath Diane

8    Hedgcock's name, and it would be from Beth Tibbetts, all the

9    way through --

10       JUDGE BUXBAUM:  Oh, I see.  Yes, yes, yes, you're right,

11   actually.

12       MR. FRASER:  -- where it says Diane Hedgcock --

13       JUDGE BUXBAUM:  Any objection to redacting that?

14       MR. McKNIGHT:  Well, I would just like to ask Mr. Viar

15   one question about that.

16       JUDGE BUXBAUM:  You may.  You may.

17   Q.   BY MR. McKNIGHT:  Mr. Viar, are these communications

18   between Ms. Hedgcock and Ms. Tibbetts made in the ordinary

19   course of business between Douglas and American Funds?

20   A.   She e-mails -- she did e-mail -- yes.

21       JUDGE BUXBAUM:  Now, Tibbetts, of course, is not an

22   employee, right, of Douglas?

23       THE WITNESS:  No.

24       JUDGE BUXBAUM:  She's an employee of American Funds?

25       THE WITNESS:  She is.

522

1    JUDGE BUXBAUM:  Okay.  All right.

2    Q.    BY MR. McKNIGHT:  And so Ms. Hedgcock and Ms. Tibbetts

3    are ordinarily in communication back and forth regarding the

4    proper administration of the fund, subject, of course, to

5    your oversight; is that correct?

6    A.    This does not strike me as being out of the ordinary.

7    It's an e-mail from Diane to our contact at American Fund.

8    Q.    And an e-mail back from your contact at American Fund to

9    Ms. Hedgcock.

10   A.    Yeah.

11       MR. McKNIGHT:  Okay.  I offer Charging Party Exhibit 3,

12   Your Honor.

13       MR. FRASER:  Again, Your Honor, I don't -- I

14   understand -- that's why I didn't ask for a hearsay objection

15   as to the entire document.  I think those normal course of

16   business provisions are those attached at the last pages, but

17   those are the --

18       JUDGE BUXBAUM:  Your concern is with the part in which

19   Ms. Tibbetts, a nonemployee of Douglas, is the declarant?

20       MR. FRASER:  Exactly.

21       JUDGE BUXBAUM:  Mine, too.  Why would that come in?

22       MR. McKNIGHT:  Because it's a necessary predicate for

23   Mr. Viar's authorization which follows.

24       JUDGE BUXBAUM:  But Ms. Tibbetts' opinion as to what the

25   proper procedure is for these two employees' defaulted loans

1    is not material to anything.  You would agree, would you not?

2    We don't care whether Ms. Tibbetts thinks that these

3    employees -- that these bargaining unit members were on

4    strike, under lockout, terminated former employees, or men in

5    the moon?

6        MR. McKNIGHT:  I agree.

7        JUDGE BUXBAUM:  Okay.  I'm going to admit Charging

8    Party's 3, beginning with, as Mr. Fraser correctly points

9    out, the boldface in quotations statement, "Hedgcock, Diane,"

10    which is roughly halfway down the page.  And it'll be -- I

11    don't think there's a need to redact it formally.  My

12    statement's on the record, so it should be clear.  So that's

13    Charging Party's 3, admitted with that one caveat.

14    **(Charging Party's Exhibit 3 received into evidence.)**

15        MR. McKNIGHT:  I was just getting Maneesh's second

16    opinion about that topic.

17        JUDGE BUXBAUM:  Yes, one thing we have here is a wealth

18    of legal experience represented by every part of this

19    proceeding.  We have no shortage of lawyers.  It's a far cry

20    from my days hearing small claims cases, where, if it was a

21    fender bender, we kept some Tonka trucks in the drawer at the

22    bench and would pull them out and say, "Show me what

23    happened."

24    Q.    BY MR. McKNIGHT:  What was Mr. Kirk's title?

25    A.    Director of Finance and Sales.

524

1    Q.    Okay.  In terms of the company's labor relations, what

2    was his role?

3    A.    Two roles, really.

4    Q.    Okay.

5    A.    He was our chief financial guy, so he helped cost out

6    all of our proposals and helped me analyze everything from a

7    proposal and demand standpoint, from a financial perspective.

8    That was one thing.  But, also, because of his experience

9    with the UAW, I leaned on him a great deal to help me with

10   the strategy, so he helped chart the overall strategy, too.

11   So two roles.

12   Q.    What was his experience with the UAW?

13   A.    Well, I believe he was a member of the UAW when he first

14   started at General Motors, and he worked as a supervisor and

15   through several negotiations while working in Lansing at the

16   assembly plant there.

17   Q.    Okay.  And then he had had some prior -- I want to say

18   labor relations experience on behalf of employers, has he

19   not, before he came to Douglas?

20   A.    Most recently, before coming to Douglas, he worked at

21   the City of Lansing and helped with their negotiations.

22   Q.    He represented the City in negotiations with City

23   employees?

24   A.    He did, yes.

25   Q.    Okay.  Who's Matt Hauret, H-a-u-r-e-t?  Does that name

1  ring a bell?

2  A.   Hauret.

3  Q.   Hauret?  Okay.

4  A.   H-a-u-r-e-t.  He is the Director of Manufacturing today.

5  You've got to give me a time frame of what --

6  Q.   Okay.  When did he become Director of Manufacturing?

7  A.   Oh, two or three months ago.

8  Q.   Okay.  And before that, what was his position?

9  A.   He was on the staff, on the corporate staff, plant

10  manager at Hopkinsville.

11  Q.   Plant manager at Hopkinsville, and then when did he come

12  to -- or has he ever come to Bronson?

13  A.   It's consistent with his promotion into the -- what we

14  call Director of Manufacturing.  He now has both plants.

15  He's plant manager at both facilities.

16  Q.   Okay.

17  A.   April 2009.

18  **(Charging Party's Exhibit 4 marked for identification.)**

19  Q.   BY MR. McKNIGHT:  Okay.  I've handed you something

20  marked Charging Party Exhibit 4.  And this, again, was

21  something produced in response to one of the subpoenas duces

22  tecum, probably mine, that was directed to you.  This appears

23  to be authored by whom?

24  A.   Authored by who?  That was the question?

25  Q.   Yes, yes.

1  A.    Me.

2  Q.    Okay.  So this is a --

3  A.    Oh, I'm sorry.  Let me look, make sure.  It appears that

4  Glenn Kirk wrote this e-mail.

5  Q.    Okay.  Do you have any explanation as to why your name

6  appears underneath the body of the e-mail?

7  A.    No.

8  Q.    You were sent a copy of this e-mail; is that correct?

9  A.    Yes.

10 Q.    To your knowledge, was this e-mail sent in the ordinary

11 course of business?

12 A.    I think it was extraordinary course of business, so, no.

13 These were completely unique circumstances, unprecedented.

14 Q.    I believe we previously received an exhibit -- I think

15 it was General Counsel Exhibit 52, where you had authored

16 some talking points for Mr. Q-san and Glenn -- I believe that

17 would have been Glenn Kirk -- with respect to meetings with

18 salaried employees?

19 A.    Yes.

20 Q.    And Mr. Kirk, as you say, participated in, I guess,

21 strategy with you, with respect to the labor dispute that was

22 underway from May 1, 2008, forward; is that correct?

23 A.    No, it was not limited to that, counsel.  He was

24 instrumental in the strategy for the negotiations and the

25 labor dispute.

1        MR. McKNIGHT:  Okay.  Offer it.

2        JUDGE BUXBAUM:  You are seeking the admission of

3    Charging Party Number 4?

4        MR. McKNIGHT:  Yes, Your Honor.

5        JUDGE BUXBAUM:  Mr. Carlson?

6        MR. CARLSON:  Oh, I'm sorry, Your Honor.  No objection.

7        JUDGE BUXBAUM:  Mr. Fraser?

8        MR. FRASER:  If I may have just a moment, Your Honor?

9        JUDGE BUXBAUM:  You may.

10        MR. FRASER:  No objection.

11        JUDGE BUXBAUM:  Charging Party Number 4 will be

12    received.

13        THE WITNESS:  Well, I don't have Charging Party Number

14    4.

15        MR. McKNIGHT:  I think that's in front of you, isn't it?

16    This one right here.

17        THE WITNESS:  Oh, I'm sorry, I do.

18        JUDGE BUXBAUM:  Good.  Okay.

19    **(Charging Party's Exhibit 4 received into evidence.)**

20    Q.   BY MR. McKNIGHT:  Mr. Viar, do you recall your testimony

21    on June 25 in which you stated that the August 4, 2008 letter

22    sent to every one of the former strikers confirmed their

23    status under the Act?

24    A.   Yes.

25    Q.   Did you develop that phrase for the purpose of this

1  legal proceeding, Mr. Viar?

2  A.    No.

3  Q.    Did you discuss your testimony with anybody, Mr. Viar?

4  A.    No.

5  Q.    Did you review any documents in preparation for

6  testifying?

7       JUDGE BUXBAUM:  Now, on which occasion?

8       MR. McKNIGHT:  Today.

9       JUDGE BUXBAUM:  Today.

10      THE WITNESS:  Yes.

11  Q.    BY MR. McKNIGHT:  Did those documents refresh your

12  recollection?

13  A.    I don't understand the question.  To what issue?

14  Q.    To any issue.

15  A.    Yes.

16  Q.    What were the documents you reviewed in preparation for

17  testifying today?

18  A.    I looked at subpoenaed documents.  I looked at some of

19  those, and I looked at -- this morning, I looked at some

20  notes from Diane Hedgcock.

21  Q.    Notes of what, Mr. Viar?

22  A.    Oh, I'm sorry.  Bargaining session notes.

23  Q.    Okay.  And did you review any documents prior to

24  testifying on June 25, 2008?

25  A.    Yes.

1  Q.    And what documents did you review prior to testifying on

2  June 25, 2008?

3  A.    Boy, it would have been a lot more than that.  Reviewed

4  some position statements, I reviewed some e-mails, I reviewed

5  some case law, a lot of that.  I reviewed some unfair labor

6  practice charges.

7  Q.    Can you tell us what --

8  A.    Things of that nature.

9  Q.    Okay.  What position statements did you review?

10  A.    I think the original position statements relating to the

11  picket line misconduct.

12  Q.    Okay.  Any others?

13  A.    Maybe just the first two, I think.

14  Q.    First two position statements?  And did those documents

15  assist you in preparing to testify?

16  A.    Yes.

17  Q.    Okay.  And then, I'm sorry, what other things did you

18  review?

19  A.    Case law.

20       MR. McKNIGHT:  Case law.  Excuse me one second, Your

21  Honor.

22       JUDGE BUXBAUM:  Very well.

23       THE WITNESS:  I have a -- I did one more -- I should --

24  spirit of being complete, I also reviewed this Berbiglia

25  case.  I reviewed that, you know, last night.

1       MR. McKNIGHT:  I'm sorry.

2       THE WITNESS:  I can see why.  Anyone having to review

3   that case -- be sorry.

4       JUDGE BUXBAUM:  I have a feeling anyone reading this

5   transcript will sympathize that there are way too many

6   lawyers in this case, and I'm just talking about the

7   witnesses.

8   Q.  BY MR. McKNIGHT:  Now, but you never did discuss any of

9   your testimony with anybody?

10      MR. FRASER:  Objection, asked and answered.

11      JUDGE BUXBAUM:  Well, it's cross, counsel.  I'll permit

12  it.

13      THE WITNESS:  No.

14      MR. McKNIGHT:  Okay.  This is the home stretch, Your

15  Honor.

16      JUDGE BUXBAUM:  No problem.  This is going to be

17  Charging Party's 5 for identification?

18      MR. McKNIGHT:  That's correct.

19  **(Charging Party's Exhibit 5 marked for identification.)**

20  Q.  BY MR. McKNIGHT:  It's sort of cut off on the side

21  there, but I don't think print was missed, it's just the

22  exhibit sticker.  Mr. Viar, I'm sure you told us before, but

23  who is Mr. Koichi -- or Mr. Kawakyu Koichi?

24  A.  It's confusing, sir.  Koichi is the first name.

25  Q.  Okay.

1  A.    And Kawakyu or Q-san -- Q like Q, Q-san.  That's the

2  former company president.

3      JUDGE BUXBAUM:  So Q-san is a -- would it be fair to say

4  a nickname --

5      THE WITNESS:  Yes.

6      JUDGE BUXBAUM:  -- for Koichi Kawakyu?

7      THE WITNESS:  Yes.

8      JUDGE BUXBAUM:  Thank you.  That cleared something up in

9  my mind.

10  Q.    BY MR. McKNIGHT:  Right.  And you've previously, I

11  think, identified Eddie Ogusu and, of course, Mr. Kirk, as

12  well?

13      JUDGE BUXBAUM:  And I gather Q-san is sort of an

14  honorific, isn't it, in Japanese culture, would it be?  The

15  san?

16      THE WITNESS:  Yes, that's a fair statement.

17  Q.    BY MR. McKNIGHT:  Now, is Charging Party Exhibit 5 an

18  e-mail from you to Mr. Q-san and Mr. Ogusu and Mr. Kirk?

19  A.    I'm forwarding on the letter that counsel had drafted,

20  yes.

21  Q.    And you describe that as what kind of a letter?

22  A.    It says, "Please see attached termination letter."

23  Q.    You've described that as a termination letter?

24  A.    That's what it says.

25  Q.    And the date of this e-mail, sir?

 1   A.    August 4th, 2008.

 2   Q.    Okay.  And you signed each and every one of those

 3   individual termination letters for roughly 145 persons; is

 4   that correct?

 5   A.    Counsel, as I have testified probably half a dozen

 6   times, I signed the letters, confirming the people's status

 7   under the Act.

 8   Q.    And is the letter, as you say, confirming the status the

 9   document that's attached to this e-mail?

10   A.    It doesn't have an addressee --

11   Q.    That's a sample of the letter, though, right?

12   A.    -- but I think it's the same letter, sure.

13   Q.    Now, in your review of the documents that were

14   subpoenaed, in all the materials -- I mean, you've looked at

15   a lot of materials in preparation for testifying, right?

16   A.    I'd say thousands of pages of documents at one time or

17   another, yes.

18   Q.    I've been unable to find, but perhaps you can tell me

19   where I could find it, anything that you produced -- because

20   the subpoenas were directed to you as the custodian of the

21   records, at least mine was -- in which you used the phrase

22   "confirming their status under the Act" to describe what you

23   wrote on August 4, 2008, to 145 persons.

24        MR. FRASER:  Objection, Your Honor.  The letter

25   itself --

1  Q.   BY MR. McKNIGHT:  Did you locate any document like that?

2       MR. FRASER:  Objection, Your Honor.

3       JUDGE BUXBAUM:  Let's hear the objection.

4       MR. FRASER:  The letter itself says, "You have lost any

5  and all protection under the National Labor Relations Act."

6  I think the question is misleading.

7       JUDGE BUXBAUM:  Well, but, Mr. McKnight, it's

8  argumentative.  I think it is, in essence, part of closing

9  argument, and perhaps a good closing argument, but it's

10 argumentative.  In other words, you've made -- and, in fact,

11 it's useful that you've made that point now.  We approach the

12 moment when we'll begin to hear the company's case.

13 Certainly, you've called counsel for the company's attention

14 to the fact that, as of now, there is nothing in the record,

15 I think, other than what counsel just referred to, the

16 termination letter's language itself, that would use anything

17 approaching that phraseology.  So --

18      MR. McKNIGHT:  Oh, did he say so?

19      JUDGE BUXBAUM:  No, I said so.

20      MR. McKNIGHT:  Oh.  Well, I -- don't you -- I mean, it

21 just seems to me it would be helpful, if I've overlooked

22 something, that the witness would identify it for us.  And if

23 I haven't, and if the General Counsel hasn't, then he could

24 say so.

25      MR. FRASER:  Objection, Your Honor, because what it

1    calls for in part -- in large part, actually, is him to -- is

2    the witness to get into attorney-client privilege

3    information.  He's simply not going to do that.

4        JUDGE BUXBAUM:  Why does it call for -- oh, you're

5    say -- all right.  Rephrase it.  If that's the objection, you

6    can rephrase --

7        MR. McKNIGHT:  Well, is there any --

8        MR. FRASER:  Well, there were two, I think.  The first

9    was may -- then you trumped me and said argumentative, so I

10   appreciated that.  Then the next one was that he's asking for

11   my client to get into attorney-client information.

12       JUDGE BUXBAUM:  Well, look, it's designed to make a

13   point, which is why it's argumentative, and the point's been

14   made, and it comes at a perfect moment in the trial because

15   Mr. Fraser was here, he heard you make the point, and we'll

16   see whether the company wishes to present any additional

17   evidence to respond to your philosophic and -- your

18   philosophic point.  Let's leave it at that.

19       MR. McKNIGHT:  Well, have I offered Charging Party

20   Exhibit 5?

21       JUDGE BUXBAUM:  I don't think you have.  Do you wish to?

22       MR. McKNIGHT:  I would like to offer this.

23       JUDGE BUXBAUM:  Any objection from General Counsel?

24       MR. CARLSON:  No, sir.

25       JUDGE BUXBAUM:  And Mr. Fraser?

1    MR. FRASER:  No objection.

2    JUDGE BUXBAUM:  It will be received.

3    **(Charging Party's Exhibit 5 received into evidence.)**

4    MR. McKNIGHT:  Well, I wouldn't want to do anything to

5    diminish the perfection of this moment, so I have no further

6    questions.

7    JUDGE BUXBAUM:  Very well.

8    Mr. Fraser, do you wish to ask questions of Mr. Viar at

9    this point in time?

10    MR. FRASER:  I'm still trying to fathom what that last

11    statement from Mr. McKnight was about, but once I get past

12    that --

13    JUDGE BUXBAUM:  That was also argumentative.

14    MR. FRASER:  It was.  I understand that.  Let me -- if

15    we could take a moment so that I can confer?

16    JUDGE BUXBAUM:  Sure, sure.

17    MR. FRASER:  Thanks.  And I'd like to confer with the

18    witness, not about his testimony but about whether or not

19    we're going to ask any additional questions.

20    JUDGE BUXBAUM:  Okay.  Sure.  As long as it's not about

21    his testimony, that's fine.  I realize he's also your client.

22    COURT REPORTER:  Do you want off?

23    **JUDGE BUXBAUM:  Yes, we'll go off.**

24    **(Off the record.)**

25    JUDGE BUXBAUM:  All right.  Mr. Fraser, do you wish to

1  inquire of the witness at this time?

2      MR. FRASER:  Not at this time, Your Honor.

3      JUDGE BUXBAUM:  Very well.  Then, Mr. Viar, you may step

4  -- well, no.  Is there any -- redirect is really the wrong

5  word here, but I don't know what the right word is.  Do you

6  wish --

7      MR. CARLSON:  I have no further questions, Judge.

8      JUDGE BUXBAUM:  All right.  You may step down, Mr. Viar.

9  Thank you.

10  **(Witness excused.)**

11      JUDGE BUXBAUM:  Mr. Carlson, where do you stand now?

12      MR. CARLSON:  Your Honor, I think that the General

13  Counsel is ready to rest.  I just would ask, given the late

14  hour, just ask for your indulgence that I just make sure that

15  we've dotted all our i's and crossed all our t's, but I am

16  99.9 percent sure that we will rest tomorrow morning without

17  putting on any further evidence.

18      JUDGE BUXBAUM:  Okay.  And I think because I was to be

19  sort of -- I want to give some guidance here to Mr. Fraser.

20  My sense, Mr. McKnight, is that your -- whatever you're going

21  to do tomorrow by way of the Charging Party's case is not

22  going to consume a great deal of time?

23      MR. McKNIGHT:  That's correct.

24      JUDGE BUXBAUM:  So, Mr. Fraser, I assume, then, that you

25  should fairly -- eat your Cheerios fairly early in the

1    morning.  We'll start with your opening statement, if you

2    wish to give one.

3        MR. FRASER:  That's great.

4        JUDGE BUXBAUM:  And then we'll proceed with your

5    witnesses.

6        MR. FRASER:  So we're going to start at nine o'clock; is

7    that the --

8        JUDGE BUXBAUM:  We're going to start at nine o'clock in

9    this location.

10       MR. FRASER:  Okay.  Very good.

11       JUDGE BUXBAUM:  Anything we need to do on the record?

12       MR. McKNIGHT:  I just had one question of you.

13   Mr. Fraser has indicated that there are some individuals he

14   subpoenaed he would like here tomorrow, one of them being

15   Kevin Kolassa.  So if you wish to call him as a witness, I

16   would request that you do that in the morning.  He has to

17   leave here by two o'clock because he has -- I think he's told

18   you he has a class.

19       MR. FRASER:  He may have mentioned that in the past.

20       MR. McKNIGHT:  He's studying to become something besides

21   unemployed.

22       MR. FRASER:  Is there a chance that Mr. Kolassa could be

23   back and available on Wednesday morning?

24       MR. McKNIGHT:  Yes, yeah.

25       MR. FRASER:  Then why don't we just plan on doing that

1  so we don't interfere with his day tomorrow.

2      MR. McKNIGHT:  That's fine.  There's one other --

3  another person I would say that you've said you may need is

4  Mr. Gruza, and he also has -- he has a job, but it also

5  entails a class that he needs to go to at five, so it

6  means --

7      MR. FRASER:  My anticipation, given where we are right

8  now, is that I'm doubtful I'll need to talk to any of your

9  people tomorrow.

10      MR. McKNIGHT:  Okay.

11      MR. FRASER:  So if you want to let them know that

12  Wednesday would be the day when they can come back --

13      MR. McKNIGHT:  Okay.  I appreciate that.

14      MR. FRASER:  -- that would be fine.  I think tomorrow

15  we'll probably have a full day.  And just for the record,

16  Mr. Lillie is one of our witnesses.  Mr. Lillie, based on

17  representations that were made before as to how long this

18  might go, is in Chicago.  He leaves 7 p.m. on Tuesday.  He

19  will be here bright and early on Wednesday morning to

20  testify.  So I'm anticipating, with those people I have to

21  put on tomorrow, we will probably have at least a full day

22  and maybe they'd roll over into Wednesday.

23      JUDGE BUXBAUM:  All right.  Well, that is the goal, a

24  full day --

25      MR. FRASER:  But, again, I just wanted to make sure

1    everybody knew that so that --

2         JUDGE BUXBAUM:  As long as you -- yeah, I do want you

3    to, please, do your very best to make it a full day tomorrow.

4         MR. FRASER:  Definitely.  Right.

5         JUDGE BUXBAUM:  Other than that, how you do it is fine.

6         MR. FRASER:  Okay.  All right.

7         MR. McKNIGHT:  Okay.  So, okay, that's what I'll do with

8    those folks, then.

9         JUDGE BUXBAUM:  All right.  Then, we will resume

10   tomorrow morning at 9 a.m. in this location.  Have a good

11   evening, everyone.

12        MR. FRASER:  Thank you.

13        MR. CARLSON:  Thank you, Judge.  You, too.

14        **JUDGE BUXBAUM:  We can go off the record.**

15   **(Whereupon, at 5:03 p.m., the hearing in the above-entitled**

16   **matter was adjourned, to be reconvened on the following day,**

17   **Tuesday, August 18, 2009, at 9:00 a.m.)**

18

19

20

21

22

23

24

25

## CERTIFICATION

This is to certify that the attached proceedings before the National Labor Relations Board (NLRB), Region 7, in the matter of **DOUGLAS AUTOTECH CORPORATION**, Case No. GR-7-CA-51428, at Grand Rapids, Michigan, on August 17, 2009, were held according to the record, and that this is the original, complete, and true and accurate transcript that has been compared to the reporting or recording, accomplished at the hearing, that the exhibit files have been checked for completeness and no exhibits received into evidence or in the rejected exhibit files are missing.


_____

Jeremy Tieking
Official Reporter



_____

Cheri Grissom
Transcriber



Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

In the Matter of:

**DOUGLAS AUTOTECH CORPORATION,**

       Respondent,

   and                          Case No. **GR-7-CA-51428**

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), AFL-CIO, AND ITS LOCAL 822,**

       Charging Party.

    The above-entitled matter came on for hearing pursuant to notice, before **PAUL BUXBAUM**, Administrative Law Judge, at **Gerald R. Ford Federal Building, 7th Floor Courtroom, 110 Michigan, N.W., Grand Rapids, Michigan**, on **Wednesday, August 19, 2009**, at **8:55 a.m.**

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

# <u>A P P E A R A N C E S</u>

**Counsel for the General Counsel:**

    STEVEN E. CARLSON, ESQ.
    National Labor Relations Board
    82 Ionia Ave. NW, Suite 330
    Grand Rapids, MI  49503
    (616) 456-2270

**On Behalf of the Charging Party:**

    SAMUEL C. McKNIGHT, ESQ.
    Klimist, McKnight, Sale, McClow & Canzano, PC
    400 Galleria Officentre, Suite 117
    Southfield, MI  48034
    (248) 354-9650

    MANEESH SHARMA, ESQ.
    Associate General Counsel
    UAW Legal Department
    8000 E. Jefferson Ave.
    Detroit, MI  48214
    (313) 926-5216

**On Behalf of the Respondent:**

    JEFFREY J. FRASER, ESQ.
    KIMBERLY RICHARDSON, ESQ.
    KELLEY E. STOPPELS, ESQ.
    Varnum, LLP
    333 Bridge St., NW
    P.O. Box 352
    Grand Rapids, MI  49501
    (616) 336-6000

**I N D E X**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Glenn Kirk | 818 | 896 905 | -- | -- | 852 |
| Bruce Lillie | 960 | 1015 1040 | -- | -- | 970 |
| John Canzano | 1054 | 1056 | -- | -- | -- |
| Philip Winkle | 1058 | 1063 | -- | -- | 1061 |

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

## E X H I B I T S

| EXHIBIT NUMBERS | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| ADMINISTRATIVE LAW JUDGE'S | | |
| ALJ-2 | 866 | 866 |
| GENERAL COUNSEL'S | | |
| GC-63 | 899 | Not Offered |
| GC-64 | 959 | 959 |
| GC-65 | 1021 | Not Offered |
| GC-66 | 1026 | Not Offered |
| GC-67 | 1058 | 1062 |
| RESPONDENT'S | | |
| R-5 | 817 | 817 |
| R-6 | 852 | 856 |
| R-7 | 968 | 974 |

1          P R O C E E D I N G S

2                          (Time Noted:  8:55 a.m.)

3          JUDGE BUXBAUM:  Good morning, everyone.  This is a

4    continuation in the case of Douglas Autotech Corporation and

5    the UAW Local -- Local what? -- 822?  Am I remembering that

6    right, Mr. Winkle?

7          MR. WINKLE:  Yes, sir.

8          JUDGE BUXBAUM:  All right.  It's GR-7-CA-51428.

9          Mr. Fraser, you may proceed with your case.

10         MR. FRASER:  We have a couple of procedural issues we'd

11   like to work through.  First of all, Your Honor, any moment,

12   hopefully shortly, we'll have one of my colleagues come

13   through the door with the amended attorney-client privilege

14   document.

15         JUDGE BUXBAUM:  I appreciate it.

16         MR. FRASER:  Secondly, Mr. Carlson, there was a GC-58 I

17   think you were going to try and get a copy of and get to me.

18   Did you have a chance --

19         MR. CARLSON:  I haven't had a chance to make a copy, but

20   I will, at our first break today -- opportunity.

21         MR. FRASER:  Okay.  That's great.

22         And then, Your Honor, I'd like to ask that Respondent

23   Exhibit 5 be introduced.  And this is responsive to General

24   Counsel 56.  There was a letter that Mr. Carlson sent to me

25   regarding the attorney-client privilege log.  There was an

1    e-mail exchange that went back and forth.  And so we're going

2    to ask that this document also be introduced into the record,

3    if we could.

4        JUDGE BUXBAUM:  This is our recent e-mail exchange,

5    right.  Any objection, gentlemen?

6        MR. CARLSON:  I need to read through it for a second,

7    Judge.

8        JUDGE BUXBAUM:  Sure.

9        MR. CARLSON:  What is this?  Respondent what, 5?

10        MR. FRASER:  It's responding to your General Counsel --

11        MR. CARLSON:  No, no, no.  The exhibit number.

12        MR. FRASER:  Oh, it's five, yeah.  I believe that was

13    what we left -- come up to.

14        JUDGE BUXBAUM:  Yeah, no, I think that's right.  That is

15    right, isn't it?

16        COURT REPORTER:  Yes.

17        JUDGE BUXBAUM:  Mr. Carlson, I'm not a hundred percent

18    sure why Mr. Fraser wants it admitted, but as you'll recall,

19    at the very beginning of this trial, I said that anything

20    that I've committed to writing that any party wants in the

21    record, I'm going to put in the record.

22        MR. CARLSON:  Oh, I understand, Judge.

23        JUDGE BUXBAUM:  I assume there's no objection to this

24    being admitted?

25        MR. CARLSON:  I don't have any objection.

1    JUDGE BUXBAUM:  Mr. McKnight?

2    MR. McKNIGHT:  No objection.

3    JUDGE BUXBAUM:  It'll be received.

4    MR. FRASER:  Thank you, Your Honor.

5    **(Respondent's Exhibit 5 marked for identification and**

6    **received into evidence.)**

7    MR. FRASER:  With that, then, we are prepared to

8    continue our testimony.

9    JUDGE BUXBAUM:  Excellent.

10    MR. FRASER:  With Mr. Glenn Kirk.

11    JUDGE BUXBAUM:  If you'd have said Mr. Viar, now, we all

12    would have been upset.

13    MR. FRASER:  You know, it may have just slipped out,

14    he's been there so long, but --

15    JUDGE BUXBAUM:  I know, I know.

16    Sir, would you please raise your right hand?

17    (Whereupon,

18                    **GLENN KIRK**

19    was called as a witness by and on behalf of the Respondent

20    and, after having been first duly sworn, was examined and

21    testified as follows:)

22    JUDGE BUXBAUM:  Please be seated.  Would you please

23    state your name?

24    THE WITNESS:  Glenn Kirk.

25    JUDGE BUXBAUM:  And Kirk is spelled the usual way?

1        THE WITNESS:  K-i-r-k, sir.

2        JUDGE BUXBAUM:  Thank you.

3        You may proceed, counsel.

4        MR. FRASER:  Thank you.

5                        **DIRECT EXAMINATION**

6    Q.   BY MR. FRASER:  Good morning, Mr. Kirk.

7    A.   Good morning.

8    Q.   Just preliminaries.  There are two binders in front of

9    you.  I've prepared those so that it would be easier for you

10   to look at exhibits when I reference them for you.  So I just

11   wanted to make sure you knew why they were sitting in front

12   of you.

13   A.   Right.

14   Q.   Can you tell us who you work for, please?

15   A.   Douglas Autotech Corporation.

16   Q.   And I'm going to try to be efficient here and not ask

17   you the same questions that I asked Mr. Viar on the

18   preliminary.  Who's the parent company?

19   A.   Fuji Kiko Corporation, Limited, out of Japan.

20   Q.   Okay.  And what is your current position at Douglas?

21   A.   I am currently the Director of Finance, Director of

22   Sales, and a member of the Board of Directors.

23   Q.   Okay.  And how long have you been in that position?

24        JUDGE BUXBAUM:  Which one?

25        MR. FRASER:  Well, I think he said that's his colloquial

1  title.

2  Q.   BY MR. FRASER:  But if I'm wrong, correct me.  Is that a

3  generic title for all the duties you have, or they're

4  separate titles?

5  A.   Separate titles, okay.

6  Q.   Okay.  How long have you been the Director of Finance?

7  A.   Since December of 2007.

8  Q.   Okay.  When did you begin employment at Douglas?

9  A.   Officially -- I was on contract there for a couple of

10  weeks before that, but, officially, December 3rd, 2007.

11  Q.   Okay, okay.  And how long have you been Director of

12  Sales?

13  A.   Since September of 2008.

14  Q.   And how long have you been on the Board of Directors?

15  A.   Since June of 2008.

16  Q.   Okay.  And can you describe your primary duties as the

17  Director of Finance?

18  A.   I oversee all of the accounting, banking, reporting

19  operations to assure that we're meeting all the state,

20  federal, as well as Japanese governmental requirements for

21  accounting and reporting.  Take care of all of the financing

22  arrangements with banks, et cetera.  For finance, that's --

23  that's just the basic, general oversight of all the financial

24  activities.

25  Q.   Okay.  How about your duties, general duties as Director

1  of Sales?

2  A.   Again, an oversight.  A little more active with

3  customers, but oversight of the sales and marketing activity

4  for the corporation, to promote our products and our company

5  to companies that would be our customers around the world.

6  Q.   Okay.  And any functions or duties as a member of the

7  Board of Directors?

8  A.   Just, again, the normal Board of Director activities.  I

9  also act as secretary of the board to, again, assure that we

10  keep all the record-keeping, required record-keeping for our

11  charter, as well as for both national requirements.

12  Q.   All right.  Has there been a union at Douglas?

13  A.   Yes, sir.

14  Q.   Which union is that?

15  A.   The union that was there was Local 822 of the UAW.

16  Q.   Okay.  Have you been involved in collective bargaining

17  on behalf of Douglas?

18  A.   I have been.

19  Q.   And what negotiation year did you begin those -- what

20  year did you begin helping Douglas with their negotiations?

21  A.   Let me answer it, just going back --

22  Q.   Sure.

23  A.   -- I'm going to tell you that I was -- that my -- I was

24  hired on the 3rd.  I think my first meeting with Mr. Lillie

25  was December 10th, and that was in preparation -- I didn't

1   know that there was a potential contract coming due.  But my

2   first meeting with the attorneys and the people involved from

3   the company side goes back to December of '07, to talk about

4   what's going to happen.  The negotiations started -- I think

5   officially started sometime in the February/March time frame,

6   I think.

7   Q.   Of which year?

8   A.   Of 2007, I'm sorry -- or, 2008, I'm sorry.

9   Q.   Okay.  Have you been involved in any other contract

10  negotiations for Douglas?

11  A.   For Douglas?

12  Q.   Yes.

13  A.   No, sir.

14  Q.   Have you been involved with any other contract

15  negotiations?

16  A.   Yes, sir.

17  Q.   Just quickly tell us what your prior experience is.

18  A.   My prior experience, I worked -- working backwards from

19  Douglas, I worked for the City of Lansing as the Chief

20  Financial Officer for the City.  I was involved in

21  negotiations, as well as providing financial support.  We had

22  nine different unions.  We were always in contract

23  negotiations, it seemed, my whole time there, with one union

24  or another.

25       And then, over my 36 years with General Motors for local

1   plant negotiations, local plant contracts, both at Lansing

2   and at Willow Run Assembly in Ypsilanti.

3   Q.   Okay.  Do you recall when the contract between Douglas

4   and the UAW expired?

5   A.   April 30th.  I think that's the last day of April.

6   April 30th, 2008.

7   Q.   What was Douglas' financial condition at that time?

8   A.   Horrendous.

9   Q.   Tell me what you mean.

10  A.   We had --

11       MR. McKNIGHT:  Objection.  What's the relevance?

12       JUDGE BUXBAUM:  No, I'll allow it.

13  Q.   BY MR. FRASER:  Go ahead.

14  A.   Okay.  It was horrendous.  We had just experienced,

15  through 2007, a year where we had a loss of almost $20

16  million.  To be exact, I think it was around $19.6 million.

17  For the three-year period ending in 2007, over 30 -- I think

18  it's close to 30 -- about between 30 and 35 million dollar

19  loss over the three-year period.

20  Q.   Okay.

21  A.   In 2007, the parent company, in order to keep the light

22  on and keep us afloat, had to put over $25 million cash into

23  the business.  We were losing sales.  It was horrendous.

24  Q.   Okay.  Did you share that information with the Union?

25  A.   I did.

1    Q.    How did you do that?

2    A.    We held an information meeting in January.  We shared --

3    Q.    Of which year?

4    A.    January of 2008.  Forgive me.

5    Q.    Okay.

6    A.    I'll try to do better with remembering years.

7    Q.    That's all right.  I'll ask you if you don't.

8    A.    Okay.  To spell out what was the status of the company's

9    sales, what had happened, particularly what had happened to

10   the truck sales in our Bronson operation, that we had seen it

11   dwindle by almost 50 percent over a two- or three-year

12   period, that the company was bleeding, et cetera.

13        During that informational meeting, I was asked if I

14   would provide that information to --

15        JUDGE BUXBAUM:  Well, hold on, hold on.  Let's avoid the

16   narrative, again.

17        MR. FRASER:  That's fine, Your Honor.  I can keep

18   interspersing, "What happened next?  What happened next?"

19        JUDGE BUXBAUM:  Well, yeah, but I want you to be more

20   sort of directive than that.

21        THE WITNESS:  I'm sorry.

22        JUDGE BUXBAUM:  You understand the problem, Mr. Fraser.

23   It's a problem for you as much as for opposing counsel and

24   me, if the witness can wander around into all sorts of areas

25   that we don't either need or want.

1    MR. FRASER:  Yeah, I asked him what he did regarding

2  sharing financial information --

3    JUDGE BUXBAUM:  Right, and the answer was that he held a

4  meeting with the Union, and we learned --

5    MR. FRASER:  Okay.  What did you --

6    JUDGE BUXBAUM:  -- we've learned the response to your

7  question.

8    MR. FRASER:  Thank you, Your Honor.

9  Q.    BY MR. FRASER:  What did you provide the Union?

10  A.    They requested information in writing that we would give

11  -- we asked for confidentiality statements, and we provided

12  audited financial statements by our CPA firm, Plante and

13  Moran.  We gave audited information from 2005, 2006, and

14  unaudited information, because it wasn't completed, for 2007.

15  Q.    Okay.

16  A.    We also -- I'm sorry.  We also provided to them

17  strategic business plan items that they asked for.

18  Q.    All right.  If you would look at the binder to your

19  left, there is a tab I think that says Joint Exhibit 1.  If

20  you can't find it, let me know.  I'll show you.

21  A.    There's joint exhibits, yes, I've got it.

22  Q.    Take a look at that.

23  A.    Okay.

24  Q.    Were you on the Douglas bargaining team --

25  A.    I was.

1  Q.   -- for 2008?

2  A.   I was.

3  Q.   I'm going to focus your attention on May 1, 2008, going

4  forward.  All right?

5  A.   Yes.

6  Q.   Okay.  Who else was on that team?

7  A.   Diane Hedgcock, myself, Bruce Lillie, Mr. Viar, and Mr.

8  Cohen, another attorney who came in at the end.

9  Q.   Okay.  All right.  Did Douglas have a chief spokesperson

10  during the 2008 bargaining, from May 1, 2008, forward?

11  A.   We did.

12  Q.   And who was the spokesperson?

13  A.   The official chief spokesperson was Bruce Lillie, and

14  from the company side, it was Mr. Viar.

15  Q.   What were your responsibilities during bargaining from

16  May 1, 2008, forward?

17  A.   From May 1st forward?

18  Q.   Yes.

19  A.   It was to act as a financial advisor on items and to act

20  as business advisor on the strategy for the company going

21  forward.

22  Q.   Okay.  Where were negotiations held prior to May 1,

23  2008?

24  A.   At Michigan Works, in Coldwater, Michigan.

25  Q.   And after May 1, 2008, where were the negotiations held?

1   A.   At the Hilton Hotel.  I think it's called -- I can't

2   remember the name of the --

3   Q.   Where is it located?

4   A.   It's in Coldwater, Michigan, but it's the Hilton Hotel

5   there.

6   Q.   Okay.

7   A.   About four o'clock this morning, I'll remember the name

8   of it, the specific name of it.

9   Q.   If you'd look at that exhibit carefully for me and look

10  at the date June 2 of 2008?

11  A.   Yes, sir.

12  Q.   Were you present on June 2, 2008, for a bargaining

13  session?

14  A.   No, sir, I was not.

15  Q.   And how do you know that?

16  A.   I know that for a couple of different reasons.  First, I

17  was asked not to be there.

18  Q.   Okay.  Do you remember who asked you not to be there?

19  A.   Mr. Viar and Mr. Lillie asked me not to be there.  They

20  said that -- at the request of the Local Union.

21  Q.   Okay.  Did they specify who from the Local Union?

22  A.   They did not.

23  Q.   Okay.

24  A.   Or if they did, I don't remember.

25  Q.   Okay.

1  A.    Because this was a time --

2       MR. McKNIGHT:  Objection, hearsay.

3       JUDGE BUXBAUM:  Sustained.

4       MR. FRASER:  He just said, "This was a time," and I'm

5  trying to understand --

6       JUDGE BUXBAUM:  He was reporting what he was told by

7  Mr. Viar and Mr. Lillie.

8       MR. FRASER:  It seems to me that that came in before the

9  objection was raised, and I --

10      JUDGE BUXBAUM:  Oh, sure, that's in, that -- as much is

11  in is in.  But counsel objects to your going further with

12  hearsay, and I'll sustain the objection.

13      MR. FRASER:  Well, I spent a little time with the Rules

14  of Evidence last night.  There is an exception called party

15  admission.  It applies when an individual who is a party to

16  the organization and an agent of the organization makes a

17  statement.  Because those are party admissions, those are

18  admissible as an exception to hearsay.

19      JUDGE BUXBAUM:  But isn't that an opposing party,

20  counsel?

21      MR. FRASER:  It depends, Your Honor.  I'm not sure that

22  it matters whether it's an opposing party or not.

23      MR. CARLSON:  Judge, the hearsay exception is for

24  admissions from party opponents, not admissions of your

25  own --

1        JUDGE BUXBAUM:  That's my understanding.

2        MR. CARLSON:  Why don't they just put Mr. Viar up, and

3    he can tell what Mr. Lillie said and what Mr. Kirk said and

4    what Ms. Hedgcock said?  Why do we have all these witnesses?

5        JUDGE BUXBAUM:  Well, and, in fact -- but it's beyond

6    that, Mr. Carlson.  Mr. Viar did testify on --

7        MR. FRASER:  Well, I'd like to be able to do that, Your

8    Honor.

9        JUDGE BUXBAUM:  It's already been done.

10       MR. FRASER:  That'd be great.

11       JUDGE BUXBAUM:  It's been done, Mr. Fraser.  Mr. Viar

12   just testified about this.

13       MR. FRASER:  Thank you.

14   Q.    BY MR. FRASER:  Mr. Kirk, your recollection as to

15   whether or not you were there, again, I think you testified

16   you were not?

17   A.    I was not.

18   Q.    Okay.  Do you know the reasons why you were not there?

19       MR. McKNIGHT:  Objection, calls for hearsay.

20       JUDGE BUXBAUM:  No, that's a proper foundational

21   question.  I'll permit it.

22       Do you know what the reasons were?

23       THE WITNESS:  Yes.

24       JUDGE BUXBAUM:  Okay.

25   Q.    BY MR. FRASER:  Could you tell us your understanding of

1   those reasons --

2       MR. McKNIGHT:  Objection, calls for hearsay.

3   Q.  BY MR. FRASER:  -- and please do not say somebody told

4   me something.

5       JUDGE BUXBAUM:  I'm going to allow it.

6       MR. McKNIGHT:  Your Honor, if I might just speak to

7   it --

8       JUDGE BUXBAUM:  I must say --

9       MR. McKNIGHT:  It goes to -- if -- he has to ask him the

10  basis of his knowledge or understanding as to why he wasn't

11  there.  Otherwise, it just calls for hearsay.

12      MR. CARLSON:  He hasn't laid a proper foundation.  He

13  hasn't asked him how he knows.

14      JUDGE BUXBAUM:  I don't agree with that.  That's why we

15  have cross-examination, if you want to explore the basis of

16  his knowledge.  He's laid the appropriate foundation.  And,

17  frankly, I'm mystified as to why this is a significant bone

18  of contention among all the lawyers.  This seems a very small

19  point.  But, anyway, he has laid the foundation.  I'll permit

20  that answer so long as it doesn't wander into hearsay.

21      THE WITNESS:  Could you repeat the question, please?

22  Q.  BY MR. FRASER:  Yeah.  I think the answer was -- I think

23  the question was How do you know -- I can't even remember the

24  question anymore --

25      JUDGE BUXBAUM:  No, you've already -- you're past that.

1   You're past that.  The question, I think, was why didn't they

2   want you at the meeting?

3   Q.   BY MR. FRASER:  To the extent you know.

4   A.   I know why I wasn't at the meeting.  I thought that was

5   the question.  The reason I wasn't at the meeting was

6   Mr. Viar and Mr. Lillie asked --

7        MR. McKNIGHT:  Objection.  That's hearsay.

8        MR. FRASER:  We'll move along.

9        THE WITNESS:  Well, no, wait a minute.  It's not

10  hearsay --

11       JUDGE BUXBAUM:  Sir, hold on.  Hold on.

12       MR. FRASER:  The judge gets to --

13       THE WITNESS:  Sorry.

14       MR. FRASER:  The judge gets to make that decision.

15       JUDGE BUXBAUM:  Go ahead and move along, counsel.  I

16  mean, we've spent way too much time on a trivial thing.

17  Q.   BY MR. FRASER:  Did the Douglas bargaining team have a

18  note-taking protocol?

19  A.   Yes, we did.

20  Q.   And can you tell me what that was, again, May 1, 2008,

21  forward?

22  A.   Ms. Hedgcock was assigned to -- when we were in general

23  sessions, Ms. Hedgcock was assigned to be the keeper of the

24  notes and minutes of those meetings.

25  Q.   Okay.  Can you tell me what you mean by general session,

1  please?

2  A.    Yes.  Much of the time, the Union parties were all in

3  one section, and we were in a breakout room in another

4  session.  What went on in there weren't recorded.  What was

5  happened in sidebars wasn't recorded.  Only when both parties

6  got together for the purposes of discussing -- for

7  discussions did she take notes.  That was a general session,

8  is my understanding.

9  Q.    Okay.  So I'm going to call those joint sessions going

10  forward so that --

11  A.    That's fine.

12  Q.    All right.  How often did you take notes during

13  bargaining, May 1, 2008, forward?

14  A.    I am a doodler.  I would doodle and make notes, but

15  there was -- my recollection, there was one meeting that I

16  felt compelled, for my own purposes, to take pretty detailed

17  notes for at least part of that meeting.

18  Q.    And I'll have you hold on that and we'll talk about that

19  in a minute.  May 1, 2008, forward, what was Douglas trying

20  to accomplish through bargaining?

21  A.    We were trying to get an agreement that established an

22  operating pattern and an operating agreement that would allow

23  us to survive and thrive going forward, financially and

24  otherwise.

25  Q.    And what was the general reaction from the Union to

1   those proposals May 1, 2008, forward?

2        MR. McKNIGHT:  Objection as to general reaction.

3        JUDGE BUXBAUM:  Sustained.

4   Q.   BY MR. FRASER:  We'll go through each specific date,

5   then.  Did the Douglas UAW contract expire in 2008?

6   A.   Yes.

7   Q.   And are you aware of whether the Union went on strike?

8   A.   Yes, I'm aware.

9   Q.   And how did you first learn about the strike?

10  A.   I got a call from Mr. Viar shortly after midnight.

11  Q.   Okay.  And where were you when you received that call?

12  A.   I was home, at my home in Holt, Michigan.

13  Q.   Okay.  After you received the call, what did you do?

14  A.   I went to bed in preparation for what appeared to be a

15  tough day the next morning.

16  Q.   Did you then come to the facility the next day?

17  A.   Next day I did go.

18  Q.   Okay.  Tell me what happens when you get to the

19  facility.

20  A.   There was picket lines --

21        JUDGE BUXBAUM:  Now, this is the morning of May 1st; am

22  I right?

23        THE WITNESS:  Morning of May 1st, yes, sir, of 2008.

24        JUDGE BUXBAUM:  Eight, good, okay.

25        THE WITNESS:  When I show up, there's picket lines and

 1  people carrying signs, saying that the UAW was on strike.

 2  I'm not aware of what all other things that they said.  There

 3  was a lot of noise, as is normal with those situations.  I

 4  pulled up, the guards made way for me to pull in, and I

 5  entered the facility.

 6  Q.   BY MR. FRASER:  If you'd turn -- the binder, again, to

 7  your left, not the blue one but the black binder, and look at

 8  tab --

 9  A.   Yes, sir.  Let me close this one.

10  Q.   Yeah.  Look at tab number six for me, please.

11  A.   Yes, sir.

12  Q.   Have you seen General Counsel's Exhibit 6 before?

13  A.   Yes.

14  Q.   When did you first see this?

15  A.   The morning of May 1st, 2008.

16  Q.   And how did you see that?

17  A.   When I got to work, I went to see Mr. Viar.  He shared

18  this with me.

19  Q.   After you saw that document, what was your next action

20  on May 1, 2008?

21  A.   As was the case, my action was to go to the factory

22  floor to see what I personally could do to assure that we got

23  up and operational and ran product to the best we could that

24  day.

25  Q.   Okay.  And were you able to accomplish that?

1  A.   We were.

2  Q.   Did you have any interaction with any UAW representative

3  from May 1 through May 5, 5 a.m.?

4  A.   Not to my recollection, not directly.

5  Q.   Okay.  Can you tell me whether or not the Bronson

6  Douglas facility operated between May 1 and May 5, 2008?

7  A.   It did.

8  Q.   How often were you at the Bronson Douglas facility

9  between May 1 and May 5, 2008?

10  A.   Every -- I was there -- I wasn't there on Sunday, but

11  other than that -- Sunday would have been May 4th.

12  Q.   Okay.

13  A.   Other than that, I was there every day.

14  Q.   On April 30, 2008, do you know how many bargaining unit

15  members there were at Douglas?

16     MR. McKNIGHT:  Objection.  It's in the record as to how

17  many --

18     JUDGE BUXBAUM:  Well, of course.  While that's not a

19  legal objection, the thought has crossed my mind, too, that

20  we are plowing a lot of ground that's not in dispute.

21     MR. FRASER:  Well, Your Honor, of course, we are.  And

22  the big issue in this case, according to General Counsel and

23  according to Mr. McKnight, who has made all kinds of comments

24  about credibility issues, is whether or not this testimony is

25  consistent and whether or not these folks are telling the

1   truth.  And you know what?  In order to protect this record,

2   I'm going to go back all the way through and make sure that

3   each one of those events that they recall is stated from

4   their own personal perspective so there's no doubt about what

5   happened, unless General Counsel and Mr. McKnight want to

6   stipulate to every fact that I start to raise.  Then I would

7   be happy to stop and move along.

8       JUDGE BUXBAUM:  Mr. Fraser, look, it's my responsibility

9   to control what -- the Board wants a complete record but not

10  an excessive record.  If it's stuff that isn't in dispute, it

11  does not need to be reiterated through each witness.

12      MR. FRASER:  I understand, Your Honor.  I understand --

13      JUDGE BUXBAUM:  You know -- you are certainly a very

14  capable attorney who's paid close attention in this trial.

15  You know what's in dispute and what isn't.

16      MR. FRASER:  I understand that, Your Honor, but --

17      JUDGE BUXBAUM:  I'll permit some of it, but if it gets

18  excessive, I'm going to stop it.  But we're not at excessive

19  yet.  Go ahead.

20      MR. FRASER:  Thank you.

21      JUDGE BUXBAUM:  Use your judgment, though.  I count on

22  that.

23      MR. FRASER:  I understand that.

24      JUDGE BUXBAUM:  All right.

25      MR. FRASER:  I've already skipped about two pages worth

1   of testimony, so --

2       JUDGE BUXBAUM:  I noticed you have -- I see you crossing

3   them off.  I know.

4   Q.  BY MR. FRASER:  Mr. Kirk, again, do you recall, as of

5   April 30, 2008, how many bargaining unit members there were

6   at Douglas?

7   A.  There was 115 active.  I think it was 145 total.

8   Q.  Okay.  Can you tell me when you first learned that the

9   strike had ended?

10  A.  The evening of May 5th, somewhere around five or six

11  o'clock in the evening.

12  Q.  And how did you learn that?

13  A.  I was in a meeting with Mr. Lillie and Mr. Viar at the

14  East Lansing Marriott Hotel and was presented a document --

15  when we received a document from the Union bargaining

16  committee.

17  Q.  Okay.  Let me back you up a second.  What happened the

18  morning of May 5, 2008?

19  A.  I went to see Mr. Viar when I first got into work.  He

20  told me he'd received a strange call wanting him to come to

21  the picket line to receive a document and that he had told

22  them no, and we agreed that we needed to call Mr. Lillie.

23  Q.  When you say "we," who are you talking about?

24  A.  Mr. Viar and I both agreed that we needed to call

25  Mr. Lillie.

1   Q.   Did you call Mr. Lillie?

2   A.   We did.

3   Q.   Okay.

4   A.   During that period of time, one of my employees came in

5   and asked if --

6        JUDGE BUXBAUM:  Well, hold on, now.  There wasn't a

7   question.

8        THE WITNESS:  Sorry.

9        JUDGE BUXBAUM:  You had answered the question.

10       THE WITNESS:  Sorry, sir.

11       JUDGE BUXBAUM:  Go ahead, counsel.

12  Q.   BY MR. FRASER:  What did you do next, Mr. Kirk?

13  A.   One of my employees came in and asked if we had noticed

14  that the signs had changed in front of the factory.

15  Q.   Had you noticed anything with the signs?

16  A.   I had not noticed.  And they said it had changed from

17  being on strike, that they were locked out.

18  Q.   Did you look to see whether or not --

19  A.   Mr. Viar and I both went out to walk the perimeter and

20  noticed that, in fact, they had changed.

21  Q.   What had changed?

22  A.   They had said that they were now locked out as opposed

23  to being on strike.

24       JUDGE BUXBAUM:  When was this, sir, that you went out to

25  look?

 1      THE WITNESS:  This was roughly 8, 8:30 in the morning of

 2  May 5, 2008.

 3      JUDGE BUXBAUM:  Thank you.

 4  Q.  BY MR. FRASER:  Okay.  I think you've already testified

 5  that there was a meeting later on with the Union.  How, to

 6  the best of your knowledge, did that meeting get scheduled?

 7  A.  As I mentioned, we called Mr. Lillie, who has, I was

 8  informed, contacted Mr. Winkle to set up a meeting to receive

 9  whatever documents he wanted to present to us.

10  Q.  Okay.  Did you meet prior to the meeting with the Union

11  on May 5, 2008, you being yourself and anyone else?

12  A.  Just prior, maybe an hour before, with Mr. Viar and

13  Mr. Lillie, who discussed what we thought was about to

14  happen --

15  Q.  Okay.

16  A.  -- and what would be our appropriate response.

17  Q.  Okay.  If you would look at General Counsel Exhibit

18  Number 7, please?

19  A.  Yes, sir.

20  Q.  Have you seen that GC-7 before?

21  A.  Yes, sir.

22  Q.  When did you first see that?

23  A.  Again, the evening of May 5th, between five or six

24  o'clock in the afternoon.

25  Q.  Okay.  Can you tell me, after your meeting with

1  Mr. Lillie and Mr. Viar -- and be very specific in terms of

2  the chronology -- what happens when you meet with the Union?

3  Who's there and what is said, please?

4  A.   When the Union bargaining committee, Mr. Viar,

5  Mr. Lillie and myself, when they came in --

6  Q.   Tell me who the Union bargaining committee was, to your

7  recollection.

8  A.   It was Mr. Winkle, Mr. Kolassa -- because they're both

9  here, I can remember them -- the president, Mary Ellis, Frank

10  Gruza, and several others that my memory just won't serve me

11  to remember all of them.

12  Q.   Okay.  Was Diane Hedgcock with you?

13  A.   She was not.

14  Q.   Why not?

15  A.   That was a meeting that was in East Lansing.  It was in

16  the evening.  It appeared to us to be too much to ask

17  Ms. Hedgcock to disrupt her family life to do that.

18  Q.   Okay.

19  A.   And we could handle it without her, we thought.

20  Q.   Okay.  So to tell me now, as that meeting begins, what

21  happens, please?

22  A.   They came in, Mr. Winkle presented this information to

23  Mr. Lillie --

24  Q.   When you say "this information," you're referring to

25  General Counsel 7?

1  A.    This letter, yes, and saying they were offering to

2  return to work unconditionally.

3  Q.    Okay.  Then what happens?

4  A.    Then, Mr. Lillie then -- my recollection, Mr. Lillie

5  then presented to Mr. Winkle a document, stating that we did

6  not want them to return to work and that -- unless they met

7  the terms and conditions that we spelled out in the

8  attachment to that letter.

9  Q.    Could you look at General Counsel Exhibit 8, please?

10 A.    Yes.

11 Q.    Have you seen this document before?

12 A.    Yes.

13 Q.    What is this document?

14 A.    This is the document that I mentioned that Mr. Lillie

15 gave to Mr. Winkle about not having them to return to work,

16 and attached to that, behind the lead page, are the terms and

17 conditions that they must meet in order to return to work.

18 Q.    When was this GC-8 prepared, if you know?

19 A.    The day of May 5th.

20 Q.    And it's got an Autotech letterhead on it.  Can you tell

21 us how it was prepared?

22 A.    I'm not sure that I understand that question.

23         JUDGE BUXBAUM:  Well, I want to back up a moment.

24 Mr. Fraser asked you when this was prepared, and I want to be

25 sure that we're talking about the whole thing.  Was the whole

1  thing prepared on the day of the meeting?  In other words, I

2  want to be sure that your answer wasn't just the cover

3  letter.

4      THE WITNESS:  Well, I'm going to tell you that there had

5  been discussions and conversations about back pieces --

6  pieces of that were already pulled together, but pulled

7  together as a package for the first time was the day of May

8  5th.

9      JUDGE BUXBAUM:  I got it.  Okay.  So it incorporated

10  some preexisting language that you had had in terms of

11  collective bargaining positions, but it was actually put

12  together in this particular form on May 5th?

13      THE WITNESS:  Yes, sir.

14      JUDGE BUXBAUM:  Okay.  Now, I didn't put words in your

15  mouth, did I?

16      THE WITNESS:  I thought you repeated what I thought I

17  said.

18      JUDGE BUXBAUM:  Okay, okay.

19  Q.  BY MR. FRASER:  So I interrupted you.  You were telling

20  me, as this document was handed, what was said.  If you'd

21  please just continue?

22      MR. McKNIGHT:  Well, he wasn't telling him what was

23  said, but he could ask him now what was said.

24      JUDGE BUXBAUM:  Well, come on, Mr. McKnight.

25      Go ahead.

 1      MR. McKNIGHT:  Well, Your Honor, with all due respect,

 2 what was said is very important.

 3      JUDGE BUXBAUM:  It is.

 4      MR. McKNIGHT:  And I do want to protect the record in

 5 terms of what was said.

 6      JUDGE BUXBAUM:  All right.

 7 Q.   BY MR. FRASER:  Mr. Kirk, could you please tell me,

 8 after this document was handed out or as it was handed out,

 9 what was said?

10 A.   Again, I think I have covered that we gave it to them,

11 told them that here were the terms and conditions to return

12 to work.  Mr. Lillie also, at that point in time, told them

13 that we were not sure about why -- let me back up if I could,

14 please.  What was said was we're presenting this.  We have

15 reason to think that something is not straight.  I think he

16 said that maybe -- my recollection was he said that -- reason

17 to believe the strike was illegal and that we were reserving

18 all of the rights accorded to the company under the Act.

19 Q.   Okay.  Did anyone from the Union respond to that?

20 A.   Not to my recollection.

21 Q.   Okay.  When that document was handed out to the Union or

22 any other time during May 5, do you remember any union

23 response to this document, the cover letter and the

24 attachment, any response from the Union?

25 A.   Yes, the response was could they have some time alone to

1    discuss the document.

2    Q.    And do you know who that came from -- I mean, who said

3    that?

4    A.    Mr. Winkle asked for that.

5    Q.    Okay.

6    A.    And we said we -- of course.  We got up and went out of

7    the room for a while.

8    Q.    Okay.

9    A.    When they called us back in, they told us that -- I

10   think Mr. Lillie asked them what was their response, and they

11   said there was too much to digest, they needed more time to

12   look this over, and that they would get us a response by the

13   next day.

14   Q.    Okay.  Did you receive -- what happens next on May 5,

15   2008?

16   A.    I think kind of cordialities were exchanged, then we

17   were dismissed.

18   Q.    Okay.  Did you receive a response the next day from the

19   Union?

20   A.    No.

21   Q.    Can you take a look for me, please, at General Counsel

22   Exhibit Number 9?  Have you seen that document before?

23   A.    I'm sorry.  Yes.

24   Q.    When did you first see that?

25   A.    Either the day of May 6th or May 7th.

1    Q.   Okay.  And who showed that to you or how did you receive

2    it?

3    A.   Mr. Viar shared that with me.

4    Q.   After you received or saw this letter, what did you do?

5    A.   We got on the phone with Mr. Lillie to say what does

6    this mean, and what are we looking for, what is the meaning

7    of the letter, and what do we have to do to respond to this?

8    Q.   You said "we."  Can you tell me who "we" is?

9    A.   Mr. Viar and myself.  I'm sorry.

10   Q.   Okay.  After you talked to Mr. Lillie, what did you do?

11   A.   We went about making -- trying to put together some kind

12   of a response, is my recollection, to this.

13   Q.   Okay.  On May 5, 2008, did you know that the strike was

14   illegal?

15   A.   No.

16   Q.   Well, what was your knowledge on May 5, 2008, about the

17   strike?

18   A.   My knowledge on the strike is that they were on strike.

19   My knowledge on the strike was they were making an offer to

20   return unconditionally.

21   Q.   Okay.

22   A.   My fear was we didn't trust what they were trying to do.

23   Q.   Okay.  Why not?

24   A.   Well, we had been fairly successful at getting up and

25   operational.  What my major fear was, was that I was asking

1    questions about, if they come back, can they take us out on

2    strike again?  And the answer was yes, of course, they can.

3    Q.    Okay.

4    A.    So there was some mistrust about --

5          JUDGE BUXBAUM:  When you say "the answer," you don't

6    mean from the UAW?  You mean in your internal discussion?

7          THE WITNESS:  I'm sorry, Your Honor, the answer --

8          JUDGE BUXBAUM:  You said that you posed the question,

9    could they go out on strike again?  And you then said the

10   answer was yes, they could.  I just want to be clear --

11         THE WITNESS:  The answer from Mr. Lillie.  I'm sorry.

12         JUDGE BUXBAUM:  That's good, okay.

13         THE WITNESS:  Forgive me.  Forgive me, sir.  Forgive me,

14   sir.

15         JUDGE BUXBAUM:  I just wanted to be sure that didn't

16   reflect some communication from the Union.

17         THE WITNESS:  No, no, it did not.  It was strictly

18   between Mr. Lillie, Mr. Viar, and myself --

19         JUDGE BUXBAUM:  Thank you.

20         THE WITNESS:  -- and that I raised that question, if

21   they go out, and we now bring everybody back into work, and

22   could they go back out on strike, therefore disrupting what I

23   felt was lightning in a bottle that we had accomplished in a

24   short period of time.

25   Q.    BY MR. FRASER:  So that was one of your concerns?

1    A.    That was my major concern at that time.

2    Q.    Okay.

3    A.    Mr. Lillie did mention that he didn't know what they

4    were doing and what was going on.  And, certainly, that was

5    one strategy that could be happening.  He breached the point,

6    I think, that it's possible that something is amiss with the

7    strike.

8    Q.    But let me have you look at General Counsel Exhibit

9    Number 10, please.

10   A.    Yes.

11   Q.    Okay.  Have you seen General Counsel Exhibit 10?

12   A.    Yes.

13   Q.    Can you tell me when you first saw this?

14   A.    The exact date that I first saw this, I am not sure.  It

15   was somewhere around the 8th or 9th of May, is my

16   recollection.

17   Q.    Okay.  Did you ever determine that the strike was

18   illegal?

19   A.    Yes.

20   Q.    Can you tell me the process that you went through to try

21   to make that determination?

22   A.    Well, somewhere during this week, on the 8th or the 9th

23   of May 2008, Mr. Lillie gave Mr. Viar and I a call, saying

24   there was some concerns raised to him about whether or not

25   the lockout was illegal because if the strike was illegal

1  because they didn't file an FMCS form, then the lockout must

2  be illegal because we didn't file an FMCS form, either.

3  Q.   And did he say who raised that?

4  A.   Yes, he said who raised it.

5  Q.   Okay.  Can you tell us?

6  A.   He said it was Mr. Winkle that raised that.

7  Q.   So what do you do next?

8  A.   Well, we go to -- Mr. Viar and I go to see Mr. Lillie

9  and with the sole purpose of officially requesting a copy of

10 the FMCS form that was filed by the Union, by Local 822.

11 Q.   Let me have you look at General Counsel Exhibit Number

12 13, if you would, please.

13 A.   Thirteen?

14 Q.   Yeah, we have 13.

15 A.   Yes.

16 Q.   Can you tell me, have you seen that before?

17 A.   Yes.

18 Q.   Can you tell me what that is?

19 A.   That's the letter that -- it's the letter requesting

20 copies of notices sent by the UAW to FMCS.

21 Q.   Do you recall whether you ever received a response from

22 Mr. Winkle to this letter?

23 A.   No, we never received it from Mr. Winkle.  We did

24 receive it from Mr. McKnight, however.

25 Q.   Do you recall when Mr. McKnight responded?  Only if you

848

1 can recall.

2 A.    It was sometime in the month of August.

3 Q.    Of which year?

4 A.    Of 2008.

5 Q.    Okay.  Would you back up one page in that notebook and

6 look to General Counsel Exhibit 12, please?  Have you seen

7 that document, General Counsel 12?

8 A.    Yes.

9 Q.    And can you tell us when you saw that and what that is?

10 A.    I think I saw that in -- when I visited Mr. Lillie's

11 office with Mr. Viar on May 9th.

12 Q.    When was this document prepared?

13       JUDGE BUXBAUM:  But, Mr. Fraser, why do we need to know

14 this?  This is the stuff that isn't in contention.  This is

15 not the signatory on the document.  There is no dispute, I

16 think, that this document was sent.

17       MR. FRASER:  We'll move along, Your Honor.

18       JUDGE BUXBAUM:  Thank you.

19 Q.    BY MR. FRASER:  So, Mr. Kirk, you were going to tell me

20 when you first learned that the strike was illegal.  Do you

21 remember, specifically, when that --

22 A.    Well, I was frustrated that we didn't know, and so I got

23 on the website -- I personally got on the website, got

24 online, got on the website of FMCS and -- actually, got on

25 the NLRB, which led me to the FMCS website.  I got a 1-800

1  number.  I called, talked to a young lady there, asked her if

2  it was possible -- told her who I was, what my position was,

3  told her who the UAW local involved was, and asked if I could

4  get a copy of the filing of the FMCS, what I learned later to

5  be an F-7 form.

6  Q.   Did you ever obtain a copy?

7  A.   Yes, I did.

8  Q.   Okay.  So I'm going to show you what's been marked as

9  Respondent's Exhibit Number 1.  I'm not sure if I have it in

10 this other binder.  Can you look at that for me, please?

11 A.   Yes.

12 Q.   Have you seen that?

13 A.   I have.

14 Q.   Is that the document you received from the FMCS?

15 A.   Yes, it was.

16 Q.   Do you remember about when you received that?

17 A.   Oh, around the 24th, 25th of May.

18 Q.   Is that the date, on or about, that you thought the

19 strike was illegal?

20     MR. McKNIGHT:  Objection, leading.

21     JUDGE BUXBAUM:  Yes.  Sustained.

22 Q.  BY MR. FRASER:  Do you recall what date you thought the

23 strike might be illegal?

24     MR. McKNIGHT:  Objection, asked and answered.

25     JUDGE BUXBAUM:  I'll allow it.

1    You may answer.

2    THE WITNESS:  Mr. Fraser, your question is what date I

3    thought it might be.  I thought it might be somewhere around

4    the 7th or 8th of May.

5  Q.   BY MR. FRASER:  Do you have a date you might recall that

6    you confirmed it was illegal?

7    MR. McKNIGHT:  Objection.

8    JUDGE BUXBAUM:  Sustained.  It's a bit leading.

9    Rephrase it.

10  Q.   BY MR. FRASER:  Could you tell me if you learned that

11   the strike was illegal?

12  A.   Yes.

13  Q.   What date was that?

14  A.   Around the 24th --

15    MR. McKNIGHT:  Objection.  Really, he -- this witness

16   isn't a trier of facts.  He's not going to make a conclusion

17   one way or another.  He had suspicions.  He's piling up

18   information from Lillie, from Viar, from FMCS.  That question

19   calls for some kind of -- Mr. Kirk to make some kind of

20   judgment.

21    JUDGE BUXBAUM:  Yes, but the company's judgment about

22   these matters is, I think, an issue in this case.  Overruled.

23    You may answer.

24    THE WITNESS:  Yes, once we received it, we immediately

25   got copies to Mr. Viar.  I got copies to Mr. Viar and to

1  Mr. Lillie, and Mr. Lillie confirmed that, in his judgment --

2       MR. McKNIGHT:  Objection, hearsay.

3       JUDGE BUXBAUM:  Sustained.  Don't go further.

4  Q.   BY MR. FRASER:  That's perfectly great, Mr. Kirk.  Can

5  you look at the small binder again for me, please?

6  A.   The blue one?

7  Q.   Yeah.  Again, that Joint 1 Exhibit.  We're going to look

8  at the date of May 21.  Were you at that bargaining session?

9  A.   Yes.

10 Q.   Can you tell me where that was held?

11 A.   At the Hilton Hotel, in Coldwater, Michigan.

12 Q.   Okay.

13 A.   Hilton-Hampton Inn.

14 Q.   You just recalled the specific name?

15 A.   I do.

16 Q.   Can you tell me how that meeting starts, please, best of

17 your recollection?

18 A.   Yes.  It starts by Mr. Lillie stating to the bargaining

19 committee that he thought the strike was illegal, we had

20 reason to believe the strike was illegal, and that by meeting

21 with them, we were not waiving our rights afforded to the

22 company under the Act.

23      MR. FRASER:  Okay.  I think we're up to Employer Exhibit

24 -- or, Respondent Exhibit 6.  You don't need to look yet,

25 because I haven't given it to you.  I'll provide it here in a

1  minute.

2       THE WITNESS:  Very good.

3       JUDGE BUXBAUM:  Oh, oh.  I was doing the same thing,

4  Mr. Fraser.  Yeah, you're right, it's six is the next one.

5  **(Respondent's Exhibit 6 marked for identification.)**

6  Q.   BY MR. FRASER:  Can you take a look at what's been

7  marked as Respondent's Exhibit 6, please?

8  A.   Yes.

9  Q.   Can you tell me what those are?

10  A.   Those are my notes of that meeting on that day.

11  Q.   That meeting being which meeting?

12  A.   May 21st, 2008, bargaining -- the first session.

13  Q.   Okay.  Were you in a joint session when you took the

14  notes?

15  A.   We were.

16  Q.   Okay.  And could you --

17       MR. FRASER:  Your Honor, we'd move for admission of

18  Respondent's 6.

19       JUDGE BUXBAUM:  Any objection?

20       MR. CARLSON:  I would like some voir dire, Your Honor.

21       JUDGE BUXBAUM:  Sure.

22                    **VOIR DIRE EXAMINATION**

23  Q.   BY MR. CARLSON:  Mr. Kirk, earlier in your testimony,

24  Mr. Fraser asked you about the company's note-taking protocol

25  at the bargaining sessions, and I understand your testimony

1  to be that Diane Hedgcock was the designated note-taker for

2  the company; is that correct?

3  A.   Yes.

4  Q.   And you testified --

5       MR. FRASER:  Your Honor, I would object.  I think these

6  questions are not voir dire but cross-examination questions.

7       MR. CARLSON:  No, they go to the admissibility of the

8  document, and I'm going to --

9       JUDGE BUXBAUM:  Well, let's wait and see a little bit.

10  Let him develop it a little further, Mr. Fraser, and then

11  I'll hear you.

12  Q.   BY MR. CARLSON:  And your testimony was further that you

13  felt compelled, for your own purposes, to take notes at the

14  May 21 meeting?

15  A.   Yes.

16       JUDGE BUXBAUM:  Well, I'm not sure -- hold on a minute.

17  I want to understand that, too.  I don't think -- and let me

18  ask all of counsel their recollections.  I don't think he

19  said which meeting.  He said a meeting, didn't he?

20       MR. FRASER:  That's correct.  He didn't identify --

21       JUDGE BUXBAUM:  Yeah.  So that is the question that I

22  think --

23       MR. CARLSON:  Is this the meeting where --

24       JUDGE BUXBAUM:  Go ahead, go ahead.

25  Q.   BY MR. CARLSON:  And is this the meeting we're talking

1    about, the May 21 meeting?

2    A.    Yes, sir.

3        JUDGE BUXBAUM:  So, in other words, we're not going to

4    find elsewhere another set of notes that you took, other than

5    doodles, at another meeting?

6        THE WITNESS:  No, sir, I don't believe so.

7        MR. CARLSON:  And that was my third question.  And I am

8    going to object to the admissibility of this document.  I

9    think this document is hearsay.  He was not only not the

10   company's regular note-taker, he was not a regular note-taker

11   at all.  This is hearsay.  It's not an exception to the

12   business record.  This wasn't a note that was made in the

13   ordinary course of business.  He was not only not, as I

14   said --

15       JUDGE BUXBAUM:  But, Mr. Carlson, don't notes taken by

16   anyone at a bargaining session come in under Board practice?

17   In other words, if there's some question that he really --

18   you know, he heard he was getting sued, and then he wrote

19   this down as a falsification, of course, that's something

20   else.  But if I assume that these are authentic notes that he

21   took at the May 21st session, wouldn't they always come in?

22       MR. CARLSON:  Well, his testimony was that he took these

23   notes for his own purposes.

24       JUDGE BUXBAUM:  Well, sure, but everyone at a bargaining

25   session is taking notes for a variety of purposes, including

1    their own, don't you think?  For example, we --

2        MR. CARLSON:  Well, I think the fact that --

3        JUDGE BUXBAUM:  For example, you didn't object when

4    Mr. Viar's notes -- it seemed to me -- didn't he have some

5    notes that we admitted?

6        MR. FRASER:  Absolutely.

7        JUDGE BUXBAUM:  Yeah.

8        MR. FRASER:  Mr. McKnight made them CP-7, CP-8.

9        JUDGE BUXBAUM:  Yeah, I think the notes should come in,

10   shouldn't they?  Unless there's an issue as to authenticity.

11       MR. CARLSON:  Well, I think there is -- I think there's

12   an issue as to admissibility when, out of almost 20

13   bargaining sessions, we have a single page of notes from this

14   witness.  But that's my objection.

15       JUDGE BUXBAUM:  But, again, that goes to the weight.  I

16   don't have any trouble with that as an argument going to the

17   weight.

18       MR. FRASER:  And, Your Honor, again, the record gets

19   replete with these types of statements.  I mean, it's no

20   different from seeing -- having Mr. Winkle testify that he

21   doesn't take notes, either.  I mean, it's an argument.  It's

22   not an objection.

23       JUDGE BUXBAUM:  Sure, no, clearly, what I'm saying about

24   bargaining notes applies to the notes on both sides.  It's,

25   in my view -- and, look, you tell me in the brief if I've

1   gotten it wrong, but I think the Board's policy is that,

2   assuming they're authentic, notes taken by any participant in

3   collective bargaining will come in when there's an issue

4   before the Board relating to what happened at a session, in

5   other words, when they're relevant.

6        I'll admit Respondent's 6.

7        MR. FRASER:  Thank you, Your Honor.

8   **(Respondent's Exhibit 6 received into evidence.)**

9                    **DIRECT EXAMINATION (cont.)**

10  Q.   BY MR. FRASER:  Mr. Kirk, do you remember any response

11  from any UAW member to the statements on Respondent's 6, at

12  the first part of the page?

13  A.   There was some response later in the same general time

14  frame.  There was a response, "Well, we think the lockout is

15  illegal, as well."  Mr. Winkle responded like that.

16  Q.   Did the company -- did Douglas reach a collective

17  bargaining agreement with the Union on May 21, 2008?

18  A.   No.

19  Q.   Was there any discussion in your presence on May 21

20  regarding return-to-work issues?

21  A.   No, not as a return --

22       MR. McKNIGHT:  "No" is an answer.

23       JUDGE BUXBAUM:  Well, I should think you'd want to hear

24  the answer.  Certainly, I'm going to let him finish his

25  answer.

1      THE WITNESS:  No.

2      JUDGE BUXBAUM:  Well, did you want to add something,

3  sir?

4      THE WITNESS:  Any -- no, any discussions at any of these

5  sessions would have been in regard not to returning to work

6  but as part of any negotiations.  And it was dependent upon

7  getting an agreement.

8      JUDGE BUXBAUM:  A collective bargaining agreement?

9      THE WITNESS:  A collective bargaining agreement.

10  Q.  BY MR. FRASER:  And on May 21, 2008, did you -- by you,

11  I mean Douglas -- did Douglas and the Union reach any

12  agreement regarding reinstating the illegal strikers?

13     MR. McKNIGHT:  Objection.  Same objection as before.

14     JUDGE BUXBAUM:  I understand.  Overruled.

15     THE WITNESS:  No.

16  Q.  BY MR. FRASER:  I'd like you to look at General Counsel

17  Exhibit Number 37 in the large binder, please.

18  A.  Yes.

19  Q.  Have you seen that document?

20  A.  Yes.

21     MR. McKNIGHT:  I'm sorry.  Which one is it, counsel?

22     MR. FRASER:  General Counsel 37.

23     MR. McKNIGHT:  Oh, 37.  I thought you said something

24  else.

25  Q.  BY MR. FRASER:  Mr. Kirk, was there any discussion on

1    May 21, 2008, regarding the return-to-work conditions

2    provided to the Union on May 5?

3        MR. McKNIGHT:  Objection as to that question, which is

4    leading.

5        MR. FRASER:  I just asked him, "Were there any

6    discussions?"  I didn't say, "There were discussions, weren't

7    there?"

8        JUDGE BUXBAUM:  Yeah.  How is it leading, Mr. McKnight?

9        MR. McKNIGHT:  Because I -- can we excuse the witness,

10    Your Honor?

11        JUDGE BUXBAUM:  All right.  Mr. Kirk, would you please

12    wait outside the courtroom for a moment?

13        THE WITNESS:  Yes, sir, I will.

14        JUDGE BUXBAUM:  Don't discuss your testimony with anyone

15    while you're out there.

16        THE WITNESS:  Yes, sir.

17    **(Witness exits.)**

18        MR. McKNIGHT:  May I proceed?

19        JUDGE BUXBAUM:  You may, certainly.

20        MR. McKNIGHT:  The Employer has a legal theory here that

21    the contract proposal of May 5, 2008 is the conditions, the

22    conditions of employment, and for that purpose, counsel calls

23    it that.  And that is why that's a leading question because

24    the document doesn't call itself "Conditions of Employment

25    Upon an Unconditional Offer to Return to Work."  So when he

 1   phrases this as, "Was there any response to the Employer's

 2   conditions of return to work?" he is leading the witness.

 3   And the question -- the appropriate question is "Did the

 4   Union respond to the company's, quote, proposal?" which is

 5   what that is called.

 6       JUDGE BUXBAUM:  And, now, the document you're referring

 7   to is what, GC --

 8       MR. McKNIGHT:  I think it's GC-7.

 9       JUDGE BUXBAUM:  Yeah, I think so.  Let's see.  No, GC-8,

10   I believe.

11       MR. McKNIGHT:  That's correct.

12       JUDGE BUXBAUM:  Mr. Fraser?

13       MR. FRASER:  That's an interesting theory and argument,

14   and I'm glad Mr. McKnight thought last night about that

15   issue, but here's the problem with that.  This witness has

16   testified that those were the return-to-work conditions

17   offered to the Union.  It's not my statement, it's Mr. --

18       JUDGE BUXBAUM:  Oh, no, clearly.  And Mr. Viar testified

19   to that, too.

20       MR. FRASER:  Exactly.  So I can't be leading him into

21   something that he's already said it.  They said they were the

22   return-to-work conditions.  My only question was --

23       JUDGE BUXBAUM:  Yeah, I think I'll allow it.  It's not

24   sufficiently leading to be troublesome in the sense that it

25   doesn't suggest its own answer, only because we know what the

1  witness thinks that the document was.  So if it were a
2  witness who hadn't expressed the view already, I think it'd
3  be a different story.
4      All right.  While we are in a break in the testimony, I
5  noticed, Mr. Fraser, that Ms. Stoppels has arrived, and if
6  you want to take care of that matter, we can get her on her
7  way to do other business.
8      MR. FRASER:  Well, she has enjoyed this process so much
9  that she wants to stay and watch, regardless, but --
10     JUDGE BUXBAUM:  Well, she is certainly welcome to do
11 that.
12     MR. VIAR:  Take my spot.
13     JUDGE BUXBAUM:  Be careful, Mr. Viar.  Your spot
14 involves a lot of testimony.
15     MR. VIAR:  No, I want to be here.  I'm trying to be
16 light-hearted.
17     JUDGE BUXBAUM:  I'm just -- of course.
18     **JUDGE BUXBAUM:  We'll go off the record for a moment.**
19 **(Off the record.)**
20     MR. FRASER:  We do now have the edited, amended,
21 whatever we're going to call it, attorney-client privilege
22 log, with the document listed that we had previously
23 described.  I don't know how you would like to have that
24 marked, but it's an ALJ exhibit --
25     JUDGE BUXBAUM:  I want it marked ALJ Number 2.

1      MR. FRASER:  ALJ-2.

2      JUDGE BUXBAUM:  And Mr. Fraser, then, what you are

3  representing to me -- because, of course, as you know, in the

4  peculiar situation we're in, you're the only person that

5  knows for sure -- well, you and your colleagues --

6      MR. FRASER:  Right.

7      JUDGE BUXBAUM:  You're representing to me that these 23

8  documents that were -- or, 25, I see it is.  These 25

9  documents that were listed in your original privilege log are

10  the ones that would comply with my directive for in camera

11  production?

12      MR. FRASER:  Your Honor, although if you look to the

13  second page, the last document is in slot 25.  So that

14  counsel doesn't have a hemorrhage, if you look at the first

15  two lines on the first page --

16      JUDGE BUXBAUM:  Oh, yeah.

17      MR. FRASER:  -- you'll see that line number one says

18  "Author/Recipient," line number two says "Date Created."  If

19  you actually count the documents, there are 23, as we

20  identified previously.

21      JUDGE BUXBAUM:  Okay, okay.  All right.  So those 23 are

22  -- first of all, I want to be sure that they are documents

23  that appeared on your original privilege log?

24      MR. FRASER:  Yes, they are.

25      JUDGE BUXBAUM:  And those are the documents that you

1  have determined, in your professional judgment, are those

2  that would be subject to my order for in camera inspection?

3      MR. FRASER:  That meet the definition that you provided

4  on the record and that we agreed we would provide in response

5  to that request, yes.

6      JUDGE BUXBAUM:  By "that you agreed you would provide,"

7  you mean the log, not the documents.

8      MR. FRASER:  Exactly.

9      JUDGE BUXBAUM:  You haven't changed your position, I

10  take it?

11      MR. FRASER:  No, not that we would provide for your in

12  camera review, but that we would identify.

13      JUDGE BUXBAUM:  All right.  All right.  Because I

14  believe that the record should contain a concise indication

15  of what those documents are, in the event that any higher

16  authority wishes to take any action with respect to the

17  noncompliance with my directive for in camera inspection, I'm

18  going to admit this as ALJ-2.

19      MR. McKNIGHT:  Before you admit it, Your Honor, I'd like

20  to speak to it.

21      JUDGE BUXBAUM:  Yes, yes, I'll hear you.

22      MR. McKNIGHT:  May I examine it for just a few moments?

23      **JUDGE BUXBAUM:  You may.  We'll go off the record for a**

24  **moment.**

25  **(Off the record.)**

1       **JUDGE BUXBAUM:  We're on the record.**

2       I'll hear from you, Mr. McKnight.

3       MR. McKNIGHT:  What I understood by your ruling -- and I

4  just want to make sure so I can grasp that ruling in the

5  context of Respondent's Exhibit -- does this have a number?

6       MR. CARLSON:  I think it was going to be ALJ-2.

7       JUDGE BUXBAUM:  ALJ-2.

8       MR. McKNIGHT:  ALJ-2.  Was that -- documents to or from

9  Mr. Viar, where he asserted that he was functioning as legal

10  counsel to the company, should be identified on the privilege

11  log, a shorter privilege log, for in camera inspection.

12      JUDGE BUXBAUM:  Those documents which were not merely a

13  paraphrase of some other attorney's --

14      MR. McKNIGHT:  Where he was acting as a conduit for some

15  other attorney's advice.

16      JUDGE BUXBAUM:  Right, right.

17      MR. McKNIGHT:  So where Mr. Viar was acting as a conduit

18  for some other attorney's advice, those documents did not

19  have to be -- and they had about 20 different attorneys.  I

20  understand that.

21      JUDGE BUXBAUM:  Sure.

22      MR. McKNIGHT:  Those documents did not have to be

23  identified for in camera inspection.

24      JUDGE BUXBAUM:  By the terms of my order, based on my

25  view of it, that is correct.

1      MR. McKNIGHT:  Okay.  But --

2      JUDGE BUXBAUM:  Again, an appellate authority obviously

3  could view it differently.

4      MR. McKNIGHT:  But those documents where Mr. Viar

5  assertively was either a recipient or an author, acting as

6  counsel for the company, should be identified in the

7  privilege log, and --

8      JUDGE BUXBAUM:  On ALJ-2.

9      MR. McKNIGHT:  Yes.

10      JUDGE BUXBAUM:  Yes.

11      MR. McKNIGHT:  For your in camera inspection.

12      JUDGE BUXBAUM:  Correct.

13      MR. McKNIGHT:  And if that's what counsel has produced,

14  it means that, from January of 2008 until August 26, 2008,

15  Mr. Viar was neither the recipient nor the author of a single

16  document when acting as counsel for -- purportedly, as

17  counsel for the company.  And that's the question I'm raising

18  with respect to this.  Is that what you're saying, counsel?

19      MR. FRASER:  Are you making an argument or asking me a

20  question?  I'm not sure that I've got an obligation to

21  respond, other than to say we have abided by the judge's

22  request and intentionally had three different lawyers, two

23  lawyers independently, looking at the same 130 documents,

24  myself with the clients looking at the same documents,

25  bringing those two independent reviews together for another

1    hour to review additionally those 130 documents where we each

2    indicated we think it fits the judge's request and then

3    providing those documents that are now on this log.  So we

4    have met your request and order.

5        JUDGE BUXBAUM:  All right.

6        MR. McKNIGHT:  Well, I would only say for the record,

7    Your Honor, that the number of attorneys that the company has

8    had affiliated with this is not a measurement of anything

9    other than the number of attorneys they've had affiliated

10   with it --

11       JUDGE BUXBAUM:  Well, I don't agree with that,

12   Mr. McKnight, but it doesn't matter.  Look, the point is I --

13       MR. McKNIGHT:  But I just wanted -- that's my

14   understanding of what I've seen here, and I wanted to point

15   that out for the record.  I think -- because this is the

16   first -- I mean, the first document that appears from this

17   massive log --

18       JUDGE BUXBAUM:  All right.  But you've made your point,

19   Mr. McKnight.  It actually doesn't go to any issue that's

20   before me now because I've already ruled on these things, so

21   some other decision maker down the line may want to hear that

22   argument, but it's not material to anything before me at this

23   moment.

24       I'm going to admit ALJ-2, which, of course, is my

25   prerogative to do because I want the record to be plain as to

1  what it is that counsel believes complies with my directive

2  to submit these documents for in camera inspection, a

3  directive which they've chosen not to obey.

4      MR. CARLSON:  Well, I'd like to just, on the record,

5  briefly, Judge, is to seek some clarification from Mr. Fraser

6  if there is a reason why there is no document that appears on

7  here predating August 26, 2008, if there is a reason for that

8  because I find that confusing.

9      JUDGE BUXBAUM:  Well, do you want to answer that,

10  Mr. Fraser --

11      MR. FRASER:  You know what, Your Honor?  I'm --

12      JUDGE BUXBAUM:  -- again, I'm not going to take much

13  time from the matters before me, but --

14      MR. FRASER:  And that's fine.  I'm going to say one more

15  time, I am tired of the implications from Mr. McKnight and

16  Mr. Carlson about not only my credibility but my compliance

17  with your request.  And so I'll say one more time, we have

18  complied with your request.  Their conspiracy beliefs are

19  completely theirs.  If they want to raise those arguments

20  somewhere else, that is fine with me.  We'll respond at the

21  appropriate time.

22      JUDGE BUXBAUM:  All right.  Okay.  ALJ-2 is admitted.

23  **(Administrative Law Judge's Exhibit 2 marked for**

24  **identification and received into evidence.)**

25      JUDGE BUXBAUM:  Let's have Mr. Kirk back to resume the

1    stand.

2    **(Witness returns.)**

3         JUDGE BUXBAUM:  All right.  The record will reflect that

4    we had had a discussion out of Mr. Kirk's presence regarding

5    an objection to Mr. Fraser's latest question.  I am

6    overruling the objection.

7         Mr. Fraser, do you want to restate the question so

8    that -- unless Mr. Kirk says he remembers it --

9         THE WITNESS:  I do not remember it.

10        JUDGE BUXBAUM:  All right.  I had a feeling.  I don't

11   either, Mr. Kirk.

12                    **DIRECT EXAMINATION (cont.)**

13   Q.   BY MR. FRASER:  I believe the question was did Douglas,

14   in your presence, May 21, 2008, reach any agreements

15   regarding reinstating the illegal strikers?

16   A.   We did not.

17   Q.   And I believe the next question that I had asked --

18   maybe I'm mistaken myself because it gets belated as we go

19   through this.  Give me a moment to confer.

20        **JUDGE BUXBAUM:  Sure.  We'll go off the record for a**

21   **moment.**

22   **(Off the record.)**

23        JUDGE BUXBAUM:  Go ahead.

24   Q.   BY MR. FRASER:  Mr. Viar, I think the question was --

25   I'm sorry, Mr. Kirk.  See, you've got me so frustrated, I

1    can't even call you the right name right now.

2          JUDGE BUXBAUM:  No, in the course of this trial, we all

3    think every witness is Mr. Viar because he has been every

4    witness for much of the trial.

5          MR. FRASER:  There you go.

6    Q.   BY MR. FRASER:  Mr. Kirk, I think you were looking at

7    General Counsel Exhibit 37, and then I asked you the

8    question:  At any point in time during the May 21, 2008

9    session with the Union, did Mr. Winkle or anyone from the

10   Union respond to the return-to-work conditions provided to

11   them on May 5, 2008?

12   A.   Yes, they did.

13   Q.   Can you tell me who responded and what they said?

14   A.   When Mr. Lillie asked Mr. Winkle, "Receiving this

15   proposal, is it safe to assume that you are rejecting or not

16   accepting our return-to-work terms and conditions from May

17   5th?"

18   Q.   When you say "this proposal," were you referring to GC-

19   37?

20   A.   37, yes.

21   Q.   Okay.  And what was Mr. Winkle's --

22   A.   And Mr. Winkle said, "Yes, that's right.  We are not

23   accepting that."

24   Q.   If you'd look at that blue binder again just for a

25   second and focus your attention on June 13, please.

1  A.   This is from Exhibit 1?

2  Q.   Joint Exhibit 1.

3  A.   Yes.

4  Q.   Were you at this meeting?

5  A.   I was.

6  Q.   Were you part of any private conversations with the UAW

7  during this session?

8  A.   Private as far as --

9  Q.   Not in a joint session.

10  A.   Yes.

11  Q.   Okay.  And can you tell me what you recall?  Where were

12  you, who was there?

13  A.   Yes.  It was late in the day.  Asked if we could --

14  Mr. Lillie came in and said that he had been asked, I think

15  by Mr. Winkle, to be able to sit down and just have some

16  general discussion in a small group, and it was Mr. Curry

17  (ph.), who was from the FMCS --

18  Q.   Okay.

19  A.   -- it was Mr. Lillie and myself, along with Mr. Winkle

20  and Mary Ellis and Frank Gruza in the eating area of the

21  Hampton Inn.

22  Q.   Okay.  And can you tell me what was discussed?  Who said

23  what?

24  A.   It was generally, "What are we going to have to do?"

25  Q.   Who's saying this?

1   A.    I think, best of my recollection, Mr. Winkle was trying

2   to ask, "What do we got to do?  We got to find a way to get

3   this settled," et cetera, et cetera.  Mr. Gruza wanted to

4   know why we did not -- why the company did not want the

5   people back to work.

6        I responded that it wasn't a matter of not wanting

7   people back to work; we wanted people that wanted to be

8   there, that wanted to buy into the success of the company,

9   that what I had seen, that was not the case.  I reminded him

10  that it was those people sitting at -- the Union people

11  sitting at that table that, prior to the strike, had made

12  comments about wishing to bankrupt the company now -- rather

13  bankrupt the company now than later and that the company -- I

14  assured them that we were not going to sign any agreements or

15  come to any kind of agreements that would bankrupt the

16  company now or later.

17       Mr. Gruza took me to task --

18       JUDGE BUXBAUM:  Hold on.  Hold on.

19  Q.    BY MR. FRASER:  Hang on a second.  That's okay.  During

20  this sidebar or private conversation with the Union that

21  you've just described, was there any discussion about the

22  illegal strike?

23  A.    I don't remember.

24  Q.    Okay.  Did you know whether -- did you, the company,

25  Douglas, reach a collective bargaining agreement with the

1    Union during the 6/13/08 meeting?

2    A.    No.

3    Q.    Did you discuss any return-to-work issues at any time

4    during the 6/13/08 meeting?

5    A.    No.

6    Q.    Was there any discussion during the 6/13 meeting about

7    replacement workers?

8    A.    Not to my memory.

9    Q.    Okay.  Was there any agreement reached regarding

10   reinstating the illegal strikers on the 6/13/08 meeting?

11        MR. McKNIGHT:  Just so that the record reflects, I have

12   a standing objection to that --

13        JUDGE BUXBAUM:  But, Mr. McKnight, that objection

14   particularly irritates me because there's no question that

15   there was an illegal strike.  So to characterize people who

16   participated in the illegal strike as illegal strikers is

17   entirely legitimate.  I don't understand -- I understand it

18   about certain other terms, but that one is a legitimate use

19   of the English language.

20        Mr. Fraser, you may continue.

21   Q.    BY MR. FRASER:  Mr. Kirk -- I almost called you Mr. Viar

22   again.  I know, I know, I'm in trouble.  Mr. Kirk, if you

23   could look at General Counsel Exhibit Number 15, please?

24   A.    Would that be in the black book?

25   Q.    Yes, the big black book, please.

1    A.    Number 15, sir?

2    Q.    Yes, please.  Have that in front of you?

3    A.    I do.

4    Q.    Have you seen that before?

5    A.    Give me a moment, if I could, please.

6    Q.    Tell me when.

7    A.    I don't remember seeing this.

8    Q.    Okay.  I'm going to move you to July 1 of 2008, Joint 1,

9    if you'd look at that again?

10        JUDGE BUXBAUM:  Well, hold on.  I can't leave that

11   without some further exploration.  Stay with GC-15 for a

12   moment, Mr. Kirk.

13        THE WITNESS:  Yes, sir.  Oh, I'm sorry.  I'm looking at

14   14.  Forgive me.

15        MR. FRASER:  I wondered about that.

16        JUDGE BUXBAUM:  Yeah, all right.  Well, let's go back

17   and replow this furrow.

18        THE WITNESS:  I'm sorry.  Forgive me.

19   Q.    BY MR. FRASER:  Have you seen GC-15 before?

20   A.    I have.

21   Q.    And can you tell me when?

22   A.    I'm sorry.  I was looking at 14.  My mistake.

23   Q.    Okay.  I was wondering about that, but --

24   A.    Since I signed it, it would be difficult not to --

25        JUDGE BUXBAUM:  Well, that was what had us all

1   perplexed.

2   Q.   BY MR. FRASER:  What is that, please?

3   A.   That is a notification to Mr. Winkle that the letter was

4   prepared by, I think, Mr. Viar, stating that --

5   Q.   You don't need to tell me what it says.  At any time,

6   did you provide that to the Union?  Do you recall?

7   A.   I think it was provided.  I don't know that I provided

8   it directly, but I think Mr. Lillie provided it directly.

9   Q.   Okay.

10        JUDGE BUXBAUM:  But so the record is clear, now, who

11   signed it?

12        THE WITNESS:  I did.

13        JUDGE BUXBAUM:  That's your signature?

14        THE WITNESS:  That is my signature.

15        JUDGE BUXBAUM:  Okay.  All right.

16        THE WITNESS:  Yes, I saw it, I signed it, yes.

17        JUDGE BUXBAUM:  Okay.

18   Q.   BY MR. FRASER:  Okay.  I want to move you now to July 1

19   of 2008, so if you'd look at that joint exhibit, Joint

20   Exhibit Number 1.  Were you at that session, July 1?

21   A.   Yes.

22   Q.   Do you know whether there were any sidebars between

23   Douglas representatives and the UAW during that session?

24   A.   I don't remember, sir.

25   Q.   Okay.  Were there any new participants to the bargaining

1   process beginning July 1, 2008?

2   A.   Yes, sir.  Mr. -- the attorney for the Union,

3   Mr. Canzano, showed up for the first time at that session.

4   Q.   Do you recall whether there were any joint sessions that

5   day?

6   A.   My recollection is there were none.

7   Q.   Okay.  Was there a collective bargaining agreement

8   reached during the July 1, 2008 meeting?

9   A.   No, sir.

10  Q.   To the best of your knowledge, at any time, was there a

11  discussion regarding return to work that you were part of?

12  A.   No, sir.  If I may?  There was a document that was

13  presented late in the day --

14  Q.   We're going to get to that.

15  A.   Okay.

16  Q.   Please.  Was there any agreement reached on July 1,

17  2008, regarding reinstating the illegal strikers?

18  A.   No, sir.

19  Q.   If you'd look at General Counsel Exhibit Number 39,

20  please?

21  A.   And it will say 39 on the bottom.

22  Q.   Yes, it will.

23  A.   Yes, sir.

24  Q.   Have you seen that before?

25  A.   I have.

1  Q.   When did you first see that?

2  A.   On July 1st, late in the day.

3  Q.   Tell me what happens, how it comes into your --

4  A.   Mr. Canzano brings it into the breakout room where we

5  were and presents it to Mr. Lillie.

6  Q.   Was there any discussion that you heard as that

7  occurred?

8  A.   I don't remember the exact discussion that Mr. Canzano

9  and Mr. Lillie had concerning this.  There was some -- I

10 don't remember the exact conversation.

11 Q.   Did the company -- did Douglas agree to this GC-39?

12 A.   No.

13 Q.   I'm going to move you to the next bargaining date, which

14 is July 2.

15 A.   Yes, sir.

16 Q.   Were you at that session?

17 A.   I was.

18 Q.   Okay.  Do you know whether or not any Douglas

19 representative engaged in any private conversation with a UAW

20 representative that day?

21 A.   Specifically, I don't remember.

22 Q.   Okay.

23      MR. McKNIGHT:  I'm sorry.  I didn't hear which GC you

24 were referring to.

25      MR. FRASER:  I'm not referring to any GC right now.  The

1  last GC I referred to was on 7/1/08, and that was GC-39.

2        MR. McKNIGHT:  I'm sorry.  Thank you.

3        MR. FRASER:  That's okay.  Sam, the exhibit I was

4  referring to was Joint 1.

5        MR. McKNIGHT:  Oh, okay.

6  Q.   BY MR. FRASER:  Mr. Kirk, was there any discussion in

7  your presence on July 2, 2008, about the illegal strike?

8  A.   Not specifically, to my recollection, sir.

9  Q.   Okay.  Were there joint sessions on 7-2-2008, if you

10  recall?

11  A.   No, sir, there was not, not to my memory.

12  Q.   Do you know whether or not there was a collective

13  bargaining agreement reached on July 2, 2008?

14  A.   There was not.

15  Q.   Was there any discussion on July 2, 2008, regarding

16  return-to-work issues?

17  A.   There was some discussion about -- oh, sir, I'm sorry,

18  I've got the -- not that I remember.

19  Q.   Okay.  Did you, the company and the Union, reach any

20  agreements on reinstating the illegal strikers on July 2,

21  2008?

22  A.   No, sir.

23  Q.   At any point during the July 2 session, was there any

24  discussion regarding replacement workers that you recall?

25  A.   Ask me that again, if you would, please.

1    Q.    Yeah.  At any point during -- on July 2, 2008, do you

2    remember any discussion regarding replacement workers?

3    A.    Yes, sir, there was some discussion about replacement

4    workers, about whether or not they were permanent or not

5    permanent, temporary or permanent.

6    Q.    Hang on a second.  Tell me what you recall,

7    specifically, not in general.  Where were you, who said what,

8    regarding that topic?  If you can recall.

9    A.    I can't recall, Mr. Fraser.

10   Q.    Now, do you recall any discussion during July 2, 2008,

11   regarding a transition plan?

12   A.    Again, yes, I can remember that -- I can remember some

13   discussion about -- but exactly where and who was involved, I

14   can't remember, specifically.

15   Q.    Okay.  That's fine.

16   A.    I can give you generalities, but --

17   Q.    No, that's okay.  Look for me, if you would, please, at

18   General Counsel Exhibit Number 18.  Have you seen that

19   document before, GC-18?

20   A.    I have.

21   Q.    And when did you first see that?

22   A.    On July 2nd.

23   Q.    Okay.  And where were you, how did you see it?

24   A.    We were in the breakout room at the Hampton Inn --

25   Hilton-Hampton Inn, in Coldwater, Michigan, and there had

1  been discussion between Mr. Lillie and Mr. Canzano about what

2  we referred to as a cooling-off period, and --

3      JUDGE BUXBAUM:  Well, hold on.  There's really no

4  question before you right now.

5  Q.   BY MR. FRASER:  Okay.  So you've seen the document.  Did

6  the company agree, did Douglas agree to this GC-18?

7  A.   Yes.

8  Q.   Okay.  So on July 2, was there any agreement reached

9  between the company and the Union?

10 A.   Other than this?

11 Q.   Yes.

12 A.   No.

13 Q.   So was there a collective bargaining agreement reached?

14 A.   No.

15     MR. McKNIGHT:  I think we could stipulate for the record

16 we haven't reached a collective bargaining agreement.

17     JUDGE BUXBAUM:  Well, we already had -- yeah, I debated,

18 Mr. McKnight, whether it would take longer to make that point

19 to Mr. Fraser, or just to let him ask the question with each

20 witness.

21     But, Mr. Fraser, it's true.  In the first weeks -- in

22 the June portion of this case, the same issue came up, and

23 there was a stipulation that the parties have never reached a

24 collective bargaining agreement.  So the question is not

25 really material.

1    MR. FRASER:  If I can hear Mr. Carlson and Mr. McKnight

2    say that again, I'll -- I vaguely remember that.

3    MR. McKNIGHT:  I withdraw my comment, Your Honor.  I'm

4    sorry I said it.  Just let him proceed.

5    JUDGE BUXBAUM:  Well, the fact is there was such a

6    stipulation, but go ahead, Mr. Fraser.  Again, I've proven my

7    own internal deliberation to be correct, that I've wasted

8    more time discussing it than letting you ask the question.

9    So ask away.

10    MR. FRASER:  Thank you.

11    Q.    BY MR. FRASER:  I think we're ready to move on to July

12    14, Mr. Kirk.  Can you look again at Joint Exhibit 1?  Were

13    you present at this session?

14    A.    I was.

15    Q.    Do you recall any sidebar, private discussions, between

16    representatives from Douglas and the UAW during this session?

17    A.    I don't --

18    MR. McKNIGHT:  Objection, foundation.

19    JUDGE BUXBAUM:  Well, all right.  Do you recall any

20    sidebars in your presence that you were aware of?

21    THE WITNESS:  No, sir, I don't remember.

22    MR. FRASER:  Your Honor, I think whether he was in the

23    sidebar or not wasn't the question; the question was whether

24    he is aware whether there were any, and he certainly can be

25    aware of that from means other than him participating in it

1  himself.

2     JUDGE BUXBAUM:  Yes, but that goes back to

3  Mr. McKnight's objection.  If the reason that he's aware of

4  it is that the front desk clerk said, "By the way, I saw, you

5  know, Lillie and Canzano chatting," that's hearsay, and the

6  objection would be appropriate.

7     MR. FRASER:  Well, only if --

8     JUDGE BUXBAUM:  If he saw -- if he's aware of it because

9  he saw Canzano and Lillie chatting, then it's fine.

10     MR. FRASER:  Exactly.  And so the first question, of

11  course, can't be asked until the second question; otherwise,

12  I'll get an objection as to leading.  I could say to

13  Mr. Kirk, "Mr. Kirk, did you, in fact, see somebody

14  participating in a sidebar conversation?"  And I suspect that

15  they would argue that that's leading, so I --

16     JUDGE BUXBAUM:  Well, it isn't leading, and it's fine to

17  ask that question.

18     MR. FRASER:  Great.  Fine.

19  Q.  BY MR. FRASER:  Mr. Kirk, did you see anyone

20  participating in a sidebar conversation on 7-14-2008?  Just

21  best of your recollection.

22  A.  Not to my recollection.

23  Q.  Okay.  Was there a collective bargaining agreement

24  reached on July 14, 2008?

25  A.  No, sir.

1    Q.    Was there any discussion regarding return-to-work issues

2    in your presence on July 14, 2008?

3    A.    Only in the concept of discussing proposals that were

4    made that day.

5    Q.    Okay.  What do you mean by that?

6    A.    I think there was a proposal made by the -- a 7-14

7    proposal made by the UAW on that day, and there may have been

8    some discussion about that, about doing that if we reached an

9    agreement.

10   Q.    Did you reach any agreement on July 14, 2008, to return

11   the illegal strikers to work?

12   A.    No.

13   Q.    Did you reach any agreements on July 14, 2008, that

14   you're aware of?

15   A.    No.

16   Q.    I'm going to show you General Counsel Exhibit Number 40.

17   Have you seen that document?

18   A.    Yes, sir.  That's what I referred to before.

19   Q.    Okay.  When did you first receive that?

20   A.    On July 14th.

21   Q.    And did the company agree to this proposal?

22   A.    We did not.

23   Q.    You said, "That's what I referred to before," and I

24   think I had asked you a question about return-to-work issues.

25   Was there discussion based on this proposal about return-to-

1  work issues?

2  A.   Mr. Fraser, in my mind, this is my interpretation of

3  that is all of the discussions that we're talking about here

4  is, if we get an agreement --

5  Q.   Okay.

6  A.   -- then the people -- we get an agreement that has been

7  ratified, then the people would return to work.  So all

8  discussions about reaching agreement is about people

9  returning to work.

10 Q.   Okay.  Let's move to July --

11 A.   But, specifically, specifically, "Hey, I want you to

12 bring these people back to work today.  Please do this or

13 don't do that," I don't remember those conversations like

14 that.

15 Q.   Okay.  Thank you.  July 15th, 2008, were you at that

16 bargaining session?  It's Joint Exhibit --

17 A.   I was.

18 Q.   Did you see anyone participating in a sidebar

19 conversation on July 15, 2008?

20 A.   Not to my specific recollection.

21 Q.   Okay.  Did you participate in a sidebar conversation on

22 July 15, 2008?

23 A.   Not to my recollection.

24 Q.   Were there any statements that -- first of all, were

25 there any joint sessions on July 15th that you're aware of?

1   A.   I don't remember.

2   Q.   Okay.  Did you reach a collective bargaining agreement

3   with the Union on the July 15, 2008 session?

4   A.   We did not.

5   Q.   All right.  Do you recall whether there was discussion

6   regarding any return-to-work issues during the July 15, 2008

7   session?

8   A.   There was not.

9   Q.   Did you reach any agreements on reinstating the illegal

10  strikers on July 15, 2008?

11  A.   We did not.

12  Q.   I'm going to show you what's been marked as General

13  Counsel Exhibit 22.

14  A.   22?

15  Q.   Yes, please.  Have you seen that?

16  A.   Yes.

17  Q.   Can you tell me when you first saw that document?

18  A.   On July 21st.

19  Q.   Did you help prepare that document?

20  A.   Helped prepare the contents of it, the questions, yes.

21  Q.   Okay.  And what was the purpose for that document?

22  A.   To get clarification on where the -- two-fold, in my

23  recollection.  One is to get information and understanding of

24  where and how the Union came up with their demands; and,

25  also, maybe an attempt to get the Union to think back about

1  the financial condition of the company as it relates to what
2  they were asking for.
3  Q.   Okay.  I'm going to move you to July 24, 2008.  Were you
4  at that bargaining session?
5  A.   I was.
6  Q.   Did you see anyone from the company having any sidebar
7  discussions with any UAW representative?
8  A.   Not to my specific recollection.
9  Q.   Do you recall whether there were any joint sessions on
10  July 24?
11  A.   Yes, sir, I think there was.
12  Q.   Okay.  And in those joint sessions, do you recall any
13  discussion regarding the illegal strike?
14  A.   Try me thataway again, please.
15  Q.   Yes.  On July 24, 2008, in a joint session, do you
16  recall whether there was any discussion about the illegal
17  strike?
18  A.   Yes, sir.
19  Q.   Tell me what you recall.
20  A.   Mr. Lillie reminding the Union that we think the strike
21  is illegal and that we're not waiving our rights by meeting
22  and discussing it.
23  Q.   Okay.
24       MR. McKNIGHT:  I'm sorry.  What was the last thing?  I
25  couldn't hear that.

 1      JUDGE BUXBAUM:  Could you repeat it?

 2      THE WITNESS:  Mr. Lillie reminding the Union that the

 3  strike was illegal and that we're not waiving our rights

 4  afforded us under the Act by meeting or discussing it.

 5  Q.    BY MR. FRASER:  Do you recall whether there was any

 6  response to that statement from any union representative?

 7  A.    Mr. Canzano was very incensed and --

 8  Q.    What did he say?

 9  A.    He made some reference about, "Just because you say it's

10  so, it doesn't make it so," and that a restaurant can put a

11  sign in the coatroom saying that they're not responsible, and

12  that doesn't make it so.

13  Q.    Any other discussion about that topic that session that

14  you can recall?

15  A.    Not specifically.

16  Q.    Did you reach a collective bargaining agreement with the

17  Union on July 24, 2008?

18  A.    Did not.

19  Q.    Did you reach any agreement on return-to-work issues on

20  the July 24, 2008 session?

21  A.    We did not.

22  Q.    Did you reach any agreements on reinstating the illegal

23  strikers on July 24, 2008?

24  A.    We did not.

25  Q.    So we're moving to July 25, 2008.  Were you at that

1  session?

2  A.    I was.

3  Q.    Did you see anyone have any sidebars on the July 25,

4  2008 session that you can recall?

5  A.    Not specifically recall.

6  Q.    Do you recall whether there were joint sessions on July

7  25, 2008?

8  A.    Yes, there were.

9  Q.    On July 25, 2008, do you recall any discussions

10 regarding the illegal strike?

11 A.    No, sir.

12 Q.    Okay.  If you would look for me at General Counsel

13 Exhibit 41, please?  Have you seen that document?

14 A.    I have.

15 Q.    And is that a document that was exchanged during the

16 July 25, 2008 session?

17 A.    It was.

18 Q.    Do you recall whether there was any discussion about

19 that?

20 A.    There was discussion about -- we tried to get

21 understanding about what, specifically, was it that the Union

22 had against this proposal, tried to get to discussion to --

23 but --

24 Q.    Could you look at page two of that document for me,

25 please?

1  A.   Yes.

2  Q.   Do you recall whether there was any discussion regarding

3  return-to-work issues on July 25, 2008?

4  A.   Yes, sir.

5  Q.   Can you tell me what your recollection is?

6  A.   With this discussion, there was quite a bit of

7  discussion about the return-to-work agreement on page two,

8  about how would we do that, how would we select the 40, who

9  would that be, who would make the selection, why wouldn't it

10  be seniority-based, that there would be -- that to have the

11  potential of having illegal strikers coming back and working

12  along with replacement workers was just not acceptable --

13  Q.   You just mentioned that.  Who made that statement?

14  A.   That was a combination of Mr. Winkle was making that

15  observation.  I think Mr. Gruza was making that observation

16  at different times.

17  Q.   Was there any agreement reached on return-to-work issues

18  on July 25?

19  A.   No.

20  Q.   Was there any agreement regarding reinstating illegal

21  strikers on July 25?

22  A.   No.

23  Q.   If you'd look at General Counsel Exhibit 42 for me,

24  please.  Have you seen that?

25  A.   Yes, sir.

1  Q.    When did you see that first?

2  A.    When it was presented to us on July 25th.

3  Q.    And who presented it to you?

4  A.    I think Mr. Canzano presented it to us.

5  Q.    Okay.  What was your understanding of that document?

6  A.    It was an attempt by the Union to make a proposal to try

7  to get a collective bargaining agreement.

8  Q.    Okay.  Did the company agree to that proposal?

9  A.    No.

10  Q.    I'm going to take you to July 28, 2008 now, if I could.

11  Were you at that session?

12  A.    Yes, sir.

13  Q.    And did you see anyone participating in any sidebar

14  conversations on July 28?

15  A.    Specific recollections, no.

16  Q.    Okay.  Was there any discussion that you recall in your

17  presence on July 28 about the illegal strike?  Only if you

18  can recall.

19  A.    Not that I recall, specifically.

20  Q.    All right.  Do you recall whether there were any joint

21  sessions on July 28?

22  A.    I think there were, yes.

23  Q.    Okay.  Was there a collective bargaining agreement

24  reached on July 28 with the Union?

25  A.    No.

1  Q.   Do you recall whether there were return-to-work issues

2  discussed on July 28?

3  A.   In the context of discussing the different proposals

4  that were being thrown at us.   Only in that context.

5  Q.   Were there any agreements reached on July 28, 2008,

6  about any topic?

7  A.   Not to my recollection.

8  Q.   We're going to take you to July 31, the bargaining

9  session.   Were you present?

10  A.   I was.

11  Q.   And do you recall seeing any of the Douglas

12  representatives involved in sidebars or private conversations

13  with the UAW on July 31?

14  A.   Mr. Fraser, that day was very hectic, and they were

15  going on, but, specifically, who and when and what, I don't

16  have a recollection of that.

17  Q.   Okay.

18       JUDGE BUXBAUM:  So as I understand, in other words,

19  there were sidebars, but you can't give us the details?

20       THE WITNESS:  Exact --

21       JUDGE BUXBAUM:  But you do recall that there were

22  sidebars?

23       THE WITNESS:  Well, there were sidebars throughout

24  there, Judge, but I can't remember, specifically, who and

25  when and what the subjects were about any of those sidebars,

1    with my recollection.  Couldn't in the others; I can't on

2    this one.  I just know that there was a lot of activity,

3    because --

4        JUDGE BUXBAUM:  On this day?

5        THE WITNESS:  Yes.

6        JUDGE BUXBAUM:  I got it.  Okay.

7    Q.   BY MR. FRASER:  Why do you know there was a lot of

8    activity on this day?

9    A.   Well, this was the last date that we were to meet before

10   the 30-day cooling-off period document ran out.

11   Q.   Okay.

12   A.   And so there was, on both sides, an attempt to try to

13   make something positive happen.

14   Q.   Okay.  And so I want to focus your attention on the end

15   of that bargaining session.  Do you recall the end of that

16   bargaining session?

17   A.   I do.

18   Q.   Can you tell me what you recall happened?

19   A.   Yes, sir.  It was late, we'd been at it for a long time,

20   had lots of discussions and a lot of pressure, and Mr. Lillie

21   -- we were in a breakout room.  Mr. Lillie said we had to go

22   back in general session or joint session, if you will --

23   Q.   Okay.

24   A.   -- because he had some housekeeping things that he had

25   to take care of.

1    Q.    Did you go back into joint session?

2    A.    We did go back into joint session, and Mr. Lillie, very

3    specifically, again, reminded them that the 30-day cooling-

4    off period was coming to an end and that he once again, very

5    specifically, very pointedly, reminded them that we think the

6    strike was --

7        MR. McKNIGHT:    Objection as to "once again."

8        JUDGE BUXBAUM:    All right.    I'll strike "once again."

9    Go ahead.

10        THE WITNESS:    He told them that the strike was illegal

11    and that the company still reserved its rights afforded under

12    the Act and wasn't waiving that.

13    Q.    BY MR. FRASER:    Was there any reaction from the Union?

14    A.    Yes.

15    Q.    Can you tell me who reacted and what they said?

16    A.    Again, Mr. Canzano was very vociferous.

17    Q.    And what did he say?

18    A.    Again, some references about this was not positive and

19    some references about, again, not -- of just saying it

20    doesn't make it so and --

21    Q.    What happens then?

22    A.    My recollection, cordialities, and we broke up.    We left

23    the meeting.    The meeting stopped.

24    Q.    Was there a collective bargaining agreement reached on

25    July 31st?

1   A.   No, there was not.

2   Q.   Was there an agreement reached on return-to-work issues

3   on July 31st?

4   A.   No, there was not.

5   Q.   I'll take you to August 14 of 2008.

6   A.   Yes, sir.

7   Q.   Do you recall whether you were present at that

8   bargaining session?

9   A.   I was.

10  Q.   And do you recall seeing anyone engaging in any sidebar

11  or private conversations between Douglas and the Union?

12  A.   Yes, sir.

13  Q.   Okay.  And what do you recall seeing?

14  A.   That -- matter of fact, the whole session then was a

15  sidebar where Mr. McKnight, Mr. Winkle and Mary Ellis came to

16  the room where the company representatives were housed, and

17  Mr. McKnight wanted to understand about were we refusing

18  to -- he was talking to Mr. Lillie.  He was talking to all of

19  us, in general, but Mr. Lillie was our spokesperson.

20  Q.   Tell me what Mr. McKnight said.  I guess, first of all,

21  who -- by your recollection, who was in this meeting?

22  A.   Mr. Viar, myself, Diane Hedgcock, Bruce Lillie and

23  Mr. Cohen were there.  And, again, McKnight, Mr. Winkle and

24  Mary Ellis were in this meeting.

25  Q.   Okay.  And what do you recall Mr. McKnight saying?

1  A.   Well, two or three different issues that he wanted to

2  point out.   One on misbehavior on the picket line,

3  misbehavior where racial epithets and racial slurs and stuff

4  were being thrown about.   He wanted to make sure --

5  Q.   So hang on a minute.

6  A.   Okay.

7  Q.   Instead of saying he wanted to make sure, tell me what

8  you remember him saying, to the best of your recollection,

9  about that topic?

10  A.   He said, "Do you think that the UAW would condone this?"

11  Q.   Okay.

12  A.   "It's not condoned, it's not right.   Do you truly

13  believe that the UAW would condone this?"

14  Q.   Okay.   Thank you.   What else did Mr. McKnight say?

15  A.   He said to Mr. Lillie, "Are you refusing to bargain with

16  us?"

17  Q.   Okay.   Any response to that?

18  A.   Mr. Lillie said, "Sam, I know what you're trying to do.

19  We will bargain with you on effects.   And as far as an

20  agreement for the people that are in there, we're not sure

21  who represents them."

22  Q.   Okay.

23       JUDGE BUXBAUM:   By "the people who were in there," did

24  you understand who he meant?

25       THE WITNESS:   Yes, the replacement workers.

1  Q.   BY MR. FRASER:  Did Mr. McKnight respond?

2  A.   Mr. McKnight again repeated, "So you're refusing to

3  bargain with us?"

4  Q.   And was there any response from anyone at Douglas?

5  A.   Again, Bruce repeated his -- I think that scene was

6  repeated two or three different times.

7  Q.   When you say Bruce, you're talking about Bruce Lillie?

8  A.   Mr. Lillie.  I'm sorry.  Forgive me.

9  Q.   Okay.  What happens next?  Any other statements from

10  Mr. McKnight?

11  A.   I don't remember Mr. McKnight's statement, but

12  Mr. Lillie told him that any time that the Union wanted to

13  bargain the effects or have negotiations, please let us know,

14  and we would get together.

15  Q.   Okay.  What happens next in that meeting?

16  A.   Best of my recollection, they left.

17  Q.   They being the Union?

18  A.   The Union representatives left the room.

19  Q.   Okay.  Did you reach a collective bargaining agreement

20  on August 14?

21  A.   We did not.

22  Q.   Did you discuss any return-to-work issues during that

23  August 14 meeting?

24  A.   We did not.

25  Q.   Was there an agreement reached regarding reinstatement

1   of the illegal strikers during the August 14 meeting?

2   A.   No.

3   Q.   Have you had any other bargaining sessions with the

4   Union since August 14?

5   A.   No.

6   Q.   To the best of your knowledge, has the Union requested

7   to meet since August 14?

8   A.   No.

9   Q.   Are you aware whether or not any of the bargaining unit

10  members crossed the picket line and came back to work?

11  A.   No.

12       JUDGE BUXBAUM:   No, you're not aware, or, no, they

13  didn't?

14       THE WITNESS:   No, I'm not aware.

15       JUDGE BUXBAUM:   Okay.

16       MR. FRASER:   Okay.   No other questions.   Thank you.

17       JUDGE BUXBAUM:   Before you begin, shall we take a five-

18  minute recess?

19       MR. CARLSON:   I need to use the restroom, yes.

20       JUDGE BUXBAUM:   All right.   Let's take a five-minute

21  recess.

22       Mr. Kirk, of course, don't discuss your testimony during

23  the recess.

24       THE WITNESS:   Yes, sir.

25  **(Off the record.)**

1    **JUDGE BUXBAUM:  All right.  We can go on the record.**

2  **Are we on?**

3    All right.  Mr. Carlson, you may proceed with cross-

4  examination.

5    MR. CARLSON:  Thank you, Judge.

6                    **CROSS-EXAMINATION**

7  Q.  BY MR. CARLSON:  Mr. Kirk, I want to ask you some

8  questions about the May 5th meeting with the Union that took

9  place in Lansing at six o'clock.  You testified that, at that

10 meeting, Mr. Lillie made a statement about the strike being

11 illegal and that the company was reserving its rights with

12 respect to that.  Was that your testimony?

13 A.  Yes, sir, that's my recollection.

14 Q.  Did you take any notes at the May 5th meeting?

15 A.  I did not.

16 Q.  Do you know if anyone on behalf of the company took any

17 notes of the May 5th meeting?

18 A.  On behalf of the company, specifically, I don't think

19 so.

20 Q.  Now, as to the May --

21 A.  If I may?

22 Q.  Sure.

23 A.  I know that Mr. Lillie -- I have seen notes that

24 Mr. Lillie made of that meeting.

25 Q.  When did you see those notes?

1  A.   The exact date, I'm not sure, but shortly after that

2  meeting.

3  Q.   And what were the circumstances where you saw those

4  notes?

5  A.   Just a general conversation in his office, remembering

6  that we went to his office on the 9th and we were reviewing

7  whether or not, now that --

8       MR. FRASER:  Your Honor, I'm going to object.  I

9  hesitated for a moment, but I think he's starting to get into

10 attorney-client bargaining strategy.  I would object on that

11 basis.

12      JUDGE BUXBAUM:  Well, but he's not asking -- well, I

13 guess your concern is more --

14      MR. FRASER:  He's about ready to -- exactly.

15      JUDGE BUXBAUM:  -- with what Mr. Kirk is going to say

16 than with what counsel has asked.

17      MR. FRASER:  Clearly, there was a meeting.  He said he

18 reviewed the notes at that meeting.  Beyond that, I'm

19 concerned he's going to --

20      JUDGE BUXBAUM:  Why do we need to know more,

21 Mr. Carlson?

22      MR. CARLSON:  I'll move on.

23      JUDGE BUXBAUM:  All right.

24 Q.   BY MR. CARLSON:  Do you have Respondent's 6 in front of

25 you?

1      JUDGE BUXBAUM:  That's your notes of May 21st.  It's

2   probably not in there, I suspect.

3      THE WITNESS:  It was up here.  I don't know --

4   Q.   BY MR. CARLSON:  Okay.  Let me hand you Respondent's 6.

5   A.   Here it is.

6   Q.   You've got it?

7   A.   I knew it was here somewhere.  I haven't gone anywhere

8   except to the restroom, and I didn't take it with me.

9   Q.   Now, I think it's your testimony, and I think it's clear

10  on the record, but just let me make sure that this is the

11  only bargaining session at which you took notes, other than

12  doodles, is the May 21st bargaining session?

13  A.   Yes, sir.

14  Q.   And I think your testimony was that you took them for

15  your own purposes, and what did you mean by that?  Why did

16  you take notes just at this May 21st meeting?

17  A.   This was the first meeting after the May 5th meeting.

18  We had very high suspicions that the strike, in fact, was

19  illegal.  We didn't trust the Union, the Local, with what

20  they were trying to -- the games that we felt they were

21  playing, and I wanted to make sure that, from my

22  understanding, what was happening in this May 21st meeting,

23  specifically, the discussion about making sure that we

24  preserved our rights.

25  Q.   But you didn't find it necessary to write that down on

1    May 5th; is that correct?

2    A.    I did not.

3    Q.    And isn't it true, Mr. Kirk, that Mr. Lillie never made

4    any statement about the strike being illegal or about the

5    company reserving its rights prior to the May 21st meeting?

6    That was the first time, wasn't it?

7    A.    No, sir, that's not true.

8    Q.    Okay.  Mr. Kirk, do you recall giving an affidavit to

9    the National Labor Relations Board in this case during its

10   investigation of the charge?

11   A.    Yes, sir.

12   Q.    And you recall meeting with an agent of the National

13   Labor Relations Board, and he asked you some questions and

14   then wrote down what you said, and you looked through it and

15   signed it?

16   A.    Yes, sir.

17        MR. CARLSON:  Okay.  I'm going to mark this as General

18   Counsel's -- I think it's 62, 63?

19        JUDGE BUXBAUM:  Sixty-three, yep.

20   **(General Counsel's Exhibit 63 marked for identification.)**

21        MR. FRASER:  Is there a -- I didn't bring my copy with

22   me.  Is there a copy I might see?

23        MR. CARLSON:  You can look at it before I hand it to the

24   witness.

25        MR. FRASER:  Then I'll take my time to do that.

1    JUDGE BUXBAUM:  Mr. Carlson, are you intending to ask

2    the witness about a specific portion of it?

3    MR. CARLSON:  Yes, sir.

4    JUDGE BUXBAUM:  Do you want to perhaps indicate to

5    Mr. Fraser which portion?

6    MR. CARLSON:  Paragraph six.  While Mr. Fraser's

7    reviewing it, may I ask a couple more questions?  Is that

8    okay?

9    JUDGE BUXBAUM:  Is that agreeable?

10    MR. FRASER:  No, it's not agreeable.  I certainly want

11    to concentrate on the questions he's going to ask.

12    JUDGE BUXBAUM:  All right.  Well, please finish your

13    review, Mr. Fraser.  You've already indicated you've seen it

14    before, so it doesn't require a detailed review at this

15    moment.  If you need to see it back during the further

16    questioning, I'll direct Mr. Carlson to provide it to you.

17    MR. FRASER:  Thank you.

18    MR. CARLSON:  You're welcome.

19  Q.   BY MR. CARLSON:  Mr. Kirk, do you recall that the Board

20  Agent -- that the purpose of him coming out to meet with you

21  that day was specifically to ask questions about what was

22  said during the bargaining sessions between the company and

23  the Union in May, June, July and August of 2008, about

24  reservation of rights?  That was the purpose for him coming

25  out and asking you questions; is that correct?

1    A.   I thought -- that was not my total understanding.

2    Q.   But he did ask you several questions about that?

3    A.   Yes.

4    Q.   And he asked you about whether or not you had notes with

5    respect to reservation of rights and claims about the

6    illegality of the strike during those meetings?

7    A.   I don't remember specifically.

8    Q.   And, again, I'm going to ask you, you are certain that

9    Mr. Lillie made the statement about the illegality of the

10   strike at the May 5th meeting?  You're certain about that, as

11   you sit here today?

12   A.   That's my recollection, sir.

13   Q.   I'm going to show you your affidavit.

14   A.   May I get my glasses?

15   Q.   Absolutely.

16   A.   Okay, sir.

17   Q.   Is this your affidavit?

18   A.   Yes, sir.

19   Q.   And is that your signature on the affidavit?

20   A.   Yes, sir.

21   Q.   Okay.  And by signing it, you certified that it was true

22   and correct to the best of your knowledge and belief; is that

23   true?

24   A.   Yes, sir.

25   Q.   I'm going to read paragraph six into the record.  Read

1  along with me and make sure I read that accurately.

2          "The 5/21 meeting was not the only meeting in

3          which Lillie told the Union that their strike was

4          illegal and that our meeting with them was in no

5          way a waiver of our rights.  I believe Lillie made

6          such announcement at all of the meetings I attended

7          after the 5/21/08 meeting.  I believe I attended

8          all but one of those meetings, though I do not know

9          which one I missed."

10     Did I read that accurately?

11  A.   Yes, sir.

12  Q.   Mr. Kirk, I want you to take a look at this affidavit

13  and tell me whether or not there's anything in there about

14  any statements made by Mr. Lillie at the May 5th meeting,

15  regarding the strike being illegal or the company reserving

16  its rights.  Is there any specific description in that

17  statement of Mr. Lillie saying that, at the 5/5/08 meeting?

18  A.   If you would give me just a few minutes to read through

19  it.  It's been a while since I --

20  Q.   Sure.  Certainly.  I understand.  Take your time.

21       **JUDGE BUXBAUM:  Sure.  Let's go off the record to save**

22  **some tape.**

23  **(Off the record.)**

24  Q.   BY MR. CARLSON:  And Mr. Kirk, I'll repeat my question.

25  Is there any discussion, specific discussion of anything said

1  at the May 5th, 2008 meeting in your affidavit?

2      MR. FRASER:  Object on the characterization of

3  discussion.  I think it's vague and ambiguous.

4      JUDGE BUXBAUM:  You had phrased it more narrowly

5  originally, Mr. Carlson.  Can you recall, maybe, and repeat

6  what you had phrased it as originally?

7  Q.  BY MR. CARLSON:  Is there any statement in your

8  affidavit of any discussion about the strike being illegal

9  and about the company reserving its rights at the May 5th,

10  2008 meeting, in your affidavit?

11  A.  No, sir.

12  Q.  And the May 5th, 2008 meeting is referenced in your

13  affidavit, though, is it not?  And I'll refer you to

14  paragraph two.

15  A.  Yes.

16  Q.  And can you read the second sentence in paragraph two?

17  A.  The second sentence:

18      "This was the first session conducted since the 5/5

19      session, which was held simply to receive the

20      Union's unconditional offer to return to work from

21      their strike."

22  Q.  And the "this" it's referring to, the first word in the

23  sentence you read, is the 5/21/08 meeting; is that right?

24  A.  Yes.

25  Q.  Mr. Kirk, I'm going to hand you General Counsel's 15,

1    just so you don't have to flip through that book.  It's a

2    great book, but it's -- and I think your testimony was that

3    you recall -- I'm sorry.  Have you had a chance to look at

4    that?

5    A.    I have.

6    Q.    And I think your testimony was that you recall signing

7    that document?

8    A.    I did.

9    Q.    Why did you put that document in writing?  Why did the

10   company do that?

11   A.    Again, I signed the document, and we wanted it clear to

12   the Local Union that we were not going to collect union dues

13   from the replacement workers.

14   Q.    And why did you find that necessary to put that in

15   writing?

16   A.    At advice of counsel --

17        MR. FRASER:  I'm going to object to make sure that

18   there's no statement beyond that, in terms of disclosure or

19   what counsel told the client to do.

20        JUDGE BUXBAUM:  All right.  Mr. Carlson is indicating

21   that's acceptable.

22   Q.    BY MR. CARLSON:  I'm going to go back and ask you

23   another question in an area that we got into and then left,

24   and I'm going to approach it one more time.  I want to talk

25   to you again about the meeting you had, the meeting you

1    testified about with Mr. Lillie, after the 5/5/08 meeting,

2    where you say you saw his notes.  I don't want you to tell me

3    anything that was said during that meeting; I want, just to

4    the best of your ability, to describe his notes.  I don't

5    want you to tell me what they said.  I just want you to

6    describe what they were, the paper that they were on --

7         JUDGE BUXBAUM:  You mean were they on a green piece of

8    paper, that kind of thing?

9         MR. CARLSON:  Precisely.

10         JUDGE BUXBAUM:  Okay.

11         THE WITNESS:  My recollection is that they are a note to

12    -- if you have a copy of the lockout notice, Mr. Lillie made

13    the note on his copy of the lockout notice and the terms and

14    condition document.  That's my recollection.

15         JUDGE BUXBAUM:  So that's General Counsel 8?

16         THE WITNESS:  May be.  Yes, sir.

17         MR. CARLSON:  I don't have any further questions.

18         JUDGE BUXBAUM:  Mr. McKnight?

19                     **CROSS-EXAMINATION**

20    Q.   BY MR. McKNIGHT:  Mr. Kirk, did you discuss your

21    testimony with anybody before you came here today?

22    A.   No, sir, no more than prep with my lawyer.

23         MR. McKNIGHT:  I'd like to ask for production of

24    Mr. Kirk's Jencks statements.

25         JUDGE BUXBAUM:  Very well.

1    MR. CARLSON:  I'm handing Mr. McKnight Mr. Kirk's

2 affidavit in case GR-7-CA-51428.  It's a three-page affidavit

3 with a one-page attachment.

4    MR. FRASER:  Your Honor, hang on.  Before that's handed

5 over, please hand that back.  Your Honor, I'm asking you to

6 have him hand that document back to Mr. --

7    JUDGE BUXBAUM:  All right.  Mr. McKnight, hand it back

8 until we hear --

9    MR. FRASER:  -- and ask that he stop reading the

10 document, please, as well, until I make this objection.

11    JUDGE BUXBAUM:  All right.  It's been handed back.

12    MR. FRASER:  The Jencks materials are provided before

13 any question is asked of a witness.  This counsel has asked a

14 question of the witness before he asked for the Jencks

15 materials.  My view is that he's not entitled to those Jencks

16 materials at this point.

17    JUDGE BUXBAUM:  Well, Mr. Fraser, you know, you're

18 right, of course, that it's an issue, and the Board has

19 addressed it and left it to the discretion of the judge.  And

20 I'll say this -- and I've had it happen because this comes up

21 a lot.  If he's three-quarters of the way through, I'm not

22 going to permit it, but he just asked a sort of preliminary

23 question, and I'm going to permit it.  It's within my

24 discretion.

25    In future, Mr. McKnight, and all counsel, he's right.

1  The 100 percent proper way to do it is to ask before you
2  start questioning the witness.
3      You may turn it over, Mr. Carlson.
4      **And let's go off the record so Mr. McKnight can review**
5  **it.**
6  **(Off the record.)**
7      JUDGE BUXBAUM:  You may proceed, counsel.
8  Q.  BY MR. McKNIGHT:  Did you review any documents in
9  preparing before testifying?
10  A.  Ask me that again, please, sir.
11  Q.  Did you review any documents in your preparation for
12  testifying?
13  A.  Mr. McKnight, I've read through Ms. Hedgcock's minutes
14  of the different dates.
15  Q.  Did they assist you in preparing for testifying?  Well,
16  did you find them useful and refreshing your recollection as
17  to what happened and who said what?
18  A.  Yes.
19  Q.  Okay.  Did you review any other documents in your
20  preparation for testifying?
21  A.  Not to my recollection, no.
22  Q.  Did you look at bargaining proposals?
23  A.  I saw bargaining proposals; I did not study them.
24  Q.  Okay.  Now, I think you said --
25  A.  If I may, Mr. McKnight?  In the context of, again,

```
 1  prepping -- my attorney prepping me for this, he would --
 2  Q.   Show you proposals?
 3  A.   -- show me the document and say, "Do you recognize
 4  this?"  Pretty much what he did today.
 5  Q.   Okay.
 6  A.   So I saw the documents; I didn't actually study and
 7  review --
 8  Q.   I'm not asking if you studied them, but they kind of
 9  assisted you in refreshing your recollection as to when
10  things happened and what was done and what was said?  Would
11  that be fair to say?
12  A.   I would say that's fair to say.
13  Q.   Did you review any other documents other than Hedgcock's
14  notes and bargaining proposals?
15  A.   Not to my recollection, sir.
16  Q.   When did you review these documents that you've
17  described?
18  A.   I have referenced Ms. Hedgcock's documents probably off
19  and on for some time, and --
20  Q.   Some time, meaning several months?
21  A.   Several months.
22  Q.   Okay.
23  A.   And I have looked at them within the last couple of
24  weeks.
25  Q.   Okay.  And how many times within the last couple of
```

1   weeks have you looked at Ms. Hedgcock's notes?

2   A.   Mr. McKnight, if you're wanting the exact number, I

3   couldn't give that to you.

4   Q.   Best estimate?

5   A.   Maybe four or five times.

6   Q.   Okay.  On May 5, 2008, you hand-delivered a letter -- or

7   you, meaning the company bargaining team, hand-delivered a

8   letter to the Union, stating that the Union had made an offer

9   to return to work that was unconditional; is that correct?

10  A.   Are you talking about GC-8, sir?

11  Q.   No, I'm not talking about anything at this point.  I'm

12  just saying, is it correct that the company hand-delivered

13  something to the Union, stating that the Union had made an

14  offer to return to work that was unconditional?

15  A.   If you're asking me for my specific memory,

16  Mr. McKnight, I happen to be -- I have it open in front of me

17  is GC-8, which is that document.  So the answer to that is

18  yes.

19  Q.   Okay.  That would have been my next question, so that

20  we're fine.

21  A.   So the answer to that is yes, the first line of that,

22  first sentence, makes that statement.

23  Q.   Okay.  And that piece of -- that document, GC-8, was

24  prepared before you met with the Union, correct?

25  A.   Yes.

1  Q.   So is it safe to say that, before the company met with

2  the Union on May 5, 2008, somebody knew that the Union had

3  made an offer to return to work that was unconditional?  Is

4  it safe to say that somebody knew that?

5  A.   Somebody knew -- no.

6  Q.   No, okay.  So when Mr. Viar wrote the offer to return to

7  work was unconditional, he didn't know that?

8  A.   No, sir.

9  Q.   Okay.  He was making that up?

10 A.   No, sir.

11 Q.   Okay.

12 A.   He suspected that.

13 Q.   Did Mr. Lillie look at this letter?

14 A.   Yes, sir.

15 Q.   Okay.  Is there anything in this letter that tells you

16 that that is only a suspicion from the company?

17 A.   No, sir.

18 Q.   And when you went to -- you said you went to work about

19 what time on May 5?

20 A.   On May 5, I was -- Mr. McKnight, the exact time, I don't

21 know, but it was somewhere around seven o'clock in the

22 morning.

23 Q.   And security guards, you said, waved you in?

24     MR. FRASER:  Objection, Your Honor.  It mischaracterizes

25 the testimony.  He testified about May 1, not May 5.

1       JUDGE BUXBAUM:  I think that's right.

2       MR. McKNIGHT:  I'm correct.  Thank you very -- I'm

3  incorrect.  You're right.

4  Q.   BY MR. McKNIGHT:  It was about May 1 when you went to

5  work and the security guards waved you in, right?

6  A.   No, they didn't wave me in.

7  Q.   Okay.  What did they do?

8  A.   They asked the picketers to make -- I think the term is

9  make a hole.

10 Q.   For you to go in?

11 A.   For me to go in.

12 Q.   Okay.  And the other employees who went to -- when were

13 those security guards retained?

14      MR. FRASER:  Objection, Your Honor.  Outside the scope

15 of direct.

16      JUDGE BUXBAUM:  What do you say to that, Mr. McKnight?

17      MR. McKNIGHT:  Well, he said that they had security

18 guards, and I think that that's -- I'm asking when they were

19 retained.

20      JUDGE BUXBAUM:  I'll allow it.

21 Q.   BY MR. McKNIGHT:  When were they retained, sir?

22 A.   I'm trying to get the dates correct, Mr. McKnight.

23 Again, it was -- Mr. McKnight, I'm going to give you a couple

24 of dates.  It was one of two dates, either May 28th, 2008, or

25 May 29th, 2008.

1  Q.   And were they retained in anticipation of a possible

2  strike?

3  A.   They were.

4       JUDGE BUXBAUM:  Well, so you don't mean May, do you?

5  Don't you mean some month earlier?

6       THE WITNESS:  I'm sorry.  I'm sorry.  April.

7       JUDGE BUXBAUM:  April, okay.  So --

8       THE WITNESS:  April, April.  Before -- one or two days

9  before the strike, we retained them.

10  Q.   BY MR. McKNIGHT:  And how were the employees who came to

11  work on May 1, 2008 transported in?

12       MR. FRASER:  Objection, Your Honor.  Again, it's

13  completely outside the scope now.

14       JUDGE BUXBAUM:  Well, this does seem beyond the scope of

15  direct, doesn't it?

16       MR. McKNIGHT:  Well, I think it goes to -- I mean, the

17  company has said they didn't lock people out, and I'm going

18  to ask him how people got in.

19       JUDGE BUXBAUM:  On May 1st?

20       MR. FRASER:  On May 1st?

21       MR. McKNIGHT:  Well, it would lead to that, Your Honor.

22       JUDGE BUXBAUM:  All right.  If it's foundational, I'll

23  allow it.

24  Q.   BY MR. McKNIGHT:  How did employees who came to work on

25  May 1 come to work?

1  A.   Ask me that again, please.

2  Q.   How did employees who came to work on May 1 come to

3  work?

4       MR. FRASER:  Objection.  Calls for speculation.

5       JUDGE BUXBAUM:  Well, come to work, yeah.  You mean

6  how'd they get in?

7  Q.   BY MR. McKNIGHT:  How did they gain access to the

8  facility?

9       MR. FRASER:  Objection.  Calls for speculation, as well.

10  There's no foundation he was even there.

11      JUDGE BUXBAUM:  Okay.  Lay a foundation.

12      MR. McKNIGHT:  Well, it's cross-examination, Your Honor.

13      JUDGE BUXBAUM:  Yeah, all right.  If you don't know the

14  answer, of course, obviously, I want you to indicate that.

15  But go ahead and repeat the question.

16  Q.   BY MR. McKNIGHT:  Didn't the company make arrangements

17  to have employees transported in by bus or van?

18  A.   We did.

19  Q.   And the individuals who were allowed to come into the

20  plant on May 1, other than yourself and Mr. Viar, the workers

21  or employees who were allowed to come into the facility came

22  in by bus or van; is that correct?

23  A.   The vast majority of those, that is correct.

24  Q.   Okay.  And that was true on May 2nd, right?  You don't

25  have to look to counsel.

914

1     MR. FRASER:  My objection is speculation.

2     JUDGE BUXBAUM:  Well, why would it be -- well, now,

3   again, if you don't know the answer, sir, you tell us.  But,

4   otherwise, if you do know the answer, you may answer.

5     THE WITNESS:  We provided -- you're asking me to speak

6   to how everyone came in, and I'm going to tell you --

7   Q.  BY MR. McKNIGHT:  Well, no, I'm just asking you,

8   generally.  I'm not trying to -- I'm not looking to see if

9   there's somebody who snuck through.  I'm just asking,

10   generally, wasn't it true that the employees who were

11   permitted access to the facility on May 1 and the dates

12   thereafter, May 2, May 3, May 4, May 5, got their access or

13   transportation by bus or van provided by the company?

14   Generally speaking?

15   A.  Generally speaking, yes.

16   Q.  Okay.  And what instructions did the security guards

17   have for employees who did not have company escorts or bus or

18   vans to come -- access to the facility?

19     MR. FRASER:  Objection.  Calls for speculation, it's not

20   relevant, it's beyond the scope of direct.

21     JUDGE BUXBAUM:  Well, it's certainly beyond the scope of

22   direct.  Yeah, I'll sustain.

23   Q.  BY MR. McKNIGHT:  Could the employees who were -- could

24   the hourly workers who had struck on May 1 come to work on

25   May 5?

1      MR. FRASER:  Objection.  Calls for speculation.

2      JUDGE BUXBAUM:  Well, no, why does it call -- no, I

3  don't see that.  Overruled.

4      You may answer.

5      THE WITNESS:  Please ask that question again,

6  Mr. McKnight.

7      JUDGE BUXBAUM:  Mr. McKnight, do you wish to repeat the

8  question?

9      MR. McKNIGHT:  I don't think so.

10      JUDGE BUXBAUM:  All right.  Well, I'll treat it as

11  withdrawn.

12  Q.  BY MR. McKNIGHT:  Do you dispute that the company locked

13  out the bargaining unit, in support of its bargaining

14  position, on May 5, 2008?

15      MR. FRASER:  Objection.  Calls for a legal conclusion.

16      JUDGE BUXBAUM:  No, I don't -- I think, given the

17  witness' direct testimony, position with the company, it's

18  appropriate.

19      You may answer.

20      THE WITNESS:  We served the document saying that we were

21  locking them out.

22  Q.  BY MR. McKNIGHT:  And did that document, to your

23  recollection -- well, let's look at it.  Could you look at

24  GC-8 in front of you?  Do you still have it?

25  A.   I still have it open there.

1  Q.   And do you dispute, looking at that document, that the

2  company locked out the bargaining unit in support of its

3  bargaining position?

4  A.   That's what the document says.

5  Q.   Do you agree?

6  A.   That, now, Mr. McKnight, is now asking me to be an

7  attorney, and I'm not.

8  Q.   No, I'm just asking if you agree this is what the

9  company told the Union on May 5, 2008?

10 A.   I'm sorry.  I thought I said that's what the letter

11 says.

12 Q.   Okay.  And can you tell me, when it says, "In support of

13 its bargaining position," what is that referring to?  Well,

14 does it --

15      JUDGE BUXBAUM:  Well -- all right.  Go ahead.  I would

16 have liked to have heard the answer, counsel.

17      THE WITNESS:  We had --

18 Q.   BY MR. McKNIGHT:  Just tell me what it refers to,

19 without describing it.

20 A.   Well, I'm trying to, Mr. McKnight.  I'm --

21      MR. FRASER:  Yeah, objection, Your Honor.  Hang on --

22      MR. McKNIGHT:  That doesn't call for a narrative.

23      MR. FRASER:  But when Mr. McKnight asks a question, he

24 can't direct the witness as to how he can answer the

25 question.  He can answer the question --

1        JUDGE BUXBAUM:  Well, in some circumstances on cross, he

2   can, but not in this circumstance.  Do you want to persist

3   with the question, Mr. McKnight?  I feel now like I've forced

4   you to persist with it, and I don't mean to do that.  It's

5   your call.  You're the cross-examiner.

6        MR. McKNIGHT:  Well, I'll ask -- I'll proceed.

7        JUDGE BUXBAUM:  Thank you.

8   Q.   BY MR. McKNIGHT:  Do you see the words "see attached"?

9   A.   I do.

10  Q.   Do you know what that refers to?

11  A.   That refers to the terms and conditions on which they

12  can return to work.  That's --

13  Q.   That refers to the attached document, correct?

14       MR. FRASER:  Objection, Your Honor.  It misstates what

15  the witness just said.  He said terms and conditions.

16       JUDGE BUXBAUM:  Well, but this is a follow-up question.

17  I'll allow it.

18  Q.   BY MR. McKNIGHT:  Is what you call terms and conditions,

19  is that the attached document?

20  A.   It is.

21  Q.   Okay.

22       JUDGE BUXBAUM:  Although I'd like to point out,

23  Mr. McKnight, that I think that's -- I want to be careful

24  here.  It's two documents that are attached, and I

25  tentatively think that may have some significance.  In other

1  words --

2      MR. McKNIGHT:  Well, I understand what you're saying,

3  but I didn't --

4      JUDGE BUXBAUM:  It's a synopsis --

5      MR. McKNIGHT:  I mean, I see it as a single document

6  that's got two sections, or --

7      JUDGE BUXBAUM:  It's a synopsis, and then it is an

8  elaboration.

9      MR. McKNIGHT:  Okay.

10  Q.   BY MR. McKNIGHT:  So "see attached," does that refer to

11  what the judge has described as a synopsis and then the

12  elaboration?

13  A.   My way of answering that is my understanding is "see

14  attached" is everything that is included in GC-8.

15  Q.   Okay.  Now, do you understand that "its bargaining

16  position" is "see attached"?

17  A.   No.

18  Q.   Okay.  Did the company, at this point, have a bargaining

19  -- could the Union have reached a contract with the company

20  at this time?

21  A.   It was my understanding --

22  Q.   You can say yes or no.  Could the Union have agreed to a

23  contract --

24      MR. FRASER:  Again, objection, Your Honor --

25      JUDGE BUXBAUM:  No, I'm going to let him elaborate on

1    that.

2        MR. FRASER:  Right.

3        THE WITNESS:  It is my understanding that, had they

4    accepted the terms and conditions of the attached, that we

5    could have reached an agreement.  And had they been able to

6    get that ratified.

7    Q.  BY MR. McKNIGHT:  And what would the term of the

8    agreement be?

9    A.  I'm not sure that it spells it out in here.  I'm not

10   that familiar with it, without --

11   Q.  Well, if you'd look at the first page --

12   A.  I'm sorry.

13   Q.  If you would look at the first page, maybe that would

14   refresh your recollection.

15       MR. FRASER:  Your Honor, I'd ask that counsel let the

16   witness answer the question before he shoots off another

17   question.

18       JUDGE BUXBAUM:  Well, I think he was helping the witness

19   here.

20       Have you found it?  The top of the first page.

21       THE WITNESS:  Term of contract, three years.

22   Q.  BY MR. McKNIGHT:  Now, the next sentence of GC-8 asks if

23   the Union accepts the proposal.  Do you see that sentence?

24   A.  I do.

25   Q.  Do you agree that that also is a reference -- or that

1  that is a reference to "see attached"?

2  A.    If it accepts the proposal of the proposed terms and

3  conditions?

4  Q.    Well, the attached materials, whatever you wish to call

5  them.

6  A.    I agree that the proposal are the proposed terms and

7  conditions which I think are attached.

8  Q.    Do you see, looking at -- and, actually, you assisted in

9  preparing this, correct?

10  A.    Yes, in an ancillary way, as a non-attorney could.

11  Q.    And as an ancillary non-attorney?

12      JUDGE BUXBAUM:  Well, he said in an ancillary way, as a

13  non-attorney.

14  Q.    BY MR. McKNIGHT:  Okay.  And what was the title the

15  company gave this document, if you recall?

16      JUDGE BUXBAUM:  And we're now referring to page --

17      MR. McKNIGHT:  "See attached."

18      JUDGE BUXBAUM:  Okay.  Of GC-8.

19      MR. McKNIGHT:  I think the title would be on the very

20  first page.

21      JUDGE BUXBAUM:  Well, now, you see, you're running afoul

22  of me again because there's two different documents, so

23  there's going to be two titles.  I think it's significant,

24  and I want the record to be clear on it.

25      MR. FRASER:  And, again, I guess, Your Honor, objection.

1    The document speaks for itself.

2        JUDGE BUXBAUM:  Well, yeah, it does, but this is cross.

3    I mean, are you going somewhere with it, Mr. McKnight?  I

4    certainly am well aware of what the titles are.

5        MR. McKNIGHT:  Well, I'm just trying to make sure that I

6    can figure out the relationship between this cover letter and

7    "see attached."

8        JUDGE BUXBAUM:  I clearly understand your desire to do

9    that.  I'm not sure that the titles help us.

10        THE WITNESS:  Mr. McKnight, when you say -- I mean, the

11    document is what the document is, and the title that is on

12    here is on there.  If you're -- if I may --

13    Q.   BY MR. McKNIGHT:  I know.  Do you see the word

14    "proposal" in that title?

15    A.   If I may, if your question is, is the title that was

16    written what the company ended up referring to this? that's

17    one question.  If you're asking if --

18    Q.   Here was my question.

19    A.   Please.

20    Q.   Do you see the word "proposal" in the title?

21    A.   I don't remember that being your question, but, yes, I

22    do see that.

23    Q.   Okay.  Now, let's look at the cover letter.  Do you see

24    the word "proposal" in the last sentence of the cover letter?

25    A.   I do.

1  Q.   And do you disagree that the word "proposal" in the

2  cover letter is a reference to the page that follows with the

3  word "proposal"?

4  A.   I do not disagree with that.  I do agree with that.

5  Q.   Okay.  Thank you.  Would you agree, Mr. Kirk, that the

6  words "terms and conditions" do not appear in the cover

7  letter?

8      MR. FRASER:  Again, Your Honor, objection.  The document

9  speaks for itself.

10     JUDGE BUXBAUM:  It does.  Let's not take the time to do

11  that.

12  Q.   BY MR. McKNIGHT:  Would you agree that the words "terms

13  and conditions" do not occur anywhere in the attached

14  proposal?

15     MR. FRASER:  Objection, Your Honor.  Document speaks for

16  itself.

17     JUDGE BUXBAUM:  Well, and, Mr. McKnight, I certainly

18  don't want to sit here while he reads through page after page

19  of strikethroughs and et cetera.  I can assure you that I

20  will go over this document with a fine-tooth comb.  Indeed,

21  I've already done so during the period in between the two

22  weeks of trial.

23     **Let's go off the record a moment, please.**

24  **(Off the record.)**

25  Q.   BY MR. McKNIGHT:  Now, Mr. Kirk, do you recall that, in

1  February of 2008 -- well, let me back up.  Who is Toru
2  Hasegawa?
3  A.   He was the Chairman of the Board of Douglas Autotech
4  Corporation.
5  Q.   And did he hold that position in February of 2008?
6  A.   He did.
7  Q.   Now, I think you've stated that you were reporting to
8  the Union bargaining team in early 2008 that the company's
9  financial position was very bad, correct?
10  A.   Yes.
11  Q.   Was Mr. Hasegawa also familiar with the company's
12  financial position?
13  A.   He was.
14  Q.   In fact, would you agree that Mr. Hasegawa could speak
15  authoritatively for the company in early 2008?
16     MR. FRASER:  Your Honor, I'm going to object to the --
17  again, it's outside the scope of direct --
18     JUDGE BUXBAUM:  Well, it looks that way, but it's
19  preliminary, so let's see where he's going.  Do keep it
20  within the scope.
21     THE WITNESS:  Ask me again, please.
22  Q.   BY MR. McKNIGHT:  Do you agree that Mr. Hasegawa could
23  speak to regarding the company's financial condition in
24  February of 2008?
25  A.   Yes.

```
 1   Q.   And do you agree that Mr. Hasegawa advised employees in

 2   February of 2008 that Douglas Autotech had a very bright

 3   future?

 4        MR. FRASER:  Objection, Your Honor.  Again, it's outside

 5   the scope of direct, and I'm not sure how that's foundational

 6   to jack in this case.

 7        JUDGE BUXBAUM:  I don't agree.  I think it's good cross.

 8        You may answer.

 9        THE WITNESS:  I don't specifically remember the

10   language, but I think there was a document -- if I may

11   elaborate --

12   Q.   BY MR. McKNIGHT:  Without talking about a document, I

13   just asked if you can remember or agree that Mr. Hasegawa did

14   advise employees that, as far as he was concerned, Douglas

15   Autotech had a very bright future?

16   A.   I think there was -- the proper context is "if."

17   Q.   I didn't ask for context, sir.  I just asked if you

18   could answer my question.

19        JUDGE BUXBAUM:  Well, no, I'll allow him to provide

20   context.

21        Go ahead, finish your answer.

22        THE WITNESS:  If we were able to survive until we --

23   through this very difficult period.  We have told our people

24   that we have new business coming and that we felt like, if we

25   could survive through till the new business got there, we had
```

1   a very bright future ahead of us.

2       JUDGE BUXBAUM:  And you're paraphrasing what he said?

3       THE WITNESS:  I am.  I am.

4       JUDGE BUXBAUM:  Okay.  I just want to be clear.

5   Q.   BY MR. McKNIGHT:  Do you agree that Mr. Hasegawa advised

6   employees that Fuji Kiko had invested millions of dollars in

7   2007 into Douglas Autotech and our future?

8   A.   I don't remember specifically, but that would not

9   surprise me.

10  Q.   And when you made representations about the company's

11  financial circumstances, did some of the employees on the

12  bargaining committee respond and remind you of what they

13  thought Mr. Hasegawa had represented to them?

14      MR. FRASER:  Again, Your Honor, objection.  It's way

15  outside the scope of direct.

16      JUDGE BUXBAUM:  Yeah, I don't know how that -- it seems

17  to me this whole line relates to Mr. Carlson's theory --

18  alternate theory regarding Employer motivation.  So I don't

19  think the response would be material, would it?

20      MR. McKNIGHT:  Well, I objected to that line of

21  questioning, and -- because I didn't think it was material,

22  and then it went in.

23      JUDGE BUXBAUM:  Well, but, Mr. Carlson --

24      MR. McKNIGHT:  But I'm just trying to develop the record

25  about who said what then.

1      MR. CARLSON:  Mr. Fraser asked him specific questions

2  about the financial condition of the company, and

3  Mr. McKnight objected on relevance grounds --

4      JUDGE BUXBAUM:  He did.  He did.

5      MR. CARLSON:  -- and you allowed the testimony.  And now

6  Mr. McKnight is cross-examining.

7      JUDGE BUXBAUM:  And I allowed it as part of the defense

8  to the question -- to the General Counsel's alternate theory

9  regarding -- that requires a finding of Employer antiunion

10  animus, unlawful animus.  Therefore, what the company's view

11  of its financial position was, inferentially, is relevant and

12  material.  What the Union's view of the company's financial

13  position was doesn't strike me as material to any issue.  But

14  if either of you have an argument you want to make to me that

15  it is material, I'll hear it.

16      MR. McKNIGHT:  I understand what you're saying now.

17      MR. CARLSON:  I think the question is what he said about

18  the financial condition, right?  It's what Mr. Kirk said to

19  other people.

20      JUDGE BUXBAUM:  Sure, sure.  So what Mr. Gruza, for

21  example --

22      MR. CARLSON:  So Mr. Kirk has testified here about the

23  financial condition.  This is a prior statement he made about

24  the financial condition.

25      JUDGE BUXBAUM:  Well, right, but what Mr. Gruza

1    responded by saying -- and I just picked Mr. Gruza at random.

2    I don't know if he said anything.  But what he may have

3    responded by saying, "No, we think that the company's in

4    great financial shape," doesn't help us.  How does it advance

5    any issue?

6        MR. FRASER:  And that, in fact, was the question that

7    Mr. McKnight asked.

8        JUDGE BUXBAUM:  It was.

9    Q.  BY MR. McKNIGHT:  I would also ask you if you recall

10   that the Union, in your discussions regarding the company's

11   financial condition, expressed numerous complaints regarding

12   what they understood were the company's unreliable accounting

13   procedures?

14       MR. FRASER:  Objection, again, Your Honor.  Outside the

15   scope, and not relevant.

16       JUDGE BUXBAUM:  Well, I'm not sure that it's outside the

17   scope, but I have trouble with the relevance, counsel.

18   What's the relevance?

19       MR. McKNIGHT:  It's just responding to what the witness

20   testified as to who said what in bargaining.

21       JUDGE BUXBAUM:  I'll sustain the objection.

22   Q.  BY MR. McKNIGHT:  On August 14, 2008, at the Hampton

23   Inn, was there a large bargaining room available for the

24   parties, to your knowledge?

25   A.   Yes.

1    Q.    And is that where the Union's bargaining committee was?

2    A.    Mr. McKnight, on August 14th, I don't remember seeing

3    them.  Anything there would just be an assumption and

4    speculation on my part.

5    Q.    Okay.

6    A.    I assumed that those that were there were in that room.

7    Who they were and how many, I have no idea.

8    Q.    And the room that you assumed the Union's bargaining

9    committee was in, is that the room that the parties would

10   ordinarily use for joint bargaining sessions?

11   A.    Yes.

12   Q.    Do you agree that, on August 14, 2008, before I came to

13   the company's room in the hotel, the company did not come to

14   the Union's bargaining room or to the joint bargaining room?

15   A.    That the company did not come there?

16   Q.    Uh-huh.

17   A.    That's my recollection.

18   Q.    And --

19   A.    Which, by the way, was the normal course of business on

20   all of the other events, all the other dates that we had met

21   there.

22   Q.    And I didn't ask --

23        JUDGE BUXBAUM:  Yeah, are you going to clear that up?

24        MR. McKNIGHT:  Yes.

25        THE WITNESS:  We would not go to that room.  We went to

 1    our breakout room first on every session that we met at the

 2    Hampton Inn.

 3    Q.    BY MR. McKNIGHT:   Okay.   So you would go to your

 4    breakout room, and then you would come to the joint

 5    bargaining room?

 6    A.    If there was reason to do so.

 7    Q.    Do you agree that, after I came and met with you, with

 8    the company, in your room, the company did not come to the

 9    joint bargaining room?

10    A.    I agree with that.

11    Q.    Do you agree that the federal mediator accompanied us to

12    the company's room --

13         JUDGE BUXBAUM:   Who's "us"?

14    Q.    BY MR. McKNIGHT:   Us being myself -- and who was with

15    me?

16    A.    My recollection, Mr. McKnight -- we're about the same

17    age, so I can understand -- but I understand that Mr. Winkle

18    was with you and that Mary Ellis was with you.   I don't

19    remember if Mr. Gruza was or not, but -- I don't remember him

20    being there.   He may have been, but I don't remember that.

21         JUDGE BUXBAUM:   And you recollect that the mediator was

22    with him?  Or do you?   I don't mean to --

23         THE WITNESS:   I don't remember if he was or not.

24         JUDGE BUXBAUM:   All right.

25         THE WITNESS:   He may have been.

1  Q.   BY MR. McKNIGHT:  Well, let me see if I could refresh

2  your recollection.  Do you remember that somebody knocked on

3  the door?

4  A.   Yes.

5  Q.   And do you remember now that somebody -- that the door

6  was opened and somebody said, "Could we come and talk to

7  you?"

8  A.   Mr. McKnight, now that you refreshed my memory,

9  Mr. Curry, I think, in fact, was with you.  In fact, he asked

10 if he could come in.

11 Q.   In fact, the mediator --

12 A.   And I think he came in, as well.

13 Q.   The mediator asked if the Union --

14     MR. FRASER:  Objection, Your Honor.  It calls for

15 hearsay testimony.  The mediator can't be here to testify.

16 It's not a party that I'm aware of, and there's not supposed

17 to be any discussion about what the mediator did or didn't do

18 in any sessions.

19     JUDGE BUXBAUM:  I think that's right.

20     MR. McKNIGHT:  I think that's not correct.  I do think

21 that what the mediator says to both parties, in our presence,

22 can be expressed on this record.

23     MR. FRASER:  Absolutely not, Your Honor.

24     JUDGE BUXBAUM:  But it is hearsay, isn't it?

25     MR. McKNIGHT:  No, it is not because they heard it.

1   It's what he said to them.  It's not an out of --

2       MR. FRASER:  Of course, it's hearsay.

3       MR. McKNIGHT:  If I might?

4       JUDGE BUXBAUM:  It's not an out-of-court statement

5   offered for the truth; it's a statement made to the company

6   in the presence of the company.

7       MR. FRASER:  Your Honor, I'm not quite sure I understand

8   that logic.  It clearly is an out-of-court statement offered

9   for the truth of what he said, so that the witness can

10  testify about --

11      JUDGE BUXBAUM:  Well, are you offering it for the truth

12  of what the mediator is going to -- what the testimony will

13  be as to what the mediator said?  Or, are you just setting it

14  up so that you can explain what happened after?

15      MR. McKNIGHT:  Just setting it up.

16      JUDGE BUXBAUM:  All right.  I'll allow it on that basis.

17      MR. FRASER:  Your Honor, one more swing at this, that

18  it's irrelevant what was said.  If he's simply asking whether

19  this witness saw the mediator there, there's no need to

20  figure out what was said.

21      JUDGE BUXBAUM:  Well, I'm going to permit it because I

22  think I understand what counsel's getting at.

23  Q.  BY MR. McKNIGHT:  Did the mediator ask the company if

24  some of the Union representatives could come into the

25  company's breakout room?

1      MR. FRASER:  I'm going to object again, Your Honor.  I

2  understand your ruling, but my objection stands.

3      JUDGE BUXBAUM:  Very well.  You may answer.

4      THE WITNESS:  It is my recollection that -- he did not

5  talk to me, so I'm not sure what he did say.  I didn't answer

6  the door, and I don't remember who did.  But it is my

7  understanding that something along those lines was asked.

8  Q.   BY MR. McKNIGHT:  And does it refresh your recollection

9  if I tell you that the mediator was a Mr. Sedrowski (ph.), a

10  rather large man?

11  A.   Doesn't change one thing.

12  Q.   Okay.

13  A.   During the course of time, I think we had three

14  different mediators --

15  Q.   I just was asking about that particular day.

16  A.   No, no.  Doesn't change it.

17  Q.   Okay.  Now, how long did the visit last in the -- and

18  the company's breakout room, by the way, this date, was a

19  room in the hotel; is that correct?

20  A.   It was.

21  Q.   Okay.  Did the company ordinarily rent a room in a hotel

22  for breakout?

23  A.   No.

24  Q.   Okay.  Ordinarily, the company would conduct its, quote,

25  breakout sessions or whatever you want to call it, in the

1  lobby or some other place generally available in the hotel,

2  right?

3  A.   Yes, there was a small office.  We had additional people

4  there that day.  We didn't rent a room.  We asked the hotel

5  if we could move out of that into another room.

6  Q.   Now, how long did the visit last to the company's

7  breakout room in the hotel?

8      MR. FRASER:  Objection, vague and ambiguous.  I'm not

9  sure what visit he's talking about.

10      JUDGE BUXBAUM:  Well, I assume you mean the visit in

11  which Mr. McKnight was a participant?

12      MR. McKNIGHT:  That's correct.

13      JUDGE BUXBAUM:  Yeah.

14  Q.   BY MR. McKNIGHT:  Were there any other visits, to your

15  knowledge, between the --

16      JUDGE BUXBAUM:  No, we don't care, Mr. McKnight.  Let's

17  talk about the one we do care about.  How long did that

18  conversation in the breakout room, involving Mr. McKnight,

19  last?

20      THE WITNESS:  Seemed like forever, but was probably just

21  a few minutes.  Mr. McKnight, if you said it was five to

22  twenty, I couldn't -- I wouldn't argue.  I mean, it certainly

23  didn't last hours.  It was a short visit, relatively short

24  visit.

25  Q.   BY MR. McKNIGHT:  After the short visit, relatively

```
 1   short visit, did the company come to the room where joint
 2   bargaining sessions were ordinarily conducted?
 3   A.   No, sir.
 4   Q.   Do you recall whether or not I said, "We are going to
 5   leave," during that visit?
 6   A.   I don't recall one way or the other.
 7   Q.   Do you recall that, after that visit, that I did leave?
 8   A.   Well, Mr. McKnight, the fact that you're here is
 9   indication to me you left.  Exactly when you left, I don't
10   know.
11   Q.   Do you recall that, after that visit, you left?
12   A.   I did leave.
13   Q.   Did Mr. Cohen leave?
14   A.   He did.
15   Q.   Did Mr. Viar leave?
16   A.   Yes.
17   Q.   Did Ms. Hedgcock leave?
18   A.   Yes.
19   Q.   Did Mr. Lillie leave?
20   A.   Yes.  Exactly when after that meeting, I'm not sure.
21   Q.   You raised a concern, you said, on May 5, 2008,
22   regarding the Union returning to work unconditionally; is
23   that correct?  Do you recall that concern?
24   A.   That was not how I would say that, Mr. McKnight.  That's
25   not what I --
```

1    Q.   Well, did you not express a concern that if the Union

2    came back unconditionally, the Union could go out on strike

3    again?

4         MR. FRASER:  Objection.  It mischaracterizes his

5    testimony.

6         JUDGE BUXBAUM:  Gee, I didn't think so.  I'll allow it.

7         THE WITNESS:  I raised some concerns about the -- I

8    stated that I had mistrust of what they were trying to do,

9    and that I questioned -- I did question that if they came

10   back, could they go back out on strike again?

11   Q.   BY MR. McKNIGHT:  You questioned that if the Union came

12   back to work unconditionally, they wouldn't be prohibited

13   from going out on strike again.  Isn't that true?

14        MR. FRASER:  Objection.  Mischaracterizes his testimony.

15        JUDGE BUXBAUM:  Do you want to elaborate, Mr. Fraser?

16   Because I don't see it.

17        MR. FRASER:  There was no testimony in my notes -- and

18   this was a reference I heard yesterday to notes that were

19   here -- that the unconditionally was connected to the concern

20   of people going out -- if they came back to work, he was

21   concerned that they might be able to go out on strike and

22   that a -- it was a pre-discussion with counsel about what,

23   potentially, could be going on.  They weren't linked up.

24   Unconditional and return to work were not linked up.

25        JUDGE BUXBAUM:  I think the questions are all right.

1  You may proceed.

2      THE WITNESS:  Please ask me the question again so I

3  can --

4  Q.  BY MR. McKNIGHT:  Look, you've done plenty of bargaining

5  with unions, right?

6  A.  Yes, sir.

7  Q.  You're a pro when it comes to collective bargaining?

8  A.  I wouldn't call myself that at all, sir.

9  Q.  Well, you bargained with nine separate unions for the

10  City of Lansing, right?

11  A.  Yes, sir.

12  Q.  And you bargained for two major production facilities

13  involving the UAW locals and, I guess, GM, right?

14  A.  I was financial support for that team.

15  Q.  And you did have a concern that, in the absence of a no-

16  strike clause, if the employees came back unconditionally,

17  they could walk out again, didn't you?

18  A.  I --

19  Q.  You had that internal concern?

20  A.  My turn?  A no-strike clause never came into play.

21  Q.  I didn't ask whether it came into play.  I'm asking you

22  if you had that concern.  He could say yes or no.

23      MR. FRASER:  Objection, Your Honor --

24      MR. McKNIGHT:  Okay.

25      JUDGE BUXBAUM:  No, let him finish.

1      You may finish your answer.

2      THE WITNESS:  The way you asked the question, the answer

3  is no.

4  Q.   BY MR. McKNIGHT:  Okay.  When you have a collective

5  bargaining agreement with a no-strike clause, can employees

6  walk out anytime they want?

7      MR. FRASER:  Objection.  Calls for a legal conclusion.

8      JUDGE BUXBAUM:  Well, I'm going to sustain it.

9      MR. FRASER:  And it's irrelevant.

10      JUDGE BUXBAUM:  Yeah, I think it's irrelevant, yeah.

11  You want to probe his thought process, that's fine, but it

12  doesn't matter whether he's right or wrong.

13  Q.   BY MR. McKNIGHT:  Well, what was your thought process,

14  sir?

15  A.   My thought process was that I didn't understand what was

16  being presented.  I didn't trust the Union.  I thought that

17  it was a ploy to try to somehow disrupt what we had been able

18  to do.  I felt like -- my thought process was we were able to

19  get up and operational and do very well, and this was a ploy

20  by them to say, "Let's disrupt that."

21  Q.   Okay.  And what was your thought process regarding the

22  Union striking again?

23  A.   That -- I just --

24      JUDGE BUXBAUM:  Was that the disruption you were

25  concerned about?

1    THE WITNESS:  That was the major one, yes.  Whether it

2  was the entirety, probably not, but that was a major concern.

3  Q.  BY MR. McKNIGHT:  And based on your experience, is there

4  a customary contractual provision that would address that

5  concern?

6    MR. FRASER:  Objection, Your Honor.  Way outside the

7  scope of direct.

8    JUDGE BUXBAUM:  Yeah, I agree.  Sustained.

9  Q.  BY MR. McKNIGHT:  Well, had the Union accepted the

10  company's proposal of July 25, 2008, would the employees have

11  been contractually prohibited from striking?

12    MR. FRASER:  Objection.  Calls for a legal conclusion.

13    JUDGE BUXBAUM:  Sustained.

14  Q.  BY MR. McKNIGHT:  Was the attachment accompanying the

15  company's letter of August 5, 2008, was that drafted to

16  address in any respect the concern or thought process you've

17  just described?

18  A.  Yes.

19  Q.  And directing your attention to page 14 of the

20  attachment, which is part of GC Exhibit 8, would you look at

21  that?  The box at the very bottom.  Have you looked at that

22  box at the very bottom?

23  A.  I'm looking at it as we speak, sir.

24  Q.  Okay.  Can you describe generally the kind of contract

25  provision that is?

1          MR. FRASER:  Objection, Your Honor.  The document speaks

2     for itself.

3          JUDGE BUXBAUM:  Sustained.  Let's go on to something

4     else, counsel.

5     Q.   BY MR. McKNIGHT:  Does that provision address the

6     concern and thought process you described?

7     A.   Most of them.

8     Q.   And was it your understanding that that provision, had

9     the Union accepted it, would have remained in effect for the

10    length of this attachment?

11         MR. FRASER:  Objection, Your Honor, relevance.  The

12    document speaks for itself.

13         JUDGE BUXBAUM:  It speaks for itself.

14    Q.   BY MR. McKNIGHT:  I think that you said words to the

15    effect -- and if I've got this wrong, you correct me -- that

16    discussions about returning to work all took place, to your

17    recollection, in the context of the parties trying to get a

18    collective bargaining agreement; is that right?

19    A.   Yes.

20    Q.   And there was one document, however, talking about the

21    employees returning to work without a collective bargaining

22    agreement.  Do you remember that document?

23    A.   No, sir.

24    Q.   Okay.  Well, didn't the Union write up its unconditional

25    offer to return without a collective bargaining agreement?

 1    A.    You're asking me for legal understanding --

 2    Q.    No, no, no.  I'm just asking you, didn't the Union

 3    present the company a document saying we would return to work

 4    unconditionally?

 5    A.    Well, Mr. McKnight, they did do that.

 6    Q.    Okay.  And in that document, didn't the Union remind the

 7    company that its unconditional offer to return to work was

 8    continuing and still on the table, if you recall?

 9    A.    It was my understanding, Mr. McKnight, if --

10    Q.    Well, just if you recall that that's what the document

11    said.  If you recall that.

12    A.    Oh, the document?

13    Q.    Yes, yes.

14    A.    Could I look at the document?

15    Q.    Sure, if that would help you.  It'll be GC-39.  You

16    don't recall without looking at it, sir?

17    A.    No.

18    Q.    Okay.

19    A.    GC-39?

20    Q.    Uh-huh.

21    A.    Mr. McKnight, I do remember this document.

22    Q.    And you recall that the Union, in addition to the letter

23    making the unconditional offer to return, actually furnished

24    a proposal reiterating its unconditional offer to return,

25    correct?  Stating that it was -- that its unconditional offer

1    to work was still on the table?

2    A.    This was in contrast to the May 21st, where they

3    specifically said they --

4    Q.    I wasn't asking about contrast, I was just asking about

5    this document.

6         MR. FRASER:  Objection, Your Honor.  He gets to answer

7    the question.

8         JUDGE BUXBAUM:  Yeah, please.  Finish your answer, sir.

9         THE WITNESS:  This was in contrast to them pulling off

10   the table the terms and conditions we put forth for them to

11   return.  Therefore, in our understanding, in my

12   understanding, which not being an attorney, was their

13   unconditional offer was, in fact, conditional.  And when we

14   put the terms and conditions for them to return on May 21st,

15   they said no, they're not acceptable.  So, therefore, they

16   took it off the table.  This was brought back and saying it's

17   still open.  We said no.

18   Q.    BY MR. McKNIGHT:  Did you understand that GC Exhibit 39

19   included a promise that the Union would not strike for 60

20   days?

21   A.    Yes.

22   Q.    At some point, did Mr. Viar or Mr. Lillie ever show you

23   Mr. Winkle's letter of May 5, 2008, in which he said that the

24   employees were ready to return to work unconditionally?

25   A.    Again, sir, if you could refer me to the document?

1  Q.   Do you remember whether you were ever shown that letter?

2  A.   Again, sir, if you could tell me which letter --

3  specifically, which letter we're talking about, I can answer

4  that.

5  Q.   Okay.

6  A.   Which letter are we talking about?  Does it have a

7  reference?

8  Q.   Well, do you remember that the company wrote the Union

9  on May 5 and said that the Union had made an unconditional

10  offer to return to work?

11     MR. FRASER:  Objection, Your Honor.  We've been over

12  this a number of times.

13     JUDGE BUXBAUM:  Well, it's cross, and I'm loathe to cut

14  it off, but, Mr. McKnight, I don't see the point either,

15  truthfully.  If you want to persist, I'll let you for a while

16  yet.  It is cross.

17  Q.   BY MR. McKNIGHT:  I'm sorry.  Without looking, you don't

18  remember that anymore, either?

19  A.   Oh, I absolutely remember it, Mr. McKnight.

20  Q.   And do --

21  A.   But I'm assuming that -- I was reaching to go back to it

22  because I was assuming you were going to ask me some more

23  finite detail about it.  But in answer to your question, yes.

24  Q.   And so does that refresh your recollection that the

25  company did receive a letter from the Union regarding an

1  unconditional offer to return to work?

2  A.   We did receive one.  Whether it's the one you're

3  referring to, I'm not sure.

4  Q.   Look at GC Exhibit 7, if you would.

5  A.   GC-7.  All right.

6  Q.   Do you understand that that is the letter the company

7  received in which the Union made an unconditional offer to

8  return to work?

9        MR. FRASER:  Objection, Your Honor.  I mean --

10       JUDGE BUXBAUM:  Yeah, let him answer that.

11       THE WITNESS:  Yes.

12       JUDGE BUXBAUM:  It's shorter, Mr. Fraser.

13       MR. FRASER:  Yeah.  Thank you.

14 Q.   BY MR. McKNIGHT:  So are you aware of any documents,

15 other than -- any writings, other than GC Exhibit 7, and then

16 GC-39, in which the Union memorialized its unconditional

17 offer to return to work?

18 A.   Do I remember any others?

19 Q.   That's correct.

20 A.   No, sir, I don't remember any others.

21 Q.   On May 5, 2008, do you have a recollection of about what

22 time in the day you and Mr. Viar and perhaps Mr. Lillie began

23 the work of preparing the attachment to the letter of GC

24 Exhibit 8?

25 A.   I don't remember the exact time.  I think it -- I know

1   that Mr. Lillie was in an all-day session, but -- and he was

2   working with people back at his office by telephone, and --

3   Q.   Okay.  So during the course of the day?  I'm not

4   saying --

5   A.   During the course of the day.

6   Q.   Okay.  So at some point during that day, the company's

7   principal bargainers began preparing -- the work of preparing

8   this document that's attached; is that right?

9   A.   Yes.

10  Q.   Okay.  And my question is do you recall at about what

11  time on the day of May 5 the company's principal bargainers

12  began preparing this document?

13       MR. FRASER:  Objection, asked and answered.

14       JUDGE BUXBAUM:  Well, asked and answered really isn't a

15  proper objection in cross-examination, but it is getting

16  repetitive, counsel.  One more time.  Answer it once more.

17       THE WITNESS:  I don't remember the exact time.

18  Q.   BY MR. McKNIGHT:  Approximate?

19  A.   Probably, the afternoon.

20  Q.   Early afternoon?

21  A.   Mid-afternoon.

22  Q.   Okay.

23       JUDGE BUXBAUM:  Mr. Fraser, that's not to say that, if

24  it becomes excessive, badgering the witness wouldn't be a

25  proper objection.

1    MR. FRASER:  I try not to get all hung up on those fancy

2    terms, but I appreciate you letting me know.  I'll say

3    badgering next time instead of asked and answered.

4    JUDGE BUXBAUM:  Well, but no, no, but my point is it's a

5    question of quantity, of course.

6    MR. FRASER:  Understood.  Thank you for helping me.

7    Q.   BY MR. McKNIGHT:  Do you recall how the company referred

8    to the employees in its return-to-work proposal?

9    MR. FRASER:  Objection, Your Honor.  Vague and

10   ambiguous.

11   JUDGE BUXBAUM:  Well, doesn't it speak for itself?  I

12   mean, we have it in writing, and as I've already promised,

13   I'm going to go through it yet again with a fine-tooth comb.

14   In other words, some of this cross-examination, Mr. McKnight,

15   I think is really an argument directed to me that ought to be

16   in the brief.  And the witness doesn't have to -- asking the

17   witness about it isn't going to be productive of anything.  I

18   grasp the argument, and I'll consider it, and I hope you'll

19   articulate it in your brief.

20   MR. McKNIGHT:  Thank you, Your Honor.

21   Q.   BY MR. McKNIGHT:  You stated, I think, that on the

22   meeting of June 13, 2009, you didn't remember whether there

23   was a discussion of the replacement employees?

24   MR. FRASER:  Objection, Your Honor.  It mischaracterizes

25   his statement.  I think it's 6/13 of '08, not '09.

1    MR. McKNIGHT:  I'm sorry, very sorry.  Thank you,

2    counsel.

3    Q.   BY MR. McKNIGHT:  My notes indicate that you testified

4    that you did not remember whether there was a discussion

5    about replacement workers on June 13, 2008?

6    A.   I do not remember that.

7    Q.   Does that mean that there was no discussion, or you just

8    don't remember?

9    A.   I don't remember.

10   Q.   Okay.  Either way?

11   A.   Either way.

12   Q.   Okay.

13   JUDGE BUXBAUM:  There could have been a discussion?

14   THE WITNESS:  Sure.  There was --

15   Q.   BY MR. McKNIGHT:  Okay.  I don't know if you testified

16   to this, but let me -- so I'll ask you.  Do you remember

17   whether or not there was a discussion about replacement

18   workers on August 14, 2008?  I don't think that there would

19   be any paper that would help you, sir.  I'm just asking for

20   your recollection.

21   JUDGE BUXBAUM:  Well, you're looking at Joint Exhibit 1,

22   I take it?

23   THE WITNESS:  I'm just looking at Joint Exhibit 1 --

24   MR. McKNIGHT:  Oh, fine.  Absolutely.

25   THE WITNESS:  -- putting it in time frame and context.

1        MR. McKNIGHT:  Yeah.

2        THE WITNESS:  August 14th.  Mr. McKnight, I, again,

3    don't have an exact recollection that that happened.

4    Anything that -- any memory that I would have now of

5    discussion on that wouldn't -- I wouldn't be sure to say.

6    That doesn't mean it didn't happen, but I don't remember it.

7    Q.   BY MR. McKNIGHT:  Okay.  Were you -- and I think -- you

8    worked pretty closely with Mr. Viar during this labor

9    dispute?

10   A.   Yes, sir.

11   Q.   Okay.  And did you participate in the -- or at least

12   share with Mr. Viar the process of making strategic decisions

13   about the labor dispute?

14       MR. FRASER:  Your Honor, I'm going to object to the

15   extent this starts to get into Berbiglia strategy issues.

16       JUDGE BUXBAUM:  Well, I don't think it's gotten there

17   yet.  You may answer.

18       THE WITNESS:  Please ask the question again, sir.

19   Q.   BY MR. McKNIGHT:  Would Mr. Viar customarily keep you

20   apprised of decisions that have been made regarding positions

21   the company took during the labor dispute?

22       MR. FRASER:  Your Honor, objection.  Outside the scope

23   of direct.

24       JUDGE BUXBAUM:  Well, I'll allow it.  Again, it's

25   preliminary.

1     THE WITNESS:  Yes.

2     JUDGE BUXBAUM:  Mr. McKnight, given the hour, can you

3   give me a sense of how much further you plan to cross-

4   examine?

5     MR. McKNIGHT:  I don't know, exactly.  I don't think I

6   have that much more, but I would really like 15 or 20 minutes

7   to go through my notes and just make sure that I've covered

8   everything I want.  I probably have about another 20 minutes.

9     MR. FRASER:  Your Honor, we would like to finish this

10  cross-examination before lunch.  We're happy to wait until

11  the cross-examination is done.  I think our witnesses are

12  fully capable of enduring another 20 minutes of this cross-

13  examination until then.

14     JUDGE BUXBAUM:  Well, Mr. Kirk, how do you stand in

15  terms of lunch?

16     THE WITNESS:  I'm fine, sir.

17     JUDGE BUXBAUM:  Are you?

18     THE WITNESS:  Does it look like I'm fading away?

19     JUDGE BUXBAUM:  All right.  Mr. McKnight, no way I'm

20  giving you 20 minutes to look at your notes.  That's not how

21  cross-examination works.  I'll give you a couple of minutes

22  right now.

23     **We'll go off the record, and we'll resume in five**

24  **minutes.**

25  **(Off the record.)**

1    Q.    BY MR. McKNIGHT:  Mr. Kirk, do you recall that, after

2    the meeting of August 14, 2008, Mr. Pilchak -- or

3    Mr. Cohen -- Mr. Cohen is an attorney for the company, right?

4    A.    Yes.

5    Q.    And he was present during our relatively short get-

6    together on August 14, 2008, correct?

7    A.    Yes.

8    Q.    And do you recall that, after that meeting of August 14,

9    2008, he wrote a letter to me in response to certain

10   questions or inquiries I'd made at that meeting?

11        MR. FRASER:  Objection, Your Honor.  Outside the scope

12   of direct.

13        JUDGE BUXBAUM:  Sustained.

14   Q.    BY MR. McKNIGHT:  Well, you said that, at the meeting,

15   it's possible the question of temporary replacements came up?

16   A.    I said I don't remember.

17   Q.    Okay.  Would you look at GC Exhibit 31?

18   A.    I am there.

19   Q.    Okay.  Have you seen that letter before?

20        MR. FRASER:  Objection, Your Honor.  Again, it's outside

21   the scope of direct.

22        JUDGE BUXBAUM:  Well, no, I'm going to permit it.

23        THE WITNESS:  Yes.

24   Q.    BY MR. McKNIGHT:  Does that refresh your recollection

25   that I made an inquiry on August 14, 2008, regarding the

1  status of the replacements?

2  A.   Yes.

3      JUDGE BUXBAUM:  Mr. McKnight, I hope you're going to ask

4  what his recollection now is; otherwise, why did you refresh

5  it?

6  Q.  BY MR. McKNIGHT:  Do you recall that I asked if the

7  replacements were temporary or permanent?

8  A.   What this does for me, Mr. McKnight, it does not give me

9  memory that you, in fact, asked it.  It substantiates to me,

10  in my mind, the fact that it obviously was asked and answered

11  in this letter.

12      JUDGE BUXBAUM:  But you're saying you still don't

13  remember it?

14      THE WITNESS:  I still don't remember it.

15      JUDGE BUXBAUM:  Okay.

16      MR. McKNIGHT:  Now I'd like about five minutes, Your

17  Honor.

18      **JUDGE BUXBAUM:  All right.  We'll resume at quarter of.**

19  **(Off the record.)**

20      JUDGE BUXBAUM:  Mr. McKnight, you may proceed.

21  Q.  BY MR. McKNIGHT:  Mr. Viar, do you have explicit --

22  A.   Kirk.

23  Q.  I'm sorry.  Mr. Kirk.  That's correct.  Thank you.

24      MR. VIAR:  Everyone's doing it.

25  Q.  BY MR. McKNIGHT:  Do you have explicit recall that, on

1    the exchange with -- or the representations -- or exchange

2    between Mr. Lillie and Mr. Canzano, regarding the company

3    reserving its rights, occurred at the end of the meeting on

4    July 31?

5    A.   On July 31st?

6    Q.   Yes.

7    A.   Yes, sir.

8    Q.   Okay.  And you do have very explicit recall of that,

9    correct?

10   A.   Yes, sir.

11   Q.   Okay.  And do you have explicit recall that, at that

12   meeting, Mr. Canzano analogized to a restaurant having some

13   kind of signage that it doesn't accept responsibility for

14   something?

15   A.   Yes, sir.

16   Q.   And that exchange regarding which you have explicit

17   recall occurred at the end of the meeting on July 31, or near

18   the end?

19        MR. FRASER:  Your Honor, counsel is badgering the

20   witness.

21        JUDGE BUXBAUM:  No, not yet.  Not yet.

22        THE WITNESS:  Mr. McKnight, the exact analogy that

23   Mr. Canzano used -- Mr. Canzano is very colorful and has a

24   lot of different analogies he has used over the time, but the

25   timing that you're asking me about for this discussion was,

1    in fact, at the end of the meeting.

2    Q.    BY MR. McKNIGHT:  Do you have recall of whether or not,

3    on August 14, I raised or made an inquiry regarding the

4    company having any outstanding information requests to the

5    Union?

6    A.    Yes.

7    Q.    Do you recall Mr. Lillie saying that the company would

8    get back to me on that?

9    A.    Yes.

10   Q.    Do you have a recall of Mr. Lillie saying that the

11   company would get back to me on my inquiry regarding whether

12   the company truly believed the UAW supported or condoned the

13   use of racial epithets?

14        MR. FRASER:  Objection, Your Honor.  It calls for

15   hearsay.

16        JUDGE BUXBAUM:  No, he's asking if has a recollection.

17   I don't see how --

18        MR. FRASER:  Well, he asked if he had a recollection of

19   what Mr. Lillie said.

20        JUDGE BUXBAUM:  Well, he's probing the witness' power to

21   recollect what happened at the meeting.  I'll permit it.

22        THE WITNESS:  Mr. McKnight, I remember you making the

23   statement about did we think that the UAW would condone such

24   things.  I do not remember you saying, "Please get back with

25   me with an answer on that."

1    Q.   BY MR. McKNIGHT:  Do you recall whether or not

2    Mr. Lillie said anything -- words to the effect that the

3    company -- he would get back to me or they would take that

4    inquiry under consideration?

5    A.   I know that Mr. Lillie -- that was kind of his standard

6    answer to you when you were asking those types of questions.

7    Q.   At that particular, very brief, 15-or-so-minute meeting

8    on August 14?

9    A.   Uh-huh.

10   Q.   Correct?

11   A.   Yes.

12   Q.   Okay.

13        MR. FRASER:  Your Honor, again, for clarification, the

14   answer to the question related to that meeting, in general,

15   and not the specific question asked about whether Mr. Lillie

16   recalled "Please get back to me on the racial epithets"?

17   Q.   BY MR. McKNIGHT:  So your recall is that that was

18   Mr. Lillie's kind of standard response to the inquiries I

19   made?

20   A.   Yes.  Exactly which ones he applied it to, I don't

21   remember.

22   Q.   In other words, I mean, you hadn't seen me or Mr. Lillie

23   talk at any other time?  You weren't talking about the way we

24   normally talk to each other, just what occurred at that

25   meeting, right?

1   A.   Yes.

2   Q.   Now, you didn't take any notes of that meeting?

3   A.   No.

4   Q.   And do you know whether or not Mr. Lillie took any notes

5   of that meeting?

6   A.   I don't know.  I don't think so.

7   Q.   Why don't you think so?

8   A.   We were busy being engaged.

9   Q.   Do you know whether or not Mr. Lillie made any notes

10  about that meeting after that meeting?

11  A.   I don't know that for a fact.

12  Q.   Do you know whether or not Mr. Cohen made any notes of

13  that meeting during or immediately after that meeting?

14  A.   I do not know that.

15  Q.   Do you know whether or not Mr. Viar made any notes of

16  that meeting during or shortly after that meeting?

17  A.   I don't have specific recollection of that.

18  Q.   Do you know whether or not Ms. Hedgcock made any notes

19  of that meeting during the meeting or shortly -- or sometime

20  thereafter that meeting?

21  A.   She did not make notes during the meeting.  Don't think

22  any of us in the room were making notes, specific notes.  I

23  think we may have been writing down some of your requests,

24  noting down some of your requests, but specific notes of

25  trying to document everything that happened in the meeting, I

1  don't think anybody did that.  I think there was --

2  Q.   Who may have written down my requests, if you recall?

3  A.   It may have been -- my recollection is Mr. Lillie would

4  have done that.

5       MR. McKNIGHT:  I would ask, if the company has those, if

6  they would produce that, please, because I haven't seen that.

7       MR. FRASER:  Your Honor, this is the worn-out argument

8  that's being made over and over again.  We have produced

9  everything that the company has provided to us in response to

10  both General Counsel's subpoena requests, in plural --

11      JUDGE BUXBAUM:  Yeah, let's not go down that road again.

12  A to-do list is not going to merit our wasting time on it.

13      THE WITNESS:  Judge, you did a better job of

14  articulating it as a to-do list.

15      JUDGE BUXBAUM:  Well, don't say anything, sir.  Don't

16  say anything.

17      You may proceed, counsel.

18  Q.   BY MR. McKNIGHT:  In your affidavit to the NLRB, your

19  sworn statement, did you tell the -- or did you swear that

20  the meeting with respect to which you had specific or

21  explicit recall was the July 31, 2008 meeting?

22  A.   If I can see the -- I don't remember.

23  Q.   Okay.  Please look it over and see if you can tell us

24  which meeting with respect to which you swore that you have

25  explicit recall.

1  A.  5/21, 7/31.

2  Q.  You didn't have explicit recall about who said what at

3  the other meetings, did you?

4  A.  No.

5  Q.  And you don't have explicit recall about exactly who

6  said what on August 14, 2008, do you?

7  A.  On a verbatim basis, no.

8  Q.  After you took these notes of Respondent Exhibit 6 --

9  remember those?

10  A.  Uh-huh.

11  Q.  What did you do with them?

12  A.  I kept them in a manila folder that I had.

13  Q.  Where did you put that manila folder?

14  A.  My office.

15  Q.  Did you have anything else in that manila folder?

16  A.  Yes.

17  Q.  What did you have?

18  A.  Copies of proposals, different versions of proposals

19  that went back and forth.

20  Q.  Was there ever a time from, I guess, starting on May 1,

21  2008 through July 31, 2008, when the company didn't want to

22  get -- wasn't trying to get a contract with the UAW?

23  A.  As I understand your question, it's was there a time

24  during that period of time when we were bargaining in good

25  faith that we were not trying to get a contract?  We were

1    trying to get a contract during all of that.

2        MR. McKNIGHT:  Okay.  One minute.

3        **JUDGE BUXBAUM:  Very well.  We'll go off the record.**

4    **(Off the record.)**

5        MR. McKNIGHT:  No further questions.

6        JUDGE BUXBAUM:  Very well.  Any redirect?

7        MR. FRASER:  No further questions.

8        JUDGE BUXBAUM:  All right, sir.  You may step down.

9    Thank you.

10   **(Witness excused.)**

11       JUDGE BUXBAUM:  Does anyone -- I don't know whether

12   Mr. Kirk plans to stay, in any event, but let me ask you if

13   anyone requires that he stay?

14       MR. FRASER:  I think he plans.

15       MR. KIRK:  I plan to be here, sir.

16       JUDGE BUXBAUM:  You plan to, anyway.  All right.

17   Doesn't matter, then.

18       All right.  Two o'clock sharp, and I presume we're going

19   to start with Mr. Lillie?

20       MR. FRASER:  Yes, we are.

21       JUDGE BUXBAUM:  All right.

22   **(Whereupon, at 1:05 p.m., a lunch recess was taken.)**

23

24

25

1          <u>A F T E R N O O N   S E S S I O N</u>

2                                (Time Noted:  2:01 p.m.)

3          JUDGE BUXBAUM:  We're back on the record.

4          Mr. Carlson had mentioned he had some housekeeping

5     matters, but before we do that, I think, let's finish --

6     well, no, we did finish, didn't we, with the witness.

7          MR. CARLSON:  Yes, sir.

8          JUDGE BUXBAUM:  Yeah, go ahead, Mr. Carlson.

9          MR. CARLSON:  Well, my housekeeping matter was with

10    respect to correcting, for lack of a better word, General

11    Counsel's Exhibit 1.  It was pointed out, I think by you,

12    Judge, that Exhibit 1(g), Respondent's motion for a bill of

13    particulars in this case, appeared to be missing a page or

14    pages.  We looked into that and, indeed, it was missing its

15    third page.  I gave those to the court reporter, and we've

16    marked that as General Counsel's Exhibit --

17         JUDGE BUXBAUM:  64.

18         MR. CARLSON:  64.  And I would offer that into the

19    record at this time to --

20         JUDGE BUXBAUM:  And I guess we should explain on the

21    record that it's just the last page, and there's -- of

22    course, the thought immediately occurs to you, why don't you

23    add it to 1(g) and just complete -- put it with the first two

24    pages.  And we can't do that because 1(g) has already been

25    bound up.  So we'd have to cut the strings, and it would make

1    a mess.  So it's going to be -- the record should reflect

2    that 1(g) is completed by the -- its last page being at 64.

3    Hopefully, if anyone is that interested in Mr. Fraser's

4    brilliant motion for a bill of particulars, they'll piece it

5    all together.

6        MR. FRASER:  I don't think you'll have any requests for

7    that, but --

8        JUDGE BUXBAUM:  Probably not.  All right.  Then, GC-64

9    will be admitted into the record.

10   **(General Counsel's Exhibit 64 marked for identification and**

11   **received into evidence.)**

12       MR. CARLSON:  One other matter, Judge.  Yesterday,

13   during Mr. Viar's cross-examination, I showed him a document,

14   General Counsel's Exhibit 58, which was a position statement,

15   a rather lengthy position statement that the Respondent

16   submitted to the NLRB during the investigation of the charge

17   in this case.  I provided -- Mr. Fraser had an opportunity to

18   look at the document during the cross-examination, and I told

19   him that I would give him a complete copy of that.  I've made

20   the copy, and I'm now going to hand that to him.

21       JUDGE BUXBAUM:  Very well.

22       MR. FRASER:  Thank you very much.

23       JUDGE BUXBAUM:  Any other housekeeping?

24       MR. CARLSON:  Nothing further from General Counsel.

25       JUDGE BUXBAUM:  All right.  Then, Mr. Fraser, you may

1   proceed.

2       MR. FRASER:  Great.  We have asked Mr. Lillie to take

3   the stand.

4       JUDGE BUXBAUM:  Mr. Lillie, would you please stand and

5   raise your right hand?

6   (Whereupon,

7                           **BRUCE LILLIE**

8   was called as a witness by and on behalf of the Respondent

9   and, after having been first duly sworn, was examined and

10  testified as follows:)

11      JUDGE BUXBAUM:  Please be seated.  Would you please

12  state your name and spell your last name?

13      THE WITNESS:  Sure.  It's Bruce Lillie, L-i-l-l-i-e.

14      JUDGE BUXBAUM:  You may proceed.

15      MR. FRASER:  Thank you.

16                      **DIRECT EXAMINATION**

17  Q.   BY MR. FRASER:  Could you let us know what your

18  profession is, please?

19  A.   I'm a labor attorney.

20  Q.   And how long?

21  A.   Well, I was a union steward for three years, a union

22  business agent for a little under twelve years, and I've been

23  a labor consultant or a labor attorney, I guess, for around

24  twenty years.

25  Q.   Okay.  Do you work with Douglas Autotech?

1    A.    I do.

2    Q.    And in what relationship?

3    A.    I typically would help them negotiate their labor

4    contracts every three years, and I've done that, I believe,

5    since around 1997 or 1998, and I would occasionally arbitrate

6    a case for them.  They occasionally had arbitration cases,

7    and I would help out with those.

8    Q.    Okay.  Do you perform similar services for other

9    clients?

10    A.    Many.

11    Q.    Were you involved in the 2008 negotiations between

12    Douglas and the UAW?

13    A.    Yes.

14    Q.    And could you tell me your role?

15    A.    Well, I'd love to say that it was chief negotiator, and

16    I suppose that was the role I was supposed to be playing, but

17    in the negotiations between the company and Douglas, it's one

18    of those relationships where kind of everybody talks.  But I

19    suppose I filled the role of chief negotiator.

20    Q.    Okay.  And I'm going to focus your attention on May 1 of

21    2008, forward.

22    A.    Okay.

23    Q.    So May 1 of 2008, forward.  Did your role change from

24    that date forward, related to your relationship at Douglas

25    and the contract negotiations?

1   A.   No.

2   Q.   Can you tell us -- I'm going to share with you that

3   there are binders in front of you.

4   A.   Yes.

5   Q.   I tried to neatly organize those into exhibit binders.

6   If you could look at the big binder, tab number seven,

7   please?

8   A.   Is this the big binder?

9   Q.   Yeah, the large binder compared to the one up to your

10  right, which is the smaller binder.

11  A.   Number 7?

12  Q.   Yep.

13  A.   Okay.  Let's see, these are kind of going -- oh, I see

14  it.  Okay, got it.

15  Q.   I want to make sure you're at the right --

16  A.   Right.  This is the -- this is to serve notice that our

17  membership --

18  Q.   Yeah.  Could you just look at it for a second, please?

19  A.   Sure.

20  Q.   Have you had a chance to do that?

21  A.   Yes, I have.

22  Q.   Have you seen that document before?

23  A.   I have.

24       JUDGE BUXBAUM:  And for the record, that's GC-7?

25       MR. FRASER:  GC-7.

1    Q.    BY MR. FRASER:  Can you tell me when you received that

2    and how you received it, please?

3    A.    Yeah.  On May 5th, my client, Paul Viar, contacted me

4    and indicated that the Union was trying to hand him something

5    at the company.  And this was early in the morning, and so I

6    called Phil Winkle and said, "What are you trying to hand to

7    my client?" and he said, "A return to work."  And I said,

8    "Why don't you fax that over to me?"  I was on my way to see

9    another client at that time, but this was faxed over to my

10   office, and then Phil and I spoke, I believe, later on that

11   morning.

12   Q.    On -- I'll just take the date, May 4 of 2008 -- do you

13   know what the relationship between the Union and the company

14   was?  Do you know whether there was a strike going on or not?

15   A.    Oh, yeah.  Well, I think the Union went on strike at

16   midnight, on April 30th, and so they were on strike on May

17   4th.

18   Q.    Okay.  Did you have any additional -- any other

19   conversations with Mr. Winkle on May 5?

20   A.    Yeah.  I believe, later on that morning, I had -- one of

21   my assistants had brought this over to me --

22   Q.    This, being General Counsel 7?

23   A.    Yes.

24   Q.    Okay.

25   A.    Had brought this document over to me, and I had

1    contacted Phil, and we had established a meeting time for

2    later on, late that afternoon, I think five or six o'clock.

3    Q.    And where was that meeting to be held?

4    A.    It was going to be held at the Marriott Hotel, in East

5    Lansing, Michigan.

6    Q.    Okay.  And why there?

7    A.    Well, I had a meeting all day at the Marriott, until

8    around four o'clock.  Obviously, I wasn't expecting to get a

9    return-to-work letter from the Union four or five days after

10   they had started a strike, so I needed at least a little bit

11   of time to talk to my client, Douglas, and so I was going to

12   finish my meeting with my other client at about four

13   o'clock --

14   Q.    Okay.

15   A.    -- meet with Douglas for an hour or two, and then meet

16   with the Union.

17   Q.    And, in fact, is that what you did?

18   A.    That is, in fact, what I did.

19   Q.    Okay.  I think you testified you had two conversations

20   with Phil Winkle before the meeting that evening on May 5.

21   Any other conversations you can recall?

22   A.    None that I can recall.

23   Q.    Okay.  Now, you did meet with Douglas to discuss -- or,

24   did you meet with Douglas to discuss the document, GC-7?

25   A.    Yeah, I sure did.

1    Q.    Okay.  And, again, because you're an attorney and there

2    are Berbiglia strategy privileges, can you tell me at least

3    when that meeting took place with Douglas?

4    A.    I think that the company was able to get to the Marriott

5    around 3:00 or 3:30 or 4:00, somewhere in that vicinity, and

6    we had a chance to sit down and talk about next steps.

7    Q.    Okay.  And, again, just in terms of general topics, what

8    was discussed?

9    A.    Well, we talked about why would the Union be doing this,

10   obviously.

11   Q.    Okay.

12   A.    Four days earlier or five days earlier --

13        JUDGE BUXBAUM:  Let me interrupt a moment, Mr. Fraser.

14   I just want to be clear here that --

15        MR. FRASER:  I understand.  I'll withdraw the question.

16   Q.    BY MR. FRASER:  Mr. Lillie, talk to me about May 5, the

17   meeting, the meeting itself.  I want you to describe for me

18   where the meeting occurs, what is said, in sequential order

19   the best of your recollection.

20   A.    Sure.  And you're talking about once we meet with the

21   Union?

22   Q.    You're done meeting with Douglas and you're now meeting

23   with the Union.  What happens?

24   A.    All right.  Well, at that point in time, the company and

25   I delivered the Union a letter and a return-to-work document.

1  Q.   Let me show you -- if you would please look at -- flip

2  the tab to GC-8.

3  A.   Okay.

4  Q.   You just referenced a document, a letter and a document.

5  Is that the letter?

6  A.   That is the letter.

7  Q.   If you'd look at the rest of the document, please?

8  A.   Yep, that's it.

9  Q.   So that's -- GC-8 is the document you handed to the

10 Union on May 5?

11 A.   That's correct.

12 Q.   Okay.  When was that document prepared?

13 A.   That was prepared between four o'clock and six o'clock.

14 Q.   Okay.  And how were you able to present this to the

15 Union with Douglas Autotech letterhead?

16 A.   From a prior communication, I had Douglas Autotech

17 letterhead on my computer, a prior communication that we had

18 prepared together where I had Douglas Autotech letterhead,

19 and so I had a printer with me and a computer with me, and so

20 I was able to accomplish that.

21 Q.   Okay.  So I interrupted you.  You said you handed this

22 document to the Union.  Can you tell me, specifically, what

23 you said when that was done?

24 A.   Essentially, that we understand that -- I think the

25 first thing was that, you know, we understand that the Union

1   is making an unconditional offer to return to work.

2   Q.   Okay.

3   A.   And I'm sure that I expressed my surprise at that.

4   Q.   Okay.

5   A.   But, nonetheless, I indicated that the attachment were

6   those conditions --

7   Q.   Okay.

8   A.   -- and if they wanted to come back to work

9   unconditionally, here are those conditions for which they

10  could return to work.

11  Q.   Okay.  Was there any response to that?

12  A.   I think that, initially, the Union wanted to just take a

13  little bit of a break, and so after we had communicated this

14  to them, they took a short break in the conference room.  My

15  client and I left and gave them a chance to talk, and then we

16  came back -- they told us to come on back into the room,

17  which we did, and they said that they would give us a

18  response tomorrow, which would have been May 6th.

19  Q.   Okay.  Now, I focused your attention on GC-8.  I want to

20  make sure that I've done justice here.  The room that you

21  were in on May 5, 2008, where was that again?

22  A.   In a conference room at the Marriott Hotel, in East

23  Lansing, Michigan.

24  Q.   Okay.  So please bear with me.  You just walked into the

25  conference room at the Marriott on 5/5/08.  Again, run me

1   through the sequence of events.

2   A.   Right.   The union showed up, as Phil and I had agreed,

3   and --

4   Q.   Phil Winkle?

5   A.   Phil Winkle, that's correct.

6   Q.   Okay.

7   A.   And the committee.   And I was able to -- because I was

8   already at the hotel, I was able to secure a conference room

9   for us, and after my client and I had met, we asked the Union

10  to come into the conference room.

11  Q.   Okay.   I'm going to show you a new document.

12       MR. FRASER:   Am I up to --

13       JUDGE BUXBAUM:   Seven.

14       MR. FRASER:   Seven?

15       COURT REPORTER:   Seven.

16  **(Respondent's Exhibit 7 marked for identification.)**

17  Q.   BY MR. FRASER:   Take a look at that for a minute,

18  please.

19  A.   Right.

20  Q.   Have you had a chance to look at that?

21  A.   Yes.

22  Q.   Can you tell me what that is, please?

23  A.   Those are my notes going into that meeting on May 5th,

24  2008.

25  Q.   Okay.

1  A.   That meeting with the Union at the Marriott at around

2  six o'clock.

3  Q.   And when you say "going into that meeting," what do you

4  mean?

5  A.   Well, I had made these notes as talking points for that

6  meeting.

7  Q.   Okay.  Is that your handwriting at the bottom of the

8  page?

9  A.   Yes, it is.

10      JUDGE BUXBAUM:  And at the upper right?

11      THE WITNESS:  Yeah, where it says, "Master, 6:00 p.m.,"

12  that's also my writing.

13      MR. FRASER:  Your Honor, we'd move for admission of

14  Respondent's 7.

15      JUDGE BUXBAUM:  Any objection to my asking the witness

16  to read his -- not that this should be construed as a comment

17  on his handwriting -- but to read into the record what that

18  note says?

19      MR. FRASER:  None from me.

20      JUDGE BUXBAUM:  Any problem with that, gentlemen?

21      MR. CARLSON:  No objection.

22      JUDGE BUXBAUM:  Mr. McKnight?

23      MR. McKNIGHT:  No.

24      JUDGE BUXBAUM:  All right.  Would you do that,

25  Mr. Lillie?

1    THE WITNESS:  Sure.  It says, "5/5/08, meet with union,

2    dash, not waiving rights."  The second line says, "Why

3    lockout signs when the company had not locked out yet?"  The

4    third line is, "Union to respond on 5/6/08."  And the last

5    one is, "Proposal is complete."

6    JUDGE BUXBAUM:  All right.  Thank you.

7    Now, is there any objection to the receipt of

8    Respondent's Number 7?

9    MR. CARLSON:  I'd like to voir dire, Your Honor.

10   JUDGE BUXBAUM:  You may.

11                    **VOIR DIRE EXAMINATION**

12   Q.   BY MR. CARLSON:  Mr. Lillie, I'm going to direct your

13   attention to the top right-hand corner of this document.

14   A.   Sure.

15   Q.   Is that your handwriting on the document?

16   A.   Yes, it is.

17   Q.   And can you tell us what that says?

18   A.   Sure.  "Master, 6:00 p.m."

19   Q.   And when did you write that on there?

20   A.   I would have written that -- I don't know for sure, but

21   probably as the meeting was getting started.

22   Q.   And why did you write that on there?

23   A.   Commemorate the time.

24   Q.   What does "master" mean?

25   A.   That means it's my original.

971

1   Q.   So I take that to mean there's only one of these?

2        MR. FRASER:  Your Honor, again, I think it exceeds the

3   scope of voir dire.

4        JUDGE BUXBAUM:  Well, I don't understand it.  What do

5   you mean?

6        MR. CARLSON:  I mean there's only one -- I want to know

7   what that means.  I want to know what "master" means.

8        JUDGE BUXBAUM:  Okay.  Do you want to explain that

9   further?

10       THE WITNESS:  Sure.  It's something that I write at the

11  top to say this is the one I'm using.

12  Q.   BY MR. CARLSON:  Were there any other documents like

13  this that said "master" on them?

14  A.   I don't know.

15  Q.   You don't know?

16  A.   No, I don't.

17  Q.   Would you have had any reason to create additional

18  masters?

19  A.   Sure.  I have multiple masters from time to time, using

20  one document, and then I change the document, and then the

21  new one becomes the master.

22  Q.   Did you do that in this case?

23  A.   I don't know.

24  Q.   Why would you change the master?

25  A.   For various reasons.  One is this -- for example, in

1    some instances, I create a document and I'm going to use that

2    one, and then I change my mind and then I'm going to use a

3    different document.

4    Q.   Do you have any reason to believe that you would have

5    changed this document at any time?

6    A.   Which part of it?

7    Q.   Any of it that you would have created a new master using

8    this document?

9    A.   It's possible.

10   Q.   And what would have been that reason?

11   A.   Something that may have happened in the meeting.

12   Q.   Do you recall anything happening at this meeting that

13   would have caused you to change this document?

14       MR. FRASER:  Your Honor, again, I'm going to object

15   on -- it sounds to me it's cross.  Voir dire is to determine

16   if the document --

17       JUDGE BUXBAUM:  No, I think this is voir dire.  I'll

18   allow it.

19       MR. CARLSON:  I have nothing further.

20       JUDGE BUXBAUM:  Mr. McKnight, do you want to be heard on

21   voir dire?

22       MR. McKNIGHT:  No.

23       JUDGE BUXBAUM:  I have -- I want to be sure I understand

24   it, Mr. Lillie.  The word process part of this piece of paper

25   was prepared on your computer before the meeting?

1      THE WITNESS:  That's correct.

2      JUDGE BUXBAUM:  And I think what I heard you say is that

3  the handwritten note underneath was also prepared before the

4  meeting?

5      THE WITNESS:  Not all of it, necessarily.  Some of it

6  was prepared beforehand, some of it as the meeting went on.

7  As you can see, in the third line, it says, "Union to respond

8  on 5/6/08."  I would not have known that at the beginning of

9  the meeting.

10     JUDGE BUXBAUM:  Can you recall which part was written

11  before the meeting and which after?

12     THE WITNESS:  For sure, I know for sure that at least

13  the two lines were definitely there before the meeting.

14     JUDGE BUXBAUM:  The first two?

15     THE WITNESS:  The first two.  That's correct.  "5/5/08,

16  meet with union, not waiving rights."  Now, the reason I have

17  that there, Your Honor, if I could --

18     JUDGE BUXBAUM:  Well, now, that's beyond voir dire.  I'm

19  going to leave that to the lawyers.

20     THE WITNESS:  Okay.

21     JUDGE BUXBAUM:  But -- all right.  What about the last

22  two lines?

23     THE WITNESS:  Well, the "Union to respond on 5/6/08,"

24  that would have occurred at the end of that meeting because

25  that's when the Union would have told me that they're going

1   to get back to me on 5/6/08.  The next line, "Proposal is

2   complete," that would have been in response to the Union's

3   question, and the Union's question was is this complete?

4        JUDGE BUXBAUM:  Any follow-up question, Mr. Carlson,

5   based on mine?

6        MR. CARLSON:  No, sir.

7        JUDGE BUXBAUM:  And what is your position as to the

8   admission of the exhibit?

9        MR. CARLSON:  No objection.

10        JUDGE BUXBAUM:  Mr. McKnight?

11        MR. McKNIGHT:  No objection.

12        JUDGE BUXBAUM:  Respondent's 7 will be received.

13   **(Respondent's Exhibit 7 received into evidence.)**

14        JUDGE BUXBAUM:  On that general topic, Mr. Fraser, I

15   believe six was marked for identification but has not been

16   offered for admission.  That may be your intention or it may

17   be an oversight.  I generally try to give lawyers a heads-up

18   in case it's an oversight.

19        MR. FRASER:  Your Honor, I appreciate you doing that.

20   Let me --

21        JUDGE BUXBAUM:  Let me ask the reporter.  I'm right, am

22   I not, that six was not admitted?

23        MR. FRASER:  You are correct, Your Honor.

24        JUDGE BUXBAUM:  Yeah.

25        MR. FRASER:  We would move that Respondent's 6 be

1    admitted.

2        JUDGE BUXBAUM:  Mr. Carlson, any objection to that?

3        MR. CARLSON:  I'm sorry, Judge.  Respondent's 6 --

4        JUDGE BUXBAUM:  It's Mr. Kirk's notes.

5        MR. CARLSON:  Oh, no, no objection.

6        JUDGE BUXBAUM:  And, Mr. McKnight?

7        MR. CARLSON:  I think, actually, I did have an objection

8    and you overruled it, now that -- I think I did object to

9    Mr. Kirk's notes, but you overruled it.

10       JUDGE BUXBAUM:  Is that right?

11       MR. CARLSON:  Yeah.

12       JUDGE BUXBAUM:  Neither the reporter nor I noted that it

13   was received.

14       MR. CARLSON:  Yeah, I objected about Mr. Kirk being --

15   that the only case -- time he took notes, and --

16       JUDGE BUXBAUM:  Well, you voir dired him about that?

17       MR. CARLSON:  Oh, you're right, Judge.  I'm sorry.

18       JUDGE BUXBAUM:  Yeah.

19       COURT REPORTER:  I have it received.

20       JUDGE BUXBAUM:  You do?  Okay.  Well, then, in any

21   event, I guess, unless I hear some reason not to, I'll admit

22   it now.

23       MR. McKNIGHT:  You know, the only question I have,

24   Judge, is I don't recollect it being offered and received,

25   and I -- maybe we can stipulate to this, or maybe it's

 1  already clear on the record that that was the only meeting at

 2  which Mr. Kirk claims or took -- says he took notes at.  I

 3  mean --

 4      MR. CARLSON:  Other than doodles.

 5      JUDGE BUXBAUM:  Well, other than doodles.  Other than

 6  doodles.

 7      MR. McKNIGHT:  Other than doodles, yes, okay.

 8      JUDGE BUXBAUM:  Mr. Fraser, right, that was the

 9  testimony, wasn't it?

10      MR. McKNIGHT:  Okay.  Then I have no objection.

11      MR. FRASER:  The record will say what it says.  I think

12  that's accurate, but --

13      MR. McKNIGHT:  Then I have no objection.  Otherwise, I

14  would actually want to ask him some questions, but --

15      JUDGE BUXBAUM:  No, that is the state of the record.  I

16  mean, obviously, Mr. Fraser's right.  The transcript will

17  verify what I say or contradict it, but I'm confident that's

18  the state of the testimony.  I'll admit Respondent's 6 and 7.

19                 **DIRECT EXAMINATION (cont.)**

20  Q.   BY MR. FRASER:  So, Mr. Lillie, if you're looking at

21  Respondent's 7, again, can you go through this chronology of

22  what occurred in the meeting of May 5?  You've already told

23  us that you walked in.  You're in the door.  What do you say?

24  What does Mr. Winkle say?

25      MR. FRASER:  And, again, I'm sorry, Your Honor.  I'm

1  starting to lose track of what he's already testified about.

2      JUDGE BUXBAUM:  All right.  That's all right.

3      THE WITNESS:  Right.  And as you can see from my notes

4  here, we meet with the Union, we give them the return-to-work

5  document, ask them if they're returning to work, they tell us

6  that they'll let us know the next day, which is May 6th.  I

7  did ask them why they had lockout signs when the company

8  hadn't locked them out yet.

9  Q.  BY MR. FRASER:  Okay.  And did you get a response, if

10  you can recall?

11  A.  Not really.

12  Q.  Okay.

13  A.  And then, as you can see from the notes, the Union is

14  going to respond on May 6th, the next day --

15  Q.  Who told you that?

16  A.  Phil Winkle.

17  Q.  Okay.

18  A.  And then the Union asked if this was everything, and we

19  responded, "Yes, it is.

20  Q.  Okay.  I think you already testified about -- but I'll

21  ask you anyway.  Did you make any comments to the Union about

22  not waiving rights?

23      MR. McKNIGHT:  Objection, leading.

24      JUDGE BUXBAUM:  Sustained.

25  Q.  BY MR. FRASER:  Did you make any comments -- to the

 1   extent you haven't confirmed all you've said to the Union, at

 2   the beginning of that session on May 5, did you make any

 3   additional comments?

 4        MR. McKNIGHT:  Objection, leading.

 5        JUDGE BUXBAUM:  The first part of that is leading.

 6   Q.   BY MR. FRASER:  Did you make any additional comments

 7   during that meeting, to the Union?

 8        MR. McKNIGHT:  I just want to state for the record that

 9   he asked this witness three times to tell us everything that

10   happened, to walk us through that meeting, and this is

11   leading examination.  Whether you let it in or not, I just

12   want to make a record.

13        JUDGE BUXBAUM:  Mr. McKnight, again, I've said to you

14   before on this topic, and I say it from the bottom of my

15   heart, I'll take into account all the circumstances.  I'm

16   wide awake and paying attention.

17        MR. McKNIGHT:  Thank you.

18        JUDGE BUXBAUM:  You bet.  Go ahead.

19   Q.   BY MR. FRASER:  I think you're free to answer the

20   question, Mr. Lillie.

21   A.   Okay.  Well, as it points right out there, we were

22   indicating that we were not waiving any rights.

23   Q.   Okay.  And you're confident you said that?

24        MR. McKNIGHT:  Objection, leading.

25        JUDGE BUXBAUM:  Sustained.  Now, that is grossly

1   leading, counsel.  Do not do that again.

2        MR. FRASER:  I was trying to see if Mr. McKnight was

3   awake.

4        JUDGE BUXBAUM:  Do not do that again.

5   Q.   BY MR. FRASER:  Well, why did you provide the Union GC-8

6   on May 5, 2008?

7   A.   Is that the --

8   Q.   Yeah, if you can just take a look at GC-8.

9   A.   GC-8, okay.  That's the letter and the attachment,

10  right?

11  Q.   Yes.

12  A.   Well, the Union had made an unconditional offer to

13  return to work, and these were the conditions.

14  Q.   Okay.  During that meeting on May 5, did the Union

15  accept the conditions?

16  A.   No, they didn't.  They said that they would get back on

17  May 6th.

18  Q.   Did the Union get back to you?

19  A.   No.

20  Q.   On May 5, did you know that the strike was illegal?

21  A.   No.

22  Q.   What did you know on May 5 about the strike?

23  A.   Well, here, on April 30th and April 29th, I had watched

24  the company leadership beg the Union not to go on strike.

25  Q.   And I want to be very careful because I want to move

1  this testimony along as quickly as we can, just to make sure

2  that I don't have you up there forever, so I want to try and

3  short-circuit this the best we can.

4  A.  Okay.

5  Q.  Did you know on May 5, 2008 -- were you aware of whether

6  or not the strike was illegal?

7      MR. McKNIGHT:  It's been asked and answered.

8      JUDGE BUXBAUM:  State it again.

9  Q.  BY MR. FRASER:  Maybe I'll ask it this way.  When did

10  you learn and how did you learn that the strike was illegal?

11  A.  We believed, we had probably a good faith belief that

12  the strike was illegal toward the end of May 2008, and the

13  reason that I say that --

14  Q.  You just testified toward the end of May.  Is that what

15  you mean?

16      MR. McKNIGHT:  Objection.

17      JUDGE BUXBAUM:  Sustained.

18      THE WITNESS:  Yes.  And that's what I'm saying is that

19  there was at least a belief that the strike was illegal

20  toward the end of May.  And let me explain, if I may.

21      MR. FRASER:  Okay.

22      MR. McKNIGHT:  Your Honor, I really don't think it's

23  appropriate for Mr. Lillie to be drifting off into his

24  explanations.  He asked him a question when he --

25      JUDGE BUXBAUM:  Well, as you know, I don't like

1  narrative answers, but this, I think, is part of the answer

2  to the precise question that was asked, so I'm going to allow

3  it.

4      You may explain.

5      THE WITNESS:  Okay.  On May 5th -- and I guess I'm

6  trying to answer the question about May 5th here a little

7  bit.

8      MR. McKNIGHT:  Well, then I would object again, Your

9  Honor.  We answered that one twice.

10     MR. FRASER:  I don't know if we answered anything,

11 Mr. McKnight.  You're not testifying.

12     JUDGE BUXBAUM:  Well, I'm going to permit it.  You may

13 answer.

14     THE WITNESS:  On May 5th, again, it's around seven

15 o'clock in the morning that the Union says they're returning

16 to work unconditionally.  Now, I have no idea at that moment

17 if this is part of an intermittent strike strategy, or if the

18 Union has figured out that the company is going to hire

19 replacements and those replacements are going to succeed.  I

20 have no idea what's going on here, but I do know that I'm at

21 least thinking, I don't know what's going on.  I don't know

22 why the Union's returning to work, but we are giving them

23 these terms and conditions for which they can return to work,

24 based upon their unconditional offer to return to work.

25     Okay.  Around May 7th or 8th, I get a call from the

1  mediator, saying, "I see that there's a lockout going on at

2  Douglas Autotech."

3      MR. McKNIGHT:  Now, this is hearsay, Your Honor.  And

4  not only that --

5      JUDGE BUXBAUM:  Well, all right.  Sustained.

6      Don't tell us what the mediator said.

7      THE WITNESS:  All right.  Nonetheless, the mediator

8  calls, and I become aware from the mediator --

9      MR. McKNIGHT:  Same objection.  You know --

10      JUDGE BUXBAUM:  Yeah, that's the same thing.

11      What did you do after the mediator spoke to you?

12      THE WITNESS:  After the mediator spoke with me, I

13  contacted -- I believe his name is John Pinto at the Federal

14  Mediation and Conciliation Service, to see if the F-7 form

15  has been filed.

16      JUDGE BUXBAUM:  Do you recall when you did that?

17      THE WITNESS:  I'm thinking that that is around May 7th

18  or 8th.  Mr. Pinto will not tell me.

19      MR. McKNIGHT:  Same objection, Your Honor.  Really, you

20  know, and not only that, but it's a sort of selective, I

21  guess, application of privilege.  Now we have Mr. Lillie

22  describing his internal legal analysis of this circumstance.

23      MR. FRASER:  He's not describing --

24      MR. McKNIGHT:  And I'm entitled to make a record here,

25  Your Honor, if I may.

1    JUDGE BUXBAUM:  Go ahead.  I'll hear you.

2    MR. McKNIGHT:  And I think we're entitled to the

3  internal documents he has at this point, for this period of

4  time.  I mean, that's exactly what counsel is eliciting from

5  him.

6    MR. FRASER:  Absolutely not.  He's not describing his

7  internal deliberations or dialogues with clients about where

8  they're going to go with this.  He's simply describing what

9  he thought at the time about the issue and that he contacted

10  FMCS.  And by the way, it's not hearsay.  He's not telling us

11  what Pinto said.

12    JUDGE BUXBAUM:  Well, yeah, he's not describing what he

13  thought, which I think might be -- well, he's describing what

14  he did to attempt to investigate this question --

15    MR. FRASER:  Absolutely.

16    JUDGE BUXBAUM:  -- which is an important issue in this

17  case.  I mean, I don't see that as involving privileged

18  communications.  Certainly, there's no privilege between him

19  and the FMCS.  And it is an important issue in this case; is

20  it not?

21    MR. McKNIGHT:  I don't know.  I doubt it.

22    JUDGE BUXBAUM:  Well, you know, that's a very fair

23  answer, Mr. McKnight --

24    MR. McKNIGHT:  I don't think it is particularly

25  important, frankly.

1      JUDGE BUXBAUM:  Maybe you're right.  I don't know.  But

2  it is conceivably an important issue.

3      MR. McKNIGHT:  But I do think that, once Mr. Lillie

4  starts saying, "Well, I don't know if this is an issue about

5  the status of the replacements.  I'm considering that.  I'm

6  not sure about the -- you know, those ramifications, I don't

7  know about these ramifications," that's an attorney --

8      JUDGE BUXBAUM:  All right.  I hear you.

9      MR. McKNIGHT:  -- I mean, he's got an attorney-client

10  relationship.

11      JUDGE BUXBAUM:  Mr. Fraser, I guess you're going to have

12  to be careful here; and, therefore, let's not have a

13  narrative.  You ask the questions.  Be mindful that you

14  don't -- I mean, obviously, you will consider before you ask

15  a question whether you're waiving any privilege.

16      MR. McKNIGHT:  Yeah, you know, it's not that I really

17  have any -- I don't have any desire to read Mr. Lillie's

18  materials, but --

19      JUDGE BUXBAUM:  I know.

20      MR. FRASER:  Well, that's not true in the least bit.  He

21  has every intention --

22      MR. McKNIGHT:  No, no, I --

23      MR. FRASER:  -- which is why we have the attorney-client

24  privileges that we're talking about --

25      MR. McKNIGHT:  Well, that is actually --

1    MR. FRASER:  Don't be ridiculous, Sam.

2    JUDGE BUXBAUM:  Well, but, Mr. McKnight, the point is I

3  know you're respectful of the privilege because you live and

4  die by it, too, as an attorney.  So I recognize that you want

5  to be -- you are, in fact -- well, let's leave it at that.

6    MR. McKNIGHT:  I'm just operating on the premise that --

7    JUDGE BUXBAUM:  Mr. Fraser, you are now acutely aware

8  that this issue lurks here.

9    MR. FRASER:  Thank you.

10    JUDGE BUXBAUM:  It's a troublesome issue, and I urge you

11  to figure out how to avoid it.

12    MR. FRASER:  Thank you.

13    MR. McKNIGHT:  It's not that I'm all that respectful of

14  the privilege; I'm just respectful of the fact that every

15  proceeding should have a beginning and a middle and an end,

16  and I don't really want to go down that path --

17    JUDGE BUXBAUM:  Amen.

18    MR. McKNIGHT:  -- but I will if Mr. Lillie's testimony

19  requires that I do so.

20    JUDGE BUXBAUM:  All right.  Go ahead, Mr. Fraser, in a

21  non-narrative fashion.

22  Q.  BY MR. FRASER:  Mr. Lillie, again, as succinctly as

23  possible, okay, when did you suspect that the strike might be

24  illegal?

25  A.  Around May 8th, May 9th.

1  Q.   Okay.  And when did you know that the strike was

2  illegal?

3  A.   Actually know that the strike was illegal?

4  Q.   Yes.

5  A.   In May, I had made an information request to the Union,

6  asking them for a copy of the F-7 form that they filed.

7  Q.   Okay.  Did you get it?

8  A.   I got that F-7 form out of Sam McKnight's trunk of his

9  car in the middle of August 2008.

10  Q.   And is that the first date that you knew the strike

11  was --

12  A.   For absolute certain?

13  Q.   Yes.

14  A.   I think so --

15     JUDGE BUXBAUM:  You have to say yes or no.

16     THE WITNESS:  I'm sorry.  I think so.  If we're talking

17  about absolute, positive, unequivocal certainty, yes.

18  Q.  BY MR. FRASER:  Okay.  Did you have any conversations

19  with Mr. Winkle about the F-7 form, not letters, but

20  conversations with Mr. Winkle about the F-7 form?

21  A.   I told him that I was going to make a request for the

22  F-7 form and that I was sending over an information request

23  to him, and, yes, and he indicated there was no way I was

24  ever going to get it.

25  Q.   Okay.  And do you remember when that conversation took

1  place?

2  A.   Also, probably around May 8th or 9th.  And I have to go

3  back a little bit here, if I may.  I indicated --

4      MR. CARLSON:  I'm going to object.  There's no question

5  before the witness.

6      JUDGE BUXBAUM:  Sustained.

7  Q.  BY MR. FRASER:  Mr. Lillie, did the Union accept the

8  return-to-work conditions that were offered on May 5, 2008?

9  A.   No.

10  Q.   When did you learn that they had not accepted them?

11  A.   On either May 21st, May 22nd, one of those dates.

12  Q.   And why do you say one of those two dates?

13  A.   I can't remember if it was May 21st or May 22nd.

14  Q.   Do you remember the context in which you learned that?

15  A.   Yeah, the company had a meeting with the Union and the

16  committee, the Union committee and the mediator on that day,

17  where the Union submitted a counterproposal to an

18  unconditional offer to return to work.

19  Q.   Okay.  Let me have you look at the binder on the right-

20  hand side of you -- right-hand side, up there.

21  A.   Okay.

22  Q.   There's a document that says "Joint Exhibit 1."

23  A.   One, okay.  Right, okay.

24  Q.   Can you just take a look at that for a minute?

25  A.   Yeah, these look like they have dates of negotiations.

1  Q.   We've stipulated to that document, so I want to take you

2  to May 21, 2008, that bargaining session.

3  A.   Right, right.

4  Q.   Were you there?

5  A.   Yes.

6  Q.   Now, if you'd look at -- now, what I'd like you to do is

7  start to tell me -- tell me where that session took place,

8  best of your recollection.

9  A.   Well, that session took place at the Hampton Inn, in

10 Coldwater.

11 Q.   Okay.  And I want you to be very, very careful as you

12 answer this question.  I want the sequence, the chronology.

13 Do you remember what time that session started?

14 A.   I don't remember off the top of my head.  I'm sorry.

15 Q.   Okay.  Tell me your first recollection of an event in

16 that meeting, May 21, 2008.

17 A.   Well, the first thing is is that we were meeting at a

18 different location --

19 Q.   Okay.

20 A.   -- and this was important.  Prior to this time --

21     MR. McKNIGHT:  It's kind of a narrative again, Your

22 Honor.  He asked a question --

23     JUDGE BUXBAUM:  Yeah, and it's not responsive to the

24 question.

25     MR. McKNIGHT:  Objection.

         1        MR. FRASER:  And that's fine.

         2   Q.   BY MR. FRASER:  Mr. Lillie, I know that we have worked

         3   through preparation for this case, and so I'm trying to be

         4   very careful about the questions I ask you, so, please, just

         5   listen to my questions and try to be as succinct as possible.

         6   A.   Sure.

         7   Q.   You're at the hotel.  You've already testified you were

         8   there.  Do you have any joint sessions with the Union?

         9   A.   I think we do.

        10   Q.   Okay.  Can you tell me what happens in the first joint

        11   session that you have, from the time it starts until I ask

        12   you not to tell me any further.  I'm sorry.  I'm, again,

        13   trying to be efficient here.

        14   A.   Well, okay.  A few things happened in the joint session,

        15   but the first that comes to mind is that the Union generates

        16   a counterproposal to the return-to-work document of May 5th.

        17   And I asked the Union, "Does this mean that you're rejecting

        18   the return-to-work document that we gave you on May 5th?" and

        19   they respond yes.

        20   Q.   Okay.  When you say "they," who responded?

        21   A.   Phil Winkle.

        22   Q.   Okay.  Do you make any other comments to the Union at

        23   the beginning of this bargaining session?

        24        MR. McKNIGHT:  Objection.  You know, he just asked him

        25   to tell us what you said at the start of the bargaining

1  session.

2     JUDGE BUXBAUM:  I'll allow that, but no more,

3  Mr. Fraser.

4     THE WITNESS:  I don't remember the first thing that I

5  said off the top of my head.  I'm sorry.

6  Q.  BY MR. FRASER:  Okay.  After Mr. Winkle said that he was

7  rejecting the return-to-work conditions, what did you do

8  next?

9     MR. McKNIGHT:  Well, he didn't say that.  He said we're

10 rejecting what counsel characterized or Mr. Lillie

11 characterized as the return-to-work document.

12    JUDGE BUXBAUM:  All right.  After Mr. Winkle rejected

13 the return-to-work document.

14 Q.  BY MR. FRASER:  What happens next, Mr. Lillie?

15 A.  Well, after he rejects the return-to-work document or

16 conditions, the -- at some point, I asked him, "I thought

17 your offer to return to work was unconditional?"

18 Q.  And what did he say?

19 A.  He said, "No, we have a proposal."

20 Q.  Then what happens?

21 A.  I believe, at that meeting, the Union continues on with

22 its criticism of the company and what they have heard from

23 the plant manager who has left and another plant manager who

24 doesn't work there before, and I believe it's even at this

25 meeting where the Union explains that the company makes money

1    by losing money.

2    Q.    Okay.  Did you make any statements to the Union on

3    May 21 regarding the illegal strike?

4        MR. McKNIGHT:  Objection.

5        JUDGE BUXBAUM:  Be careful here.

6        MR. FRASER:  Your Honor, it's the same question that

7    I've asked on every one of my witnesses.

8        JUDGE BUXBAUM:  I know, I know.

9        MR. McKNIGHT:  It's plainly leading.  You know, it's

10    plainly leading, Your Honor.

11        MR. FRASER:  It wasn't leading for Mr. Viar, and it

12    wasn't leading for Mr. Kirk.

13        JUDGE BUXBAUM:  No, I'll allow it.

14        MR. McKNIGHT:  Of course, it was.

15        JUDGE BUXBAUM:  I'll allow it.

16        MR. FRASER:  Sam, I'm tired, man.

17        JUDGE BUXBAUM:  You may answer.

18        THE WITNESS:  Well, at this meeting and every subsequent

19    meeting or sequence of meetings, I indicate the same thing to

20    the Union that I indicated on May 5th, which is that the

21    company is not waiving any of its rights relative to their

22    conduct.

23    Q.    BY MR. FRASER:  I'm going to take you to the next

24    session.  If you'd look at that document in front of you,

25    Joint 1, the next date we've stipulated to is June 2.  Do you

1   remember being at that meeting?

2   A.   Sure, yes.

3   Q.   Do you remember whether there were any proposals

4   exchanged?

5   A.   I think, at that meeting, the company proposed what

6   is -- what I guess has become known as the modern operating

7   agreement.

8   Q.   Could you look at General Counsel Exhibit 38 in that

9   large binder in front of you, please?

10  A.   Sure.

11       MR. McKNIGHT:  I'm sorry --

12       MR. FRASER:  General Counsel Exhibit Number 38.

13       MR. McKNIGHT:  I was just asking the -- I didn't hear

14  the first question as to which meeting we were at.

15       MR. FRASER:  June 2 is the next session that we're on.

16       MR. McKNIGHT:  June 2, okay.  Thank you.

17       THE WITNESS:  Yes, that looks like it.

18       MR. McKNIGHT:  And the witness is now looking at GC --

19       JUDGE BUXBAUM:  38.

20       MR. FRASER:  38.

21       MR. McKNIGHT:  38.

22       JUDGE BUXBAUM:  Is that right, sir?

23       THE WITNESS:  That is correct.

24  Q.   BY MR. FRASER:  Do you recall who was at that session

25  with you from Douglas?  You know -- yeah, do you recall who

1    was with you at that session from Douglas?

2    A.    Not without looking at the roster, but I'm presuming it

3    was Paul and Glenn.

4         MR. McKNIGHT:  Objection as to presumptions.

5         JUDGE BUXBAUM:  I'll strike that.

6         MR. FRASER:  That's fine.

7    Q.   BY MR. FRASER:  Did this GC-38 have a label?  Did you

8    refer to it by a certain name?

9    A.    The company referred to it as the modern operating

10   agreement.

11   Q.    Do you recall whether or not, on June 2, during the June

12   2, 2008 session, you made any statements to anyone -- or a

13   UAW representative about illegal strikers?

14        MR. McKNIGHT:  Objection.

15        JUDGE BUXBAUM:  I'll allow it.

16        MR. McKNIGHT:  He actually answered that question

17   already, Your Honor.

18        JUDGE BUXBAUM:  Well, he did.  That's true.

19        MR. McKNIGHT:  And he --

20        MR. FRASER:  Not as to --

21        MR. McKNIGHT:  Excuse me --

22        JUDGE BUXBAUM:  He did, counsel.  It's true.

23        MR. FRASER:  As to June 2?

24        JUDGE BUXBAUM:  As to every date from May 21st, forward.

25        MR. FRASER:  All right.

1     THE WITNESS:  Actually, Your Honor, what --

2     JUDGE BUXBAUM:  Go ahead, Mr. Lillie.  I want to hear

3  what you want to say.

4     THE WITNESS:  Very good.  Thank you.  In those instances

5  where the Union and the Employer had meetings back to back,

6  like two days in a row, I would not necessarily have said

7  that both days.  I would have said that at the beginning.

8     JUDGE BUXBAUM:  Okay.  Well, that's important.  I

9  appreciate you drawing that to my attention.

10     You may ask your question, counsel.

11     MR. FRASER:  I think he said that before.  I think he

12  said where there are sequential dates.  That's what the

13  testimony was.

14     JUDGE BUXBAUM:  Well, maybe.  Look, it doesn't matter.

15  I'm going to allow the question, given what he's just told.

16     MR. FRASER:  Great.

17  Q.  BY MR. FRASER:  On June 2, 2008, Mr. Lillie, do you

18  recall making any statements to anyone about illegal

19  strikers?

20  A.  Yes.  And by now, even though the company had not

21  received, nor had I --

22     MR. McKNIGHT:  Well, I guess I am going to object again.

23  Mr. Lillie told us what he said at every meeting, where he

24  said it.  And I guess except the second meeting --

25     JUDGE BUXBAUM:  No, Mr. McKnight, I've ruled on this.

1          But, Mr. Fraser, he does now appear to be going beyond

2     an answer to your question, so ask another question.  He

3     answered in the affirmative.

4     Q.   BY MR. FRASER:  Mr. Lillie, do you remember having any

5     conversations on June 2, 2008, regarding return-to-work

6     issues?

7     A.   I do recall telling the Union that, by this time, we had

8     received some information from the FMCS that would have

9     indicated that the strike was illegal --

10         MR. McKNIGHT:  Objection.  That's not responsive.

11         JUDGE BUXBAUM:  Well, that's prefatory.  Finish your

12    answer, sir.

13         THE WITNESS:  And I, on June 2nd, was being much more

14    emphatic with the Union about their peril.

15    Q.   BY MR. FRASER:  About their what?

16    A.   Peril.

17    Q.   What do you mean by that?

18    A.   That their conduct was unprotected and that they did not

19    have the protection of the law and that they were illegal

20    strikers.

21    Q.   Okay.  The next bargaining session is June 13, 2008.

22    Can you look at that blue binder in front of you again,

23    Joint 1?

24    A.   Uh-huh.

25    Q.   Can you confirm that you were at that session?

1   A.   Yes, yes.

2   Q.   Okay.  Do you remember any discussion with any union --

3   let me back up.  Do you remember any sidebar conversations

4   that you had in that session?  If you don't, you just simply

5   need to tell me no or yes.

6   A.   I don't remember whether it was on June 13th or some

7   other date, but around that time, I am saying --

8        MR. CARLSON:  I'm going to object.  This is

9   nonresponsive.  He asked if, on June 13th, he remembers.  The

10  answer is either yes or no.  Now he's talking about around

11  that time.  This is nonresponsive.

12       JUDGE BUXBAUM:  You want to explore it further,

13  Mr. Fraser?

14  Q.   BY MR. FRASER:  Mr. Lillie, do you recall any

15  conversations with the Union between May 1, 2008 and August

16  14, 2008, where you had a sidebar with the Union?

17  A.   I would have had several of them, yes.

18  Q.   Can you recall any sidebars where you discussed return-

19  to-work issues?

20  A.   No.

21       MR. McKNIGHT:  Objection.  That's overly vague.

22       MR. FRASER:  Well, give me a break.

23       MR. McKNIGHT:  I really don't --

24       JUDGE BUXBAUM:  Well, overruled, and the witness has

25  answered in the negative.

1    Q.   BY MR. FRASER:  Did you say no?

2        JUDGE BUXBAUM:  Well, first of all, you did say no,

3    didn't you?  I thought I heard you say no.

4        MR. FRASER:  I didn't hear that.  I was reacting to

5    Mr. McKnight.

6        THE WITNESS:  I'm not sure that I completely understand

7    the question and the objections.

8        JUDGE BUXBAUM:  No, but hold on, Mr. Lillie.  Hold on.

9    First of all, my question is very simple.  Didn't you just a

10    moment ago say no in answer to that question?

11        THE WITNESS:  I did, as I understood it.

12        JUDGE BUXBAUM:  Okay.  All right.  Okay.

13        MR. FRASER:  Great.

14    Q.   BY MR. FRASER:  On June 13, 2008, did you have any

15    conversations with Phil Winkle about temporary employees?

16        MR. McKNIGHT:  Objection, leading.

17        JUDGE BUXBAUM:  Overruled.  You may answer.

18        THE WITNESS:  I don't remember.

19    Q.   BY MR. FRASER:  Okay.  Let's move to July 1, 2008.  Do

20    you recall the joint exhibit, if you could take a look at

21    that for me for a minute?

22    A.   Which one is it?

23    Q.   It's to your right, again, back in the binder.

24    A.   This one right here?

25    Q.   Joint Exhibit 1.

1   A.   Right top?

2   Q.   Yeah.  It's stipulated agreement as to the dates that

3   bargaining took place.  Do you recall being at the bargaining

4   session, whether you were there on July 1?

5   A.   Yeah, July 1st and July 2nd were back-to-back dates.

6   Q.   Okay.  Were there any new parties to the --

7   A.   Yes.  I had suggested to the Union that they should have

8   some counsel, and Mr. Canzano --

9        MR. McKNIGHT:  Objection.

10       JUDGE BUXBAUM:  Sustained.  It's nonresponsive.

11  Q.   BY MR. FRASER:  And was there a new party -- were there

12  any new parties?

13  A.   Yes.

14  Q.   Who?

15  A.   Mr. Canzano.

16  Q.   Mr. Canzano.  Who is Mr. Canzano?

17  A.   Apparently, an attorney from Mr. McKnight's law firm.

18  Q.   Okay.  Do you recall any sidebars with Mr. Canzano that

19  day?

20  A.   Yes.

21  Q.   Do you recall whether or not you discussed illegal

22  strike with Mr. Canzano in any sidebars that day?

23       MR. McKNIGHT:  Leading.

24       JUDGE BUXBAUM:  Overruled.

25       THE WITNESS:  Absolutely.

1    Q.    BY MR. FRASER:  And can you tell me what you recall?

2    A.    Yes, absolutely.  I had a very serious conversation with

3    Mr. Canzano, explaining what the circumstances were --

4    Q.    Best you can, don't paraphrase it, tell me what you said

5    to him, please.

6    A.    Explain -- okay.  I indicated to Mr. Canzano that the

7    employees had gone on an illegal strike --

8    Q.    Okay.

9    A.    -- and that they were not having any protections of the

10   Act --

11   Q.    Okay.

12   A.    -- and that it was -- I was pleased that the Union had

13   gotten an attorney involved because I didn't believe that the

14   Union understood their situation.  And Mr. Canzano and I

15   spoke at length.  Mr. Canzano indicated that he did not

16   expect to be there that day but that he was filling in for

17   Mr. McKnight, who could not be there that day.

18   Q.    Did Mr. Canzano make any responses to your statement

19   about illegal strike?

20   A.    Mr. Canzano indicated he knew absolutely nothing about

21   what was going on and that he had to be brought up to speed.

22   And I think he -- I can't remember if it was on July 1st or

23   July 2nd, he generated some sort of a document --

24   Q.    Hang onto that.  We're going to get to that, okay.  Just

25   hang on for a minute.

1   A.   Okay.

2   Q.   Do you know whether there were any joint sessions on

3   July 1, the first day Mr. Canzano was in negotiations?

4   A.   I don't believe there were, but I'm not certain of that.

5   Q.   Okay.  If you would look in front of you at General

6   Counsel Exhibit Number 39 in the big binder -- yep.

7   A.   Okay.  Yes.

8   Q.   Can you take a look at that document?

9   A.   Yes.

10  Q.   Have you seen that before?

11  A.   Yes, I have.

12  Q.   When did you first see that?

13  A.   I can see from the date that I would have seen it on

14  July 1st, 2008.

15  Q.   And how did you receive it?

16  A.   Mr. Canzano presented it to me in a sidebar conversation

17  in the hotel lobby.

18  Q.   Okay.  Can you tell me about that sidebar conversation,

19  who said what to whom?

20  A.   Sure.  Mr. Canzano advanced this and said, "If you're

21  worried about the Union coming back to work and going right

22  back out on strike, this would allay those concerns."

23  Q.   Okay.  And what did you say?

24  A.   I said, "What happened to the unconditional offer to

25  return to work?"

1   Q.   And what did he say?

2   A.   He said, "Here's our offer."

3   Q.   Okay.  Anything else happen in that sidebar?

4   A.   Not that I can recall.

5   Q.   Okay.  So now I'm going to move you to the next

6   bargaining session, which is July 2, 2008.

7   A.   Right.

8   Q.   Can you look to see in Joint Exhibit -- which is off to

9   your right again --

10  A.   Yes.

11  Q.   Do you recall being at that session?

12  A.   Yes.

13  Q.   Do you recall any sidebar conversations with

14  Mr. Canzano?

15  A.   Mr. Canzano and I --

16       MR. McKNIGHT:  Same objection.

17       JUDGE BUXBAUM:  Overruled.

18       THE WITNESS:  Mr. Canzano and I had multiple sidebar

19  conversations.

20       MR. CARLSON:  I'm going to object.  This is

21  nonresponsive, unless he's talking about multiple sidebars on

22  July 2nd.

23       JUDGE BUXBAUM:  Well, I assumed he was.  Aren't you?

24       THE WITNESS:  I am.

25       JUDGE BUXBAUM:  Yeah, I thought so.  Okay.

1    THE WITNESS:  And we had multiple sidebar conversations

2  on July 2nd, and --

3  Q.  BY MR. FRASER:  Okay.  So stop there for a minute.  Can

4  you tell me, in any of those sidebar conversations, whether

5  you talked to Mr. Canzano about the illegal strike?

6  A.   That would have been the total content of our

7  conversations on July 2nd.

8  Q.   So tell me what you recall stating to Mr. Canzano?

9  A.   Well, Mr. Canzano had needed July 1st to get up to

10  speed, and I understood that, and now it was July 2nd, and I

11  was saying to Mr. Canzano in various ways, "Why aren't you

12  accepting the unconditional offer to return to work?  What's

13  the problem here?"

14  Q.   What did Mr. Canzano say?

15  A.   He believed that -- he seemed to be indicating that he

16  thought that the lockout was illegal.

17  Q.   Okay.  Did you respond?

18  A.   Except to say that I felt that the lockout was

19  appropriate.

20  Q.   Okay.  In that session on July 2, did the company come

21  to any type of agreement with the Union?

22  A.   No.

23  Q.   Let me show you, if you would, look at General Counsel

24  Exhibit Number 18.

25  A.   Right.

1   Q.    Tell me when you've had a chance to look at that.

2   A.    Yeah, I have.

3   Q.    Can you tell me what that is?

4   A.    Yes.  And, I'm sorry.  I was thinking that this was a

5   different date, but, yes, this is what we finally concluded

6   on July 2nd.  Mr. Canzano said he needed more time to get up

7   to speed --

8        MR. McKNIGHT:  Objection.

9        JUDGE BUXBAUM:  Well, that's true.  It's not responsive.

10  Q.    BY MR. FRASER:  Why did you enter into this agreement

11  with the Union on July 2?

12  A.    Well, at that point in time, the National Labor

13  Relations Board was getting at full speed in all these

14  investigations --

15       MR. CARLSON:  I'm going to object as to his knowledge

16  about what the status of the government's investigation -- I

17  don't think this witness has any knowledge.  And there's

18  certainly been no foundation with respect to his knowledge as

19  to what the status of the government's investigation was.

20       MR. FRASER:  Your Honor, it's simply preliminary for him

21  to explain why they were entering the agreement.

22       JUDGE BUXBAUM:  Yeah, I'll allow it.

23       You may answer.

24       THE WITNESS:  All right.  It seemed that the National

25  Labor Relations Board was getting up to speed on all of the

 1   charges that had been filed by both of the parties.  Multiple

 2   charges had been filed by both parties.  And Mr. Canzano was

 3   indicating that he needed more time to get up to speed.  It

 4   was clear Mr. McKnight was not going to join us, as was

 5   originally scheduled, and, instead, Mr. Canzano was going to

 6   be there, and he was indicating he knew nothing about the

 7   situation.

 8       We decided then that everybody would just withdraw the

 9   charges for 30 days, give everybody a chance to talk, give

10   everybody a chance to get up to speed, and give everybody a

11   chance to try and figure out where they stood and how they

12   might resolve this topic.

13   Q.   BY MR. FRASER:  And so this document, GC-18, it was

14   agreed to on July 2nd?

15   A.   Yes.

16   Q.   Okay.  If you'd look at GC-19?

17   A.   Right.

18   Q.   Tell me when you've had a chance to look at that.

19   A.   I have.

20   Q.   Did you take any action after entering GC-18, related to

21   the GC-18 commitment?

22   A.   Yes.  In fact, in reaching the July 2nd -- what

23   everybody's referring to as GC-18, I know I spoke with Pat

24   Zane, and I believe Mr. Canzano spoke with Pat Zane, in an

25   effort -- Pat Zane is, I believe, a supervisor at the

1  National Labor Relations Board -- indicating what the parties

2  were doing so that it was completely above board with the

3  National Labor Relations Board.

4  Q.   Okay.  Do you recall any conversations in joint session

5  on July 2nd, regarding temporary workers or replacement

6  workers?

7  A.   I don't recall anything to that effect, specifically.

8  Q.   Okay.  I'm going to move you to July 14, 2008.  Would

9  you look at that binder again behind you?  Do you recall

10 being at a bargaining session on July 14?

11 A.   Yeah, I believe July 14th and 15th were two dates back

12 to back, and I believe that those were the two dates where we

13 were scheduled to start at 5:30 in the afternoon rather than

14 at nine or ten in the morning.

15 Q.   Okay.  Do you remember having any sidebar conversations

16 with Mr. Canzano or any other UAW representative on July 14?

17 A.   I don't remember any particular sidebar conversations at

18 that time.

19 Q.   I'll move you to the next date, which is July 15, 2008.

20 A.   Right.

21 Q.   If you'd look at that binder again.  Can you tell me if

22 you were at that bargaining session?

23 A.   I was.

24 Q.   And do you recall having any sidebar conversations with

25 either Mr. Canzano or anyone else that represented the UAW

1  that day?

2  A.   I don't recall anything specific happening.   Those were,

3  again, both fairly short meetings, starting at 5:30 in the

4  afternoon.

5  Q.   Okay.  Did you have any conversations with Mr. Canzano

6  about lawyers and law firms that day, July 15?

7       MR. McKNIGHT:  Objection, leading.

8       JUDGE BUXBAUM:  No, I don't think so.  I'll allow it.

9       THE WITNESS:  Well, I don't remember if it was

10 specifically on the 14th or 15th, but it was probably --

11      MR. CARLSON:  I'm going to object.  It's nonresponsive

12 now.

13      JUDGE BUXBAUM:  Well --

14 Q.   BY MR. FRASER:  Between May 1, 2005 and August 14 -- I'm

15 sorry, May 1, 2008 and August 14, 2008, do you recall having

16 any conversations with Mr. Canzano regarding other law firms

17 related to Douglas?

18 A.   Yes.  And --

19 Q.   Can you tell me your recollection and what the

20 conversation was, please?

21 A.   Yes.  And, first of all, as it relates to the sidebar, I

22 indicated to Mr. Canzano that the company was going to be

23 retaining a different law firm than myself.  Now, this did

24 not translate to me not representing the company, but just

25 that the company was going to be seeking additional legal

1    counsel.

2    Q.    Okay.  What did Mr. Canzano say?

3    A.    I believe, at this point in time, Mr. Canzano -- and I

4    believe Mr. Canzano indicated that if the company was going

5    to fire the employees, that -- I remember this because it was

6    so prophetic.  He said if the company was going to fire the

7    employees, if they were hiring these attorneys to fire the

8    employees, the Democrats were going to take over office in

9    Washington, and Liebman was going to run the Labor Board, and

10   it wouldn't matter anyway because Liebman would rule in favor

11   of the Union.

12   Q.    Okay.  Did you respond to that?

13   A.    Only with marvel.

14   Q.    What do you mean by that?

15   A.    Just that that was a pretty good theory.

16   Q.    Okay.

17        MR. McKNIGHT:  I'm sorry.  Is that what he said?  I

18   couldn't figure that out.

19        JUDGE BUXBAUM:  Well, you're right.  That's a good

20   point.  Did you say that to Mr. Canzano, or --

21        THE WITNESS:  I said, "That sounds extremely

22   interesting, but --" yes, that did sound very interesting.

23   Q.    BY MR. FRASER:  That's what you said, "That seems

24   extremely interesting"?

25   A.    Something along those lines.

1    Q.    Anything else that you said to him at that point?

2    A.    No.

3    Q.    Okay.  I want to take you to the July 25, 2008 session.

4    Again, if you could look at that binder?

5    A.    Right.

6    Q.    Do you recall being at that session on July 25?

7    A.    Well, I think that I was at the session on July 25th,

8    but also on the 24th and 28th.  It was part of a three-day

9    sequence.

10   Q.    Okay.  Do you remember whether you had any sidebar

11   conversations with Mr. Canzano or anyone else from the UAW on

12   July 25?

13   A.    Specifically?

14   Q.    Yes.

15   A.    Not right off the top of my head.

16   Q.    Okay.  That's great.  Will you just confirm for me

17   whether you were at the July 28, 2008 bargaining session?

18   A.    Yes, I was.

19   Q.    And I'm going to take you to July 31.  Are you

20   comfortable that that was one of the bargaining sessions that

21   was held?

22   A.    Yes.

23   Q.    And were you there?

24   A.    Yes.

25   Q.    Do you remember having any sidebar conversations with

1  Mr. Canzano regarding the illegal strike?

2  A.   Specifically, no.

3  Q.   Okay.  I want to focus your attention toward the end of

4  the July 31 session.  Do you remember making any comments in

5  joint session regarding illegal strike?

6       MR. McKNIGHT:  Objection, leading.

7       JUDGE BUXBAUM:  Overruled.  You may answer.

8       THE WITNESS:  I don't remember right off the top of my

9  head at this point.

10  Q.   BY MR. FRASER:  Okay.  If I showed you --

11       MR. FRASER:  Your Honor, I'd like to try and refresh the

12  witness' recollection.

13       JUDGE BUXBAUM:  Very well.

14       MR. FRASER:  Your Honor, I have -- I'm sorry.  I have

15  Respondent's Exhibit 4.

16  Q.   BY MR. FRASER:  Mr. Lillie, I'm going to show you what

17  documents have been introduced in this case as July 31 notes

18  of the bargaining session, and I'd like you just to look --

19  now look at the last --

20       MR. CARLSON:  I'm going to object.  I don't think

21  there's been any testimony from this witness that looking at

22  those notes would help refresh his recollection --

23       JUDGE BUXBAUM:  Well, that's right.  Lay your

24  foundation, counsel.

25       MR. CARLSON:  -- which is a precursor to Mr. Lillie

 1  reviewing the notes.

 2      JUDGE BUXBAUM:  That's right.  You're right, you're

 3  right.

 4  Q.  BY MR. FRASER:  Mr. Lillie, would it help refresh your

 5  recollection to see Diane Hedgcock's notes of the July 31st

 6  session?

 7  A.  Yes, it would.

 8  Q.  Show you again the July 31st notes, and I'm just going

 9  to show you the last page.  Don't answer any questions.

10  Please look at that and read it and tell me when you've

11  finished reading it.  Don't answer any questions, just read

12  it and tell me when you've finished reading it.

13  A.  I have finished reading it, yes.

14  Q.  Okay.  Right.  Now, having read those notes from

15  Ms. Hedgcock, does that refresh your recollection as to the

16  session on July 31st?

17  A.  Yes.

18  Q.  And if I focus your attention on the session, toward the

19  end of the session, can you recall whether you made any

20  statements to Mr. Canzano or the Union regarding illegal

21  strike?

22      MR. McKNIGHT:  Objection, Your Honor.  That's a leading

23  question, and it's actually -- that's a leading question.

24      JUDGE BUXBAUM:  Other than the reason you've been

25  asserting throughout, which I find in the case of illegal

1  strike totally baseless, what reason is it leading?

2      MR. McKNIGHT:  Well, an appropriate question would be do

3  the notes refresh your recollection about what was said?  Not

4  what was said about counsel's characterization of what was

5  said.

6      JUDGE BUXBAUM:  But it's not a characterization.  That's

7  my point, counsel.  There was an illegal strike.  Everybody

8  agrees with that, so there's no mischaracterization involved,

9  and, therefore, it's not leading.  Overruled.

10     You may answer the question, please.

11     THE WITNESS:  Yes, I do remember saying --

12  Q.  BY MR. FRASER:  I don't want you to say, "I remember

13  saying."  I want you to tell me what you said and what the

14  response was to whatever you said, please.

15  A.  I had indicated to John or -- as many, many times --

16     MR. McKNIGHT:  Objection.  That's not responsive,

17  either.

18     THE WITNESS:  I had indicated --

19     JUDGE BUXBAUM:  State just -- direct it right to -- hone

20  in with a laser right in on what Mr. Fraser wants.

21     MR. FRASER:  Very last part of it, right.

22     THE WITNESS:  I'm not usually a witness.

23     JUDGE BUXBAUM:  It's tough for lawyers.  Everyone

24  understands.

25     THE WITNESS:  On July 31st, I had indicated to John that

1   the strike was illegal, the company is not waiving their

2   rights.  John had responded by saying, "You don't know what

3   the Labor Board's going to do.  The Labor Board might do

4   this, the Labor Board might do that.  It's a risk."

5   Q.   BY MR. FRASER:  Anything else you recall from that

6   meeting?

7   A.   Not particularly.

8   Q.   Okay.  So we're going to move to August 14, 2008.  Can

9   you tell me whether or not you recall being at that

10  bargaining session?

11  A.   I was at that session.

12  Q.   Okay.  Can you tell me whether or not you had any

13  sidebar conversations with any union representative on August

14  14?

15  A.   Just with Mr. McKnight.  This was his first time there,

16  and Mr. McKnight and I had a conversation.

17  Q.   Okay.  Why don't you walk me through what occurred on

18  the 14th, best of your recollection.

19       JUDGE BUXBAUM:  Well, you've got to narrow that -- what

20  do you mean?  At the joint session, at a sidebar --

21       MR. FRASER:  Your Honor, I've tried to get the witness

22  to tell me what his recollection is of that bargaining

23  session.

24       JUDGE BUXBAUM:  The joint -- well, the whole event?

25       MR. FRASER:  Yes, Your Honor.

```
 1        JUDGE BUXBAUM:  Okay.  The whole event.  All right.
 2   Q.    BY MR. FRASER:  Mr. Lillie, you're at the session on
 3   August 14.  Where are you, who's with you, and then tell me
 4   what is said, please.
 5   A.    Right.  Well, we're at the Hampton Inn --
 6   Q.    Okay.
 7   A.    Where we've been since the strike began, and at this
 8   meeting, as I had indicated, one of the company's additional
 9   attorneys is at the meeting.
10   Q.    Who is that?
11   A.    That's Dan Cohen.
12   Q.    Okay.  So I want to focus your attention on -- as you're
13   there, is there a time when you interact with the Union?
14   A.    There is.  Well, there's a time when Sam McKnight and I
15   interact.  This is the first time that Sam is on the scene --
16        JUDGE BUXBAUM:  But that's not responsive to Mr. --
17        THE WITNESS:  I'm sorry.
18   Q.    BY MR. FRASER:  So, yes, you interact -- that's okay.
19   You interact with Mr. McKnight.  Tell me what Mr. McKnight
20   says, and then tell me what you say.
21   A.    Well, essentially, Mr. -- I can't remember exactly what
22   was said off the top of my --
23   Q.    Okay.  Tell me the best you can recall what he said.
24        MR. McKNIGHT:  Objection.  Just answered.
25        MR. FRASER:  He just said he can't remember exactly what
```

1  he said.  I said tell me the best you can recall what he

2  said.

3      JUDGE BUXBAUM:  I'll allow it.

4      THE WITNESS:  Essentially, I indicated to Sam that the

5  strike was illegal, and couldn't we try to figure out a way

6  to work this out?  Sam contradicted that and disagreed, and I

7  suppose I've just summed up a 10- or 15-minute conversation

8  in a nutshell.

9  Q.  BY MR. FRASER:  That's how long you thought it was, or

10 you think it --

11 A.  10 or 15 minutes, yes.

12 Q.  Okay.  Was that -- where were you with Mr. McKnight,

13 having that conversation?

14 A.  We were stuck in this really small office with a

15 mediator by the name of Larry Kolaski.

16 Q.  Okay.

17     MR. McKNIGHT:  Sedrowski.

18     THE WITNESS:  Thank you.  Sedrowski.

19     MR. McKNIGHT:  I'm sorry.

20     MR. FRASER:  Well, since Mr. -- yeah, no, no, no, I

21 won't say it, but okay.

22     THE WITNESS:  It has a "ski" in it.

23     MR. McKNIGHT:  Big man, little room.

24     MR. FRASER:  I'm sorry, I didn't hear that.  All right.

25 Q.  BY MR. FRASER:  Who else was there?  You mentioned three

1  people.  Just the three of you?

2  A.   Just the three of us.

3  Q.   Okay.  At any point after that on August 14th, was there

4  a session with the UAW representatives larger than the three

5  of you together, that you can recall?

6  A.   I can't recall.

7      MR. FRASER:  Okay.  That's fine.  That's all right.  No

8  other questions.  Thank you.

9      JUDGE BUXBAUM:  All right.  Mr. Carlson, you may cross-

10  examine.

11      MR. CARLSON:  Thank you, Judge.

12      MR. McKNIGHT:  I think it would be prudent if I made a

13  phone call at this point because Mr. Lillie is moving faster

14  than I anticipated.

15      JUDGE BUXBAUM:  Well, I'll take a five-minute recess.

16      Mr. Lillie, don't discuss your testimony during this

17  brief recess.

18  **(Off the record.)**

19      JUDGE BUXBAUM:  Mr. Carlson, you may proceed.

20      MR. CARLSON:  Thank you, Judge.

21                    **CROSS-EXAMINATION**

22  Q.   BY MR. CARLSON:  Mr. Lillie, I want to ask you first --

23  I believe your testimony initially was that, at every meeting

24  after May 5th, 2008, every company meeting with the Union,

25  you said that the company was not waiving its rights.  And

1  then I think, later, and I think in response to a question

2  from the judge, you qualified that and said it wasn't at

3  every meeting that you said that.  If there were -- I think

4  the word was "sequential," if there were days that followed,

5  you may not have said it at the next day's meeting?

6      MR. FRASER:  And, again, I object, Your Honor, that the

7  original testimony was exactly as Mr. Carlson states the

8  later testimony was.  That mischaracterizes the testimony.

9      JUDGE BUXBAUM:  I don't think so.  I mean, it can't be a

10  perfect -- none of us are tape recorders, it can't be

11  perfect, but I think it's a fair characterization.

12      And, Mr. Lillie, if you disagree, again, I don't want

13  you to be shy.  You let us know.  Don't let counsel, me or

14  anyone else, put words in your mouth.

15      THE WITNESS:  No, I understand.  And I'm not sure

16  exactly what the question is --

17      JUDGE BUXBAUM:  Well, that's right.  We haven't had it

18  yet.

19  Q.  BY MR. CARLSON:  Right.  Well, the question is -- well,

20  I guess, was that your testimony?

21      JUDGE BUXBAUM:  Okay.  Was that a reasonably fair

22  paraphrase of your testimony on two different occasions

23  during your direct?

24      MR. FRASER:  Objection, Your Honor.  The record will

25  speak for itself on the matter.

1    MR. CARLSON:  It's cross-examination, Judge.

2    JUDGE BUXBAUM:  Yeah.  Overruled.

3    You may answer.

4    THE WITNESS:  What I thought that I had said, what I

5    believe I said is that at every meeting, that I would

6    indicate that the company wasn't waiving their rights.  And

7    what I meant by at every meeting is that --

8    MR. McKNIGHT:  Objection as to what he meant.

9    JUDGE BUXBAUM:  No, no, I'll hear it.

10    THE WITNESS:  What I meant by that every meeting is

11    that, when we were meeting two days in a row, I looked at

12    that as one meeting.

13   Q.   BY MR. CARLSON:  Okay.  So and your testimony is that --

14   is it your testimony, then, that at the May 5th meeting, you

15   indicated to the Union -- you made this statement about the

16   strike being illegal and the company reserving its rights?

17   A.   What I indicated is that the company wasn't waiving any

18   of its rights.  I didn't know that the strike was illegal on

19   May 5th.

20   Q.   To the best of your recollection, specifically what did

21   you say to the Union about the company reserving its rights

22   on May 5th?

23   A.   Essentially, that the company was reserving its rights.

24   I didn't know if the strike was illegal, I didn't know if the

25   Union --

1      MR. McKNIGHT:  Objection as to his process internally.

2      JUDGE BUXBAUM:  Well, see, that's the thing that is

3   ambiguous --

4      MR. CARLSON:  I assumed that that's what he said.

5      JUDGE BUXBAUM:  -- and we've got to clarify.  But let

6   him finish first, and then let's clarify it.

7      Finish your statement.

8      THE WITNESS:  Well, he was asking me what I was saying

9   to the Union --

10      JUDGE BUXBAUM:  Yes.

11      THE WITNESS:  -- or at least communicating to them that

12   I didn't know whether the strike was illegal, and I didn't

13   know if this was part of an intermittent job action, I didn't

14   know if they were coming back until the replacements were

15   gone, I didn't know if they had simply decided to come back

16   because the replacements were working well.  I had no idea.

17      JUDGE BUXBAUM:  You're saying, though -- so I'm clear,

18   you're saying you said that to the Union people?

19      THE WITNESS:  Communicated that to them, yes.

20      JUDGE BUXBAUM:  But in words, I'm assuming?

21      THE WITNESS:  Yes, yeah.

22      JUDGE BUXBAUM:  Okay.  All right.

23      THE WITNESS:  Not necessarily in those exact words,

24   but --

25      JUDGE BUXBAUM:  No, I understand.

1     THE WITNESS:  -- but the basic concept of not

2  understanding what was happening.  Yes, I was communicating

3  that I wasn't understanding.

4     JUDGE BUXBAUM:  Okay.  Mr. Carlson?

5     MR. CARLSON:  Thank you, Judge.

6  Q.   BY MR. CARLSON:  Now, Mr. Lillie, during the

7  investigation of this case -- and by "this case," I'm

8  referring to GR-7-CA-51428 -- you gave an affidavit to a

9  National Labor Relations Board investigator; is that correct?

10 A.   Probably.

11 Q.   And the investigator administered an oath to you, is

12 that correct, when you gave the statement?

13 A.   Yes.

14    MR. FRASER:  Your Honor, again -- once again, there are

15 two critical affidavits I don't have with me.  One of those

16 happens to be Mr. Lillie's --

17    MR. CARLSON:  That's Mr. Fraser's --

18    MR. FRASER:  -- but I'd request, if there's an

19 additional copy of that --

20    MR. CARLSON:  I don't.  I don't.  If I show him -- the

21 witness something, Mr. Fraser has every right to ask him what

22 I'm going to show the witness.  But I'm not providing

23 Respondent's counsel copies of its own witness' Jencks

24 statement.

25    JUDGE BUXBAUM:  I understand that.  I agree.  But if

1   Mr. Fraser wants to refer to it during the proceedings --

2       MR. CARLSON:  He has the right to ask.  I understand.

3       JUDGE BUXBAUM:  Sure.  And I hope you'll point him to

4   the right spots in it when he does.

5       MR. FRASER:  Your Honor, for the record, we sincerely

6   appreciate that courtesy.

7       JUDGE BUXBAUM:  Very well.

8   Q.   BY MR. CARLSON:  And when you gave the statement, the

9   Board Agent allowed you to review it, to review the affidavit

10  and make sure that it was accurate?

11  A.   Sure.

12  Q.   Okay.  And make any corrections to it?

13  A.   Uh-huh.

14      JUDGE BUXBAUM:  You have to say yes or no.

15      THE WITNESS:  Yes, yes.

16      JUDGE BUXBAUM:  The record will reflect that Mr. Carlson

17  is showing Mr. Fraser the document and pointing at some part

18  of it, if I got that right, Mr. Carlson.  Mr. Carlson?

19      MR. CARLSON:  I'm sorry, Judge?

20      JUDGE BUXBAUM:  You're showing opposing counsel the

21  affidavit, and you've pointed to a particular spot?

22      MR. CARLSON:  I did.  Paragraphs two and three, Judge.

23      JUDGE BUXBAUM:  Okay.

24      MR. CARLSON:  This is case GR-7-CA-51428.

25      JUDGE BUXBAUM:  In other words, the instant case, to use

1  the old-fashioned language?

2      MR. CARLSON:  Correct, Judge.

3  **(General Counsel's Exhibit 65 marked for identification.)**

4  Q.   BY MR. CARLSON:  Mr. Lillie, I'm going to show you what

5  I've marked as General Counsel's Exhibit 65.  Take a look at

6  that and tell me if that's the affidavit you gave to the

7  National Labor Relations Board in this case.  For the record,

8  on or about November 3rd, 2008.  You can confirm that.

9  A.   That looks about right.

10 Q.   And if you'll turn to the final page -- or, excuse me --

11 the last page of the affidavit.  There's a few exhibits.  Is

12 that your signature on the affidavit?

13 A.   Yes.

14 Q.   Okay.  Mr. Lillie, I'm going to read this into the

15 affidavit (sic), and I want you to follow along, make sure I

16 read correctly.  Paragraph two:

17         "On several occasions following the local strike, I

18         declared to the Union that we felt that their

19         conduct was illegal in that strike.  I believe that

20         I told the Union at the start of several but not

21         all bargaining sessions that followed the five-one-

22         five-five-oh-eight (sic) strike with that remark.

23         I would tell them each time that we thought their

24         conduct of the strike was illegal and that we were

25         not waiving any of our rights in regard to that."

1    And you have some handwriting --

2    A.   Right.

3    Q.   -- where it says, "I would tell them each time."  Can

4    you read that?

5    A.   Yeah.  "At the beginning of each meeting."

6    Q.   At the beginning of each meeting in regard to that.

7    Paragraph three:

8         "I did not make any such remarks of this kind in

9         our 5/5/08 meeting since, at that time, we were not

10        yet aware that the strike was, in fact, illegal."

11   A.   True.

12   Q.   I read that correctly?

13   A.   Yes.

14   Q.   Mr. Lillie, when you gave this affidavit to the National

15   Labor Relations Board, on November 3rd, it was your

16   understanding, was it not, that the Board Agent was coming

17   out to investigate the specific issue of what was said at

18   bargaining meetings with respect to reservation of rights and

19   that kind of thing.  That was the specific purpose of those

20   meetings with the company on November 3rd, 2008; is that

21   right?

22        MR. McKNIGHT:  With the NLRB.

23   Q.   BY MR. CARLSON:  With the NLRB?

24   A.   I don't recall that being the specific purpose.

25   Q.   Do you recall the NLRB agent asking you for any

1  bargaining note -- or, excuse me -- any notes you would have

2  taken that would reflect the company saying that it reserved

3  its rights?

4  A.   They may have.

5  Q.   And, in fact, you've turned those notes over to the

6  NLRB, and there's three pages of them there, and they're

7  attached to this affidavit; is that correct?

8  A.   I don't know.  Let me take a look.

9  Q.   Okay.

10  A.   This would have been with the investigator's name -- oh,

11  Alex Cass (ph.).

12  Q.   That's correct.

13  A.   Yes.

14      JUDGE BUXBAUM:  So the yes being that those are the

15  notes that you gave him?

16      THE WITNESS:  Yes.

17  Q.   BY MR. CARLSON:  And now I want you to take a look at

18  paragraph five of the affidavit, in conjunction with those

19  notes.

20      MR. FRASER:  Your Honor, I'd like to see paragraph five.

21      JUDGE BUXBAUM:  Certainly.

22      MR. CARLSON:  Certainly.

23      MR. McKNIGHT:  Are you guys all looking at the same one,

24  same affidavit?

25      JUDGE BUXBAUM:  Not me, Mr. McKnight, not me.  They

1  haven't show me it.

2      MR. McKNIGHT:  I'm just asking -- can I ask

3  Mr. Carlson --

4      JUDGE BUXBAUM:  Of course, of course.

5  Q.  BY MR. CARLSON:  Okay.  Did you have a chance to look at

6  paragraph five?

7  A.  Not completely yet.

8  Q.  Okay.

9      JUDGE BUXBAUM:  Oh, take your time, Mr. Lillie.  You

10  tell us when you're ready.

11      **Let's go off the record while he does that.**

12  **(Off the record.)**

13      **JUDGE BUXBAUM:  On the record.**

14      Mr. Lillie, have you had an opportunity to read it?

15      THE WITNESS:  I have.

16      JUDGE BUXBAUM:  All right.

17  Q.  BY MR. CARLSON:  Would you agree, Mr. Lillie, that

18  paragraph five indicates -- is a discussion of notes you took

19  at bargaining sessions with respect to the issue of comments

20  or statements made by the company regarding illegal strike

21  and the company reserving its rights?

22  A.  Sure.

23  Q.  And that the Board investigator did ask you for notes on

24  that date in conjunction with this affidavit you had made

25  with respect to that issue?

1   A.   He asked me if I had any notes, yes.

2   Q.   And you provided the notes that you had?

3   A.   The ones that I had with me, that's correct.

4   Q.   And do you have Respondent's 7 in front of you?

5   A.   I do.

6   Q.   Respondent's 7 is not attached to the affidavit that you

7   gave to the Board on November 3rd, 2008, is it?

8   A.   I didn't see it as one of those.

9   Q.   Mr. Lillie, I want you to take a look at General

10  Counsel's -- just a sec -- General Counsel's Exhibit 19.  Can

11  you take a look at that?

12  A.   Yes.

13  Q.   And, actually, 18.  Take a look at 18.

14  A.   Yes.

15  Q.   All right.  And I think there was some testimony about

16  the NLRB investigation that was going on regarding the

17  charges that are mentioned in GC-18, and you testified

18  about -- you represented the company before the National

19  Labor Relations Board in that investigation; is that right?

20  A.   Yes.

21  Q.   Okay.  And you submitted a position statement on behalf

22  of the company to the National Labor Relations Board in that

23  investigation; is that right?

24  A.   I believe so.  I'd have to take a look at it.

25       JUDGE BUXBAUM:  You're marking another exhibit, counsel?

1    MR. CARLSON:  I am, Judge.

2    JUDGE BUXBAUM:  That's going to be 66?  Am I right on my

3 numbers?  Good.  Okay.

4    And Mr. Carlson, I take it, then, you're not seeking the

5 admission of 65?

6    MR. CARLSON:  Not at this time.

7    JUDGE BUXBAUM:  Very well.

8 **(General Counsel's Exhibit 66 marked for identification.)**

9 Q.  BY MR. CARLSON:  Mr. Lillie, I'm going to hand you what

10 I've marked for identification as General Counsel's Exhibit

11 66.  Will you take a look at that?

12    JUDGE BUXBAUM:  Don't forget me, Mr. Carlson.

13    MR. CARLSON:  I'm sorry, Judge.

14    JUDGE BUXBAUM:  No problem.  Thank you.

15    Have you had a chance to see it?

16    THE WITNESS:  Yes, this is the one that I filed.  That's

17 correct.

18 Q.  BY MR. CARLSON:  Mr. Lillie, will you turn to page --

19 the third page from the back, sir?

20 A.  The third page from the back?

21 Q.  Yes.

22    MR. McKNIGHT:  Is there a page number?

23    MR. CARLSON:  There is no page number.  It's an

24 attachment.

25    MR. McKNIGHT:  Oh, oh, oh, you're looking at that

1  exhibit.  I'm sorry.  We're looking at GC-8?

2      MR. CARLSON:  No, I'm sorry.  We're looking at GC-66,

3  Mr. Lillie's position statement to the Board.

4      MR. McKNIGHT:  Oh, I've got it.  Thank you.

5      MR. CARLSON:  Yeah.

6      THE WITNESS:  Yeah, I got it.

7  Q.  BY MR. CARLSON:  And Mr. Lillie, you would agree with me

8  that Exhibit Number 3 to General Counsel's 66, which you

9  submitted to the National Labor Relations Board on June 23rd,

10  2008, does not contain what you testified to be your talking

11  points/notes from the May 5th meeting?

12  A.  Right.

13      JUDGE BUXBAUM:  The reference in this to Exhibit Number

14  3 means it's the third exhibit attached to your position

15  paper?

16      MR. McKNIGHT:  The judge asked a question --

17      MR. CARLSON:  Oh, I'm sorry.

18      JUDGE BUXBAUM:  The word here, "Exhibit Number 3" on

19  it --

20      THE WITNESS:  I don't have it in front of me, Your

21  Honor.

22      JUDGE BUXBAUM:  Sure.  Would you --

23      MR. CARLSON:  I'm going to turn, for ease of reference

24  for Mr. Lillie, to page six, which I think references --

25      THE WITNESS:  I'm trying to answer --

 1      JUDGE BUXBAUM:  No, but what I'm trying to --

 2      MR. CARLSON:  Oh, I'm sorry.

 3      JUDGE BUXBAUM:  -- have the answer to a question.

 4      MR. CARLSON:  Oh, I'm sorry.

 5      JUDGE BUXBAUM:  Would you turn back to the page you were

 6  asking about.  All right.

 7      THE WITNESS:  Yep.  And we wrote that down as Exhibit 3,

 8  yes.

 9      JUDGE BUXBAUM:  Right.  In other words, what that means,

10  the Exhibit Number 3 language there, is that it's the third

11  exhibit of the position statement?

12      THE WITNESS:  That's correct.

13      JUDGE BUXBAUM:  Okay.  Thank you.

14  Q.  BY MR. CARLSON:  Mr. Lillie, I want to ask you about

15  something I'm a little bit confused about with respect to --

16  is it your testimony that you did not know for certain that

17  the Union strike was illegal or the Union had not filed its

18  notice -- you didn't know that until August?  Is that your

19  testimony?

20  A.  Well, as you'll recall, I tried to clarify that a little

21  bit, and you and Mr. McKnight objected to it, so I guess this

22  is my opportunity to clear that up.

23  Q.  Well, I just want to --

24  A.  Do I get a chance to clear that up, or no?

25  Q.  Was that not your testimony?

1   A.    What I was trying to testify to --

2   Q.    No, sir, I would ask that you respond to my question,

3   please.

4   A.    Yeah, it was.  Yes, it was.

5   Q.    Let me show you -- Mr. Lillie, I'm going to show you

6   what's been entered into evidence as Respondent's Exhibit 1.

7   Can you take a look at that document?

8   A.    Sure.  Yep.

9   Q.    Have you had a chance to look at that?

10  A.    It's exactly the one I was trying to qualify to you.

11  Q.    Okay.  So is it your testimony, sir, that Mr. Kirk or no

12  one else from the company ever shared this document with you

13  prior to August?

14  A.    As I was attempting now for the third time to explain

15  what I was saying, what I was saying is that the first time

16  that we actually had the Union respond to the information

17  request, asking them for a copy of the F-7, was in August.

18  And I guess, from my perspective, that's when I knew

19  absolutely for certain, but we knew pretty good toward the

20  end of May that the strike was illegal because we finally

21  were able to get documents from FMCS.

22       JUDGE BUXBAUM:  Let me see if I understand your point.

23  I think I do.  You got the documents from FMCS that made you

24  reasonably sure, but the government is a fallible

25  institution, and your remaining concern was that it could be

1  that the Union had filed an earlier one and somehow FMCS

2  wasn't providing it to you, lost it, or somehow --

3      MR. CARLSON:  Judge --

4      JUDGE BUXBAUM:  -- and until you got it directly from

5  the Union, at which point you became 100 percent certain?

6      THE WITNESS:  Well, especially, Your Honor, in view of

7  the fact that I had contacted Mr. Pinto, who had directed me

8  to contact Dawn Stark, who is I understand the head of FMCS

9  in Washington, D.C., and I still wasn't getting responses.

10  And so I was reasonably certain at the end of May, though,

11  that the strike was illegal.

12      JUDGE BUXBAUM:  Based on what you did receive from FMCS?

13      THE WITNESS:  That's correct.

14      JUDGE BUXBAUM:  Got it.

15  Q.  BY MR. CARLSON:  I'm sorry, Mr. Lillie.  And I apologize

16  if I'm -- maybe I missed something here.  What is it that Mr.

17  -- I withdraw the question.  Mr. Lillie, you also gave an

18  affidavit to the National Labor Relations Board in cases

19  51235 and 7-CB-160409 -- or, excuse me, 16049, did you not?

20      JUDGE BUXBAUM:  It's a tough question, Mr. Carlson,

21  isn't it?  Why don't you show us the documents.

22      MR. FRASER:  Yeah, again, I don't have that with me,

23  so --

24      MR. CARLSON:  I'm just asking if he gave an affidavit in

25  the case.  You don't need to review the entire document.

1    MR. FRASER:  Steve, you're a little uptight today, but

2  that's fine.  If you want to show him that, I'd like to see

3  it at some point.

4    JUDGE BUXBAUM:  Well, Mr. Carlson, show the witness the

5  affidavit at this point, and if he says yes, that's his

6  affidavit, then we'll make sure that Mr. Fraser has the

7  chance to see the appropriate parts of it.

8  Q.  BY MR. CARLSON:  Is that your affidavit, Mr. Lillie?

9  A.  Taking a look, Mr. Carlson.

10    JUDGE BUXBAUM:  All right.  You tell us when you're

11  ready, sir.

12    THE WITNESS:  I will.

13    This looks like it.

14  Q.  BY MR. CARLSON:  Okay.  And will you turn to page seven?

15  A.  Seven?

16  Q.  Yeah.

17  A.  Okay.

18  Q.  And it's true, is it not, that this affidavit includes a

19  discussion of what took place at the May 5th meeting with the

20  Union at six o'clock, in East Lansing?  Beginning at line

21  four.

22    MR. FRASER:  Could I see a copy of the charge that this

23  relates to?

24    MR. CARLSON:  No, you may not.

25  Q.  BY MR. CARLSON:  Can you review the affidavit, please?

1       MR. FRASER:  Your Honor, while that question is being

2   asked, perhaps it would be appropriate that I be able to see

3   the affidavit, as well.

4       JUDGE BUXBAUM:  It would.  Would you point to the right

5   spot, Mr. Carlson?  Counsel is being shown the affidavit.

6       THE WITNESS:  And I'm sorry.  Could you restate the

7   question?

8   Q.   BY MR. CARLSON:  Yes.  Does this affidavit include a

9   discussion or statement -- excuse me -- a statement by you of

10  what took place -- your description of the events at the May

11  5th, 2008 meeting between the company and the Union, at the

12  hotel in East Lansing, Michigan?

13  A.   On page seven?

14  Q.   Yes.

15  A.   Yeah, there is some reference to it, yes.

16  Q.   Okay.  And you would agree, would you not, sir, that

17  there is nothing in the statement that indicates that you

18  said anything at that meeting about the strike being

19  illegal -- excuse me -- about the company reserving any

20  rights?

21  A.   I don't see it in here.  Do you want me to read it over?

22  Q.   Please do.

23  A.   Yeah, I cannot -- I don't believe that that was the crux

24  of what this charge was about, but, no, I don't see it in

25  there.

1  Q.   But you certainly discussed the meeting, did you not?

2  A.   Oh, no doubt about it, but the -- I don't know that that

3  was the crux of what this was about.

4      MR. McKNIGHT:  I think it would be appropriate if

5  Mr. Lillie just answered the question instead of --

6      JUDGE BUXBAUM:  I think he's answering okay.

7  Q.   BY MR. CARLSON:  Mr. Lillie, you would agree with me,

8  would you not, that the Union's strike was over as of May 5?

9  It ended on May 5, right?

10 A.   Are you asking for a legal opinion?

11     MR. FRASER:  Objection, Your Honor.

12     JUDGE BUXBAUM:  What's the basis for the objection?

13     MR. FRASER:  It requires a legal conclusion.

14     MR. CARLSON:  He's an attorney.  He was the company's

15 attorney for labor matters on the day in question.

16     MR. FRASER:  Yeah, but he's certainly not obligated to

17 render a legal opinion in an ongoing case regarding whether

18 the matter is an illegal strike.

19     JUDGE BUXBAUM:  You haven't called him as an expert

20 witness, Mr. Carlson.  Nobody has.  He's a fact witness here.

21     MR. CARLSON:  He was the company's labor attorney, and

22 I'm asking him whether or not --

23     JUDGE BUXBAUM:  Why don't you ask him what his opinion

24 was on May 5th?  That would be a matter of fact, I suppose.

25     MR. McKNIGHT:  Without asking for opinion, couldn't we

1  just ask him as a matter of fact, was the strike over on May

2  5?

3      MR. FRASER:  I mean, that's sort of like what is the

4  meaning of is?  I mean, he can certainly say --

5      JUDGE BUXBAUM:  Well, believe me, I sympathize with that

6  point.  A lot of this is semantics, but --

7  Q.  BY MR. CARLSON:  As a matter of fact, Mr. Lillie, was

8  the Union strike over as of May 5, 2008?

9      MR. FRASER:  Renewing my objection, Your Honor.  Calls

10  for a legal conclusion.

11      JUDGE BUXBAUM:  Given that it's calling for a legal

12  conclusion on the part of the witness that he's to formulate

13  on the witness stand today, I'm going to sustain the

14  objection.

15  Q.  BY MR. CARLSON:  Mr. Lillie, again referencing General

16  Counsel's Exhibit 66, which was the position statement you

17  submitted to the National Labor Relations Board on June 23rd,

18  2008, isn't it true that, in this document, you stated that

19  the UAW strike began May 1st, 2008?  The strike lasted

20  approximately four days?

21  A.  I don't have that in front of me, sir.  I'll presume

22  that's accurate.

23  Q.  I'm going to show you page five of the document.

24  A.  Okay.  Yes, that is correct.

25  Q.  Mr. Lillie, it's true, is it not, that the replacement

1  workers used by the company during the course of the lockout,

2  utilized by the company from May through August 2008, these

3  were temporary replacements; is that correct?

4        MR. FRASER:  Objection, Your Honor.  Outside the scope

5  of direct.

6        MR. CARLSON:  No, he asked him questions --

7        JUDGE BUXBAUM:  Yeah, you asked about replacement

8  issues.

9        MR. FRASER:  I don't think with this witness, Your

10  Honor.

11        MR. CARLSON:  Oh, he did.

12        JUDGE BUXBAUM:  Yeah, I think you did, yeah.  Overruled.

13  Q.   BY MR. CARLSON:  They were temporary, right?  They

14  weren't permanent replacements?

15  A.   I wasn't privy to the company's decision about all of

16  its workers.  I knew that some were temporary from the

17  Coldwater area.  Others were from their facility in Indiana,

18  and others -- I don't know.

19        JUDGE BUXBAUM:  You've indicated a facility in Indiana.

20  Could it have been Kentucky?

21        THE WITNESS:  I'm sorry, Kentucky.  I apologize.

22        JUDGE BUXBAUM:  That's all right.

23  Q.   BY MR. CARLSON:  Mr. Lillie, I'm going to show you page

24  two, again, of General Counsel's 66, which is your position

25  statement to the National Labor Relations Board.  I'm going

1   to read this into the record.

2           "Importantly, the replacement workers used during

3           the course of the lockout have at all times been

4           temporary replacements."

5       Did I read that correctly?

6   A.   In that context, that is correct, yes.

7   Q.   And that context being a statement by you as an attorney

8   to the National Labor Relations Board?

9   A.   That's correct.

10  Q.   And it's true, isn't it also, Mr. Lillie, that it was

11  well known among the replacement workers between May of 2008

12  and August of 2008 -- it was well known among them that they

13  were temporary replacements?

14      MR. FRASER:  Objection.  Calls for speculation.  He

15  doesn't know what the replacement workers knew.

16      JUDGE BUXBAUM:  Sustained.

17      MR. McKNIGHT:  I object also.

18      JUDGE BUXBAUM:  Well, I'm going to sustain you as well.

19      MR. CARLSON:  I have nothing further, Judge.

20      JUDGE BUXBAUM:  And, again, Mr. Carlson, just being

21  cautious, you're not seeking admission of General Counsel 66,

22  position statement?

23      MR. CARLSON:  No, sir.

24      JUDGE BUXBAUM:  Very well.  All right.  Mr. McKnight,

25  you may proceed.

1     MR. McKNIGHT:  I'd like any <u>Jencks</u> statements.

2     JUDGE BUXBAUM:  Very well.

3     MR. CARLSON:  Let the record reflect that I'm turning

4  over to Mr. McKnight Mr. Lillie's affidavits in case GR-7-CA-

5  51428, which is approximately two and a half pages, with

6  three pages of attachments.  I'm also turning over

7  Mr. Lillie's affidavit in cases 7-CA-51235 and 7-CB-16049,

8  which is approximately -- it's 11 numbered pages.  I'm also

9  turning over to Mr. McKnight Mr. Lillie's position statements

10 submitted to the Labor Board --

11    JUDGE BUXBAUM:  Well, those, presumably, he has, don't

12 you, Mr. McKnight?  They wouldn't be served on the Charging

13 Party?

14    MR. McKNIGHT:  No.

15    MR. CARLSON:  No.

16    JUDGE BUXBAUM:  Oh, okay.

17    MR. CARLSON:  Well, the one is General Counsel's 66,

18 which is Mr. Lillie's June 23rd, 2008 position statement, and

19 the other is -- excuse me -- and the other is a position

20 statement from Mr. Lillie in case 7-CA-51235, that appears to

21 be undated, which is approximately 18 pages -- or is 18

22 numbered pages.

23    JUDGE BUXBAUM:  Does that conclude the <u>Jencks</u> materials?

24    MR. CARLSON:  Yes, sir, I'm sorry, yes, sir.

25    MR. FRASER:  Your Honor, I stood for a reason, and the

1  question that I have is that the turning over of those

2  position statements reminds me that I asked Mr. Carlson -- I

3  just want a clarification on the record.  When I asked for

4  Jencks statements for anything and everything related to the

5  witnesses that testified for the Union, I don't recall

6  getting any position statements.  So I guess I'm looking for

7  confirmation that there weren't any position statements.

8      JUDGE BUXBAUM:  Well, I just addressed this in a

9  different context, and as a result, I never should have asked

10  the question I asked because I should know better.  The

11  Charging Party's position statements are treated differently

12  by the Board.  It's a curious thing, perhaps, but --

13      MR. CARLSON:  Let me state on the record, Judge.  The

14  General Counsel, as I recall, had three witnesses in this

15  case.

16      JUDGE BUXBAUM:  Let's see.  Yes, that's right.

17      MR. McKNIGHT:  Two.

18      MR. CARLSON:  Two witnesses.  Mr. Canzano and

19  Mr. Winkle.

20      JUDGE BUXBAUM:  No, three.  Mr. Winkle, Mr. Canzano and

21  Mr. Viar.

22      MR. CARLSON:  Mr. Canzano did not submit a position

23  statement to the Board.

24      JUDGE BUXBAUM:  Okay.

25      MR. CARLSON:  Nor did Mr. Winkle.

 1      JUDGE BUXBAUM:  And Mr. Viar would be what --

 2      MR. CARLSON:  Well, the only thing --

 3      JUDGE BUXBAUM:  He wouldn't have submitted it himself,

 4  would he?

 5      MR. CARLSON:  Well, it was a position statement from

 6  attorney -- either Dan Cohen or William Pilchak --

 7      JUDGE BUXBAUM:  Right.  So it wouldn't have been his

 8  personal --

 9      MR. CARLSON:  -- that Mr. Viar testified he collaborated

10  on but was not the signing party to the document.  And I

11  would note, too, that Mr. Fraser has been provided that

12  document in any event.

13      JUDGE BUXBAUM:  Okay.  All right.  So you're saying

14  there's nothing to worry about.  Everything has been

15  provided.

16      MR. CARLSON:  That's correct, Judge.

17      JUDGE BUXBAUM:  Okay.

18      MR. FRASER:  Thank you.

19      JUDGE BUXBAUM:  All right.  Now, Mr. McKnight, I'm going

20  to -- let me do this.  Why don't I recess till 4:15.  If you

21  need more time, I'll give it to you.  I know you'll do your

22  best here.  I realize this is -- it's a difficult situation.

23      MR. McKNIGHT:  Okay.  Thank you.

24      JUDGE BUXBAUM:  Perhaps Mr. Sharma can pitch in.

25      MR. McKNIGHT:  Why don't we just -- let's say 4:20, and

1  then --

2      **JUDGE BUXBAUM:  Good deal, 4:20.  We'll recess till**

3  **4:20.**

4  **(Off the record.)**

5      JUDGE BUXBAUM:  Mr. McKnight, you may proceed.

6                      **CROSS-EXAMINATION**

7  Q.  BY MR. McKNIGHT:  Do you agree that, on June 23, 2008,

8  you represented to the National Labor Relations Board that

9  the Employer's lockout in support of its bargaining position,

10  after the Union's four-day strike and sabotage, is a lawful

11  lockout?

12  A.  I'd have to see what you're talking about, but that

13  sounds accurate.

14  Q.  Okay.  I'm very sorry that I did this.  I wasn't

15  thinking, but I highlighted it.

16      JUDGE BUXBAUM:  That's all right.  Obviously,

17  Mr. Lillie, you shouldn't consider the highlight as being

18  part of the document.

19      THE WITNESS:  Yeah, I think, probably --

20      MR. FRASER:  Sam, what page are you on?

21      MR. McKNIGHT:  Page 13.

22      THE WITNESS:  I think, at that point in time, what was

23  being asked of the Employer was to justify the lockout --

24  Q.  BY MR. McKNIGHT:  I was just asking if that's what

25  you -- you represented that to the NLRB?

1   A.   I think, in the context of them asking the Employer to

2   justify the lockout, yes.

3   Q.   Do you agree that, on June 23, 2008, you represented to

4   the National Labor Relations Board that the Employer may use

5   temporary replacements to engage in business operations

6   during the lockout, in support of its bargaining position?

7   A.   That sounds accurate.

8   Q.   Do you agree that you represented to the National Labor

9   Relations Board on June 23, 2008 that the replacements were

10  temporary?

11  A.   I think I've seen that before when Mr. Castle had it in

12  front of me.

13  Q.   I just was asking if you remember that you represented

14  that.

15  A.   I don't remember, specifically, no.

16  Q.   Okay.

17       MR. CARLSON:  Let me let the record reflect that

18  Mr. Lillie just said Mr. Castle.  I think he was referring to

19  me, Mr. Carlson.  I just want the record to accurately

20  reflect -- I'm not offended.

21       JUDGE BUXBAUM:  Mr. Lillie; is that right?

22       THE WITNESS:  I apologize profoundly.  I can't keep you

23  guys straight.

24  Q.   BY MR. McKNIGHT:  I'm going to show you page three.

25  Again, these are my highlights.  You might want to look at

 1  other parts.

 2        MR. FRASER:  What document are we on, Sam?

 3        MR. McKNIGHT:  The June 23, 2008 statement.

 4        JUDGE BUXBAUM:  The same document.

 5        MR. FRASER:  GC-66?

 6        MR. CARLSON:  That's correct.

 7        THE WITNESS:  Can I take a look?

 8        MR. McKNIGHT:  Sure.  This --

 9  Q.  BY MR. McKNIGHT:  Without reading it out loud.  I just

10  want you to look at that.

11  A.  This is --

12  Q.  Have you read it?

13  A.  This is a restatement of the Union's contentions.

14  Q.  You've got to stay with me, please.

15  A.  I'm sorry.

16  Q.  That's only fair.  Have you read it?

17  A.  I have read it.

18  Q.  Okay.  Do you agree that, on June 23, 2008, you

19  represented to the National Labor Relations Board that the

20  Employer's conduct of hiring replacement workers is not in

21  violation of the National Labor Relations Act, as the

22  replacement workers are temporary workers?

23        MR. FRASER:  Objection, Your Honor.  The document speaks

24  for itself.

25        JUDGE BUXBAUM:  I'll allow it.  I'll allow it.

1    MR. CARLSON:  The document's not in evidence.

2    MR. FRASER:  And we know that.

3    JUDGE BUXBAUM:  Yeah, it isn't.  I'll allow it.

4    THE WITNESS:  Yes, I am stating that the workers are

5    temporary.

6  Q.  BY MR. McKNIGHT:  Do you agree with what I stated as

7  your representation?

8  A.  I don't remember what you stated, but --

9  Q.  Well, I'll ask again.  Do you agree that, on June 23,

10  2008, you represented to the National Labor Relations Board

11  that the replacement workers are temporary workers?

12  A.  Yes.

13  Q.  Okay.  Do you agree that, on June 23, 2008, you

14  represented to the National Labor Relations Board that none

15  of the workers have been informed that they are permanent

16  employees?

17  A.  If that's what I've written, then yes.  I don't remember

18  what I wrote on June 23rd, 2008, Sam.  I'm sorry, I --

19  Q.  Do you agree that, as of June 23, 2008, none of the

20  replacement workers had been informed that they were

21  permanent?

22  A.  I don't know if any were informed that they were

23  permanent.  That part is accurate.

24  Q.  Well, don't you -- do you agree that it was well known

25  among the replacement workers that they were temporary

1   replacements?

2   A.   I have no idea what was going on among the temporary or

3   the permanent or whoever replacements.

4   Q.   Do you agree that you represented to the NLRB on June

5   23, 2008, that it was well known among the workers that they

6   are temporary replacements, only?

7   A.   As I said, I don't remember what I wrote --

8        MR. FRASER:  Your Honor, objection --

9        JUDGE BUXBAUM:  Hold on.  Okay.  What's the basis of the

10  objection?

11       MR. FRASER:  Objection, relevance.  I'm just struggling

12  with what this is relevant to at all.

13       JUDGE BUXBAUM:  How is it relevant?

14       MR. McKNIGHT:  Well, it certainly -- it's relevant

15  because it corroborates what was said during bargaining about

16  the status of the employees who were working.

17       JUDGE BUXBAUM:  How does it corroborate it?

18       MR. McKNIGHT:  Well, because there is testimony

19  regarding what was said and by whom, regarding the status of

20  employees --

21       JUDGE BUXBAUM:  No question there is testimony, but how

22  does the representation to the Labor Board corroborate that

23  testimony?

24       MR. McKNIGHT:  This is a party to the bargaining

25  sessions, and he --

1    JUDGE BUXBAUM:  Well, now, as I think about it, I agree

2  with you.  I'll allow it.

3    MR. FRASER:  Well, Your Honor, if I may try one more

4  time.  Corroboration requires some nexus between the document

5  being used and the statement made during bargaining.  I don't

6  hear that there's any nexus at all.  It's a statement to the

7  Board.  There were bargaining statements.

8    JUDGE BUXBAUM:  Yes, but one could draw a conclusion

9  from the statement to the Board that certain testimony given

10  very early in this case is more likely true, testimony of the

11  General Counsel's witnesses.

12    MR. FRASER:  I remember the testimony well.

13    JUDGE BUXBAUM:  I'll allow it.

14  Q.  BY MR. McKNIGHT:  I'm just directing your attention to

15  this sentence here.

16  A.  Right.  If I wrote this on June 23rd, 2008, then that is

17  accurate.

18  Q.  And this is a statement that it's well known among the

19  workers that they are temporary replacements, only?

20  A.  That would be accurate.  I don't personally remember

21  what I wrote on June 23rd, 2008, but if it's in that position

22  statement, it was accurate at that time.

23    JUDGE BUXBAUM:  Well, but hold on now.  Is it in there?

24  You're saying, if it's in there, it's accurate.

25    MR. McKNIGHT:  Oh, yeah.  Good point.

1   Q.   BY MR. McKNIGHT:  Is it in there?

2   A.   It is.

3        JUDGE BUXBAUM:  All right.

4   Q.   BY MR. McKNIGHT:  Would you agree that the Employer was

5   concerned on about June 23, 2008, that it could not be

6   certain that the Union would not strike again, once the

7   temporary replacements had ceased their work, if the

8   unconditional offer were accepted?

9        MR. FRASER:  Objection.  Calls for speculation.

10       JUDGE BUXBAUM:  Well, I don't see that, but it seems to

11  me the witness is -- well, actually, I'm not going to put

12  words in Mr. Lillie's mouth.

13       You answer it, Mr. Lillie.

14       THE WITNESS:  Could I see the document?

15  Q.   BY MR. McKNIGHT:  Well, no.  Let me ask you this, first,

16  without talking about any documents.  In June of 2008, did

17  the Employer have a concern that, if it accepted the Union's

18  unconditional offer to return to work, and the replacements

19  were sent back to Hopkinsville, the Union could go out on

20  strike again, without a contract?

21  A.   Well, first, the Employer had accepted the Union's --

22  Q.   I'm just asking if -- about that concern.  Do you agree

23  that the Employer had that concern?

24  A.   But the question says that, if the Employer accepted the

25  Union's unconditional offer to return to work.  The Employer

1   did say, "Here are the terms and conditions," on May 5th.  So

2   the question seems inaccurate --

3   Q.   Do you have -- okay.  Let me ask you about that.  Let me

4   ask you about that.  Do you have any writing in which the

5   Employer says, "We accept the Union's unconditional offer to

6   return to work"?

7   A.   The -- what is Joint --

8   Q.   Do you have any writing using those words?

9        JUDGE BUXBAUM:  Well, he's looking for it.  He's looking

10  for it.

11       THE WITNESS:  And I can't remember which one it was.

12  Eighteen, I guess.  Well, what has been entered as Number 7

13  here says --

14  Q.   BY MR. McKNIGHT:  Does it use those words, "We accept

15  the Union's unconditional offer to return to work"?

16  A.   Specifically?

17       JUDGE BUXBAUM:  Well, 7 is the Union's offer.  Are you

18  referring to 8?

19       THE WITNESS:  Defendant's Exhibit 7.

20       JUDGE BUXBAUM:  Oh, Respondent's 7, okay.

21       THE WITNESS:  The last paragraph says, Sam:

22            "Please advise the company as soon as possible if

23            the union accepts the proposal and when the

24            agreement has been reached so that employees can be

25            expeditiously returned to work."

1  Q.   BY MR. McKNIGHT:  I understand what the last paragraph

2  says.  Do you have any writing in which the Employer said,

3  "We accept the Union's unconditional offer to return to

4  work"?

5  A.   Specific writing?

6  Q.   Yes.

7  A.   I'm not aware of any.  I can't recall any, anyway.

8  Q.   Do you agree that would be an important thing to write

9  down?

10  A.   I can --

11     MR. FRASER:  Objection.  Calls for, again, speculation

12  and a legal conclusion.

13     JUDGE BUXBAUM:  Sustained.

14  Q.   BY MR. McKNIGHT:  Now, do you agree that, in June, you

15  represented to the NLRB that the Employer was concerned about

16  the Union striking again?

17  A.   That would have been one of the concerns, yes.

18  Q.   Would that concern have been addressed by the document

19  attached to what's called Defendant Exhibit 7?

20  A.   You mean where the Union indicated it wouldn't go back

21  out for 60 days?

22  Q.   I didn't ask you what the Union indicated --

23  A.   Well, I'm just asking --

24     JUDGE BUXBAUM:  Well, no, but he's trying to identify

25  which document.

1    Q.    BY MR. McKNIGHT:    -- I asked you if that concern would

2    have been addressed by the document attached to -- I'll give

3    you a clean copy of this -- GC Exhibit 8?

4    A.    If what would have been?    I --

5    Q.    A concern about the employees going out on strike again.

6    A.    Yes.

7    Q.    Would that concern that the Employer had have been

8    addressed if the Union accepted the document attached to GC

9    Exhibit 8?

10   A.    If the Union had accepted the Employer's offer --

11   Q.    I didn't ask you to describe it.    I said, if the Union

12   accepted the document --

13         MR. FRASER:    Objection, Your Honor.    Let him answer the

14   question.

15         JUDGE BUXBAUM:    No, I'll allow this.    I'll allow it.

16   Q.    BY MR. McKNIGHT:    If the Union accepted the document,

17   without any description, whatever it is, would the concern

18   about the employees going back out on strike have been

19   addressed?

20         MR. FRASER:    Again, objection, Your Honor.

21         JUDGE BUXBAUM:    Overruled.

22         THE WITNESS:    GC-8?    Yeah, because it would have been a

23   term of three years.

24   Q.    BY MR. McKNIGHT:    Yes?    The answer is yes?    It would

25   have been a term of how many years?

 1  A.    Three.

 2  Q.    Three years.  Thank you.

 3        JUDGE BUXBAUM:  Well, but I'm not sure I heard the

 4  answer.  Would you repeat it?

 5  Q.    BY MR. McKNIGHT:  Was the answer because it would have

 6  been a term of three years?

 7  A.    It would have been a contract, that's right.

 8  Q.    Thank you.

 9        JUDGE BUXBAUM:  Okay.

10  Q.    BY MR. McKNIGHT:  Was there any point from May 5, 2008

11  until, let's say, July 31, 2008, when the Employer did not

12  have on the table a bargaining proposal or a contract

13  proposal that the Union, had it accepted it, would have ended

14  the lockout?

15  A.    In that --

16  Q.    You can say yes or no.

17        MR. FRASER:  But you're not required to, Mr. Lillie.

18        MR. McKNIGHT:  Hey, hey --

19        JUDGE BUXBAUM:  I'll let him answer.

20        THE WITNESS:  In that proposals were made in package

21  form, and the Union rejected those packages, I would think

22  that there were times during that period of time when there

23  was not something out there.

24  Q.    BY MR. McKNIGHT:  And when you're saying when there's

25  not something out there, what you mean, I think -- and is

 1  that a package proposal by the Employer for a contract had

 2  been rejected and perhaps the company was thinking about

 3  whether or not to reshape the package?

 4  A.   That's right.  And it would have been whether it might

 5  have been rejected or countered in some way, correct.

 6  Q.   So at that point in time, the Union could have still

 7  said, "We changed our mind.  We accept the package we just

 8  rejected or just countered," or the Employer would be

 9  considering whether or not to, in some way, modify the

10  package, right?

11       MR. FRASER:  Objection.  Calls for speculation.

12       JUDGE BUXBAUM:  Well, all right.  Let me ask it this

13  way, Mr. Lillie.  Counsel asked very broadly, was there ever

14  a moment when there wasn't an opportunity for the Union to

15  accept a package, and that is a very broad question.  Is it

16  fair to say that there were numerous times during that time

17  period when, had the Union accepted an offer that was

18  actually on the table from the company, that it would have

19  ended the lockout, they would have signed a collective

20  bargaining agreement, and that would have been it?

21       THE WITNESS:  Yes.

22       JUDGE BUXBAUM:  Okay.

23       MR. McKNIGHT:  Can I have just a moment?

24       JUDGE BUXBAUM:  Sure.

25  Q.   BY MR. McKNIGHT:  I'm just going to ask you -- you can

1  tell me if you already answered it.  I think you did, but at

2  one point, Mr. Carlson was directing your attention to

3  Respondent Exhibit 7, which had some jottings from you.

4  A.   Right.  I don't have that in front of me anymore, but --

5  thank you very much, Your Honor.

6       JUDGE BUXBAUM:  Sure.

7       THE WITNESS:  That's correct.

8  Q.   BY MR. McKNIGHT:  All right.  And then, at another

9  point, he was looking at another -- or the identical letter

10 called "Master, 6 p.m.," and it didn't have the same

11 jottings?

12 A.   Right.

13 Q.   Okay.  And in terms of the one that had -- and I'm

14 calling them jottings.  The words on the bottom, "Proposal is

15 complete."

16 A.   Uh-huh.

17 Q.   Are you positive who spoke those words?

18 A.   I feel certain that it was me --

19 Q.   Thank you.  Okay.

20 A.   -- in response to the Union's question of is this --

21      MR. McKNIGHT:  I just wanted to know who spoke them.

22      I have no further questions.

23      JUDGE BUXBAUM:  Very well.  Redirect?

24      MR. FRASER:  None.  Thank you.

25      JUDGE BUXBAUM:  Then, may Mr. Lillie be excused?

1053

1   Anybody anxious to keep him here?  I'm not hearing any

2   takers.

3        Mr. Lillie, thank you.  You're excused.

4        THE WITNESS:  Thank you very much, sir.

5   **(Witness excused.)**

6        JUDGE BUXBAUM:  And Mr. Fraser, I'll hear from you

7   shortly.

8        MR. FRASER:  Can I have one minute, Your Honor?

9        JUDGE BUXBAUM:  You may, indeed.

10       **We'll go off the record.**

11  **(Off the record.)**

12       JUDGE BUXBAUM:  Mr. Fraser?

13       MR. FRASER:  Your Honor, at this point -- and I to have

14  to tell you that I've not been in, actually, any Board cases

15  where there are rebuttal witnesses, so I'm not even sure

16  whether there's surrebuttal or not, but at this point, I

17  would say that the company rests, Respondent rests.

18       JUDGE BUXBAUM:  Well, right.  Resting, of course,

19  doesn't address rebuttal, so that's fine.

20       MR. FRASER:  Understood.

21       JUDGE BUXBAUM:  But, in other words, in terms of your

22  case in chief, you rest?

23       MR. FRASER:  Yes.

24       JUDGE BUXBAUM:  Very well.  Then, Mr. Carlson, does the

25  General Counsel wish to present any rebuttal evidence?

1054

1    MR. CARLSON:  I think we may, Your Honor.  I'd like just

2  a few moments to confer with Mr. McKnight.

3    **JUDGE BUXBAUM:  Of course.  We'll go off the record.**

4  **(Off the record.)**

5    JUDGE BUXBAUM:  Mr. Carlson, you may proceed.

6    MR. CARLSON:  Thank you, Your Honor.  General Counsel

7  calls John Canzano.

8    JUDGE BUXBAUM:  A return engagement.  This way,

9  Mr. Canzano.  It's a return engagement but a different room.

10    Would you please raise your right hand?  It's been a

11  long time, so --

12  (Whereupon,

13                      **JOHN CANZANO**

14  was re-called as a witness by and on behalf of the General

15  Counsel and, after having been first duly sworn, was examined

16  and testified further as follows:)

17    JUDGE BUXBAUM:  Please be seated.

18    You may proceed, Mr. Carlson.

19    MR. CARLSON:  Thank you, Your Honor.

20                   **DIRECT EXAMINATION**

21  Q.  BY MR. CARLSON:  Mr. Canzano, any time prior to July 24,

22  2008, did you have a sidebar discussion with Bruce Lillie

23  during which Mr. Lillie stated that the Union's strike of May

24  1, 2008 was illegal?

25  A.  No.

1  Q.    Anytime prior to July 24, 2008, did you have a sidebar

2  discussion with Bruce Lillie during which Mr. Lillie stated

3  that the strikers were unprotected by the Act?

4  A.    No.

5  Q.    And anytime prior to July 24, 2008, did you have a

6  sidebar discussion with Bruce Lillie during which Mr. Lillie

7  stated that the company was reserving its rights with respect

8  to take action against the strikers?

9  A.    No.

10        MR. CARLSON:  Nothing further, Judge.

11        JUDGE BUXBAUM:  Mr. McKnight?

12        MR. McKNIGHT:  I have no questions.

13        JUDGE BUXBAUM:  Mr. Fraser?

14        MR. FRASER:  Your Honor, again, it's a very unique

15  position, but I'm going to ask if there are any additional

16  Jencks materials that I haven't seen at this point in this

17  case.

18        JUDGE BUXBAUM:  Sure.  I don't think that's illegitimate

19  in any way.

20        MR. CARLSON:  Oh, no, sir.  No, Mr. Canzano has not

21  given any additional statements to the Board since --

22        MR. FRASER:  So those documents that I received back on

23  June 24th, 25th, whatever the dates were, are the only things

24  that exist at this point in time?

25        MR. CARLSON:  That's correct.

1    **CROSS-EXAMINATION**

2    Q.   BY MR. FRASER:  Mr. Canzano, good afternoon.  How are

3    you?

4    A.   Pretty good.

5    Q.   That's the first lie you've told today.  We appreciate

6    it, Mr. Canzano.

7         JUDGE BUXBAUM:  I should say for the record, to put it

8    in a little bit of context, that one of the unique features

9    of this trial is that I think, what, 50 percent of the

10   witnesses have been lawyers, and it has illustrated -- I

11   think all of us in the profession who've observed that will

12   agree that it's a difficult transition for lawyers and not

13   necessarily a pleasant one, Mr. Canzano.

14        THE WITNESS:  It was a nice drive, nice day outside.

15        JUDGE BUXBAUM:  All right.  Very diplomatic.  Very

16   diplomatic.

17        MR. FRASER:  Very good.  That's better.

18        JUDGE BUXBAUM:  Go ahead, counsel.

19   Q.   BY MR. FRASER:  Mr. Canzano, what time did you get here?

20   A.   About a half hour ago.

21   Q.   Did you prepare for your testimony just a few minutes

22   ago -- the testimony you gave, did you prepare for it?

23   A.   I was asked questions by -- attorney for the General

24   Counsel asked me a couple questions.

25   Q.   Okay.  Did anyone show you a copy of the transcript in

1    this -- or tell you about the testimony that's occurred since

2    you've testified previously?

3    A.    No, no one told me about any of the testimony that's

4    happened since my testimony.

5    Q.    And you say you were asked questions --

6    A.    Yes.

7    Q.    -- is that correct?

8    A.    Yes.

9    Q.    And can you tell me what those questions that you were

10   asked were?

11   A.    The same questions that were asked right now.

12   Q.    Okay.  And besides those questions that were asked,

13   there was no other discussion about your testimony here

14   today?

15   A.    No.

16   Q.    How long did that take?

17   A.    Five minutes.

18        MR. FRASER:  I don't have any other questions.  Thank

19   you, Your Honor.

20        JUDGE BUXBAUM:  You may step down, Mr. Canzano.  Thank

21   you.

22        Any need to keep Mr. Canzano --

23        MR. CARLSON:  No.  No, sir.

24        THE WITNESS:  Thank you.

25        JUDGE BUXBAUM:  All right.  You are excused, sir.

 1   **(Witness excused.)**

 2       JUDGE BUXBAUM:  Mr. Carlson?

 3       MR. CARLSON:  General Counsel is going to call again

 4   Phil Winkle.

 5       JUDGE BUXBAUM:  Mr. Winkle.

 6       MR. CARLSON:  What exhibit is the General Counsel up to,

 7   please?

 8       COURT REPORTER:  67.

 9       MR. CARLSON:  60-what?

10       COURT REPORTER:  7.

11       MR. CARLSON:  67.

12       JUDGE BUXBAUM:  Mr. Winkle, again, because of the

13   passage of time, would you raise your right hand?

14   (Whereupon,

15                        **PHILIP WINKLE**

16   was re-called as a witness by and on behalf of the General

17   Counsel and, after having been first duly sworn, was examined

18   and testified further as follows:)

19       JUDGE BUXBAUM:  Please be seated.

20       You may proceed, counsel.

21       MR. CARLSON:  Thank you, Judge.

22   **(General Counsel's Exhibit 67 marked for identification.)**

23                        **DIRECT EXAMINATION**

24   Q.  BY MR. CARLSON:  Mr. Winkle, I'm going to hand you what

25   I've marked for identification as General Counsel's Exhibit

1   67.  Can you take a moment and look through that document?

2        Have you had a chance to review that document,

3   Mr. Winkle?

4   A.   Yes, sir.

5   Q.   And can you tell me, what is that document?

6   A.    It is my handwritten account of the events as they took

7   place on August the 14th of 2008, at the Hampton Inn.

8   Q.   Okay.  And can you tell me, when did you create this

9   document?

10  A.   Shortly after we left the meeting.  We left the Hampton

11  Inn and went to the Eagle's, in Coldwater, and I wrote them

12  when we arrived at the Eagle's.

13  Q.   Okay.  And when you say "we," to whom are you referring?

14  A.   The entire bargaining committee and Mr. McKnight.

15  Q.   And at whose direction did you create this document?

16  A.   Mr. McKnight's.

17  Q.   And what did Mr. McKnight tell you to do?

18  A.   He asked me if I would take a pen and paper and go to a

19  table by myself, and while it was fresh in my mind, to the

20  best of my ability, write down what transpired at the meeting

21  on August the 14th of 2008.

22  Q.   And this is the document that you created?

23  A.   Yes, sir.

24  Q.   Mr. Winkle, I want you to take a look at the very bottom

25  line of the document.  You have an original copy.  And for

1   the record, I made copies of this, and the copy machine

2   downstairs has cut that off, but I'll give everybody an

3   opportunity to review it if they need to, but can you --

4        JUDGE BUXBAUM:  Oh, you're saying there's something

5   you're asking the witness to look at that isn't --

6        MR. CARLSON:  No, it's on his document because he has

7   the copy that's not cut off.

8        JUDGE BUXBAUM:  Okay, okay.

9        MR. FRASER:  I'm confused.

10       JUDGE BUXBAUM:  Well, yeah, and, Mr. Fraser, you

11   probably want to come up and look at it.  Why don't you come

12   up and look at it.

13       MR. FRASER:  If it's something different than I have --

14       JUDGE BUXBAUM:  Yes.

15       MR. FRASER:  -- that'd be great.

16       MR. McKNIGHT:  I probably have a good copy of it, too,

17   somewhere.  I'll look and see.

18       JUDGE BUXBAUM:  Can I see it -- well he's got to write

19   it first, but -- I guess, Mr. Carlson, is it something I

20   should see?  Are you ever planning to admit this or --

21       MR. CARLSON:  Yes, I am.

22       JUDGE BUXBAUM:  All right.  Then I'll take a look, too.

23       MR. CARLSON:  And I will do what I can to get --

24       JUDGE BUXBAUM:  Well, I don't think it's a problem.

25   Q.   BY MR. CARLSON:  Mr. Winkle, can you read in for the

1   record what is written on that bottom line of the first page

2   of General Counsel's 67?

3   A.   You want me to read the last sentence?

4   Q.   No, just the bottom -- the very bottom line, those

5   words.

6   A.   "Have a copy he got FMCS" -- "got from FMCS."

7   Q.   Okay.

8        MR. McKNIGHT:  Say the words again.

9        THE WITNESS:  "Have a copy he got from FMCS."

10       MR. McKNIGHT:  Period?

11       JUDGE BUXBAUM:  It's not really cut off on this, either.

12       MR. McKNIGHT:  I also have a copy of the same document

13  where the words are not cut off.  I'll just give it to you.

14       MR. CARLSON:  I'll put those two into the record, the

15  copy that Mr. Winkle has --

16       JUDGE BUXBAUM:  Yes, please, yeah, the best copy should

17  go in the record, please.

18       MR. CARLSON:  Nothing further, Judge.  I'm sorry.  We

19  would offer GC-67.

20       JUDGE BUXBAUM:  Mr. McKnight, any objection to its

21  receipt?

22       MR. McKNIGHT:  I have a couple questions on voir dire.

23       JUDGE BUXBAUM:  You may.

24                    **VOIR DIRE EXAMINATION**

25  Q.   BY MR. McKNIGHT:  After you wrote this down, did anyone

1   ask you to make any changes on this?

2   A.   No.

3   Q.   Is this an exact replica of what you wrote?

4   A.   Yes, sir.

5   Q.   Approximately how long after you left the Hampton Inn

6   did you write this document?

7   A.   Approximately -- took 15 minutes to get across town --

8   within 20 minutes.

9        MR. McKNIGHT:  I have no questions -- no further

10  questions.

11       JUDGE BUXBAUM:  And your position?

12       MR. McKNIGHT:  I have no objection.

13       JUDGE BUXBAUM:  Mr. Fraser?

14       MR. FRASER:  No objection, Your Honor.

15       JUDGE BUXBAUM:  Very well.  Then, General Counsel 67

16  will be received in evidence.

17  **(General Counsel's Exhibit 67 received into evidence.)**

18       JUDGE BUXBAUM:  And I believe you --

19       MR. CARLSON:  I have no further questions.

20       JUDGE BUXBAUM:  Mr. McKnight?

21       MR. McKNIGHT:  I have no further questions.

22       JUDGE BUXBAUM:  Mr. Fraser?

23       MR. FRASER:  I'm just trying to see if there are any

24  other Jencks materials that may have been produced.

25       JUDGE BUXBAUM:  Absolutely.

1    MR. CARLSON:  No, sir.

2                    **CROSS-EXAMINATION**

3  Q.   BY MR. FRASER:  Mr. Winkle, you said these are your

4  notes, GC-67, correct?

5  A.   Yes, sir.

6  Q.   You did not prepare these while the discussions were

7  going on, correct?

8  A.   No, sir.

9  Q.   I note that you have a number of times that are entered

10  here in this document.  Those times were your best

11  recollection of the times that events occurred after you left

12  the meeting, right?

13  A.   Yes, sir.  That's why I wrote "approximately" at the

14  top.

15  Q.   But then, later on, you say, "At 11:30 a.m."

16  A.   Yeah.

17  Q.   How do you recall it was at 11:30 a.m.?

18  A.   I looked at my watch.

19  Q.   And you recalled that that's the time it was, correct?

20  A.   Yes, sir.

21  Q.   What preparation have you had for your testimony here

22  today?

23  A.   Just Sam McKnight gave me a copy of these and asked me

24  to look at them.

25  Q.   When did that happen?

1   A.   Last night.

2   Q.   Any preparation other than that?

3   A.   No, sir.

4   Q.   Any discussion about the notes themselves?

5   A.   No, sir.

6   Q.   Any discussion about the questions that you'd be asked

7   today?

8   A.   No, sir.

9   Q.   So today's the first time you've heard the questions

10  that were asked by Mr. Carlson related to this GC-67?

11  A.   I had testified to this document earlier in my --

12  Q.   Your testimony is you testified about this document

13  when?

14  A.   When I was on trial last -- or, on the stand last time.

15  Q.   Feels like that, I know.

16  A.   Yeah.  On the particular bargaining date and --

17       JUDGE BUXBAUM:  You're talking about, in other words,

18  the proceedings in this case, back in June?

19       THE WITNESS:  Yes, sir.

20  Q.   BY MR. FRASER:  Okay.  So nobody asked you to -- nobody

21  told you the questions they were going to ask you today?

22  A.   No, sir.

23  Q.   You acknowledge, don't you, that you were not part of

24  every meeting that took place between Mr. McKnight and any

25  representative of the company on August 14, correct?

1    MR. McKNIGHT:  Objection.  It's beyond the scope.

2    JUDGE BUXBAUM:  Repeat the question, Mr. Fraser.

3  Q.   BY MR. FRASER:  My question is these notes don't reflect

4  all the discussions that took place between Mr. McKnight and

5  company representatives on August 14, 2008, correct?

6    JUDGE BUXBAUM:  I'll allow it.

7    THE WITNESS:  As far as I know -- I don't know of any

8  other discussion they had.  This is the one I was present at.

9  Q.   BY MR. FRASER:  Okay.  So you're not aware if there were

10  other discussions?

11  A.   No, sir.

12  Q.   Your testimony that there were other discussions, does

13  that refresh your recollection as to whether there were?

14  A.   The only discussions I heard was with the mediator and

15  Sam -- or, with Mr. Lillie.

16  Q.   And you weren't at that --

17  A.   No, sir, I wasn't.  They didn't ask me to come.

18  Q.   So you don't know what was said there, correct?

19  A.   No, sir, I do not.

20  Q.   And none of these notes reflect what was said in that

21  session?

22  A.   No, sir, they do not.

23    JUDGE BUXBAUM:  I guess that's a point.  These notes, do

24  they reflect just what you heard and saw yourself, or do they

25  include things that people later told you had happened?

1    THE WITNESS:  No, sir, I was in the room, present, when

2  we went in on the 14th.  It was a very short meeting, lasted

3  about 15 minutes.

4    JUDGE BUXBAUM:  And everything you've written here, you

5  saw and/or heard?

6    THE WITNESS:  The way I understood it, to the best of my

7  ability, what I heard, yes, sir.

8    MR. FRASER:  I don't have any other questions.  Thank

9  you.

10    JUDGE BUXBAUM:  Any redirect?

11    MR. McKNIGHT:  You know, there is something that I --

12  okay.  No, I have no further -- I'm sorry.

13    JUDGE BUXBAUM:  No further questions of this witness?

14    MR. CARLSON:  No further questions for Mr. Winkle, no,

15  sir.

16    JUDGE BUXBAUM:  All right.  Mr. Winkle, you may step

17  down.  Thank you, sir.

18    THE WITNESS:  Who gets this document?

19    JUDGE BUXBAUM:  That's a good question.  I think

20  Mr. Carlson.

21  **(Witness excused.)**

22    MR. CARLSON:  Oh, thanks for reminding me, yeah.  I'm

23  going to give these two copies to the court reporter, where

24  that writing is not cut off.

25    JUDGE BUXBAUM:  And, Mr. Carlson, do you wish to present

1   any further rebuttal evidence?

2        MR. CARLSON:  No, sir, I do not.

3        JUDGE BUXBAUM:  And, Mr. McKnight, do you wish to

4   present any rebuttal?

5        MR. McKNIGHT:  No.

6        JUDGE BUXBAUM:  Mr. Fraser, you raised the question.  I

7   don't know the answer, either, but is there anything further

8   you want to do in response to the rebuttal?

9        MR. FRASER:  Well, Your Honor, just to satisfy my

10  curiosity, you said you didn't know the answer --

11       JUDGE BUXBAUM:  I don't, so I'll make it up as I go

12  along.

13       MR. FRASER:  That sounds like a similar process for both

14  of us.  If I were to ask for some, would you permit it?

15       JUDGE BUXBAUM:  Well, if it's going to be designed to

16  directly deal with what little bit we heard?

17       MR. FRASER:  I simply am trying to make sure that I

18  protect my interests going forward in the next case that I

19  have --

20       JUDGE BUXBAUM:  Right, right.  Yeah, the answer --

21  actually, I shouldn't answer it, but I will.  Yes, I mean, if

22  it's directly related to this claim, I think I would.  You

23  know, I'm not a big fan of endless proceedings, but I

24  probably would.

25       MR. FRASER:  Neither am I.  If I could take a minute?

1    JUDGE BUXBAUM:  Yeah.

2    MR. FRASER:  Are we on the record?

3    JUDGE BUXBAUM:  We are.

4    MR. FRASER:  We don't have any rebuttal to the rebuttal.

5    **JUDGE BUXBAUM:  All right.  I'd like to go off the**

6    **record for a moment, please.**

7    **(Off the record.)**

8    JUDGE BUXBAUM:  All right.  While we were off the

9    record, Mr. Carlson, you indicated you had one last matter.

10    MR. CARLSON:  Yeah, I'd like to request that the parties

11    return the Jencks statements to the General Counsel at this

12    time.

13    MR. FRASER:  And we are returning the Canzano and Winkle

14    materials, which I believe are the only Jencks statements

15    that I have in my possession.

16    JUDGE BUXBAUM:  Excellent.  And Mr. McKnight?

17    MR. CARLSON:  Let the record reflect that Mr. McKnight

18    handed me a large stack of documents.

19    JUDGE BUXBAUM:  And he's handing you one more.  And

20    another one.  He's clearing off his desk at your expense,

21    Mr. Carlson.

22    All right.  Now, let me also solicit from each of you

23    whether there are any other preliminary -- not preliminary.

24    They wouldn't be preliminary, would they?  Any other loose

25    ends, to use a very technical, legal term.  Mr. Carlson?

```
 1       MR. CARLSON:  No, sir.

 2       JUDGE BUXBAUM:  Mr. McKnight?

 3       MR. McKNIGHT:  No, Your Honor.

 4       JUDGE BUXBAUM:  Mr. Fraser?

 5       MR. FRASER:  No, Your Honor.

 6       JUDGE BUXBAUM:  All right.  And am I correct in assuming

 7  that the three of you will waive closing argument in favor of

 8  including it in your briefs?

 9       MR. FRASER:  Yes, Your Honor.

10       MR. CARLSON:  That's correct, Judge.

11       MR. McKNIGHT:  Yes.

12       JUDGE BUXBAUM:  All right.  Then the maximum time the

13  rules permit for me to grant for the filing of briefs is 35

14  days, which, by my calculation, is September 23rd of 2009.

15  Any request for extension of time for filing briefs must be

16  made in writing through the Chief Judge, served on all

17  parties.  And extensions are granted when justified, of

18  course.

19       I guess the last thing I want to say is -- I want to say

20  two things.  First of all, I want to thank every participant

21  in this trial for the degree of civility and professionalism

22  that they demonstrated.  This is an emotional situation.  I'm

23  not so blind that I wouldn't recognize that.  And despite how

24  emotional it is, everyone behaved in an admirable fashion.  I

25  think it's a tribute to the American sense of, you know, fair
```

1 play and trying to be decent to each other.  And I thank all

2 of you for that from the bottom of my heart.  I say it in

3 many cases, but it's particularly true in this case.

4      The last thing, then, is that up till now the lawyers

5 and witnesses have done the heavy lifting.  It's now my job

6 to do the heavy lifting.  I can promise you this.  I will do

7 my very best to come up with a result that is both legally

8 correct and fair.  Of the two, sometimes, rarely I hope, but

9 sometimes there is a conflict between them.  My duty, of

10 course, is to make a decision which is legally correct.  I

11 will strive certainly to do that and hopefully to be fair as

12 well.

13      And, again, it's been a pleasure working with each and

14 every one of you.  I wish you all the best of luck.  With

15 that, I'm going to close the hearing and the record.

16 **(Whereupon, at 5:23 p.m., the hearing in the above-entitled**

17 **matter was closed.)**

18

19

20

21

22

23

24

25

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947

**CERTIFICATION**

This is to certify that the attached proceedings before the National Labor Relations Board (NLRB), Region 7, in the matter of **DOUGLAS AUTOTECH CORPORATION**, Case No. GR-7-CA-51428, at Grand Rapids, Michigan, on August 19, 2009, were held according to the record, and that this is the original, complete, and true and accurate transcript that has been compared to the reporting or recording, accomplished at the hearing, that the exhibit files have been checked for completeness and no exhibits received into evidence or in the rejected exhibit files are missing.


_____
Jeremy Tieking
Official Reporter


_____
Cheri Grissom
Transcriber

Free State Reporting, Inc.
1378 Cape St. Claire Road
Annapolis, MD 21401
(410) 974-0947