STEPHEN M. GLASSER, Regional Director
of the Seventh Region of the
National Labor Relations Board, for and on
behalf of the National Labor Relations Board,

        Petitioner,

                                  CASE NO. 1:10-CV-674

v.

                                  HON. ROBERT J. JONKER

DOUGLAS AUTOTECH CORPORATION,

        Respondent.

_____/

## OPINION

      This matter is before the Court on Plaintiff National Labor Relations Board's ("NLRB" or

the "Board") Petition for Injunction Under Section 10(j) of the National Labor Relations Act (docket

# 1). The Court has heard oral argument on the petition and received further briefing in light of the

oral argument (docket ## 40, 41, 42). The Court has thoroughly reviewed the record and carefully

considered the applicable law. The petition is ready for decision.

### Background

***The parties' long history of collective bargaining.***

      Douglas Autotech Corporation ("DAC"), a Delaware corporation, is a more than 100 year

old business now owned by Fuji Kiko Company, Ltd. (ALJ Decision, docket # 2-3, at 6.) DAC

manufactures parts for vehicles and industrial applications, and it maintains manufacturing facilities

in Hopkinsville, Kentucky and Bronson, Michigan. (*Id.*) Since 1941, Local 822 of the UAW (the

"Union") has represented a bargaining unit of employees at the Bronson facility.[1]  (*Id.* at 7.)  The Union exists solely to represent this bargaining unit.  (*Id.*)  At the time the events giving rise to this dispute occurred, the bargaining unit included at least 114 active employees.  (*Id.*)  Throughout the past seventy years, DAC and the Union have negotiated and entered into a series of collective bargaining agreements.  (*Id.*)  Their most recent collective bargaining agreement expired on April 30, 2008.  (*Id.*)  By January of 2008, the parties had opened the door to early discussions about a new collective bargaining agreement.  (*Id.* at 7-8.)

### *Tough negotiations in a hard business environment eventually lead to strike.*

The negotiations began in the midst of a challenging business environment for the auto industry.  According to a key management participant, Paul Viar, DAC was in "'horrific financial shape, really bad financial shape, going into the negotiations.'"  (*Id.* at 8.)  Mr. Viar described management's position: "'we needed concessions.  We needed systemic across-the-board improvement on how we did business to keep the doors open.'"  (*Id.*)  In management's view, the Union took a hard stance against management's own position, even when faced with the risk that the company might fail.  (*Id.*)  On February 19, the Union's lead negotiator, Phillip Winkle, delivered a 60-day notice required under Section 8(d)(1) to Mr. Viar, notifying him that the Union proposed to terminate the parties' CBA upon its expiration date.  (*Id.*)  At the time he asked his secretary to prepare the 60-day notice, Mr. Winkle also requested that she file a 30-day notice with the Federal Mediation and Conciliation Service (FMCS) as required under Section 8(d)(3).  (*Id.*)  His secretary neglected to file the required notice.  (*Id.*) The parties negotiated in apparent good faith throughout January, February, March and April of 2008, but they reached "no significant agreement[] . . . on any

---

[1]The Hopkinsville, Kentucky, employees are unrepresented.  (*Id.* at 7.)

topic." (*Id.*)  With the expiration of the CBA imminent, the parties met on April 28, 29 and 30, and the Union declined a contract extension.  (*Id.* at 9.)

Just before midnight on April 30, Mr. Winkle and two other Union officials delivered a written notice to Mr. Viar formally notifying DAC that the Union would be on strike effective 12:01 on May 1, 2008.  (*Id.*)  The notice came as no surprise to Mr. Viar, who "reported that he was present in his office at that late hour, because 'I had to prepare for the very real possibility of a walkout that night at midnight.'"  (*Id.*)  Upon meeting with the Union leaders and receiving the notice, Mr. Viar alerted other managers that the Union would be on strike.  (*Id.*)  There is no dispute that the strike was an economic strike through which the Union sought, in Mr. Winkle's words,  "'to put leverage on the Company to get our just demands.'"  (*Id.*)

The strike continued throughout May 1 and 2.  (*Id.*)  The Union maintained a picket line, and management implemented its plans to continue operations in the event of strike.  (*Id.*)  Specifically, management recruited a replacement workforce including "salaried staff, workers referred by an employment agency, persons referred by the salaried staff, and local candidates for employment who appeared at the plant."  (*Id.*)  The facility's operations continued without interruption.  (*Id.*)

### The Union discovers that the strike is illegal and offers to return to work.

On the afternoon of May 2, Mr. Winkle received a call from a union official that caused him to question whether the 30-day notice had been filed.  (*Id.*)  Mr. Winkle consulted with his secretary, and they realized that the 30-day notice had not been filed.  (*Id.*)  Mr. Winkle understood that failure to file the required 30-day notice rendered the current strike illegal.  (*Id.*)  On May 3, Mr. Winkle met with other Union officials to alert them to the situation and determine how to proceed.  (*Id.*)  They

decided to ask the Union's membership to agree to cease the strike immediately by unconditionally offering to return to work. (*Id.* at 10.) On May 4, the Union membership voted to do so. (*Id.*)

Early on May 5, Mr. Winkle proceeded to the Bronson facility, bringing with him "the entire complement of day shift employees." (*Id.*) Mr. Winkle attempted to hand deliver to Mr. Viar a letter informing DAC that "'our membership UAW Local 822, your employees, are immediately returning to work unconditionally.'" (*Id.*) A security guard stopped Mr. Winkle and informed him that Mr. Viar would not accept any documents. (*Id.*) Mr. Winkle had the letter faxed to DAC's human resource department, where it arrived soon after 7:00 a.m. (*Id.*) Shortly after that, DAC's counsel, Bruce Lillie, called Mr. Winkle and inquired whether the bargaining unit members sought to return to work. (*Id.*) Mr. Winkle replied, "'[y]es, we've offered an unconditional offer to come back to work.'" (*Id.*) Mr. Lillie advised that he would respond to Mr. Winkle later. (*Id.*) By 8:00 a.m., the Union filed the 30-day notice with the FMCS. (*Id.*) Around 10 or 11:00 a.m., Mr. Lillie contacted Mr. Winkle and requested that the bargaining committee meet with management that evening. (*Id.*)

### *DAC responds with a lockout.*

In the hours before the evening meeting with Union representatives, Mr. Viar, Mr. Lillie, and another company representative, Glen Kirk, met to formulate a response to the Union's offer to return to work. (*Id.*) They began to question whether the 30-day notice had been filed, and soon realized that they could not find a copy of the notice. (*Id.*) They "accurately assessed the situation underlying the Union's sudden offer to return to work," that the Union had failed to file the 30-day notice. (*Id.*) Having made this assessment, they prepared a written response to the Union's offer. (*Id.*) The response stated:

> Earlier today the Company received from the Union a request to return from the Strike. The offer to return to work was unconditional.

> Please be advised that effective immediately, the Company is locking out the bargaining unit in support of its bargaining position. (See attached.)
>
> Please advise the Company as soon as possible if the Union accepts the proposal and when an Agreement has been reached so that employees can be expeditiously returned to work.

(*Id.*) The attachment the response mentions was "entitled 'DOUGLAS AUTOTECH COMPANY PROPOSAL/GENERAL SYNOPSIS AND SUPPORTING DOCUMENTS' . . . and consist[ed] of 15 pages that appear to contain a variety of deletions, substitutions, and additions to the parties' expired collective-bargaining agreement." (*Id.* at 12.)

As to the May 5 meeting in which the Company responded to the Union's offer to return to work, the ALJ concludes:

> The Company took the following action. It formally acknowledged, both orally and in writing, the Union's unconditional offer to return to work. It responded by locking out the bargaining unit members through clear written and oral statements to that effect. It presented a 15-page proposal that it deemed to be the terms and conditions of employment that the Union must accept in order to end the lockout. Finally, it made a written commitment that, upon acceptance of these terms and conditions, the 'employees can be expeditiously returned to work.' . . . [T]he Company did not raise any issue regarding the legality of the Union's strike, nor did it make any reservation of rights, either oral or written, concerning that matter.

(*Id.* at 15.) The Union did not return to work immediately, but responded with a written request for financial information related to DAC's proposed terms and conditions. (*Id.*)

### *The parties resume collective bargaining for months.*

Not long after the lockout began, FMCS notified the parties that a mediator had been assigned to the dispute. (*Id.* at 16.) Mr. Lillie contacted Mr. Winkle and asked whether the 30-day notice had been filed. (*Id.*) Mr. Winkle told Mr. Lillie, "I filed my paperwork," which the ALJ characterizes as "an answer that was technically accurate but, nevertheless, served to temporarily

mask his filing error." (*Id.*) Mr. Lillie and Mr. Winkle scheduled a negotiating session for May 21. (*Id.*) In the meantime, DAC attempted to obtain a copy of the 30-day notice from the Union and the FMCS. (*Id.*)

On May 21, DAC and the Union met for negotiations. (*Id.* at 16.) An FMCS mediator participated in the meeting. (*Id.*) There is no dispute that at the May 21 meeting, Mr. Lillie stated that the strike was illegal and that DAC was not waiving any of its rights. (*Id.*) Also at the May 21 meeting, the Union explicitly rejected the return-to-work proposal DAC had included in its written response to the Union's offer to return to work, and the Union made its own counter-proposal. (*Id.*) The parties met again for negotiations on June 2. (*Id.*) At that meeting, DAC offered another contract proposal, which the Union rejected. (*Id.*) Additional negotiations took place on June 13 and July 1. (*Id.* at 16-17.) In a meeting on July 2, Mr. Lillie proposed a cooling-off period of 60 days, and the parties withdrew their various charges of unfair labor practices without prejudice. (*Id.*) During the same meeting, Union representatives inquired about the status of the replacement workers at the facility. (*Id.*) Management representatives responded that the replacement workers were temporary, not permanent, workers. (*Id.*)

The parties continued to negotiate during the first two weeks of July, exchanging detailed contract proposals. (*Id.*) They met for bargaining sessions on July 14 and 15. (*Id.*) The ALJ observes that "[t]he evidence suggests that the course of the parties' negotiations during the 'cooling off' period was highly variable and that the participants veered between optimism about reaching an agreement and despair that this goal was unattainable." (*Id.* at 18.) The parties met again on July 24 and 25, with both the Union and DAC offering "major proposals." (*Id.*) Further bargaining sessions took place on July 28 and 31. (*Id.* at 19.) At the July 31 meeting, the Union offered a

"complete proposal," and eight hours of negotiations ensued. (*Id.*) The negotiations did not yield a new CBA. (*Id.*) DAC emphasized at the July 31 meeting that it was not waiving any of its rights. (*Id.*)

### *DAC terminates the bargaining unit employees.*

On August 4, William Pilchak, new counsel for DAC, advised the Union in writing that his law firm was entering an appearance on behalf of DAC. (*Id.* at 20.) Mr. Pilchak added that DAC "has . . . come to final decision on its response to the illegal strike that was called on May 1, 2008, in violation of § 8(d)(3). Today, [DAC] is mailing letters to the illegal strikers, notifying them that their employment with the company is formally terminated." (*Id.*) A letter went out to each member of the bargaining unit under Mr. Viar's signature, stating:

> Because you participated in an illegal strike, you have lost any and all protection under the National Labor Relations Act, including any right to continued employment. Your employment with Douglas Autotech Corporation is terminated effective immediately because of your participation in the illegal strike of May 1, 2008 and thereafter.

(*Id.*) DAC sent the letter to all bargaining unit employees, regardless of whether they personally participated in the strike, and regardless of whether they were on active status immediately before the strike. (*Id.* at 38.) On August 5, the Union filed the original unfair labor practice charge underpinning this case, alleging unlawful discharge of the bargaining unit employees. (*Id.* at 21.)

The parties had previously scheduled a bargaining session for August 14. (*Id.*) They agreed to meet despite the notice of termination. (*Id.*) When the Union representatives arrived for the meeting, the mediator informed them that DAC's representatives would not meet with them after all. (*Id.*) DAC's representatives were present, though, and the Union representatives urged them

to continue bargaining. (*Id.*) DAC's representatives responded that they would bargain only on effects. (*Id.*) No bargaining occurred on August 14, nor did any further bargaining occur. (*Id.*)

DAC continues to operate with a greatly reduced workforce. (Respondent's Br. in Opp. to NLRB's Pet. for 10(j) Injunction, docket #21, at 9.) Before the strike, approximately 113 Union members worked at the Bronson facility, but DAC is now operating the facility with approximately 41 employees. (*Id.* at 9-10.) DAC explains that it needs fewer employees at the Bronson facility both because of increased operational efficiency and a decline in demand for automobile parts. (*Id.*)

### *The NLRB files a complaint, and the ALJ hears and decides the case.*

On February 25, 2009, the Regional Director of the NLRB filed a complaint alleging that DAC's discharge of the bargaining unit employees, and DAC's refusal to bargain with the Union, violated the law. (ALJ Decision at 21.) The case was tried on June 24-25 and August 17-19, 2009. (*Id.* at 1.) On January 5, 2010, the ALJ's decision issued. (*Id.* at 46.)

The ALJ determined that "on May 1, the Union commenced an economic strike in violation of the notice provisions of Section 8(d)." (*Id.* at 25.) The ALJ pointed out that "during the duration of the illegal strike, the Company would have been privileged to terminate the strikers from its employ." (*Id.* at 26.) The ALJ found that "management did not take this action during the strike." (*Id.*) Further, "[u]pon being presented with the Union's unconditional offer to return to work early in the morning of May 5, the Company's negotiator's spent much of the day working on their response." (*Id.*) The ALJ found that even after carefully formulating its response, "the Employer did not take any action to terminate its employment relationship with the bargaining unit members." (*Id.* at 27.) Instead, "by announcing its lockout of the bargaining unit employees, the Employer [chose] a [different] response to the potential obligation to reinstate those employees that has been

authorized by the Board." (*Id.*) Quoting the Sixth Circuit's decision in *Shelby County Health Care Corp. v. American Federation of State, County, and Municipal Employees, Local 1733*, 967 F.2d 1091 (6th Cir. 1992), the ALJ noted that Section 8(d)

> allows the [employer] to do what it wants to with illegally striking employees by withdrawing the statutory rights of those employees. The [employer] could terminate them or it could invite them all back to their jobs without consequence. In addition, under the principle that the greater power includes the lesser, the [employer] could decide on some compromise solution.

(*Id.* at 28 (quoting *Shelby County*, 967 F.2d at 1096-97).) The ALJ emphasized that, under *Shelby County*, "'once the employer decides not to discharge the employee, that employee is once again brought under the protective mantle of the NLRA.'" (*Id.* (quoting *Shelby County*, 967 F.2d at 1096).)

The ALJ found that DAC's decision to impose a lockout in response to the Union's unconditional offer to return to work "represented a middle course or, in the words of *Shelby* a 'compromise solution.'" (*Id.*) He concluded that "the invocation of this response inexorably led to restoration for the illegal strikers of 'the protective mantle of the NLRA.'" (*Id.*) Thus, by locking out the striking workers without reserving its rights, DAC on May 5, 2008 reinstated the striking workers to employee status. "Once [DAC] exercised the wide-ranging discretion afforded to it in Section 8(d) by choosing a response to the Union that did not include termination of illegal strikers, it was bound by its choice. By declining to terminate those strikers, it acceded to their resumption of protected status under the Act." (*Id.* at 33.) Once the bargaining unit employees had regained protected status through the May 5, 2008 lockout, DAC could not discriminate against them on the basis of their union affiliation and activities. (*Id.* at 36.) However, on August 4, 2008, DAC "terminated the bargaining unit members for the stated reason of their participation in the strike."

(*Id.*)  The ALJ found that the terminations, explicitly based on union affiliation and activities, were unlawful within the meaning of the NLRA.  (*Id.*)  Moreover, the ALJ found that the terminations reflected an unlawful discriminatory motivation lacking any legitimate business justification.  (*Id.* at 38.)

The ALJ concluded as a matter of law that

1.   By discharging all of the bargaining unit members on August 4, 2008 based on their membership in the Union and their activities in support of the Union, the Company has engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(3) and (1) and Section 2(6) and (7) of the Act.

2.   By failing and refusing to meet and bargain collectively with the Union since August 14, 2008, regarding the terms and conditions of employment for the bargaining unit members, the Company violated Section 8(a)(5) and (1) of the Act.

(*Id.* at 40.)

The ALJ ordered a series of remedies including, among others, reinstatement and back-pay from August 4, 2008.  (*Id.* at 41.)  Though the Union had not requested it, the ALJ also imposed a broad cease-and-desist order after considering "the sweeping impact of the unfair labor practices that have been committed by this Employer . . . . the continuity in management of the Company . . . [and] the [continuing] economic conditions that spurred the shift to an unlawful strategy designed to rid the workplace of the Union."  (*Id.* at 41-43.)  The ALJ emphasized that DAC initially responded to the unlawful strike "in a measured fashion," with a lockout; that after the lockout, "the parties continued their longstanding collective-bargaining relationship by engaging in bargaining for a new agreement;" and that "on August 4 the Company made an abrupt, sweeping, and unlawful change in direction."  (*Id.* at 42- 43.)  The ALJ observed that "the Company's success in maintaining its

operations with a replacement workforce played a prominent role in fostering this change in attitude." (*Id.*) The ALJ went on to find DAC's unfair labor practices "egregious" in nature and "sweeping" in extent. (*Id.* at 44.) On February 1, 2010, DAC filed exceptions to the ALJ's Decision, and the matter is now pending before the NLRB. (Pet. for Prelim. Inj. under Section 10(j) of the NLRA, docket # 1, ¶ 7.)

### *The NLRB seeks 10(j) relief.*

The NLRB now seeks a preliminary injunction under Section 10(j) to preserve the status quo until the Board issues its ultimate decision. The NLRB did not file its 10(j) request at the time it filed its original complaint against DAC. It did not even file it immediately after the ALJ's decision against DAC on January 5, 2010. Indeed, it waited until July 15, 2010. This was the first date on which the NLRB sought judicial relief in this matter. The NLRB requests, among other things, that the Court order DAC to cease and desist from: refusing to bargain collectively and in good faith with the Union; discharging or otherwise discriminating against employees because of their Union or other protected concerted activity; and otherwise interfering with the exercise of rights under Section 7 of the NLRA. (*Id.* at 6-7.) The NLRB also requests that the Court order DAC to offer all the discharged employees "immediate and full reinstatement to the currently available positions that most closely approximate the jobs they held as of April 30, 2008, without prejudice to their seniority and other rights and privileges previously enjoyed . . . [and on] the terms and conditions of employment in effect for them as of their August 4, 2008 discharges." (*Id.* at 7.) If there exists an inadequate number of positions to fill, the NLRB requests that the Court order DAC to "place the remaining discharged employees on a non-discriminatory preferential hiring list and recall the employees in a manner consistent with their recall rights and privileges previously enjoyed." (*Id.*

at 7-8.)  The NLRB further requests that the Court order DAC to bargain collectively and in good faith with the Union until the parties reach either agreement or a good faith impasse.  (*Id.* at 8.)

## Legal Standard

Section 10(j) of the NLRA authorizes the NLRB, upon issuing a complaint charging that a person has engaged in an unfair labor practice, "to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order." 29 U.S.C. § 160(j).  For the most part, labor disputes are resolved administratively and enforced to the extent necessary by the courts of appeals.  *Kobell v. United Paperworkers Int'l Union, AFL-CIO, CLC*, 965 F.2d 1401, 1406 (6th Cir. 1992).  Because the administrative process at times unfolds slowly, "interim injunctive relief occasionally may be necessary to preserve the remedial power of the Board . . . pending the Board's substantive review of [alleged unfair labor practices]."  *Id.*  "Section 10(j) reflects Congress's view that interim injunctive relief to restore and preserve the status quo, pending final Board adjudication, may be required to avoid frustration of the basic remedial purposes of the Act and possible harm to the public interest."  *Fleischut v. Nixon Detroit Diesel*, 859 F.2d 26, 29 (6th Cir. 1988) (citing *Levine v. C&W Mining, Inc.*, 610 F.2d 432, 436-37 (6th Cir. 1979)).

The Court's role in deciding a motion under Section 10(j) is to preserve the Board's remedial power by preserving the status quo.  It is not the Court's role to determine the merits of the underlying case.  *Fleischut*, 859 F.2d at 28.  "The question of whether a violation of the Act has been committed is a function reserved exclusively to the Board, subject to appellate court review of final Board orders."  *Id.*  (citing *C&W Mining*, 610 F.2d at 435).  The Court is particularly mindful of this principle in this case, in which an ultimate decision on the merits will likely involve Board policy

determinations regarding, at a minimum, the re-employment theory the ALJ's Decision advances.

The Court's sole purpose here is to preserve the Board's power to enforce whatever merits decision

the Board finally makes.

A court may issue a temporary injunction under Section 10(j) only after making two findings:

the court must find reasonable cause to believe that the alleged unfair labor practices have occurred,

and, if the court finds reasonable cause to believe the allegations, the court must determine whether

injunctive relief is just and proper. *Id.* (citing *C&W Mining*, 610 F.2d at 435).

### Analysis

*A.     Reasonable Cause*

The NLRB bears a "relatively insubstantial" burden in establishing reasonable cause. *Id.*

(citing *Gottfried v. Frankel*, 818 F.2d 485, 492 (6th Cir. 1987)). "To establish 'reasonable cause,'

the Director must simply produce some evidence in support of the petition." *Id.* The NLRB "need

not prove a violation of the Act, in fact [it] 'need not convince the court of the validity of the Board's

theory of liability, as long as the theory is substantial and not frivolous.'" *Id.* (*citing Frankel*, 818

F.2d at 493). Further, "the district court need not concern itself with resolving conflicting evidence

if facts exist which could support the Board's theory of liability." *Id.* Whether the NLRB's theory

of liability is substantial is a question of law. *Schaub v. West Michigan Plumbing and Heating, Inc.*,

250 F.3d 962, 969 (6th Cir. 2001) (citing *Kobell v. United Paperworkers Int'l Union*, 965 F.2d 1401,

1406-07 (6th Cir. 1992)). Whether the facts are consistent with and could support the Board's theory

of liability is a question of fact. *Id.* (citing *Kobell*, 965 F.2d at 1407).

It is uncontested that the Union's failure to file the required F-7 form, even if inadvertent,

rendered illegal the strike that began on May 1. *See Boghosian Raisin Packing Co., Inc.*, 342

N.L.R.B. 383 (2004). Further, it is uncontested that during the illegal strike, the striking workers lost their status as employees protected under the NLRA, and DAC could have discharged them while the strike was ongoing. *Id.* at 385. The parties disagree, however, about the legal impact of DAC's response to the Union's offer to return to work. Consistent with the ALJ's Decision, the Board presses the theory that DAC "could not lawfully fire the employees for engaging in the strike because it 'reemployed' them by locking them out in response to the Union's unconditional offer to return." (Pet. Br. in Support of Pet. for Prelim. Inj., docket # 1, at 12.) The NLRB contends that at the moment DAC locked them out, "the employees who joined the strike ceased to be illegal strikers and became locked out employees," entitled to the full protection of the NLRA. (*Id.*) Under this theory, argues the Board, DAC's refusal to bargain in good faith to agreement or impasse, and DAC's eventual termination of the Union employees, amount to unfair labor practices under the NLRA. The Board posits that for all these reasons, it has established reasonable cause.

DAC counters that the Board fails to establish reasonable cause because the re-employment theory cannot succeed as a matter of law and because the re-employment theory is novel. (Respondent's Br. in Opp. to NLRB's Pet. for 10(j) Injunction, docket # 21, at 14.) In support of the former point, DAC asserts that the NLRB has not offered legal support for the theory that the lockout amounts to re-employment. (*Id.* at 15.) DAC disregards the ALJ's careful reading of *Shelby County* and relevant NLRB decisions, all of which offer support for the re-employment theory the ALJ articulated and the NLRB advances here. Similarly, DAC emphasizes that in *Boghosian Raisin*, the NLRB held that an employer could discharge workers engaged in an illegal strike even after bargaining with those striking workers despite awareness that the strike was illegal. (*Id.* at 15-16.) However, in *Boghosian Raisin* the employer explicitly reserved the option of discharge from the

outset, unlike DAC. *Boghosian Raisin*, 342 N.L.R.B. 383 (June 30, 2004). DAC also asserts that in the absence of NLRB precedent "which specifically addresses 're-employment' in the lockout context," the Court in ruling on the Section 10(j) motion would be "mak[ing] new law in the context of a 10(j) proceeding." (Respondent's Br. in Opp. to NLRB's Pet. for 10(j) Injunction, docket # 21, at 17.) DAC itself offers no support for the proposition that the novelty of the re-employment theory precludes the Court from finding the theory "substantial and not frivolous." *See Fleischut*, 859 F.2d at 28.

The Court finds that the Board has established reasonable cause. The ALJ carefully detailed and supported the re-employment theory the Board now advances. The ALJ observed that upon receiving the Union's unconditional offer to return to work on May 5, 2008, DAC spent most of a day developing the letter it delivered to the Union at the meeting that evening. (ALJ Decision, docket # 2-3, at 27.) He found that DAC neither mentioned in the May 5 meeting nor stated in the letter delivered that evening that DAC was not waiving any rights. He added that DAC "took no action to terminate its employment relationship with the bargaining unit members." (*Id.*) Bearing in mind these factual findings, all of which the evidence supported, the ALJ went on to consider the applicable law. He emphasized in particular *Shelby County's* determination that "once the employer decides not to discharge the employee, that employee is once again brought under the protective mantle of the NLRA." *Shelby County*, 967 F.3d at 1096.

The ALJ reasoned that in imposing a lockout after receiving the unconditional offer to return to work on May 5, "DAC eschew[ed] the extreme alternatives of granting an immediate return to work or firing the strikers," choosing instead the kind of compromise solution of which *Shelby* speaks." (ALJ Decision, docket # 2-3, at 28.) The ALJ concluded that "[t]his response was clearly

permissible under the [NLRA] . . . [and] the invocation of this response inexorably led to the restoration for the illegal strikers of 'the protective mantle of the NLRA.'" (*Id.*) The ALJ considered several NLRB precedents and found them "entirely consistent with the reasoning expressed in *Shelby*." (*Id.*)

The re-employment theory on which the Board relies, and which the ALJ detailed in his Decision, does chart new legal ground based upon the unusual facts of this case. However, the theory is tethered closely to statutory text, existing legal precedent and the ALJ's factual findings. The theory may or may not ultimately turn out to be correct, but the Court finds that the Board has satisfied its "relatively insubstantial burden" to show that reasonable cause supports the theory that an unfair labor practice occurred. *See Fleischut,* 859 F.2d at 29 (citing *Frankel*, 818 F.2d at 492). The theory is legally substantial, not frivolous, and the facts as determined by the ALJ are consistent with and support the theory. *Id.*

**B.**     ***Just and Proper***

"'[T]he district court must inquire whether the relief is necessary to preserve the remedial power of the Board and is just and proper "in the sense of being 'in the public interest' that an injunction issue here pending the NLRB's resolution of the underlying unfair labor practice controversy.'"'" *Fleischut*, 859 F.2d at 29 (quoting *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1096 (3d Cir. 1984)). "The goal of a § 10(j) injunction is to preserve the status quo pending completion of the Board's unfair labor practice proceedings." *Schaub*, 250 F.3d at 970 (citing *Fleischut*, 859 F.2d at 30). The status quo to be preserved is "that which existed before the charged unfair labor practices took place." *Fleischut*, 859 F.2d at 30, n. 3.

### 1. "Just Cause" and "Status Quo" Determination

In this case, the charged unfair labor practices are the termination of all bargaining unit employees on August 4, 2008, and DAC's refusal to engage in collective bargaining toward a new contract from that point on. Immediately before the mass termination, the status of the parties was that the employer, DAC, had locked out the striking workers who had offered unconditionally to return to work. No one disputes that the lockout itself was lawful. Indeed, the lockout was predictable given the tough bargaining that led up to the expiration of the CBA. Throughout the duration of the lockout, the parties were engaged in collective bargaining, and they had not reached a good faith impasse at the time the terminations occurred. As part of its locked-out status, the bargaining unit was entitled to continued collective bargaining to a new CBA or good faith impasse. The Court concludes that injunctive relief reinstating the parties to the lockout status that preceded the mass termination is just and proper, as is requiring the parties to resume collective bargaining to a new CBA or good faith impasse. This was the last, lawful status quo that preceded the unfair labor practices that DAC committed according to the ALJ's Decision.

### 2. Response to and Rejection of Some of the Board's Proposed Relief

The Board further requests that the Court reinstate the striking workers to the "currently available positions that most closely approximate the jobs they held as of April 30, 2008, without prejudice to their seniority and other rights and privileges previously enjoyed . . . [and on] the terms and conditions of employment in effect for them as of their August 4, 2008 discharges." (Pet. for Prelim. Inj. under Section 10(j) of the NLRA, docket # 1, at 7.) It appears that the Board seeks reinstatement on the terms of the CBA that expired in April 2008. Reinstating the striking workers in the manner the Board requests would not re-establish the last lawful status quo, however. The

17

relief the Board seeks would sweep past the lockout status and the illegal strike.  In effect, the Board is requesting the pre-lockout position of the parties to the extent it helps the Union – that is, by placing Union members back into jobs – but not to the extent that it hurts the Union – that is, by recognizing the illegal strike.  The Board cannot have it both ways.  As long as the lockout was lawful, as all parties agree it was, the lockout was the last lawful status quo.  Reinstatement on the terms of the expired CBA would not be just and proper.

The Board argues that the reinstatement of employees to the jobs, seniority and privileges they held at the end of April, 2008 is proper under *Dayton Newspapers, Inc. v. NLRB,* 402 F.3d 651 (6th Cir. 2005), and *NLRB v. Ancor Concepts, Inc.*, 166 F.3d 55 (2d Cir. 1999).  Both of those cases are distinguishable, however.  Neither involved the unique factual situation the parties confront in this case, in which an illegal strike immediately preceded a lawful lockout, and in which there was no pending unconditional offer to return to work at the time of the unfair labor practice.  In the Board decision underlying *Dayton Newspapers*, the Board found that the employer had lawfully locked out the union, but that upon the union's unconditional offer to return to work, the employer was obligated to end the lockout.  *Dayton Newspapers*, 402 F.3d at 662.  Because the employer refused to end the lockout, the lockout became illegal as of the date the union made its unconditional offer, December 27, 1999.  *Id.*  The appellate court agreed and upheld the Board's order to reinstate the employees with back pay from December 27, 1999.  *Id.* at 668.  *Ancor Concepts* also involved a lockout during which striking workers made unconditional offers to return to work.  The Board determined that the employer's lockout of striking workers became unlawful when the employer indicated to the union that replacement workers were permanent employees, and that the employer was therefore obliged to reinstate the workers who had made unconditional offers to return to work.

*Ancor Concepts, Inc.*, 323 N.L.R.B. 742 (May 20, 1997). On appeal, the court held that the reference to permanent replacements did not render the lockout unlawful, and the court denied enforcement of the order of reinstatement. *Ancor Concepts*, 166 F.3d at 59. In contrast to *Dayton Newspapers* and *Ancor Concepts*, the last lawful position in the case before the Court was that the employees were on lockout status, and there was no intervening event, such as an unconditional offer to return to work, that would mandate reinstatement other than on lockout status. Neither case dictates that the bargaining unit employees in the case before the Court be reinstated on the terms the Board seeks, terms which would overlook the lawful lockout and illegal strike altogether.

The Court recognizes that reinstatement to lockout status and not to the terms of the CBA that expired in April 2008 leaves the Union in a difficult bargaining position. However, this is the last lawful position the parties occupied before the unfair labor practices occurred. Indeed, though not a necessary factor in the Court's decision, this is likely the position the parties would have occupied had the failure to file the 30-day notice not occurred. The parties had radically different views of the economics of the situation, and on the reasonable bargaining positions necessitated by those competing economic visions. After filing the proper papers, the Union had every right to strike in support of its economic position. DAC, however, had a corresponding right to lock out union employees in support of DAC's own economic position. In the meantime, DAC also had the right to operate its plant with temporary replacements, as it has continued to do to this very day. Whether the parties can ever negotiate their way to a new agreement given all that has transpired remains to be seen. It will certainly be a tall order. But the overriding policy of the NLRA is to keep the parties at the bargaining table in a good faith effort to try. The 10(j) relief the Court is prepared to order here will do that without disarming the economic weapons of either party.

### 3.      Rejection of DAC's Arguments against "Just Cause" Determination

DAC argues that reinstatement on any terms is inappropriate here.  Among other things, DAC argues that the Board is not entitled to a preliminary injunction under Section 10(j) because the Board did not seek such an injunction before the ALJ considered the case.  However, Board delay does not require denial of a motion for a preliminary injunction under Section 10(j).  *See Gottfried v. Frankel*, 818 F.2d 485, 495-96 (6th Cir. 1987) (explaining that district courts may but are not required to consider Board delay and that the proper focus is whether injunctive relief is necessary to return the parties to status quo to protect the Board's remedial powers).  Agencies may change their decisions regarding remedies to pursue for a wide variety of reasons, including policy-based or resource-based limitations.  The Court believes that the Board must have the power to assess and re-assess its position regarding whether to seek a preliminary injunction under Section 10(j) as the underlying unfair labor practice case proceeds.  Delay is not a basis for denying injunctive relief here.[2]  This is particularly true where the parties are currently not negotiating at all, which is fundamentally inconsistent with the core purpose of the NLRA.

DAC also argues that the Board theory of re-employment is too novel to justify injunctive relief under Section 10(j).  The Court recognizes that the re-employment theory breaks new legal ground, but as already discussed, the theory ties closely to statutory language, existing precedent and the factual findings of the ALJ.  The theory is not so novel as to preclude injunctive relief here,

---

[2]  In reaching this conclusion, the Court has carefully considered the Board's filing delay, including the parties' additional briefing on the issue (docket ## 47, 48).  The Court has also reviewed and considered the amicus brief from the Union (docket # 49).  None of this briefing adds much to the arguments the parties and the amicus originally made on the issue.  There is no reason to strike the amicus brief, or to permit further responses.  Accordingly, DAC's Motion to Strike (docket # 50) is **DENIED**.

especially in light of the ALJ's finding of discriminatory animus on the part of DAC. To the extent the theory reflects any change in NLRB policy, the agency's ultimate decision on the merits, not this Court's decision as to injunctive relief, is the appropriate forum to address that.

DAC finally contends that reinstating the bargaining unit, at least under the expired 2008 CBA terms and conditions, will make DAC instantly insolvent and that this is another reason reinstatement would not be just and proper. The NLRB and the Union dispute this claim, but even assuming reinstatement would force DAC into bankruptcy, this is not a reason to deny the Board's petition. *See Central States, Southeast and Southwest Areas Pension and Health & Welfare Funds v. McNamara Motor Express, Inc.*, 503 F. Supp. 96, 99 (W.D. Mich. 1980) ("[C]oncern over insolvency cannot be used by defendant to evade its responsibilities . . . . It would be improper for the court to defer enforcement of these obligations merely because defendant could go bankrupt.") Bargaining can occur regardless of whether DAC is solvent or in a bankruptcy proceeding designed for restructuring.[3] Accordingly, there is nothing unfair or inequitable about ordering reinstatement to the status quo even if it has the effect of triggering a bankruptcy. Sometimes the economics of an industry change so quickly and so completely that restructuring in bankruptcy is the only viable option for reorganizing the business. Moreover, in this case, the record does not present an unequivocal picture of economic ruin for DAC, particularly on a reinstatement of lockout status. The ongoing pressure of the bargaining and information gathering process will allow the parties to continue evaluating that issue.

---

[3]Indeed, the bankruptcy code expressly contemplates the possibility of good faith collective bargaining within the context of a proposed acceptance or rejection of a collective bargaining agreement. 11 U.S.C. § 1113. Bankruptcy does not eliminate the possibility of bargaining. It just changes the range of possible outcomes absent agreement, and in that way affects the leverage available to each bargaining party.

## C.    The Parties and the NLRA

The parties' positions highlight the theory and purpose underlying the NLRA, which encourages the parties to bargain and gives them economic weapons to use in the process. The prohibition on unfair labor practices exists to police the economic fight, and to maintain order in a sometimes unruly process. The prohibition does not exist to create weight on either side. In this case, the Board wants to deny DAC the lockout and temporary replacements even though there is no claim that the lockout and use of temporary replacements amount to unfair labor practices. That is not appropriate. It would unfairly disarm DAC by taking away the lockout altogether. DAC says it can and must operate with a dramatically lower cost structure, and the lockout and use of replacement workers allow it to test that business strategy and demonstrate its strength to its bargaining partner. In terminating the bargaining unit, however, DAC took the strategy beyond permissible bounds. DAC seeks to remove the Union members' most fundamental protection of all – their status as employees – and effectively end the 70-year bargaining unit based on a delayed reaction to a clerical oversight. DAC did have a narrow window, the period of the illegal strike, during which it indisputably could have done so, but the window closed based on the ALJ's determination that DAC re-employed the striking workers by locking them out without a reservation of rights. Even if DAC ultimately prevails at the Board level, there is no harm in requiring good faith bargaining with the Union until that time. Indeed, in this case the parties anticipated tough bargaining in an economically difficult climate for months before the CBA expired. A strike, a lockout, or both were necessarily within the reasonable contemplation of the parties, regardless of whether a clerical oversight delayed one of the required notices. All the remedy does here is require the parties to join issue as they probably would have done anyway in the absence of clerical error.

On the other hand, if DAC loses at the Board level, then the best if not only way to preserve the bargaining unit and bargaining process in the meantime is with reinstatement to the lockout position and the bargaining table. A chasm exists between the parties, and bargaining alone may not suffice to bridge it. The Court's decision to reinstate the parties to the status of a lockout, including the concomitant obligation to bargain to good faith impasse, will at least keep the possibility of resolution alive until the Board enters a final ruling in the matter.

## Conclusion

For these reasons, Petitioner is entitled to injunctive relief under Section 10(j) in accordance with this Opinion. The Court will separately order the specific relief granted.


Dated:   February 9, 2011          /s/ Robert J. Jonker
                                   ROBERT J. JONKER
                                   UNITED STATES DISTRICT JUDGE